

# REPORT

### United States of America v. State of Michigan

### No. M 26 - 73 C.A., U.S.D.C.

### Western District of Michigan, Northern Division

Helen Hornbeck Tanner, Ph.D.
1319 Brooklyn Avenue
Ann Arbor, Michigan

April 1974

United States Department of Justice

PLEASE
2 TO

UNITED STATES ATTORNEY
WESTERN DISTRICT OF MICHIGAN
544 FEDERAL BUILDING
GRAND RAPIDS, MICHIGAN 49502
April 29, 1974

Hon. Noel P. Fox
Chief Judge
United States District Court
Federal Building
Grand Rapids, Michigan   49502

Dear Judge Fox:

> Re:  United States of America vs.
>      State of Michigan, No. M26-73 CA

      We are herewith filing a Report relating to the above-captioned case, prepared by Dr. Helen Hornbeck Tanner, our principal expert witness.

      I intend to file a motion for admissions under Rule 36 as soon as I am back from the hospital.

Yours very truly,

John Milanowski
United States Attorney

JM/eu
Att.

# REPORT

### United States of America v. State of Michigan

### No. M 26 - 73 C.A., U.S.D.C.

### Western District of Michigan, Northern Division

Helen Hornbeck Tanner, Ph.D.
1319 Brooklyn Avenue
Ann Arbor, Michigan

April 1974

TABLE OF CONTENTS

Page

Introduction

Map Section

    Map 1.   Historical Development of the Bay Mills Indian
             Community

    Map.2.  Reservations of the Ottawa and Chippewa of Michigan,
             Treaty of March 28, 1836

    Map 3.   Sault Ste. Marie Bands and Their Neighbors, 1640-
             1780

I.    The Sault Ste. Marie Bands:  Ethnohistorical Summary . . . .    3
        French at Sault Ste. Marie by 1620  . . . . . . . . . .    3
        Distribution of tribes in Michigan: Chippewa, Ottawa,
            Potawatomi and Wyandot . . . . . . . . . . . . . . . .    5
        Frontier warfare up to Treaty of Greeneville (Ohio)
            1795 . . . . . . . . . . . . . . . . . . . . . . . . .    6
        Indian annual economic cycle . . . . . . . . . . . . . .    7
        Cass leads first American expedition to Sault, 1820 . .    8
        Waishkee family: he attends 1836 treaty . . . . . . . .    10
        Missionary activity among Sault bands; at
            Naomikong, 1849  . . . . . . . . . . . . . . . . . . .    13
        Disruption caused by St. Mary's Ship Canal, 1853. . . .    16
        Summary . . . . . . . . . . . . . . . . . . . . . . . .    17

II.   Efforts to Secure Permanent Homes: 1855-1880 . . . . . . . .    18
        Four reserves for six Sault bands established by
            1855 treaty . . . . . . . . . . . . . . . . . . . . .    18
        Delays in land allotment. . . . . . . . . . . . . . . .    20
        Patents distributed, 1873 . . . . . . . . . . . . . . .    25
        Indian land loss at the Sault . . . . . . . . . . . . .    27
        Point Iroquois settlement, 1877-1880. . . . . . . . . .    29
        Establishment of Bay Mills lumber firm, 1880. . . . . .    31
        Summary:  Bay Mills Indian Community incorporated
            under Indian Reorganization Act of 1934; additional
            land purchased . . . . . . . . . . . . . . . . . . . .    32

III.  Fishing:  The Important Occupation . . . . . . . . . . . . .    34
        Methods of fishing in 17th and 18th century; sales
            at Michillimackinac  . . . . . . . . . . . . . . . . .    35
        Dependence upon fishing . . . . . . . . . . . . . . . .    37
        Preparation as food . . . . . . . . . . . . . . . . . .    41
        Commercial development in 19th century; barrelling
            and salting. . . . . . . . . . . . . . . . . . . . . .    43
        Summary . . . . . . . . . . . . . . . . . . . . . . . .    47

Page

IV.    The Sault Bands and the Treaties of 1820, 1836, and 1855 . .    48
        1820, permanent fishing reserve established at
              Sault rapids . . . . . . . . . . . . . . . . . . .    48
        1836, five areas and fishing grounds reserved for
              bands  . . . . . . . . . . . . . . . . . . . . .    49
        References to fishing in Article Fourth and Thirteenth
              of the Treaty of March 28, 1836  . . . . . . . . .    52
        Fishing rights controversy in Upper Peninsula in 1830's    53
        Background of 1836 treaty . . . . . . . . . . . . . .    57
        Participation of traders in treaty negotiations . . . .    63
        Indian dissatisfaction with 1836 treaty . . . . . . . .    65
        Article Eighth, basis for equitable claims in later
              treaty . . . . . . . . . . . . . . . . . . . . . .    67
        Need for definite land provisions  . . . . . . . . . .    69
        Basis for legal claims in later treaty  . . . . . . . .    71
        Objectives of 1855 treaty; financial settlements. . . .    74

V.     The August 2, 1855 "Agreement" . . . . . . . . . . . . . .    76
        Value of damaged "permanent reserve" at Sault rapids. .    76
        Efforts to gain compensation  . . . . . . . . . . . . .    77
        Right to continue fishing observed  . . . . . . . . . .    78
        Later charge of forgery. . . . . . . . . . . . . . . . .    79
        Summary of treaty provisions concerning fishing rights.    80

VI.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . .    84


APPENDIX

A.     Treaty Instructions of Lewis Cass, Secretary of War, to    87
              Henry R. Schoolcraft, Commissioner, for the Treaty
              of March 28, 1836
                                              1855
B.     Letter of Transmittal, Treaty of July 31, 1866 with the    89
              Ottawa and Chippewa

C.     Letter of Transmittal, Treaty of August 2, 1855 with the    94
              Chippewa of Sault Ste. Marie

D.     Hunting and Fishing Clauses in Treaties with Michigan    95
              Indian Tribes, 1795-1836

E.     "Release Clauses" in Federal Indian Treaties, 1854-1855.    97

## INTRODUCTION

This report provides information to establish the basis for the Bay Mills Indian Community's declaration of an aboriginal right to fish in the waters of Lake Superior. The legal proceedings are identified as United States of America v. State of Michigan, No. M 26 - 73 C.A., USDC, Western District of Michigan, Northern Division.

As a background, the report first traces the history of the Sault Ste. Marie Chippewa to 1880, when the lumber concern called the "Bay Mills" began operation near their settlements on Point Iroquois at the eastern entrance to White Fish Bay of Lake Superior. The Sault Ste. Marie bands are the ancestors and predecessors of the present day Bay Mills Community, now located near the former mill site on Waiska Bay, approximately twenty miles southwest of Sault Ste. Marie in Chippewa County, Michigan.* Some of the members live at a separate reserve on Sugar Island, about fifteen miles southeast of Sault Ste. Marie.

Other sections of the report cover: (1) the historical importance of fishing - both for subsistence and trade - for the Sault Ste. Marie bands; (2) their efforts to retain control and use of their fishing grounds, and (3) the protection of the traditional fishing rights of these bands by the federal government. The discussion focuses particular attention on articles of three treaties to which the United States and the Sault Ste. Marie bands were parties, namely: Treaty signed at Sault Ste. Marie, June 16, 1820 (7 Stat. 206, 2 Kapp. 187); Treaty signed at Washington, March 28, 1836 (7 Stat. 491, 2 Kapp. 450); and Treaty signed at Detroit, July 31, 1855 (11 Stat. 621, 2 Kapp. 725).

Research for this report has been carried out at the Graduate Library of The University of Michigan, The Michigan Historical Collections

---

*22 Indian Claims Commission 79, Decision November 19, 1969. See par. 2, page 81, Findings of Fact in Docket 18 F.

in Ann Arbor, and the Clarke Historical Library at Central Michigan University in Mt. Pleasant.  The principal source of documentary evidence has been the original government correspondence of the Mackinac Indian Agency from the 1820's up to the closing of the agency in 1880.  These records are preserved in the National Archives in Washington, D. C. and are available on microfilm from the Federal Records Center in Chicago.

The investigation has been initiated at the request of the United States Attorney for the Western District of Michigan, Northern Division, and conducted under contract with the Bureau of Indian Affairs, Department of Interior.

Helen Hornbeck Tanner, Ph.D
1319 Brooklyn Avenue
Ann Arbor, Michigan 48104



MAP 1

HISTORICAL DEVELOPMENT OF THE BAY MILLS INDIAN COMMUNITY

1820 Treaty, "Permanent Reserve" for Sault Bands
1820 Treaty, Military Reserve, Fort Brady
1836 Treaty, Reserves in Sault Ste. Marie area
1855 Treaty, Land Reserved for allotments
Bay Mills Indian Community, present landholding (approx.)

Map Section from
Atlas of the State of Michigan
by H.F. Walling (Detroit, 1873)
Chippewa County, p. 122-123

MAP 2

Dates and
Boundaries of
Major Indian Land
Cessions in Michigan

1807 – Ceded by Ottawa,
Chippewa, Wyandott and
Potawatomi.

1819 – Ceded by the
Chippewa

1821 – Ceded by Ottawa,
Chippewa and Potawatomi

1836 – Ceded by Ottawa
and Chippewa

1842 – Ceded by Chippewa
on Lake Superior

Adapted from C. C. Royce,
U. S. Bureau of Ethology
Annual Report, 1896-97,
Washington, 1899.

H.H. Tanner, 1974

RESERVATIONS OF THE OTTAWA AND CHIPPEWA OF MICHIGAN
Treaty of March 28, 1836

Article 3: Reservations for bands north of Straits
of Mackinac. Sault Bands, No. 5 - 9.

Article 2: Reservations south of Straits of Mackinac

Military Reserve at Sault Ste. Marie, est. 1820

Based on H.R. Schoolcraft, "A Map of the Acting Superin-
tendency of Michigan, Sept. 15, 1837. National Archives
RG 75, L R 1837. Michigan Superintendency, F 334



M A P 3

SAULT ST. MARIE BANDS and THEIR NEIGHBORS
1640 — 1780

Map Section from Erwin Raisz, LANDFORMS OF THE UNITED STATES, 1957
H. H. Tanner, 1974

I

THE SAULT STE. MARIE BANDS:   ETHNOHISTORICAL SUMMARY

The Indians living in the vicinity of present day Sault Ste. Marie are descendants of Chippewa bands identified with Lake Superior and the St. Mary's river outlet for an estimated period of possibly four hundred and fifty years.  Tribal tradition tells the story of a slow migration covering an interval of two centuries from an area east of Montreal in Canada to the falls of the St. Mary's river.  From this base, the Chippewa expanded north and south of Lake Superior, making their final headquarters near a narrow needle of land on Chequamegon Bay and on an adjacent island in Lake Superior, both called "La Pointe."  Three generations passed before these Chippewa encountered a European, a time placed at 1612 by the traditional historian and at 1618 or 1622 by French documents.  The same tradition tells that the Ottawa and Potawatomi tribes, who speak related Algonquian languages, split off during this migration, the Ottawa establishing a base on Manatoulin Island in northern Lake Huron and the Potawatomi moving south into the Lower Peninsula of Michigan.[1] Chippewa, Ottawa and Potawatomi today acknowledge their common origin in calling themselves "The Three Fires."

The Chippewa population of the St. Mary's river apparently remained undisturbed for many years, but along with all tribes east of the Mississippi river was affected by the outbreak of Iroquois warfare in 1649, instigated by British-French fur trade rivalry.[2]  Supported by British merchants in Albany, the Iroquois of northern New York launched an attack on the French-affiliated Huron living in towns on the Ontario peninsula below Georgian Bay.  The Iroquois' objective was to gain control of the Huron's trade and their hunting grounds as well.  This first phase of a half-century of Iroquois wars drove refugee Hurons and their Ottawa

---

[1]William W. Warren, History of the Ojibways, Collections of the Minnesota Historical Society, Vol. V. (St. Paul, 1885) pp. 81.

[2]George T. Hunt, The Wars of the Iroquois, (Madison, 1940) is the standard reference covering the period 1640 - 1698.

neighbors on the north, through the Sault area to the western part of the Michigan Upper Peninsula and even to the Green Bay area of Wisconsin. By 1665, Huron and Ottawa were living temporarily near the Chippewa on Chequamegon Bay.[3] Though Iroquois war parties pursued the westward fleeing Huron and Ottawa, they were permanently repulsed in 1662 by the Chippewa at Iroquois Point, a location on Whitefish Bay of Lake Superior named for the battle site.[4] According to French accounts, Chippewa at their summer fishing grounds detected the smoke of the Iroquois campfires, reconnoitered, and later annihilated the sleeping Iroquois warriors.[5]

To the west of Lake Superior, the Chippewa came in conflict with the Sioux [Dakota] of northern Minnesota whose hunting grounds they were invading. In fear of retaliation from the Sioux, the Indian population for a time retreated from Chequamegon Bay in 1671. The refugee Huron and Ottawa moved from the Upper Peninsula to Mackinac, south of the straits.[6] Concurrently, some Chippewa drew back to Keeweenaw Bay and Sault Ste. Marie but La Pointe remained the central focus for the tribe.[7] Also in 1671, French officials asserted formal authority over the Upper Great Lakes in dramatic ceremonies at the place recognized as the gateway to the northwest fur trade, Sault Ste. Marie.[8] The name comes from the French word for a waterfall, spelled "sault" or "saut," a natural reference to the falls of the river outlet from Lake Superior. Sainte Marie was the name given to the Jesuit mission established at the falls in 1668. In the twentieth century, the term for the Sault Ste. Marie area has been abbreviated and anglicized to become simple the "Soo."

---

[3]W. Vernon Kinietz, Indians of the Western Great Lakes, 1615 - 1760 (Ann Arbor, Mich, 1940, 1965) p. 2.

[4]Grace Lee Nute, Lake Superior, (Indianapolis & New York, 1944) p. 24. For a traditional account of the battle, see Warren, History of Ojibways, p. 147-148.

[5]Edward D. Neill, History of the Ojibways and their Connection with Fur Traders, Collections of the Minnesota Historical Society, Vol. V (St. Paul, 1885) p. 402-403.

[6]Nute, Lake Superior, p. 27.

[7]Warren, History of Ojibways, pp. 108 and 123.

[8]F. Clever Bald, Michigan in Four Centuries, (New York and London, 1954, 1961), pp. 35-37.

Returning to the Chippewa chronology, in the late seventeenth century the Lake Superior warriors followed up their victory over the Iroquois at Whitefish Bay with an aggressive campaign to reconquer from the Iroquois the original Huron country on the Ontario peninsula southeast of Georgian Bay.  These successful expeditions, aided by the French, led to the settlement of Chippewa, including some Mississauga from north of Lake Huron, as far east as present day Kingston, Ontario, at the eastern end of Lake Ontario where the St. Lawrence river begins.[9]  By the early eighteenth century, Chippewa were living on both sides of the St. Clair river, in Michigan and in Ontario  Iroquois warfare ended by 1700.

In conjunction with  the southward advance of tribes sympathetic to the French, Detroit was founded in 1701.  Within a few years, the small surviving Huron population, later called Wyandot by the English, returned to the vicinity of their original homeland and established a village on the Ontario side of the Detroit river.  A group of Ottawa accompanied the Huron, locating near their long-time allies.  Potawatomi from the St. Joseph river in southwestern Michigan settled on the northwest bank of the Detroit river not far from the new French fort.[10]

In summary, readjustments made in the wake of the Iroquois wars determined the ultimate tribal distribution throughout Michigan and the Upper Great Lakes.  Chippewa at Sault Ste. Marie were surrounded by friends and allies.  In present-day Michigan, Chippewa occupied the Lake Superior shores of the Upper Peninsula, and spread along the eastern side of the Lower Peninsula.  Ottawa from Manatoulin Island and Michilimackinac expanded along the eastern shore of Lake Michigan to Grand Traverse Bay and down to the Grand river.  They also hunted and fished on the Lake Michigan shore of the Upper Peninsula.  Southern Michigan was the home of the Potawatomi whose territory extended around Lake Michigan to the Door Peninsula by Green Bay in Wisconsin.  The Hurons [Wyandots to the English]

---

[9]George Copway, History of the Ojibway Nation, (Boston, 1851) pp. 90-94.

[10]Bald, Michigan in Four Centuries, pp. 49-50.  See also "Extracts from the Answer of Vaudreuil and Begon to Cadillac's Petition"...Quebec, Nov. 4, 1721; and selections from Charlevoix's "Journal" dated Fort Ponchartrain, June 8, 1721, Documents B 7 and B 8 in Ernest J. Lajeunesse, The Windsor Border Region, (Toronto, 1960), pp. 26 and 27.

had towns and corn fields on both sides of the Detroit river, but hunted south of Lake Erie in northern Ohio.

By the beginning of the eighteenth century, consequently, Indian tribal distribution had stabilized in the region including Sault Ste. Marie. Warfare had not disappeared, but the frontiers of conflict were distant. To the west, the fighting line in the intermittent Chippewa-Sioux warfare continued in Minnesota and Wisconsin, even after an inter-tribal boundary and neutral zone had been established at the Treaty of Prairie du Chien in 1825.[11]  To the east and south, the Chippewa – like other tribes – were drawn into the inter-colonial conflict first between the English and the French, later between the English and thirteen rebel colonies, and finally fought against insatiably land-hungry Americans.

The Chippewa covered a broad territory.  In the 1750's, for example, Upper Great Lakes Chippewa and Ottawa supported the French army in battles in New York and Pennsylvania.[12]  During the American Revolution, Chippewa and warriors of other tribes joined British expeditions at Detroit that advanced against Kentucky frontiersmen along the Ohio river.[13]  In the 1790's, northern Ottawa and Chippewa opposed American armies campaigning to break the Indian control over southern Ohio.  Along with a dozen other tribes, Chippewa were present at the great peace and land cession convocation at Greenville, Ohio in 1795.[14]  On this occasion, the Great Lakes tribes agreed to the cession of the southern two-thirds of Ohio with the assurance that the balance of the Northwest Territory was recognized as Indian land.[15]  The  Chippewa bands in the Saginaw Valley and the

---

[11] Treaty with the Sioux, Chippewa.....August 19, 1825 at Prairie du Chien  Michigan Territory [Wisconsin] (7 Stat. 272, 2 Kapp. 250).

[12] Howard H. Peckham, Pontiac and the Indian Uprising, (Chicago, 1947, 1961), pp. 41, 44.

[13] Bald, Michigan in Four Centuries, pp. 80-84. A number of reports of war councils, attended by the Chippewa are in the Michigan Pioneer and Historical Collections, Vol. X.

[14] Minutes of the Treaty of Greeneville Proceedings, H. DeButts, Secretary, covering period from June 16 to August 10, 1795, in American State Papers, Indian Affairs, Vol. I (Washington, 1835), pp. 564 - 583.

[15] Treaty with the Wyandot, etc. at Greeneville, August 3, 1795. Article IV.  (7 Stat. 49, 2 Kapp 39).

Upper Peninsula were sympathetic to the British in the War of 1812.

The only significant military engagements near the Sault, after the episode during the Iroquois wars, were two isolated attacks on Mackinac garrisons, in 1763 and 1812. Most famous in general history is the Chippewa capture of Fort Mackinac, present Mackinaw City, in 1763 about a year after British troops took over the fort from the French at the close of the Seven Years' War.[16] The event was one of a series of Indian victories at the beginning of Pontiac's uprising and occurred at the beginning of the long siege at Detroit. Three years later, gifts and prospect of more advantagious trade made a British garrison acceptable.

Near the end of the American Revolution, Fort Mackinac was transferred to Mackinac Island, and in 1796 turned over to troops of the new American nation. The second attack on a Mackinac garrison took place at the outbreak of the War of 1812. British from St. Joseph's Island in Lake Huron, along with an Indian contingent, seized the Fort in a surprise attack with no casualties.[17] American "sovereignty" over the Sault Ste. Marie area had little reality until the arrival of the expedition headed by Michigan territorial governor Lewis Cass in 1820.

At the time of the Cass expedition, Chippewa in the Upper Peninsula were still living in a traditional Indian manner. Their small communities of bark wigwams shifted from time to time, but remained within the same general areas. Indian life followed an annual round of activities that varied according to the season. Corn customarily had been planted in the spring, although the harvest at a latitude as high as Sault Ste. Marie was undependable. Potatoes became a basic food crop where gardening was carried on. Hunting and fishing continued the year round. Gathering and drying berries and canoe-making were summertime occupations. In the fall, the Chippewa dispersed to winter hunting grounds to accumulate a surplus

---

[16]This was the occasion on which the Indians used the "lacrosse game tactic", hitting the ball over the palisades as a ruse for gaining entry and killing the British soldiers. The entire spectacle reported by a hidden eye witness, Alexander Henry, who included a description in his autobiography.

[17]Bald, _Michigan in Four Centuries_, pp. 71-73, 123.

that could be traded for European manufactured goods in the spring.  The severity of late fall storms and eratic icing conditions closed off lake travel from October until March; snow shoes were needed for winter travel by land.

From the Sault, family units often went out to spend the winter along the shore of Lake Superior or on the lower course of the St. Mary's river, although some families remained near the falls to fish throughout the winter.  In the early spring, families gathered at maple groves for sugar-making.  Trading expeditions to Sault Ste. Marie or Michilimackinac took place at the beginning of summer when weather was favorable for canoe-travel.  By the ninetheenth century, the Chippewa had become accustomed to woolen blankets and coats, cotton shirts, guns, and a long list of metal items:  kettles, needles, hatchets, spears, hooks, ice cutters and traps.  These manufactures replaced articles the Chippewa had made from pottery, bone, wood and stone.

Although the Chippewa communities along Lake Superior were linked by hereditary clan membership and by intermarriage, they gradually became identified by geographic locale.  Along the south shore of Lake Superior, the three major centers in 1820 were:  (1) La Pointe on Madeline Island at the head of Chequamegon Bay in present day Wisconsin, (2) the L'Anse and Keeweenaw Bay settlements in Michigan, and (3) Sault Ste. Marie, central point in a district extending from Drummond Island in Lake Huron to Grand Island in Lake Superior opposite modern Munising.  The Taquamenon band on western Whitefish Bay and the Garden river band on the Canadian side of the St. Mary's River were both included in the Sault Ste. Marie group.  Sometimes the Bay de Noc band of Chippewa on the north shore of Lake Michigan at the head of Green Bay was also considered subsidiary to this division.

Up to the time of the Cass expedition in 1820, virtually nothing was known of the hinterland territory west of Sault Ste. Marie along the Lake Superior shores, river courses and inland lakes.  French missionaries, whose accounts are often relied upon, had abandoned the Upper Peninsula before 1700.  With few exceptions, the small number of traders who wintered

with the Indian inhabitants, were illiterate and thus left no journals or letters.  Governor Cass' pioneer exploration, therefore, provides an early report of locations frequented by Chippewa who were included in the Sault Ste. Marie bands.  According to Henry Rowe Schoolcraft, who accompanied the expedition as minerologist, Indian parties were encountered along Lake Superior at the mouth of Shelldrake river on Whitefish Bay, and at Grand Island.  His journal for June 18, 1820 records:

> At the Shelldrake river, we found several lodges of Chippeway Indians, who are drawn to this spot by the advantages of taking fish at the mouth of the river; they appeared friendly — presented us some dried white fish, and received in return, some tabacco.[18]

Departing from the Shelldrake river next day, they met five barges laden with furs from Fond du Lac, the western end of Lake Superior, and "eighteen or twenty canoes of Chippeway Indians on their way to Sault de St. Marie and Michilimackinac."[19]  Two days later, the expedition camped on Grand Island and were entertained by the music and dancing of the resident Chippewa, whose warriors had recently returned from warfare against the Sioux.  Describing the expedition's arrival at Grand Island, Schoolcraft wrote:

> Here we found a village of Chippeway Indians, who, as soon as we landed, came from their lodges to bid us welcome.  They manifested the most friendly disposition toward the party, and toward the United States; and when they were told of our objects in visiting their country, appeared highly pleased.  The promptitude with which they offered the pipe of peace, left no doubt of their sincerity....  In the evening they assembled in our camp, to show their skill in dancing, upon which they all pride themselves, and spent sometime in this amusement, which is also done as a mark of respect.[20]

The principal purpose of the first American expedition to reach the Sault was to secure from the local Chippewa a cession of land for a fort. The tribe was still strongly partisan to the British who had retaken Fort Mackinac during the War of 1812 and remained in control of the regional

---

[18]Henry R. Schoolcraft, Narrative Journal of Travels through the Northwestern Regions of the United States.....to the Sources of the Mississippi River.....in the Year 1820, (Albany, 1821), pp. 144-145.

