AUG 8 1979

145

IN THE UNITED STATES DISTRICT COURT

JOHN P. HEHMAN, Clerk

FOR THE WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

- - - -

FILED

Nov 23  12 53 PM '76

CLERK, U.S. DIST COURT
WESTERN DIST OF MICH

BY _____

UNITED STATES OF AMERICA,                    )
                                             )
                    Plaintiff,               )
                                             )
BAY MILLS INDIAN COMMUNITY,                  )
                                             )
          Plaintiff-Intervenor,              )     79-1414
                                             )
SAULT STE. MARIE TRIBE OF CHIPPEWA           )
INDIANS,                                     )
                                             )
          Plaintiff-Intervenor,              )
                                             )
             vs.                             )     No. M 26-73 CA
                                             )
STATE OF MICHIGAN, MICHIGAN NATURAL          )
RESOURCES COMMISSION, and its agents,        )
DR. HOWARD A. TANNER, Director of            )     FEDERAL COURT
the Department of Natural Resources;         )     GRAND RAPIDS, MICHIGAN
DR. WAYNE H. TODY, Chief, Fisheries          )     FRIDAY
Division, Department of Natural              )     NOVEMBER 5, 1976
Resources; and GEORGE DAHL, Chief,           )
Law Enforcement Division, Department         )
of Natural Resources,                        )
                                             )
                    Defendants.              )
                                             )
MICHIGAN UNITED CONSERVATION CLUBS,          )
 INC.,                                       )
                                             )
          Petitioner for Intervention.       )

- - - -

Before

THE HONORABLE NOEL P. FOX,

U.S. District Judge

2

APPEARANCES:

FRANK S. SPIES, U.S. Attorney
Federal Building
Grand Rapids, Michigan   49503
            and
U.S. DEPARTMENT OF THE INTERIOR, by
ELMER T. NITZSCHKE, Field Solicitor
686 Federal Building
Fort Snelling
Twin Cities, Minnesota   55111

            On behalf of the United States of America;

BRUCE GREENE, Esq., and
MS. ARLINDA LOCKLEAR
1506 Broadway
Boulder, Colorado   80302
            and
MS. KATHRYN TIERNEY
Bay Mills Community
Route 1
Brimley, Michigan   49715

            On behalf of Bay Mills Indian Community;

DANIEL T. GREEN, Esq.
416 Ashmun Street
Sault Ste. Marie, Michigan   49783

            On behalf of Sault Ste. Marie Tribe of
            Chippewa Indians;

FRANK J. KELLEY, Attorney General, by
STEWART H. FREEMAN and
GREGORY T. TAYLOR, Asst. Attorneys General
Environmental Protection and Natural Resources
 Divisions,   630 Law Building
525 West Ottawa
Lansing, Michigan   48913

            On behalf of State Defendants;

3

APPEARANCES:   (Continued)


ALSO PRESENT:

　　　　PETER W. STEKETEE, Esq.
　　　　Peoples Building
　　　　Grand Rapids, Michigan   49503

　　　　　　　On behalf of Michigan United
　　　　　　　　Conservation Clubs, Inc.,


- - - -


I N D E X


ARGUMENTS:                              Pages

BY MR. TAYLOR                            5-9
BY MR. BRUCE GREENE                      9-10
BY MR. FREEMAN                          10-24
BY MR. BRUCE GREENE                     24-31
BY MR. FREEMAN                          31-42
BY MR. BRUCE GREENE                     42-46
BY MR. FREEMAN                          46-50
BY MR. BRUCE GREENE                     50-51
BY MR. FREEMAN                          51-54
BY MR. BRUCE GREENE                     54-55
BY MR. FREEMAN                          56-61


- - - -

4

## P R O C E E D I N G S

THE COURT:          Well, who goes first?

MR. SPIES:          May it please the Court, one preliminary matter.  We would ask that Elmer Nitzschke, who is the Field Solicitor for the Department of Interior, a member of the Bar of the State of New Mexico, be allowed to participate on behalf of the Government.

THE COURT:          So ordered.

MR. TAYLOR:          May it please the Court, my name is Gregory Taylor, Assistant Attorney General.  I will be addressing the three-judge panel issue today, Your Honor, and Mr. Freeman, lead counsel for the State, will be addressing the other issues.

I believe the three-judge panel issue is perhaps the first item that we ought to take up.

THE COURT:          What, I didn't get your representation?

MR. TAYLOR:          Gregory Taylor, Assistant Attorney General.

THE COURT:          Assistant Attorney General.

MR. BRUCE GREENE:    Excuse me.  I wonder if I could ask the Court for one moment for another preliminary matter.

I would like to introduce Miss Arlinda Locklear, who is my associate for Native American Rights Fund.  She

5

is admitted in the State of North Carolina, and she will be with us on the case, as well.

THE COURT: All right.

MR. BRUCE GREENE: I have no objection to Mr. Taylor's suggestion that the three-judge court issue be considered first, if that meets with your approval, Your Honor.

THE COURT: All right.

MR. TAYLOR: Your Honor, we have moved for a three-judge district court in this matter, limited solely to the injunctive phase of this case. We are not asking for a three-judge panel, of course, for the declaratory judgment aspect of the case.

Now the plaintiffs have opposed our application for a three-judge panel, relying primarily on Swift and Company vs Wickham, which they have cited in their memorandum and which I have also cited in our memorandum in support of our application.

Now I think the Swift and Company case is clear that a three-judge panel is not authorized where the sole issue of unconstitutionality is based on the supremacy clause. And we certainly do not deny that aspect or that ruling of the Supreme Court.

Here, however, it is our feeling -- and the complaint bears it out -- that there are multiple grounds

6

upon which the plaintiffs wish to enjoin enforcement of State Law, and those include allegations of unconstitutionality under the commerce clause, under the searches and seizures' provisions of the Fourth Amendment, under the equal protection and due process clauses of the Fifth and Fourteenth Amendments. And these are just some indications of the various theories the plaintiffs have set forth to date as to why a State Law should be enjoined. As a matter of fact, we recently heard about a new one. In their memorandum opposing our motion to compel discovery, the plaintiffs have come up with what, at least to us, seems to be a new theory of their case. Where before they were relying upon a reserved treaty right, they mention in that pleading that they also had retained rights as distinguished from reserved rights. Apparently these retained rights are independent of the treaty, apparently independent of State Law. I won't presume to argue their theory. I just bring this up to indicate that this is not a Swift and Company case where we have really a question of statutory construction, which is really what Swift was.

THE COURT:        Well, isn't the cardinal issue, the single cardinal issue the treaties --

MR. TAYLOR:        It would certainly seem to me, Your Honor, but that is not the way the plaintiffs

7

have chosen to plead their case.

THE COURT:            -- in the way I have bifurcated the case?

Now down the road your position may be correct, but I set limits and guidelines when we were in Marquette, looking only to the treaty first, and not coming in with a lot of collateral matters --

MR. TAYLOR:            I quite agree.

THE COURT:            -- that which relates to remedy, if the plaintiffs should prevail.

Now it seems to me as though our starting point is precisely as I have outlined it.

MR. TAYLOR:            Your Honor, I couldn't agree with you more, and that's what I would like to make clear, that we are not asking for a three-judge district court as to the first days of this action.  We wouldn't presume to do so.

THE COURT:            I haven't left the first phase of this action.

MR. TAYLOR:            Yes, I understand.

THE COURT:            I am still in the first phase of this action, and that's where I want to be until that is resolved.

