

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

- - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA, et al, )
                           )

         Plaintiffs,      )

                           )

      -vs-             )     No. M 26-73

                           )

STATE OF MICHIGAN, et al,     )

                           )

         Defendants.     )

- - - - - - - - - - - - - - - - - - -

         The Deposition of HELEN HORNBECK TANNER,

Ph.D., a witness called by Defendants, taken before

Sandra Crowley, Certified Court Reporter and Notary Public,

at the Mason Building, Lansing, Michigan, on Monday,

January 10, 1977, at the hour of 9:20 A.M.

         APPEARANCES:

                J. TERRANCE DILLON, Esq.   (P23404)
                United States Attorney
                544 Federal Building
                110 Michigan Street, N.W.
                Grand Rapids, Michigan   49502

                    In behalf of Plaintiff,
                    United States of America.

                BRUCE R. GREENE, Esq.
                1506 Broadway
                Boulder, Colorado   80302

                    In behalf of Plaintiff Intervenor
                    The Native American Rights Fund.

KATHRYN L. TIERNEY  (P24837)
Bay Mills Indian Community Tribal Office
Route 1
Brimley, Michigan  49715

      In behalf of Plaintiff Intervenor
      Bay Mills Indian Community.

DANIEL T. GREEN, Esq.  (P25548)
416 Ashmun Street
Sault Ste. Marie, Michigan  49783

      In behalf of Plaintiff Intervenor
      Sault Ste. Marie Tribe of Chippewa Indians.

MARIANA R. SHULSTAD
Field Solicitor
U.S. Department of the Interior
686 Federal Building
Twin Cities, Minnesota

      In behalf of Plaintiff.

GREGORY T. TAYLOR, Esq.  (P24141)
STEWART H. FREEMAN, Esq. (P13692)
Assistants Attorney General
Law Building
Lansing, Michigan  48913

      In behalf of Defendant State of Michigan.

FREIHOFER, HECHT, OOSTERHOUSE & DeBOER, P.C.
505 Peoples Building
60 Monroe Avenue, N.W.
Grand Rapids, Michigan  49502
By
PETER W. STEKETEE, Esq.  (P20967)

      In behalf of Defendant
      Michigan United Conservation Club.

ALSO PRESENT:

      JOHN SCOTT              RONALD KAISER
      SPIKE TANNER            PHILIP MASON
      ASA WRIGHT              CAROLE STEINBERG
      CHARLES E. CLELAND

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

2.

Lansing, Michigan

Monday, January 10, 1977

9:20 A.M.

(R E C O R D)

H E L E N   H O R N B E C K   T A N N E R, Ph. D.

having been first duly sworn, testified as follows:

MR. TAYLOR:  This is the Deposition of Dr. Helen Hornbeck Tanner.

EXAMINATION

BY GREGORY T. TAYLOR, Esq.:

Q. Could you please state your name and address for the record?

A. Helen Hornbeck Tanner, 1319 Brooklyn, Ann Arbor, Michigan.

Q. Dr. Tanner, you are employed by the United States as an expert witness in this case, is that correct?

A. Yes.

Q. When were you first employed by the United States for this particular case?

A. I shouldn't be blank on this, it's so long ago.  I think I finished a report in 1974, so it must have been 1973.

Q. Was it prior to the filing of the Complaint or after the filing of the Complaint, do you know that?

A. Actually, I don't know when the original Complaint was filed.  I think you could find that factual data is better reported by the legal people on the staff.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

3.

Q. Well, when you were hired as a consultant by the United States for this case, was part of the purpose to determine whether or not to bring this action, or were you hired exclusively to testify in the action?

A. I was asked to write a report to clarify the historical background of the Treaty and the Indian parties to the Treaty. There isn't any adequate Indian history of Michigan written as yet, except reports such as these.

Q. Okay. You're an ethno-historian, is that correct?

A. Presently I'm considered an ethno-historian. I've had a rather lengthy professional career, but most of my work is involved with ethno-history, at the present time.

Q. What is an ethno-historian?

A. History of non-Western peoples. In the United States, it's usually considered American Indian Tribes.

Q. Is this a specialty within the general branch of history?

A. Yes.

Q. Is it recognized by some professional organization or group?

A. I think ethno-historians recognize themselves and each other. There is an American Society for Ethno-History and a publication that has the same name.

Q. Does this Society certify people as Ethno-Historians?

A. Historians seldom apply for licenses, sir.

Q. I guess that doesn't answer my question.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

4.

A.    I don't know what you mean by certification.  By certification, I always think of, you know, a certified medical technologist or something like that.

Q.    Does this society certify?

A.    It grants no certification papers.  I don't know of any historical society that does.  It's an organization which people participate in because of their mutual interest in the same subject matter.

Q.    Can one earn a degree in ethno-history?

A.    I don't know, I don't know whether there is any degree program that is specifically called ethno-history.

Q.    You don't have a degree in ethno-history, I take it?

A.    I don't know of anybody that does.

Q.    But I'm asking whether you do?

A.    No, I don't.

Q.    What are your degrees, then?  I see you have an AB in 1937 from Swarthmore College, what was that in?

A.    I think that was called a division of social sciences at that time.

Q.    And what is your Master's degree in?

A.    History, Ph.D. in history, also.

Q.    Now, did you specialize, then, in ethno-history in college?

A.    Ethno-history is a very recent development in the academic field.  My special training at the time I was in

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

5.

graduate school was in Latin American History. That has a very strong ethno-historical component, because one is involved with native people, to a large extent.

Q. Well, then, how did you get into this ethno-history?

A. Excuse me for smiling, I guess I'm asked that about every 36 hours by new people that I come into -- come in contact with. My own special field at the doctoral level was Spaniards in Florida who were very highly involved on the frontier with Creeks, Cherokee, Choctaw, Chickasaws, and Indian Tribes from the Great Lakes, so that I became very well acquainted with the frontier scene that involved Americans and Spaniards and Frenchmen and Indians. After I finished my doctoral degree work at the University of Michigan, I had only a part time job teaching in that particular field, and --

Q. Excuse me, what particular field?

A. In Latin American History. I was teaching Latin American History. An anthropologist, Nancy Lurie, who is now at the Milwaukee Museum in Milwaukee, who at that time was in Ann Arbor, persuaded me to take over the responsibility for some of the work that she had been engaged in. She had been working as an expert witness for about eight years in Indian claims cases, and she was going to have to give that up; and she asked me if I could help out lawyers by finding out what Indian people lived around

JEAN E. INGRAM & ASSOCIATES. INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

6.

Ann Arbor at the time of the American Revolution.

Q.    Now, when was this?

A.    1961-62.

Q.    All right, continue.

A.    That was the beginning and kept -- I was drawn further, every legal case seemed to hinge on every other legal case; and I have worked on litigation involving --- well, I think all of these cases are written in my biographical information. There's no need to repeat, it's all a matter of record.

Q.    Did you become an ethno-historian, then, primarily as a result of becoming a consultant as a witness on Indian cases?

A.    Yes, most people who are now considered ethno-historians received their training in this practical fashion.

Q.    How many ethno-historians are there, have you got any idea, in the United States?

A.    I don't know what the membership of the Society is, but it's, oh, it must -- well, I think there were probably 300 at the last meeting last fall, although the term now is enlarged to include people who are interested in the South Pacific Islands and the native people of interior Brazil and Siberia, and it's become global in its interest to comparative ethno-historical studies.

Q.    Now, what is your present employment?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

7.

A.  I'm Director of the project to create an <u>Atlas of Great Lakes Indian History</u> at the Newberry Library in Chicago.

Q.  Does that involve ethno-history?

A.  Yes, ethno-history and historical cartography.

Q.  In what way will this involve ethno-history?

A.  Well, that's the title, "The History of the Great Lakes Indians," that's the subject matter of the atlas.

Q.  When did you first begin to study the Great Lakes Indians?

A.  Intensively, 1962.

Q.  Was this the result of consulting on a case?

A.  On a group of cases.

Q.  What group was this?

A.  Well, this was a group of consolidated cases that actually came up  for  hearing in 1963 and '64 among Indian claims people.  Those consolidated cases included areas in Ohio and Michigan.

Q.  Was this before the Indian Claims Commission here?

A.  Yes.

Q.  Did that include the Chippewa Tribes?

A.  Yes, I was an expert -- I was an expert witness for the Chippewa, for the Saginaw, Swan Creek and Black River Indians.

Q.  And where are those Indians located?

A.  Southeastern Michigan.

Q.  And the Court in that case approved you as an expert

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

8.

witness, is that correct?

A.  Yes.

Q.  These Indians are in southeastern Michigan.  When did you start studying the Indians in the Upper Great Lakes Region?

A.  Well, Indian history is really all of -- all of one piece. The general history of the Great Lakes Region, the entire Great Lakes Region, the United States and the Canadian portion was a background for the very first study that I did.  I didn't actually work on detailed microfilm for later history until I started working on the report that I've submitted to -- that I've submitted in this case, that's when I became really detailed about this particular area.

Q.  You've done extensive work, apparently, on the Indians of Florida and southern United States, is that correct?

A.  Yes.

Q.  I glean that from your resume, which we have.

A.  Yes, and Texas, Louisiana, North and South Dakota, Minnesota.

Q.  Michigan?

A.  Yes.

Q.  Your present position as director of this -- Maybe I better ask you again, what was your title again at your present employment?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

9.

A.    The project is to develop an Atlas of Great Lakes Indians--

Indian History.  This has been funded by the National

Endowment for the Humanities and is supported by Newberry

Library in Chicago.  This is a private research

institution.

Q.    The Answers to Interrogatories indicated that the

publication is the Atlas of Early American History.  Is

that separate from what you're talking about now, or is

that the same thing?

A.    No, the Atlas of Early American History is already

published; I was consultant on that project prior to

acquiring a project of my own.  I drew three manuscript

maps for the Atlas of Early American History that was

published by Princeton University Press last summer.

Q.    Is this present project a full time position?

A.    Yes.

Q.    Would you say your primary employment in the last three

years has been as a consultant in litigation?

A.    Yes, whenever I have time I teach for the University of

Michigan Extension Service, but that has not been possible

the last two years.

Q.    Have you ever been a tenured teacher at any university?

A.    No.

Q.    Have you ever applied for tenure at any university?

A.    First you have to apply for the university, then I guess

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

10.

you can apply for tenure.  I don't know anybody -- now, I've never had a regular university appointment.  I've taught temporarily at the University of Michigan.

Q.  You've never applied for tenure there?

A.  That's a strange phrase!  People don't apply for tenure, they are granted -- no, I haven't applied.

Q.  How does one gain tenure at a university?

A.  I'm not sure, I think Deans decide.

Q.  Is a major portion of your professional income from serving as a witness and a consultant in lawsuits over the last few years?

A.  Well, consulting in lawsuits and consulting in other projects, a major portion of my time during the last two years has been as consultant for a number of projects at the Newberry Library, The Center for the History of the American Indian.  I've done research work for the Center for the History of Cartography.  I also was a consultant for the office of Charles Ames on the West Coast in connection with their Washington and Jefferson Exhibit. I think all of that is also a matter of record that's been submitted.

Q.  Yes, I guess it is.  I guess what I was getting at, I was wondering, as far as your professional employment is concerned, how these things interrelated.  Do you consider yourself as making most of your professional income as a

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

11.

witness in lawsuits, or do you --

A.   I didn't bring my income tax records along, but a significant part of my work has been in litigation.

Q.   All right.  You are employed by the United States Government in this case?

A.   Yes.

Q.   Are you also employed by any of the Indian Plaintiffs in this case?

A.   No.

Q.   Are you receiving any compensation from any of the Indian Plaintiffs in this case?

A.   No.

Q.   Is your attorney here, by the way?

A.   Mariana.

MRS. SHULSTAD:  And the United States Attorney's Office is going to be about an hour late.

MR. FREEMAN:  You have no objection to just proceeding?

MRS. SHULSTAD:  (Shook head negatively.)

MR. GREENE:  We'd like to expunge the last 20 minutes of questions, but other than that, I have no objection.

Q.   (MR. TAYLOR)  Getting back to your last answer, I'm not clear on this.  Were you consulted prior to the United States filing a Complaint on this case, to help them

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

12.

determine whether or not they had a viable cause of action?

A.  I don't believe so, I believe this case was off and running before I ever heard of it.

Q.  Okay.

A.  But as for the date of the filing of the suit, I think the lawyers, you must have a record of when this suit started?

Q.  Oh, yes, we do.  I'm more concerned from your point of view whether your position as a consultant was one of consulting with the United States to determine whether or not they should file the case in the first instance.

A.  Oh, no.

Q.  I take it it was not?

A.  No, I think they managed the case.

Q.  Are you familiar with the Interrogatories that the State Defendants sent to the United States, numbered 1 through 90?

A.  I've read a great many Interrogatories in this case; I think I probably did read those.

Q.  Did you prepare Answers for some of those Interrogatories?

A.  I didn't write any answers; I probably helped in supplying information for them.  I'm sure I helped on supplying some of the information for them.

Q.  Do you have a copy of those Interrogatories with you?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

13.

A.   No, no, I don't.

Q.   Okay.

                    (Mr. Dillon present for Deposition.)

                    MR. TAYLOR:  Off the record.

                    (Whereupon, off-the-record discussion.)

Q.   (MR. TAYLOR)  Dr. Tanner, I'm going to hand you a document entitled Plaintiff's Answers to Interrogatories propounded by Defendant State of Michigan.  I think you indicated in your testimony that you had had some input into these Answers, but that you had not actually written any answers, is that correct?

A.   It's possible that some remarks I made or gave to somebody could have been incorporated in these Answers.

Q.   Okay.  Would you look at Interrogatory No. 24, please?  "Please identify with specificity those bands of the Chippewa Tribe which the United States regards and recognizes as having been incorporated in the Bay Mills Indian Community."  I wonder if you would read the Answer there, for the record?

A.   "The bands from which the Bay Mills Indian Community members are descended are:  The Grand Island Band, the Point Iroquois Band, the Sault St. Marie Band, the Garden River Band, Sugar Island Band, and Drummond Island Band.  The Tahquamenon Band is considered part of the Grand Island Band."

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

14.

Q.   To your knowledge, were you consulted with respect to the Answer to that question?

A.   I don't, I don't recall being specifically consulted, but that subject was covered in the report which I submitted.

Q.   Do you agree with the Answer that the United States has given here; more specifically, do you agree that these are the bands from which the Bay Mills Indian communities are descended?

A.   Yes.

Q.   And what is the basis for your opinion?

A.   Well, the report that I wrote, I thought I traced rather carefully the geographical points -- or the geographical locations of the Sault Ste. Marie people, the Sault Bands, and the latter part of the report indicated that representatives of all of these different groups did come to Bay Mills, or were represented in the land allotment arrangements that were finally being implemented in the 1870's.  I'm sorry if I didn't make it clear; I had hoped that it would be clear from the report.

Q.   Well, we'll get into the report later.  If you want to refer to the report in answering, that's fine.  What is it that makes you conclude that Bay Mills Indian communities are descended from these Bands; what are some of the factors that give rise to that opinion?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

15.

A. Well, many of them are family names, there's a list of 103 land assignments that were made in 1871, and the names on those lists are recognizable in the Bay Mills Indian community today.

Q. Who made that list?

A. The Federal -- That was drawn up by the Federal Government.

Q. For what purpose?

A. To allot land to Sault Ste. Marie Bands.

Q. Did the list list the band which the individual was in?

A. Yes.

Q. Is there a name for this list?

A. I think it's just called a land allotment list. I'm sure I made a footnote reference to it; it's just a list of land allotments.

Q. Where would this be available?

A. I can give you a copy if you want it; I thought it was being -- I thought it was being used. I had it transcribed.

Q. It may well be, I'm wondering where it comes from?

A. From the National Archives.

Q. This isn't the Durant Roll, is it?

A. Oh, no, the Durant Roll was drawn up, was devised in 1907. These are land records.

Q. Anything else besides this list that you would rely on to determine these various bands that are listed in Answer

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

16.

to No. 24?

A.   Well, I think that's probably the most satisfactory source.  If you wanted documents, that would probably be one of the most satisfactory documents.  People who are in the Upper Peninsula now are descendants of Indian people who have been there for a long time, and these family names and family connections are known by the people who live there.  As a matter of fact, there's some families whose genealogy can be traced back to 1671 without any difficulty.

Q.   That would not be relying on the 1871 list?

A.   No.

Q.   What would you rely on to do that?

A.   Well, I just happen to have collected a great deal of genealogical information, and one of the members of my staff is also interested in Great Lakes genealogy; and we could supply more genealogy than I think you could tolerate.

Q.   Let's go on to the next Interrogatory, which is No. 25, which relates to the question we just discussed:  State the basis for the recognition, if any, which is described in your Answer to Interrogatory No. 24."  And I believe a fair reading of the Answer to that indicates that the basis that the United States used in responding to this Interrogatory was because of the Durant Roll of 1910.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

17.

A.  Well, that is a longer -- that is a longer list.  And a more -- and a later list, and in litigation in the twentieth century, the Durant Roll has been a great utility; as a matter of fact, within the last few years, somebody's been publishing it and selling it for $10 here in Michigan.

Q.  Were you consulted about the Answer to No. 25?

A.  I don't know, I'm sure -- I didn't write answers to any of these Interrogatories.  I know about the Durant Roll; I've read it.

Q.  Which would you rely on primarily in order to determine the answer to these questions, No. 24 and No. 25, would it be the 1871 list, or would it be this Durant Roll of 1910?

A.  There's no conflict between them, I don't think.  If you -- depends upon what you want to find out.

Q.  What I want to find out is the bands from which the Bay Mills Indian Community members are descended.

A.  Well, the band information, of course, is more closely allied to the treaty information.

Q.  I'm afraid I don't understand your answer.  Let me get at it another way --

A.  I don't recall whether or not the Durant Roll is drawn up by bands or whether or not that's alphabetically. Now, what I'm thinking of, I know there was -- the data

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

18.

on land allotments and the Durant Roll should corroborate each other. These should not be conflicting lists, one would amplify the other. You move a generation later, and you have more names.

Q. I guess what we're looking for here, rather than names, is bands. What I'm trying to get at is what is the best way to determine the bands from which the Bay Mills Indian Community members are descended? Would you say it's the 1871 list that you discussed --

A. I think --

Q. -- a few moments ago?

A. That would be the most helpful. I think the best way would be to ask them.

Q. Ask whom?

A. Ask the Indian people today.

Q. Would they know from which band --

A. I think they would know the geographical area that their people came from, and by now they're very much intermixed, of course; so the groups that were discrete bands in 1835 are very much intermarried, and in some cases have moved around since then.

Q. Just asking people where they came from, though, isn't a very objective way of determining where their forefathers came from, is it?

A. What's wrong with it?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

19.

Q.   I'm asking you if you consider it an objective way of determining that?

A.   It's a way of getting information.  I know we're inclined to rely only on written information, but I asked my grandmother where she came from, and she told me.

Q.   Would you consider it to be an objective way to find out?

A.   Yes.

Q.   Does the Durant Roll list the bands, do you know?

A.   I've forgotten now, you know; I've forgotten whether that was drawn up alphabetically or by bands.  Land allotment, I'm sure, was by band, because in the list they sort of left a space in between.  Maybe somebody else here could supply that information.  I don't know whether you've looked at the Durant Roll yourself or not.

Q.   Well, let's take a look at No. 26.  Would you read that into the record, please?

A.   No. 26?

Q.   Right.

A.   The question or the answer?

Q.   Question.

A.   The question, "Identify with specificity as to substance, date, location, and custody, any documents, executive orders, judicial orders, rules, regulations, opinions of counsel, policy manuals or other materials reduced to writing which interpret, construe or identify the bands

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

20.

of the Chippewa as revealed in your Answer to Interrogatory No. 24, which you regard as having been incorporated into the Bay Mills Indian Community and/or the rights by treaty of such bands."

Q.  Do you understand the question?

A.  That's a killer!

Q.  Well, the answer to that question is that you're going to do all that, I think, if you take a look at the answer to No. 26, it indicates that the documents are contained in your report.

A.  Really?  Policy manual, you know . . . well, I'll do anything I can, Mr. Taylor.

Q.  Do you have your report?

A.  Yes, I have my report with me.

Q.  Could you indicate generally in that report where the documents are which answer this question?

A.  Oh, that's ridiculous!

Q.  Why?

A.  Oh, well, the information in my report is all footnoted. See, you're still trying to find out about the bands, is that right?

Q.  That is correct.

A.  And you want me to find in my report where I'm talking about bands?

Q.  The identity of the bands and the documents and other

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

21.

materials which support the proposition that certain bands --

A. Well, it would waste an awful lot of time just in conversation here for me to go through and index my report every time the word band comes up. A satisfactory way to approach the bands is to look at the treaties themselves and to realize that mention of these bands occurs in the correspondence, in Henry Schoolcrafts' letters, in his personal memoirs, in his accounts of the missionaries who visited the area, and in the reports of people who were there. These are all geographical. There's one band that was associated with Tahquamenon, and there was Showanos Band. The best guide is the treaty itself.