[19]Ibid. p. 145.

[20]Ibid. p. 155

fur trade.  After an intial show of hostility, the Chippewa were pur-
suaded to sign a treaty on June 16, 1820 granting sixteen square miles to
the United States, but reserving a fishing site and place to camp by the
falls.[21]  Two years later, a small American force arrived to establish
Fort Brady.  Along with the military force, Henry Rowe Schoolcraft
returned as the first American Indian agent.  At this point, Schoolcraft
began accumulating information about the Chippewa with considerable detail
concerning daily events at Sault Ste. Marie.

In 1823, Schoolcraft married Jane Johnston, the half-Chippewa
daughter of an Irish trader, John Johnston, who lived at Sault Ste. Marie.
Jane had been educated in Ireland and served as informant and mediator in
Schoolcraft's dealings with the Indians.  The entire family had been help-
ful in negotiating the 1820 treaty.  Jane's three brothers, George,
William, and John all served as interpreters and sub-agents in the Indian
service for the next forty years.  Mrs. Schoolcraft's mother was a daughter
of Waub-o-jeeg, a highly-respected chief at La Pointe.[22]

The year of Schoolcraft's marriage, Waub-o-jeeg's eldest son,
called Waishkee, moved to the Sault area with his wife and nine children.
On October 30, 1826, he came to Schoolcraft's office to report that "he
was on his way to make his first hunt on Red Carp river, L.S. [Lake
Superior]."[23]  This is the first reference to the settlement of the
Waiskees in the vicinity of the bay and river now named for the family.

---

[21]Treaty with the Chippewa, June 16, 1820 (7 Stat. 206,
Kapp. 187).  The cession secured by the United States, according to
the report of Schoolcraft and others, was four miles square, the base
line extending approximately two miles upriver from the fort location
and two miles downriver to the Little Rapids.  See Schoolcraft's
Narrative, etc. of the negotiations and final settlement, pp. 135-140.
The standard map reference for Indian treaties, C. C. Royce, Indian
Land Cessions in the United States, 18th Annual Report of the Bureau
of American Ethnology, Part 2 (Washington, 1899), appears to be inaccurate
on this point.  The legend "Little Rapids" is placed about twelve miles
off, at the Neebish Rapids opposite Neebish Island.  The Little Rapids was
actually opposite the northwest point of Sugar Island.  The error appears
on two maps "Michigan 1" and "Michigan, Region about Mackinac and Detroit."
Because "Little Rapids" is inaccurately located, the land cession Numbered
112 appears long and narrow rather than square.

[22]Henry R. Schoolcraft, Personal Memoirs of a Residence of Thirty
Years with the Indian Tribes.....A.D. 1812 to A.D. 1842, (Philadelphia,
1851), pp. 106-107

[23]Ibid. pp. 250, 303.

Very early maps of the Upper Peninsula use the name "Red Carp" for the modern Waiska river.  Since the first Waishkee had such a large family, it is understandable that many present day residents of the area have a "Waiskee" in their genealogy.

Waishkee played an active role in regional Indian affairs in which the federal government became involved.  He was a signer of the Treaty of St. Mary's, previously mentioned, negotiated by Governor Cass in 1820.  He was also a member of the delegation from the Sault Ste. Marie bands attending the Treaty of Fond du Lac at the west end of Lake Superior the summer of 1826.[24]  This treaty council was held to gain acceptance of a larger group of Chippewa to the Sioux-Chippewa boundary line established by the Treaty of Prairie du Chien in 1825.  Other representatives of the Sault bands at Fond du Lac were Shewaubeketon, Shegud, and Shingabawassin, recognized leading Chippewa chief in the Upper Peninsula at the time.  The Fond du Lac treaty in Article 5 provided for an annuity of $2,000 to be paid the Chippewa at Sault Ste. Marie; and in Article 6 granted $1,000 annually for a school to be established on the St. Mary's river.  Article 4 of the treaty, which never became a reality, was a grant by the Chippewa to their half-breed relatives of an estimated 125 or more sections of land to be located along the St. Mary's river and on Sugar Island.[25]

In the following summer, 1827, the same quartet of Indian leaders from Sault Ste. Marie, (i.e. Shingabawassin, Shewaubeketon, Waishkee and Shegud) went to the Fox river by Green Bay for another post-Prairie du Chien treaty.  In this case, the purpose was to settle the boundary line

---

[24]Treaty with the Chippewa, August 5, 1826 (7 Stat. 290, 2 Kapp 268)

[25]Of the 45 grants listed in the schedule at the end of the treaty, there are 25  to an Indian woman and her children, the number not stated. With few exceptions, the names are identifiable as families of Indian traders.  The list is headed by a grant to Schoolcraft's mother-in-law, her children and grandchildren.  Last grant on the list is two sections of land for two children of Waishkee.  William Warren, who later wrote a traditional history of the Chippewa, was one of the beneficiaries of a section of land. Land granted in Article 4 of the Fond du Lac treaty totals close to 80,000 acres.

between the Chippewa and their neighboring tribes in Michigan and Wisconsin, the Menominee and Winnebago.[26]  The Sault Ste. Marie contingent constituted four out of sixteen Chippewa treaty signers.  Both the 1826 and 1827 treaties were negotiated by Lewis Cass, governor of Michigan Territory which included Wisconsin.  Henry R. Schoolcraft was present to witness the treaties as Indian agent.

Waishkee and a son who carried the traditional clan name of Waub-o-jeeg, were the two representatives of the Sault Ste. Marie bands who went to Washington in February, 1836 for discussions culminating in the Treaty of March 28, 1836.[27]  In this treaty, Ottawa and Chippewa bands ceded to the federal government all of northwestern Michigan above the Grand river and the majority of the Upper Peninsula.  Terms of the treaty were very complex, including tenative provisions never carried out for removing all the bands westward.  In the 1836 treaty, the Sault bands reserved Sugar Island and a large area estimated at close to 250,000 acres at the base of Whitefish Bay, extending from the mouth of the present Waiska river to the Taquamenon, with the off shore fishing grounds and islands.[28]  This treaty also confirmed the provisions of the 1820 treaty concerning the rights to camp and fish at the falls of the St. Mary's river.

The advent of the Protestant missionary era in the Upper Peninsula in the 1830's brought a new type of observer to the Indian communities. This decade marks the beginning of some activity in education, gardening and house construction for the Chippewa living near the Sault.  The first experimenter in Indian education at Sault Ste. Marie was the Reverend A. Bingham, who established a Baptist school and mission to the rear of Fort Brady in 1828.  During the course of a quarter of a century in Sault Ste. Marie, the Reverend Bingham educated only a few Indian children

---

[26] Treaty with the Chippewa, at Butte des Morts, on the Fox river, August 11, 1827. (7 Stat. 303, 2 Kapp. 281).

[27] The "Records of the Treaty of March 28, 1836 list as the chief and delegate from Sault Ste. Marie two names:  "Waishkee" and "Keewasie", Chippewa terms for "first born" and "son".  On the treaty, they signed their formal names, "Iawba Wadick" and "Waub Ogeeg."  The identification is established by correlating many pieces of correspondence.  HHT.

[28] This large reserve is the yellow section of Map 1 of this Report. The entire cession of the 1836 treaty is identified as 205 on Royce's map in Indian Land Cessions.

and young people, but he did secure a "valuable helper in the person of Rev. Mr. Cameron, a native convert, educated by the Protestant Episcopal Church, but giving his adherence to the Baptist mission."[29]   The Camerons now associated with the Bay Mills Community are descendants of this nineteenth century missionary-trader.

In 1833 and 1834, enthusiastic Methodist missionaries brought about a religious revival among the soldiers at Ft. Brady and converted many Indians and mixed race residents of the Sault area.  Most effective were the preachers of Chippewa heritage who came from Canada.  In June, 1833, the Sault bands granted land to the Methodist church for a school and mission at Little Rapids, two miles below Fort Brady where the St. Mary's river divides into two channels around Sugar Island.[30]  By the following year, a few houses had been built for Indian families and gardening commenced.

Although missionary accounts are singularly devoted to spiritual matters, they do provide a closer view of Indian life than most official correspondence.  For the St. Mary's river and Whitefish Bay areas, the most detailed account was written by the missionary John H. Pitezel, who spent the years from 1843 to 1852 in the Lake Superior region.  While he was stationed at Little Rapids in 1843-44, his mission territory extended down the St. Mary's river twelve miles to Hay Lake, a part of the river channel, west to Grand Island, and included the Garden river settlement on the Canadian side of the St. Mary's river.[31]  This mission district coincided with the region occupied by the various communities of the Sault Ste. Marie bands.

During his first winter at the Sault, Pitezel made an excursion to the Chippewa encampment twelve miles downriver at Hay Lake or Mah-shkoo-ta-sa-ga.  He started out February 3, 1844 on snowshoes,

---

[29] John H. Pitezel, Lights and Shades of Missionary Life, (Cincinnati, 1883, First Ed. 1857), pp. 437-438.  This was James D. Cameron.

[30] Grant for Methodist Mission at Little Rapids, Sault Ste. Marie, June 20, 1833.  (Michigan Superintendency, Sault Ste. Marie Agency, Letters Received. Nat. Archives, M 1, Roll 71, pp. 81-84).

[31] Pitezel, Lights and Shades, p. 41.

carrying provisions by dogsled. En route he "overtook an Indian train drawn by a pony, on a fishing tour."[32] Pitezel described his visit at the lodge of "I-ah-be-dah-sing, a subordinate chief," observing that the winter occupations included making gill nets:

> We gave our provision to the chief's wife, who did our cooking to admiration. They had just caught several rabbits, and the boys that day, caught a fine lot of fish, which, with the stock of eatables we had with us, made us fine living. The chief was employed in making a gill net, which labor he performed with great ease and dexterity.....
>
> I was seated upon a mat, Indian fashion, at supper. Before the fire were some fish spread out on a stick, stuck in the ground, roasting. Any one approached and took a piece at pleasure. On each side of us the Indians were eating corn soup with wooden spoons.....Overhead were suspended, on poles, some of the fish caught the preceding day.[33]

Pitezel became well-acquainted with many of the chiefs, headmen and families of the Sault Ste. Marie bands. With his support, a school and mission settlement was established in 1849 on Naomikong point at the base of Whitefish Bay. Lumber for the new buildings came from a saw-mill in operation six or eight miles from the mission site.[34]

During the winter of 1849-50 when Pitezel was again based at Sault Ste. Marie, he visited the outlying Chippewa settlements on the shores of Whitefish Bay. The Naomikong settlement included the family of Monomonee, a chief who had recently moved from Grand Island. At the mouth of the Tahequamenon river, he conversed with Kay-ba-no-den, "the old chief", and O-ge-mah-penasa, or the King Hawk. Tahquamenon was also the residence of She-gud, "a devoted Christian, a deacon in the Baptist Church, but in a declining state."[35] She-gud was a minor chief married to a daughter of Shingabawassin, famous Chippewa leader of the previous generation whose home was at the Sault. Pitezel made several references to the Waishkee

---

[32] Ibid., pp. 48-49.

[33] Ibid., pp. 50-51. At Hay Lake, modern Lake Nicolet.

[34] Ibid., pp. 227-229, 303. Indians bought land.

[35] Ibid., pp. 188.

family living at Waishkee's Bay, and to a group living on the Carp river near the saw mill, six or eight miles from Naomikong.[36]

The climax to Pitezel's nine years of missionary endeavors was an Indian camp meeting, the first religious gathering of its kind in the eastern Upper Peninsula, held in July, 1852 near White Fish Point.  He explained that "The Indians spent much of the summer at White Fish Point, engaged in fishing."[37]  The camp meeting was a big event, drawing Chippewa leaders from Lake Vieux Desert in northern Wisconsin and the Keeweenaw Bay area of western Lake Superior.  Participants from the Sault bands mentioned by Pitezel include:  Pi-ah-be-dah-sing, chief of the Garden river band, Johnson Sky, Moses O-mon-o-mo-nee, Sara Pwan [or Bwan, meaning "Sioux"], Mother Waishkee, William Pwan [Bwan] acting chief from Naomikong, Louis Waishkee a chief from Waishkee's Bay, Henry and Isaac Kakakoons [Little Hawk].  Chief Waubojeig Waishkee made a speech at a special temperance meeting.[38]

In the closing session, three missionaries were honored by receiving names of honored but recently deceased chiefs: "Shing-wauk" or "Pine Tree," father of the aged Garden river chief, O-gish-ta; "Wa-za-wah-we-doong," or "Yellowbeard," identified as "an old family name....of one of the best Indians ever connected with the Te-Quah-me-nah band;" and "I-ah-be-wa-dic."[39]  This last name, which Pitezel translates "Male Elk" is the real name for the chief commonly called "Waishkee" [meaning "first-born"], uncle of Schoolcraft's wife who had come from La Pointe to the Sault in 1823.  Reference has already been made to Waishkee's record as a treaty signer in 1820, 1826, 1827, and 1836.

Pitezel's account has been quoted at length because it describes the situation around Whitefish Bay just prior to the Treaty of July 31, 1855, the last treaty of the Sault bands with the federal government.

---

[36] Ibid., pp. 187-188, 191, 195, 197, 229-230.

[37] Ibid., pp. 367.

[38] Ibid., pp. 355-356, 351.

[39] Ibid., pp. 359.

Indian names noted in the preceding paragraphs all appear in connection with one or more of three documents:  the Treaty of March 28, 1836, Treaty of July 31,  1855, or a list of the land allotments made to the Sault Ste. Marie bands in 1864, carrying out provisions of the 1855 treaty.  Pitezel's emphasis was naturally on the segment of the population that had embraced Methodism.  Families who adhered to their traditional Indian beliefs, or preferred some other religious denomination received no mention.

A conspicuous omission from Pitezel's account was the band of O-Sha-wa-no, a prominent chief whose family religious preference was Roman Catholicism.[40]  Chief O-Sha-wa-no lived at the head of the falls of the St. Mary's river, on the "permanent reserve" created by the Cass treaty of 1820.  This band was most immediately affected by the commencement of excavation for the St. Mary's ship Canal in June, 1853, when Indian homes were destroyed or taken over by the four hundred workmen who arrived to begin digging.  In the larger economic picture, of course, the opening of the canal in 1855 led to the development of iron and copper mines in the Upper Peninsula, the timber industry, and the expansion of commercial fishing.  But to the Chippewa, this was a serious blow.  Chief O-Sha-wa-no was himself forced to take refuge on a small island in the middle of the river, where he was joined by some of his closest friends and relations.  Others of the band were scattered up and down the St. Mary's river.[41]

The Chippewa bands were understandably disturbed by the seizure of their fishing encampment at the falls, and the callous destruction of their ancient burial ground.  In 1839, troops from Fort Brady had prevented workmen, under contract with the young State of Michigan, from digging a canal through the military reserve.  This action had

---

[40] Speech of Keewayzie Shawwanno, translated by Audrain, June 21, 1834.  Nat. Arch. M 234, Roll 400: p 364.  O-Sha-wa-no's son herein testified to a strong Catholic belief.  It seems likely this was a paternal influence.  The family never became associated with any Protestant missionary activity.  Spelling of the name varies in documents, but is arbitrarily standardized as "O-Sha-wa-no" in this report except when quoted.

[41] Henry C. Gilbert, Agent, to George W. Manypenny, Commissioner of Indian Affairs, July 4, 1853.  Nat. Arch. M 234, Roll 404: 67-68.  A more descriptive letter is J. P. Richardson to George W. Manypenny, written from Pontiac, Dec. 17, 1853.  Nat. Arch. M 234, Roll 404: pp 229-231.

protected the Indian encampment.[42]    But in 1853, the canal project was sanctioned by Act of Congress.  Their demands for compensation added to the complaints of other Ottawa and Chippewa bands about the operation of past treaties, and a general apprehension among the Indians about the possibility of forced removal, are all factors that brought the parties to the 1836 treaty together again in Detroit in 1855.

In summary:  By 1855, the centers of activity for the Sault bands were restricted both on the east and west to a smaller area than in 1820.  Drummond Island, whose Indian population did not participate in the 1836 treaty, is scarcely mentioned.  In 1834, the Drummond Island group had been strongly urged by Canadian authorities to move to Manatoulin Island in Canadian territory.  Many of the Grand Island band moved to Naomikong in the 1840's.  The site of the Methodist mission was moved in 1854 from Naomikong to Point Iroquois.[43]    In 1855, the main district occupied by the Sault Ste. Marie bands extended from Sugar Island to Whitefish Bay, some still remaining near the village of Sault Ste. Marie.  In addition to the reserve damaged by building the St. Mary's Falls canal, the Sault bands had 28,000 acres of land on Sugar Island and about 250,000 acres fronting on Whitefish Bay, by terms of the Treaty of March 28, 1836.

---

[42]Harlan Hatcher.  A Century of Iron and Men (New York, and Indianapolis, 1950). pp. 75-76.  Also, W. A. Richmond, Acting Supt. of Indian Affairs in Detroit to William Medill, Commissioner of Indian Affairs, Jan. 27, 1846:  "United States troops drove by force the contractors from the ground through which the State Of Michigan contemplated constructing a ship canal." Nat. Arch. M 234, Roll 771: 155.

[43]"The Missionary Society purchased between eight and nine hundred acres of land for the use of the Indians." James Shaw, Supt. of Indian Missions, Lake Superior District, to Agent H. C. Gilbert, Sept. 10, 1854.  Report of the Commissioner of Indian Affairs for 1854. pp. 244-245.

II

EFFORTS TO SECURE PERMANENT HOMES: 1855-1880

When the Treaty of July 31, 1855 was signed, the headquarters for administering Indian affairs in Michigan, the "Mackinac Agency", was actually in Detroit.  There had been further changes since the days when Schoolcraft resided in Sault Ste. Marie, or on Mackinac Island where he moved in 1833.  In Washington, the Office of Indian Affairs had been transferred from the War Department to the Department of Interior when this new division of the federal government was created in 1849.  The Indian office at Sault Ste. Marie was discontinued in 1853.  Under the prevailing system for managing Indian Affairs in Michigan in the 1850's and 1860's the agent in Detroit made an annual trip as far as La Pointe to distribute cash and goods in fulfillment of treaty stipulations. Communication between the agent and the Sault bands was infrequent, aside from the brief direct contact at the time of annuity payment. Correspondence was usually restricted to  the months when navigation was open on Lake Huron.  Following the Treaty of July 31, 1855, the subject matter of correspondence was almost exclusively concerned with efforts of the Indians to secure land allotments provided for in that treaty.

The principle objective of the 1855 treaty, aside from settling financial accounts from previous treaties, was to establish permanent homes in the State of Michigan for the Ottawa and Chippewa bands living in northwestern Michigan and the eastern Upper Peninsula.  The Saginaw Chippewa, assembled concurrently to settle similar problems, signed a separate treaty on August 2, 1855.[44]

For the six bands at Sault Ste. Marie, the Treaty of July 31, 1855 set aside "all the unsold lands" in approximately thirty-two sections of land (including some fractional sections), described in the first clause of Article 1 of the treaty.  These lands were located at four places: (1) Salt Point, east of Naomikong Point on the Whitefish Bay:  (2) Point Iroquois, (3) eastern side of Sugar Island, and (4) Hay Lake and the southern St. Mary's River channel opposite Neebish Island.[45]  The first three locations are within the areas reserved by the 1836 treaty:  the

---

[44]Treaty with the Chippewa of Saginaw, August 2, 1855. (11 Stat. 533, 2 Kapp. 733)

[45] See Map 1.

fourth includes the place visited by Pitezel in February, 1844, described earlier (p. 14). A glance at the map of the four areas reserved for permanent homes for the Sault bands might lead to the expectation that compact settlements of Chippewa families would soon be established in those particular localities. In reality, the plans incorporated in the treaty were frustrated in many ways, so that the actual distribution of patents did not take place until 1873. But developments in the land assignment procedure are the key to the transitional stage in the history of the Sault Ste. Marie Chippewa from six bands in 1855 to the present Bay Mills organization.

A thorough investigation has never been made of the land allotments to Michigan Indians, or what happened if and when patents were received. At the outset, they faced ' three major obstacles. In the first place, the St. Mary's **canal company** had a priority in selecting 750,000 acres in Michigan as payment for building the canal.[46] Secondly, all lands classified as "swamp lands" were turned over to the State of Michigan by the federal government, and were unavailable for Indian selection.[47] Thirdly, distribution of patents was delayed so long that Indians faced aggressive competition from homesteaders and investors. Although no scandals were reported in the Sault area comparable to the fraudulent dealings in Ottawa and Chippewa lands in the Lower Peninsula, the Sault bands had great difficulty in securing any land. The correspondence in the Mackinac Agency files on the subject of land for the Sault Ste. Marie bands contains many inconsistencies that are not yet resolved. Yet from twenty-five years of records, 1855 - 1880, the following succession of events can be reconstructed, culminating in an identifiable Bay Mills community.

---

[46] Irene D. Neu, "The Building of the Sault Canal" 1852-1855," Mississippi Valley Historical Review, Vol XL (1953) pp 28, 38, 44. The representative of the Canal Company received patents to 750,000 acres of land from Michigan's Secretary of State by June 1, 1855.

[47] Act of September 28, 1850.

In April of 1856, R. W. Clelland of the Department of Interior urged the Commissioner of Indian Affairs, George Manypenny, to "direct Agent Gilbert to make without delay the necessary selections," in view of the pressure from competing interests for Michigan land.[48]  The Commissioner and Henry C. Gilbert, Indian Agent in Detroit, had represented the federal government in negotiating the Treaty of July 31, 1855. In spite of the need for prompt action, the process of Indian land selection at the Sault and in the Lower Peninsula encountered a series of delays.

A new agent, A. M. Fitch, replaced Gilbert in July, 1857.  The following fall, 1858, Fitch went to the Sault and reported on progress with land distribution.  The population of the six Sault bands was about 700.[49]  The reserve on the east side of Sugar Island had been surveyed and selected for Pia-da-sung's Garden River Band, but was insufficient to fulfill the treaty stipulations according to Fitch. Furthermore, ten selections had been made in a section not specified in the treaty, but bordered on three sides by reserved land (Township 47 North, Range 2 East, Section 10).  Fitch urgently recommended that this particular section and three additional sections be added to the area reserved on Sugar Island.

The reserved area at Hay Lake presented some problems.  Fitch found that the land south of Hay Lake and opposite Neebish Island was almost all under a foot to eighteen inches of water, and consequently the Indians refused to move there.  The two bands for whom this location was intended, O-Sha-wa-no's and Shaw-Wan's, expressed a desire to occupy land on Sugar Island adjacent to the land already surveyed for Pia-da-sung's band.  Fitch asked that the government comply with the request for a change of location.  For this purpose, he recommended that additional land taking up the entire mid-section of Sugar Island be reserved for these two bands then living in the immediate vicinity of Sault Ste. Marie.[50]

---

[48] Clelland to Manypenny, April 24, 1856, Nat. Arch. M 234, Roll 405: 253-54.  The revised treaty was ratified April 15, 1856.

[49] Richard Smith to Commissioner of Indian Affairs, March 13, 1867. Nat. Arch. M 234, Roll 408: 248-49.  Total population of Ottawa and Chippewa, parties to July 31, 1855 treaty was five thousand.

[50] Fitch to Commissioner of Indian Affairs, Oct. 2, 1858. Nat. Arch. M 234, Roll 406: 160-161.