MR. TAYLOR:            Okay.  When we filed our -- you know, when we filed our motion, we had no intention

8

it would have to be heard now, when we filed our motion for the three-judge panel.

And if Your Honor wishes us to renew that at a later date, we certainly have no objection.

We simply feel it is appropriate to be on the record that we do feel this case requires a three-judge panel as to the remedy or injunctive phase of the action.

And I would simply add, Your Honor, that I think that if any motions for preliminary injunction should arise in this case, then we would be faced at that point again with the question of whether or not a three-judge panel should be convened.

Thank you.

THE COURT:            You see, we are not now looking to the regulations of the State or a challenge of the regulations of the State.  We are looking singularly to the issue of Indian treaties or treaties, and in that area the validity of the treaty can be heard by a single judge.

MR. TAYLOR:            Do I understand, Your Honor, then, that we should -- this motion will be more or less pending then until we get to that point, is that correct?

THE COURT:            Yes.  You can file whatever you want to.

MR. TAYLOR:            Fine.

9

THE COURT:          To protect your position, and then when we get over the first basic problem, then we can look at all other matters.  And once the basic problem is decided, it would probably clarify the multiplicity of issues which are raised.

All right.  Now where do we go?

MR. BRUCE GREENE:   Your Honor, we have also brought on a motion for a protective order with respect to the scope of discovery in the Phase One versus Phase One -- Two, Phase Two -- excuse me, Your Honor -- trial, which we would like to bring out now, if that meets with the Court's approval.

THE COURT:          Protection of what?

MR. BRUCE GREENE:   Well, Your Honor, as you recall, of course, the case was divided into two parts. We have now a good deal of discovery which has been scheduled in the form of depositions on the part of the state defendants, which we believe pertains to Phase Two matters.

For example, on Monday, Tuesday, and Wednesday of next week, the 8th, 9th, and 10th, the fish biologist employed by the Fish and Wildlife Service has been scheduled for depositions by the defendants.

THE COURT:          For what purpose?

MR. BRUCE GREENE:   Well, that is our question,

10

Your Honor.  We don't understand what that has to do with the several issues --

THE COURT:          With the treaties.

MR. BRUCE GREENE:    -- that are going to be heard in Phase One, and we are asking Your Honor for a protective order limiting all discovery to Phase One issues until the Phase One trial has been handled.

THE COURT:          This is what I -- I want to make it crystal clear that I am only considering the treaty or treaties.

MR. FREEMAN:        May it please the Court, we are --

THE COURT:          Now it may be that in the area of life style of the Indians -- my readings indicate that this has been a factor in some decisions as to what the Indians intended at the time and what the Indians thought they got at the time.  Then you probably could get into the activities of fishing or fish, but I don't see it otherwise, unless you can point out to me how it would be relevant.

MR. FREEMAN:        I think it is relevant, Your Honor.  Let me point out that I, at this point in time, am not bringing anything before the Court.

What counsel on the plaintiffs' side is trying to do is to stop us from taking any discovery at all in

11

certain areas.

Our position, stated as simply as possible, is that we would like the opportunity to take the discovery that we think is appropriate, and then to make a decision on what we think might be material or relevant for Your Honor.

Now just to give you a couple of examples why I hesitated to say whether it is material now -- and I think there is sufficient doubt so we felt that we should be proceeding with depositions with some of these people -- the plaintiffs served upon us, for example, a document authored by one James Cleland, who will be testifying as an expert witness for the plaintiffs.  And Mr. Cleland is an archeologist.

I have refused to admit, stipulate to its admissibility, because in my judgment there are many, many problems with that document, things that I think are just too hard to deal with in terms of a report, hearsay, objectionable statements, that sort of thing. But to make that evaluation -- I read the document --

THE COURT:            Well, when we get into some tradition, the Indians didn't always right out what they did.

MR. FREEMAN:            That's correct, Your Honor. But Mr. Cleland in his report goes a lot farther than

12

that. He talks about the status of the fishery in 1830's 40's, 50's, and 60's. He talks about what kind of fishery there was, what kind of equipment was used, what kind of vessels were used. When we get into the areas of the 1830's, we are in areas where there is much documentation available. The early commercial fishing records of Michigan have been preserved. We have, for example, without making any formal offers of proof before you now, but we have, for example, licenses the United States Government issued to people to go fishing in the Great Lakes prior to the time Michigan was a state. We have manifests of fish barrels being shipped out, indicating who caught those fish.

So these are areas of wide documentation.

Now in reading what the archeologist says about the state of the fishery, we believe that there is a substantial question as to whether what he is saying is consistent with what we understand to be the position on a number of points of the United States Fish and Wildlife Service.

The plaintiffs in their interrogatories have identified to us three biologists employed by the United States Fish and Wildlife Service who they intend to call as witnesses, presumably in Phase Two.

But to the extent testimony of these peoples

13

might bear on some of the issues coming up in Phase One, we think it is appropriate to take depositions.

We have also interrogatories relating to some of these. Now some of this is very difficult for us to separate out in terms of saying, "Well, this relates to this phase and this relates to this phase." And the reason is the very nature of this case that is before you. This is, as far as I can tell from my reading, the broadest Indian right that has been litigated. Perhaps I have missed a case some place, but just in terms of the number of square miles of water involved, the potential impact on the fishery, it just seems to be the biggest, the most controversial case. The one the plaintiffs keep referring you to is in the State of Washington. That case involved a single river, a single run of --

THE COURT:            Judge Boldt's case.

MR. FREEMAN:            Right, Judge Boldt's case.

Now Judge Boldt dealt with a river. Now you are dealing with some of the largest inland lakes in the world. Now I think it is appropriate for us to try to pin down where there are areas of agreement which may be material in Phase One and where there are substantial areas of disagreement. There will be testimony, for example, in the Phase One proceedings, I presume, based

14

upon some of the answers we have seen in interrogatories by the plaintiffs' experts as to where the Indians fished in the 1830's prior to signing the treaty.

I frankly don't know at this point how relative that is, but I think it is not totally irrelevant to think that this Court at some point may desire testimony dealing with whether or not those areas are still areas which are available for fishing. Have all of the Indians accustomed places of fishing in the 1800's been destroyed by the industrialization of our society? Are they still there? Are they better fisheries than they were in the 1830's? I am not sure that is exactly Phase Two. I think to a certain extent as we talk about what the Indians of 1836 understood they would get. And if we are going to be talking about specific places, we have to look at what is there now.

Is there a whole city built some place where the Indians traditionally launched their canoes? I can't at this point say to you what we may want to bring before you in the case. I think we have to evaluate the evidence. There is obviously going to be evidence that supports us where we simply say, "Enough is enough. We can't bring this whole volume of cluttered materials before Judge Fox. We are going to overly extend the record."

There may be some points where we say this is

15

terribly important, this is terribly relevant. We should attempt to focus on this point and attempt to bring it before the Court.

All I am trying to do in discovery is to give us the ability to do that. We are not getting much cooperation out of the plaintiffs, as I think the Court knows from the many motions to compel discovery and other things we have filed. Here we are today, I have got a deposition set for Monday, and they are asking to quash a subpoena duly served by the United States Marshal.

But I am not saying that in the sense of challenging the good faith of anyone involved. I think to a certain extent the plaintiffs are just confused about their own case. They have managed to confuse us.