Q. Well, let me ask you this, Dr. Tanner, and the reason I ask you this is because the United States in the Answers to Interrogatories indicated that this information is all present in your report. Now, have you discussed each one of these bands that's listed in the answer to No. 24 and indicated the basis upon which the United States draws the conclusion that these are the bands from which the Bay Mills Indian Community members are descended?

A. Well, I don't think I discussed that with anybody. Seems to me that it's, you know, self-evident; the treaties are the best guide. If you look at the treaties themselves, and particularly the groups that signed the agreements to

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

22.

the modification of the treaties, that they're arranged by bands, and they identify themselves, and correspondence, correspondence that comes from that area to the Indian officials, the people are identified by their band names. And if you want me to, I can locate some of these documents, I think, during the noon hour or during the recess; but suffice it to say that all of the correspondence that comes from this area, they talk about the Chief or the Head Men of such and such a band, and there is no doubt but that these are the bands, that's the way they signed the treaties.

Q. So that if we look at the Treaty of 1836 or some other treaty, if they indicate the name of the band or the Head Man of a certain band, then that is evidence of --

A. That's right.

Q. Of what?

A. That is evidence of the existence of the band.  The supplement to the 1836/Treaty indicates what type of presents are to be given to the band, to various individuals; and all of the names on the 1836 Treaty can be identified with reference to specific bands.

Q. Now, Dr. Tanner, conceding that what you've just said may be evidence of the existence of the bands at the time of the Treaty, I think what our question relates to is these bands in relationship to the present Bay Mills

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

23.

Indian Community.  How does that provide evidence that these are the bands from which the present Bay Mills Indian Community members are descended?

A.  Well, you could ask them.

Q.  Pardon me?

A.  From my point of view, I found it very helpful, and we're backing up, backing up to use this list of 103 -- 103 land allotments, and I found that that -- my report covered the period up to 1880, and the peoples whose names appear on that list are people who can be linked with Upper Peninsula Indians right now from the, you know, family names like Teeple and Cameron and the -- and the numerous Waishkees.  These names are all there, and these Upper Peninsula Indians haven't gone anyplace.  Some of them went out to the Red River area and came back again, but they're all there.  I'm baffled, you know, I'm baffled at why it's so puzzling.  Present day Indians in the Upper Peninsula are living in the same area that their ancestors did, and they haven't gone anywhere.

Q.  You're discussing now the 1870 land allotment?

A.  Yes.

Q.  Did you discuss that in your report?

A.  I think so.

Q.  Okay.

A.  And in the literature about arranging for these bands,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

24.

for these allotments, the correspondence indicates, you know, part of the bands have made their selections, but there are two other bands that haven't yet made that selection, and they're being accommodated, and they're being accommodated by certain adjustments by other bands. The whole discussion in the correspondence highlights the existence of these bands in the 1870's.

Q. Would you look on page 30 at Interrogatories 43 and 44.

A. Page 30, Interrogatory 43.

Q. Interrogatory No. 43 asks whether or not it's the position of the United States that the Treaty of 1836 reserves for the Chippewa the fishing rights other than those specifically provided for in Article Third of such Treaty, and the Answer was yes.  Do you recall whether you were consulted as to that question and answer?

A. I doubt if I would be, that looks to me like that's the type of a legal question that many of you have been considering at length.

Q. As far as you know, you weren't consulted regarding that?

A. No, there's no historical data that is concerned with, you know, with the legal matters.  I don't think I was asked about that.

Q. Well, the reason I asked you that, because if you look further, question and answer No. 44 deal with what the United States considers to be the additional fishing

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

25.

rights.  And I think a fair reading of Interrogatory No. 45 asks for historical evidence to support that position, and the answer is that you will be addressing that in your report.  Why don't you just look over those questions and answers, see if that's a fair summary of what they discuss?

A.    You want me to look over Interrogatory 45?

Q.    I think you should look at 44 and 45.

A.    Forty-four and Forty-five.

Q.    Let me read No. 44:  44 asks  that if your answer to Interrogatory No. 43 was in the affirmative, to state exact waters in which you claim this right to presently exist.  And the answer to that is, "In addition to the reservation fishing rights contained in Article Third of the Treaty of 1836, descendants of the Treaty reserve rights to fish in the following waters:  All of the State of Michigan waters of Lake Michigan, north of Grand River at Grand Haven, those waters of Lake Superior from the mouth of the Choclay  River at the City of Marquette easterly to and including the St. Mary's River and the connecting waters between Lake Superior and Lake Huron, and those waters of Lake Huron from the Straits of Mackinac southerly to the mouth of Thunder Bay at Alpena."

And then Interrogatory No. 45 is -- it's a rather lengthy Interrogatory, I won't read it all, but

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

26.

it's really asking for the substance of the historical evidence for the position set forth in the previous question, and the answer to No. 45 is that Dr. Helen Tanner's testimony will be addressing these materials.

Were you consulted regarding these questions and answers, to your knowledge?

A. Well, I know that one of the reserve subjects that I was asked to cover, and I believe I did cover in my supplementary report, is historical data concerning Indian fishing along the shores of Lake Michigan and Lake Huron and Lake Superior adjacent to the land that had been ceded.

Q. Did your studies indicate that there had been Indian fishing in the areas indicated in the Answer to Interrogatory No. 44?

A. Yes, Indians, Indians fished in the areas adjacent to the 1836 Treaty session, and that geographical description, I think, is covered in No. 44.

Q. And where is this information, this is in your supplemental report or your original report?

A. No, in the supplementary. My original report concentrated on the history and fishing activities of the Sault Ste. Marie Bands, and the supplementary report indicated historical information about fishing in the balance of the area.

JEAN E. INGRAM & ASSOCIATES. INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

27.

Q.  Maybe we can get into the answer to that, then, when we discuss your supplemental report later on in your testimony, maybe I'll reserve that.

A.  All right.

Q.  I just have a further question, though, as to question and answer No. 45.  It's indicated that your testimony will be addressed to the materials contained in your report which is based upon documentary evidence located "at repositories indicated in her report", I guess indicating in your original report.  You're saying to me now most of the information to answer this question is in your supplementary report?

A.  Yes, it probably is.

Q.  We'll get back to that later, then, when we discuss your report.  In fact, a number of these Interrogatories indicate that the information is available in your report, and rather than go into them now, we'll wait until we get into your report, because we'll have some questions on that.

        Let's get at one more Interrogatory, though, No. 72.  It's on page 43.  Do you have that?

A.  Yes.

Q.  Question: "Is the following a correct quotation from the instructions given by Lewis Cass, Secretary of War, to Henry R. Schoolcraft?" And the quote is, "It's desirable,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

28.

as well as practicable, to extinguish the Indian title to our settlements so as to keep the Indians beyond our borders." And the question was whether or not that was an accurate quote, and the answer was no. Do you agree that that is not an accurate quote? The document is attached to the Answers, the document in question; the letter is attached to the --

MR. GREENE: What page is that, Counsel?

MR. TAYLOR: Well, it's unnumbered . . .

MR. GREENE: How do we identify it?

MR. TAYLOR: It's the last document, I think.

MR. GREENE: Would you be willing to assist us in pinpointing it?

MR. TAYLOR: Sure. Let me ask a couple questions about that.

Q. (MR. TAYLOR) Do you have the document that was attached by the United States to the Interrogatories? At the top it says Appendix A, "Treaty Instructions of Lewis Cass".

A. Yes.

Q. Did you supply that to the United States?

A. Yes, I supplied that.

MR. GREENE: For the record, that's attached, it's denominated Appendix A, it's attached to the original report prepared by Dr. Tanner.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

29.

THE WITNESS:  This Xerox is from my report.

Q.    (MR. TAYLOR)   All right.

A.    This Xerox is  from my report, that is one sentence that is taken out of the six-paragraph letter.

Q.    I understand, and I believe that the sentence begins at the bottom of the page, the last paragraph, second sentence -- Why don't you just read that sentence into the record?

A.    Well, it's already printed in your -- All right.  The sentence I'm reading is the sentence, I believe, that appears in your Interrogatory No. 72.

Q.    Right.

A.    "It is desirable, as far as practicable, to extinguish the Indian title as our settlements advance so as to keep the Indians beyond our borders."

Q.    Now, if you compare that with the question asked in Interrogatory No. 72, it appears that the only difference is that Interrogatory No. 72 says "as well as practicable" whereas the quote says "as far as practicable"?

A.    That's right.

Q.    Okay.  Now, this attachment here which apparently is also a part of your report, who made this typewritten copy?

A.    I don't know, it was -- I honestly don't know.  I might have done it, or a secretary might have done it.

Q.    Were these instructions handwritten in the original?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

30.

A. Yes, they're handwritten in the original.

Q. Do you have an opinion as to whether or not the original --

A. Says "far" or "well"?

Q. Yes.

A. Well, no point in having an opinion on it, we should look it up and find out which one is correct.

Q. Have you looked at the original of this?

A. I'm sure I have, I'm sure -- I'm sure I have, because I have the microfilm, the microfilm frame number.

MR. GREENE:  Would it assist you, Counsel, I believe it's also included as an Exhibit in Plaintiff's documents?

MS. TIERNEY:  Yes, it is.

MR. GREENE:  And I believe we have copies of the copy of the handwritten original in our efforts to accurately describe them as accurately as we could.  We could refer to them, if we could.

THE WITNESS:  Is it a concern?

MRS. SHULSTAD:  Could we go off the record?

MR. TAYLOR:  Let's just continue on, we'll get to those documents.  I appreciate that, Bruce; I just wanted to make it clear that this typewritten copy, which is attached, does not purport to be the original, does it?  The original was handwritten.

THE WITNESS:  Oh, yes, the original is

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

31.

there.  Excuse me, I'm just baffled as to what -- this is such a small bone of contention, I can't understand the concern about it, but you must have something in mind.

Q.  (MR. TAYLOR)  Would you look at Interrogatory No. 77, please.  You have that?

A.  Excuse me, sir, could I inquire whether or not anybody here has located the original document so that we could, if there is a question about the accuracy of the transcription, perhaps we should settle it right now. Does that seem appropriate?

Q.  We'll get back to that later.

MR. GREEN:  We've located it.

MS. TIERNEY:  For the record, Plaintiff's Exhibit 53, which is in the second volume of Exhibits, I'm showing Mrs. Tanner the second page of P-53, and it's the second sentence, and if she'd like, she can read it into the record.

THE WITNESS:  Yes, I'm now looking at the handwritten original, and it says quite clearly, "It's desirable, as far as practicable", so that "as far as" is the word in the handwritten original.

Q.  (MR. TAYLOR)  Okay, thank you.  So the only difference between those quotes, I guess, is that word "far" instead of "well"?

A.  Yes.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

32.

Q. Would you look at No. 77, please?

A. Certainly.

Q. Seventy-seven deals with instructions given by the United States to those persons who negotiated from the United States the Treaty of July 31st, 1855, and whether any of these instructions were reduced to writing. Were you consulted regarding this question?

A. I don't recall being, I don't recall being consulted about this matter; and I think if I had, if I'd found such a document, that I probably would have included it as a matter of record.

Q. The answer to No. 77, "The United States is unable to locate any instructions, and therefore assumes that there were none in writing." Would you agree with that answer?

A. I haven't found any instructions, although I know that normally, normally written instructions are issued for treaties; but there is an attrition in treaty documents, I know.

Q. Are you aware of any oral instructions?

A. I'm not aware.

Q. Or any evidence of such instruction?

A. No, you're just sure that there were. There was a great deal of discussion going on at the time, Mr. Taylor, of which a written record is a very, very small portion.

Q. Okay. Why don't you let me have that back?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

33.

A.    Certainly.

Q.    Dr. Tanner, are you aware of the term "oral tradition" or "oral history"?

A.    Yes.

Q.    What does that mean to you?

A.    Tradition that is not written.

Q.    What does it mean to you in relationship with Indian history?

A.    In all Indian history, the oral tradition is very important. And a part of the training of Indian children was to memorize their traditions of their tribe.

Q.    Do you rely upon oral tradition in your study of this, in preparation of your report in this case?

A.    I have not engaged in any field work in oral history.  Many anthropologists consider this part of their own special work, but I do believe that oral history should be taken into consideration and an attempt   be made to find out to what extent it can be substantiated by and correlated with written reports, because written reports can be very fallacious themselves, and oral history can sometimes check on the errors in written records.

Q.    Do you consider the oral tradition to be generally reliable?

A.    Well, it's impossible to make any general statement like that.  Some people, some people are better reporters than

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

34.

others; some books are better written than others.

Q. Are you familiar, you mentioned, for example, part of the tradition was to have the Indian children memorize certain oral history, oral tradition. Can you tell me how this is done?

A. I can give you my impression. Again, Mr. Taylor, I think it's lamentable that such questions cannot be asked of Indian people who are best able to answer for themselves.

Q. Well, they can be --

A. But evenings are spent, according to my understanding, my conversations, my readings of the life of Indian people, evenings are spent, particularly during the wintertime, in older people instructing younger people.

Q. Would this be formalized instruction, how would you classify it?

A. It comes out usually in story form that is engrossing and engaging, the Indian equivalent of TV.

Q. Would the child be informed or aware of the fact that this is important oral tradition, or this is an important tradition of his group that should be memorized in their own?

A. Naturally it's his responsibility to learn.

Q. How would it be brought home to the child, the importance of this tradition?

A. I presume they'd tell him, or her,  it's recognized quite

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

35.

early that children listen to older people, and that

grandparents particularly instruct grandchildren.

Q.    Has the way of passing this oral tradition on been the

same for several centuries, would you say?

A.    I would say so.

Q.    Could you just give me an idea, rather than responding to

each little question that I give you, could you just

describe how this whole process comes about, this oral

tradition, how it's passed on, what the setting is, and

so forth?

A.    As I understand, I've tried to say very briefly, evenings

particularly in the wintertime are devoted to conversation

and discussion and the recounting of myths, legends -- I

know these words are very disturbing to lawyers, but quite

often the moral values for the instruction of children

come out in the form of stories and parables, as they do

in our culture, and in recounting the important events.

Now, there's one other way of recording important

information that is referred to by William Warren in his

history, and that is records that were kept on a copper

plate in the Upper Peninsula.  We have his description of

this fact, but I don't know of anybody who ever, who ever

saw it.  Indians also have pictographic records and

information about their tradition that is kept on bark

scrolls as a sort of a shorthand guide to past events and

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

36.

important ceremonies in the tradition. Does that clarify . . .

Q. It certainly helps a great deal, yes.

A. All right.

Q. Now, would this practice take place among Indian peoples throughout the United States?

A. Yes.

Q. Would the manner be about the same of importing this knowledge?

A. Yes.

Q. In Florida it would be about the same as the Upper Great Lakes region?

A. The oral tradition is always important among Indian people.

Q. Would the method of passing it on be the same?

A. Yes.

Q. This is primarily true --

A. There's only one method, and that's talking and listening.

Q. But here's what I'm trying to get at, people talk and listen a great deal; they're not always engaging in passing on the oral tradition, I assume, is that correct?

A. Well, there can be perfunctory type of conversation, but when older people speak, younger people listen intently.

Q. And they're aware of the fact that -- or made aware of the fact that this is very important, and they should, in your terms, memorize it, is that correct?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

37.

A.   Yes.

Q.   Would this be in the United States, is this a procedure which is unique to Indian groups.

MR. GREENE:   Counsel, in the United States, everywhere, covering the beginning of this country to the present, or could you be more specific with your question?

MR. DILLON:   Yes, I'd like to register an objection to this whole line of inquiry about oral tradition.   Is this at the time of the Treaty or present day oral tradition?   If you could be specific on that ground, please.

Q.   (MR. TAYLOR)   I think the witness testified that it's been the same over a number of centuries, was that your testimony?

A.   Over a number, over many centuries.   My own frame of reference, Mr. Taylor, is the 1836 Treaty.   I think of this whole procedure as kind of background for the 1836 -- for the 1836 Treaty itself.

Q.   And if we were going to rely on whatever extent on oral tradition as to what happened during the negotiations, for example, to the 1836 Treaty, we would be relying upon oral tradition which arose in the way that you've testified, isn't that right?

A.   Yes, and there's a good deal today in the Indian tradition about what happened at the 1836, and particularly at the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

38.

1855 Treaty, that is quite revealing about the circumstances of the 18- -- resentment of what happened at the 1855 Treaties has been handed down by oral tradition that, I believe, comes right up to this century. I located a Deposition that I believe I submitted that was a document in the 1930's of a man who was recording information he had heard from his grandfather.

Q. Well, I take it from your testimony, we could ask a member of an Indian tribe today to give us his idea of what the oral tradition was as to what took place at the time of the 1836 Treaty, and his knowledge would have arisen in the same way that you've testified to, is that right?

A. I'm hesitant to give you an answer. My field has not been to discuss contemporary affairs at length. I haven't surveyed contemporary Indian populations, but you would have to pick, by now, Mr. Taylor, you've have to locate the proper person within the group, because there has been an attrition of the oral tradition by this time, if you know what I mean. And some people, some people within any group have remembered a great deal, and some people, because of displacement, for one reason or another -- there are present day Indians who have not remained in contact with their oral tradition, and that's one of the reasons there is a good deal of interest among

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

39.

Indian people in reacquiring more familiarity with their own ways.

Q. Is this idea of passing on a history orally unique to the Indians in the United States?

A. I don't know, but I have not studied oral history on a worldwide basis.

MR. GREENE:  I object to the question.

MR. TAYLOR:  She's already answered it, anyway.

Q. (MR. TAYLOR)  Now, how would one determine what the oral history or the oral tradition is as to a specific manner, for example, let's say we wanted to -- we had some specific questions regarding negotiations during the 1836 Treaty.  How would you go about finding out what the oral tradition of the Indian groups is regarding those negotiations?

A. I'm not a specialist in oral history, and this is a research technique that is largely a part of anthropological training.  My own training is more particularly documentary.

Q. You haven't, then, gone out and sought to interview various members of Indian groups to find out what the oral tradition is?

A. No, I've talked to a number of people; I was a member of the State Commission on Indian Affairs for several years,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

40.

and I've talked to a number of people, but I haven't engaged in any systematic inquiry.  And there are ways set up, particularly among anthropologists, for investigating and double-checking on source material of this kind.

Q. Would this be a matter, then, that's primarily within the matter of anthropology rather than ethno-history?

A. It's considered in the anthropological field.

MR. TAYLOR:  Okay, I do have other questions, but I'm going to defer at this time to Mr. Steketee or Mr. Freeman.

EXAMINATION

BY STEWART H. FREEMAN, Esq.:

Q. Dr. Tanner, the -- well, phrase it this way, if a person claimed to be offering an oral tradition and I wanted to see whether that person was simply stating their opinion or whether they were truly offering an oral tradition of a group of Indians of the Upper Great Lakes, what kind of questions might I ask that person?

A. I don't know, I think you should properly be trained and instructed by a competent anthropologist before you started out on this line of research.

Q. You wouldn't know how to do it, then?

A. I've not been trained in this field.

Q. Okay.  You indicated, in response to a question earlier

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

41.

this morning, that one of the ways we could determine the location of the bands was to look to see where Indian peoples live now, am I correct, is that your testimony?

A. I don't believe I said that.

Q. Can I tell anything today based upon where a particular individual, who claimed to be Indian or are Indians, are living, can I tell in terms of the location of the bands in 1836?

A. There's probably a correlation, I don't know how scientific that method would be.

Q. So the mere fact that an individual lives at a particular spot today would give us no information as to where the band he is descended from might have been in 1836?

A. It isn't necessary, but these people haven't moved a great deal.

Q. Have you reviewed the documents that Professor Cleland appended to his report?

A. Documents that he appended to his report, I don't believe I have.

Q. Would it be your opinion that a report which indicated that individual Indians had moved for purposes of finding employment was incorrect?

A. Say that again, would you repeat your question, please, sir?

(Whereupon, last question read by reporter.)

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

42.

MR. DILLON:  I'd object to the broadness of that question in that is it regarding the Chippewa Indians, Indians in Alaska, where?

MR. GREENE:  And I didn't understand the question, and if you don't understand the question either, you can ask that he rephrase the question.

THE WITNESS:  It sounds like an unemployment problem.

Q.  (MR. FREEMAN)  That's precisely the point.  You do understand my point, don't you?  You said that the Indians did not move --

MR. GREENE:  Counsel, I'm going to object to your continued recharacterization of Dr. Tanner's assessment.  I believe she's been asked questions; I believe she's answered questions, and I don't think it serves any useful purpose to continually recharacterize that process.