There is no indication the Fitch's recommendations were acted upon, nor were any other substitute arrangements made to accommodate the bands of O-Sha-wa-no and Shaw-wan.

A further complication was the actual land lists.  In July, 1860, Fitch informed the Commissioner of Indian affairs that the "numerous change, and errors" made by his predecessor, Agent Gilbert, made it necessary to compile a new register or land.  He sent a remittance to cover the cost of printing new certificates.[51]  He also made arrangements for Peter Marksman, a man of Indian heritage who served as missionary at Naomikong, to subdivide the sections of land at Iroquois Point and assist in making selections for the three bands of Kay-ba-no-din, John Waiskkee and Edward O-maw-no-maw-nee.  This task was completed in August, 1861.[52]

By 1861, therefore, only four of the six Sault Ste. Marie bands had made land selections, and these 83 selections were all in two reserved areas, Sugar Island and Point Iroquois, the two places listed for annuity distribution by Agent Fitch in 1860.[53]  In spite of the evident impatience of the Indians, Agent D. C. Leach (who replaced Fitch at Detroit in May, 1861) did not submit a list of selections for these four bands until January 12, 1864.  His list had 95 names of selectees.[54]

No further action was taken until the summer of 1870 when a new agent, Captain and Brevet Major James W. Long, went to the Sault to work on the land selection list for the six bands.  He predicted "the

---

[51]Fitch to Commissioner of Indian Affairs, July 31, 1860.  Nat. Arch. M 234 Roll 406:747.

[52]Bill submitted by Peter Marksman, dated August 31, 1861, forwarded by Leach on May 10, 1864.  Nat. Arch. M 234 Roll 407: 484-485.

[53]Estimate of Dry Goods, required to Fill Treaty Stipulations with the Ottawas and Chippewas, March 10, 1860.  Nat. Arch. M 234 Roll 406:695.

[54]Leach to Dole, January 12, 1864.  Nat. Arch. M 234, Ro 11407: 408-432.           On this list, called "List No. 3," the first name is Louis Waishkey, chief.  The subsequent names through No. 19 appear to be members of his band.  The numbers 20 through 32 are for the Kay-bay-no-din band, earlier associated with the Taquamenon River.  The "O-maw-no-maw-nee" (one of many spellings) band takes up numbers 33 through 54.  All these selections are within the land reserved at Iroquois Point by Article 1 of the Treaty of July 31, 1855.  Number 55 is Chief Pi-aw-be-daw-sing, who heads the list of land allotments continuing through number 95, on the Sugar Island reserve.

completion of the list is going to be an exceedingly delicate as well as onerous task." He found that his proceedings were "watched with a feverish anxiety by the white citizens, and among them some of the <u>very</u> <u>leading</u> and <u>ruling</u> citizens of the State."[55]

The following year, 1871, the land problems of Michigan Indians were turned over to a new set of agents. In May, Captain Long was replaced as head of the Mackinac Agency by Richard M. Smith who for more than ten years had served as clerk in the agency in Detroit.[56] In July, the Secretary of Interior appointed a special agent, John J. Knox whose assignment in Michigan included instructions to "make selections of land for the Grand Traverse and Sault Ste. Marie bands, acting in conjunction with Mr. Smith.[57]

Smith was drowned October 15 when the ship on which he was returning from the Sault to Detroit went down in a fall storm on Lake Huron. No estimate was made of the records lost with him, but Knox retained a land list and made a final report, dated December 8.

The section of Special Agent Knox's report of December 8, 1871, dealing with the situation at the Sault is as follows:

> ...Proceeding from Detroit to the Land Office at
> Marquette, Lake Superior, plats were made of the
> reservation set apart for the Sault Ste. Marie
> bands -- the Indians were assembled in Chippewa
> County both for the purpose of payment and per-
> fecting their selections of land. It was reported
> by late Agent Long, and the opinion concurred in
> by late Agent Smith that insurmountable difficulties
> would be encountered in making selections for the
> above bands -- owing to the fact that one band,
> (Saw wan's) had never made any selections, and to
> whom United States Indian Agents had promised from
> time to time to have lands set apart for their
> special purpose -- adjoining lands purchased by
> said band from the government, and it was also
> reported that there was not a sufficient amount
> of desirable land to give to the Indians the
> quantity to which they were entitled under the treaty
> of July, 1855, but after a long deliberation in
> Council, the matter was amicably adjusted by Chief
> Waw-Be-ga-kake and O-maw-no-maw-ne consenting and

---

[55] Long to Parker, Nov. 8, 1870. Nat. Arch. M 234 Roll 408: 305-309.

[56] James W. Long to Commissioner, May 20, 1871. Nat. Arch. M 234 Roll 409: 579-80.

[57] Columbus Delano, Sec. of Interior, to H. R. Clum, Acting Commissioner of Indian Affairs, July 28, 1871. Nat. Arch. M 234,Roll 409:630.

agreeing to allow Shaw-wan's band to become equal
partners in selecting from the lands claimed by the
above chiefs and their bands.[58]    Selections were
made accordingly by all those entitled under the
treaty to the satisfaction of the Indians and
the lands thus set apart were completely exhausted.

Owing to some conflicts between the records of
the General Land Office and the Land Office at
Marquette it was found necessary to make an additional
journey to that point for a more thorough comparison,
and to rectify some errors in selctions made by a
portion of O-Shaw-Waw-no's band residing near Marquette,
and it is believed the selections as now reported will
entirely harmonize with the plats and tract books of
the General Land Office....[59]

In the process of completing the land selection for the Sault
Ste. Marie bands in October 1871, a number of changes were made in the
list originally submitted in January, 1864.  All ten selections in the
section on Sugar Island, reported in 1858 as occupied but not yet
reserved, were transferred, usually with the assignment of additional
land.  Some of the reassignments were on Sugar Island, but a few were
transferred to the reserve at Point Iroquois.  At the end of the
original list of 95 selections, seven additions were made (i.e. 96
through 102) in Richard Smith's handwriting and dated "October 9, '71."
The names of O-Sha-wa-no and Shaw-wan are not found on the revised list,
and there is no band identification for these additions.  Four of the
seven additions, and six changes made in October, 1871 are the only
land allotments in the region generally called Naomikong.  All ten
allotments were in the fractional sections along the coast of Whitefish
Bay, east and west of Sault Point.  Although Knox stated that all the
Indian land was exhausted, no allotments were made in six other adjoin-
ing sections also reserved by the 1855 treaty for the Sault bands.
Three of the new allotments were made in the Hay Lake reserve which
Fitch had declared unsuitable for occupation in 1858.

Nevertheless, as Knox indicated in his own report of December
8, 1871, the Sault Chiefs appeared satisfied.  On October 12, 1871, a

---

[58] Waw be ga kake, Chief, son  of Mose Kay ba no din, see Nat.
Arch. M 234, Roll 407: 422, No. 20.  Notation probably made in October,
1871.

[59] John J. Knox to F. A. Walker, Commissioner of Indian Affairs,
December 8, 1871. Nat. Arch. M 234, Roll 409: 684-689.

letter was written to Acting Commissioner of Indian Affairs, H.R. Clum:

> We the chiefs and headmen of the Sault Ste. Marie
> bands of Ottawas & Chippewas desire to thank you and
> through you, the Hon. Secretary of the Interior, and our
> Great Father for sending Major Jn. J. Knox of the Indian
> Office to complete our selections for lands set apart for
> us under the Treaty of 1855.  We had almost despaired of
> getting a title to our lands as patents have been promised
> us from time to time for the past fifteen years. We are
> delighted with the word Major Knox brings us from the
> department, that soon we are to have our patents. We have
> waited for them a long time -- we see now we are to get
> them.  Major Knox has just completed the selections to the
> entire satisfaction of every Indian on these reservations.
> We thank you for sending him to us.  We all thank you in
> our hearts and take you by the hand.

The names appended included "Chief O Shaw Wa no," "Chief John Waish-kie," "Chief Edward O-mun-o-me-nee," "Chief Shawan" and two or three head men for each chief.[60]

There was no sign of anxiety about land in the letter sent January 31, 1872 by John Waishkey as "Chief of the Methodist Mission, Pt. Iroquois," his signature witnessed by John M. Johnston, interpreter.  In this communication, he stated:

> ...I am cultivating land granted me in the Treaty of
> Detroit, 1855, making slow progress.  I am getting too
> old to hunt...

Chief Waishkey's troubles were the heavy timber to be logged and the scarcity of game.  In expectation of a last payment from the government in 1872, he requested the agent to send him a "yoke of oxen, cart, plow, breeding mare, harness and wagon."[61] Although this letter gives the impression that land title was secure, the process was not yet complete. John Waishkey was one of the four chiefs who, with headmen, wrote the Commissioner of Indian Affairs from Whitefish Point on August 24, 1872 requesting patents for lands selected in the fall of 1871.  Other Chiefs were "David Kay-ba-no-din, E. O-mum-o-mu-nee and O Shaw Waw no."  In a letter that appears to have been composed by the interpreter Edward

---

[60] Sault Chiefs to H.A. Clum, Acting Commissioner, October 12, 1871.  Nat. Arch. M 234, Roll 409:900-901.

[61] John Waishkey to Commissioner, January 31, 1872.  Nat. Arch. M 234, Roll 410:122-123.

Ashmun, they stated:

> We the undersigned Chiefs and Headmen of the Sault
> Ste. Marie Bands of Ottawas and Chippewas would respect-
> fully state that John J. Knox gave us entire satisfaction
> in the selection of our lands last fall, and request that
> you send Mr. Knox to deliver to us our patents for the
> selections made last fall.  We look to you for the final
> settlement of our land matters with the government that has
> been a treaty stipulation since July, 1855.

At the end, a request was made to have the answer sent to E. Ashmun in Sault Ste. Marie.[62]

Special Agent John J. Knox returned to Michigan in the summer of 1873 to distribute the land patents so long awaited by the Indian population. After transacting business in Northport on Grand Traverse Bay in late May, he went on to Sault Ste. Marie, where he received the patents for those bands.  The Special Agent's letter to the Commission of Indian Affairs, dated June 13, 1873, stated simply:

> I have the honor to acknowledge the receipt of
> your letter dated 29th ultimo, and two hundred and fifty
> three patents, dated May 21st, 1873, issued to members of
> the Sault Ste. Marie bands of Ottawa and Chippewa Indians
> of Michigan under the provisions of the treaty of July
> 31st, 1855.[63]

Knox's report of expenses for the trip from Washington included an item for delivery of patents to the Sault bands.[64]

Considering the precise statements about the distribution of patents in 1873, it is puzzling to find the subject re-emerging in correspondence two years later.  On July 5, 1875, a letter from Sault Ste. Marie was directed to the Secretary of Interior:

> We the undersigned Chippewas, Chiefs and Men belong-
> ing heretofore to the Mackinaw Treaty of 1836, and renewed
> in the year 1855 - in the city of Detroit - and under the
> last Treaty grants of land being made to us within our
> reservations, and Patents issued with the exception of
> 320 - we now call the earliest attention of the Hon.

---

[62] Chiefs and Headmen to Walker, August 24, 1872.  Nat. Arch. M 234, Roll 410:572-573.

[63] Knox to E.P. Smith, Commissioner of Indian Affairs, June 13, 1873.  Nat. Arch. M 234, Roll 410:973.

[64] Knox to Smith, June 25, 1873.  Nat. Arch. M 234, Roll 410:978.

Secretary of Interior to cause the forwarding of the
said Patents to the Indian Agent Rev. George J. Betts
at Lansing, Michigan – as the White Settlers are
encroaching upon us every day, we are in great fear
that the detention of those Patents will cause us a
great deal of trouble.

Eight names appear at the end of this letter with the usual "X"
marks beside, including chiefs "O Shaw wa no," "Paw be daw sing," "John
Waishkey," and "Edward Omahnomune."[65] In November of the same year, the
interpreter Edward Ashmun wrote to John Knox, that he wanted a list of
land selections in Town 47, range North 4 and 5 (i.e., the Salt Point area)
because "Indians are all mixed up."[66]

The Reverend George Betts, the Indian Agent mentioned in the
letter of July 5, 1875, quoted in the previous paragraph, had succeeded
Richard M. Smith who was drowned October 15, 1871.  The appointments of
both Smith and Betts were made under a new policy inaugurated by President
Grant in 1871, in response to great pressure from reformers to have
religious denominations administer the Indian agencies of the federal
government.  Under this policy, the Mackinac Agency in Michigan for a brief
time was assigned to the Methodist Episcopal Church.[67] The Reverend Betts
had spent four years in Indian Mission work, and in November of 1871 began
a four-and-a-half year career as head of the Mackinac Agency, transferring
his office from Detroit to Lansing in March of 1873.[68]

Agent Betts had previously written to Washington in February of
1873, asking that the patents for the Sault Ste. Marie bands be sent to
him for distribution.[69] The decision of the federal office of Indian Affairs
to have Special Agent Knox handle the patent distribution in 1873 probably

---

[65]Sault Chiefs to Secretary of Interior, July 5, 1875.  Nat. Arch.
M 234, Roll 411:539-540.  The term "Mackinac Treaty" refers to the signing
of an agreement to 1836 Treaty amendments which took place at Mackinac in
July of that year.

[66]Edward Ashmun to John Knox, November 16, 1875.  Nat. Arch. M 234,
Roll 422:281-282.

[67]W.L. Harris, Asst. Corresponding Secretary of Missions. Methodist
Episcopal Church to Columbus Delano, Sec. of Interior, April 28, 1871.  Nat.
Arch. M 234, Roll 409:609.  Commission of George Betts, November 4, 1871.
Nat. Arch. M 234, Roll 409:650.

[68]Betts to H.R. Clum, Acting Commissioner of Indian Affairs, March
28, 1873.  Nat. Arch. M 234, Roll 410:858. See also Roll 411:429.

[69]Betts to Commissioner, Feb. 10, 1873. Nat. Arch. M234, Roll 410:818.

reflects a lack of confidence in Betts, whose reliability was already questioned.  In February of 1876, a special inspector of the Indian office recommended immediate suspension of Betts, after investigating charges of his complicity in illegal land dealings at the Isabella Reservation.[70]

The successor to Betts was George W. Lee, a man of rare integrity and humanity, who supervised Michigan Indian Affairs until the end of the Mackinac Agency in 1881.  In May, 1876, he began operating the Indian office from Ypsilanti, Michigan.[71]  Questions and objections concerning Indian land allotment still cropped up.  The leading men of the Sault Bands, and other bands, believed that the land set aside by the Treaty of July 31, 1855 had not all been allotted, and requested further distribution for their young men and women as they became adults.  He also received a further inquiry about land allotments on Sugar Island; this one from Francis Gornoe, who had served as interpreter for Richard Smith in 1870.  Gornoe relayed a complaint that members of the Kaboosa family, who belonged to Pia-be-daw-sung's band, had not received certificates from Mr. Knox in 1871 because they were at Marquette at the time.[72]

A more perplexing problem presented to Lee concerned land purchased by and for the Sault bands, some deeded in trust to the Governor of the State.  O-Sha-wa-no's band had suffered the loss of part of their land as early as 1855.  When the delegates returned from Detroit after signing the Treaty of July 31, 1855, they found that seven of the best fractions of their reserve, three-fourths of all grazing land, had been taken over by two men identified only as "Kemp" and "Paul."  To rectify the loss, Agent Long requested that the "sale" be cancelled.[73]  Other land of O-Sha-wa-no's

---

[70]J.Q. Smith, Commissioner of Indian Affairs to Col. E.C. Kemble, U.S. Indian Inspector, January 25, 1876; and Report February 24, 1876.  Nat. Arch. M 234, Roll 411:761-762, 764.

[71]Lee to Commissioner of Indian Affairs, May 8, 1875.  Nat. Arch. M 234, Roll 411:796,701.  Agency records and property transferred on May 17, 1876.

[72]Letter of Francis Gornoe, May 25, 1878, Nat. Arch. M 234, Roll 413:489-490.

[73]George Johnston to H.C. Gilbert, December 31, 1855.  Nat. Arch. M 234, Roll 405:82. (George Johnston, a brother-in-law of Henry Schoolcraft, had served as sub-agent at La Pointe and Mackinac, and was present as an interpreter at the 1855 treaty.)

band had been sold more recently because taxes had not been paid.  The
acreage lost to tax sale is uncertain.  In February, 1880, Lee estimated
that there were 1000 acres of these lands that could be redeemed for 1000
dollars.  The following August, he reported that 300 acres had been sold
for taxes, but still could be redeemed for less than 400 dollars.

Lee wrote eloquently on the subject of O-Sha-wa-no's lost lands.
His lengthy communication on the subject was part of a report dated February
4, 1880.  The pertinent section of the report stated:

> My attention has been called again to the matter of
> lands which were purchased for the Ottawas and Chippewas,
> and the Chippewas of Sault Ste. Marie - from the govern-
> ment with a portion of their annuity monies, many years ago.
> These lands were deeded to the Governor of the State, in
> trust, for these Indians, the persons I think were not
> names in the patent, who contributed the money.  This was
> long before the settlements had reached the vicinity of the
> lands in question, and such matters as taxes were unknown,
> but the "March of Civilization" brought the tax gatherer,
> this tract of course like its neighbors was not exempt,
> and no person being individually interested in the matter,
> the taxes were not paid, and as a matter of course were sold
> for non-payment.  They supposed as they were deeded to the
> Governor as Trustee; that he would take care of them, but
> I presume our present Governor, and very likely his prede-
> cessors had no knowledge of the transaction.  Now I am asked
> to have the land partitioned among them so that each one
> can have and care for his own.  There are about a thousand
> acres of these lands, and they want me to ask for money
> enough  from their funds to redeem them from these tax
> sales.  It will require near a thousand dollars for all.[74]

Lee referred to the same problem in his August, 1880 report, but
the sum of money needed was only $400.00 and the land stated as only 300
acres.  This further reference to the tax sale was made after Lee had made
an extensive tour of his entire district as far as La Pointe, including a
stop at Sault Ste. Marie.  On the subject of O-Sha-wa-no's land, he
reported:

> At the "Sault," the Old Chief Shaw-wa-no is in very
> destitute circumstances, and much aggrieved as his land
> which amounts to some 300 acres bought by annuity money

---

[74]Lee to Commissioner of Indian Affairs, February 4, 1880.
Nat. Arch. M 234, Roll 415:123-130.

and deeded <u>in trust</u> to the Governor of this State many years
ago, has been sold for taxes and as it is the common pro-
perty of the tribe no one felt obligated to pay taxes, and
no one had the means even if they had the disposition to
pay them, so the land has been sold for several successive
years and they have not the ability to redeem, as the amount
is now near $400.  The old man wished me to do something
for him or ask the Government to provide the means to
cancel this claim for taxes.  He is old, sick and blind:
and all his people are very poor, simply sustaining life
by fishing, picking berries, an odd day's work which chance
may throw their way...[75]

The location of the tribal land originally belonging to O-Sha-wa-no's
band or to Shaw-wan's has not been established.  Tax sale was one of the
methods by which Indians frequently lost their lands.  Other forms of sale,
more or less regular, occurred fairly rapidly after Indians acquired land
patents, sometimes on the basis of arrangements made before the patents were
received.  Detailed information on the subsequent history of land alloted
to the Sault Ste. Marie bands has not been assembled, but it has become
apparent that very few land titles remained in the hands of Indian families.

Lee's descriptions of visits to Sault Ste. Marie and Point Iroquois
convey a more realistic picture of the Sault Ste. Marie bands than can be
found in any correspondence for the previous twenty years.  Point Iroquois
where the Methodist Church had purchased land, was still an isolated Indian
community that could be reached only by a boat trip of twelve of fifteen
miles from Sault Ste. Marie.  No roads had been built in any direction from
the Point.[76] After Lee's visit in 1877, arrangements were made to have a
school reestablished for the benefit of the estimated forty children of
school age living nearby.  The school reopened in March, 1878, with John M.
Johnston as teacher.[77]

---

[75]Lee to Commissioner of Indian Affairs, Monthly Report for
August, 1880.  Nat. Arch. M 234, Roll 415:397.

[76]Lee to Commissioner of Indian Affairs, September 10, 1878,
Nat. Arch. M 234, Roll 413:577-578.

[77]Carl Shurz, Secretary of Interior, to Commissioner of Indian
Affairs, February 7, 1878.  Nat. Arch. M 234, Roll 413:232.  A school for
Garden Island, in upper Lake Michigan, was recommended at the same time.
For appointment of John Johnston, at a salary of $33.00 per month, see Roll
413:437.

This youngest brother-in-law of Henry Schoolcraft had been educated at an academy in New York State.  He as well as his brother George had served as interpreter at the 1855 treaty negotiations in Detroit.  As part of the school program, Lee encouraged a demonstration project in gardening.

Lee's most comprehensive report and appeal on behalf of the Sault Ste. Marie bands was composed on June 12, 1879.  Writing to the Commissioner of Indian Affairs from the Sault, he explained:

> I have stopped here on my return from Lake Superior for the purpose of visiting the Indian School at Iroquois Point, twelve miles up the Lake from this place; and having performed this duty, while waiting the arrival of a steamer, upon which to pursue my journey homeward; I propose to devote the leisure time thus afforded, to the consideration of the condition of the people, belonging to the Chippewas of Lake Superior; or the Sault Ste. Marie as they are sometimes termed, who reside in this vicinity.  --At various points, in this immediate vicinity, or within from 40 to 50 miles, from the Point on Lake Superior before named (i.e., Iroquois), there are somewhere near one thousand Indians; and mixed bloods, recognized as members of the tribe, --there are two chiefs, both of whom are very worthy men viz,Waishkey  and Shaw-wa-no.  Both are sick, the latter nearly blind, and both very poor, Waishkey about 65 years old, Shaw-wa-no nearly 90, yet as fine a specimen of manhood as I have ever met with among them in a long time.  They both claim that when in 1870, Agent Smith made their last payment, he assured them, they had several thousand dollars due them, but they never received anything since in the shape of payments--

> As I have no means of knowing the condition of the funds, which may be to their credit, I promised an answer to their urgent appeal for aid; and the self evident fact of their destitution; that I would ask if there was any money to the credit of their tribe and if so any provision could be made to relieve the necessities of these men, who have ever been true and faithful in keeping their people in obedience of all treaty stipulations. --Neither of these men have been addicted to the use of whiskey, so common among them, and Waishkey uses neither whiskey or tobacco, setting an excellent example to their people in this respect.

> When I first visited Iroquois Point, there was not a single garden or spot of ground enclosed or cultivated round the Indian houses.  I authorized the teacher of the school to enclose a garden and cultivate it last year.  He did so and his example and success has induced several to imitate it, and I was pleased to notice in my visit yesterday, several gardens enclosed and planted with various kinds of vegetables.

I wish if there are any funds belonging to this particular tribe that some might be had for the purpose named.[78]

In the monthly report for August, 1880, in which he also explained O-Shaw-wa-no's destitute circumstances, Lee commented on the ever present whiskey menace, noting at the same time the new lumber mill near Iroquois Point. This passage of his report stated:

> There are 23 whiskey dens in a community of about 1500 and the Point (i.e., Iroquois Point) aforesaid offers all the school privileges as well as religious instruction they receive -- The school at Iroquois Point has done tolerable well but the teacher for the past two years (John M. Johnston) has resigned and I have now engaged another to take his place and hope we shall be gratified with the results. The people at this point have been doing extremely well the past season all the young men having found employment at the mill, and in various duties pertaining to the manufacture of lumber upon a very extensive scale in their vicinity.

> Owing to the prevalence of an unusual drought this season the crop of potatoes upon which the Indians of all these localities depend upon the food to a large extent will be very small indeed -- up to the 25th of August there had been but very little rain since the 1st of July.[79]

The mill to which Lee referred was the new Bay Mill that had commenced operations on the hook of land projecting into Waiskey's bay, southeast of Iroquois Point. The mill provided badly-needed, though short-term, economic support for the community. The Reverend Pitezel, checking on his former mission field in 1882, received the additional information that the mill, located a mile and a half below the mission, employed a hundred men. At this little population center, "There are about twenty houses, a store, and a school house...the country back of it, and on the Tequamenon River, is rapidly settling." Referring specifically to the Indian Mission, the outlook in 1882 was discouraging:

---

[78] Lee to Commissioner of Indian Affairs, June 12, 1879. Nat. Arch. M 234, Roll 414:398-401.