We are not sure where they are going on some points, and that is another thing to bring into the discovery. I think it would be a reflection upon the competency of all the attorneys involved in this case if when we come to that hearing before Your Honor we are still in cross-examination trying to identify documents that might be relevant, trying to find out what sort of things people based their opinions upon. I think that is the sort of thing in a complex case like this -- I don't know what we are up to now with Mr. Nitzschke. I think he is 22 or 23 in terms of counsel that have appeared

16

at various places on the plaintiffs' side.  I, as you know -- well, we have a much smaller staff.  We have very, very competent people in my division to assist on the case.  I think with that kind of legal manpower involved here, we can narrow this case down to find out what pieces are involved, find out what is relevant and what is not relevant.

Is there an Indian tribe, for example?

Now the plaintiffs have repeatedly said there is a tribe before you.  You admitted what purports to be a tribe in this case.

Some of those people, as the Court knows, have some kind of thing that has been referred to you in argument by counsel as an Indian tribe.  Our research indicates that there may be some very serious questions about all that, particularly in light of that section, the treaty of 1855, which provided that the Chippewa tribe was dissolved.  We think that part of the history of the times is to explain that.

Now part of the history of the times, in our view, goes to this question, which plaintiffs first raised, and they have raised it every time we have come before you, through oral argument, through the arguments of their counsel.  They have said to you, "The right to fish was so valuable the Indians would never have given

17

it up.  Obviously, therefore, none of these treaties mean the Indians gave up their right to fish.  There has to be some mistake.  The Indians could not have understood that."  The evidence that we desire to get at, in part through the discovery that's in progress, is precisely what was happening in the 1830's.  Biologists, who have spent many, many years studying the Great Lakes, studying those fish that are available to commercial fishing operations in Michigan, I think it would give us some insight as to precisely what kind of a fishery there might have been.

Now that would seem to me -- it would seem to me highly material to whether or not they understood a particular fishing right to exist.

There is some evidence which seems to indicate the percentage of fur-bearing animals and others were down to perhaps the lowest point in the history of the State; that the fishery was not an organized fishery at all.

John Jacob Astor attempted to get up a commercial fishery, and he went into bankruptcy.  There were a few Indians that worked for his company.  There seems to be little evidence of the kind of fishery they are talking about, the kind of thing where the Indians were very, very conscious of, very, very protective.

18

This goes into the whole question of the various portions of the treaty which set aside land out West to provide for the removal of Indians. Now if there was no active fishery in the 1830's, I suggest that is highly relevant to the case. If that fishery wasn't there, if these were a hungry people bargaining with the United States for lands somewhere else where they were going to move to, that, I think, puts a very different slant on the treaty. And, as I say, I am not saying to you, I am not asking the Court to make a decision on any of that now, obviously.

I am not even prepared to say to the Court how we really want to get at those questions, but I think those questions are relevant to Phase One.

I think we are entitled to have some discovery. And even to the extent such questions are only relevant to Phase Two, I believe that unless we are going to complete Phase One, Your Honor, and then go into -- well, we have already been in discovery in this case for four years, and I really haven't gotten very far. We have answered the best we can every interrogatory that was served upon us. We have not had much cooperation on the other side.

Assuming that the Court's decision is that there is some kind of a treaty right, do we then go into

19

four or five years of discovery prior to Phase Two? I think it would be helpful to the State, I think it would be helpful to the Court if we could complete the discovery, make an evaluation of what is relevant to Phase One. Anything we try to bring in, of course they still have the opportunity to object at any time. Any question I ask before Your Honor, any document I am trying to bring in, they could raise the question of materiality or relevancy as to Phase One, and at that point Your Honor may rule on it.

But I think we are entitled to go out and see what is there, to find out just what the history of all this was, to see what kinds of records were available, to see what the experts employed by the United States say.

Now to take just one, that is the deposition set for Monday morning, the man's name is Richard L. Pycha. In the interrogatories served upon us by the plaintiffs, it appears that Mr. Pycha has spent the better part of his adult life in the employ of regulatory agencies concerned with saving the fisheries of the United States. He is one of a group of highly dedicated people that were brought on the scene in the post World War II era where it appeared the nation's fisheries were in danger of collapse, to try and save the great infusion of federal

20

money and talent and things of this state.

They identified Mr. Pycha as their expert on Lake Superior.  Of all the biologists employed by the Federal Government, this is the one they would use as their witness in this case.

I checked out Mr. Pycha with some of our people.  I said, "Tell me about him."

They told me they hold him in very high regard. He is a highly competent expert.

They also told me that Mr. Pycha has worked very closely with the Indian groups in Michigan.  He made some suggestions, some of which have been followed, some of which have not; that he has studied the problem at great length; that he has studied the historical use of certain types of gear by the Indians.

Based on that, it would seem to me highly appropriate to take his deposition.

I advised the plaintiffs of my intent to do that, and asked them for some dates, something convenient to counsel.

After about a year of no response, I requested the United States Marshal to formally serve a subpoena. And here we are today, the deposition is set for Monday.

Now I don't say that we will be totally unable to proceed some day when we get to Phase One without

21

taking Richard Pycha's deposition, but I do think we are entitled to take it. I do think that man's testimony -- he is their witness. He is a man apparently of considerable competence. It might be useful in reading that deposition we may well choose to go a significantly narrow road before this Court, because maybe at least on the biological issues so far as they relate to Phase One, if we find there is total agreement between the State biologist and the Federal biologist, I am content to put our people on the stand, and we will use Mr. Pycha as our witness, too. Perhaps he can come on as a joint witness for the plaintiffs and the defendants. But I can't make that kind of decision without asking a few questions at a deposition.

As to issues which may come up -- and I don't know how likely they are. I can tell you I have received letters from some of the counsels for the plaintiffs threatening us with various motions for preliminary injunctions and things like that. How serious they are, whether they're going to file them, I don't know. I would like a chance to talk to the Federal biologist on the evidence that might come out on an issue like that, so that I don't have to come before the Court and say, "Your Honor, I have got this motion, and we are simply not prepared to respond to it. I need some time." I am

22

going to do that. I am going to prepare -- if this Court contacts me on Thursday and says you want me here on Friday to talk about a motion, I would like to get far enough along in the discovery of this case so whatever that motion is I will be here and I will be ready to go on it.

I think what it really comes down to, Judge -- and I say this just based on my own looking at this case for four years. I think what it really comes down to is they're afraid of what that biologist is going to say in the deposition. This isn't really -- we are not really talking about the convenience of counsel. There are so many of them somebody can come down to represent them. We are not talking about the expense. We have got the United States Government in here, and there is plenty of money.

What we are talking about is that, is come home to the counsel for the plaintiffs, that some of the assertions they have made to this Court in the pleadings, some of the arguments they have made before this Court are not supported by the people they have identified as their expert witness. They don't want that part of the court record. They don't want us to have a chance to ask questions on depositions relating to the status of this fishery.

23

Now a good part of this fishery is composed of species of fish which weren't there in the 1830's. I think to the extent those species are being discussed in Phase One, we are entitled to talk a little bit about where did those fish come into Michigan waters, where did they come from, who is paying the cost of the fish hatcheries which were raising these fish, who made the decisions, what kinds of decisions were they, how did these decisions affect other resources, for when you make a decision to increase one fish species, that may well have implications to other species in terms of its survival.

And so I just suggest to the Court that from my perspective the plaintiffs are saying to you, "We don't want a deposition as part of this court record that may be inconsistent with the assertions of counsel and the Court."

And I am saying in all candor that is exactly the reason I want to take that deposition. I want to see what this expert they have identified has to say.

And if I have wasted two hours of somebody's time at a deposition in bringing out things which the Court ultimately holds are not relevant to Phase One, I don't feel anyone has been damaged.