Q.  (MR. FREEMAN)  Well, I'll get back to that later.  During the lunch break, Dr. Tanner, would you take a look at this United States vs. Michigan P-4 through P-7 documents submitted by Professor Cleland, with specific reference to those documents which are identified as P-5 concerning the Indians in 1837 -- or 1937.

MR. GREENE:  I'm also going to register a general objection.  I believe Dr. Cleland --

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

43.

MR. FREEMAN:  To my asking her to look at a document?

MR. GREENE:  If you'd care to allow me to finish, I'll tell you what's on my mind!  I believe Dr. Cleland has stood two days of cross-examination on documents, and if it's your intention to cross-examine Dr. Tanner about Dr. Cleland's documents and Dr. Tanner's documents, I object.

MR. FREEMAN:  I think we're entitled to know if the documents submitted by Dr. Cleland may not be historically accurate, and that's really the point in question, but we'll go on, we'll get back to that.

Q. (MR. FREEMAN)  You indicated, as I understood your testimony in response to an earlier question, that one good source for determining which bands were where were by the Treaty documents themselves, is that correct?

A. Yes.

Q. Have you done any research as to those treaties which do not indicate bands, or are you aware of any such treaties? I'll rephrase that question.

A. You're holding a book that has approximately, you know, three or four hundred treaties.  Don't you have Mr. Kappler's work down there someplace?

Q. It's in front of me.

A. I've read almost all of them.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

44.

Q.    Would you like me to be specific as to the treaty?

A.    There are a great many treaties.

Q.    All right, I'll select you a specific treaty and ask you.

A.    There were treaties that they acquired in there after they acquired the signatures.

Q.    Some of these treaties, then, are not valid treaties, in your judgment?

A.    Yes, they stand up legally just fine, though.

Q.    Well, that surprises me, Dr. Tanner.

A.    That surprises me, too, but that's another problem.

Q.    Can you identify for me the specific intent in which the United States Government forged a treaty and subsequently the Court upheld that treaty?

A.    No.  You're testifying, sir!

Q.    No, I'm not.

A.    It's not a forged treaty.

            MR. GREENE:  I think it's pretty clear what treaties are at issue in this particular litigation. I would object to the extent you're going to be asking this witness about treaties that have nothing to do with this litigation, which she has not studied for purposes of this litigation, which are not referred to in her report.

            MR. FREEMAN:  She claims to have read them.

            MR. GREENE:  She claims to have read them,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

45.

but she's not here to stand cross-examination for every treaty that's in Kappler's.

MR. FREEMAN:  Mr. Greene, if at any point the witness doesn't understand the question, she can say so.  There's no shame in that.

THE WITNESS:  It would help if you were specific.

MR. DILLON:  Mr. Freeman, let me just note, she may know the answer to another treaty, but it may not be a relevant answer, so there is a valid objection to any question and answer that's not relevant to these proceedings, whether or not she knows the answer to it.

THE WITNESS:  I'm sorry, I'm sorry I brought that up, but I don't know any purpose in discussing the merits of treaties in Oklahoma and Texas and places like that.  We've got too many conversations already, I'm afraid.

Q.   (MR. FREEMAN)  I'm glad you're all agreed it's not relevant.

Dr. Tanner, which side did the Chippewa fight on, if either, in the War of 1812?

A.   Some Chippewa sided with the British.

Q.   Do you know if the United States Government, following the cessation of hostility, made a decision involving the Chippewa Tribe which was reflected in a treaty?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

46.

MR. GREENE:  I object to that, Counsel, I don't understand what that question is.

Q.  (MR. FREEMAN)  Did the United States do anything following the War of 1812 in regard to treaties with the Chippewa, specifically regarding the hostilities?

A.  Following the War of 1812, the United States Government negotiated a series of treaties to establish peace with Tribes that had previously been adversaries.

Q.  And the purpose of those treaties, were they not, was to restore Indian lands and the Indian titles and Indian rights to certain groups, what we might call amnesty?

A.  I'm not aware of that.

Q.  That wasn't the purpose?

A.  The idea was to achieve, was to make sure if they could that these Indians wouldn't fight against them anymore. There are a whole series of peace treaties.

Q.  Did the United States make any promises to the Indian tribal groups -- to the Chippewa, let's be specific, any promises to the Chippewa as part of that series of treaties?

A.  I don't know, what treaty are you speaking of?  I know that the Chippewa signed one of those peace treaties, and the date was probably 1815.  The term of that particular 1815 Treaty that, I believe, was signed at Spring Wells, those terms do not spring immediately into my mind.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

47.

Q.    Well, I think that's the one I've been leading up to.
Let me show you what's identified in Kappler's book as
Treaty with the Wyndot, et cetera, 1815.  Tell me if
that's the Treaty you're referring to.

A.    Whether it's the Treaty you're referring to?

Q.    You said Spring Wells, is that the Treaty of Spring Wells
I put in front of you?

A.    Did you look to see where it was signed?  I'm on page 117,
and this is a treaty in 1815, and one of the many Tribes
that are listed as parties to the Treaty is Chippewa.

Q.    Is that the Treaty we're referring to, or is that a
different one?

A.    No, that's right, here it is, there's a Treaty of Spring
Wells in 1815.

                    MR. GREENE:  Can we go off the record?

                    (Whereupon, off-the-record discussion.)

                    THE WITNESS:  Yeah, I've read this; I've
read this Treaty.  I gather you're interested in
Article 2?

Q.    (MR. FREEMAN)  Well, what important point do you see in
Article 2?

A.    The important point I see in Article 2 is that you asked
me a question about possessions and rights and privileges
of the Chippewa, and those are words which I find in
Article 2, so I presume that was what was on your mind.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

48.

MR. GREENE:  Dr. Tanner, I would suggest you let him ask the questions.

THE WITNESS:  Okay.

Q. (MR. FREEMAN)  Dr. Tanner, have you in your research done any research concerning that Treaty and its relevancy, if any, to the Treaty of 1836?

A. No.

Q. Can you identify, looking at the signatures on that Treaty, which bands of the Chippewa may have been involved in negotiation in the signature of that Treaty?

A. No, I can't.

Q. Can you tell if representatives of all the bands of the Chippewa were involved in those negotiations?

A. I can tell that they all, all the Chippewa are spread between Kingston, Ontario and Western Minnesota, certainly all of them were not represented in this Treaty.

Q. So if I, as a non-professional, non-ethno-historian, were to look at this Treaty and say we have to identify these signatories because this is surely something less than all of the bands of the Chippewa, that would be a correct interpretation, is that right?

A. These are probably Saginaw, St. Clair River Chippewa, because those were the Chippewa that lived, that lived near Detroit.  Some of them lived over in Canada and moved back and forth.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

49.

Q. Did you look at any treaties other than the Treaties of 1836 and 1855 in the course of your research, specifically related to interpretation of the Treaties of 1836 and 1855?

A. I concentrated on the Treaties of 1820, 1836 and 1855.

Q. The Treaty of 1820 provided for a perpetual right to fish in the Sault, did it not?

A. Yes.

Q. Has your research suggested a reason why that particular provision was put into the Treaty of 1820?

A. Well, the Indians demanded it.

Q. Your research indicate why the Indians demanded it?

A. Yes, it was important to them.

Q. Did your research suggest any concern on the part of the Indians that the United States would take away reserved fishing rights at the Falls of St. Mary?

A. No.

Q. Has your research suggested a reason why the Indians focused on that one fishery as opposed to two fisheries or three fisheries, why just the one?

A. Because that was the most important one, and a place that was a resort of a great many of their friends and allies in the summertime.

Q. Up until the point of the Treaty of 1820, was there any history of the United States destroying or taking away an

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

50.

Indian fishery?

MR. GREENE:  Objection, Counsel, where are you talking about, in the United States?

Q.  (MR. FREEMAN)  The Chippewa, was there any history of the United States taking the Chippewa fishery away?

A.  United States had never before dealt with the Chippewa fishery.  This was British territory that was being entered by American representatives.

Q.  Does your research indicate any basis, then, for the Indian demand of the inclusion of this perpetual right of fishing in the Treaty of 1820, other than some vague apprehension on the part of the Indians?

MS. TIERNEY:  I would object, I don't think she's testified that there was vague apprehension.

Q.  (MR. FREEMAN)  Well, she can use her own vocabulary, I'm not trying to trick her.  You understand where I'm going, do you not?  You understand the point?

A.  Not really.  I haven't read about any vague apprehension.  The apprehension was on the part of the Americans, you know, would they get out of there alive.

Q.  Can you offer us any historical insight as to why the Indians demanded that the perpetual right of fishing be included in the Treaty of 1820?

A.  It's probably best stated by Henry Schoolcraft and Lewis Cass, you know, "This is important to the people," and the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

51.

fact that the United States wanted a military base in that vicinity, that they wanted -- if they granted a military base, that military base should not interfere with their fishing and encampment. That's the only insight that I have.

Q. You used the word "people" in that answer, which group were you referring to by the use of the word "people"?

A. Well, I'm getting fuzzy, did I say Indian people or American people?

MR. GREENE: That's why we have a reporter, the reporter can read that back, please.

(Whereupon, the following answer was read back: "It's probably best stated by Henry Schoolcraft and Lewis Cass, you know, 'This is important to the people,'.")

THE WITNESS: Meaning Indian people.

Q. (MR. FREEMAN) Your answer was meaning Indian people?

A. Yes.

Q. Did all of the bands of the Chippewa become involved in the War of 1812?

A. Involved in what, sir?

Q. The War of 1812?

A. No.

Q. Which ones, if you know, or which ones were not, depending on which is the shorter list?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

52.

A.    The theatre of action involving Chippewa people was close to Detroit, and Chippewa were among the Indian people -- some Chippewa were among the Indian people who engaged in military warfare at that time.  There is, to my knowledge, no engagement in which all of the tribe or all of the band participates.  This is a matter of, usually of factional decision or minority groups.  Some Chippewa may have come down from the Upper Peninsula, more likely Ottawa.

Q.    Were there any engagement, to your knowledge, involving Chippewa in the Upper Peninsula during the War of 1812?

A.    Well, yes, a group came, there were Indians among the small party that took over Fort Mackinac at the War of 1812.

Q.    Were there any other engagements that you know of involving some Chippewa?

A.    In the War of 1812?

Q.    In the Upper Peninsula.

A.    No, that could scarcely be called an engagement.  This small group went over and took over the Fort, that's the only incident that I know of up there.

Q.    Is there any historical evidence to suggest that some of the Chippewa left their traditional areas to go into Canada during the War of 1812?

A.    Canada was their traditional area.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

53.

Q.   Well, I'm talking about modern Canada, what is today the
Dominion of Canada.

A.   Modern Canada, the Indian people went back and forth
across the border as late as 1850's.  It was difficult
to determine which tribe should be considered under
Canadian control and which group should be considered
under American control, and to this day they go back and
forth, because their friends and relatives are on both
sides of the border.  And there are, I think, 92 reserves
in Canada.  This is complicated by the fact that in the
1830's, about 3,000 largely Potawatomis moved onto
Canadian reserves, and some of them later came back.  The
ties across the American-Canadian border are very strong.

Q.   Are there specific Chippewa reserves in Canada?

A.   Yes, some are called Chippewa, and some are called
Ojibwa by the people who are up there.  These are
equivalent terms, but there are these reserves in Canada.

Q.   Did any of the bands that were signatories to the Treaty
of 1836 move into Canadian reserves?

A.   Some of their people can be found on both sides.  The
borderline case, as you're probably aware, is the Garden
River group.  The Garden River itself is in Canada, but
there is a very thin line of water separating the opening
of the mouth of the Garden River from Sugar Island, and
Indian people normally went back across.  I believe that

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

54.

the 1855 Treaty includes a specific statement that Garden River Indians should not be excluded from the Treaty.

Q. Are you familiar with the way the line was drawn between the United States and Canada, the history of the drawing of the international boundary, or is that beyond the scope of your research?

A. I haven't studied it. I know in my historical cartography, I'm aware there was an expedition to establish the international boundary.

Q. The line on a map does not appear at all straight as one uses a map in some detail, that's because they drew it to include certain islands and exclude certain others. Are you not --

MR. GREENE: Where are you talking, Counsel?

MR. FREEMAN: I'm talking about the line between Michigan and the Dominion of Canada.

THE WITNESS: In which Lake?

Q. (MR. FREEMAN) Well, Michigan, Superior, the basic Treaty area.

A. What am I supposed to answer to now?

MR. FREEMAN: Let's go off the record, take a lunch break.

(Whereupon, at 12:10 noon recess was taken.)

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

55.

MR. STEKETEE:  We're back on the record again.

EXAMINATION

BY PETER W. STEKETEE, Esq.:

Q.   Dr. Tanner, my name is Peter Steketee, and we're kind of jumping around, who's all asking you questions and what the subject matter is, and I hope you'll bear with us.

I would like to ask you a series of questions which are more or less related to the recent opinion of the Michigan Supreme Court in People vs. LeBlanc, and I wonder if you have had a chance to review that?

A.   I'm sorry, I haven't.

Q.   I don't think it's necessary that you have reviewed it. I wonder if you would obtain a copy of it now.

A.   I have a copy; I don't have it with me.

MR. GREENE:  I presume you're not asking her about her legal opinion about the decision, Counsel?

MR. STEKETEE:  No, I'm not, but I'm going to ask her questions about treaty interpretation, since that's apparently one of the reasons she's been retained.

Q.   (MR. STEKETEE)  Now, Doctor, I wonder if you could tell me, is it possible, if you know, to tell a Chippewa from an Ottawa by their looks?

A.   I wouldn't presume to.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

56.

MS. TIERNEY: If you will state when, Counsel, specify a time frame. Are you talking about present day?

Q. (MR. STEKETEE) Today, today, is that possible?

A. I doubt it.

Q. Do you know whether it ever was?

A. I doubt it.

Q. In what way did the Chippewa differ from the Ottawa?

A. Very little.

Q. In what way?

A. They were geographically neighbors, and the Ottawa dialect, as I understand it from people whose specialty is linguistics, is slightly different from Ojibwa, but there are several different dialects of Ojibwa, too.

Q. And by Ojibwa, you mean Chippewa?

A. Yes.

Q. In your view, is there a real difference -- I mean, the Chippewa and the Ottawa, are they different Indian tribes?

A. Their tribal, present day tribal organization is different.

Q. Does that stem from some real difference, or is that just historical accident, are these people --

A. No, they -- The term Anishinabe, a-n-i-s-h-i-n-a-b-e, people, the Indian people, covers both of these groups and others today.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

57.

Q. All right. Isn't it true that the United States, in treating with these Indians in 1836, treated with them as separate nations?

A. This was the framework; this is the terminology in treaties.

Q. So apparently to the treaty negotiators for the United States, there was some difference?

A. Yes.

Q. All right. Are you prepared to say what that difference was?

A. One group was called Chippewa, and one group was called Ottawa.

Q. Was that just something the United States made up, or did the Indians call themselves by different names?

A. They used these names for themselves.

Q. All right, thank you. Now, I wonder if you could tell me a little bit about where these Indian groups were located within the State of Michigan, and I wonder if it might not be helpful for you to refer to a map which is in your first report, it's map No. 2. All right, now, I'm going to ask you a series of questions that will all have the same basic thrust. I'm going to ask you whether a given Indian group continuously occupied a territory at the time of the advent of white civilization or white contact, okay, do you understand that question? Do you understand

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

58.

what I'm going to ask you?  For example, I'll name an area, and I'm going to ask you whether the Chippewa or Ottawa or some other group continuously occupied that area at the time, had occupied it at the time of white contact?

MR. GREENE:  I'm sorry, Counsel, I'm a little confused.  It may be my confusion can be cleared up  if you could talk about a particular time frame.  Do you mean were they in a particular geographical locale at the time that white civilization first appeared, or do you mean they were there 100 years before the white civilization?

MR. STEKETEE:  I didn't make up the term. I refer you to People vs. LeBlanc where there is a distinction apparently drawn by the Court between the Ottawa and the Chippewa, and there apparently is some importance drawn from the continuous occupation of a given area at the time of white contact or civilization.

MS. TIERNEY:  Could you give a date that you'd like?

MR. STEKETEE:  Perhaps she can give a date. Maybe in asking the question, it will become clear.

Q.  (MR. STEKETEE)  If you don't understand the question --

A.  Am I allowed to object to any terminology?

Q.  If you don't like it, you can certainly explain why you

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

59.

don't like it.

A.   "White civilization appeared", that doesn't mean anything.

Q.   Let me ask -- Instead of asking you these general questions, let me ask a number of specific questions. Looking at your map No. 2 from the Straits of Mackinac to Alpena on the shore of Lake Huron, what Indian tribe or tribes occupied that area continuously, or had occupied that area continuously at the time of first contact between the Indians and the whites in that general area?

A.   I don't believe that there's any -- I don't believe that there's any data that is that geographically specific. If we use a time, say 1650 when the first isolated individuals came, I do not know of a report that describes the area and the population distribution in detail at that time.  I could tell you the group that is traditionally associated with that area.

Q.   All right, and what group is that?

A.   That is usually called -- There are two groups that are generally referred to in that area, one is the Cheboygan Band, and the other are the Thunder Bay Band.

Q.   The Cheboygan Band is what tribe of Indians, are they Chippewas or Ottawas?

A.   I think they're Chippewa, I'd have to look at the way they signed the Treaty.  I believe they're Chippewa.

Q.   What about the Thunder Bay Band?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

60.

A.    I think they're considered Chippewa, too.

Q.    Were there any Ottawa within that territory?

A.    As individuals, probably so.  Every Indian group includes minorities of other Indian groups.

              MS. TIERNEY:  As of what date are we talking about now, Counsel, more or less?

              MR. STEKETEE:  I think she's talking about 1650.

              THE WITNESS:  No, I have said that, that there is no specific data that I'm aware of as of 1650. If we utilize data from the nineteenth century, it's clear that there are two groups that are traditionally by that time associated with that area.

Q.    (MR. STEKETEE)  All right, would that -- and those are the two groups you've named?

A.    Yes, those are the two groups that I've named.

Q.    Does that hold true, also, to 1836?

A.    Those are groups that are recognized in 1836.  The proximity of this area of Upper Lake Huron to Manitoulin Island assumes the Ottawa were long associated among the groups associated with Manitoulin Island.  That's usually considered an Ottawa base, and it's quite probable that some Ottawa came across the lake to that point, you see what I mean?

Q.    Yes, I do.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

61.

A.  Any Indian group will have a designation, a general tribal designation. Most every Indian group includes minorities, a family or a few Indians of some other Indian group.

Q.  Can you say that as to the area we're now talking about from the Straits of Mackinac to Alpena, that the Chippewa continously occupied that territory before 1650?

A.  I couldn't say anything about it before 1650.

Q.  From 1650 to 1836, could you make that statement with regard to that period?

A.  I would say it's highly likely, but the data is very sparse.

Q.  All right.  Now, I want to talk about a different area. From the mouth of  Choclay River, do you know where that is?

A.  Yes.

Q.  To Sault Ste. Marie, the present Sault Ste. Marie on the American side, on the southern shore of Lake Superior, can you tell me whether any group of Indians continuously occupied that territory before 1650, and if so, what group was it?

A.  My answer would be the same, that the data that is available is very sparse; and the period prior to 1650, the data available is more from archaeological sources than from historical sources, because so few people were there.  But again, when historical data is available,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

62.

there is a traditional association of the presence of the Grand Island Band.

Q.   All right.   And the Grand Island Band were what group of Indians?

A.   They were Chippewa, and they do not appear to be, you know, newcomers.

Q.   Are there any other groups other than the Grand Island Band in the territory from before 1650?

A.   Well, you know, I didn't say they were there before 1650, I'm stating very clearly that when we have information available, it tends to reflect occupancy in the past. I know this is -- It's very difficult to realize the limitations of information in an area that was almost as remote as Alaska or the North Pole.

Q.   All right.   Now, from 1650 to 1836, would the same hold true with regard to this area between the mouth of the Choclay River and the present day Sault Ste. Marie on the American side?

A.   The same situation?

Q.   The same situation being was this area exclusively controlled by, exclusively and continuously controlled by the Chippewa?

A.   In this case, I have to --

            MR. GREENE:   I'm going to object for a moment, please.   You've introduced another term, which is

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

63.

not the same as you have referred to earlier, you talked about exclusively and continuously, and previously you talked about continuously, and I'm going to ask which of those two do you mean?

MR. STEKETEE:  That's a fair objection, let's just leave it at continuously, let's not worry about exclusively for the moment.

THE WITNESS:  Thank you.

Q.  (MR. STEKETEE)  Okay, thus rephrased, can you answer the question?

A.  The impression of the historical data is that the Indian groups who were there at the beginning of the nineteenth century had been there for some time before. I think that one of the documents that I came across at the Sault, for example, said that their people had been in residence for seven generations before any white person appeared.