[79] Lee to Commissioner of Indian Affairs, August, 1880. Nat. Arch. M 234, Roll 414:398-401.

> These are the Indians that were at this village
> ( i.e., Sault Ste. Marie) years ago.  They are rapidly
> decreasing; the young men moving away and the old
> people dying off.  About twenty-five families at
> present at the mission.  Government this year withdrew
> support from the school which leaves them without a
> resident missionary.[80]

Aside from the Iroquois Point community, about a hundred Indians were living in the village of Sault Ste. Marie, where the population had grown only to two thousand.  On Sugar Island, the population was "supposed to be near five hundred," but there is no indication of the number of Indian families.[81]  In Chippewa County, the remaining members of the Sault Ste. Marie bands still constituted a significant percentage of the total population.[82]  As Agent Lee had reported, there were over a thousand Indians within forty or fifty miles of Point Iroquois, a statement implying sizeable though scattered population.

In summary: Point Iroquois became the focal point for Indian affairs in the Sault region, during the quarter-century following the 1855 treaty.  Of the four areas set aside for the Sault bands by the First Clause of Article 1 of that treaty (i.e., Naomikong, Point Iroquois, Sugar Island and Hay Lake), Point Iroquois was the largest reserve in which land was actually alloted.[83]  Here three of the six bands named in the Treaty of July 31, 1855, selected lands by 1861.  In the final land assignment in 1871,

---

[80] John H. Pietezel, Lights and Shades of Missionary Life: New Edition with Important Supplementary Matter. (Cincinnati and New York, 1883), pp. 460-461.

[81] Ibid.

[82] By contrast, Marquette County had a population of 25 thousand and Houghton more than 22 thousand.  Population for the town of Marquette, which grew up at the site of the Carp river missionary station, was 7 thousand according to 1882 estimates.  Ibid., 450-451.

[83] Land allotments were made in all 9 sections ( amounting to approximately 9 square miles) at Point Iroquois, 5 sections at Sugar Island and less than 1 section total for Naomikong and Hay Lake, from the 32 sections reserved for the Sault Ste. Marie bands.  In terms of acreage, calculations indicate that approximately 6500 acres were alloted out of about 20,000 set aside by the Treaty of July 31, 1855.  HHT.

some selections were transferred to Point Iroquois from Sugar Island and arrangements were made to accommodate other band members living near the town of Sault Ste. Marie.  The population, which had increased from 700 to one thousand since the 1860's, remained strongly attached to the area but somewhat flexible as to residence.  Although part of O-Sha-wa-no's band located at least temporarily near Marquette, and an estimated one hundred Chippewa remained in town, the rural headquarters at Point Iroquois probably represented all the bands by the 1880's.

The Bay Mills, established in 1880, became a prominent landmark and replaced "Point Iroquois" and "Waiskey's Bay" as the common identification for that geographical area.  The name "Bay Mills" was given to the Indian school established near the lumber mill property, and ultimately to the Indian community which is still centered on the Bay.  The name survived even after the mill passed out of existence when the local forestry resources had been harvested.

The lumber mill, therefore, accounts for the origin of the name "Bay Mills" for the reservation that became the final land base for descendants of the Sault Ste. Marie bands of Chippewa, who in the treaties of 1836 and 1855 were included in the larger combination of bands called "The Ottawas and Chippewas of Michigan."

The Ottawa and Chippewa bands in Michigan were among the first Indians in the United States to be assigned individual land allotments.  This procedure became national policy with the passing of the General Allotment Act in 1887.  The forfeiture and attrition of Indian land holding among the Sault bands, indicated in the previous discussion, was characteristic of Indian experience throughout the country.  By 1934, Indian land holdings had decreased from 138,000,000 acres to 48,000,000 acres.  Revelation of this and other developments in the government-authorized Merriam Report of 1928 led directly to the passage of the Indian Reorganization Act in 1934.  The new law ended land allotment, instituted a program of land acquisition for Indian tribes, and enabled Indians to draw up constitutions for the government of their people, with approval of the Secretary of Interior.  Under the IRA Act, the Bay Mills Community adopted a constitution and ByLaws on November 4, 1936. Through land purchase, the present Bay Mills reservation now includes 2,189 acres of tribal land held in trust by the United States government.

III

FISHING:  THE IMPORTANT OCCUPATION


Fishing, both for subsistence and for trade, has been an ancient occupation in the vicinity of Sault Ste. Marie.  Before French traders penetrated the area in 1622, the Indians living in the Sault area participated in an extensive inter-tribal trading network, in which one of the items was fish.[84]  The principal entrepot for commerce in the Upper Great Lakes region was the place called Michillimackinac, present day Mackinaw City, on the straits between Lake Michigan and Lake Huron at the northern tip of the Lower Peninsula of Michigan.  Transportation was carried on almost exclusively by canoe, so the waterways were the main routes of travel.

The earliest French reports of the Chippewa [Ojibwa] at the eastern end of Lake Superior describe fishing at the rapids of the St. Mary's river and note that dried fish were sold at Michillimackinac.  The following translation of a French account written prior to 1702, was based on information gathered during the previous quarter-century:

> The Sauteurs [i.e. Sault Ste. Marie bands], who live beyond the Missisakis, take their name from a fall of water which forms the discharge of Lake Superior into Lake Huron, through extensive rapids of which the ebullitions are extremely violent.  Those people are very skillful in fishery which they carry on there, of fish which are white, and as large as salmon.  The savages surmount all those terrible cascades, into which they cast a net which resembles a bag, a little more than half an ell in width

---

[84]Leading traders of the northeast were the Huron, who drew a map for French explorers indicating twenty-nine tribes that understood their language.  The trading circuit included Sault Ste. Marie.  See George T. Hunt, The Wars of the Iroquois (Madison, 1940) pp 38 et. ff.

and an ell deep, attached to a wooden fork about fifteen feet
long.  They cast their nets headlong into the boiling waters,
in which they maintain their position, letting their canoes
drift while sliding backward.  The tumult of the waters in
which they are floating seems to them only a diversion; they
see in it the fish, heaped up on one another, that are endeav-
oring to force their way through the rapids; and when they
feel their nets heavy they draw them in.  It is only they, the
Missisakis, and the Nepiciriniens who can practice this fishery,
although some Frenchmen imitate them.  This kind of fish is
large, has firm flesh, and is very nourishing.  The savages dry
it over a fire, on wooden frames placed high above, and keep
it for winter.  They carry on an extensive traffic in this fish
at Michillimackinac, where both the savages and the French buy
it at a high price.[85]

Essentially the same protrayal of Indian fishing occupations at
Sault Ste. Marie was presented by Alexander Henry, the first English trader
to reach the Upper Peninsula after the French military defeats in Canada
during the French and Indian War.  Henry had joined General Amherst's
invasion of Canada in 1761, and reached the Sault area in May of 1762,
three months in advance of the British detachment dispatched to take over
the French fort.  He reported the Indian manner of catching fish at
St. Mary's rapids and preserving fish in the following paragraphs:

These rapids are beset with rocks of the most dangerous
description; and yet they are the scene of a fishery in which
all their dangers are braved and mastered with singular
expertness.  They are full of whitefish much larger and more
excellent than those of Michilimackinac, and which are found
here during the greater part of the season, weighing in general
from six pounds to fifteen.

The method of taking them is this:  each canoe carries two
men, one of whom steers with a paddle, and the other is provided
with a pole ten feet in length, and at the end of which is
affixed a scoop-net.  The steersman sets the canoe from the
eddy of one rock to that of another; while the fisherman in the
prow, who sees through the pellucid element the prey of which
he is in pursuit, dips his net and sometimes brings up at every
succeeding dip as many as it can contain.  The fish are often

---

[85]From La Potheries' Histoire de l"Amerique septentrionale (Paris
1753), La Potherie had a royal appointment in Canada in 1668, and had
access to writings of Perrot who had a long career in the upper Great Lakes.
He was in Sault Ste. Marie in 1671.  This quotation is from a selection
published in Emma Helen Blair, Indian Tribes of the Upper Mississippi
Valley (Cleveland, 1911) 2 vols. Vol. I pp. 275-576.

crowded together in the water in great numbers, and a skilful
fisherman in autumn will take five hundred in two hours.

This fishery is of great moment to the surrounding Indians,
whom it supplies with a large proportion of their winter's pro-
visions; for having taken the fish in the manner described, they
cure them by drying in the smoke, and laying them up in large
quantities.[86]

Henry also participated in the fall fishing season at the Sault,
when "several canoe loads" of fish were exported to Michilimackinac.
His full account states:

In the beginning of October the fish as is usual was in
abundance at the Sault; and by the fifteenth day of the month
I had taken upward of five hundred.  These I caused to be
dried in the customary manner by suspending them in pairs, head
downward, on long poles laid horizontally for that purpose and
supported by two stakes driven into the ground at either end.
The fish are frozen the first night after they are taken; and
by the aid of the severe cold of the winter they are thus pre-
served in a state perfectly fit for use even till the month of
April.

Others were not less successful than myself; and several canoe-
loads of fish were exported to Michilimackinac.....[87]

After a fire in December, 1762, destroyed the military barracks,
part of the stockade and all the provisions for the troops, the small
British contingent at the Sault was forced to subsist in the manner of the
native inhabitants.  The method for spear fishing through the ice is
vividly described by Alexander Henry on the basis of his experiences at
the Sault during the winter months of 1762-1763.  As Henry explained
in his autobiography:

The commandant and all the rest now lived in one small hours,
subsisting only by hunting and fishing.  The woods afforded us
some hares and partridges,and we took large trout with the spear.
In order to spear trout under the ice, holes being first cut of
two feet in height are built over them of small branches of
trees; and these are further covered with skins so as wholly to

---

[86]Alexander Henry's Travels and Adventures in the Years 1760-1776
Ed. by Milo M. Quaife (Chicago, 1921), p. 61

[87]Ibid., p. 63

exclude the light.  The design and result of this contrivance
is to render it practicable to discern objects in the water
at a very considerable depth; for the reflection of light from
the water gives that element an opaque appearance and hides all
objects from the eye at a small distance beneath its surface.

A spear head of iron is fastened on a pole of about ten feet
in length.  This instrument is lowered into the water; and the
fisherman, lying upon his belly, with his head under the cabin
or cover, and therefore over the hole, lets down the figure of
a fish in wood and filled with lead.  Round the middle of the
fish is tied a small packthread; and when at the depth of ten
fathoms where it is intended to be employed, it is made, by
drawing the string and by the simultaneous pressure of the
water, to move forward in the manner of a real fish.  Trout
and other large fish, deceived by its resemblance, spring toward
it to seize it; but by a dexterous jerk of the string it is
instantly taken out of their reach.  The decoy is now drawn
nearer to the surface, and the fish takes some time to renew
the attack, during which the spear is raised and held con-
veniently for striking.  On the return of the fish the spear
is plunged into its back; and, the spear being barbed, it is
easily drawn out of the water.

So completely do the rays of the light pervade the element
that in three fathoms of water I have often seen the shadows
of fish on the bottom, following them as they moved; and this
when the ice itself was two feet in thickness.[88]

In June, 1820, members of the first American expedition to reach
the Sault were impressed with the importance of fishing to the local
Chippewa bands.  The dependence upon fishing is noted both by Lewis Cass,
governor of Michigan territory and head of the expedition; and by
Henry R. Schoolcraft, minerologist, who returned in 1822 as first
American Indian agent when Fort Brady was established that year.

Reporting to the Secretary of War concerning the treaty with
the Sault Ste. Marie bands, negotiated on June 12, 1820, Cass explained:

You will find that the right of fishing is secured to them.
Common humanity, as well as their urgent entreaties required
such a stipulation in their favor.  The supply of fish at this

---

[88]Ibid., p. 65.  Sault Ste. Marie had only four houses in 1762;
one each for the commandant and the interpreter, and two serving as
barracks.  Only the interpreter's home escaped the flames.

place is abundant and inexhaustible.  It constitutes a considerable part of the food of the Indians upon this extensive frontier.  Deprived of this means of support, they must absolutely perish.  As a consequence of the right to fish upon the falls, the right of encamping upon the adjoining shore is guaranteed to them....[89]

Henry R. Schoolcraft's narrative similarly commented on the subsistence as well as the commercial aspects of fishing at the Sault for the Indian population.  In his narrative of the expedition, he observed:

It has always been the residence of Indian tribes, who are drawn to this spot in great numbers, by the advantages of taking the white-fish are very abundant at the foot of the rapid.  There are, at present, [June, 1820] about forty lodges of Chippewa Indians (called Saulteurs by the French) containing a population of about two hundred souls, who subsist wholly upon the white-fish....These fish are preferred by most of our party to the Mackinac trout.  Their abundance may hereafter render them an important article in the commerce of the upper lakes.....

Later in the same passage of his book, Schoolcraft elaborated on the subject of the important fishing resources, at the same time calling attention to the strategic location of the St. Mary's river waterway:

By this place all the fur trade of the northwest is compelled to pass, and it is the grand thoroughfare of Indian communication for the upper countries, as far as the arctic circle.  Independent of these circumstances, the advantages of taking the white-fish, at the foot of the Rapids, have always rendered it a place of resort to the Indian tribes of the region, particularly during the summer season when the hunting is most precarious.[90]

Travellers only occasionally  reached the remote frontier on Lake Superior so that there are few records of this class that provide

---

[89]Cass to J. C. Calhoun, Secretary of War, June 17, 1820 in Clarence C. Carter, ed. The Territorial Papers of the United States, Vol. XI, Michigan, 1820-1829, p. 36.

[90]Henry R. Schoolcraft, Narrative Journal of Travels...in the Year 1820 (Albany, 1821), pp. 132-135.

real insight into Indian life.  Johann G. Kohl, an unusually inquisitive traveller, drew considerable knowledge from his French informant concerning the extensive Chippewa vocabulary for fishing occupations. Although he was apparently inaccurate in stating that the Chippewa have a general term for fishing, his other data on terms for different kinds of fishing are corroborated by later linguistic research.  Present day evidence indicates that the only general Chippewa term referring to fishing, "gigo$^n$ike," actually means "processing fish."[91]

The Chippewa words for fishing differentiate all the various fishing methods.  As Kohl reported:

"Nin pagidawa" means "I catch fish with nets;" "Nin Pagibadi", "I catch fish with a line on which there are many hooks."  "Nin akawa" means "I fish with a spear."  We would certainly convey this idea in English with one word, "I spear," still it would not be so comprehensive as the Indian word, in which it is explained that the fish is speared.

They also have a separate term for spearing fish by torch-light; they call it "wasswewin" (fishing with a spear in the light).

"Nin wewebanabi" signifies:  "I fish with a hook;" it is the only term of the whole category which we can render in one English work, "I angle."[92]

Of all the fishing methods, Kohl judged that spearing was the most important, and was in winter "almost the sole method of catching fish." His description of fishing through the ice is so close to those already cited that there is no need to add his version.  He does include some information on types of spears, one operating like a harpoon.  As he explains:

---

[91]The 'ike' suffix means "process" or even "manufacture."  For example, "mi$^n$ike" means "to process (dry, can, etc.) berries", not gathering berries. [Personal communication, Dr. Nancy O. Lurie, Director of the Milwaukee Museum to HHT, October 24, 1973]

[92]Johann C. Kohl, Kitchi-Gami (London, 1860), pp. 326-327.

I saw nearly all their varieties of fishing-spears. They call them generically "anit" but have special names for the various sorts. They all appeared to be neatly made, and admirably adapted for the purpose. Some had two prongs, others three. In the trident the center prong is shorter than the other two, which diverge slightly. At times they use several short central prongs, while they all have barbs on the outer sides.

For catching larger fish they also have a species of spear-head, which, on striking comes loose from the pole, and is merely attached to it by a cord. The fish darts off, dragging the wooden bob after it, gradually becomes exhausted, and is captured without difficulty.[93]

Pitezel's account of missionary experiences at the Sault beginning in 1843, devotes one brief section specifically to fishing:

From the time that we had reached Mackinaw we had often shared in the luxury afforded by the delicious fishes abounding in those waters. In the spring and fall the far-famed whitefish are caught plentifully in scoop-nets, just at the foot of the Rapids. Trout are also abundant, including the speckled, or brooktrout, a rare pan fish. Pickerel are caught in the spring and fall, and barreled in large quantitites, at Muddy Lake, several miles downriver from the Saut. Another excellent fish is the herring. These run in schools at certain season, winter and summer, and are caught either in gill-nets or with the spear. The latter method furnishes great amusement to the natives in the winter season. Some of the mission boys exhibited much dexterity in this line, and in the season, kept us in fish.[94]

Since fish constituted a significant part of their diet, the Sault Ste. Marie population developed a variety of cooking techniques. Henry R. Schoolcraft, who recorded so many aspects of Chippewa life, also reported on fish preparation. Following a description of netting whitefish at the rapids, which he counted a "highly celebrated locality," he continued:

---

[93]Ibid., p. 328-331.

[94]Pitezel, Lights and Shades, p. 52

The fish will average three pounds, but individuals are sometimes two or three times that weight....The flesh is perfectly white and firm, with very few bones.  It is boiled by the Indians in pure water, in a peculiar manner, the kettle hung high above a small blaze; and thus cooked, it is eaten with the liquid for a gravy, and is delicate and delicious. If  boiled in the ordinary way, by a low hung pot and a quick fire it is soft and comparatively flabby.  It is also broiled by the inhabitants, on a gridiron, after cutting it open on the back, and brought on the table slightly browned. This must be done, like a steak, quickly.  It is the most delicious when immediately taken from the water, and connoisseurs will tell you, by its taste at the table, whether it is immediately from the water, or has lain any time before cooking.  It is sometimes made into small ovate masses, dipped into batter, and fried in butter, and in this shape, it is called petite pate. It is also chowdered or baked in a pie.  It is the great resource of the Indians and the French, and of the poor generally at these falls, who eat it with potatoes, which are abundantly raised here.  It is also a standing dish with all.[95]

In citing the regional preference for white fish, Kohl quoted his French informant:  "Mais la force c'est le blanc" -- the "poisson blanc." He continued:

This fish may be called the daily bread of the fisherman on this lake [Superior]; for it is, in the first place, and the most abundant, and may be caught the whole year through; and then it is the most wholesome sort of fish, and has a very agreeable taste.  The meat is snow-white, and, when carefully boiled, rather flaky, though never dry.  You can eat it for breakfast dinner and supper, without growing surfeited -- especially when cooked by Indian women, for they manage to serve it up deliciously.

The Indians are very particular about their food, and this is especially the case with the atikameg (the Indian name for blanc) and if it should happen to be watery, or overboiled, the severe head of the house is sure to give a hint.

After discussing the relative importance of hunting and fishing for Chippewa living along the lakeshore and in the interior country, Kohl correctly concluded:

---

[95] Henry R. Schoolcraft, Personal Memoirs of a Residence of Thirty Years With the Indian Tribes on the American Frontiers (Philadelphia, 1851) p. 123.

But for all that, the lake people are passionate hunters too, and the "people of the interior" come at times long distances to profit by the fisheries.  The migrations of the fish, their regular arrival and departure, the periods of their spawning, being out of season and becoming in condition again, hence have a material influence on the movements of the population.[96]

Although the Sault Ste. Marie bands moved about to take advantage of fishing runs, they selected sites for main bases near established fishing grounds, usually by river mouths and creek entrances on Whitefish Bay or along the channel of the St. Mary's river.  The familiar fishing grounds were:  Whitefish Point, Shelldrake River, Taquamenon River and Island, Naomikong, Point Iroquois, Red Carp River [now Waiska] on Waiskee's Bay, St. Mary's Falls, Little Rapids, Sugar Island, Hay Lake [Nicolet] and Mud Lake [Munuskong].  (See Map 1)  The missionary John Clarke reported a customary cycle of events, in writing from Sault Ste. Marie in July 1836:

They [Indians] left the village at the time of making sugar – and returned to plant since when they have resided at their different fishing stations more or less.[97]

When the missions were founded, their location was made with attention to the availability of fishing resources.  In 1833, the first Methodist mission, originally planned for Sugar Island, was changed to the Little Rapids, two miles below Fort Brady, because the Indians decided Sugar Island was too far from the fishing place at Little Rapids.[98]  The selection of Naomikong for a mission house in 1849 was based on the same consideration.  As Pitezel stated:

This place [Naomikong] has been noted as a great fishery, and hence the desire of the Indians to concentrate here.[99]

---

[96] Kohl, Kitchi-Gami, p. 329.

[97] John Clarke to Henry R. Schoolcraft, July 2, 1836, Nat. Arch. M 1, Roll 41:5

[98] Extract of Letter of F. Audrain, June 22, 1833, Nat. Arch. M 1, Roll 71:84.

[99] Pitezel, Lights and Shades, p. 227.

For the Sault Ste. Marie bands, fishing continued to be important in the exchange economy as well as in the subsistence economy. With the depletion of the fur-bearing animal population on the Upper Peninsula and consequent decline of the fur trade, the fishery resources assumed a greater significance.[100] When Ramsay Crooks reorganized the American Fur Company in 1834, he founded a commercial fishing enterprise with head-quarters at La Pointe, largest of the Apostle Islands off Chequamegon Bay in Lake Superior. Among the auxiliary fisheries contributing to the American Fur Company shipments were White Fish Point and the Sault. In describing the American Fur Company's fishing industry, historian Grace Nute wrote:

> At the Sault many fish were taken in the rapids; pickerel were caught there as well as many other varieties. Gabriel Franchere was in charge of this station and attended to the receiving of fish from La Pointe and the shipping of all the Lake Superior fish to Detroit....William Brewster was in charge at Detroit, both of the forwarding of furs, salt, and provisions, and of the marketing of fish.[101]

Gabriel Franchere, in charge of American Fur Company operations at Sault Ste. Marie, made agreements with twelve men to handle the fishing at White Fish Point for the spring of 1835, some on wages and the rest to be paid four dollars for every hundred fish delivered. By May 27, three weeks after the season started that year, his employees had salted twenty barrels at the Sault and thirty barrels at White Fish Point. The catch diminished by mid-summer because of a shortage of "twine" and hooks.[102]

The importance of commercial fishing can be seen by the inclusion in the 1836 treaty of a clause providing an annual supply of 100 barrels of salt and 500 fish barrels for the Ottawa and Chippewa. The treaty

---

[100] Bela Chapman, an American Fur Company employee heavily in debt from extending credit in the Indian trade wrote to Gabriel Franchere, May 6, 1835: "...let Charles [Holiday ?] get all the sugar and fish on the old accounts he can." Gabriel Franchere Papers, Box 1, Clarke Historical Library.

[101] Grace Nute, "The American Fur Company's Fishing Enterprises," Mississippi Valley Historical Review, Vol. XII (1926), p. 493. Based on American Fur Company papers in New York Public Library.

stipulated in Article Fourth, Sixth Clause, that this federal support for Indian commercial fishing would continue for twenty years.

The American Fur Company's fishing industry ended in 1842, when the firm failed as a result of business depression, but commercial fishing at the Sault continued under the direction of other firms. The extent to which fishing had augmented the fur trade in the Indian economy is indicated in reports from the Sault Ste. Marie Indian agency for two years, 1842 and 1844.