The witness has lost perhaps two hours. Perhaps

24

the counsel have.  But if something comes out of it that is useful to this Court, something that may strike this Court as being a terribly relevant and material point, then I think we have all spent the time wisely.  And that's the reason that, while we will certainly obey any order this Court makes, it is our feeling that we should be allowed to go forward with our discovery.  And if the plaintiffs at any time feel we are unduly harassing them, if they feel that we are attempting to stall, trying to drag on the case, when they say something like that, I think they are entitled to come before you at any time and make that argument.  They are not saying that.  They can't say that with a straight face.

What they are just saying to you is they don't think we should be allowed to do any discovery in a lawsuit they filed against us.

We think we are entitled to it.

Thank you.

MR. BRUCE **GREENE:**  Your Honor, I would like to suggest that the defendants here, in effect, are re-arguing something that was before this Court early in the summertime, and that was the Motion for a Separate Trial.

What they are saying to you today is, "Allow us, even though you have severed certain issues for early

25

trial, even though the Court has made an effort to try to expedite the process and move the case along and determine certain threshold legal issues before considering other issues, which may not be relevant, depending upon how the Court decides those threshold issues," they, in effect, are saying, "allow us to discover on the entire case. Let us finish all that we want to discover, and then we will go to the trial on the Phase One issues."

And I suggest to Your Honor that is totally contrary to what we believe the Court ordered in June, and it would totally frustrate the whole notion of a separate trial.

Now we have -- on certain limited issues, we have cited quite a number of cases in our brief in support of our protective order where the kind of order we are asking the Court to issue has been issued by other Courts subsequent to issuing an order on the separate trial. We think it is perfectly appropriate here. Without it, Your Honor, we suggest to you that we don't know when this case can come to trial.

We have tried our best. And I resent very much the suggestions of counsel for the defendants that we have been delaying things or that we have been attempting to obfuscate any matters before the Court.

We have what we believe shown the Court what

26

Phase One is all about.  We have indicated who our witnesses are.  We indicated that when we were supposed to indicate that on the 9th of August.  Thusfar the defendants have not indicated a witness list.  They have not indicated to us who they intend to call during Phase One of this trial, except for indicating Dr. Mason.

We have tried to arrange for Dr. Mason's deposition.  We have had some difficulty doing that.

As it stands now, the defendants are still apparently trying to arrange for a convenient date for the deposition of Dr. Mason.

We have said very clearly we have two anthropological or ethnohistorical witnesses, Dr. Cleland, Dr. Tanner.  We have six Indian witnesses.  We are ready to go to trial, Your Honor, within a matter of 60 days, at the most.  All we need to do is to depose Dr. Mason and whomever else the defendants eventually, I suppose, would care to indicate to us that they would like to call during the Phase One matters, Phase One trial of this case.

I think the big difference between the plaintiffs and the defendants at this point, Your Honor, is that we are trying to get this case to trial.  That was the reason behind our Motion for Separate Trial.  And we presume that was the reason the Court granted that

27

motion this past summer.

But I believe the defendants are not cooperating with us at all.  It seems to us, really, Your Honor, to make absolutely no sense to engage in discovery on the entire case if some of those issues are simply never going to be -- may never be heard before the Court.  Then again they may.  But the point is, we need to analyze and come to some determination about these threshold issues.

Mr. Freeman has suggested that somehow we have something to hide.  Again, I resent that.  But even despite the resentment for that, if he is right, that is going to come out.  There is no question about us hiding anything.  It is a question when it comes out.

We don't object to the depositions of the fish biologists.  We do object to them now when we are all trying busily to get ourselves ready for trial on the Phase One issues.  There is no way under any theory of the case, it seems to me, that the fishing biologist could be considered for testimony during Phase One of this case.  And yet of the witnesses that the State has asked or scheduled for deposition, who is scheduled first?  The three biologists.  Who is scheduled at the end in January?  The anthropologist or the historian, Helen Hornbeck Tanner.  I suggest that's completely inconsistent

28

with the notion of trying to get this case to trial in a hurry.

We are about to, as soon as my comments are over, we would like to ask this Court for a trial date. We believe that in 30 days discovery can be completed, depositions can be taken.

THE COURT:            What would be the testimony of your anthropologist?

MR. BRUCE GREENE:    The anthropologist, Dr. Tanner, is going to -- she is an ethnohistorian, which is more of a people -- I suppose, a people-oriented discipline. She is going to be testifying about the circumstances surrounding the treaty of 1836 and the treaty of 1855, and she will explain the many documents, which we have already submitted in our request for admissions, to try to, in effect, fill in the gaps and the holes which may not appear explicitly on the face of the treaty, to explain what the Indians retained or reserved by way of fishing rights, and what in fact they ceded under those treaties. In other words, what they gave up and what they retained.

And Dr. Cleland is going to be testifying concerning the fishing practices of the Indians during treaty times, so that the Court can understand the vital importance of the fishery to the Indians and can conclude,

29

as we argue, that if the fishery was of such importance in terms of both subsistence and the livelihood, that the Indians would not have conveyed those rights away, that they retained or reserved those rights under that treaty. And that is what our ethnohistorian and our archeologist, I suppose, is what Dr. Cleland likes to refer to himself as, will be testifying about. In other words, this Court needs to know, as you properly indicated a few moments ago, surrounding circumstances at the time the treaties were negotiated, in order to determine what was ceded and what was retained. And that essentially is what they will be testifying about.

The Indian witnesses are scheduled to testify -- and we have indicated this in an offer of proof -- what they understood by virtue of the oral traditions of the community what the treaty meant, what they retained, what they gave up. And as far as we are concerned, that is basically what Phase One is about, what did we give up in 1836, what did we retain. If we have fishing rights under the '36 treaty, the next issue is what happened as a result of the 1855 treaty.

There is an argument that article 3, which contains a release clause, resulted in the Indians releasing or giving up whatever rights they retained under the 1836 treaty. We contend that is simply not

30

true, that the release clause didn't pertain to fishing rights.

Assuming those two issues are decided favorably to the Indians, the final question, which is simply a legal question, requires no testimony, in our estimation. It is a question of whether the State has any jurisdiction whatever to regulate the Indians in their fishery.

If that is answered, that is the end of Phase One, as we see it, certainly, and as the Court has so ordered in its order dated July 30th.

If the Court rules that we have treaty rights, that we didn't lose them by the '55 treaty and that the State does have jurisdiction to regulate, contrary to our position, then questions will arise about what kind of regulations are permissible, who may they run against, are they necessary for conservation purposes, did they discriminate against the Indians. Those kinds of issues may be issues with respect to pollution, **PCB**, the status of the fishery today, the number of Indian fishermen today -- all of those questions may come up, but we submit it is entirely premature to be considering any of those until we find out whether we have any rights. Or if we had them, whether we lost them by a later treaty. That is as clear as I can say to Your Honor what Phase One is all about. We tried to say that in our pleadings.

31

We have tried to say that in briefs.  The defendants have consistently tried to isolate certain issues and asked us to brief them out of order and out of time. And we have tried -- we have done that when we felt we had no other choice but to do that, but we suggest that is not what we perceive to be an orderly way to handle this lawsuit.  We think the Court has laid out an orderly way to handle the lawsuit, and we are trying to comply with that.

We would like a trial date, Your Honor.  We would like to ask this Court for a trial date.

THE COURT:          I would like one, too.

MR. BRUCE GREENE:    We think we don't need any more than approximately 30 days, if the defendants will tell us who their witnesses are.

THE COURT:          Trial dates are hard to come by these days.

MR. BRUCE GREENE:    I realize that, Your Honor.