Q.  All right.

A.  And anybody who came was probably apt to hit Sault Ste. Marie, so we have more reports from Sault Ste. Marie than from other places, but I do recall that specific bit of information.

Q.  All right.  Now, from Sault Ste. Marie, I'm referring only to land that is presently within the United States, from Sault Ste. Marie around the eastern portion of the Upper Peninsula and then back to the Straits of Mackinac,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

64.

including any islands that may be part of the United States within that area, can you tell us what Indian tribe, if any, had continuously occupied that territory?

A. The statement that I made about seven generations prior to white occupancy would probably cover that entire area.

Q. Would it include Sugar Island?

A. Yes.

Q. Drummond Island?

A. I believe so.

Q. Mackinac Island?

A. Yes.

Q. Would it be --

A. Yes, Mackinac Island is very important in the most ancient Ojibwa traditions.

Q. How about Round Island?

A. Yes.

Q. Les Cheneaux?

A. Yes, indeed.

Q. All right, from Escanaba east to the Straits of Mackinac to the northern shore of Lake Michigan, what Indian Tribe continuously occupied that territory?

A. Now, I'm troubled with the term, with the term "occupy".

MR. GREENE:  Could you explain that to the witness?

Q. (MR. STEKETEE)  Well, it's an ordinary English word, are

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

65.

you having trouble with that?  Maybe you could explain the source of your difficulty, then I could perhaps rephrase it.

A.  Well, I have difficulty with the term "occupy", because to me it's a sort of a connotation of something like occupation troops.  Indian people use some land, some have a seasonal -- they don't stay just in one place all of the time.  Now, the data that I have from the Historic, from the Historic Period indicates that the Bay de Noc region had a Chippewa Band that was associated with that area geographically, and some, there were times of the year when people from Mackinac area were on the northern, were on the northern shore of Lake Michigan; but there are tribal groups or bands that are associated with Bay de Noc and with Oak Point and with St. Ignace, those three points along the northern shore of Lake Michigan.

Q.  Those are all Chippewa?

A.  Yes.

Q.  Are there also Ottawa associated with those points on the northern shore of Lake Michigan?

A.  At the time of the 1836 Treaty and in the/confrontation that I described in my report, Ottawa from the Little Traverse Bay region referred to the fact that they did fish off those shores, and in the 1830's, there appeared to be some relationship between Indians who were living at

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

66.

Manistique and Indians living at Beaver Island and Indians living at Little Traverse Bay.

Q. All right, are you saying, then, that there was joint occupancy by Chippewa and Ottawa Bands on the northern shore of Lake Michigan, is that what you're saying?

A. Joint occupancy is a legal term. Sometimes people from the Lower Peninsula used the resources of the land on the northern shore.

Q. And the people from the Lower Peninsula were, by and large, Ottawa?

A. Were from a mixed Ottawa-Chippewa group. I guess I'm speaking more of a geographical relationship rather than a tribal relationship.

Q. All right. Now, referring to the Beaver Island group of Indians, including North and South Fox, can you tell me what group of Indians continuously occupied that area?

A. Well, there were a great many of those, of those islands; and I, again, any detailed information that we have about them comes from really, from the nineteenth century, and those people --

Q. What does that information show?

A. That there were Ottawa and Chippewa, they really differentiated themselves as the Beaver Island Group, but the population itself seems to have been derived from some predominantly Ottawa families who lived in

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

67.

northwestern Michigan and some Chippewa families who had come from Bay de Noc, because there was a good deal of traffic back and forth across north Lake Michigan.

Q. Have you ever been on Garden Island?

A. No, I wish I had.

Q. I was on Garden Island this summer, and there is an Indian graveyard on Garden Island.  This is just for my own information --

MR. GREENE:  Should we go off the record?

MR. STEKETEE:  No, I'd like to keep this on the record.

Q. (MR. STEKETEE)  All the graves have sort of little wooden huts built above them.

A. Yes.

Q. What was the significance or purpose of those huts, do you know?

A. That's anthropological lore largely, but that is the traditional type of structure that was placed over Chippewa burial sites, and the same sort of structures, I believe, have been recorded in the Indian cemetery on Waishkee Bay.

Q. Are you saying that those are Chippewa graves?

A. I could not state whether there's a difference between the burial customs of Ottawa and Chippewa in this area, I frankly, I just don't know.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

68.

Q.  Did you know about those graves before I told you about them today?

A.  Yes, I know about that burial ground.

Q.  All right, from the Straits of Mackinac to Petoskey on eastern Lake Michigan, can you tell us which Indian group, if any, continuously occupied that territory, that would include present day Harbor Springs?

A.  Just to introduce a time frame into it, in the eighteenth century, when again we have some more explicit information of this area in the eighteenth century, largely through Alexander Henry, this was an area of Ottawa and Ottawa and Chippewa groups.  And the term that Henry Schoolcraft used in describing this population reflected his own training as a mineralologist.  He said that the groups were intercalated, i-n-t-e-r-c-a-l-a-t-e-d, and I think that's a term that refers to identifiably different strata of rock.  So there were groups of Ottawa and groups of Chippewa at that time within that area, I'm speaking of the time of the Treaty.

Q.  Are you saying that the term implies that they were discrete groups, that they lived mixed up among each other?

A.  There was a great deal of intermarriage, but some of these groups were identified as being Chippewa, and some were identified as being Ottawa.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

69.

Q. If it were important today to determine exactly which areas were occupied by Ottawa and exactly which areas were occupied by Chippewa, would it be possible to do that, or would you be able to do it?

A. I don't think that would be a very profitable line of inquiry.

Q. If it were necessary, would you be able to do it?

A. Only if a person, bearing in mind the fact that the permissive relationship and canons of hospitality would make the decision so abstract that it's hard to see it would be useful. You could tell which, I think there's data that would say which little community called themselves Ottawa and which little community called themselves Chippewa, but I think there might be some, a good deal of confusion about the data.

Q. All right. Have you made any such study yourself?

A. No.

Q. Are you able to say which areas were which?

A. No, no, I'm not.

Q. Are you?

A. No, I wouldn't, no, I wouldn't.

Q. All right. Would the same situation hold true along the shore from Petoskey south to Leland, including Grand Traverse Bay?

A. Probably.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

70.

Q.    A mixed situation?

A.    Yes, but again, we must keep the time, keep the time
frame, it's important.  Communities, the population
centers, little communities on Grand Traverse Bay changed
somewhat in the, after the 1830's.  Those --

Q.    I'm not interested for purposes of this question in
changes after 1836; I'm only interested --

A.    Oh, okay.  Up to 1836, usually people speak of the
Ottawa in western Michigan down to the Grand River, but
to be --

Q.    Don't you make it clear in your report there were Chippewa
in that area as well?

A.    That this is called the Ottawa and Chippewa of northwestern
Michigan.  There are some Chippewa amongst them.

Q.    Is there any meaningful distinction in terms of what you
just said, the admixture of these various tribes anywhere
between the Straits of Mackinac and the mouth of the
Grand River, or is it all like this?

A.    The Grand River, the Grand River Ottawa regarded
themselves as a separate group, recognizing that the
Grand River Ottawa included within their population a
certain number of both Chippewa and Potawatomis, because
they lived contiguous to the area of the Saginaw  Chippewa
and the southern Michigan Potawatomis, but the Grand
River Ottawa is a term that has meaning even today.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

71.

Q.    All right.   Is there anything in the Treaty of 1836 that indicates a recognition of the United States of this combining of Ottawa and Chippewa in the area between the mouth of the Grand River and the Straits of Mackinac?

A.    I believe the term the Ottawa and Chippewa of northwestern Michigan is in that Treaty.

Q.    What about reservations within that territory, are they reserved for the Ottawa and Chippewa, or are they reserved in common?

A.    I should go back and look, I haven't read that Treaty in the last few weeks.

        MR. GREENE:   Are there any objections to my passing --

        MR. STEKETEE:   No, I have a number of other questions.

        MR. GREENE:   -- I will pass a copy of the 1836 Treaty to Dr. Tanner.

        THE WITNESS:   Well, Article 9 refers to the Ottawas and Chippewas returning to the Grand River.

Q.    (MR. STEKETEE)  What about Article 2?

A.    Well, Article 2 uses the terminology:   "The aforesaid tribes," Ottawa and Chippewa,  they use the terms in the plural.   I believe the Indian Claims Commission has made the determination that the Ottawa -- and that the Ottawa and Chippewa were/a single tribal organization.   I should

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

72.

probably have referred to their decision in that matter, but then again that's a legal, that is a legal matter. The headline is this is a treaty with the Ottawa, with the Ottawa and Chippewa, and Article Second starts out: "The aforesaid tribes", and so I presume that calls -- that refers to the Ottawa and Chippewa.

Q. All right, and they refer to their own use to be held in common certain tracts, don't they?

A. Yes.

Q. For five years. What about Article Third, isn't there sort of a difference between Article Second and Article Third in that regard?

A. Yes, that's right, refers to Chippewas living north of the Straits.

Q. All right. So do you regard that as some evidence of the admixture of these two tribes in the northwestern Lower Peninsula?

A. Oh, yes.

Q. That's all I have on that point, Doctor. Now, looking at your map No. 2, I wonder if you could explain one thing to me. My copy of it shows the Treaty line coming down the Thunder Bay River to Alpena, and it shows a reservation south of that line, a small reservation south of that line marked in red, an Article 2 Treaty -- I mean an Article 2 reservation. Could you explain to me why

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

73.

there is a reservation that is not within, apparently not within the ceded territory?

A.   Yes, geographical knowledge at that time was quite obscure. What I did was to mark out the Treaty line according to the conventional Royce line and took the location of the little reserve itself from Henry Schoolcraft's manuscript map in 1837.  There is very little geographical knowledge of that area.  The same problem occurred in the 1819 Treaty where the references turned out to be in the area of the 1807 Treaty.  That's just -- The reservation was never surveyed, to my knowledge.

Q.   Now, the reservations shown on Map No. 2, although they're very general, I gather those are intended to be the reservations spelled out in the Treaty of 1836, is that correct?

A.   Those represent Henry Schoolcraft's manuscript map that I assume was based on the 1836 Treaty.

Q.   All right.  Now, do you have any knowledge of where any existing Indian reservations are today that are within the Treaty area of the Treaty of 1836 you have indicated here by this heavy black line on Map No. 2 in your original report?

A.   Well, both the Bay Mills and the -- I'm not sure if the Mt. Pleasant Reservation is within that area or not.  We know the Bay Mills Reservation is within that area.  It

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

74.

just occurred to me I'm not sure whether or not
Mt. Pleasant Reservation is or not.

Q.  All right.  Are there any other reservations on Sugar
Island?

A.  That's a portion of the Bay Mills Reservation of present
day land on Sugar Island.

Q.  Have you ever heard of the Sault Ste. Marie Band of
Chippewa Indians?

A.  As a present day organization?

Q.  Yes.

A.  Yes, I have.

Q.  Did they have a reservation on Sugar Island, if you know?

A.  The Sault Ste. -- Sugar Island is listed as one of the
reservations in the 1836 Treaty, as one of the areas of
the Sault Bands.

Q.  I'm talking about present day reservations.  I know on
your Map No. 1 you show all of Sugar Island as a reserve
under the 1836 Treaty.  I'm asking you today about Map
No. 2 and about present day reservations.  Are you aware
of any reservation of the Sault Ste. Marie Tribe of
Chippewa Indians on Sugar Island today?

A.  I don't know about lands of the, about -- maybe I should,
but I don't know about the land status of the present
Sault Ste. Marie Band.

Q.  All right.  Now, aside from those possible four

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

75.

reservations, the two on Sugar Island, the Bay Mills Reservation and the Mt. Pleasant Reservation, which you testified may or may not be within the Treaty territory, do you know of any other present day reservations?

A.   Federal reservations?

Q.   Indian reservations within the territory that we're talking about.

A.   I don't know of any other Federal reservations in that area.

Q.   All right.  Now, just as an example, I note that all of the Beaver Island group appear to be a reservation under -- on your Map No. 2, isn't that true?

A.   Yes, that's specified in the 1836 Treaty.

Q.   All right.  Isn't it also equally true that the Beaver Island group are not now an Indian reservation?

MR. GREENE:  I'm going to have to object to that, Counsel, I think you asked her if she knew today whether there were any Indian reservations within the Treaty area, and her answer, I believe, was she didn't know.

MR. STEKETEE:  So you're saying it's clear from the record this is not --

MR. GREENE:  I think it's clear from the answer to your question, she knows of none.

THE WITNESS:  The Bureau of Indian Affairs

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

76.

has a map of the Indian reservations.

Q. (MR. STEKETEE)  I'm trying to find out what information you have.  I know this may be painfully tedious, but we've got to go through it, nevertheless.

Now, in its opinion, the Michigan Supreme Court concludes that the reservations spelled out in the Treaty of 1836 lapsed in 1855 by virtue of the Treaty of 1855.  Do you agree with that?

MS. TIERNEY:  I object, that's requesting a legal interpretation from this witness, and this witness is not a lawyer.

MR. STEKETEE:  This witness, Counsel, has been called by you -- or by the United States to give opinions as to the meaning of these various treaties, and I think we can ask her these kinds of questions.

MR. GREENE:  But not the legal meaning, Counsel, and so our objection would stand for the record.

Q. (MR. STEKETEE)  All right, I don't think he's instructed you not to answer, and besides, he's not your lawyer anyway. I wonder if you could answer that question, if you know?

A. I don't understand "lapsed", so I really don't understand that.  That sounds like there's some technical property law involved, and I don't understand that.

Q. Okay, I don't think it's quite that complicated, Doctor. The Article 2 and Article 3 reservations in the Treaty of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

77.

1836 are for a term of five years from the date of the ratification of the Treaty and no longer, unless the United States shall grant them, that's the Indians, permission to remain on said lands for longer period. Now, you know that, don't you?

A.    Yes, and I know they were granted permission to continue to stay there.

Q.    You say that?

A.    I say that.

Q.    Until when?

A.    I don't know that, in view of the 1855 land provisions, I do not regard them as being evicted.

Q.    All right.  Now, this brings me to my question, the Michigan Supreme Court on the other hand concluded that the 1855 Treaty did constitute an act which, in effect, told the Indians that they no longer had permission to retain those reservations, okay, would you accept that as fact?  I believe it's true, your Counsel will say so, if it's different than --

            MS. TIERNEY:  I'd just like the record to note also a continuing objection to that line of questioning.

            MR. STEKETEE:  On what ground?

            MS. TIERNEY:  You're requesting a legal conclusion from this witness who is not so qualified.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

78.

MR. STEKETEE:  All right.

MR. DILLON:  Let me object, and instead of paraphrasing what the Michigan Supreme Court said, let's be totally accurate, and why don't you quote what they said?

MR. STEKETEE:  Well, I think it's accurate enough, you know, I'd like to ask my own questions, gentlemen!

MR. DILLON:  You asked her to accept this as a fact, and it's based on a paraphrased statement of yours.

MR. STEKETEE:  Your objection is noted for the record.

Q   (MR. STEKETEE)  Now, can you answer the question?  Now the question is, apparently you disagree with the interpretation of the Treaty of 1855 that the Michigan Supreme Court has come to?

MR. GREENE:  Counsel, I'm going to object to that line of questioning.

MR. STEKETEE:  Counsel, can you let her answer the question, or have someone instruct her not to answer!

MR. GREENE:  I'm going to object and ask you to refer to the opinion, portion of the opinion you're talking about; and I'm also going to ask you not to

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

79.

characterize what the testimony has been.

MR. STEKETEE:  It's going to take a long, long time, then!

MR. GREENE:  It's your choice, Counsel!

MR. GREEN:  For purposes of the record, I will add my objection to those already voiced for --

MR. FREEMAN:  Why don't we accommodate the request and go off the record for a couple minutes?

MR. GREENE:  Okay.

(Whereupon, off-the-record discussion.)

MR. STEKETEE:  All right, can we go back on the record?

Q.  (MR. STEKETEE)  On page 16 of the slip opinion --

A.  Of what?

Q.  -- of the slip opinion I'm going to read you --

A.  No, excuse me, a slip opinion?

Q.  Yes.

MR. DILLON:  Mr. Steketee, so you can ask all the questions you want, let me raise my standing objection so it's perfectly clear for the record.  I think I've read a good portion of the Supreme Court opinion, and it starts out prior to interpreting the Treaty with certain standards as to treaty interpretation, and the legal conclusion they base upon the facts applying certain construction to the Treaty based upon certain

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

80.

precedents of certain previous cases.  I think that's their legal opinion, and as to the consequences of the Treaty, I think it is in a different arena, and it's quite different from the opinion Dr. Tanner proffers by way of testimony as to what her opinion of the Treaty interpretation of 1836 and 1855, and that's my standing objection to the following litany of questions.

Q.   (MR. STEKETEE)  All right, I think we're ready to proceed, then.  Doctor, on page 16 of the slip opinion, the Court has concluded, before ending with a rather long quote at the top of the page, that the Indians -- that the United States had not, up to the Treaty of 1855, had not taken back its permission to occupy the reservations that are set forth in the Treaty of 1836.  Then the following appears, this is a quote from the opinion and not from any quote within it:  "However, the permission to remain on the reservations created  in Article Third of the Treaty of 1836 ended with the Treaty of 1855.  In the Treaty of 1855, the United States, recognizing the failure of its removal policy, moved to create permanent homes for the Chippewas, pursuant to Article 1 of that Treaty, as is indicated in a letter quoted above.

"In accordance with Article 1 of the Treaty of July 31, 1855, and the Indian Appropriation Act of June 19, 1860, 12 Stat. 58, the United States

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

81.

Government purchased 527.85 acres of land within the area reserved in Article Third of the Treaty of 1836 from the Methodist Mission Society, to be held in trust for the Chippewa Indians.  This land, along with 1,053.91 acres purchased in 1937 pursuant to Indian Reorganization Act, 48 Stat. 94 (1934), constitutes the Bay Mills Reservation. Pendill's Bay is about ten miles west of the westernmost boundary of the Bay Mills Reservation.

"In establishing new homes for the Chippewas pursuant to the Treaty of July 31, 1855, the United States terminated its permission to retain the reservations created in Article Third of the Treaty of 1836, including the reservation apparently containing Pendill's Bay.

"We hold, then, that Pendill's Bay is not part of the present-day Bay Mills Reservation, and that Defendant LeBlanc was not exercising an on-reservation fishing right when arrested."

Now, do you understand the interpretation of the Michigan Supreme Court, then, on this question of termination of permission to remain on the reservations established in the Treaty of 1836?  Do you understand what the Court has said?

A.  Yes, I do.

Q.  Do you agree with that interpretation?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

82.

A.   I think it would be presumptuous for me to review a Michigan Supreme Court decision, sir.

Q.   All right.  Now, you are a historian, are you not?

A.   I am a historian.

Q.   And you have been retained to give opinions as to the meaning of various parts of the Treaties of 1836 and 1855?

A.   As they were understood by Indian people.

Q.   All right.  As the Indians understood the Treaty of 1855, do you agree that the Supreme Court has come to the correct conclusion?

A.   Indian people do not think in legal terminology; they think, "We have fished, we will continue to fish."

Q.   We're not talking about fish, we're talking about reservations.

A.   You're talking about land.

Q.   We're talking, at the moment, about Article Third reservations in the Treaty of 1836.  Do you think that the Indians thought, when they signed the Treaty of 1855, that they were giving up those reservations?

A.   I personally doubt that they did, but this is a legal matter.  I wish that I had the privilege of discussing with the people who framed this decision their interpretation of the language, but I didn't.

Q.   All of us are somewhat constrained in that regard.

            MR. GREENE:  We've had a few limited formal

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

83.

discussions with them.

Q. (MR. STEKETEE) You disagree, then? Can you tell me on what basis you disagree?

A. It's going to have 18 people in a froth! The 1855 permanent homes were reservations.

Q. Excuse me, I didn't understand that.

A. The 1855 allotments of land were reservations, and they were so long in being carried out that the whole situation became very obscure.

Q. All right, you're saying there was a certain amount of delay and unfairness in the execution of the Treaty of 1855, is that what you're saying?

A. Yes, but the 1855 Treaty is really a continuation of the 1836 Treaty, also concerned reservations. They were different in territory, but it concerned reservations.

Q. Are you saying the Indians felt, in 1855 when they signed this Treaty, that they were going to retain the reservations and also get the allotments in addition to them?

A. The allotments were within reservations. When -- I pointed out that when the overall areas were surveyed, they were called reservations.

Q. All right, are you saying that the Indians felt that they were retaining, in addition to the actual allotments, the other areas that were not alloted that happened to be

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

84.

within the older reservations?

A.   I'm not sure.

Q.   You're not sure?

A.   I'm not sure, those treaties are very obscure.  There's no treaty journal.  The Indians have maintained to this day that there were considerable shenanigans that went on, and I think that the understanding of the Indians is better reflected by the Indian people themselves.