In 1842, the general financial outlook was still poor as a result of the depression period beginning in 1837. This economic factor was reflected in the fall report of the Indian agent at Sault Ste. Marie:

> ...In their hunts, the Indians have not taken more than two thirds of the quantity of furs they usually dispose of to the traders. They have, however, not been in want of food, as fish were caught in abundance the whole season and no complaints were made during the winter. In consequence of the low price of fish, few were sold to the traders. When the demand for this article is brisk, they realize from the sale of it a considerable portion of their winter supplies. As they have large patches, a sufficiency of potatoes for the ensuing winter is expected. The sugar made last spring equals the quantity made in favorable seasons....[103]

The situation was improved two years later when the agent James Ord reported in September, 1844:

> There has been some change in the condition of the Indians in this sub-agency since my last report. Instances of intoxication are not so frequent.
>
> The proceeds from their hunts have been with few exceptions applied to the payment of their debts to the traders for articles of subsistence and clothing. Those who were engaged in fishing have done better this season than for several previous ones, owing to the demand for fish.....

---

[102] Franchere to Ramsay Crooks, May 27, 1835; Franchere to William Brewster, July 3, 1835. Gabriel Franchere Papers, Box 1, Clarke Historical Library.

[103] James Ord, to Robert Stuart, Acting Supt. of Indian Affairs in Detroit, September 1, 1842. Nat. Arch. M 234, Roll 771:15. [Robert Stuart had a long career as a principal agent of the American Fur Company. HHT]

They manifest a greater disposition to live in houses than heretofore. Their crops of potatoes are greater than they were last year....[104]

A long term reliance on fishing was predicted by the missionary Pitezel, on the basis of his observation of Indian life in the Sault vicinity between 1843 and 1852. Salting fish and packing them in barrels for shipment was an occupation noted by Pitezel when he visited the Chippewa encampment on Mud Lake, below Nebbish Island. Referring particularly to the Indians living near the Naomikong mission on Whitefish Bay, he wrote:

> ....From their proximity to the Lake, and their superior skill as fishermen, fishing must always be one of the pursuits of this people, and one which, if properly followed, may be made lucrative. It must be to them what the farm and trade is to many others.[105]

The economic picture that seemed somewhat brightened and diversified in 1844 had noticeably faded by the post-Civil war era.[106] H. G. Alvord, in a special report on Michigan Indians in 1866, remarked after visiting Sault Ste. Marie, that "the Indians there depend mostly on fishing".[107] The Treaty of 1855 granted aid for agriculture and building for a period of five years, while the annuities and payments for education lasted ten years, beginning in 1856. The straitened financial circumstances of the Sault bands, and other Ottawa and Chippewa, were in a measure due to receiving devalued currency during the Civil War years, 1863 and 1864. A special act of Congress passed July 15, 1870 provided for a per capita distribution of an additional $39,000 to compensate the Indians for this earlier monetary loss.[108] In March, 1870, before these

---

[104] James Ord to Robert Stuart, Sept. 30, 1844. Nat Arch. M 234, Roll 771:92.

[105] Pitezel, Lights and Shades, pp. 52, 367.

[106] Michigan Indians formed a special sharpshooter brigade serving in the Civil War. HHT.

[107] Report of H. J. Alvord to L. V. Bogy, Commissioner of Indian Affairs, November 16, 1866. Nat Arch. M 234, Roll 407:855. The entire report includes frames 853-865.

additional funds were secured, the Indians at the Sault were reported in starving condition.  March was always a lean month for residents of the Upper Peninsula, but the food scarcity was critical at winter's end that year.  General John Pope sent a telegram on March 22, 1870 from Detroit to Washington requesting relief.  Propably because navigation was not yet open, he informed the War Department that "only the commissary at Fort Brady could supply bread and meat at that season."  The message included the inquiry:

> Shall I order the officer at Fort Brady to sell to the Indians bread and meat to be paid for on delivery?[109]

He received a favorable reply on March 29, granting permission for the "necessary sale", but the question remains as to where starving Indians would get money to pay the army commissary for food.

The fishing skill of the Chippewa continued to be an eye-catching spectacle that impressed all visitors to Sault Ste. Marie.  A guide to the Upper Peninsula, published in 1872, described the contemporary scene along the canal and river.  Following the preliminary explanation that the village of Sault Ste. Marie, founded in 1668, now had 1200 inhabitants on the American shore, the guide continued:

> Many of the inhabitants, Indians and half-breeds in the vicinity, are engaged in the fur trade and fisheries; the latter being an important and profitable occupation, here being taken large quantities of white fish.....

> The scene, as witnessed from the deck of the steamer on passing through the locks, is of the most interesting and exciting character.  The Ship Canal - the River - the Islands -- the two villages in sight on either side of the stream, and

---

[108]T. W. Ferry, Member of Congress, Fourth District of Michigan, to Commissioner of Indian Affairs, July 15, 1870.  That day, the bill passed both houses of Congress appropriating the $39,000 to cover difference between currency and coin.  Nat Arch. M 234, Roll 409:39-40.

[109]General Pope to the War Department, March 22, 1870.  Nat Arch. M234, Roll 409:6.  This was a time when land tenure was still uncertain, too.  HHT.

> the Indians in their birch canoes, engaged in taking white
> fish below the Rapids, are all in view at the same time,
> presenting altogether a magnificent panorama.

Commenting on the scene from the village, the guide states:

> From this point is afforded a grand view of the Rapids and
> islands lying in the river, while the scene is usually enlived
> by seeing Indians taking white fish by means of scoop nets.[110]

Although the prime fishing location at the head of the falls had
been destroyed by the ship canal, the traditional fishing practice was
still carried on in other parts of the rapids of the St. Mary's river.
The description from the 1872 guide is remarkably similar to the more
detailed accounts of previous centuries.  The same guide also noted that
in 1871, a total of 36,199 barrels of salt passed through the canal into
Lake Superior; and exports included 59,325 half-barrels of fish.

In Summary:  Throughout their history, the Sault Ste. Marie
Chippewa bands were dependent upon fishing.  They acquired a detailed
knowledge of fishing habits, techniques, and devices for catching fish,
and methods for cooking and preserving fish.  The Chippewa developed a
specialized vocabulary to describe their different fishing activities.
The location of fishing runs and availability of fish to a large extent
determined their dwelling sites and mobile life style.  Dried and smoked
fish was an item of exchange in the Indian trade before Europeans came to
the Upper Peninsula.

Fish from Lake Superior and the St. Mary's river were salted and
packed in barrels in the nineteenth century, when steamship navigation
made it possible to ship products to the lower lake ports of Detroit and
Cleveland.

For the Sault Ste. Marie Indians, fish constituted the most indis-
pensible resource in their natural environment.  Fishing for subsistence
and trade or sale was the most vital occupation in which these bands
engaged.

---

[110] J. Disturnell (comp.) Lake Superior Guide....also Commercial
Statistics, (Philadelphia, 1872) pp. 11, 14.

IV

THE SAULT STE. MARIE BANDS AND THE

TREATIES OF 1820, 1836, AND 1855

Since fishing was such a vital part of existence for the Sault
Ste. Marie Chippewa, it is natural that references to fishing should be found
in their treaties with the United States.  The Sault bands reserved areas
with access to fishing grounds in all three of their land cession
treaties:  1820, 1836, and 1855.

The Treaty of June 16, 1820, negotiated by Michigan territorial
governor Lewis Cass, ceded to the American government sixteen square miles
on the St. Mary's river (7 Stat. 206, 2 Kapp. 187).  The  area was
roughly four miles square, beginning at the Big Rock in the river channel
(above the falls and about a mile and a half west of Fort Brady, and
extending along the curve of the river shore as far down as the Little
Rapids, about two miles east of Fort Brady.  This base line was a little
short of four miles, and the overall cession was to be projected inland to
include a total of sixteen square miles.[111]

Within the land ceded by the 1820 treaty, the Sault Ste. Marie bands
insisted on retaining their traditional fishing site at the head of the
rapids, a place which was also an ancestral burying ground.  Recognizing
their dependence upon the fishery at St. Mary's falls, Cass established in
the four mile square cession, a "permanent reserve" and "perpetual fishing
right" described in Article 3 of the brief Treaty of 1820:

> The United States will secure to the Indians a perpetual right
> of fishing at the falls of St. Mary's, and also a place of
> encampment upon the tract hereby ceded, convenient to the
> fishing ground, which place shall not interfere with the
> defenses of any military work which may be erected, nor with
> any private rights.

---

[111]The "Treaty Rock" is marked on H. C. Thompson's Map of Chippewa
County, Michigan (1896).  See also Schoolcraft 1837 Map, Footnote 115.

According to Charles C. Royce, this reserve for fishing and encampment was located in Township 47 North, Range 1 East, and comprised fractional sections 4, 5, and 6; or most of the actual river front included in the 1820 land cession.[112]   The shoreline outside the Indian fishing reserve just described consisted of only a mile and a half above the falls to the Big Rock, and about a mile below the reserve, to the Little Rapids boundary.[113]

The mention of defenses and military work in the treaty indicates the significance of the land cession to American authorities.  The animosities created by the War of 1812 had not abated in this region that had been part of Upper Canada until 1796.  The St. Mary's river was the border between American and British territory, and it was important for Americans to establish friendly relations with the previously hostile residents.  The new frontier outpost was also intended to promote the interests of American fur traders in competition with the powerful British concern, Hudson's Bay Company.  Fort Brady became useful to the Sault Ste. Marie bands and to Chippewa who visited all the way from western Minnesota and adjacent Canadian territory.  The blacksmith at the fort fashioned fishing spears and ice cutters, repaired guns and traps.  As Indian agent, Henry Schoolcraft distributed rations in time of food scarcity, most often in March, and provided such goods as axes and hatchets when groups were dispersing to winter camps.

The Treaty of March 28, 1836, the major land cession treaty of the Sault Ste. Marie bands, likewise reserved land with access to valuable fishing grounds (7 Stat. 491, 2 Kapp. 450).  The total land cession encompassed all of the Lower Peninsula not ceded by previous treaties, i.e., the area north of the Grand River and west of Thunder Bay River.

---

[112]Charles C. Royce, Indian Land Cessions, p. 701.  Royce mapped the 1820 land cession incorrectly as No. 112 on "Michigan Map 1".  Schoolcraft's 1837 map legends the "permanent reserve" of the 1820 treaty. HHT.

[113]Thompson's Map of Chippewa County (1896) shows a mission reserve at Little Rapids, surveyed before the public land survey was extended over this area.  The western boundary of this 640 acre reserve conforms in location and angle (perpendicular to shoreline) to the boundary of the sixteen square mile military reservation described in the 1820 treaty.  HHT

In the Upper Peninsula, the 1836 land cession extended west to the Escanaba river flowing into Little Bay de Noc, considered part of Green Bay. On the Lake Superior shore of the Upper Peninsula, the 1836 land cession extended almost to modern Marquette, the land mark in the language of the treaty being the mouth of the Chocolate river.[114]

The reservations for the Chippewa bands of the Upper Peninsula are described in Article Third of the 1836 treaty, following the description of Lower Peninsula reserves in Article Second.  The lengthy Article Third lists nine reserved areas:  the first four applying to the bands centered about Mackinac, and numbers five through nine for the bands in the Sault Ste. Marie division.

One further explanation should be made before quoting Article Third of the 1836 treaty in full.  The seventh reserve, at the base of Whitefish Bay, has its eastern boundary stated as the "Pississowining" river, a name which must have been one of Schoolcraft's inventions.  The word is found nowhere except Article Third of the 1836 treaty.  Fortunately Schoolcraft made an understandable, if crude map of all nine reserved areas in the Upper Peninsula on which the modern Waiska river is easily identified.[115]  It is the only river fitting the geographical description of the river to which the fictitious name "Pississowining" is given in Article Third of the treaty.

---

[114] See Map 2 of this report.  The 1836 land cession is identified as No. 205 on Map "Michigan 1" of Charles C. Royce, Indian Land Cessions.

[115] Henry R. Schoolcraft, Ms.  A map of the Acting Superintendency of Michigan, enc. in Schoolcraft to C. A. Harris, Commissioner of Indian Affairs, Michilimackinac, Sept. 15, 1837.  Nat Arch., Records of the Bureau of Indian Affairs (RG 75), Letters Received, 1837.  Michigan Superintendency, S 334.  Schoolcraft's map represents the extent of geographic knowledge of Michigan in 1836.  No surveys had been made north of the Grand River, nor beyond Saginaw.  On contemporary maps published 1834 - 1837, the Lake Michigan shoreline was as distorted as on seventeenth century French maps.  HHT

Article Third of the Treaty of March 28, 1836 reserved for Ottawa and Chippewa bands, the following areas in the Upper Peninsula of Michigan:

[1] Two tracts of three miles square each, on the north shore of said straits [Mackinac[, between Point-au-Barbe and Mille Coquin river, including the fishing grounds in front of such reservations, to be located by a council of chiefs. [2] The Beaver island of Lake Michigan for the use of the Beaver-island Indians. [3] Round island, opposite Michilimackinac, as a place of encampment for the Indians, to be under the charge of the Indian department. [4] The islands of the Chenos [Le Cheneaux], with a part of the adjacent north coast of Lake Huron, corresponding in length, and one mile in depth. [5] Sugar island, with its islets, in the river of St. Mary's. [6] Six hundred and forty acres, at the mission of the Little Rapids. [7] A tract commencing at the mouth of the Pississowining [Waiska] river south of Point Iroquois, thence running up said stream to its forks, thence westward, in a direct line to the Red water lakes, thence across the portage to the Tacquimenon river, and down the same to its mouth, including the small islands and fishing grounds, in front of this reservation. [8] Six hundred and forty acres, on Grand Island, and two thousand acres on the main land south of it. [9] Two sections on the northern extremity of Green Bay [Bay de Noc], to be located by a council of the chiefs. All the locations, left indefinite by this, and the preceding articles, shall be made by the proper chiefs, under the direction of the President. It is understood that the reservation for a place of fishing and encampment, made under the treaty of St. Mary's of the 16th of June 1820, remains unaffected by this treaty.

A tract of six hundred and forty acres at Little Rapids, corresponding to Reserve No. 6 in Article Third of the 1836 treaty appears on an 1896 survey map of Chippewa County. The Sugar Island reserve [No. 5] and the Whitefish Bay Reserve [No. 7] required no surveys, since they could be identified by geographical landmarks. There is no indication of surveys in the Upper Peninsula other than at Little Rapids.

The instructions given treaty commissioner Henry Schoolcraft by Lewis Cass, Secretary of War, included the following statement on the subject of reservations:

...if it should be found necessary to allow particular bands to remain upon reservations, those reservations must be held

> upon the same tenure as the Indians now hold their country,
> that is, to allow them to retain possession of it 'till it
> shall be ceded to the United States.[116]

The treaty signed by the Ottawa and Chippewa delegates in Washington placed
no time limit upon the occupancy of the reservations described in Articles
Second and Third of the 1836 treaty. Yet they had little security in the
possession of these lands because the treaty was amended without their
prior consent to restrict the time of land use to:

> ....the term of five years from the date of ratification of
> this treaty, and no longer, unless the United States shall
> grant them permission to remain on said lands for a longer
> period.

In practice, the Indians were permitted to occupy their reserves until the
Treaty of July 31, 1855 set aside areas for "permanent homes" for the bands
who were parties to the 1836 treaty.

Aside from Article Third in which land and fishing grounds were
reserved, two other articles of the 1836 treaty, the fourth and thirteenth,
contained references to fishing. Article Fourth listing "Payments to be
made to the Indians" has as part of the sixth clause:

> ....one hundred barrels of salt, and five hundred fish
> barrels, annually, for twenty years.

Indians used these supplies in processing fish for sale. The article of
the treaty, Article Thirteenth stated:

> The Indians stipulate for the right of hunting on the lands
> ceded, with all the usual privileges of occupancy, until the
> land is required for settlement.

The phrase "all the usual privileges of occupancy" is a broad term,
including the right to fish and utilize the natural environment in many
ways:  cut ash saplings for baskets and wood for fuel, collect rushes
for weaving mats, gather berries and medicinal herbs, and make maple
syrup. A clause stating the right to the traditional use of natural

---

[116]Lewis Cass, Secretary of War, to Henry R. Schoolcraft, March 14,
1836. Nat Arch. M 1, Roll 72:462-465. The complete letter of instruction
is in Appendix A of this report.

resources in ceded land appeared first in Article VI of the Treaty of Greenville in 1795, and was repeated in the seven subsequent land cession treaties involving Michigan tribes, with slight variations in explicit mention of hunting, fishing, planting, dwelling, and sugar making.  The broader term "all the usual privileges of occupancy" appears first in the 1836 treaty with the Ottawa and Chippewa; and is repeated in Article II of the Treaty of La Pointe in 1842 when the balance of Michigan's Upper Peninsula was ceded by the Chippewa.  (The list of treaties and pertinent clauses is found in Appendix D of this report.)

For the Ottawa and Chippewa, there was a real need to include provisions in the 1836 treaty that would protect their fishing grounds. Indian fishing rights had become an issue both at Mackinac and Sault Ste. Marie by 1833.  The rights and regulations involved were more extensively argued in the controversy centered at Mackinac.  Here the trading firm of Biddle and Drew, a part of the American Fur Company, tried to gain exclusive use of the fishing area east of Mille Coquin on the north shore of Lake Michigan.  These fishing grounds had customarily been used by the Ottawa of Little Traverse Bay and L'Arbre Croche, as well as the bands west of St. Ignace and the Mackinac families of French and Indian heritage. The strategy of the trading firm was to get "permission" from a spurious "chief" and request confirmation by the Indian department in the form of a license that would exclude the traditional users.  The power to grant licenses for hunting, fishing, trading, and even entering the unceded Indian territory as missionaries, belonged to the Indian Agent, in this case, Henry R. Schoolcraft, in consultation with the Commissioner of Indian Affairs.  The verdict of the federal commissioner affirmed the importance of Indian rights and federal law, declaring that no such exclusive privilege could be granted.

The principal documents setting forth the facts of the fishing rights controversy at Mackinac begin with a letter from Robert Stuart, an agent of the American Fur Company in Mackinac, to Lewis Cass, Secretary of War, December 3, 1832:

I am requested by Messers. Edward Biddle and John A. Drew and Wm. Sylester, who are connected with the American Fur Company, to represent to you, that they have at considerable labor and expense, built houses, and cleared out two places to drag seines for whitefish, between the river Milles Coquins and River La Carpe (on the N.W. shore of Lake Michigan) which are say two miles apart, and about 50 miles from Mackinac — that they have paid the Indians, and have their sanction; but in order to secure themselves from intrusion – they are aware, that they must have your confirmation of their exclusive right, which I, in their behalf beg you will have the kindness to send them, at your early convenience – I will not trouble you with further detail. It is a matter not involving the rights of others, but merely extending an act of kindness to these gentlemen, which their character and industry render them worthy of. Your early attention will confer a personal favor.....[117]

Robert Stuart's personal letter made the rounds in Washington rapidly from the Secretary of War to the Commissioner of Indian Affairs, and was enclosed with the reply of Commissioner Elbert Herring to Henry R. Schoolcraft, dated December 27, 1832. On the subject of the trading firm's fishing license request, Herring wrote:

If you have no objections to the request being granted, you will permit them to fish at the places mentioned, subject however to such conditions as you may see fit to impose for the security of Indian rights and the observance of existing laws. The privilege is to be continued, however, only during the pleasure of the government and of the Indians, and to be revoked at any time when yourself or your successor in office may deem it advisable.[118]

The background facts came to the attention of the Indian department the following June, when an angry delegation of Chippewa and Ottawa came to Mackinac to protest. Henry Schoolcraft was in Detroit at the time, and learned of the protest from his brother-in-law, George Johnston who wrote from the sub-agency at Michilimackinac on June 20, 1833:

---

[117] Stuart to Cass, Dec. 3, 1832, Nat Arch. M 1, Roll 68:550.

[118] Herring to Schoolcraft, Dec. 27, 1832. Nat Arch. M1, Roll 68:578

A party of Chippewa and Ottawa Indians consisting of women and men in fourteen canoes arrived and landed at this post yesterday, headed by their chiefs Apahcousigan, Ainse and Mahcousweanaw, and assembled this day and held a council at this office, in order to ascertain facts in relation to the fishing ground situated on the North Coast of Lake Michigan and apparently given up to Messrs. Biddle and Drew by Nabanoi. The chiefs appeared very much incensed with Nabanoi's conduct for presuming in the first place to clothe himself with such authority, and in the second case, not making known and consulting the real chiefs who owned the Land and the fishing grounds on the said coast. The chiefs proved Nabanoi to be of spurious origin and but recently subsisting himself on that shore, and remonstrated against such conduct, and observed by saying that all the poor class of whites and Indians, would be injured and suffer by it, in as much as they would be deprived of subsistence were this exclusive priviledge granted — the Indians were fully aware that the traders were to blame, making application and trusted that their great Father would not allow this to take place.[119]

Schoolcraft who had not as yet issued any license to Biddle and Drew, made one further inquiry to Washington. Commissioner Elbert Herring in a letter dated June 27, 1833, answered by restating his opinion of the previous December:

In reply to your letter of 7th inst., relative to a petition of a number of persons for fishing privileges I would observe that it was never intended to confer an exclusive fishing privilege on Biddle and others.

The power given you on this subject in my letter of 27th December last [See Footnote 118] was thought to be sufficiently comprehensive; and it is not considered advisable to vary the conditions upon which you may grant the privilege. Much was then and is now left to your discretion in the premises.[120]

The four letters quoted above, indicate the probable reason that the Ottawa and Chippewa reserved two fishing sites on the north coast  of

---

[119]George Johnston to Schoolcraft, June 20, 1833.  Nat Arch M 1, Roll 71:60.

[120]Herring to Schoolcraft, June 20, 1833.  Nat Arch, Roll 71:68.

Lake Michigan in the very first clause of Article Third of the 1836
treaty.  A-pah-ko-sigan, who headed the protesting delegation at Mackinac
in June, 1833, was an active participant in the 1836 treaty negotiations
in Washington.

In June, 1833, Sault Ste. Marie bands were protesting against inter-
ference with their coveted fishing reserve at St. Mary's falls, and general
encroachment.  Francis Audrain informed Schoolcraft in a letter of
June 13, 1833, that two chiefs and about "twenty-five or thirty followers,
principally of the Home band, had visited the sub-agency office in
Sault Ste. Marie.  He continued:

> The visit was an unexpected one to me.  Kawguash and
> Shingwak made speeches, the tenor of which were com-
> plaints against the white people for building houses
> and fishing on the reservation above the garrison, and
> destroying their timber on Sugar Island.[121]

Schoolcraft must have received more complaints from the Sault bands as well
as more requests for fishing privileges from the small non-Indian population
than were recorded in his correspondence.  At the end of a letter written
September 23, 1835, suggesting strategy for securing a land cession from
the Sault bands, he concluded:

> This course [securing a land cession] would rid us of the
> complaints of the Indians for trespasses  on their lands
> and would also permit the citizens on the straits of
> St. Mary's to occupy without license the fishing grounds
> for which they have (within the past year) been so
> clamorous.[122]

The "clamor" of Sault Ste. Marie inhabitants to acquire Indian fishing
grounds probably led to the Sault bands' insisting that their "permanent
reserve" specified in the 1820 treaty be reaffirmed in the 1836 treaty.

The articles in the 1836 treaty concerning fishing and fishing
grounds, i.e. the Third, Fourth and Thirteenth, are embedded in a lengthy

---

[121]F. Audrain to Schoolcraft, June 13, 1833.  Nat Arch. M1, Roll 71:48

[122]Schoolcraft to Major Cobbs, September 23, 1835.  Nat Arch. M1,
Roll 69:121.

document with a Supplementary Article and six amendments that cover seven pages in Volume VII of United States Statutes at Large. The treaty as a whole represents a combination of special objectives desired by the individuals and groups who began assembling in Washington in November, 1835, and finally concluded a treaty on March 28, 1836.