MR. FREEMAN:        If I might just respond briefly, Your Honor, I think it is about 10 years since I was admitted in this Court.  I have never asked you to delay a trial date, and I am not going to here.

THE COURT:          I know you are not.  I know your intention wouldn't be that way.  But the question is, what does/the hatcheries used or established

32

after the treaty, what does that have to do with the determination of the validity of the treaty?

MR. FREEMAN:        Well, let me just try a couple of possibilities, Your Honor.

Now counsel has suggested to you that they are putting on six people who would testify to what their fathers told them their grandfather's told them, and so on, about the treaty.

One of the questions I asked was from how large a group did you select these six.  That is one of the interrogatories they haven't answered.

The reason for that, of course, was we wanted to do a little bit of checking to see if there were some inconsistencies in these stories.  Not that I don't trust counsel on the other side, I just see that as an obligation of mine.  To select six witnesses out of a large group, there should be some check to see that the six will give testimony representative of them.

But let's suppose when we get into the throes of this and these people begin to testify before you, that one or more of them indicates that it was the understanding of those present in the treaty times, not that there would be a complete right to fish for every species and every inch of water in the Great Lakes, but, rather, it was their understanding that certain of the

33

places that had been their traditional places of fishing would continue to be available to them on some kind of a basis, whatever basis, so many years or whatever, I think it is highly relevant to know what was available at those spots in those times.

I think it is also highly relevant to know what kinds of fish those Indians were taking, and in what quantities; not to suggest, because I will not suggest to this Court that if we can show that the Indians only took 5,000 pounds in 1829, they are limited to that today. We are not going to make that kind of argument. But I think it is relevant to know what was there, what were they taking, how were they taking it, because I suggest to Your Honor that this oral tradition, assuming it is admissible -- of course it is a legal issue -- but assuming this oral tradition is admissible, I don't think it is going to be specific testimony with great detail. It is going to indicate a certain under-standing. I am sure each witness will use different words to describe what has been related to him the under-standing was.

Now if the understanding is limited only to certain waters, I don't think the scope of the case then is all of the Great Lakes, whatever counsel says. The hatcheries become important at that point in terms of determining just what's there.

34

We know one of the traditional Indian fisheries no longer exist, for all practical purposes. It is the St. Mary's River.

We also know that at least some of this came into the case before the Indian **Claims Commission** where a large cash award was made to the people. Some of the people of the plaintiffs in this case. And that is an issue relating to another motion I would like to get to this morning.

But I think to put all of this into context, we have got to understand what the Indians thought they were giving up, what they thought they were keeping, if we are going to talk about fish in terms of fish, not in terms of Lake Superior, unless that is truly the way they understood it. But if they did not understand it in terms of Lake Superior, if they understood it in terms of the traditional encampment sites within Whitefish Bay, or something lesser than Lake Superior, then I think that is what we ought to talk about. We ought to talk about what species of fish were there, what kind of fishery was there. Otherwise I think what you are being asked to do, Judge -- and I think this really is the position of the plaintiffs. I think they are asking you to embark on a series of hearings. I don't know how many we are talking about, because I don't know whether we are going

35

to talk about things like deer or turkeys some place down the road. If we are, perhaps we are talking about, at this point, 10, 12, 13 little specific hearings they would like to bring before you, the first one being just a general sort of a thing on Indian fishery. But I think you have indicated quite clearly -- and I agree -- that the Indian fishing issue, as it relates to the treaty, is an appropriate segment to split off. But I don't think we should just talk about fish, just that word "fish." I think it is important to know precisely what kinds of things we are talking about. What did they say around them? How often did they do it? What kind of a fishery did they have?

Counsel says it was a commercial fishery. Maybe it was. I would like to see some proof on that. I would like to talk to somebody on their side who could tell me something about that. Some of our people say based upon historical research that is not so. The Indians went out and fished for food for themselves during the harsh Michigan winters. I think that is a different kind of case, because if that is the kind of right we are talking about, that is part of Phase One. Just what was the right? Was it the right to go out and engage in a large commercial venture to ship fish in interstate commerce, or was it a right to take enough

36

fish for your own people for the Michigan winter?

I don't know if there is enough evidence for us to even make an argument before you that it was a subsistence fishery, not a commercial fishery. But I sure would like to look at that evidence in advance. I would like to take a look at as much of that as I can so I don't have to spend hours of the Court's time while I laboriously try to get at an issue like this through cross-examination of these people. The only way I can see to do that now is by depositions. The answers we are getting to the interrogatories are essentially useless. I haven't read the latest that were handed to me as I came in the door this morning. Maybe they are vastly improved.

THE COURT:          Well, any discovery related to settlement of the lands, I don't think we at this point have to go through all the archives and read all the abstracts of titles and so forth. At this point, no.

MR. FREEMAN:          That is my next motion, Judge. I think if I --

THE COURT:          Well, I have looked at these pleadings, and at this point, no, because this all was subsequent to the treaty, and it involves the remedy.

37

MR. FREEMAN:        Your Honor, perhaps I am not reading it right, then.  I have never held myself out to be a great legal scholar, but as I read the treaty, it is the right -- the right is given in limited fashion until Michigan is required for settlement.

What I have been trying to get out of the plaintiffs since this case was filed is what kind of an argument are they going to make under that language?  If they are going to argue Michigan has not been required for settlement, then I think we are entitled to have some information on what they are talking about.  I think what they ought to say -- they take the liberty of suggesting arguments to me.  I would like to take the liberty of suggesting one to them.  I think what they ought to say is that quite clearly Michigan has been required for settlement.  There is no point spending a lot of time arguing about that phase of it.  I think the question is whether somehow there is a surviving Indian treaty right.

To argue the State of nine million people has not been required for settlement, it strikes me as just not a good factual argument.

But I am trying to find out if they're going to make that argument.  That's the reason for the interrogatories.  We are trying to force it out of them,

38

whether they are using that theory.

THE COURT:          I am not going to let the hearing on the validity of the treaty be bogged down by examining all the archives as to where the land was transferred from party to party and what happened to the land, not at this stage.  I am not going to occupy Court time in that phase of the case.

MR. FREEMAN:          May I say something tangentially?  This is something that came up about three years ago, and it is the reason I've been pushing on this issue.  My clients feel strongly that Michigan has been required for settlement.  The request they have made to me is that unless we can deal with this issue some other way, they suggested that I certify to the Court that the witnesses we desire to call are the county clerks, the 55 counties involved, and ask every clerk whether or not his county has been required for settlement.

I think that they have a point.  I never have called 55 witnesses in a case, and I don't propose to do it here, but I think they have a point, that some place we have got to deal with that issue.

It's inconsistent for counsel to establish before you and argue there is some treaty right which was entered into in 1836 with the contemplation it would continue forever, when the very language says "until the

39

land is required for settlement."

If we totally reserve any discovery on that issue -- and I take it that is what Your Honor is thinking of -- it seems to me that when we go through this Phase One hearing, we are then left with a question hanging that makes it almost impossible for either side to attempt to seek the proper review, which I think is one of the better reasons for splitting this case off, so if there is going to be an appeal, we don't have to wait until the whole case is tried.

But if this Court is unable to make a finding of fact at the end of Phase One as to whether or not Michigan has been required for settlement, then the Court has found, as I would understand it --

THE COURT:            If I need to make that kind of judgment, need that information to make the judgment, I can at that time launch you on that path.

MR. FREEMAN:            Well, if I correctly understand where Your Honor is going, I guess the answer I should say to counsel's request for a speedy trial is that apparently discovery is over.  I can be ready to try the case tomorrow.