Q.   There's no treaty journal for what treaty?

A.   Well, oh, I'm sorry, it's August 2nd that we don't have a great deal of information about, their dealing with the Chippewa at Sault Ste. Marie.

Q.   We're not talking about that, though, are we?

A.   No.

Q.   As a matter of fact, there is a journal for the Treaty of 1855.  Now, do you want to change what you just said, then?

A.   No, no, I think that -- I feel very uncomfortable in being asked what Indian opinion is.  I think Indian opinion is best expressed by Indian people themselves, and this -- whatever is in anybody's mind 125 years ago can be so much conjecture that I think the less said, the better.

Q.   Aren't the constraints in talking to the people that were present in 1836 even worse than the constraints that prevent us from talking to the present day Justices from

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

85.

the Michigan Supreme Court?

A.    These are always problems.

Q.    So how are we supposed to find out what the Indians believed, talk to present day Indians?

A.    This gives you some insight.  The other is the correspondence at the time, in the correspondence that I went through in drawing up this report.

Q.    And the way in which we find out how the Indians of 1836 or 1855 felt by talking to present day Indians is through this process of oral tradition that you've described, is that correct?

A.    If you -- There's oral tradition, there are also letters in the record that reflect Indian objections to the administration of the Treaty.

Q.    All right.  Now, I wonder if you could refer again to the Treaty of 1836.  Do you have a copy of that in front of you?

A.    Yes, I do.

Q.    Okay.  Would you look at Article Third, please?  Do you not see in Article Third a number of references to fishing grounds or small islands and fishing grounds, things of that kind?

A.    Yes.

Q.    All right.  Why did the Chippewas, for whom Article Third was intended to benefit, why does the Treaty refer to the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

86.

fishing grounds in front of reservations and places of encampment, small islands and fishing grounds, things of this type?

A.   Because the Indians, Indian people thought it was important to make these geographical localities a matter of record.

Q.   All right, is it fair to say that as far as the Chippewas living north of the Straits of Mackinac are concerned, that the areas reserved are those that were most important to them?

A.   Yes.

Q.   And that's why they reserved them?

A.   Yes, there is a Les Cheneaux Band, and the area of the Les Cheneaux Band, their home base were the shoreline and the islands adjacent.

Q.   All right.  Now, Doctor, the Article Third reservations were entered into for a term of five years from the date of the ratification of the Treaty, and no longer, unless the United States grant permission to remain on the lands for a longer period, is that not true?

A.   That is what the Treaty states.  That is not the Treaty that was signed by the Indians originally.

Q.   All right, would you explain how that occurred?

A.   The Indians signed a treaty for perpetual reservations. The Senate unilaterally changed it and forced these

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

87.

changes upon the Indians in 1837.

Q. All right, but they did agree to it in some way, whether they were forced to do it or not, they did agree to it?

A. From the point of view of legal arrangements, sufficient signatures were secured for the United States Government to consider it legal.

Q. Was any consideration paid or promised to these Indians for the limitation on the term of these reservations?

A. In 1837?

Q. Yes.

A. I don't recall the annuity payment list of 1837, I don't know whether that was one of the items on the list of payments to be made in 1837.

Q. Wasn't a, perhaps not a fair amount of money, but a fairly substantial amount of money promised to the Indians to be paid when the permission to occupy these reservations was finally taken away, wasn't that part of the negotiations?

A. I don't know, I don't know.  They were promised certain amounts of property in the event they moved to another location.  I don't know of any line that says, any line in the payments, maybe you have a list.

Q. Don't you recall, Doctor, that something having to do with $200,000 that was to be paid to the Indians for limiting the term of the reservations?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

88.

MR. GREENE:  Counsel, you asked it, she said she didn't recall.

THE WITNESS:  I don't recall it now, if this is in the literature, well, I should . . . It's something that momentarily does not come to my recollection.  If this is in one of the -- Tell me where I would find it?

Q.  (MR. STEKETEE)  Well, rather than waste our time, I will just pass on.  It must not be within your recollection that these monies were ever paid or not?

A.  I don't know, there were so many monies that were not paid that were added up at the time of the 1855 Treaty, I would have to refer to the specific document that lists the status of unpaid monies in 1855 to determine that point.

Q.  All right.  Do you know whether the Treaty of 1855 deals with that question?

A.  The Treaty of 1855 deals principally with amounts of money that the Federal Government still has outstanding to the Chippewa and Ottawa.

Q.  All right.  Now, Doctor, I wonder if you could look again at the Treaty of 1836.  Have you at any time familiarized yourself with the Indian signatories to that Treaty to the extent it's possible to do so?

A.  Yes.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

89.

Q.  Are you able to say whether all of the Indians that signed this Treaty are unlettered, or were unlettered?

MR. GREENE:  Unliterate?

MR. STEKETEE:  Unlettered.

THE WITNESS:  None of them signed their own names.

Q.  (MR. STEKETEE)  All right.

A.  This is the principal evidence from the treaties.

Q.  All right, so you're prepared to testify, then, that they were unlettered?

A.  I do not believe that they wrote English, I do not believe, although I'm not sure.  I have to check over to see -- I've been surprised at the number of Indian people who later wrote letters to the Federal Government, but I do not believe that these people were really writers of English.

Q.  All right.  What about the signatories of the Treaty of 1855, were they all unlettered?

A.  The case of Andrew Blackbird is usually considered an important exception in the 1855 Treaty.  He was educated, and he was literate.

Q.  And he was quite a literate man, was he not?

A.  He was a very literate man.

Q.  And he was present in Detroit at the negotiations for the Treaty of 1855?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

90.

A.    Yes, he was.

Q.    He was?

A.    Yes, he was there.

Q.    And he also spoke some English dialect, as well?

A.    Oh, yes, he spoke Indian.  One of the Indian traditions is that he was blindfolded at the time of the Treaty. His name does not appear but has an X beside it.

Q.    All right.  Have you found any substantiation for that particular part of the oral tradition, if that's what it is?

A.    I doubt if it would appear in the American file of correspondence.

Q.    Can you speak up?

A.    Yes, I doubt if it would appear in the American Government correspondence.

Q.    I don't think that's quite responsive.  Have you turned up any evidence to substantiate that part of the Indian oral tradition?

A.    This is what Indian people say.

Q.    But have you turned up any evidence to substantiate it?

A.    I don't know what you mean by "substantiate", you mean somebody who wrote down --

Q.    Any evidence, whether --

A.    I have the -- This is the report I have from Indian people that are not at variance on this subject, they all

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

91.

agree.

Q. Didn't this particular Indian write a lengthy autobiography?

A. Yes, he did.

Q. Did he ever make -- Have you read it?

A. Yes.

Q. Does he make mention of this incident in his biography?

A. No, he does not.

Q. All right.  Now, can you tell me, do you think, based on your research, the Indians believed the term in Article 13 of the Treaty of 1836 "required for settlement" meant?

A. I don't understand what that meant.

Q. I'm not asking whether you understand what it meant, what do you think the Indians thought it meant?

A. I've never heard an Indian discuss Article 13.

Q. Never discuss Article 13?

A. I've never heard an Indian discuss Article 13.  I haven't talked about this with Indian people.

Q. All right.  I gather you're of the opinion that in Article 13 where the Indians stipulate for the right of hunting on the land ceded, with the other usual privileges of occupancy, that you're of the opinion that includes the right to fish in the Great Lakes?

A. This -- Yes, you know, the right to live as they always had lived.  I think I included, in the back of my report, a number of different versions of this particular clause.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

92.

Indians always wanted assurance that they could continue to live in their accustomed fashion.

Q. All right.  So what you're saying, then, is that the Indians, to your way of thinking, that they felt that that language included the right to fish in the Great Lakes?

A. I believe, yes, that is what I believe.  I wish I were able to get that in Indian language to see what figures of speech would be used to convey this impression.

Q. All right, but you believe that that's what the Indians felt the language meant, is that correct?

A. It's among the meanings of the language.

Q. All right.  Now, I gather, then, that it's your testimony that you don't have any information one way or the other as to what the Indians believed the term "until the land is required for settlement" meant; however --

A. No, I don't, I don't know.

Q. All right.  Now, in his opinion in People vs. LeBlanc, Justice Williams concluded that the Great Lakes are not settled to this day, have not been required for settlement. You agree with that interpretation of the language insofar as your expertise is concerned?

A. I --

            MR. GREENE:  I'm going to have to object to that, Counsel.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

93.

THE WITNESS:  I don't feel qualified --

MR. GREENE:  Excuse me, Doctor, I have an objection.

THE WITNESS:  Okay.

MR. GREENE:  I'm going to have to object to that on the grounds you're asking for a legal conclusion from the witness.

Q.  (MR. STEKETEE)  All right, now, he stated his objection, can you answer the question?

A.  I've forgotten what the question was.

(Whereupon, last question read by reporter.)

THE WITNESS:  I don't understand what is termed by the Great Lakes, the land or water or what extent, so I don't feel qualified to answer that because it's a geographical obscurity.

Q.  (MR. STEKETEE)  All right, we'll limit it to those portions of the Great Lakes that are within the Treaty territory and described in Article 1 that are offshore; in other words, you know, between the wave line and the boundary of the State or the international boundary, whatever the case may be.  Surely you understand what territory we're talking about now?

A.  Yes, but I --

Q.  The open waters of the Great Lakes.

A.  I don't know whether that's the way Mr. Williams described

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

94.

the area.

Q.   Well, I don't know either, but I'm asking you if you can tell me what you believe the Indians --

A.   No, I don't think I could, I really don't.

Q.   You don't?  All right, now, so you don't know whether you agree with his interpretation of the Treaty or not on that point?

A.   No, I don't.

Q.   Now, one of the rather interesting parts of Justice Williams' opinion is that he concludes that the reservations, or at least the Article 3 reservations, the nine reservations in the Upper Peninsula lapsed in 1855, and we've been through that; but that the Article 13 rights, whatever they were, are still in existence and were not given up in 1855.  Do you agree with that interpretation of the treaties?

A.   I wouldn't presume to do that kind of broken field running through legal jargon.

Q.   Let me see if I can get at this in a different way, then. Do you think it's at all likely that the Indians in 1836 would have reserved the nine reservation areas or a term more limited in time than whatever they reserved in Article 13?

A.   I wouldn't speculate, I wouldn't speculate on that subject.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

95.

Q. I want you to speculate to the extent that you can, Doctor, what were the areas of cession most important -- What were the areas within the total Treaty area that were most important to these Indians?

A. You've already established that.

Q. Nine reservations?

A. Right.

Q. All right. Is it likely that the Indians would have agreed to a shorter period of time for the nine reservations than they would for the other areas that are concededly of less importance to them?

A. I decline to speculate on this, on this subject, because I don't think it's real in Indian terms. Indians, "We were told we could fish, we're assured we can fish; we can continue to fish and live where we've always lived."

Q. All right. Isn't it clear from the Treaty that the Indians knew that they might be asked to -- or that they might be removed from the Michigan territories?

A. Not in the Upper Peninsula.

Q. Oh, it's not? What do you find in the treaty that indicates that they will not be removed?

A. Not in the, not in the Treaty itself, but in the subsequent correspondence. If you're aware of the continuity of correspondence, the Indians who signed the 1836 Treaty were initially given an option of moving over

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

96.

into northern -- into the watershed of the Mississippi River Valley.  That option was subsequently removed, and the Indian people in the Upper Peninsula, when they were asked to go and look at lands in the west, said that they were not aware of any responsibility even to go and look at the land.  I think that the Upper Peninsula Indians believed that they had no obligation to consider this possibility.

Q.  All right.  So is it your testimony, then, that the Indians, although they believed that they were not going to be removed, even though the Treaty speaks in terms of removal, reserved the most important areas for as little as five years, but nevertheless reserved fishing rights generally in the Great Lakes and those areas of less importance to them in perpetuity?

MR. GREENE:  Objection, you asked that, she answered; she said she had no opinion about that. She said she was not going to conjecture about that.

MR. STEKETEE:  All right.

MR. GREENE:  Can I interrupt?

(Whereupon, off-the-record discussion.)

MR. STEKETEE:  Back on the record.

Q.  (MR. STEKETEE)  Doctor, I wonder if you could go through one more time, because I'm having trouble understanding how you reconcile the removal aspects of the Treaty of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

97.

1836 with any interpretation of Article 13 which would grant, in effect, a perpetual right to fish in the Great Lakes to the -- or reserved to the Indians a perpetual right to the Indians to fish in the Great Lakes?

MR. GREENE:  Objection, for one, it's been asked and answered; and two, you're asking for a legal conclusion.

Q. (MR. STEKETEE)  Subject to the objection, I wonder if you could answer the question?

A. I don't see, I don't see what's the problem, why they have to be recognized; just forget the removal provision!

Q. I don't want to forget the removal --

A. You remember it.

Q. I think it's part of the Treaty.

A. You remember it, I'll forget it.

Q. You want to forget about removal?

A. I think the removal provision had nothing to do with the Upper Peninsula Indians, really; they never intended to remove, they never considered removing.  They never felt they should remove them, so I just ignore it.

Q. So you draw a distinction between the Upper Peninsula Indians and the Lower Peninsula Indians?

A. Yes, some of the Lower Peninsula Indians did go so far as to go out and look at the land, but they didn't remove, either.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

98.

Q.    But Article 13 lists both Upper Peninsula and Lower Peninsula Indians equally, does it not?

A.    I think that's a legal question, but it's in the Treaty, and it doesn't say to whom it applies.

Q.    It doesn't draw a distinction between Upper Peninsula and Lower Peninsula Indians, does it?

A.    No, it doesn't.

Q.    So you're saying that the phrase must have some different meaning for Upper Peninsula Indians than it does the Lower Peninsula Indians?

A.    I didn't say that, you said that.  You keep testifying and keep asking me to rubberstamp it!

Q.    Okay, I'll try to avoid that now.  Let's just think about this in terms of Lower Peninsula Indians.  How do you reconcile the removal provisions of the Treaty with regard to Lower Peninsula Indians and any interpretation of Article 13 which grants to those -- or reserves to those Lower Peninsula Indians a perpetual right to fish in the Great Lakes?

A.    I don't, I don't feel any obligation to reconcile the legal interpretations of any of those Articles.  I just deal in what the Indians did.

Q.    All right.  Let's talk about it solely in terms of what the Indians believed.

A.    I'll talk about what the Indians did.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

99.

Q.   Are you not able to give us any testimony at all as to what they believed that these phrases meant?

A.   I can testify to what appears in correspondence and all the pertinent --

Q.   What correspondence?

A.   All the correspondence on the subject of immigration of the Indians, I've read it, and it has been submitted in evidence by your side of the case, whichever that is.  I don't know, are there three or four sides to this case?

Q.   By the State?

A.   Yes.

Q.   All right.  Basically letters of Schoolcraft and others?

A.   There's a sequence of correspondence, largely reports of James Schoolcraft who was in charge of trying to persuade some Indians to accept removal, and I think that the best information on the attitudes of the Indians is contained in that series of letters.

Q.   All right.  Now, let me see if we're not on the same wave length here.  Don't you agree with me that there's some internal inconsistency in interpreting this Treaty to include for those areas that are the best areas from the standpoint of the Indians, a reservation for five years or perhaps somewhat longer?

          MS. TIERNEY:  Objection, this has been asked and answered more than once.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

100.

MR. STEKETEE:  Counsel, I wonder if you could forebear and just take a continuing objection and not interfere with the questions?

MR. GREENE:  It's a little hard, you keep asking the same question about four or five times.

MR. STEKETEE:  I don't think I've gotten an answer yet.

THE WITNESS:  I haven't given you the answer you want, I suppose that's the reason you keep asking me!

Q.  (MR. STEKETEE)  I don't think you've answered the question, that's the correct state of affairs.

I wonder, Doctor, if I could ask you the question and Counsel could forebear, and we'll grant they have a continuing objection.  Do you not agree with me there is some internal inconsistency in interpreting the Treaty of 1836 to include a reservation or reservations for five years or perhaps somewhat longer for those areas that are most important to the Indians, to include for at least those Indians living south of the Straits of Mackinac an obvious intention that those Indians will be removed from Michigan, with an interpretation of Article 13 which reserves to those Indians a perpetual right to fish in the Great Lakes in those areas which were not as of as great importance to the Indians as those that were

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

101.

reserved for a lesser period of time?  Do you find any inconsistency there?

A.    I find that question so convoluted and loaded that I couldn't answer it unless it was written out phrase by phrase.  I don't --  I've read this Treaty, I don't find any . . . I don't comprehend the internal inconsistencies which seem to have been so forcibly impressed upon your mind.

Q.    All right.  Have you ever observed the Great Lakes or any part of them?

A.    I've been on a boat across the Great Lakes, yes.

Q.    You have, and you've seen it upon occasion?

A.    Yes.

Q.    Have you ever seen any evidence of man's activities on the Great Lakes, or in them?

A.    I have seen people in and on the shores of the lakes.

Q.    Have you seen boats traversing the lakes?

A.    Indeed.

Q.    Have you seen piers built out into the lakes?

A.    Yes.

Q.    You believe that the lakes are used for commerce?

A.    Naturally, Indian people used them for commerce before the advent of the white man.

Q.    Well, does the white man now use them for commerce?

A.    Yes.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

102.

Q. Can you tell me what, in addition to the activities of which you already are aware, could be accomplished in the Great Lakes more than is already being accomplished, that would require them for settlement?

MR. GREENE:  I'm afraid I don't understand the question.

MR. STEKETEE:  Let me rephrase it.

Q. (MR. STEKETEE)  Assuming that the Great Lakes are not now settled --

A. Are we talking just about water?

Q. The waters of the Great Lakes, correct.  Assuming that the waters of the Great Lakes are not now settled, okay, within the meaning of this phrase in Article 13, what more in the way of human activity can you imagine and describe for me that would require them for settlement, that would bring them within that category that they would not now be settled or required for settlement?

MR. GREEN:  I'm going to object on the grounds it calls for a legal opinion, and it's beyond the expertise of this witness.

MR. STEKETEE:  Because she doesn't know what that phrase means?

MR. GREENE:  Because she has testified she doesn't know.

MR. GREEN:  And it calls for testimony

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

103.

that is in no way related to ethno-history.

Q. (MR. STEKETEE)  Okay, noting the objection, can you answer the question?

A. Well, this question, again, seems so fanciful to me, Mr. Steketee, it sounds like you're asking do I envision a group of houseboats of Venice to go out and anchor and thus settle the lakes.

Q. Do you think that's what the Indians thought the phrase meant?

A. Of course no, I don't think they -- I think it's very difficult for a trained legal mind to comprehend the simplicity of the Indian point of view, which I'll reiterate.  From the beginning of treaty making, which for these people was significant in 1795, with the Treaty of Greenville, they were given repeated assurances that they could continue to live in the way they always had lived.

Q. All right.

A. And the treaty would be, a treaty would be incomplete -- without a repetition of this kind of assurance.

Q. Now, as far as the land occupied by the Indians in 1836 was concerned, presumably the phrase "until the land is required for settlement" has some meaning to you or to the Indians?

A. It puzzles me. If they said, if they had said "until the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

104.

land is acquired for settlement," I could deal with that; but required, I've dealt with a lot of terminology, and that term still doesn't seem particularly, particularly clear to me.

Q. All right.

A. And I don't recall any correspondence about -- Indian correspondence that was questioning or objecting to the Treaty; I don't recall it ever being mentioned.

Q. All right, well, let me ask you this, is the City of Traverse City within the Treaty territory?

A. You know that, yes.

Q. All right.  Whatever the phrase "until the land is required for settlement" means, I assume you would agree with me that the land within Traverse City has been required for settlement?

A. The land -- People live in Traverse City.

Q. Can you answer the question yes or no?

A. I don't know whether the settlement in Traverse City was, I don't recall anything, any procedure by which the Traverse City area was required.  That term just, just bothers me, because I don't know what it implies, frankly.

Q. Well, let's not, you know, draw a hair so fine that we lose sight of the common sense meaning, Doctor.  Is there any viable claim on the part of the Indians to Traverse City?

MS. TIERNEY:  That's a legal conclusion

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

105.

that you're also asking.

MR. DILLON:  I have no objection to your previous question if you'd please define for Dr. Tanner the common sense meaning of the term "required for settlement".

Q. (MR. STEKETEE)  Well, you're not able to give us any enlightenment at all of what this phrase means?

A. I wish I could.  I puzzled over it a long time.

Q. Are you able today to take a look at the Treaty territory -- now, we're speaking of the land and not of the water -- and X out any areas at all that you think are no longer covered by Article 13 because they've been required for settlement, or do you think the whole of the territory is still within the questionmark category?

A. I don't deal in that; I would not presume to deal in Article 13 in those technical terms.

Q. But you're sure, nevertheless, it includes the right to fish?

A. I'm sure that Indian people understand the Treaty as assuring that they can continue to live the way that they always have lived.