Schoolcraft had been aware of the growing pressure for a further land cession in Michigan since 1833. In the early fall of 1835, he was sounding out Indian attitudes on the basis of a request for information from the War Department – a request triggered by his own suggestions.[123]

A special objective of the Indians in both the Sault Ste. Marie and the Mackinac districts was to have guaranteed blacksmith services. There had been a big uproar in 1834, when federal legislation decreed the closing of the blacksmith shops at Sault Ste. Marie and Mackinac at the same time that Schoolcraft was arranging (finally) to survey the reservation at Mackinac granted by the Treaty of Greeneville in 1795. The chiefs knew about the Mackinac reserve, but also recalled they had of their free will given the federal government Bois Blanc Island in 1795, and felt that the least the government could do was continue to provide the services of blacksmiths.[124]

---

[123] Schoolcraft to Herring, Commissioner of Indian Affairs, September 12, 1835. Nat Arch. M 1, Roll 69:119. Herring to Schoolcraft, August 29, 1835. Nat Arch. M 1, Roll 72: 217. See also "Schoolcraft to S. T. Mason (Acting Gov. and Supt of Ind. Affairs in Michigan), Sept 17, 1835. Nat Arch. M1, Roll 69:120.

[124] Schoolcraft to Mason, August 18, 1835. Petition of Chiefs to Andrew Jackson, enclosing speeches of chiefs from Mackinac and L'Arbre Croche, Oct. 15, 1834. Nat Arch. M 1, Roll 69:51-2; 73-77. The 42 petition-ers represented Ottawa and Chippewa communities at:  Chenos [Les Cheneaux], Oak Point, St. Martins, St. Ignace, Mackinac, Cheboygan, St. Croix, Epouvette, Arbre Croche, Lake Michigan, Little Traverse Bay – as well as St. Mary's.  Signers from the Sault were:  Waishkee, Chegud, Osawatonase and Shingabawassin.  HHT

The bands at Sault Ste. Marie contended that blacksmith services had been provided at the 1820 treaty.  Using the desire of the Sault bands for a blacksmith shop as leverage, Schoolcraft in Mackinac on September 23, 1835 recommended the following course of action to Major Cobbs, commander of Fort Brady in charge of Indian affairs at Sault Ste. Marie:

> With regard to the policy of maintaining a smiths shop at St. Mary's I am of opinion that it would be of greatest utility to the Indians, and have a favorable affect on our relations with the northern bands.  In order to secure it, I think the Indians of St. Mary's had better transmit an offer through you to the department, to sell a portion of the lands connecting the two posts of Mackinac and Fort Brady including the national boundary on Upper Canada, which it may be advantageous to possess.  This offer should come from them as soliciting a boon.  Reservations might perhaps in the event of its acceptance be assented to including their villages, and the right to hunt and live on the tract until it is required. The shop may then probably come in as one of the equivalents, and they may further secure a small annuity.

The letter concludes with the statement about the "clamor" for fishirg licenses, previously cited.  (See footnote 122)

Schoolcraft did not anticipate making a treaty until the following summer (1836), but the whole process was precipitated by a group of Ottawa from L'Arbre Croche who left for Washington without permission ("clandestin ly" in Schoolcroft's words), in late October.  Leaders were A-pa-ko-sigan and Augustin Hamlin, Jr., a mixed-blood educated in Italy who was a teacher for the older boys among the Ottawas.[125]  Schoolcraft himself left for Washington in early November, 1835, after sending his brother-in-law William Johnston to get approval for the sale of Drummond Island, the most easterly American island in Lake Huron, and other lands of the Sault bands.

The Ottawa delegation that arrived first in Washington was eager to receive annuities, not only from the universal economic need because the fur trade had decreased, but also because the Grand River Ottawa received

---

[125] Schoolcraft to Herring, October 30, 1835.  Nat Arch. M 1, Roll 69: 122

annuities from previous treaties and much publicity had been given the financial awards to the Potawatomi at the Treaty of Chicago in 1833.[126] Since the A-pa-ko-sigan contingent did not represent all the territory that the government wanted to acquire; messages were sent from Washington in late December, 1835, to get six or eight chiefs from the other bands living north of the Grand River.  At the request of the Secretary of War Cass a "power of sale" was sent to Mackinac, with instructions to "procure signatures of as many Indians as practicable, duly witnessed" and then send the document by express [a runner] to Saginaw, the nearest post office.[127]

The Michigan coordinator for sending the Indian delegation to Washington was Charles C. Trowbridge, Detroit businessman who became a candidate for governor in the 1837 election.  State leaders, too, had a stake in the outcome of an Indian treaty.  Michigan's constitution had been approved by voters on October 5, 1835 and the new State could not develop without additional land.[128]  Robert Stuart, American Fur Company agent in Detroit, told Trowbridge that a treaty for additional Michigan land would be "very uncertain" unless John Drew, company agent in Mackinac, and Rix Robinson, agent at Grand Rapids, were present.[129]  Trowbridge arranged to have Drew escort the four chiefs selected at Mackinac to Washington.[130]

---

[126] Treaty notes for the March 18, 1836 cession quote Apakosigan as stating:  "...I wish to say that some chiefs present [i.e. from Grand River] have sold lands and been benefitted, but as for myself and my people, we have not received so much as one pipe of tobacco." John Hulbert, Secretary, "Records of a Treaty concluded with the Ottawa and Chippewa Nations, at Washington, D.C.  March 28, 1836 from National Archives.

[127] Schoolcraft to Capt. Clitz a Mackinac, Dec. 24, 1835 and Dec. 28, 1835.  Nat Arch. M 1, Roll 72:347, 348.  Clitz to Schoolcraft, Feb. 17. Roll 69:162.

[128] "More than four million acres, one fourth of all the land sold by all the United States land offices [in 1836] were sold in Michigan." F. Clever Bald, Michigan in Four Centuries, (New York and London, 1961), pp. 199, 206.  Michigan's population, which began rising after the opening of the Erie Canal in 1825, increased rapidly after 1830 to 85,000 in 1834 and approached 200,000 in 1836.

[129] C.C. Trowbridge to Schoolcraft, Jan. 25, 1836.

They picked up an additional delegate at Thunder Bay who went only as far as Saginaw, where he was persuaded to disassociate himself from the land sale and returned home.[131]  Rix Robinson, a relative newcomer in Michigan Indian trade, with some difficulty secured Ottawa delegates from as far north as Grand Traverse, then decided he ought to take along an older French trader.[132]  Meanwhile, a delegation from the Grand river district opposing land sale was formed under the leadership of Leonard Slater, a missionary and teacher.  In Washington, Slater changed his mind when offered several thousand dollars on which he later established his own project, the "Ottawa Colony."[133]

---

[130] The members of the official delegation sent from Mackinac were: (1) Ance from Oak Point [Pointe aux Chenes[ on north shore of Lake Michigan; Chab-wa-wa from Les Cheneaux islands; Big Sail [Chingassamo] from Cheboygan; and Blackbird [Mukaday Benais] from L'Arbre Croche.  See Clitz to Schoolcraft, Feb. 16, 1836.  Nat Arch. M 1, Roll 69:160.

[131] Mujeekiwiss [or Nawjekewiss] was influenced by Bourassa, who contributed many letters of objection to the Indian archives.  See Clitz to Schoolcraft, March 13, 1836.  Nat Arch. M 1, Roll 69:129.

[132] Rix Robinson to Schoolcraft, Grand River, Jan. 13, 1836; Robinson to Trowbridge, Feb. 1, 1836; Robinson to Trowbridge, Feb. 13, 1836. Nat Arch. M 1, Roll 72:380-81, 410, 438.

[133] Isaac McCoy, History of the Baptist Indian Missions (New York, 1840), pp. 492-498.  McCoy, founder of the Carey Mission on the St. Joseph river in Michigan, was in Washington at the time of treaty negotiations at the request of "Indians, missionary brethren and others whose opinions were entitled to respect."  His description of Slater's role and responsibility as head of a Grand River delegation ends with the statement: "...to my extreme grief and mortification, the treaty was concluded, and signed by the very delegation that was sent to Washington to prevent it." p. 495.  McCoy was concerned with securing proper payment for improvements at the Thomas mission, within the area ceded in 1836; and by assiduous effort managed to get the Senate committee to amend the treaty on this matter.  HHT

61

Ramsay Crooks, president of the American Fur Company living in New York City, sent elderly and infirm trader John Holiday and his daughter, Mary, to Washington in early January, with one of his close relatives as an escort.[134]  On the record of treaty negotiations, Holiday is listed as interpreter.  Schoolcraft through personal channels requested the commander at Fort Brady see that Waishkee get to Washington.  The chief and two sons arrived at Mackinac after Drew and the Ottawa delegation had left.  One of the sons, Waub-o-geeg,and Waishkee [Jawbawadick] continued to Washington in the care of trader William LaVaque.[135]

In its approach to a Michigan Indian treaty, the Indian office in Washington was influenced by the policy to remove all Indians to territory west of the Mississippi river, in line with the Indian Removal Act passed in 1830.  In 1836, arrangements were already under way for removal of the Potawatomi in southwestern Michigan and Chippewa bands near Lake St. Clair.  Secretary of War Lewis Cass was strong for education, missions, and technical assistance, on the basis of his experience with treaty-making while territorial governor of Michigan, 1813 - 1831.  Henry R. Schoolcraft, commissioner for the treaty and mineralogist by profession, felt it was important for the government to acquire the salt-spring region of the northwest Lower Peninsula.[136]  He also wanted annuities for the Indians in his superintendency, and considered the Sault bands particularly deserving.  In the field of border diplomacy, Schoolcraft judged that annuities from the American government would diminish the influence of the British, whom he suspected were promoting discontent among Michigan tribes.  Until 1828, British officers had distributed presents to Upper Great Lakes

[134]Ramsay Crooks to Schoolcraft, January 6, 1836.  Nat Arch. M 1, Roll 72:366.

[135]Clitz to Schoolcraft, Feb. 18, 1836.  Nat Arch. M 1, Roll 72:422-424.  Note added to letter of Feb. 17 says "Jaw ba wau dick and Waub o geeg arrived from Sault Ste. Marie this evening."  Levake and the two Sault Chippewa left Detroit March 3.  Trowbridge to Schoolcraft, March 4, 1836.  Nat Arch. M 1, Roll 72:454.

[136]Schoolcraft to Herring, Nov. 3, 1835.  Nat Arch. m 1, Roll 69:140.  In this letter concerning a possible land cession north of the Grand River, Schoolcraft noted the "sudden interest in the area as a result of reports of valuable and extensive coal beds and saline spring of good strength."  Congress gave the new state of Michigan 72 sections of land where there were salt springs.  Bald, p. 206

Indians at Drummond Island, then moved to Manatoulin Island, both localities convenient to Michigan Indians.[137]

The Indian delegations were far from united, but there was a common denominator in their need for financial aid in the form of annuities, and assistance from blacksmiths, farmers, and mechanics; some bands were more enthusiastic than others about education and missions.  The Grand river bands, closest to American settlements in Michigan were reluctant to move north to reservations but relented on condition they were compensated for their loss of buildings and "improvements" and could secure reserves protected from encroachment.  Indian traders, who actually held the power to make or break a treaty, demanded that their indebtedness on Indian trading accounts be paid and expected other financial concessions in return for securing the acquiescence of the Indian delegates.

The Sault Ste. Marie bands presented no problems at all and scarcely participated in treaty negotiations.  William Johnston and the commander at Fort Brady discussed the matter to the satisfaction of the local leaders, and sent letters and a map to Washington indicating the land these Chippewa bands would cede.  Shortly after Schoolcraft left for Washington, William Johnston sent him the following report, dated Michilimackinac, November 17, 1835:

> In compliance with your instructions dated the 7th inst. I proceeded to the Sault Ste. Marie and at which place I met the two chiefs Jaubawwaudick or Waiskee and Showono.  I stated to them the purport of my visit and inquired of them on what conditions they would be willing to cede Drummond Island, or any other portion of their lands.  They answered in behalf of their young men that they were willing to cede their lands to the United States on reasonable terms, the terms to be left to the discretion of the agent appointed by government, with this provision, they to have a full right to hunt, on the ceded lands, as long as they were unoccupied, and to make such reservations as they should think proper.

---

[137]This practice continued for more than a decade after the 1836 treaty.  James Ord, agent at Sault Ste. Marie wrote Robert Stuart, Acting Supt of Indian Affairs in Detroit, Sept. 1, 1842:  "...An unusual number of Indians from the Upper Lakes were here in July on their way to the present ground where it is said about six thousand in all were congregated to receive presents."  On the return trip, dysentery was brought to the Sault causing many fatalities.  Nat Arch. M 234, Roll 771:15.

> I then proceeded to the foot of Sugar Island, where Ocunogeegod, one of the claimants to the above named island [Drummond] resides.  He and his young men all perfectly coincide in opinion with the above named Chiefs.[138]

In January, Major Cobbs sent a map to Herring, Commissioner of Indian Affairs, with the lands the Sault bands would cede marked in red dots. Writing to Schoolcraft on January 10, 1835, he explained about the map, and put in his request for a permanent interpreter and blacksmith shop at Fort Mackinac.

On the basis of correspondence and the map, Schoolcraft reported to the treaty council  the Sault bands offer in the opening cession on March 15:

> The Chippewas of Sault Ste. Marie assembled in council at that place, last fall, and forwarded an offer to the President to sell a part of their lands, extending from the mouth of the Minushko [Munuscong] to a point southwest of Grand Island, on lake Superior, provided they could obtain suitable annuities for twenty years, with a smith shop, and other advantages stated in a letter from the commanding officer at Fort Brady, accompanied by a map.  The president has been informed that this portion of your people are very destitute, and that their country yields but little game, which is a reason for his having listened to their offer.[139]

On March 23, near the end of deliberations, the bands selected representatives to act for them in examining the final treaty.  With the exception of Augustin Hamlin who was chosen to represent the L'Arbre Croche band, these representatives were all agents of the American Fur Company: Rix Robinson for the Grand River band, Robert Stuart for the Cheboigan band, William Laslie for the Grand Traverse band, John Drew for the Point St. Ignace band [St. Ineas in the original record], and H. A. Levake for the Sault Ste. Marie band.  The complete list of the signatures on the Treaty of March 28, 1836, includes leaders of the Ottawa and Chippewa bands,

---

[138]William Johnston to Schoolcraft, Nov. 17, 1835.  Nat Arch. M 1, Roll 72:324.

[139]Records of 1836 Treaty, op. cit.

64

an independent missionary Leonard Slater, the well-represented American Fur Company, the federal government, and the fledgling State of Michigan represented by Senator Lucius Lyons.[140]

Although the Sault delegation consisted of only Waishkee and his son, the name of a third Sault Ste. Marie chief, Kawgayosh, appears on the treaty with the notation "by Maidosagee" under his name.  Schoolcraft identified Kawgaosh as a "British chief", youngest of the seven brothers of Shingabawassin, and entitled to payment as a "first class chief" under the 1836 treaty.  His father's name was Maidadosagee, and a third-class chief by the same name is  listed in the treaty.  Kawgayosh was very angry at not being invited to Washington for the 1836 treaty, and more angry because Waishkee had left without consulting him.  This information was relayed to Schoolcraft by his brother James who was living at Sault Ste. Marie.  Schoolcraft was probably responsible for having the name placed on the treaty.  Near ninety years of age, Kawgayosh died  in September, 1836.[141]

The Ottawa - Chippewa treaty of March 28, 1836 was amended before being ratified and proclaimed on May 27.  The most important amendment, of course, was the limitation on occupancy of the reserves described in Articles Second and Third to a period of five years, with a possible time extension.  Delegations from all the bands  who were parties to the March 28 treaty. were summoned to Mackinac in early July to approve the amendments, with the understanding that no goods would be distributed nor payments made under the treaty unless they agreed to the Senate amendments.[142]  According to Schoolcraft, "joy and satisfaction" was universal among the four thousand Chippewa and Ottawa and their creditors who assembled at Mackinac in September.  In addition to the $42,000 per capita annuities, $30,000 was

---

[140]Since Michigan was not yet admitted to the union, the senator had no official role as yet; but in March the bill passed the Senate establishing the contraversial Ohio and Upper Peninsula borders of Michigan.  Bald, Michigan in Four Centuries, p. 200.  Senator Lyons was present to sign the Treaty with the Saginaw Chippewa on May 9, 1836.

[141]Schoolcraft, Personal Memoirs..., pp. 533,549,570

distributed among 167 first, second and third class chiefs, $220,000 to approved creditors, and $150,000 "paid to half-breed relatives of the two tribes on carefully prepared lists."[143]

Although the first reaction to the 1836 treaty appeared favorable, sources of dissatisfaction were in the articles of the treaty and its later administration. In 1837, the federal Indian office asked the Michigan tribes to accept half of their cash annuities in goods, or wait until the following year (1838) to receive the other half in specie. The offer was rejected by the Michigan tribes, but as Schoolcraft noted in his journal for May 16, 1838, "I anticipated the storm it would raise." The Grand river bands refused to come to Mackinac to receive a half-payment, and Schoolcraft went to Grand Rapids to make payments in 1838.[144] Some individuals and bands declared they never received the second half payment. It was one of the matters raised by Waub-o-jeeg, veteran of the 1836 treaty negotiations in Washington and chief speaker for the Sault bands at the treaty of Detroit in 1855.[145]

In the years following the 1836 treaty, the Ottawa and Chippewa made persistent inquiries about the provisions in Article Sixth assigning $150,000.00 to "half-breeds" with $5,000 reserved for "the support of such poor half-breeds, as may require assistance, to be expended in annual installments for the term of ten years, commencing with the second year." The classifications of "half-breeds" into three categories, as directed earlier in the article was probably difficult to handle satisfactorily.

---

[142] C. A. Harris, Commissioner of Indian Affairs, to Schoolcraft, July 6, 1836. Nat Arch. M 1, Roll 41:9-10. Also Harris to John Garland, July 9, 1836, authorizing him to purchase $140,000.00 worth of provisions not to be distributed unless Ottawa and Chippewa assent to changes. Expects to get assent by August 7. Nat Arch. M1, Roll 41:35.

[143] Schoolcraft, Personal Memoirs, p. 543.

[144] Schoolcraft, Personal Memoirs, p. 596 - 597.

[145] Proceedings of a Council with the Chippeways and Ottawas... July 25, 1855. Nat Arch. Record Group 123. On Page 17 of the original manuscript, Waub-o-jeeg's speech includes the statement: "We wish to know in reference to the half payment in 1837 - We were told to take part
(continued on next page)

At the time of the 1836 treaty and for a decade thereafter, everyone born in the Upper Peninsula and northern Lower Peninsula was of Indian heritage with the exception of a daughter born to a missionary couple on Keewenaw Bay in 1834.[146]  O-sha-wa-no of Sault Ste. Marie raised the question of "half-breed" payments at the 1855 treaty councils in Detroit, contending his wife's name was on the list and she had not been paid.[147]

A provision in Article Ninth listing payments to "half-breeds" in lieu of reservations drew objections from one group of Grand River Ottawa. Usually the traders and others responsible for the success of an Indian treaty were rewarded with land grants, described in the treaty as grants in behalf of Indian wives and families.  This conventional strategem was forbidden in the 1836 treaty, and outright payments authorized instead. The Grand River Indians knew that Leonard Slater's grant "in trust for Chiminonoquot" referred to a fictitious child, and asserted that the money

---

145 (continued)
      pay in goods which we refused, and were promised to have the amount in money, which we never got.  There is another point we wish to ask about. That is the payment of the Garden River chief.  One year he and his band received but half what the other Indians received.  That was Sprague's last payment.  What has become of that money?" [Agent Gilbert's reply pointed out that the Garden River band was Canadian, and not entitled to any payment at all.  Yet a clause was included in Article First of the 1855 treaty stating that the provision for land "shall not be construed to exclude any Indian now belonging to the Garden River Band of Sault Ste. Marie."]

146 Henry R. Schoolcraft, Narrative of an Expedition through the Upper Mississippi to Itasca Lake, ed. by Philip Mason (East Lansing, 1958). On p. 11: "At La Pointe, the party were introduced to Mr. and Mrs. Hall, missionaries who, with Mr. Ayer, had proceeded to this place, in 1831, which is believed to be the first child of white parents, both by father and mother, ever born within the precincts of this lake."  The birth of the Sherman Hall's daughter was an isolated instance.  Harlan Hatcher in describing the arrival of the first mining company party at Marquette in 1848, stated:  Marquette consisted of two log houses and a half dozen....Chippewa wigwams.  There were no other white men between them and the Sault....The first white woman on the Upper Peninsula was in Harlow's party." Hatcher, A Century of Iron and Men, pp. 42-43.  [Men came to the Upper Peninsula as traders or military personnel. HHT]

147 Proceedings of a Council....1855, p. 24-25 of original: "O' Shaw-wa-nah.  It so happens that when I was young, a half breed woman fell in love with me and I married her.  By her I have some mixed blood children.  It is for them I speak."

67

given Slater belonged to the Indians. At the treaty councils in 1855, Commissioner Manypenny readily admitted the fiction, but called it a possible fraud against the government and not against the Indians.[148]

The removal provisions of Article Eight of the 1836 treaty aroused a long controversy, with differing opinions expressed by missionaries, traders, citizens and the Michigan legislature. There were even some initial differences among the Indian bands. In 1838, the first attempt was made to gain the cooperation of the Ottawa and Chippewa to removal. They were most reluctant in view of the fact that the Senate amendment to Article Eighth had cut out the option of moving to the Upper Mississippi river. The Sault bands flatly refused to look at the territory on the Osage river described in the remaining portion of Article Eighth.[149] James Schoolcraft, placed in charge of the expedition to view the western country, managed to get a group of fifteen representatives of the Grand Traverse and Grand River bands to go to look at the land at the forks of the Osage. They did not care for the country which was unforested and had no sugar maples, but they accepted it. In a document signed at Green Bay on August 23, 1838, they agreed to move to the Osage river "in the event they emigrated."[150] They felt the land on the Osage they had viewed belonged to them, whether or not they left Michigan.

---

[148] Ibid., pp. 18–19

[149] James Ord, Sub agent at Sault Ste. Marie to James L. Schoolcraft, June 5, 1838. "The Sault chiefs are not averse to going to land between Lake Superior and the Mississippi, but are not aware of any obligation to go west of the Mississippi river." Nat Arch. M 234, Roll 415:619.

[150] James L. Schoolcraft, Journal May 18, 1838 – August 27, 1838. Nat Arch. M 234, Roll 415: 655, 659 – 660.

Other provisions of Article Eighth led to the expectation of a year's subsistence and the receipt of clothing and equipment. The Grand River Indians did not move west, but many of them left behind homes, fields and orchards in transferring to the reservation near Pontwater in Oceana and Mason counties. They later claimed they were not paid for the value of their improvements, as required by the treaty.

In the treaty councils at Detroit in 1855, Commissioners Manypenny and Gilbert classified all the demands of the Indians arising from Article Eighth of the 1836 treaty as equitable claims, differentiating them from the legal claims to unpaid balances still owed the Ottawa and Chippewa by stipulations of other articles in the 1836 treaty and in previous treaties. At the 1855 negotiations, the Ottawa and Chippewa contended that the land they were relinquishing in the west was of greater potential value than the land they were retaining in Michigan. They were also aware that the federal government was saving a considerable sum of money as a result of cancelling removal plans.

The equitable claims of the Indians on the basis of Article Eighth of the 1836 treaty were discussed at length in Detroit on July 28, 1855, three days before the new treaty was signed. At the morning session a long speech by Andrew Jackson Blackbird, eloquent and educated leader of the Ottawa at L'Arbre Croche, ended with the statement:

> When you purchased our lands in 1836 you granted us lands west of the Mississippi. You said you would give us money, provisions, outfits. That land will always be good. What an expense it is that you save by keeping us here.

Commissioner Manypenny replied that Blackbird was in error on some points; that the bands had no real claim to western lands unless they removed, but concluded by saying

> I feel inclined, however, to be liberal with you in the adjustment of these equitable matters.

The discussion continued in the afternoon session on July 28, following a long speech by Sault leader Waub-o-jeeg whose final words were:

> You promised if you took me West of the Mississippi to give me lands, outfit and subsistence for a year. The land West of the Mississippi is better than the land here. You have kept a large amount of money in your pocket by not removing us. We wish you to give us what is equitable.