And I don't mean that to sound disrespectful, Your Honor.  I am just giving you an honest answer.  If we can't discover under those kinds of conditions, if

40

what we are going to have is the witnesses they are talking about take the stand, I think we are ready to cross-examine those people.

I think it may not be as -- it may not come out as counsel has summarized it for you, because there are, of course, points on the other side we intend to bring out on cross-examination, but we can do that cross-examination, Your Honor. We are basically prepared to do it.

THE COURT:          And now with your expert on -- what was the expert's name, "Pike"?

MR. FREEMAN:          The biologist?

MR. BRUCE GREENE:    Richard Pycha is his name.

THE COURT:          Richard Pycha. Now what would you ask of him? What would be in your search?

MR. FREEMAN:          Well, of course -- well, of course I am dealing with a great paucity of information, and I tell you candidly I would do some preliminary exploration to see if we have got any bright ideas in terms of the true discovery deposition. But some of the kinds of things we thought about asking Mr. Pycha went to what, based upon his knowledge, if any, of the records -- we understand he has studied them, but you understand we haven't talked to him. We haven't heard that from him. We are relying on hearsay. But based upon his study of

41

the records, what was the level of the fishing activity in the 1830's? What did they take, without asking him for a conclusion, basically going towards the point of was this survival thing so pervasive, so all over Indian life that it was the kind of thing counsel characterizes as something so important they would never have given it up, or was it a minor sideline? Was it a few Indians working for white commercial fishermen, or was it an established Indian fishery? What kind of equipment did they use? How far out in the lakes did they go? To the extent he knows, what sort of impact did this have? I think that is important, perhaps to Phase One, perhaps to Phase Two. I am just not clear in my own mind on it now till they provide us with the answers.

But if we are going to talk in this Court about the Indians' understanding of what they preserved or gave up, and to the extent that the Federal biologists are in the position to offer us expert testimony as to what the Indians had, I think that strongly is relevant to what they retained or gave up, what they had, what did they do. It may be that I am wasting my time, Mr. Pycha knows nothing. As I say, the interrogatories are not giving us sufficient clarity, and it seems absurb to just keep sending more and more interrogatories. So we thought we would try some depositions of some of the people they

42

have identified as their experts. But I would be the first one to concede that it is a true discovery deposition where we are going to do a little bit of a fishing expedition to see what he knows, to see if there is something we ought to know about or not. There may be older records that the Fish and Wildlife Service has that we don't know anything about that might be highly relevant to this case.

THE COURT:        Well, you can depose all of the witnesses of the plaintiffs, and I would let you go to the deposition that you have scheduled for, to whatever extent.

MR. FREEMAN:        Thank you.

THE COURT:        To see what happens there, and then we can probably come back and see what course to follow.

MR. BRUCE GREENE:   Can I?

THE COURT:        Yes.

MR. BRUCE GREENE:   Excuse me, Your Honor. Dr. Pycha, Mr. -- let me see. Mr. Cleland and the third fishery biologist. His name escapes -- Tex Wells -- excuse me -- Dr. Wells, are fishery biologists. They are employed by the Fish and Wildlife Service. They are not historians. They are not offered for any testimony by the plaintiffs with respect to anything that happened

43

during treaty times. They do know about the fishery resources in the Great Lakes today. They have studied them today. They keep abreast of them today. They may have a lot to say about what the fishery is like today. They may have something to say about the regulation --

THE COURT:          That I won't consider at the time when I consider what happened around the treaty time.

MR. BRUCE GREENE:  Yes. Well, we tried to say what -- we tried to make an offer of proof with respect to all witnesses. The purpose of those witnesses was to testify with respect to Phase Two matters, conservation, the nature of the fish stocks today, what kind of regulation takes place with the fisherman today -- all of those kinds of things. They --

THE COURT:          They are not relevant to any issue of what happened in the treaty time.

MR. BRUCE GREENE:  And that is what I understand also. But, Your Honor, if their depositions are allowed to be taken next Monday and Tuesday and Wednesday, I would suggest to the Court that we are faced with this problem, which I think we have been talking about this morning, and that is, you know, when do we address ourselves to discovery of these phase, so-called "Phase One issues"?

Now they have also noticed depositions of

44

Dr. Tanner and Dr. Cleland.  They have noticed those depositions for December and January.

Both Dr. Cleland and Dr. Tanner, despite the representations of the State defendants that they don't have any idea of what is going on in this case and what these witnesses are supposed to be testifying about, have prepared lengthy reports, which we have submitted to the Court.  They are identified already with the Court, filed with the Court.

Dr. Tanner's report is Exhibit P-1, and Dr. Cleland's report is Exhibit P-3.  We have nothing similar from any of the witnesses of the defendants.  We don't know who the witnesses are.  They haven't even given us an offer of proof or a witness list for what they at least perceive to be the Phase One part of this case.

And the nature of our Motion for Protective Order today, Your Honor, is to ask that these fishery biologists, witnesses who the defendants want to depose next week, simply be deferred until after we have come to trial on the Phase One matters.  To allow them to depose them now, it seems to me, would completely frustrate what we understood to be the Court's order when it severed certain issues out for early trial. They're current practicing employed by the Federal

45

Government type of fish biologists.  They may have something to say about this case.  I am not suggesting they have nothing to say about the case, but clearly, if anything, under any stretch of the imagination, I can't see how they have anything to say about Phase One. They may have something to say about Phase Two, depending on how this Court rules on the Phase One issues.  If the Court rules, for example, on the third issue that has been severed for separate trial, that the State has no jurisdiction to regulate Indian fishing at all, then they clearly don't have anything to say.

And similarly, if the Court rules we don't have any reserve treaty rights, or that we had them under the '36 treaty and we lost them under the '55 treaty, they wouldn't have anything to say in this case.

But, you know, Dr. Pycha, for example, Your Honor, is, as Mr. Freeman has indicated, a very knowledgeable fish biologist.  He lives up in Ashland, Wisconsin. He has studied the fish stocks in Lake Superior for quite a number of years.  But he, by no stretch of the imagination, is someone who would testify about the nature of the fish stocks in 1830, assuming they were relevant.

If the defendants want to bring on a witness for that proposition in support of some conclusion, which escapes us, we have no objection to that.  But they haven't

46

even done that.  They haven't told us who their witnesses will be beyond Dr. Mason, and they have not made Dr. Mason available for deposition.

I suppose we could proceed as they have and just notice it and issue subpoenas, but we have been proceeding on the assumption that we could arrange some of these discovery matters through letters and telephone calls, arrange for the scheduling.  We are amenable, certainly, of handling it in a more formal way, if that is the only way to do it.

MR. FREEMAN:        I have to respond to that, Your Honor.  I don't know what counsel is talking about. Now he called me and asked me to take a deposition of Dr. Mason.  I arranged a room, I arranged a court reporter --

THE COURT:        Dr. Mason?  Your voice dropped.  Doctor who?

MR. FREEMAN:        Our expert witness, our expert historian, Dr. Philip Mason.

Now Dr. Mason is a world renowned historian, who we hired at great expense for this case.

They called me and asked me to take a deposition of him.  I agreed.  They asked me if I would arrange the time and place.  I did that.  I arranged for the court reporter, I arranged for the room, I arranged

47

for Dr. Mason. I was there. It was set for a Monday morning. And Friday I received a telephone message that they wanted to call it off. I don't think that is lack of cooperation on my part. I don't know what they are talking about. I am say I totally cooperated, and I think it is a rather cheap shot to suggest I did not.