Q. All right, but they clearly understood, if they read Article 13, didn't they, there was some limitation on that?

A. These people couldn't read, sir.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

106.

Q. Well, it was explained to them, wasn't it?

A. We hope.

Q. Assuming that it were, they understood that there was some limitation on that right, didn't they?

A. I don't know.

Q. You don't know?

A. I do not know.  There is no correspondence that indicates that, that any limitations ever were suggested.

Q. Well, what are you saying, then, that the Indians went to this Treaty, and there was sort of Uncle Sugar handing out money, and they weren't giving up anything in return?

A. This is a treaty -- Are we talking about the 1836 Treaty?

Q. Yes.

A. The interest of the Upper Peninsula Indians in this Treaty was to be assured that they would continue to have blacksmith services at Sault Ste. Marie.

Q. That was all they thought they were doing was obtaining blacksmith services?

A. This was their primary concern, to see that this was --

Q. Where do you get -- Where is there proof for that statement?

A. That's in the correspondence prior to the time of the, prior to the time of the Treaty, and this is described in my report.

Q. What correspondence, and could you point to the page of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

107.

your report where this correspondence is cited?

A.   Page 57.

Q.   You say there that was a special objective with the Indians in Sault Ste. Marie or Mackinac area?

A.   Yes.

Q.   I don't believe you said it was the sole?

A.   I don't believe I said it was sole before.

Q.   All right.  Are you saying -- What are you saying, that the Indians were not aware, the Upper Peninsula Indians were not aware they were ceding most of their land, assuming that they had any concept of ownership?

A.   I, as you know, private property is a foreign concept to Indian people, that the whole concept of private property is considered immoral by Indian people.  Indian people, in talking about land, would talk about who was responsible, who had custody over the land; and in their discussion of treaties, the Federal, you know, the Federal Government can take over the responsibility for some of the land.  They're particularly interested in having blacksmith services, because they are so important to them, and reading the literature at the time, Henry Schoolcraft suggested that some leverage could be placed upon the Indians to participate in a land cession.  His interest was in national defense.  There are a great many things that go into this Indian Treaty that I think

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

108.

have not been concentrated on in our limited inquiry into its provisions.

Q. All right.  Now, assuming that this Treaty was represented to these people fairly, that in interpreting the Treaty that there were no deliberate attempts to misinterpret it or to mislead or to leave out significant portions, is it possible anyone reading this Treaty, any Indian reading the Treaty, could have interpreted it otherwise than a cession of a great amount of land?

A. It was a land cession, but this -- a land cession did not mean that they were giving up the land.  They would continue to use it, because --

Q. Until the land is required for settlement, correct?

A. Well, I do not, as I say, that still bothers me how that statement got in there.  Settlement was so remote at that time.  The population pressure was only at the very southern part of the State of Michigan.  There was no immediate, there was no immediate thought of people settling in any numbers up there.  The primary figures in this entire Treaty came from the southern peninsula.

Q. Doctor, have you ever testified before in the Court or in any Deposition as to the meaning of the phrase "required for settlement"?

A. I think I've been asked that question before, and I said the fact that the word "until" is in there looks as

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

109.

though something else, some other action would have to take place.  Now, that's just speculation on my part.

Q. When did you give that testimony?

A. It was probably either in . . . It might have been in Manistique, I think.

Q. Can you give me the Court and cause?

A. I was in Manistique in May of '75, '75, yes.

Q. What was the case?

A. The legal name of it?  I don't know the legal name of it.

Q. Do you remember what the issues were or what the Court was?

A. It was about fishing, and it was a State Court.

MR. GREENE:  Could we go off the record?

MR. STEKETEE:  Yes.

(Whereupon, off-the-record discussion.)

Q. (MR. STEKETEE)  All right, back on the record.

A. Oh, the Duhamel case, D-u-h-a-m-e-l.

MR. GREENE:  We can supply you with the names of those cases and numbers.

MR. STEKETEE:  All right.

MR. GREENE:  Duhamel, I believe the testimony came -- well, I'm not going to speculate about it, if it's not in there, it should be.  Those are continuing Interrogatories anyway, and we can supply them.

MR. STEKETEE:  I wonder if you might

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

110.

undertake to upgrade or update the --

MR. GREENE:  We'll give you --

MR. STEKETEE:  -- however you want to phrase it, the Answers to Interrogatories in that regard?

MR. GREENE:  We'll be glad to supply that.

MR. STEKETEE:  Maybe you can supply the information to the United States so it can upgrade its own Interrogatories.

MR. GREENE:  Information will be supplied you from the Plaintiffs.

MR. STEKETEE:  All right.

Q.  (MR. STEKETEE)  Doctor, do you have a copy of the LeBlanc opinion in front of you?

A.  Yes, sir.

Q.  I wonder if you'd look at page 7, please?

MR. GREENE:  Most of us refer to that as the LeBlanc decision, although you're under no requirement to do that.

MR. STEKETEE:  All right.

Q.  (MR. STEKETEE)  Do you see that, have you got that in front of you?

A.  Page 7, yes.

Q.  You agree that the Chippewa fishing had commercial dimensions in 1836?

A.  Yes, I described that in my report, I believe.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

111.

Q.   All right.   What evidence is there of commercial -- of a commercial aspect of the Chippewa fishery in 1836 specifically?

A.   Well, one of the chief pieces of evidence is right, you know, right here on this page; the Treaty provision that would, in a small way, help provide them with fish barrels and salt that were utilized for preserving fish at that time.

Q.   Okay, that provision called for delivery of 500 fish barrels a year and 100 pounds of salt a year, 100 barrels of salt a year?

A.   Yes.

Q.   What were the barrels made out of?

A.   Wood.

Q.   How large were they?

A.   I really don't know.

Q.   How many fish would they hold, how many pounds of fish?

A.   I really don't know.   Those questions would have to come from somebody who knows more about it.

Q.   What did the Indians do with those barrels of fish?

A.   They sold them.

Q.   To whom?

A.   Whoever was marketing fish.

Q.   Who was that?

A.   I'm not sure, there were people in the business of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

112.

marketing fish, and we know that the American Fur Company was one of them, because one of the duties of their representative in Detroit was to handle these marketing problems.

Q. All right. I wonder if you'd refer to Footnote 5 to the quotation from Henry Schoolcraft which takes up a paragraph of that footnote. Are you familiar with that memoir of Schoolcraft?

A. Yes.

Q. When was it written?

A. I don't know the publication date on it, but I've read it.

Q. What date is he speaking of in that quotation?

A. I don't, I don't know, but it would be sometime -- I'm surprised that there isn't a date included on it, but it would be certainly before 1842, would it not?

Q. Before or after?

A. Well, it says, part of the title is "A Memoir from 1812 to 1842.

Q. All right, was it possible that it refers to 1842?

A. I suppose so, but I'm sure -- what you should do is to get the reference, because he dates everything.

Q. All right. Now, do you know whether or not the phrase "inhabitants" in the first sentence of that quotation refers solely to Indians?

A. No, there was a small community of people living at the Soo.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

113.

Q. Could it possibly refer to white men?

A. It could refer to white men or mixed blood or Indians.

Q. All right.  All right, I'd like you to look at page 8 of the opinion.  Do you agree with Justice Williams' conclusion that the reservation of fishing rights on ceded lands was a matter of course?

A. I don't think I should review his decision; I think that's a legal matter, I honestly do.

Q. Well, you've reviewed all these treaties?

A. Yes, that's right.

Q. I think you read all the treaties of Kappler at one point or another?

A. Yes, I have read a good deal of treaties and a good deal for the historical information that's contained in them and the identification of people who are important in the Indian history.

Q. So you don't know whether the inclusion of such a reservation clause in the treaty with Michigan Indian tribes was a matter of course?

A. Now, what -- Let's back up a little.  What is the -- I don't know whether you're asking me an independent question, or whether you're asking me to comment on something on page 8.

Q. I'm asking you whether the inclusion of such a reservation clause was a matter of course.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

114.

A.   I don't know, a matter of course for whom, in what context?  In what group of treaties?  I don't, you know, I'm kind of baffled at this point.

Q.   You don't follow the question at all?

A.   I do not follow, I do not -- It would help me if I knew what on page 8 you wish me to focus my attention on.

Q.   Well, I think I was referring to the middle paragraph.

A.   Paragraph that starts "This conclusion"?

Q.   Yes.

A.   All right, in that case, I'd have to find out what the conclusion was.

Q.   The conclusion was that the usual privileges of occupancy includes the right to fish.

A.   I would agree that the usual privileges of occupancy includes the right to fish.

Q.   And do you agree that the reservation of a right to fish on ceded lands was included in treaties at this time as a matter of course?

A.   I don't know how . . . I don't know, the reservation to live in a traditional manner was included in treaties as a matter of course.  The specific language differs.  I do not know about the wordage, and I have a feeling that you're very technical about wordage.  Indians are assured by treaty articles they can continue to live in the way they have always lived.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

115.

Q.    All right.  You see Justice Williams' Footnote 6 where he lists the number of treaties that supposedly contains a number of similar provisions, do you see those?

A.    Yes.

Q.    Can you tell me which of those treaties are removal treaties, do you know?

A.    Which of -- In Article 6?

MR. GREENE:  I'm going to object --

MR. STEKETEE:  Footnote 6.

THE WITNESS:  None of them.

MR. GREENE:  I'm going to object on the grounds that I don't understand what a "removal treaty" is.  I ask you to define that term.

MR. STEKETEE:  I think she's answered the question, so she apparently understands it.

THE WITNESS:  I don't believe any of these --

MR. GREENE:  Do you understand what the term "removal" --

THE WITNESS:  A treaty that provides for removal.  Glancing at the dates of the treaties in Footnote 6, I do not believe that these treaties are concerned with removal.

Q.    (MR. STEKETEE)  All right.  Justice Williams, in the first paragraph of Footnote 6, refers to the Treaty of Detroit of November 17, 1807, which apparently includes

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

116.

an Article which provides that Indian nations shall enjoy the privileges of hunting and fishing on the land ceded aforesaid as long as they remain the property of the United States.  Can you tell me why the signatories to the Treaty of Detroit specifically included the phrase "fishing" while the Chippewa, who supposedly, for whom fishing was such an important matter, did not include that phrase within Article 13?  Do you know of any reason why that was?

A.  Among the parties to the Treaty of 1807 were some rather reluctant representatives of the Saginaw Chippewa for whom fishing in Saginaw Bay and off White Rock and Lake Huron was very important.

Q.  All right.  Now, haven't you testified that the Indians in 1836 who signed the Treaty of 1836, that fishing for them was also very important?

A.  Very important.

Q.  Why did they not negotiate for a similar inclusion of the language "hunting and fishing" in Article 13?

A.  Well, they weren't negotiating.  1807 is a very early Treaty.  By the 1830's, it was a matter of common knowledge that Indians should be able to continue to live in the way they had always lived, and such specifics, the Treaty, Article 13, is very general; it's very, very general.  Exactly why the language would have been

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

117.

changed, I don't know.

Q.  So you're saying the Chippewa of the Upper Peninsula of Michigan simply assumed that the language of Article 13 included the right to fish because of their extensive knowledge of prior treaties that had been entered into elsewhere?

A.  I would say that Henry Schoolcraft included that provision in the Article, and Lewis Cass, because of their extensive prior participation in treaties.  The Indians didn't write these treaties; the 1836 Treaty, you know, was written by Schoolcraft, negotiated by a group of Indian traders.

Q.  But you just testified that the Chippewa of Saginaw Bay felt it important enough in 1807 to bargain for the retained right of fishing.

A.  That's -- You're testifying again, Mr. Steketee!

Q.  No, you said that.

A.  I didn't say "bargained for", that's not my knowledge. I said that Indians, Chippewa Indians from Saginaw Bay were reluctantly dragged into participating in the 1807 Treaty, and I know a great deal about that Treaty.  Very few people came, nobody wanted to have anything to do with William Hull.  They barely got enough representation for even the United States Government to consider it legal.  The land was never surveyed, nobody paid any

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

118.

attention to it.  They argued later about what were even the lines of the Treaty, the proper lines for the Treaty. I don't think anybody paid attention to it at all.

Q. All right, you're saying that the Indians that negotiated that Treaty did not bargain for the right to fish?

A. There was no bargaining -- To my knowledge, there was no bargaining that went on.  William Hull wrote a treaty and with a good deal of undercover work, managed to get a few people to come and sign it.  To think of people sitting around the bargaining table, you know, like General Motors and the Union and negotiating a treaty, would be ridiculous.

Q. Well, isn't it true that as far as the Treaty of 1836 was concerned, that the people actually did come and express their viewpoints, the Indians?

MR. GREENE:  Come where, Counsel?

MR. STEKETEE:  To Washington?

THE WITNESS:  If you follow the -- well, there is a lot of hassle about that Treaty.  It was, to my knowledge, largely developed by a group of Indian traders of the American Fur Company and presented to the Indians for signature.

Q. (MR. STEKETEE)  Oh, I see.  What documentary evidence is there that the Treaty was developed as you say, by traders?

A. If you follow the Treaty Minutes which are placed in

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

119.

evidence, there is a point where the Indians have a person to represent each one of the bands, and these are all traders; and what transpired amongst that group is not recorded.

Q. All right.  Do you understand what the phrase "removal treaty" means?

A. A treaty that purports to remove Indians west of the Mississippi River.

Q. All right.  Is the Treaty of 1836 a removal treaty?

A. It was a tentative, a tentative removal treaty.  It did not remove any Indians.  I don't call it a removal treaty.

Q. Are there notes of the -- Are there Minutes of the Treaty negotiations for the Treaty of 1836?

A. Very brief.

Q. All right, but they do exist?

A. Yes, there is.

Q. Do they make any reference at all to the meaning of Article 13?

A. Not that I know of.

Q. Is there any indication in those Minutes that the Indians were concerned about retaining fishing rights?

A. I don't recall, I don't recall any discussion.

MR. GREENE:  They have been submitted as part of Plaintiff's Exhibits, I believe it's P-55, and we have copies of Plaintiff's Exhibits if you'd like the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

120.

witness to review that.

Q.    (MR. STEKETEE)    Are you aware of any other external or documentary evidence that the Indians were concerned with retention of their fishing rights in 1836?

A.    Well, they, as I pointed out in my report, there had been in 1832, I believe, some attempt on the part of one of the trading companies to take over a couple of locations on the north shore of Lake Michigan, and these were profoundly objected to by the Indian people.  They felt that they were, these resources belonged to the Indian people.

Q.    Where is this reflected, now?

A.    There is correspondence quoted in my report, summarized in my report of the attempt of the firm of Biddle and Drew to acquire two fishing locations on the north shore of Lake Michigan, and they, according to the report at the time, they made arrangements with a spurious chief, somebody who wasn't the Chief at all, to be able to fish in those two locations.  And this whole fraudulent arrangement was objected to by the Indian people.  It's all in my report, and Henry Schoolcraft was told that it was -- He was told that he must, that he essentially must protect the rights of Indian people in this area. When Lewis Cass was Secretary of War, he was very well aware of the importance and responsibility of the Federal

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

121.

Government to maintain the integrity of the Indian country.

Q.   When did Biddle and Drew try to get --

A.   1832.

Q.   Okay.  Now, I wonder if you could turn to page 9 of the opinion of Justice Williams.  At the bottom of the opinion, there is a quote from Chief Justice Marshall -- no, excuse me -- yes, it is a quote from Justice Marshall, 1823, on the nature of Indian title.  I wonder if you could read that, and I'll read it into the record so that we know what we're talking about.  It says:  "It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign -- first the discovering European nation and later the original states and the United States -- a right of occupancy in the Indian Tribes was nevertheless recognized.  That right, sometimes called Indian title and goods against all but the sovereign, could be terminated only by sovereign act.  Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the Federal law.  Indian title recognized to be only a right of occupancy, was extinguishable only by the United States."

Okay, now, I wonder if you could tell me

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

122.

whether Chief Justice Marshall's analysis reflects the Indian viewpoint on property, or whether it's a white man's construct?

A. Well --

Q. Excuse me, this may not be Marshall, I'm not sure. It's certainly the Supreme Court, whoever it is. I wonder if you could tell me whether it's an accurate reflection of the Indian view of property, or whether it's a white man's construct?

A. I have a feeling you could answer that perfectly satisfactorily yourself. This is Anglo-Saxon law that I believe derives from a Pope dividing the world in half between France and Portugal in a Papal Order about 1500. This sovereignty business is, you know, that's really mythology, but legally compelling mythology.

Q. All right. Then if that isn't the Indians' view of what transpired, what was it?

MR. GREENE: Counsel, I'm going to object, an Indian view of what transpired, you asked her whether that quote was -- I'm not even sure what you asked her, but you didn't ask her what transpired before. We can ask the reporter to repeat it if --

MR. STEKETEE: I'll try and be a little bit more articulate.

MR. GREENE: Thank you.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

123.

Q. (MR. STEKETEE) If this quotation that I read does not accurately reflect the Indians' view of the status of events in 1836 before the Treaty was signed, what was their view?

MR. GREENE: Do you understand that question, Dr. Tanner?

Q. (MR. STEKETEE) For example, do you believe that the Indian in the Upper Peninsula before the Treaty was signed in 1836 believed that the United States was the sovereign, but that somehow the Indian retained a right of occupancy?

A. That is totally incomprehensible. Sovereignty is a very difficult concept to convey to anybody. There is a very fine description of a present day anthropologist in the South Seas who, when this same problem was presented to New Zealand natives, could only convey the idea by saying, "It's the shadow of Queen Victoria upon the land."

Q. All right, then, I gather that by extrapolation, the Indians' view in 1836 before this Treaty was signed was that there was a shadow upon the land, and that it was somebody's shadow?

A. They didn't talk to Queen Victoria or her representatives! I don't think they felt there was any shadow at all, that was Indian land; it was their own home country.

Q. All right, but the white men had been there for quite some time, had he not?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

124.

A.  A few, a few.

Q.  According to the white man's view, whose land was this?

A.  It was Indian land according to the Government view, that's Indian Country, and that wrote it capital I, capital C.  And Indian Country began, from the Indian viewpoint, at the Ohio River; but they're talking about -- You can find -- You have been carrying around Paul Prucha a good deal, there are quotations in there about the responsibility of the Federal Government to maintain the integrity of Indian Country.

Q.  Isn't it true, though, that from the viewpoint of the United States of America, the land in question was owned by the United States or was under this quotation that the fee title to the land was in the United States?

        MR. GREENE:  Objection, fee title, is calling for legal conclusion.

Q.  (MR. STEKETEE)  You don't know the answer?

A.  I don't know, fee . . . The United States, I believe, that by the Treaty -- The United States and Great Britain made decisions of sovereignty in which the Indian people did not participate.

Q.  What treaty was that?

A.  1783.

Q.  What was the name of it?

A.  It was the Treaty of Paris in 1783, but that didn't cut

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

125.

any ice, because the territory to which we are referring was firmly in the hands of British military personnel and Indian people.

Q. Let me ask you a few questions about the Treaty of Paris. The Treaty of Paris, I gather, was the Treaty which terminated the Revolutionary War, is that correct?

A. It was an international war in which the American Revolution was involved.

Q. Was a part?

A. (Nodded head affirmatively.)

Q. In it the British recognized the independence of the original 13 colonies?

A. (Nodded head affirmatively.)

Q. Did that Treaty establish the international boundary between what later became Canada and what then became the United States?

A. I don't believe the international boundary was established until the Jay Treaty.

Q. All right, when was the Jay Treaty?

A. In 1794.

Q. And how far west did the international boundary get established in the Jay Treaty?

A. I don't know, it went through the Lakes. They didn't, their geographical knowledge is so . . . We could refer to it. It may talk about the Lake of the Woods. It

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

126.

talked about the Great Lakes, though, I believe.

Q. Let me ask you this, for a time, France was the sovereign in what is now Canada, was it not?

A. (Nodded head affirmatively.)

Q. When did France -- Is that correct, could you say so on the record?

A. The French nation no longer /believed that it was sovereign.

Q. All right, I'll accept that. Did a time come when the French nation no longer believed that it was sovereign?

A. Yes, that is true, in 1763 -- by 1763, most French posts were replaced by British posts.

Q. Was there some event that --

A. The Treaty of Paris in 1763 where the European nations redivided the country without talking it over with the Indian people.

MR. GREENE: Excuse me, I believe you said 1763, and I think perhaps you mean 1783, just referring to the Treaty of Paris?

THE WITNESS: No, there are two Treaties of Paris, the first Treaty of Paris --

Q. (MR. STEKETEE) All right, the first Treaty of Paris, 1763, and the second was 1783?

A. Yes.

Q. What did the first Treaty accomplish?

A. In this particular area, it transferred sovereignty from

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

127.

France to England.