Commissioner Manypenny answered:

> I admire the ingenuity of Waug-o-jeeg and I doubt not that his speech will impress our minds. I wish it understood that the government is not indebted to the Ottawas and Chippeways for that removal and subsistence matter. It is true we saved some money by not removing you, but it was not yours but the government's money that was saved. We have been ready to remove you; you thought it best to stay and you were right. We think we may say in view of the equities of the subject, that we will allow some in commutation.....

Later in the afternoon, following an explanation of sums still due for the reservations, back annuities, improvement and educational funds, Commissioner Gilbert summarized tentative financial provisions for the forthcoming treaty. As part of the government offer, he stated:

> You may further estimate the sum or $30,000 for equitable claims on the removal, outfit, subsistence matter.[151]

The greatest problem posed by the 1836 treaty was the insecurity and indefinite status of the Indian reservations listed in Articles Second and Third. Royce summarized developments following the 1836 treaty in a long notation under the heading "Historical data and remarks" on p. 757 of Indian Land Cessions:

> After the selection by Mr. Schoolcraft of the 20,000 and 70,000 acre reserves under this treaty [1836, Article Second], he was advised that the U.S. might conclude to allow the Indians to remain on the other reserves after the expiration of the five years. He was therefore instructed, Nov. 5, 1840, that the boundaries of all the reserves under this treaty ought to be marked. August 23, 1844, the Indian Office advised the General Land Office that these reserves ought not to be surveyed as public lands, the Indians having be tacitly allowed to remain thereon since the treaty.

---

[151] Proceedings of a Council....1855, pp. 40,42, 43, 47.

In 1845 the assent of the Indians was obtained for the extension of public surveys over these reserves, but no definite boundaries were marked out for them.

As late as June 7, 1850, the Indian Office notified the General Land Office that the Indians still occupied these tracts and the latter must not be offered for sale as public lands. This state of affairs, in fact, continued until other provision was made by the treaty of 1855.

As soon as land was surveyed, acquisiton of Indian reserves became the objective of speculators, homesteaders and squatters.

Discussing land matters at the 1855 treaty council, the Indian representatives insisted on having regular land patents; some preferred an outright cash settlement to land. General Lewis Cass, retired from public office but still a well-known figure to all Michigan Indians, appeared briefly before the Indians to caution against the evils of whiskey and offer the assurance:

No one can touch their land without their consent. It can't be taken from them any more than a white man's can.

Waub-o-jeeg brought along maps indicating the places the Sault Ste. Marie bands wanted for permanent homes, explaining that they wished to divide into three groups.[152] Although only Waub-o-jeeg and O-sha-wa-no spoke at the treaty council, the treaty was signed by chiefs of six bands: O-sha-wa-no, Sault Ste. Marie; Waub -o-jeeg, Iawbawadick or Waishkee band; Kay-bay-nodin, head of his own band earlier associated with the Taquamenon river; O-mo-no-mo-nee, Grand Island; Shaw-wan, Drummond Island, and Pia-be-daw-sung, Garden River.[153]

The cumulative complaints and grievances of all the Michigan Indians confronted Henry C. Gilbert of Coldwater when he took over the Mackinac Agency at Detroit in May, 1853. Added to the backlog of problems was

---

[152]Proceedings of a Council.....1855, 28-29.

[153]Identification  is based on signatures to:  Petition of Bands at Sault Ste. Marie, November 1, 1853.  Nat. Arch. M 234, Roll 404:195. The subsequent land history of the six Sault bands is discussed in Section II of this report.  HHT.

was the fresh complaint of the Sault bands about the construction of the St. Mary's Ship Canal through their "permanent reserve" at the head of the rapids.[154]  Digging began in June, 1853.  At the end of his first season of making payments to bands throughout the Upper and Lower Peninsulas of Michigan, Gilbert addressed a long report to Commissioner Manypenny explaining that "Indians won't cultivate" because once land is improved, speculators enter the plot at a land office and "the Indian is turned adrift to perform the same labors again."  He reported charges of fraud at previous payments, and noted the general "paralysis" among bands so fearful of removal that some would not come to annuity payment.  Gilbert pointed out to Manypenny:

> The memory of an Indian is very tenacious.  He treasures up
> everything that is said by a government officer and regards
> his statements and verbal assurances as equally binding
> upon the government as the formal stipulations of a treaty.[155]

Recognizing the need for settling Indian problems in  Michigan, Gilbert submitted a plan to the Commissioner of Indian Affairs dated March 6, 1854.  The plan included assignment of certain tracts of public land in Michigan for the Indians, with individual plots for each family. Enclosed with his recommendations was a financial statement entitled: "Abstract of Treaties with the Indians of Michigan still requiring payments by the United States to Fulfill their Stipulations."  This financial statement was the basis for the computing the legal claims in framing provisions of the Treaty of July 31, 1855 with the Ottawa and Chippewas, and the Treaty of August 2, 1855 with the Saginaw Chippewa.[156]

---

[154] Gilbert to Manypenny, July 4, 1853; Gilbert to Manypenny, August 15, 1853.  Nat. Arch. M 234, Roll: 404: 67-68, 88.

[155] Gilbert to Manypenny, December 10, 1853.  Nat. Arch. M 234, Roll 404: 184-190.

[156] Gilbert to Manypenny, March 6, 1854.  Nat. Arch. M 234, Roll 404: 369 - 381.

Agent Gilbert was unable to make arrangements to hold Indian treaties in the summer of 1854. The following winter, the Ottawa and Chippewa bands from Grand River to the Sault carried their protests directly to Commissioner Manypenny in Washington.  In late February, 1855, a joint delegation presented documents covering all the subjects of earlier complaints, the same matters discussed a few months later in the treaty councils of July in Detroit.  These documents requested:  a list of half breeds paid under the Sixth Article of the 1836 treaty, specific information about Articles Fourth through Eight, and the general inquiry "We desire you to inform us fully in regard to all our rights under the different treaties."  This last inquiry was part of a memorial written in the Indian language at Grand Traverse and was submitted with an English translation.  Waub-o-jeeg's name was included in the long list of signers on both the original and translation.[157]

Gilbert himself went to Washington to make plans for the 1855 treaties.  In March a group of Chippewa from Mackinac passed through Detroit on their way to Washington.  Commenting on this second delegation, Gilbert observed that they were accompanied by G. T. Wenzel, "a man unconnected with frauds on Indians, and a member of the legislature;" The Chippewa were described as "men of standing."[158]

Commissioner Manypenny wrote the Secretary of Interior on Mary 21, 1855, proposing a treaty with the Ottawa and Chippewa of Michigan. "with the view of adjusting all matters now in an unsettled condition," After summarizing the background of the 1835 treaty, he explained:

---

[157] Delegates of the Ottawa and Chippewa of Michigan to Commissioner, dated in Washington, February 28, 1855; Delegates of Grand River, Little Traverse, Cheboygan and Grand Traverse bands to Commissioner, February 27, 1855.  Translation of Memorial of Chippewa and Ottawa, January 16, 1855, written at Grand Traverse.  Original of Memorial written in Indian language. Nat. Arch. M 234, Roll 404:554-566.

[158] Gilbert to Manypenny, March 28, 1855.  Nat. Arch.M 234, Roll 404:608

> They have never emigrated west, but have continued to
> hold the reservations described in the 2nd and 3rd
> articles of the treaty [1836] which have accordingly
> been withheld from sale to accomodate the Indians.,...
> Measures should now be taken....to secure permanent
> homes for the Ottawas and Chippewas either on the
> reservations or on other lands in Michigan belonging
> to the Government.[159]

Manypenny knew this treaty was a pressing matter. Gilbert had informed him in April:

> The public lands in Michigan are being so rapidly absorbed
> that in a few months it will be scarcely possible to provide
> them with homes in suitable locations without interference
> with settlements already made or contemplated by whites.[160]

The lumber boom was on in the Lower Peninsula, and land grants sought for railroads.

Indian leaders were summoned on rather short notice to gather in Detroit. Discussion and debate began on July 25; the treaty signed July 31.

In his final vividly-phrased speech to the council, O-sha-wa-no appeared to rely on the government for future security:

> ...When we came here this council seemed like a cloud. We
> followed it fearful of what it would bring forth. Now we
> find that it is not full of storms; but only casts a
> pleasant shade.
>
> We are satisfied with what is done. We wish you to carry out
> the treaty as it is made. We believe it to be good. We wish
> not only a rope to our lands – but a forked rope, which is
> attached to all our interests, so that you can hold on to it.
> This treaty is of great importance to us and to our children,
> and we trust you to carry it out faithfully.[161]

---

[159] Manypenny to R. McCelland, Secretary of Interior, May 21, 1855. Nat. Arch. M 234, Roll 404: 845-851.

[160] Gilbert to Manypenny, April 12, 1855. Nat. Arch. M 234, Roll 404:626-627.

[161] Proceedings of a Council....1855, p. 72 or original.

The recorded proceedings of the 1855 treaty contain no mention of compensation for damages to the fishing reserve at Sault Ste. Marie by canal construction. It is possible that this subject was discussed by J. Logan Chipman, secretary for the council, in a speech near the end of deliberations. The written record states only: " J. L. Chipman here addressed the council." His talk was translated by John Johnston.[162] Chipman had witnessed a "Petition of the Bands at Sault Ste. Marie" concerning removal, dated November 1,1853. He also wrote the Commissioner of Indian Affairs in 1857 to inquire about payment to the Sault bands for canal building damages.[163] At any rate, the claim connected with the building of the St. Mary's Ship Canal was the one claim of the Ottawa and Chippewa bands not settled by the July 31st treaty. This claim concerned only the Sault Ste. Marie bands, and was reserved for special handling on August 2, 1855.

The framers of the July 31st treaty attempted to cover all other legal and equitable claims of the Ottawa and Chippewa bands who had been parties to the Treaty of March 28, 1836. This objective was set forth in the first sentence of the treaty text. The most succinct description of the treaty provisions is found in the letter of transmittal sent August 7, 1855 by the commissioners, Henry Gilbert, Indian agent at Detroit, and George Manypenny, federal Commissioner of Indian Affairs. The summary paragraph states:

> In consideration therefore of the difference in the value
> of the western lands, and the home now secured to the
> Indians in Michigan and in the release and discharge of the
> United States from all claims or demands on account thereof,
> or on account of removal thereto and subsistence, or on
> account of the claims for "articles and equipments to each
> person" and also in discharge and full satisfaction of the
> $200,000 stipulated to be paid them in lieu of the reservations
> by the Senates amendment to the 4th Article of the treaty of

---

[162] Ibid., p. 73.

[163] Petition of Bands at Sault Ste. Marie, November 1, 1853. Nat. Arch. M 234, Roll 404:193-195. Chipman to Commissioner of Indian Affairs, July 31, 1857. Nat. Arch. M 234, Roll 405:471.

> 1836, and in like discharge of the sum which has accumulated from the investment of the $1,000 per annum, provided for by the 4th article of the treaty aforesaid, and in discharge of the $1,700 permanent annuity due to the Ottawas and heretofore specifically alluded to; in fact, in lieu and satisfaction of all claims, legal or equitable, on the part of said Indians jointly and severally against the United States for land, money or other things guaranteed to them or either of them by the stipulations of any former treaty or treaties (excepting the right of fishing and encampment secured to the Chippewas of Sault Ste. Marie by the treaty of June 16, 1820) the United States are to pay to them or expend for their benefit, the sum of $538,400 in the following manner.....[164]

The information contained in the paragraph quoted above was so compressed in the awkward language of Article Three of the Treaty of July 31, 1855 that the meaning of the entire Article may be obscure to anyone unfamiliar with the correspondence preparatory to the treaty and the treaty proceedings. These documents clearly indicate the claims considered "equitable" and the claims considered "legal" by the commissioners. The term "stipulation" in the context of the treaty is an accounting term, used in appropriation bills and budgets submitted by the Indian agents.[165] The "release and discharge" phrase in Article Three was designed to prevent any more troublesome matters from arising in the future. Manypenny had encountered complaints and grievances similar to those of Michigan Indians in making treaties with other tribes. The general "release clause" was a feature of treaties which he negotiated as chief commissioner.[166] The Treaty of July 31, 1855, was an instrument to consolidate the government's obligation to the Ottawa and Chippewa arising from their treaty-based claims to land, annuities, cash, goods and services.

---

[164] Manypenny and Gilbert to Secretary of Interior, August 7, 1855. Nat. Arch. Record Group 123.

[165] The appropriation bill for the Indian department passed August 18, 1856 was entitled: "An Act making Appropriations for the Current and Contingent Expenses of the Indian Department, and for fulfilling Treaty Stipulations with various Indian Tribes, for the Year ending June thirtieth, one thousand eight hundred and fifty-seven." U.S. Statutes at Large, Vol II (Boston, 1859) edited by George Minot and George P. Sanger, p. 65.

[166] See Appendix "E" for discussion of release clauses in Manypenny treaties.

# V

## THE AUGUST 2, 1855 "AGREEMENT"

The single claim not covered by the July 31st treaty with the Ottawa and Chippewa bands was the Sault bands' claim for compensation because their fishing site had been severely damaged by construction of the St. Mary's Ship canal.  The canal commenced in 1853  was in operation by the time the 1855 treaty negotiations began in Detroit.  The "Articles of Agreement" signed by Manypenny and Gilbert on August 2, 1855, was a document contrived to cancel the obligation to pay the damage claim, considered exhorbitant by the commissioners.[167a]

The Sault chiefs were well aware of the value of their sixty-acre reserve along the St. Mary's river channel, from the foot to the head of the rapids.[167b]  Entrepreneurs in the Sault area had designs on the land before canal construction began.  In 1845, James Schoolcraft and P.B. Barbeau were competing for the right to "rent" a choice waterfront site on the reserve. Barbeau, a trader who became an American citizen in 1849, rapidly rose in the Upper Peninsula business world.  He held the contract for supplies at the 1855 treaties in Detroit, and brought along Louis Cadotte to do most of the interpreting, although both George and John Johnston were there in offical capacities.[168]  In 1845, Barbeau represented the interests of the Sault Ste. Marie Falls Smelting and Mining Company.  Faced with such contentions, the Agent at the Sault wrote for advice:

> I would respectfully request instructions in relation to the reservation at the falls of the St. Mary's.  Attempts have been made and will be made to obtain locations on this reservation.  That portion of it from the foot of the falls to the village, the most valuable, is at present the object for business and milling purposes, and the portion along the mill race or canal has been staked by individuals with the intention of claiming it.  All the islands near the reservation have, I understand, been taken up under preemption claims.[169]

---

[167a] See letter of transmittal, Manypenny and Gilbert, August 7, 1855.  Appendix. D.  Treaty with Chippewa of Sault Ste. Marie, August 2,1855. (11 Stat.631, 2 Kapp. 732)

[167b]  Contemporary document (see Footnote 171) describes reserve as "a strip of land about 60 acres."  The Indian Claims Commission decision of Nov. 19, 1969 gives area as 36.4 acres.  (22 Ind. Cl. Comm. 79)

[168] George Johnston to Manypenny, Ocotber 5, 1855.  Nat. Arch. M 234, Roll 404:872-875.

[169] James Ord to William A. Richmond, Supt.of Indian Affairs, December 30, 1845.  Nat. Arch. M 234, Roll 771:160-161.

Henry Gilbert had been impressed by the reputed value of the fishery. In July, 1853, after the Sault Ste. Marie chiefs visited his office in Detroit to protest the canal construction, Gilbert wrote a long letter to Manypenny citing the rights of the Sault bands according to the treaties of 1820 and 1836. As he explained:

> ...I am informed that the fishery there is considered the best on the Upper Lakes and that the Indians have derived nearly their whole subsistence from it. I have lately been visited by the chiefs of three bands for the purpose of calling my attention to the subject and they have requested me to lay the facts before the authorities at Washington and ask for some compensation for the privileges taken from them. They appear to be intelligent, well-disposed men and evidently feel wronged at being thus summarily deprived of their reservation...[170]

Commissioner Manypenny had received "Representation of Grievances of the Sault Ste. Marie Chippewa," sent by J.P. Richardson on December 17, 1853, including a graphic account of the work in progress and disruption of the Chippewa community at the rapids.[171]

The summer following the August 2, 1855 "Agreement," Manypenny went to the Sault to estimate the amount of compensation that the local bands should receive for the destruction of their encampment and fishing grounds. Among the notes written by Gilbert at the time of the 1856 annuity payments was O-sha-wa-no's comment that "he would have preferred his Great Father had appointed a disinterested person to appraise the damages."[172]

The subject of compensation for damages appeared at intervals in later Indian office records. In July, 1857, inquiries were made by Chipman, who had been secretary at the 1855 treaty negotiations in Detroit, and by chiefs of the Sault Ste. Marie bands.[173] After fruitless conferences with the new agent, A.M. Fitch, in the fall of 1857 and again in 1858, Kay bay nodin, O-sha-wa-no and Waub-o-jeeg sent a further representation to

---

[170]Gilbert to Manypenny, July 4, 1853. Nat. Arch. M 234, Roll 404: 67-68.

[171]J.P. Richardson to Manypenny, December 17, 1853. Nat. Arch. M 234, Roll 404:229-231. See ante, p. 16.

[172]Notes of Agent H.C. Gilbert. Nat. Arch. M 234, Roll 405:612.

[173]J. Logan Chipman to Commissioner of Indian Affairs, July 31, 1856. Also, Chiefs of Sault Bands to Manypenny, July 9, 1857. Nat. Arch. M 234, Roll 405:471, 765-766.

Washington:

> Mr. Fitch in October one year since promised us
> to represent this matter to the United States Government,
> to our Great Father the President and to the Commissioner
> and again last month (September) promised that he would
> urge our claim for $5,000...Excuse us when we remind you
> of the small amount awarded us by the late commissioner
> under said treaty when we had been offered by individuals
> the sum of fifty thousand dollars for that portion of the
> Reserve lying between the canal and the river.[174]

In 1859 and 1860, the Sault chiefs wanted to visit Washington but were not given permission. Fitch was told to turn them back if they reached Detroit; they would not be recognized at Washington.[175] Ten years later, Agent James Long recommended that Chief O-sha-wa-no be given $800.00 for the home destroyed by canal building, adding that the chief had received no compensation.[176]

For a period of more than twenty years after the "Agreement" was made on August 2, 1855, it seemed like a lifeless document. No one requested copies for reference or files; no reference was made to its provisions. No damages were awarded for destruction of the principal fishery, but there was no indication that the Sault bands had "surrendered...the right of fishing at the falls of the St. Mary's." The Indians continued to fish in other parts of the rapids. Locally this seems to have been considered their "right." The Lake Superior Guide published in 1872 included the following statement about the Sault:

> Indians of the Chippewa tribe reside in the
> vicinity in considerable numbers; they having the
> right to take fish in the waters contiguous to the
> rapids.[177]

---

[174] Sault Chiefs to Commissioner of Indian Affairs, October 21, 1858. Nat. Arch. M 234, Roll 406:250-252.

[175] Fitch to J.W. Denver, Commissioner of Indian Affairs, January 20, 1859 and Fitch to Denver, March 29, 1860. Nat. Arch. M 234, Roll 406: 305,682.

[176] J. Long to Parker, April 15, 1870. Nat. Arch. M 234, Roll 409: 190-192.

[177] J. Disturnell (comp) Lake Superior Guide (Philadelphia, 1872), p. 12.

Matters of common knowledge among Indian people may never find their way into written documents, or are recorded only after a long delay. The August 2, 1855 "Agreement" bearing the names of twelve Sault Ste. Marie Chippewa is not discussed candidly in Indian office correspondence until George W. Lee visited the Sault bands in 1877 and 1878.  On June 11, 1878 he wrote the Commissioner of Indian Affairs about the 1855 treaties as presented to him at the Sault:

> I have the honor to enclose herewith a letter upon a subject of which I am entirely ignorant, although I have had many inquiries on the part of Indians both verbally, when in the vicinity, and by letter.  There is no data in this office showing anything in regard to these people's affairs, other than the treaties, made at various times. They claim great injustice having been done them in the treaty of 1855 at least the supplemental treaty which they signed on 2nd August, in relation to their rights to fish in the Rapids of the Sault, which in the principal treaty of 31st July 1855 were especially reserved and which only from Saturday to Monday were released, which they now say that they have ever protested they did not understand, and was protested and still do so protest.  They have,  however, within a year enjoyed unmolested the privilege of fishing in the Rapids, but now are forbidden by men claiming privileges granted by the treaty aforesaid.
>
> Of course the letter of the treaty must stand, unless abrogated by subsequent action, or legislation.  I am rather inclined to believe that the Old Chief is correct, as the principal interpreter [John Johnston] says he understood that the supplementary treaty of the 2nd August did not, or was not intended as he understood it to alter the reservation made in the treaty of 31st July aforesaid...[178]

The "Old Chief" mentioned by George Lee was O-sha-wa-no, who was granted "a mere speck of rocks in the river" (as Lee described the island) by terms of the August 2, 1855 treaty.[179]  It was the island he moved to

---

[178]Lee to Commissioner, June 11, 1878.  Nat. Arch. M 234, Roll 413:487-488.

[179]Lee to Commissioner of Indian Affairs, December 7, 1878, enclosing letter of Francis O-sha-wa-no, November 11, 1878.  Nat. Arch. M 234, Roll 413:675-680.  (Old O-sha-wa-no, who had lost out on land allotments under the July 31, 1855 treaty and had his purchased land taken in tax sale, also encountered misfortune with "speck of rock" in the river.  Wanting to sell his island in 1880 before winter came, he ran into difficulty because although he was granted the island in the August 2, 1855 treaty, he never received a patent.  See George W. Brown to General Land Office, August 6, 1880.  Nat. Arch. M 234, Roll 415:385.)

when his home was destroyed by the canal building.  The tradition of wrongs in connection with the August 2, 1855 "Agreement" continued for two more generations of O-sha-wa-no's descendants.  Charles Showano, grandson of Lee's informant, made a deposition on the matter before Charles H. Chapman, Probate Judge of Chippewa County, on August 21, 1935.  The sworn statement says in part:

> My grandfather, O-shaw-waw-no-Ke-wan-ze, attended and aided in executing the treaty of July 31, 1855.  My said grandfather, together with nearly all the Indians returned to their homes on Lake Superior and two days later, on August 2, 1855, the treaty was re-enacted by two or three who remained, and they signed the names without any authority, signing away the most valuable rights of the Indians of the Lake Superior country...I solemnly state upon my oath that my grandfather, the said O-shaw-waw-no-Ke-wan-ze, made a statement to me in the presence of my father, Ed. Showano, that he did not sign the treaty of August 2, 1855, here alluded to, and that his signature was a forgery...

Charles Showano was seventy-seven years of age at the time of his deposition, and was living at the Bay Mills Indian mission.[180]

In summary: The fishing rights of the Sault Ste. Marie bands of of Chippewa granted by federal treaties can be traced through the 1795, 1820, 1836 and 1855 treaties and the supplementary 1855 "Agreement." By the late nineteenth century, the special fishing and hunting rights of Indian people were a matter of common knowledge, an understanding that had its origin in the terms of the Treaty of Greeneville (Ohio) in 1795.[181]

---

[180] Deposition of Charlie Showano before Charles H. Chapman, Judge of Probate, August 1, 1935.  Copy.  Sault Ste. Marie Collection, Miscellaneous Box, Document 20a.  Clarke Historical Library, Central Michigan University.

[181] For example, officials of the town of Bingham--recognizing unaccustomed opposition from the Indians--denied their right to vote at town meeting the summer of 1866, justifying their refusal by declaring "...They were receiving pay from the Government and were consequently minors, besides they were not subject to the draft neither did the game laws of the State prohibit their killing deer and other wild game." A. B. Page to Richard Smith, Indian Agent, August 1, 1866.  Nat. Arch. M 234, Roll 407:1192.

The significance of some articles of these treaties is not immediately evident, but is clarified by understanding the factors which influenced the negotiations of each separate treaty.  Political and economic factors important at the time of treaty-making have become obscure with the passage of many decades, but are brought to light by investigating the circumstances surrounding each treaty.