As far as the fish biologists go, I can just tell you in a report of their archeologist, which they sent to me and which they indicated they filed a copy with the Court, he goes on at great length about the status of the fishery in the 1830's. He does so by citing certain professional journals, one of which was written by one of the defendants in this case, Wayne Tody. If he is going to be testifying to that before Your Honor in Phase One, then it seems to me either Dr. Tody or somebody else ought to be answering him, ought to be telling whether or not this archeologist truly knows anything about biology. I am trying to find out if the Federal biologist would give the same testimony as the State biologist, because, frankly, I see some advantages in avoiding all the problems I anticipate, if I put some of the State defendants on the stand with suggestions -- and you have seen them already in the complaint -- that our people are motivated by bad faith, they are harassing the Indians, and all of that. If I could avoid all that

48

by just putting on a Federal expert, someone in the employ of the United States Government who is knowledgeable, I am content to do that.  It makes no difference to me whoever the testimony works for, if he is an honest, competent person.  And that is what I am trying to find out.  Maybe he knows nothing.  Maybe I will be wasting my time at this deposition, but I think I am entitled to ask him if he knows something, ask him if based on 20 years of study of Lake Superior he has an opinion as to the cycle of the thing, where do the fish spawn.  I don't think that has changed since 1830.  Maybe it has, but I don't think so.  I think that anybody who has spent their adult life studying those fish is going to have a pretty good expert opinion about what the fish stocks were like in 1830 or 1840 or 1850.  He is probably going to have read all the same technical journals that their expert cites in his archeological report.  He may be aware of a number of technical journals that would be of some use to us, that would be relevant to the Court, if we are going to that issue, that are not cited in that report.  And I think I am entitled to ask him that.

THE COURT:          Yes, for those purposes, you can, to see if there is anything that relates to the 1850 -- to the part of the time in question.  But as to anything currently, it would be premature and not in

49

keeping with the intent of deciding the threshold question.

MR. FREEMAN:          Well, might I raise one more point, Your Honor:  if we do not take any discovery on these issues, are counsel willing to give us, counsel for the plaintiffs willing to give us any assurance that this long threatened Motion for Preliminary Injunction is not going to suddenly come in?  Because if the Motion for Preliminary Injunction is coming in, if they are going to ask you to order us not to arrest anyone who claims to be an Indian, I think we would like to do some discovery on these issues.  If they're not going to do that, then I am content to wait until Phase One or Phase Two or whatever Your Honor thinks is appropriate, but that is part of what is bothering me.

THE COURT:          Well, that arresting problem I would have to handle separately and independently, and the quicker we can get the treaty problem solved, the quicker we can answer that problem.

MR. FREEMAN:          Well, that issue, Judge, will go a step farther.  You must understand we are facing a large number of people who claim to be Indians.  I suspect some of them are not, and I don't know when we would get to the phase of trying to identify who those entitled to fish are, but I suspect that is neither Phase One or Phase Two, assuming that you found the

50

fishing right and all the other things that are coming out down the road somewhere.

THE COURT:        One of the reasons I am interested in resolving the treaty issue as quickly as we can is precisely because of the threats of arrest, and that's why I want to target in on that cardinal issue.

MR. BRUCE GREENE:   Your Honor, I am just -- still perplexed by why the defendants noticed the depositions of the three Federal fish biologists first. If they are interested, if in fact they are interested, as they represent, of what happened during treaty times, and if in fact we submitted a report by Dr. Cleland that pertains to the treaty period, and if in fact we submitted the report by Dr. Tanner that pertains to the 1830's and 1850 period, why don't they depose those witnesses first and see what they have to say?  Why don't they offer a witness of their own to rebut what is clearly set forth in their report?  And indeed I don't imagine that the testimony, the direct testimony at trial is going to conflict substantially -- not conflict, but go beyond substantially what has been said in their reports.  Why aren't they offering -- why aren't they, A, deposing those witnesses first instead of the fish biologists today, who, admittedly, from our offer of proofs, pertain to

51

Phase Two issues clearly, in our mind?  And why aren't they offering or indicating to us that they have a witness that will testify with respect to rebuttal to Dr. Tanner's or Dr. Cleland's testimony?  You know, the answer --

THE COURT:       Your discovery should be directed at the kind of testimony that is going to come out in determination of the validity of the treaty.

MR. FREEMAN:       I certainly agree, Your Honor.

I can answer Mr. Greene's question.  In setting the depositions, I have a very, very heavy case schedule. It is the nature of Government employment.  I only had so many days per month I could do it, and that is why I scheduled these as far ahead as January.

I put Dr. Tanner far down the line, because they represented to me in the answers to about 10 of their interrogatories, which they handed to me on the plane going up to the last hearing, that they recognized there **were** some great deficiencies in this so-called report of Dr. Tanner's and a supplemental report was being prepared, would be filed with the Court and served upon me at an appropriate time.

I haven't got it yet.  I would like a chance to read that before I take the deposition.

52

So I took a guess probably I would be seeing that in the next couple of months, set her deposition as one of the last ones. Professor Cleland I set also near the last, because in reading his report and in reading a couple of books of his, which are not cited in the report, which we located at the Michigan State University Library, we found what appeared to be some substantial inconsistencies between what Cleland says and what the United States Government said in the Indian Claims Commission case. They have given us no cooperation on discovery on that issue.

I have a very fine capable paralegal in Washington reviewing the Indian Claims Commission papers for me to see if there are demands or admissions against interests or other things. I would like my paralegal's report before I take that deposition. Maybe I will get nothing out of him and a waste of time, but that is the reason I wanted a little block of time to do that.

The biologists are ready to go on immediately. My associate, Mr. Taylor, and I have litigated a great number of cases, as you may be aware. I don't believe many of the cases come to Federal Court, but you may be aware that Michigan has a very bad problem in terms of regulation of its commercial fishermen, a bad enforcement problem. This battle before you is one minor phase of

53

it in the over-all scope.

We have a lot of people that are running a large illegal black market of our fish, so we are in court fairly often on these kind of cases seeking injunctions, revoking licenses, taking other steps, negotiating stipulations. We are familiar with biologists. We have been educated in biological issues, so we are ready to go on these depositions right away.

We didn't, frankly, have the time to set all of these back to back over a two-week period. We just don't have that kind of time. So we had to pick out a couple of days here and say, "Well, we do this one today and that one that day." I can move the schedule around, if they want me to. As I say, I have been asking for over a year for a list of dates convenient to them. No one has ever responded to that request.

If the date we have selected for Dr. Tanner is inconvenient for them, we will move it around. If they would like me to make it a little bit earlier, I have no problem with that.

But to me those things seem to be sound reasons to schedule it that way.

I am not waiting for anything on the biologists. I am ready to go. I am waiting for specific things on the other two, one of which they represented to me is

54

coming.  Now if it isn't coming, if Dr. Tanner's so-called supplemental report isn't coming, then I am ready to go with her.  I can be ready to go with her in a matter of two or three days.  If that report is coming, I have no idea what its length is, whether it is a thousand pages long.  I am willing to take things home on the week-end to read them, but if this is a very long and complex document, I have got to leave myself some time to study it.  And I don't know as of today when that is coming. All I know is in the interrogatories they indicated they weren't going to answer a particular question right now, I could get the answer by reading the supplemental report.

I think they should tell us when the report is coming.

THE COURT:          What is the status of the report?

MR. BRUCE GREENE:    Your Honor, there is a draft report that has been prepared by Dr. Tanner, and we expect to be able to file it very shortly, certainly within 10 days, at the very most.  It is not a substantial report in terms of number of pages or volume.  It covers some areas that were not -- some geographical areas that were not originally included within the blue cover report that Dr. Tanner originally prepared.