Q. Was there some event that had occassioned this transfer?

A. Yes, they had been fighting all over the world, yes, really the first world war.

Q. Had the English won some penultimate battle in this country, or on this continent?

A. Well, fighting had stopped.

Q. Did the English defeat the French in Canada?

A. Yes, they had a defeat in Canada -- I'm sorry, I'm not trying to be obscure, this was fought in so many parts of the globe.  For a while, I couldn't be sure which theatre was considered.

Q. Was there not a great battle?

A. There was a great battle at Quebec.

Q. And when was that?

A. That was 1760.  By 1761, the troops had changed place in Detroit -- I don't know whether you need all this background, but there were British around after that.

Q. So is it a fair summary to say, then, that the British had defeated the French in Canada by the early 1760's?

A. Yes.

Q. That the Revolutionary War, insofar as it was a part of the broader war that was going on at that time, was resolved by the second Treaty of Paris in 1783?

A. Yes.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

128.

Q.    Recognized the sovereignty of the 13 American colonies?

A.    It did.

Q.    And it was not until some time later, at the time of the Jay Treaty, that the international boundary was actually spelled out in any detail?

A.    That's true.

Q.    What was the date of the Jay Treaty?

A.    The date was 1794, the change of posts was in 1796.

Q.    What was the Treaty of Ghent?

A.    The Treaty of Ghent ended the War of 1812.

Q.    Insofar as you are aware, when was the international boundary between Michigan and Canada established?

A.    I'm not sure when they did that survey.  I know they talked about it, they talked about it, but I believe that the Canadian expeditions to mark out the boundary didn't take place until Bayfield came through in between 1815 and the 1820's, but if you'd be interested in that, I'd be glad to look it up.  It's perfectly clear that in 1820, the British flag was flying in Sault Ste. Marie.

Q.    All right, when was Cass' expedition to Sault Ste. Marie?

A.    1820.

Q.    Did he do anything with that flag flying?

A.    Yes, he did.

Q.    What did he do?

A.    He persuaded them to replace it with an American flag.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

129.

Q. All right, is it clear that the United States of America was asserting sovereignty over the area in 1820?

A. It was clear the United States, I would say, gained a toehold up there. The United States was not particularly influential for a long period of time.

Q. All right. Now, Justice Williams, in his opinion, seems to make a great deal over the description of the ceded territory and the fact that it described areas far out in the Lakes. I wonder if you could tell me whether you're aware of, in your review of all of these Indian treaties in Kappler, whether there was ever any instance or instances of United States clearing title to land? Do you know what --

MR. GREENE: I'm going to object to that, Counsel.

Q. (MR. STEKETEE) Does that phrase mean anything to you, "clearing title"?

A. Clearing land, yes; but clearing title, no.

MR. GREENE: I believe the witness testified that she has read the treaties in Kappler's; she has not testified she's committed them to memory or that she's prepared to testify today about each and every one of them. And if you'd refer her to a specific treaty, I'm sure she would be glad to oblige you as best she can.

Q. (MR. STEKETEE) As a historian, have you ever come in

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

130.

contact with something called a quit claim deed?

A.    No.

Q.    Do you know what a quit claim deed is?

A.    No.

Q.    If I told you that a quit claim deed was a deed from A to B which relinquished whatever right A had in the property, but did not necessarily warrant that A had any right at all, would that have any meaning for you?

A.    No.

Q.    All right.  Let me tell you, then, that there is such a thing as a quit claim deed, and that that is what it is; it's a deed from A to B in which A relinquishes whatever right he may have in a property without necessarily warranting that he has any right.  All right?  He may have none at all.  Do you follow that?

A.    I sell you a boat, whether I have one or not?

Q.    You sell me whatever right you have in the boat without necessarily warranting to me you have any right at all, and there are many, many occasions when that kind of a deed is useful.

A.    Sounds pretty fraudulent to me.

Q.    Let me give you an example, a concrete example so you understand it's not fraudulent.  Let's suppose that I have a piece of land, and that I'm a married man, that I've been married four times before.  I've gone through a

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

131.

number of divorces.  It's not exactly clear to you, the purchaser, of when I did buy this land; it's not exactly clear to you whether all of these former wives of mine have some claim to this land, so that when I sell you the property, your lawyer insists we get quit claim deeds from all of these former wives.  All they say is whatever right I happen to have in the property, I give it up to you.

Now, do you understand what the quit claim deed is?

MR. GREENE:  Counsel, I'm sorry to interpose an objection on the grounds of relevancy, but it's beyond me what that has to do with this lawsuit.

MR. STEKETEE:  All right, your objection is noted.

Q. (MR. STEKETEE)  Do you understand the concept now?

A. Yes, that's rare.

Q. It's a way of clearing off potential rights without necessarily anybody recognizing that they actually exist, okay?  Now, from your experience with Indian treaties, have you ever run into an occasion where what the parties were doing in all, you know, characterizing it fairly, when what the parties were doing was, in effect, clearing title to the land?

MRS. SHULSTAD:  Objection, she has already

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

132.

stated she does not understand what clearing title means, so I'd ask you to rephrase it.

MR. FREEMAN:  If we're going to be barraged with six or seven people throwing out objections, we're never going to finish it.  Are you suggesting --

MRS. SHULSTAD:  He went through a long detailed explanation of quit claim deed and asked her in terms of clearing title.

MR. FREEMAN:  There's no jury; there's no judge here.

MR. STEKETEE:  If she doesn't understand, she can say so.

THE WITNESS:  I understand what you said, but for Indians to engage, I think that the concept is totally, is totally meaningless.  I don't see what this property concept has to do with Indian treaties, and if you have some treaty in mind, why, I do not recall any language like this in the 1836 or 1855 Treaties.

Q. (MR. STEKETEE)  Why don't you get your copy of the Treaty of 1836 out and take a look at Article 1.  I believe the map has been kicking around here.

A. My map?

Q. Well, let's get your map.  Your Map 2 doesn't draw the line -- doesn't connect the line between Escanaba and the mouth of the Grand River, does it?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

133.

A.    Connect Escanaba and the mouth of the Grand River?

Q.    Doesn't the Treaty description in Article 1 of the Treaty of 1836 give a legal description of the land that's being ceded, and doesn't that line run through the Great Lakes at various points?

A.    In Article First, any transit across the Great Lakes is not mentioned.

Q.    Well, have you read Article First recently?  Maybe you better take a moment to read it.

A.    Oh, I see what you mean, yes; I have read Article First.

Q.    Article First describes a line, does it not, that in some places traverses part of the part of the land areas that's part of the State of Michigan, and in other parts, traverses areas of the Great Lakes, isn't that correct?

A.    Yes, it does.

Q.    All right.  And isn't it true that line goes well out into Lake Michigan, in fact where the present Michigan-Wisconsin border presently is, halfway out into the Lake?

A.    Through the ship channel, yes, it does.

Q.    All right.  Now, are you able to testify from your knowledge as a historian in your research whether the Indians exercised any sovereignty or occupancy or, in fact, ever visited before 1836, the middle of Lake Michigan?

              MR. GREENE:  Counsel, I'm going to object,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

134.

that's a compound question.  You're talking about visited or occupied or --

MR. STEKETEE:  Any of those things.

MR. GREENE:  Well, why don't you ask one at a time, it might make things a little simpler.

Q. (MR. STEKETEE)  Are you aware of any evidence that says, off Manistee, that any Indian ever visited as far out into the Lake as the line between Michigan and Wisconsin?

A. I believe that the area in the northern part of Lake Michigan is discussed in the supplementary report which has been available more recently.

Q. I'm aware of that, I'm asking, though, off Manistee.

A. The accounts which I -- that I quoted, I do not know of a narrative that includes somebody being in the middle of Lake Michigan at Manistee.  Indian people did go back and forth across the Lake quite regularly.  You pick a specific point . . .

Q. You think they sailed across Lake Michigan to Wisconsin?

A. Repeatedly.

MR. GREENE:  Sailed, Counsel, sailed?

THE WITNESS:  Yes, they used sails, sails and canoed, and they sailed in their canoes.  I have pictures of sailing canoes.  This description is in Father Baraga's, one of the quotations.

Q. (MR. STEKETEE)  We're talking about 1836 now?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

135.

A.    Certainly.

Q.    All right.

A.    In the 1760's, there is documentary evidence of the Indians going from, I think it's Milwaukee to Little Traverse Bay in canoes.  This was their habit.

Q.    Do you believe, then, that Article First is a recognition that the Indians controlled all of this area of the Great Lakes in 1836?

A.    Controlled is a loaded word.  They freely went back and forth across those lakes.  Not everyone had that skill, but Indian people did.  They've blown up -- A map that might be helpful is a more -- larger scaled, more detailed map of the northern part of Lake Michigan that has many more islands that are shown than a map of this scale, but all of those -- There are a great many islands that Indian people knew about, and they had regular routes back and forth.

Q.    I'm not talking about islands --

              MR. GREENE:  Counsel, for everybody's sake, if you're going to ask a question, I wish you would allow the witness to answer the question.

              MR. STEKETEE:  I think she was responding to no question at all.

              MR. GREENE:  Well, you interrupted her.

              MR. STEKETEE:  I think she was not

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

136.

responding to any question that had been posed.

Q. (MR. STEKETEE)  Now, Doctor, I wonder if we could get at this a different way.  Do you believe that the line described in Article First is a description of an actual area insofar as the line describes the water of the Great Lakes, runs through the Great Lakes?  Do you believe that's an actual description of the extent of the area of the Great Lakes that the Indian nations that we're concerned with here, the Ottawa and the Chippewa, that they continuously controlled or occupied before the Treaty of 1836?

MR. GREENE:  Counsel, you asked that question, and she answered that question.

MR. STEKETEE:  I'm not sure she did answer it, and I'd like an answer.

MR. GREENE:  Let's go back on the record --

MR. STEKETEE:  We're on the record!

MR. GREENE:  Let's go back where you asked the question and answered the question, it's about two minutes ago.

(Whereupon, the following question and answer were read back by the reporter:

"Question:  Do you believe, then, that Article First is a recognition that the Indians controlled all of this area of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

137.

the Great Lakes in 1836?

Answer:  Controlled is a loaded word. They freely went back and forth across those Lakes.  Not everyone had that skill, but Indian people did.  They've blown up --

A map that might be helpful is a more -- larger scaled, more detailed map of the northern part of Lake Michigan that has many more islands that are shown than a map of this scale, but all of those --

There are a great many islands that Indian people knew about, and they had regular routes back and forth.)

MR. STEKETEE:  I wonder if you might read back the last question?

(Whereupon, the following question was read back by the reporter:  "Question:  Now, Doctor, I wonder if we could get at this a different way.  Do you believe that the line described in Article First is a description of an actual area insofar as the line describes the water of the Great Lakes, runs through the Great Lakes?  Do you believe that's an actual description of the extent of the area of the Great

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

138.

Lakes that the Indian nations that we're concerned with here, the Ottawa and the Chippewa, that they continuously controlled or occupied before the Treaty of 1836?")

MR. STEKETEE:  I think it's a different question; I wonder if you might answer that now?

THE WITNESS:  I cannot distinguish between the two questions, Mr. Steketee.  The water, fluid, the fluid portion of that, of that territory was a region frequented by the Ottawa and Chippewa who were parties to the Treaty.  They went back and forth more frequently than I think most people realized.

Q.  (MR. STEKETEE)  All right.  For us that are among the benighted, I wonder if you could tell us where the evidence is that they went back and forth freely?

A.  I just told you that there is evidence as early as the 1760's that they went back and forth, and in Baraga's description of his missionary labors, which I've cited in my supplementary report, he describes a trip in a canoe from Little Traverse Bay across to Washington Island at the head -- at the head of Green Bay.  If you continue later in history, there was difficulty in the Charlevoix region in which, I believe, that some people kidnapped somebody or other and took him across and left him, and left him at Green Bay.

JEAN E. INGRAM & ASSOCIATES. INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

139.

Q.   Are there any accounts of which you're aware of Indians in canoes or boats or whatever they had in 1836 or before traversing Lake Michigan from one side to another in the area of Manistee or Ludington or the mouth of the Grand River, or, in fact, anything south of the Beaver Island group?

A.   You mean, you're inquiring am I aware of travels across the lower part of Lake Michigan as well as the upper part of Lake Michigan?

Q.   Yes.

A.   I do not, I do not know of any.  I haven't looked for that kind of account.  They frequently went from -- They frequently cut across the lower part of the Lake from, I know from St. Joseph to Chicago; but that is outside this immediate treaty area.  I gather you're talking about the immediate treaty area?

Q.   Yes.  So your answer is that no, you're not aware of any such --

A.   No, I'm not.  I know that there was a -- well, I know there's very little information about the ships and boats on the Great Lakes.

Q.   All right.  Now, do you think you can answer the question, then, that was posed before, whether this line, which nevertheless, which encompasses a very large part of the Great Lakes, was intended to reflect an actual area under

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

140.

the continuous occupancy or control of the Indian tribes with which the Government was treating?

A.    I repeatedly object to the word "control".  I would say it was continuously utilized by these Indian people.

Q.    All right, but you have no evidence of any utilization out in the middle of Lake Michigan, south of the Beaver Island group?

A.    I think that's a very ridiculous question.  I hate to object, but if you want to draw grids across Lake Michigan north, south, east and west and put markers in there, there's probably a number of them in which there is no evidence.

Q.    All right.

A.    Evidence is very limited on this subject.  There are preferential routes of travel.

Q.    Is it possible that the Indians never visited some of those grids?

A.    Imaginary grids?

            MR. GREENE:  Counsel, how many times must you ask the same question over and over again?

            THE WITNESS:  Why speculate?  I see no point in me speculating on that subject.

Q.    (MR. STEKETEE)  Well, I'm not the one who wrote this opinion, but it may become the law of the land, and I guess we're entitled to find out what you know about these

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

141.

matters, ma'am.

A.    Quite so.

Q.    So can you answer the question, is it quite possible some of these imaginary grids might never have been visited by Indians?

A.    There is a statistical probability for many events.   I find it profitless to speculate.

Q.    All right.   Do you think that the draftsmen of the Treaty of 1836 might also have found it profitless to speculate as to whether any of the Indians had occupied any of those waters?

A.    I presume that the people who framed this Treaty did it rationally and with some purpose, and the results are on record.

Q.    Can you answer the question, however?   Do you think that the draftsmen of the Treaty believed, really believed that the Indians had been out in the middle of Lake Michigan?

A.    He must have known it; he should have known it.

Q.    But you're saying you don't know it yourself?

A.    I do know; I have told you why I know.   This was common knowledge at the time.

Q.    All right, so you're saying it's common knowledge at the time, but now the evidence has all been lost?

A.    The evidence has not been lost, I have reported it.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

142.

Q. Let's just keep our comments concerned with the area off Manistee, okay?  Let's just keep it there.  Now, you've said, you've testified already there is no evidence that you are aware of that Indians traversed the Lake at that point, okay.  Now, I know this may seem silly to you, but it's not silly to me.  Now, the draftsmen of Article 1 describe a line running down the middle of Lake Michigan which, when it got opposite the mouth of the Grand River, cut in and joined up with a line that runs up the Grand River.  Are you telling me that there was evidence available to the draftsmen of the Treaty that has disappeared, is that what you're saying?

A. I don't believe that I said that.

Q. All right.  Do you think it's possible and, in fact, likely that the draftsmen of the Treaty, insofar as drawing the line down the middle of the lake, was simply drawing it at a convenient point from his standpoint?

A. I would not speculate about that subject.  I don't see any point in my speculating about that subject.

Q. What if it became important at some point to determine whether Indians continuously occupied a point or some area far out into the Great Lakes in order to determine what their rights are today.  Are you unable to determine whether they continuously occupied areas off Manistee in the middle of Lake Michigan?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

143.

MR. GREENE:  You have asked the question, and she answered she's not speculating about that.

THE WITNESS:  You have selected a geographical point for which there is no evidence.

Q.  (MR. STEKETEE)  All right.  Now, I'm asking you, from what you know about the drafting of the Treaty and its background, why the line was drawn where it was?

MR. GREENE:  Objection, asked and answered; she doesn't know.

Q.  (MR. STEKETEE)  You don't know why it was drawn where it was?

A.  The line has to end up at the mouth of the Grand River, I guess, doesn't it?

Q.  So the draftsman just drew a line down the middle of the Lake, isn't that what obviously happened?

A.  He drew a line to get from one side to -- from one side of the river, from one side of the lake to the other. Indian people were . . . You must have some very obscure legal problem on your mind that I do not --

Q.  I do indeed, I do indeed!

A.  I will not speculate about the terms of the Treaty.  It was drawn up rationally at the time and presumably made sense to the people who were involved.

Q.  All right, now, let me ask you, Doctor, from your experience and background, in your studies of the Treaty,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

144.

I want to ask you something about Mr. LeBlanc's situation. In this case, Mr. LeBlanc was arrested for fishing with an illegal device and for fishing without a license in Pendill's Bay, part of Whitefish Bay.  Now, the Defendant asserted before the Court of Appeals and in the Supreme Court that he was fishing in a reservation set out in Article 3, I believe, of the Treaty of 1836, okay?  The Court found that that reservation as such no longer exists, that the Pendill's Bay Indian Reservation is a somewhat smaller area, and we've been through that today, okay?  Now, in your view, if the right to fish -- and we're talking about it from the standpoint of the Indians in 1836 -- if the right to fish on that reservation had lapsed because the term of five years had gone by where the Government had not granted permission for the Indians to remain on that reservation further, by what right under this Treaty did Mr. Blanc have to fish at that point without a license and with an illegal device?

MR. GREENE:  Counsel --

Q. (MR. STEKETEE)  What is there -- Let me put this more simply -- What is there in the Treaty, aside from Article Third, that Mr. LeBlanc could rely upon for his position in this case?

MR. GREENE:  I would suggest, Counsel, that this question ought to be directed towards the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

145.

lawyers briefing, and not to this witness.

MR. STEKETEE: I believe this witness is going to interpret the Treaty in the trial.

MR. GREENE: She is not a lawyer; she's an ethno-historian.

MR. DILLON: I'd like to note it goes to the ultimate issue, if nothing else.

MR. FREEMAN: So does your report!

MR. DILLON: But it's not phrased in the legalese of Mr. Steketee's question.

MR. STEKETEE: The objection is noted.

Q. (MR. STEKETEE) First of all, do you understand the question?

A. I believe you're asking me to guess at what LeBlanc's case was --

Q. No, I'm not, I'm asking you to interpret the Treaty of 1836 for me. You have a copy of it in front of you?

A. You have given it to me.

Q. All right. Now, assuming that all of these reservations in Article Third have been wiped out, that's what the Court apparently said, what right is there in this Treaty -- and you can review it right now if you want to -- what right is there in this Treaty that he could rely upon that isn't set forth in Article Third?

A. If you recall our previous discussion, I said I believed

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

146.

that the 1855 Treaty was also concerned with reserves.
Your question started out with an assumption which I
don't believe is valid, and I would decline any comment.

Q. All right, let me see if I can get at this in a different
way, then. Let's forget about our friend, Mr. LeBlanc,
for a minute and assume that somebody is fishing in
Whitefish Bay at a point which is within the reservation
described in Article Third by the Treaty of 1836, but is
not within the present day Bay Mills' Indian Reservation.

MR. GREENE:  Objection, Counsel, that's
just loaded with legal conclusions about where that
reservation is legally defined.

MR. STEKETEE:  I'm not asking her to make
any legal conclusions about where the reservations are
or any of the meaning of it; I'm just asking you to
assume that this is, in fact, the case, okay, that there
is a point in Whitefish Bay that was within a larger
reservation described in Article Third that is no longer
included in the Bay Mills' Reservation.  Assume that is a
given fact, okay?

THE WITNESS:  No.

Q. (MR. STEKETEE)  Now, go through the Treaty for me and
point out to me that part of it where, assuming that
these reservations have lapsed, where it is in this
Treaty that you derive a right to fish at this point,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

147.

this hypothetical point unencumbered by any licensing
provisions of the State of Michigan or any other laws of
the State of Michigan.  Where is this reserved fishing
right found in the Treaty of 1836?

A.   Is your question finished?

Q.   Yes.

A.   I will not presume to answer the spin-off of a fallacious
initial assumption.

Q.   What was the initial assumption that was fallacious?

A.   That something -- That reservations no longer existed or
something.

Q.   All right, but let's assume that I'm right.

A.   I will not assume you're right; it's profitless to
speculate on error.

Q.   So you're saying the Michigan Supreme Court was in error?

A.   I'm not saying anything about the Michigan Supreme Court;
I will not review their decision.

Q.   All right.  Are you saying, then, that it's physically
impossible for there to be an area covered by the Treaty
of 1836 that was once within an Article Third reservation
but no longer is?

A.   I don't believe I've said that.

Q.   All right, let's assume there is such a point.

A.   Why assume fallacy or hypotheses?

Q.   Doesn't Article Third, for example, create a reservation

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

148.

in the Beaver Islands, isn't that correct?