Each treaty was basically a land cession.  In the 1820 treaty, out of the four mile square land cession at St. Mary's Falls, the Sault bands reserved a place of encampment estimated at sixty acres and a "perpetual right" to fish there.  This particular fishing right was repeated in the 1836 treaty and referred to in the July 31, 1855 treaty.  By that time, the encampment and fishing site no longer actually existed because of canal construction.  Terms of the somewhat questionable August 2, 1855 "Agreement" included surrender of the right to fish at the falls, originally granted in perpetuity by the 1820 treaty.  The 1820 treaty and the supplementary "Agreement" of August 2, 1855 concerned a single fishing site, destroyed by the time the right to use that site was surrendered.  The surrendered fishing site at St. Mary's Fall was one of many fishing sites regularly used by the Sault Ste. Marie bands.

Fishing rights at other locations in the Upper Peninsula were granted in Article Third of the 1836 treaty, which established five additional shoreline reserves for the Sault Ste. Marie bands.  On these reserves, the Indian people retained all their traditional and intrinsic right to utilize the resources of their own land.  Secretary of War,

Lewis Cass in issuing instructions to Henry R. Schoolcraft for negotiating the 1836 treaty stated:

> .... those reservations must be held upon the same tenure as the Indians now hold their country, that is, to allow them to retain possession of it 'till it shall be ceded to the United States.[182]

The most extensive fishing rights granted to the Sault bands by Article Third of the 1836 treaty were those specified in the seventh clause creating a reserve along the base of Whitefish bay from the present-day Waiska river to the mouth of the Taquamenon river, especially mentioning the off-shore islands and fishing grounds.  The land reserve by the 1836 and 1855 treaties has been discussed in detail to fishing grounds.  The land reserved for "permanent homes" for the Saults bands by the 1855 treaty was smaller in area and more localized than the reservations established in 1836.

The subject of fishing rights was not raised in the July 31, 1855 treaty, except to indicate in Article 3 that the claim of the Sault bands based on the 1820 treaty was not covered.  Fishing rights do not come within the definition of the term "treaty stipulations" used in Article 3 of the 1855 treaty.  The term "treaty stipulations" in Article 3 referred only to provisions of previous treaties obligating the federal government to make certain payments to the Ottawa and Chippewa. Prior to drawing up the 1855 treaty, the commissioners became aware of allegations of fraud, incomplete annuity payments and other grievances that were awkward to admit and preferably omitted from terms of a formal treaty.  The general "release of liability" in Article 3 of the July 31, 1855 treaty was designed to protect the government from additional claims that might be made in the future based on the payments stipulated in articles of past treaties.  All financial provisions of previous treaties

with the Ottawa and Chippewa, but largely the Ottawa, were combined in the  revised payment schedule of the 1855 treaty stipulations.

Fishing rights reserved for the Sault Ste. Marie bands by Article Third of the 1836 treaty were not among the many matters reviewed in drawing up the July 31, 1855 treaty.  These fishing rights were not mentioned in the 1855 treaty and consequently remained unchanged.

VI

CONCLUSIONS

The Sault Ste. Marie bands of Chippewa have lived at the foot of Lake Superior and the St. Mary's River outlet to the lake for three hundred and fifty years by documentary evidence, and a century or more longer according to traditional accounts. During all this time, the Sault bands have been dependent upon the fisheries of the area both for subsistence and as an article of commerce. Fish were traditionally preserved by smoking and drying. For commercial purposes, processing with salt replaced drying in the nineteenth century.

The most valuable of the fisheries, at the falls of the St. Mary's River, was set aside as a "perpetual reserve" by the treaty of 1820 when the Sault bands ceded a sixteen square mile tract to the United States for a military post. This "permanent reserve" and fishery for the Sault bands was:  confirmed by the treaty of 1836; largely destroyed by construction of the St. Mary's Falls Ship Canal, 1853-1855; and officially  surrendered by the "Agreement" of August 2, 1855.

When the Sault bands joined with other Chippewa and Ottawa bands in ceding the Upper Peninsula and northeast Lower Michigan in the 1836 treaty, five additional shoreline reserves were created for the Sault St. Marie bands in Article Third, clauses five through nine. The 1836 treaty also confirmed the general right of Indian people to utilize natural resources, the "hunting and fishing right" first stated in the Treaty of Greeneville (Ohio) in 1795.

84

The present legal proceeding concern the fishing rights established in connection with the largest and principal reserve for the Sault bands in the 1836 treaty, described in the seventh clause of Article Third. This clause "reserved for the use of the Chippewa" a tract of land extending from the mouth of the present Waiska river along the base of Whitefish Bay of Lake Superior to the mouth of the Taquamenon river, "including the small island and fishing grounds in front of the reservation." When the land provisions of Article Third were revised in the July 31, 1855 treaty, the area set aside for "permanent homes" for the Sault Ste. Marie bands was smaller than in 1836. Two of the four reserves designated for the Sault bands by Article 1 of the July 31, 1855 treaty, located near Naomikong and on Point Iroquois, were within the large tract reserved for the use of the Sault bands by the seventh clause of Article Third of the 1836 treaty. A major representation of the Sault bands gathered at the Point Iroquois reserve, in the  vicinity later identified as Bay Mills.

The land base of the Sault bands suffered an unfortunate and unintended attrition after 1855, partially as a result of delay and malfunction of the land allotment procedure outlined in the treaty. The reservation of the present-day Bay Mills Community, descendants of the Sault Ste. Marie bands, is also within the tract described in the seventh clause of Article third of the 1836 treaty.

The subject of fishing rights of the Sault Ste. Marie bands in Lake Superior was not covered by the July 31, 1855 treaty; and was outside the scope of the August 2, 1855 "Agreement." Therefore, the traditional tribal right, or aboriginal right, of the present Bay Mills

86

Indians to use the fishing grounds from Waiska Bay across Whitefish Bay of Lake Superior to the Taquamenon river, fishing rights confirmed in the 1836 treaty with the Sault Ste. Marie bands of Chippewa, stands unaltered by any later treaty provisions.

APPENDIX A

TREATY INSTRUCTIONS OF LEWIS CASS, SECRETARY OF WAR, TO HENRY R. SCHOOLCRAFT

COMMISSIONER FOR THE TREATY OF MARCH 28, 1836

(National Archives Microcopy 1, Roll 72:464-465)

War Department
March 14, 1836

Sir:

A number of chiefs of the Ottawa and Chippewa tribes from the northern part of the peninsula of Michigan, and from the country between Lake Superior and Lake Michigan having arrived in this city with the view of forming a treaty for a cession of land in those portions of the country, the President has authorized me to inform you that you are hereby appointed a Commissioner to treat with them for that purpose.

You will therefore seek an interview with them and announce to them this arrangement.  You will ascertain in the first place, that they are the acknowledged Chiefs of those tribes in the quarter of the country from which they come, and authorized agreeably to Indian usuages to make a cession of the lands.  You will then proceed to make such purchases as they may be prepared to grant.  In doing this, you will apportion the pecuniary amount to be allowed to the value of the country, taking into view its extent, fertility, and other probable advantages which it offers for a sale and the amount which has heretofore been allowed for other cessions.  It is impracticable to give any definite directions on this point and it must of course be left to your own discretion.  The great object will be to do full justice to the Indians and, at the same time, to procure the land upon proper and reasonable terms for the United States.

You will allow no individual reservations.  It is desirable, as far as practicable, to extinguish the Indian title as our settlements advance so as to keep the Indians beyond our borders.  But if it should be found

87

necessary to allow particular bands to remain upon reservations, those reservations must be held upon the same tenure as the Indians now hold their country, that is, to allow them to retain possession of it 'till it shall be ceded to the United States.

No claims for debts or other demands against the Indians will be adjusted or settled by the treaty.  If the Indians should insist upon it, you will be at liberty to assign a reasonable portion of the consideration money to be fixed by them as a general fund for the payment of just claims against them.  These claims to be examined by a commissioner to be appointed by the President and Senate, and such of them as he finds just, to be paid from this fund.  If any portion of the fund remains, it is to be paid over to the Indians.

The usual stipulations for annuities, for farming purposes, for schools, for the purchase and delivery of a reasonable portion of goods will be allowed, but the annuities will not extend beyond the term of twenty years.

You will receive the usual pay for a Commissioner, viz, eight dollars a day during every day you are actually employed in this business, and the same sum will be allowed you for such time as you have been engaged previous to the date of this letter in communication with that portion of this deputation which has been some time in this city.  To be paid upon your certificate.

> Very respectfully,
>
> Your most obedient Servant
> Lewis Cass

Henry R. Schoolcraft, Esq.
Washington

APPENDIX B

LETTER OF TRANSMITTAL, TREATY OF JULY 31, 1855

WITH THE OTTAWA AND CHIPPEWA

(National Archives, Record Group 123)

Detroit, August 7th, 1855

Sir:

We have the honor to transmit herewith Articles of Agreement and convention made and entered into at Detroit on the 31st day of July, 1855, with the Ottawa and Chippewa Indians, parties to the treaty of March 28th, 1936.

By the terms of said last mentioned treaty the Indians retained certain reservations from the lands ceded, which by the Senates amendments were made to terminate at the end of five years from the date of ratification unless the United States should grant the Indians permission to remain longer on said reserves; and in lieu of them , the Senates amendments further stipulated, that the sum of $200,000 should be paid to the Indians in consideration of changing these permanent reservations into reservations for five years only, which sum was to be paid whenever the reservations were surrendered, and until such time interest was to be paid on the same.

It was further stipulated by the treaty aforesaid, and the amendments thereto, that the United States would furnish a home for the Indians, southwest of the Mississippi River for their final settlement, and which when selected of reasonable extent, the United States agreed to guarantee to said Indians forever:  And also to remove and provide them with a years subsistence, "in the country to which they go, and furnish the same articles and equipments to each person as are stipulated to be given to the Pottowatomies in the final treaty of cession concluded at Chicago."  It was also agreed, that such improvements as add value to the ceded lands should be appraised and paid for.

In council with the Indians it was claimed by them that the United States ought to pay to them, not only the value of the land west, which

89

on their removal was to be guaranteed to them forever, but also the value of the outfit of "articles and equipments" and the amount which it would have cost the Government to have removed and subsisted them, and likewise the value of the improvements on the ceded lands.

In reply they were told that they had no claim on the Government for the large amount of money it would have cost to have removed them to the country west of the Mississippi and to have subsisted them there for one year, for although the removal would have cost a large sum   which was saved to the Government, yet nothing was taken from or added to their means thereby.

They were further informed that they had an equitable interest in lands west, the stipulation to furnish them a home there being considered a part of the consideration for the lands ceded in Michigan, and that their improvements on the ceded lands should also be paid for, it being understood that at the end of five years from the ratification of the treaty of 1836, they were dispossessed and deprived of them by those who entered the lands.

Besides the claim to lands west these Indians have in the hands of the United States the sum of $200,000 provided for and stipulated to be paid by the Senates amendment to the 4th Articles of the treaty of March 28, 1836.  They also have in the Treasury or invested in public stocks upwards of $20,000 being the proceeds of the $1,000 provided by the 4th Articles of said treaty to be invested in public stocks.

The Ottawas have also an annual payment of $1,700 being their share of the permanent annuities to be paid said tribe by the treaties of August 3rd, 1795, November  17, 1807, September 17, 1818 and August 30, 1831, the residue of said permanent annuities ($2,600) being paid west of Missouri.

There seems to be some obscurity about the amount at which the improvements are valued.

The appraisement list of Messrs: McDonell and Clark amounted to $74,998; and subsequently Mr. Schoolcraft reported about $25,000 more.

The amount appropriated and paid for improvements is understood to be only $20,000, leaving about unpaid $19,998.

The 4th Article of the treaty of 1836.  Clauses 2nd and 3rd stipulate for the payment of $8,000 for educational and missionary purposes per annum for twenty years and as much longer as Congress may appropriate therefor.

In view of the peculiar condition of these Indians we deemed it to be the duty of the Government to deal liberally with them, and as it would have been incumbent on it to have provided for their removal and subsistence had they gone west, and as it will be necessary for them to remove and re-locate on the homes provided for them by the agreement, we have concluded with them, it was deemed but just to provide something to remove and permanently settle them on their new homes.

It was also deemed to be due to them that their educational fund should be continued; and also the blacksmith establishements for the term of ten years.

By the Agreement of July 31st, 1855, the United States agreed to give to the Ottawa and Chippewas a quantity of land equal to eighty acres for each head of a family; forty acres to each single person over twenty-one years of age; eighty acres to each family of minor children composed of two or more in the family, and forty acres to each single minor child under twenty-one years of age, the whole to be set off and assigned in severalty under certain rules, regulations and restrictions provided for in the instrument.  It will require from 120,000 to 140,000 acres of land to fulfil this stipulation; than which the home promised to be secured for them west is believed to be more valuable.

In consideration therefore of the difference in the value of the western lands, and the home now secured to the Indians in Michigan and in the release and discharge of the United States from all claims or demands on account thereof, or on account of removal thereto and subsistence, or on account of the claims for "articles and equipments to each person" and also in discharge and full satisfaction of the $200,000 stipulated to be paid

them in lieu of the reservations by the Senates amendment to the 4th Article of the treaty of 1836, and in like discharge of the sum which has accumulated from the investment of the $1,000 per annum, provided for by the 4th article of the treaty aforesaid, and in discharge of the $1,700 permanent annuity due to the Ottawas and heretofore specifically alluded to; in fact, in lieu and satisfaction of all claims, legal or equitable, on the part of said Indians jointly and severally against the United States for land, money or other things guaranteed to them or either of them by the stipulations of any former treaty or treaties (excepting the right of fishing and encampment secured to the Chippewas of Sault Ste Marie by the treaty of June 16, 1820)  the United States are to pay to them or expend for their benefit, the sum of $538,400 in manner following, viz: -

First. $80,000 for educational purposes to be paid or expended under the direction of the President in ten equal annual installments of $8,000.

Second. $75,000 in five equal annual instalments of $15,000, each in agricultural implements, carpenters tools, household furniture, building materials, cattle, labor and such other articles as may be necessary and useful in removing to their new homes and getting permanently settled thereon.

Third. $42,400 for the support of four blacksmith shops for the term of ten years.

Fourth. $306,000 in coin to be paid per capita as follows:  $10,000 of the principal and the interest on the whole of said last mentioned sum remaining unpaid at the rate of five per cent per annum annually for ten years; and the sum of $206,000 remaining unpaid at the expiration of ten years, to be then due and payable, and if the Indians then require the payment the same shall be paid per capita in not less than four equal annual instalments.

Fifth. $35,000 in ten annual instalments of $3,500, each to be paid only to the Grand River Ottawas.

While it cannot be pretended that these Indians have a legal demand against the Government for the full amount stipulated to be paid and expended for their benefit by the provisions of the instrument herewith transmitted, yet in view of their legal and equitable right and the claims which they clearly have upon the generosity of the Government, we have believed ourselves justified in making the liberal provisions we have inserted in the treaty.

These Indians number upwards of 5,000 and are now making very rapid advancement in civilization, to stimulate and encourage which it is no doubt alike the pleasure and duty of the Government. And with the aid extended to them by the provision made in the instrument we may express the conviction, that a very large body of them may be qualified to enter upon and discharge the duties and assume the obligations imposed upon citizens of the State of Michigan.

Very respectfully

your obedient Servants,

George H. Manypenny
Henry C. Gilbert

Commissioners.

Charles E. Mix, Esq.,
Acting Commissioner of Indian Affairs,
Washington.

APPENDIX C

LETTER OF TRANSMITTAL, TREATY OF AUGUST 2, 1855

WITH THE CHIPPEWA OF SAULT STE. MARIE

(National Archives, Record Group 123)

Detroit, August 7, 1855

Sir:

By the treaty of June 16th, 1820, with the Chippewa Indians a right to encamp and fish at the falls of St. Marys river was guaranteed to them in perpetuity.

In the agreement with the Ottawa's and Chippewa's of the 31th of July last, we took a release of all claims and demands of these tribes or either of them against the United States except this grant to encamp and fish, secured to the Chippewa's.

It was deemed important to have this stipulation cancelled especially as the ground for the encampment had been seriously injured if not destroyed by the construction by authority of the United States, of the canal at the Sault Ste. Marie.  The fishery is also injured by the construction of said canal.

The Indians seem to prize the perpetual grant to fish and encamp at that point very highly, and the least value they placed upon it was so much above any sum that the undersigned could suppose it to be worth, induced us to make the proposition to the Indians, that the United States should determine its value by a competent appraisor to be appointed for that purpose whose award should be final in the premises.

The appropriation of the camping ground of the Indians for the canal has from the beginning been a source of irritation to them and it was due to them that some means should be taken for its settlement.

Accompanying this note we have the honor to transmit articles of Agreement with the Chippewas in relation to this claim.

Very respectfully,

Your Obedt Servant,

Chas E. Mix, Esq.,
   Act. Comr. Indian Affairs,
   Washington

Geo. H. Mannypenny
Henry C. Gilbert
Commissioner.

94

APPENDIX D

HUNTING AND FISHING CLAUSES IN TREATIES WITH

MICHIGAN INDIAN TRIBES, 1795-1836

(1)   Treaty of Greeneville, August 3, 1795 (7 Stat. 49, 2 Kapp. 39), Art. V:  "...Indian tribes who have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States..."

(2)   Treaty of Fort Industry, July 4, 1805 (7 Stat. 87, 2 Kapp. 77), Art. VI:  "The said Indian nations....shall be at liberty to fish and hunt within the territory and lands which they have now ceded to the United States, so long as they shall demean themselves peaceably."

(3)   Treaty of Detroit, November 17, 1807 (7 Stat. 105, 2 Kapp. 92), Art. V:  "...Indian nations shall enjoy the privilege of hunting and fishing on the lands ceded as aforesaid, as long as they remain the property of the United States."

(4)   Treaty of Brownstown, November 25, 1808 (7 Stat. 112, 2 Kapp. 99), Art. IV:  (Same as 1807 treaty, HHT)

(5)   Treaty of St. Mary's, September 29, 1817 (7 Stat. 160, 2 Kapp. 145), Art. II:  "The stipulations contained in the treaty of Greeneville, relative to the right of the Indians to hunt upon the land hereby ceded....shall apply to this treaty; and the Indians shall, for the same term enjoy the privilege of making sugar upon the same land, committing no unnecessary waste upon the trees."

(6)   Treaty of Saginaw, September 24, 1819 (7 Stat. 203, 2 Kapp. 185), Art. V:  (Same as 1817 treaty, HHT)

95

98

An identical clause, also in Article 3, is in the treaty with the Omaha signed in Washington two days later on March 16, 1854.  (10 Stat. 1843, 2 Kapp. 611).

The next treaty concluded by Manypenny was not the type to which a release clause would be appropriate.  This treaty with the Delaware, May 6, 1854 (10 Stat. 1048, 2 Kapp. 614) in Article 4 does indicate the financial and accounting usage of the term "treaty stipulation."

Similar general release clauses appear in the following treaties:

Article 11 of the Treaty with the Shawnee,May 10, 1854
(10 Stat. 1053, 2 Kapp. 618)

Article 12 of the Treaty with the Iowa,May 17, 1854
(10 Stat. 1069, 2 Kapp. 628)

Article 6 of the Treaty with the Sauk and Fox,May 18, 1854
(10 Stat. 1074, 2 Kapp. 631)

Article 8 of the Treaty with the Kickapoo, May 18, 1854
(10 Stat. 1078, 2 Kapp. 634)

Article 6 of the Treaty with the Kaskaskias and Peories,
May 30, 1854 (10 Stat. 1082, 2 Kapp. 636)

Article 4 of the Treaty with the Miami, June 5, 1854
(10 Stat. 1093, 2 Kapp. 641)

Following this series of treaties concluded in Washington, treaties for the balance of the calendar year were concluded with tribes in the northwestern part of the United States, or those removed from the southern states to Indian Territory.  Another series of treaties, usually initial treaties, with western tribes occured early in 1855.

The typical "release clause" appears for the ninth time in the treaty with the Wyandot signed in Washington January 31, 1855 (10 Stat. 1159, 2 Kapp. 680). By this treaty, the tribal organization was dissolved (Article 1.).  Article 6 of the treaty stated, in part:

> The Wyandot Nation hereby relinquish and release the United States from all their rights and claims to annuity, school money, blacksmith establishments, assistance and materials, employment of an agent for their benefit, or any other object

APPENDIX E

"RELEASE CLAUSES" IN FEDERAL INDIAN TREATIES, 1854 - 1855

The "release clause" is a characteristic of a series of eleven federal Indian treaties concluded between March 1854 and August 2, 1855. In all of these treaties, George W. Manypenny, Commissioner of Indian Affairs, was chief commissioner representing the United States.  The first nine were signed in Washington, D.C. between March 1854 and January, 1855.  The last  two of the series were signed in Detroit following a period of negotiations with the Ottawa and Chippewa of western Michigan and the Saginaw Chippewa of eastern Michigan.  Dates of these last two treaties were July 31, 1855 and August 2, 1855.

In reviewing Indian treaties, the only earlier appearance of a "release clause" is a treaty with the Menominee September 3, 1836 (7 Stat. 506, 2 Kapp. 465) Article third of the treaty stated in part:

> The said Menomonie nation do agree to release the United States from all such provisions of the treaty of 1831 and 1832, aforesaid, as requires the payment of farmers, blacksmiths, millers.  They likewise relinquish all their right under said treaty to appropriation for education, and to all improvements made  or to be made upon their reservation on Fox river and Winnebago lake; together with the cattle, farming utensils or other articles furnished or to be furnished to them under the treaty.

This Article may be the precedent or model for the almost standard "release clause" that became included in the Manypenny treaties.  It seems to have been utilized to get some general release of financial obligations on the part of the United States.

The first Manypenny treaty, and the first of the "release clause" series, was the Treaty with the Oto and Missouri, March 15, 1854 at Washington, D.C. (10 Stat. 1038, 2 Kapp. 608).  Article 3 stated in part:

> The confederate tribes relinquish to the United States, all claims, for money or other thing, under former treaties, and all claim which they may have heretofore, at any time, set up, to any land on the east side of the Missouri River;.....

97

96

(7)   Treaty of Chicago, August 29, 1821 (7 Stat. 218, 2 Kapp. 198),
      Art. V:  "The stipulation contained in the treaty of Greenville,
      relative to the right of the Indians to hunt upon the land ceded,
      while it continues the property of the United States, shall apply
      to this treaty."

(8)   Treaty of Washington, March 28, 1836 (7 Stat. 491, 2 Kapp. 450),
      Art. XIII:  "The Indians stipulate for the right of hunting on the
      lands ceded, with the other usual privileges of occupancy, until
      the land is required for settlement."


NOTE:   In the report of treaty proceedings, Commissioner Schoolcraft is
        quoted as saying on March 15:  "The usual privilege of residing
        and hunting on the lands sold till they are wanted will be granted."
        Records of a Treaty concluded with the Ottawa and Chippewa nations,
        at Washington, D.C. March 28, 1836.  MS.  Papers of Henry Rowe
        Schoolcraft, Library of Congress.

99

or thing, of a national character, and from all the stipulations and guarantees of that character, provided for or contained in former treaties, as well as from any and all other claims or demands whatsoever, as a nation, arising under any treaty or transaction between them and the Government of the United States...

This clause in the Wyandot treaty seems to be a guide or model for the language of Article 3 of the Ottawa and Chippewa Treaty of July 31, 1855 (11 Stat. 621, 2 Kapp. 729).  A close reading of that article would indicate that the term "grants and payments" in Article 3 actually define the term "treaty stipulations" used earlier in the same article.  As indicated in the margin beside the printed article, it is a general release of liability for the government, stated in broad terms in a document intended to end the treaty relationship between the government and these bands of Indians. The question of fishing at the Sault, where the Soo canal is being opened, is reserved for a special treaty with the Sault Ste. Marie Chippewa signed two days later.  A shorter version of the release clause appears in Article 3 of the Saginaw Chippewa Treaty of August 2, 1855 (11 Stat. 633, 2 Kapp. 735).