We are, of course, under no obligation, we

55

don't believe, to be submitting any kind of reports, but in fact we have done it, because we think it will make the Court's task, and certainly all counsel's task, easier. And we have done it now.

It seems a little ironic that there is some suggestion now that that should somehow be held against us.  We don't see anything similar in the way of reports or anything coming from defendants with regard to their experts, or as to Dr. Mason.  In a way, it is suffice to say that report of Dr. Tanner is relatively short, maybe about 20 pages, and it will be submitted certainly within a week to 10 days.

But I would suggest again, Your Honor, that we have said before you in papers that we have filed, over and over again, what we believe Phase One is all about, and we have also said that we are prepared to go to trial as soon as we depose Dr. Mason and anybody else that the defendants indicate they are going to call as witnesses.

They have violated this Court's order of July 30th requiring them to designate those witnesses.  They haven't done it yet.  We can't depose anybody until we know who they are going to designate as a witness beyond Dr. Mason.

THE COURT:          Mr. Freeman, who are you

56

going to call?

MR. FREEMAN:      What I did, Your Honor --
I don't think I violated your order.  I, in response to
one of their interrogatories, gave them a list of the
witnesses we thought it would be necessary to call.  Now
I, candidly, advised counsel that I put down every name
of everybody we might want to call, because that is the
way you really have to do it to complete discovery, at
least have some ideas for the plaintiffs.

I advised counsel that I was going to try to
pare down that list, that I would like to do some dis-
covery before doing it.  I said the same things to him
as I said to you earlier.  Why should I put on the State
biologist if the Federal biologist is going to say the
same thing, assuming we are going to be using biologists.

So I have given him a list.  He knows the
maximum people we might be calling.  What I haven't been
able to do is pare it down and say, "All right.  We have
decided to go with two or we have decided to go with
three, and here is their names."

But that is very hard to do on the defense
side until you are clear what the plaintiffs are doing.
I don't care whether or not they have filed a report of
Dr. Tanner with you.  It makes no difference to me.  But
if they are going to attempt to use it as an exhibit

57

before you in this case, I think I want to read it, take a deposition of that witness.  Until I read that, I don't know what issues are coming up there that we may want to use one of the experts on.

Just, for example, Dr. Jenkins, who I think is one of the ones that they thought was humorous because I listed Dr. Dave Jenkins as a potential witness. Dr. Jenkins is head of the Wildlife Division of the Department of Natural Resources.  He spent the greater part of his adult life studying game in this state.

Dr. Cleland says in his report that there were no real animals available to the Indians, they were starving till they signed this treaty.  If that is the way the case is coming in before you, I don't need a biologist.  But if all of a sudden there is going to be any shift from that position, which is not stated as clearly as I just said it to you, if there is going to be any shifting from that, it might be appropriate for me to bring in three or four depositions, not for a whole day's testimony, but three or four depositions of biologists who studied the area and can tell you things about what it might have been like in Michigan in 1830.

Now in 1830, that was before we harvested the great logs in Michigan, before the timber industry really took over.  The reason Michigan in subsequent years, in

58

1840's and 50's, became one of the lumber centers of the United States is because we had the great pine trees. That meant that over many parts of Michigan there was a canopy, the sun couldn't get through.  There was no browse for animals that require browse.  So the game as it existed in 1830 was a different kind of a wildlife population than we have today or we had 50 years ago. If that is relevant, if it is relevant to bring in what the Indians were eating, what they were able to get in hunting, then we want to use Dr. Jenkins.  But if somebody on the plaintiff's side is going to lay that before the Court, what we think is in an acceptable fashion, I have no reason to bring him forth.  And it is because of those kind of nagging questions in my mind that I am having trouble paring down my witness list.  I would just as soon not call Dr. Jenkins, but I think that point could be relevant.  A lot depends on the sort of testimony that is coming before you and what sort of argument.

If there is a suggestion at some point that there was an abundance of game available to the Indians, which I would deem to be contrary to what their own experts are saying, but if that sort of thing starts to come in before you, we may want to call Dr. Jenkins. If I can get that issue totally nailed down in discovery, I can make a decision and say to them, "Okay.  We are not

59

going to use Jenkins, because the deposition of so and so makes this point clear."

But if I can't take the discovery, I may have to say to them, I may want to call Dr. Jenkins when we get to this point, I may want to put him on and ask him, because I think we need him as an expert.

You would, I think, when you hear of his qualifications, you would find if any man alive knows what the game was like in 1830, this man does.  He studied it for years and years and years.  And this is the kind of reason I have trouble paring that list down.

MR. BRUCE GREENE:  Your Honor, this is a fishing case.  It is not a game case.  It is a fishing case.  If the State wants to know what we plan to do for trial, they can depose the witnesses we have said we are going to call at trial, not the witnesses we have indicated we are not going to call to trial.  Every time you ask a question --

THE COURT:      Between now and the middle of January you can depose everyone of the witnesses that the plaintiffs have called, are going to call.

MR. FREEMAN:      Well, Judge, today, you see what they are trying to do to me there.  They have identified witnesses in the interrogatories.  Now they are saying they are not going to use them, but they have

60

people of dubious qualifications among the group they are calling who they say are going to testify to the biology.  Now if counsel is prepared to say that Jim Cleland, their archeologist, is not going to attempt to put in biological testimony, that is one thing.  But if he is going to try to use doctor or Mr. Cleland to testify to biology, I think I have a right to find out if the Federal biologists agree with what Jim Cleland is going to testify about.  That is why I keep going in a circle on this.

But I will set this discovery up at Your Honor's convenience.  If you want me done by the middle of January, I will be done by the middle of January.  I am just saying I don't think it is quite as black and white as counsel keeps trying to indicate to you.

I am really not trying to stall, I am really not trying to harass them; I am just trying to legitimately find out some things about this case of theirs.

And let me point out, he says it is a fishing case.  His complaint says the right to hunt, fish, and gather fruits of the land.  That is what the complaint says.

And I am not so sure that for purposes of the Phase One hearing there is a distinction between hunting and fishing.  I suspect indeed I have been advised that

61

the Chippewa word for "hunting and fishing" is the same word, it is a single word.  So when we talk about what did the Indians understand, if the Indians understood they had a right to hunt, and in their vocabulary the right to hunt and the right to fish were the same word, it may be relevant to know what kind of other wildlife was there, what were they doing, where were they getting their food; and that is the kind of thing I want to get at.

THE COURT:          All right.  Do you have something else you want to say?

MR. BRUCE GREENE:    I don't believe so, Your Honor, unless you have some questions for me.

THE COURT:          No.

Well, follow the outline, and you can search out for what the condition was at the time in question, but not going into anything beyond that.

MR. SPIES:          Might I make an inquiry to clarify this matter, Your Honor?  I heard Mr. Freeman earlier in his argument use the word that he wanted to, quote, "complete discovery," unquote.  Now do I under-stand the discovery is to be limited to Phase One at this point?

THE COURT:          It is limited to Phase One.

MR. SPIES:          Thank you, Your Honor.

62

THE COURT:          And anything relevant to Phase One, and not into 1976.

All right.  The Court is in recess.

(At 11:56 a.m. the Court was adjourned.)

- - - -

## REPORTER'S CERTIFICATE

I, James L. Reinardy, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

James L. Reinardy, CSR, RPR
U.S. District Court Reporter
652 Federal Building
Grand Rapids, Michigan  49503

- - - -