A.   Article Third creates a reservation in the Beaver Islands.

Q.   Now, those islands are no longer a reservation.  I'm not asking you to tell me, you know, maybe there's some obscure claim that they are, but let's assume they are no longer a reservation, can you assume that?

A.   They're not on the map as a Federal reservation.

Q.   All right.  Now, after that point, in other words, some point within the Beaver Islands that was within the original Article Third reservation but is no longer a reservation, can you point to the provision that an Indian can trace his descent from one of the original treaty tribes that would give that person a reserved fishing right?

A.   That really is a legal question!  A reserved fishing right?

Q.   Well --

A.   I can tell you where they fished and where they didn't fish.

Q.   You can't tell us anything, then, about the interpretation of Article 13 of the Treaty?

A.   For the --

              MR. GREENE:  I would object to that question, Counsel.

              THE WITNESS:  I've told you some things

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

149.

about Article 13.

Q. (MR. STEKETEE) Do you believe -- Could you look at Article 13, please?

A. I've told you what I think it meant.

Q. All right. Does Article 13 apply to the entire area ascribed in Article 1?

MR. GREENE: Do you suppose we might all profit from a break at this point?

MR. STEKETEE: Let's see if we can get an answer to this series of questions, about five minutes.

THE WITNESS: Within Article 13, there is no geographical specification.

Q. (MR. STEKETEE) Does it not refer to the lands ceded?

A. Yes.

Q. All right, what are the lands ceded?

A. Well, you know, they're the --

Q. They're the lands specified in Article 1, are they not?

A. Yes, they are.

Q. But the lands specified in Article 1 less certain reservations, correct?

A. It doesn't say that in Article 13.

Q. Well, Article 13 refers to the lands ceded, does it not?

A. I think you're going to get into some kind of technicalities, because the total land area is the whole business; and I can see that there may be some within the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

150.

ceded lands.

Q. Did the Indians cede the lands described in Article Second and Third; in fact, didn't they reserve those lands?

A. Yes, those are called reserved lands.

Q. All right.  So do you have an opinion as to whether Article 13 applies to those reserved lands or not?

A. I don't have an opinion about that.  I find that confusing.

Q. All right, you don't have any opinion on that, nor do you have any opinion as to what the Indians believed it meant?

A. Indians, I repeatedly say, believed they could continue living the way they always had lived.

Q. With one exception, though, right, that at least the Lower Peninsula Indians believed they might be removed?

A. Some of them thought that they might, but the Upper Peninsula -- the Upper Peninsula Indians were not, were not believing they might be removed.

MR. STEKETEE:  All right, we can take a break now, if you want.

(Whereupon, a recess was taken.)

Q. (MR. STEKETEE)  Back on the record.

Doctor, why did the removal policy contained within the Treaty of 1836 not work; why were

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

151.

the Indians not removed?

A.   There are two primary reasons, the Indians didn't want to remove, and the United States decided it didn't want to remove them.

Q.   All right.  And where is there evidence that the Indians did not want to remove?

A.   I have referred to the series of documents that you all have submitted that's about immigration, that the Indians said -- that they ended with the fact that the Indians said if they ever removed, why, they would remove to that land; and they didn't remove.

Q.   So the evidence is, the only evidence of which you are aware is the evidence submitted by the State of Michigan?

A.   I have read, I'm very much aware, I've read all of the correspondence, but I think the most readily accessible evidence is that evidence which has been submitted, and the evidence that I believe I alluded to in my report in the course of the correspondence.

Q.   When you said you read all of the correspondence, what are you referring to?

A.   I went through all the correspondence for the Mackinac agency from the 1830's up to 1880.

Q.   Where did you review that correspondence?

A.   On microfilm that I obtained from the Federal Records Office in Chicago, I think, probably about 12,000 frames.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

152.

Q.   Where is the microfilm kept?

A.   One copy is in the Federal Records Office in Chicago. It's the same body of information that I believe has been referred to as Record Group 75.  That's really an out of date designation for the material.  The Indian Office correspondence was placed on microfilm in 1959 and is called Microfilm 234, that's the way I've referred to it. There's also Michigan Superintendency correspondence, ancillary, that's microcopy one, M-1 is the initial. The publications are M-1 and M-234, many rolls of microfilm.

Q.   And you've reviewed all those documents?

A.   Yes.

Q.   And the evidence you refer to was on those rolls?

A.   Yes.

Q.   Any other documents that establish this desire by the Indians not to be removed?

A.   This is reflected in the local and county histories of -- the reluctance, refusal of the Indian people to move, is well recognized in State and local history.

Q.   All right, and is the decision of the Government not to remove them, is the evidence the same for that decision?

A.   That is in the correspondence, likewise.

Q.   All right.

A.   And probably of the documents that are easier to review

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

153.

this whole matter is discussed in the Minutes of the 1855 Treaty.

Q.    All right.  Now, referring to the Treaty of 1855, and in particular to Article 3 --

A.    Do you have a copy of the 1855 Treaty?

MR. GREENE:  Yes.  For the record, I'm passing down a copy of the 1855 Treaty to the witness.

MR. STEKETEE:  All right.

MR. GREENE:  Article 3 is the release clause towards the end of the Treaty.  Do you find it?

THE WITNESS:  Yes.

Q.    (MR. STEKETEE)  All right.  I believe you testified earlier that the Indians reserved the right to fish in Article 13 of the Treaty of 1836, is that not true?

A.    The Indians believed they could continue fishing.

Q.    All right.  Are you qualifying your answer in such a way that -- Are you saying to me they thought they could continue the right to fish, and that is not included in Article 13 or it's included in some other provision of the Treaty of 1836?

A.    I was using a different term.  When you say "right to", to me, this is legal language; and I'm more comfortable in using just ordinary narrative terms.

Q.    All right, but in using those ordinary narrative terms, you didn't mean to imply that their belief that they could

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

154.

continue to fish was set forth in some Article other than Article 13 of the Treaty of 1836?

A.  It was set forth in the Treaty as a whole.  That's their understanding of the Treaty.  Indians don't --

Q.  How could they get this feeling, by osmosis, or do they -- Do they ever look at the actual words of the Treaty?

A.  I don't believe so.  I really don't, you know, I really don't know about that.  If we're talking about . . .

Q.  Looking at the standpoint, the only standpoint from which we can look at it --

A.  That's right.

Q.  -- which is to read the words, what are the provisions of that Treaty of 1836 that grant them this right to fish or reserve it, isn't it Article 13?

A.  Fishing is implicit in their -- in the location of their reserves, in Article -- I thought we were going to the 1855 Treaty?

Q.  We were, but I got confused.

A.  I didn't mean to confuse you, but the Indians believed they could continue to fish.

Q.  I wish you wouldn't confuse me!  Now, Article 3 of the Treaty of 1855, July 31st Treaty, is a release clause, is it not?

A.  That's what people call it.

Q.  All right.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

155.

A.    The heading, yeah, Liabilities Under Former Treaties.

Q.    Where did that heading come from, is that on the original Treaty?

A.    I presume so, I'm not sure; I haven't checked it against the original, but I think that's probably available.

Q.    Now, isn't it the thrust of your report that -- your first report, in any event, that this clause was not intended to release the reserved fishing rights of the Indians?

A.    The July 31st, the 1855 Treaty has nothing to do with fishing whatsoever.

Q.    All right.  Now, to my untoward mind, however, I see in Article 3 a reference to the right of fishing and encampment secured to the Chippewas of Sault Ste. Marie by the Treaty of June 16, 1820, that specifically excluded from the release otherwise contained in Article 3.  How do you explain the inclusion of that language that this Treaty has nothing to do with treaty rights?

A.    As I thought I explained rather carefully in my report, this Article refers to sums of money which the Federal Government owed to the Chippewa and Ottawa.  The sums of money which the Federal Government owed to the Chippewa and Ottawa are all taken care of, the financial obligation of the Federal Government to the Indians are all taken care of, except for the financial obligation to

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

156.

the Sault Band for disruption of their fishery.  That is a claim, a financial claim that the Sault Ste. Marie Bands have against the Federal Government that is not covered by the July 31st Treaty.

Q. All right, so your testimony, then, is that the rights, the fishing rights reserved by the Treaty of June 16, 1820, had been reduced to a claim by the destruction of those fishing waters before the signing of the July 31st, 1855 Treaty?

A. I don't believe I said that.

Q. What did you say, then?

A. I believe I said that I was implying that the Federal Government owed money, still owed money to the Sault Ste. Marie Bands.

Q. All right, what did they owe them money for?

A. They owed for physical disruption of the fishing area at the falls of the St. Mary's River.

Q. And you're saying that's the sole reason that there's reference to the right of fishing and encampment secured to the Chippewas of Sault Ste. Marie?

A. Yes, that's right.

Q. Because that had been reduced to a money claim?

A. What do you mean, I don't know what you mean "reduced to a --"

Q. Well, you testified that the Treaty of 1855 deals only

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

157.

with money claims by the Indians against the Government.

A.   That's right.

Q.   You testified that it has nothing to do with fishing rights.

A.   It has nothing --

Q.   Yet it, nevertheless, it nevertheless makes reference to this right of fishing and encampment secured by the Treaty of June 16, 1820, in the release clause; and I think it's your testimony that the reason why that reference is made is because that right of fishing and encampment had been reduced to a money claim, isn't that what you just said?

A.   No, I said that the fishing, the fishing facilities at the St. Mary's River had been damaged, a damage payment -- a damage -- the Sault Ste. Marie Bands felt that damages were due to them, a damage payment.

Q.   All right.  And how had the damage been done?

A.   By digging the canal.

Q.   When was the canal dug?

A.   It was begun in 1853 and completed in 1855.

Q.   All right.  Was the canal physically located in the reservation area of the June 16, 1820 Treaty?

A.   I believe it cut across the reservation.

Q.   All right.  Who built the canal?

A.   A firm Charles -- I've forgotten his name, there was an

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

158.

engineering firm that went up and built the canal.

Q. Can you detail for me, whatever proof exists, whether it's direct documentary evidence or oral tradition or the absence of contradictory evidence, whatever it may be, that leads you to the conclusion that reserved fishing rights are not included in Article 3?

A. There is no mention of fishing in any of the preliminary correspondence, or there's no mention of fishing or any questions about fishing that are raised in the correspondence prior to the Treaty.  I don't believe that it's mentioned in the Treaty Minutes or in the correspondence summarizing the results of the Treaty.

Q. All right, so your conclusion, then, is based on lack of reference to Indian fishing in the documents that surround the Treaty?

A. No, not to a lack of Indian fishing, there's a great deal of information about Indian fishing.

Q. That wasn't my question.

A. But that was not a legal concern.

Q. Let me rephrase it.  Your conclusion, then, is based upon a lack of reference to Indian fishing in the documents surrounding the Treaty, okay, as opposed to evidence positively showing, you know, that Indian fishing rights were not included.  As an example of the latter statement of Henry Schoolcraft in the Treaty Minutes, for example,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

159.

that fishing rights were not included in Article 3.  Are you aware of any evidence of that kind?

A.   Well, I guess that from my point of view, it's absence of information; but the entire thrust of the 1855 Treaty is on the financial obligations of the Government to the Indian people arising out of the 1836 Treaty.

Q.   All right, but can you answer the question, is there any evidence indicating -- positive evidence indicating that the parties did not intend to release reserved fishing rights in Article 3; are there any statements by Indians saying, "We don't want to release our fishing rights," or Schoolcraft acknowledging that the rights were not to be acknowledged either before or after the Treaty or during the negotiations?

A.   Nobody was thinking about it; it was not in anybody's mind in connection with this Treaty.

Q.   All right.  So you're saying there is no such positive evidence?

A.   There's --

Q.   I'm not saying that the evidence you have is no good, I'm just saying there is no good documentary evidence of the type I've been suggesting?

A.   There is no evidence that says, "For the benefit of the generations to come, we have decided not to discuss Indian fishing rights in this supplementary treaty."

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

160.

Q. All right.  Now, are you able to say with the same assurance that the people who negotiated this Treaty -- was it George Moneypenny, is that it?

A. Yes.

Q. Whether he had the same view of Article 3?

A. I will say with assurance, based on his own correspondence on the subject of the Treaty, that his concerns were financial and accounting, and providing permanent homes for the Indian people, assuring them of permanent homes.

Q. All right.

A. It's absolutely clear.

Q. Going to the Treaty of 1836, do you have any opinion as to whether the Treaty rights that were negotiated in the Treaty of 1836 were individual rights that were somehow held in common by all of the Indians that were beneficiaries of the Treaty or were tribal rights recognized in some other way from the standpoint of the Indians; was there any view on their part as to how these rights were held?

A. Their fishing rights were not negotiated.  This terminology still bothers me, fishing rights were not negotiated.  I wouldn't say in the 1836 Treaty it wasn't a subject of negotiation, and Indian people felt that it was a, you know, a human right that private property, personal rights are, these are Anglo terms.

Q. All right, are you saying, then, as far as the Treaty of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

161.

1836 is concerned, the Indians simply didn't consider that fishing rights were a topic of discussion at all, whatever rights they had they continued to have?

A.    Well, it's a human right; they were continuing to live the way they had lived.

Q.    All right.  Are you aware of any evidence that indicates to you how the Indians believed these rights would be held in 1836, whether they were, for example, would be exclusive rights of the Indians, or whether they would be shared with white men coming into the territory?

A.    This was considered -- The resources of the Indian country were considered as belonging to Indian people.  If you go back to that time in history, the 1830's, white people were supposed to have a passport in order to enter Indian country.  Even the missionaries had to get a passport to enter the Indian country.

Q.    That's not true after 1836, is it?

A.    No, it's not true after 1836, but that's the background to it.

Q.    So in 1836, how did the Indians view this Treaty, did they believe the white men could fish alongside of them outside of the reservations?

A.    I don't believe that they did.  I think that they felt that these were their resources, and if you note the documents, I think Whitefish Point was reluctantly the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

162.

one place where Henry Schoolcraft let the American Fur Company have a base, but the actual work of fishing was largely by, you know, Indians and mixed bloods who were acquainted with these techniques.

Q.    All right, so your testimony is, then, that the Indians believed that these rights were held by them exclusively, that the resource was theirs?

A.    That Indian people had -- That the fishing was an Indian occupation.

Q.    All right.  And is it clear that we're talking about areas outside of the nine reservations that are reserved in Article 3?

A.    I don't know what area we're talking about.  Indians believed they could continue fishing where they always had fished.

Q.    You're not limiting this belief to the nine reservations, are you?

A.    I don't believe that Indians drew lines around --

Q.    So the answer is you're not limiting this belief?

A.    No.

Q.    All right.  Now, you believe that this was an exclusive -- that they believed it was an exclusive right?

A.    Well, exclusive as a word is an anathema to Indian people; they didn't believe that their own livelihood should be taken away from them.  If other people came in

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254
163.

and were accepted as part of their community, they should be able to share in the life of the community.

Q. Would that include the American Fur Company when the American Fur Company came to fish in the Great Lakes?

A. It did not include the American Fur Company if they wished to prevent the Indian people from fishing in their accustomed places. I believe the American Fur Company's fishery in Lake Superior was west of this area.

Q. All right. Now, let me see if I understand what you're saying. Did the Indians believe that their fishing rights, whether they derived from the Treaty or simply not mentioned in the Treaty, that they were being violated when the American Fur Company fished in the waters of the Great Lakes, particularly Lake Superior?

A. I don't know, I don't know. I know that Henry Schoolcraft felt that he should -- that it was his obligation to limit the places in which the American Fur Company could operate.

Q. Where did you get that idea?

A. From correspondence addressed --

Q. What correspondence?

A. To Henry Schoolcraft, and the fact that he knew that there were other people in Sault Ste. Marie who wanted to, who wanted to fish in the traditional Indian fisheries; and he felt that it was his obligation to try to restrain them

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

164.

and prevent them.

Q. Are those traditional Indian fisheries, are those within the reservation of Article 3 or some other treaty like the 1820 Treaty?

A. I don't know, I don't know that there's, that there's a letter that is that specific; it's just his comment which I quoted in my report that there were people who were clamoring to fish.

Q. All right.  Now, I'm still not clear on whether the Indians objected to people coming in and fishing alongside of them in areas outside of the nine reservations.

A. I don't believe, I don't believe other people alongside of -- What do you mean, alongside of them?  I don't know -- I do not know of this occurring actually.

Q. Well, there was a long period of time after 1836 down to the present, isn't that correct, more than 100 years, and during that period of time, a large commercial fishing industry developed and then went into a substantial decline, and not all of the people fishing were Indians?

A. No, not all, particularly after 1860, I guess, there were some Irishmen.

Q. Okay, now, I'm trying to find out whether the Indians, as they interpreted the Treaty of 1836 at the time that they entered into it, would have believed that this development of the commercial fishery outside of their

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

165.

lands was in violation of some rights that they'd retained?

A.    I think that's kind of speculation; I don't believe that the Indians in 1836 had any realization or assumption of the changes that would take place in the course of the next century.

Q.    So they didn't have any view at all on whether the rights were exclusive or non-exclusive; this was meaningless to them?

A.    Those words, they believed they should continue to be able to use the fishing resources on which they had depended, and nobody else should take them away from them.

Q.    As long as they continued to have that right, as you've just phrased it, they didn't object to other people fishing?

A.    They did object to other people utilizing their resources, that's recorded in, I told you, in that 1830 -- in that 1832 situation before the --

Q.    But that's before the Treaty rights were established, okay?

A.    After the Treaty --

Q.    I'm not trying to trick you, I'm just trying to find out what the nature of these rights were in the minds of the Indians that negotiated the Treaty.  I think this is a fair area for inquiry.

A.    Well, see, rights is such a -- it's a term everybody uses

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

166.

now, and yet rights is not, for Indian people, you know, it's the right to live.  You don't cut off his fishing any more than you try to choke his throat.

Q.  Is that the extent of it, as long as you don't cut off his fishing, that he doesn't care whether somebody is also fishing?

A.  If it's somebody that has his permission and is accepted as one of the group that also needs to fish to survive; but I think Indian people did not envision being, you know, being swamped.

Q.  All right.  Now, did the American Fur Company need to fish in order for the individuals involved in the fishing to survive, or was it just a straight out and out commercial venture?

A.  The American Fur Company seems, as has been demonstrated, after it was difficult for them to recover -- to recover debts owed to them by skins, tried to turn to fishing and maple sugar, to deal in fishing and maple sugar as a commerical venture.

Q.  I don't think you've answered the question.

A.  Didn't you ask me what the American Fur Company was doing?

Q.  I asked you whether they needed that to survive, whether the individuals needed that to survive.  You said that --

A.  Which individuals?

Q.  I believe you testified, ma'am, that the Indians would

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

167.

not object to somebody fishing alongside of them if they were accepted in the community, and if these people needed to fish to survive?

A. That's right.

Q. Now, I'm asking you if the American Fur Company fit into that category?

A. Well, who in the American Fur Company?

Q. Well, anybody, company or any of its agents?

A. Well, the managerial personnel did not fish, did not know how to fish. Fishing was an Indian skill that people like those American Fur Company factors, they didn't know how to do that. They might handle the financial concerns, but they didn't know how to do it.

Q. Did the Indians grant permission to the American Fur Company to engage in the fishing in which the company did engage?

A. I think that was -- I'm sure, I think, that had to be licensed by the Federal Government. I think that they had to procure a license.

Q. Did the Indians permit it; did the Indians okay it?

A. I don't know whether they had a meeting and okayed it or not. I think that the Federal Government was given the responsibility of protecting their interests. We should talk about, you know, about where, because there was an American Fur Company that was out in the Apostle Islands.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

168.

Q. Well, let me ask you this, was there any record of complaints by the Indians against the American Fur Company or against anybody else that engaged in fishing in the Great Lakes in the Treaty territory from 1836 down to the present?  When is the first Indian complaint of which you're aware that talks about reserved fishing rights?

A. I don't -- I'm not sure that I, I can't answer that.  I have to go back and go through the literature.  I think that the complaint, that the heavy complaints have been rather recent because so many -- it was assumed that fishing and hunting were Indian occupations.

                MR. STEKETEE:  I think this is as good a point as any to break.

                        (End of Record.)


STATE OF MICHIGAN    )
                     )   SS
COUNTY OF INGHAM     )

                I, Sandra Crowley, Certified Shorthand Reporter and Notary Public in and for the County of Ingham, State of Michigan, do hereby certify that the foregoing Deposition was taken before me at the time and place hereinbefore set forth.

                I further certify that said witness was by me duly sworn in said cause; that the testimony then given

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

169.

was reported by me stenographically, subsequently dictated by me, and transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of February, 1977.

_____
Sandra Crowley, Certified Shorthand
Reporter and Notary Public,
County of Ingham, State of Michigan.

My Commission Expires:  1-22-79.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

170.