FILED

APR 6  3 41 PM '77

CLERK, U.S. DIST COURT
WESTERN DIST OF MICH

BY _____

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil No. M26-73 |
| STATE OF MICHIGAN, et al., | ) | |
| Defendants. | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

MOTION FOR PARTIAL SUMMARY JUDGMENT

173

TABLE OF CONTENTS

Page

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . .  1

II. THE DOCTRINE OF COLLATERAL ESTOPPEL PRECLUDES
THE STATE FROM RELITIGATING THE MEANING OF
THE TREATIES OF 1836 AND 1855  . . . . . . . . . . . .  4

A. Introduction  . . . . . . . . . . . . . . . . . . .  4

B. Mutuality of Estoppel Is No Longer Required
for the Doctrine of Collateral Estoppel
to Apply  . . . . . . . . . . . . . . . . . . . . .  7

C. The Offensive Use of Collateral Estoppel
by the United States and the Indian
Tribes is Permissible Under the Modern
Rule . . . . . . . . . . . . . . . . . . . . . . . . 12

D. The Court of Appeals for the Sixth
Circuit Has Also Dispensed With the
Requirement of Mutuality . . . . . . . . . . . . . . 17

E. The Instant Case Is One in Which the Doc-
trine of Collateral Estoppel Applies to
Preclude the Relitigation of Certain Issues  . . 19

III. THE EFFECT OF THE APPLICATION OF THE DOCTRINE
OF COLLATERAL ESTOPPEL TO THE INSTANT CASE WOULD
RESULT IN A SHORTENED PHASE I TRIAL . . . . . . .  . . 23

IV. THE UNITED STATES AND THE INDIAN TRIBES WERE
NOT PARTIES OR IN PRIVITY WITH THE PARTIES
IN PEOPLE V. LEBLANC AND ARE NOT BOUND BY THE
DECISION . . . . . . . . . . . . . . . . . . . . . . . 28

A. Introduction . . . . . . . . . . . . . . . . . . . 28

B. Privity Is Limited to Several Distinct
Situations . . . . . . . . . . . . . . . . . . . . 29

C. The United States Had Nothing to Do
with the State Case. . . . . . . . . . . . . . . . 32

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 34

TABLE OF AUTHORITIES

<u>Cases</u>                                                          <u>Page</u>

Alaska Pacific Fisheries v. United States,
248 U.S. 78 (1918)                                           24,26

Arizona v. California, 373 U.S. 546, 600,
<u>reh</u>. <u>denied</u>, 375 U.S. 892 (1963)                            24

Bay City Shovels, Inc. v. Schueler, 245
F.2d 78 (6th Cir. 1957)                                         29

Berner v. British Commonwealth Pacific
Airlines, Ltd., 346 F.2d 532 (2d Cir.
1965), <u>cert</u>. <u>denied</u>, 382 U.S. 983 (1966)             14,20

Bernhard v. Bank of America Nat'l. Trust
& Savings Ass'n., 19 Cal. 2d 807, 122 P.2d 892     8,9,10,18,19

Blonder-Tongue Labs. v. University of Illinois
Foundation, 402 U.S. 313, 324 N.12 (1971)          4,8,10,11,22

Bronson v. Board of Education of the City
School District of Cincinnati, 525 F.2d 344
(6th Cir. 1975)                                       6,17,18,19,23

Bruszewski v. United States, 181 F.2d 419,
421 (3d Cir. 1950), <u>cert</u>. <u>denied</u> 340 U.S.
865 (1950);                                                     10

Carlson v. Tulalip Tribes of Washington,
510 F.2d 1337 (9th Cir. 1975)                                  32

Carpenter v. Shaw, 280 U.S. 363 (1930)                         26

Choctaw and Chickasaw Nation v. Seitz,
193 F.2d 456 (10th Cir. 1951), <u>cert</u>.
<u>denied</u>, 343 U.S. 919 (1952),                               32

Choctaw Nation v. Oklahoma, 397 U.S. 620,
<u>reh</u>. <u>denied</u>, 398 U.S. 945 (1970)                        26

Choctaw Nation of Indians v. United States,
318 U.S. 423 (1943)                                            26

Cromwell v. County of Sac, 94 U.S. 351 (1877)                 4,5

Dana v. Morgan, 232 Fed. 85 (2d Cir. 1916)                    30

Davis v. McKinnon and Mooney, 266 F.2d 870
(6th Cir. 1959)                                                19

Graves v. Associated Transport, Inc., 344
F.2d 894 (4th Cir. 1965)                                      8,10

Greenberg v. Giannini, 140 F.2d 550
(2d Cir. 1944)                                                 30

Hackler v. Indianapolis & Southeastern
Trailways, Inc., 437 F.2d 360 (6th Cir. 1971)                  4

Heiser v. Woodruff, 327 U.S. 726, 733 (1946)                   4

## Cases Cont'd

Hornstein v. Kramer Bros. Freight Lines, Inc.,
133 F.2d 143 (3d Cir. 1942)                                    29,30

Howell v. Vito's Trucking and Excavating
Company, 191 N.W.2d 313 (1971), 386 Mich. 37,                     12

Humphreys v. Tann, 487 F.2d 666 (6th Cir. 1973),
cert. denied 416 U.S. 956 (1974)                                 19

Jones v. Meehan, 175 U.S. 1 (1899)                               26

Kimball v. Callahan, 493 F.2d 564 (9th Cir.),
cert. denied 419 U.S. 1019 (1974)                                25

Lawlor v. National Screen Service Corp., 349
U.S. 322, 326 (1955)                                              6

Lober v. Moore, 417 F.2d 714, 717 (D.C.Cir. 1969)                10

Macan v. Scandinavia Belting Company, 1919,
264 Pa. 384, 107 A. 750, 5 A.L.R. 1502                           30

Mackris v. Murray, 397 F.2d 74 (6th Cir. 1968)             12,14,19

Manchester Band of Pomo Indians, Inc. v.
United States, 363 F.Supp. 1238 (N.D.Cal. 1973)                  32

McClanahan v. Arizona Tax Commission, 411 U.S.
164 (1973)                                                       26

Menominee Tribe of Indians v. United States,
391 U.S. 404 (1968)                                              25

Mills v. Larson, 56 F.R.D. 63 (W.D.Pa. 1972)                      2

Minnesota v. United States, 305 U.S. 382 (1939)                 21

Moe v. Salish & Kootenai Tribes of the Flathead
Reservation, _____ U.S. _____, 48 L.Ed.2d 96 (1976)             33

Narragansett Tribe of Indians v. Southern Rhode
Island Land Development Corp., 418 F.Supp. 798,
810 (D.R.I. 1976)                                                32

National Bondholders Corp. v. Seaboard Citizens
National Bank, 110 F.2d 138 (4th Cir. 1940)                     29

Nevarov v. Caldwell, 161 Cal.App.2d 762. 327
P.2d 111 (1958)                                                  14

Nickerson v. Pep Boys-Manny, Moe and Jack,
247 F.Supp. 221 (D.Del. 1965)                                 22,23

Oneida Indian Nation v. County of Oneida,
414 U.S. 661, 678 (1974)                                         21

People v. LeBlanc, 399 Mich. 31, 248 N.W.2d 199
(1976)                                                       Passim

Poafbybitty v. Skelly Oil Co., 390 U.S. 364 (1968)              32

## Cases Cont'd

Pyramid Lake Tribe of Indians v. Morton, 354
F.Supp. 252 (D.D.C. 1973)                                    32

Schlegel Manufacturing Co. v. U.S.M. Corp.,
525 F.2d 775, 778 (6th Cir. 1975), cert.
denied, ____ U.S. ____, 96 S.Ct. 1509                        18

Sea-Land Services, Inc. v. Gaudet, 414 U.S.
573 (1974)                                                   32

Seguros Tepeyac, S.A., Compania Mexicana v.
Jernigan, 410 F.2d 718 (5th Cir. 1969)                       15

Settler v. Lameer, 507 F.2d 231 (9th Cir. 1974)             26

Skrzat v. Ford Motor Company, 389 F.Supp. 753
(D.R.I. 1975)                                               16,17

State of Maryland v. Capital Airlines, Inc.,
267 F.Supp. 298 (D.Md. 1967)                               17,22

Talcott, Inc. v. Allahabad Bank, Ltd.,
444 F.2d 451, 459 (5th Cir. 1971)                          6,22

Triangle Ink & Color Co., Inc. v. Sherwin-
Williams Co., 64 F.R.D. 536 (N.D.Ill. 1974)                  2

Tulee v. Washington, 315 U.S. 681 (1942)                    26

United Air Lines, Inc. v. Weiner, 335 F.2d
379 (9th Cir.), cert. denied, 379 U.S. 951 (1964)           14

United Banana Co. v. United Fruit Co., 172 F.Supp.
580, 588 (D.Conn. 1959)                                     22

United Shoe Machinery Corp. v. United States,
258 U.S. 451, 459 (1922)                                     5

United States v. Candelaria, 271 U.S. 432 (1926)            32

United States v. Kagama, 118 U.S. 375
(1886)                                                      21

United States v. Pan-American Petroleum Co.,
55 F.2d 753, 776 (9th Cir. 1932)                            33

United States v. Shoshone Tribe, 304 U.S. 111
(1938)                                                      26

United States v. Rickert, 188 U.S. 432 (1903)               32

United States v. United Air Lines, Inc.,
216 F.Supp. 709 (E.D.Wash., D.Nev. 1962),                   14

United States v. Washington, 520 F.2d 676,
688 (9th Cir. 1975)                                         30

United States v. Webber, 396 F.2d 381 (3d
Cir. 1968)                                                 16 , 30

Cases Cont'd

United States v. Winans, 198 U.S. 37 (1905)                24,26

Winters v. United States, 207 U.S. 564 (1908)                24

Worcester v. Georgia, 6 Pet. 515 (1832)                      32

Zdanok v. Glidden Co., 327 F.2d 944, 954 (2nd
Cir. 1964), cert. denied, 377 U.S. 934 (1964)   8,12,13,14,15,21


Statutes and Other Authorities

7 Stat. 491 - Treaty of 1836                              Passim

11 Stat. 621 - Treaty of 1855                             Passim

Federal Rules of Civil Procedure - Rule 56(a)                 1

6 Moore's Federal Practice                              1,2,6,7

Currie, Civil Procedure: The Tempest Brews,
53 Calif.L.Rev. 25, 26 (1965)                                 9

F. Cohen, Handbook of Federal Indian Law,
183 (1942, reprinted 1971)                                   31

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

UNITED STATES OF AMERICA, et al.,      )
                                       )
                    Plaintiffs,        )
                                       )
         v.                            )        Civil No. M26-73
                                       )
STATE OF MICHIGAN, et al.,             )
                                       )
                    Defendants.        )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

MOTION FOR PARTIAL SUMMARY JUDGMENT

I.

INTRODUCTION

Rule 56(a) of the Federal Rules of Civil Procedure provides that ". . . a party seeking to recover upon a claim . . . may . . . move . . . for a summary judgment in his favor upon all or _any_ _part_ thereof."  (Emphasis added.) Subsection (c) of Rule 56 explicitly provides for the rendering of a summary judgment on the issue of liability alone, even though there may be disputed issues of fact regarding the amount of damages.  Professor Moore states that Rule 56 " . . . authorizes a summary adjudication that will often fall far short of a final adjudication, even of a single claim . . . "  6 Moore's _Federal_ _Practice_, Part 2, 56-1215.  1/  A partial summary judgment is especially

_____

        1/  There is little doubt but that "partial summary judgments" are interlocutory in nature and are generally not appealable.  Some courts, stating this proposition in a

appropriate here because it will have the effect of shortening trial, as the United States and the Indian tribes (hereafter "plaintiffs") will more fully explain.

On December 27, 1976, the Michigan Supreme Court issued an important decision which bears on the instant case. In People v. LeBlanc, 399 Mich. 31, 248 N.W.2d 199 (1976), the State of Michigan criminally prosecuted a Chippewa Indian, enrolled at Bay Mills Indian Community, for fishing commercially without a license and for using a gill net, a prohibited device under state law. Abe LeBlanc's defense was based upon his contention that the Treaty of 1836 (7 Stat. 491) confirmed his aboriginal right to fish in certain waters of the Great Lakes, including the site of his arrest, and that pursuant to the Supremacy Clause of the United States Constitution, he was not subject to state regulation in the exercise of his reserved, federal treaty right.

LeBlanc's defense was supported by certain documents submitted into evidence which explained the background and meaning of the Treaty of 1836 and the Treaty of 1855 (11 Stat. 621). Throughout the proceedings and at all levels within the state's judicial system, the legal significance of these treaties was argued and reargued. 2/ At all times throughout these

_____

(footnote 1 continued) misleading manner, have held that summary "judgments" for any portion of a claim less than the whole shall not lie. See e.g., Triangle Ink & Color Co., Inc. v. Sherwin-Williams Co., 64 F.R.D. 536 (N.D. Ill. 1974) and Mills v. Larson, 56 F.R.D. 63 (W.D. Pa. 1972). However, Moore indicates that these courts mean that final judgments shall not be rendered on portions of claims. 6 Moore, supra, Part 2, 56-1219.

2/ The defendant LeBlanc was convicted in the District Court, First Division of the 91st District, on October 19, 1971. On December 22, 1972, the Chippewa County Circuit Court affirmed the trial court's decision. The Court of Appeals of Michigan issued its decision on October 7, 1974 which reversed in part the Circuit Court's decision (55 Mich.App. 684, 223 N.W.2d 305). Finally, the Michigan Supreme Court affirmed the Court of Appeals on December 27, 1976.

proceedings the state was motivated to litigate fully, had the opportunity to present evidence, was the initiator of the litigation and exercised its right to set forth its views regarding the meaning of these treaties.

Under these circumstances plaintiff United States and plaintiff-intervenors Bay Mills Indian Community and the Sault Ste. Marie Tribe of Chippewa Indians contend that the state is collaterally estopped from relitigating the meaning of the Treaties of 1836 and 1855. The effect of the application of the doctrine of collateral estoppel on the instant litigation is a shortened trial before this Court. Thus, extensive historical and ethno-historical testimony will no longer be required to support the United States' and the Tribes' contentions that the Indians retained or reserved certain rights to fish in the ceded waters of the Great Lakes. Nor will it be necessary to adduce evidence concerning the meaning of the Treaty of 1855 and more particularly whether Article III effected a release of the reserved right to fish confirmed by the Treaty of 1836.

Plaintiffs do not believe that the need for a trial has been eliminated altogether because of the LeBlanc decision, supra. However, trial time can be reduced, as plaintiffs will explain more fully hereinafter.

Two additional points should be mentioned by way of introduction. First, plaintiffs bring on this motion in advance of the deadline for filing a petition in the United States Supreme Court for writ of certiorari so that the state may do so if it desires. Plaintiffs are informed and believe that Mr. LeBlanc will not file a petition for writ of certiorari before the United States Supreme Court. However, should the state petition for a writ, Mr. LeBlanc would undoubtedly file a conditional cross petition urging that

-3-

the Supreme Court not issue the writ, but if it does, that all issues decided by the Michigan Supreme Court be reviewed by the United States Supreme Court.

Second, because the United States and the Indian tribes were not parties to or in privity with the parties to the criminal prosecution in state court, collateral estoppel does not bar them from litigating the two issues decided adversely to their interests by the Michigan high court. Those issues relate to whether all or part of Whitefish Bay is a physical part of the Bay Mills' reservation and whether the state has police power jurisdiction to regulate the Indians' reserved treaty rights.

II.

THE DOCTRINE OF COLLATERAL ESTOPPEL PRECLUDES
THE STATE FROM RELITIGATING THE MEANING OF
THE TREATIES OF 1836 AND 1855

A.  Introduction.

The leading decision concerning the judicially constructed principles of res judicata and collateral estoppel is Cromwell v. County of Sac, 94 U.S. 351 (1877). 3/

> In considering the operation of this judgment
> . . . it should be borne in mind, . . . that
> there is a difference between the effect of a
> judgment as a bar or estoppel against the pro-
> secution of a second action upon the same claim
> or demand, and its effect as an estoppel in
> another action between the same parties upon a
> different claim or cause of action.  In the

---

3/  Federal law concerning collateral estoppel is to be applied in non-diversity, federal question cases. See Blonder-Tongue Labs. v. University of Illinois Foundation, 402 U.S. 313, 324 n.12 (1971); Heiser v. Woodruff, 327 U.S. 726, 733 (1946); Hackler v. Indianapolis & Southeastern Trailways, Inc., 437 F.2d 360 (6th Cir. 1971).

-4-

former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action.  It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose . . . .Such demand or claim, having passed into judgment, cannot again be brought into litigation between the parties in proceedings at law upon any ground whatever.

But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.  In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined.  Only upon such matters is the judgment conclusive in another action.

94 U.S. 352-53.

In another important Supreme Court decision, the principles enunciated in Cromwell, supra, which have become settled law, were restated in varying phraseology:

In other words, to determine the effect of a former judgment pleaded as an estoppel, two questions must be answered: (1) Was the former judgment rendered on the same cause of action? (2) If not, was some matter litigated in the former suit determinative of the matter in controversy in the second suit?  To answer these questions we must look to the pleadings making the issues, and examine the record to determine the questions essential to the decision of the former controversy.

United Shoe Machinery Corp. v. United States, 258 U.S. 451, 459 (1922).

Simply stated, res judicata has become a doctrine of

-5-

"claim preclusion" while collateral estoppel is a doctrine of "issue preclusion."  See Bronson v. Board of Education of the City School District of Cincinnati, 525 F.2d 344 (6th Cir. 1975). Under the principle of res judicata, the same parties or their privies may not relitigate the same cause of action in a second suit which was the subject of a prior suit.  But the doctrine of collateral estoppel is considerably broader in its effect than that of res judicata since it may preclude the relitigation of certain matters in a second suit even though a different cause of action is presented.  However, its application is strictly limited in that it extends only to issues actually litigated and determined.  See Moore's Federal Practice, ¶ 0.441[2], pp. 3779-3780; Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 459 (5th Cir. 1971).  4/

> Where there is a second action between parties, or their privies, who are bound by a judgment rendered in a prior suit, but the second action involves a different claim, cause, or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended.

Lawlor v. National Screen Service Corp. , 349 U.S. 322, 326 (1955) (emphasis added).

Thus, at the outset it is clear that the doctrine of collateral estoppel applies to the defendant State of Michigan in the case at bar.  The state was a party to the People v.

---

4/  The issues litigated include both matters of fact and matters of law: collateral estoppel is applicable to both areas.  Moore, supra, ¶ 0.441, P.3780.

-6-

LeBlanc, supra, decision. It is equally clear that the matters at issue and controverted in LeBlanc included the meaning of the 1836 and 1855 treaties. Further, the decision in LeBlanc necessarily depended on that treaty interpretation and the meaning of the treaties was actually litigated and determined by the Supreme Court of Michigan.

But, this analysis does not end the inquiry since two other concepts subsumed within the doctrine of collateral estoppel must also be considered - mutuality of estoppel and offensive versus defensive use of the doctrine.

B. Mutuality of Estoppel Is No Longer Required for the Doctrine of Collateral Estoppel to Apply.

Mutuality of estoppel is a doctrine concerned with which persons may avail themselves of the collateral estoppel effect of a prior decision. This now outdated rule, simply stated, is that only persons who were parties or privies to the prior litigation such that an adverse as well as favorable judgment would have bound them in the prior decision may assert the doctrine of collateral estoppel in a subsequent case.

> The doctrine of mutuality requires that, as a general proposition, one who invokes the conclusive effect of a judgment must have been either a party or his privy to the suit in which the judgment was rendered. Stated differently, the mutuality requirement prevents a litigant from invoking the conclusive effect of a judgment unless he would have been bound if the judgment had gone the other way.

Moore's, supra, ¶ 0.412[1], p.1801.

Thus, the basic thrust of the mutuality rule was premised

-7-

on the theory that since one not a party to the former action could not be bound by the judgment therein (in accordance with due process standards), it necessarily followed that neither could he take advantage of it.  See Graves v. Associated Transport Inc., 344 F.2d 894 (4th Cir. 1965).  But exceptions to the general rule were carved out under the pressure of the public interest in an end to litigation.  The modern trend in federal as well as state courts is away from the rigid requirement of mutuality.

> But even at the time Triplett [Triplett v.
> Lowell, 297 U.S. 638 (1936)] was decided,
> and certainly by the time the Restatement
> [of Judgments § 93 (1942)] was published, the
> mutuality rule had been under fire.  Courts
> had discarded the requirement of mutuality
> and held that only the party against whom the
> plea of estoppel was asserted had to have been
> in privity with a party in the prior action.
>
> *   *   *
>
> However, in 1970 Professor Moore noted that
> "the trend in the federal courts is away
> from the rigid requirements of mutuality advo-
> cated herein."  Id., [Moore's Federal Practice]
> Supp 1970, at 53.  The same trend is evident
> in the state courts.

Blonder-Tongue Labs. v. University of Illinois Foundation, 402 U.S. 313, 322, 326 (1971) (footnotes omitted).

As noted by Judge Friendly, perhaps the "widest breach in the citadel of mutuality was rammed" 5/ by the 1942 decision of the Supreme Court of California in Bernhard v. Bank of America Nat'l. Trust & Savings Ass'n., 19 Cal. 2d 807, 122 P.2d 892

---

5/  Zdanok v. Glidden Co., 327 F.2d 944, 954 (2nd Cir. 1964), cert. denied 377 U.S. 934 (1964).

-8-

(1942). _6/_ Therein, Justice Traynor, expressing the unanimous opinion of the court, chose to "extirpate the mutuality require-ment and put it to the torch."  _7/_

> The criteria for determining who may assert a plea of res judicata differ funda-mentally from the criteria for determining against whom a plea of res judicata may be asserted.  The requirements of due process of law forbid the assertion of a plea of res judicata against a party unless he was bound by the earlier litigation in which the matter was decided.  * * * He is bound by that litigation only if he has been a party thereto * * * there is no compelling reason, however, for requiring that the party asserting the plea of res judicata must have been a party, or in privity with a party, to the earlier litigation.

> No satisfactory rationalization has been advanced for the requirement of mutuality. Just why a party who was not bound by a previous action should be precluded from asserting it as res judicata against a party who was bound by it is difficult to comprehend.

Bernhard, supra, 122 P.2d, 894-95.

Thus, the Bernhard decision abolished the requirement of mutuality and delimited the privity requirement to the situation wherein an attempt is made to invoke the prior judgment against

---

6/  The facts of Bernhard are as follows: A beneficiary interested in an estate objected to the executor's final accounting, charging that money withdrawn by the executor from a bank belonged to the estate.  Decree was entered for the executor, adjudicating that the money withdrawn by him from the bank had been a gift to him by the testator.  Subsequently, the same beneficiary sued the bank to recover the money paid to the executor.  The bank was permitted to use the executor's judgment to establish con-clusively against the beneficiary that the money had been given to the executor by the testator so that payment by the bank to the executor was proper.

7/  Currie, Civil Procedure: The Tempest Brews, 53 Calif. L.Rev. 25, 26 (1965).

one not a party to the action in which it was rendered.  Further,

Bernhard, supra, listed the criteria deemed to be determinative:

> In determining the validity of a plea of res
> judicata three questions are pertinent:  Was the
> issue decided in the prior adjudication identical
> with the one presented in the action in question?
> Was there a final judgment on the merits?  Was
> the party against whom the plea is asserted a
> party or in privity with a party to the prior
> adjudication?

122 P.2d at 895.


Although addressing California law, the Bernhard decision

has exerted considerable influence: many federal courts,

exercising both federal question and diversity jurisdiction,

have since modified or abandoned the requirement of mutuality,

unless in a diversity case, a conflicting state rule dictated

otherwise.  8/


The guiding principle which has emerged focuses on

whether the party against whom the former judgment was asserted

". . . had been afforded a full and fair day in court and a

reasonable opportunity to be heard on all the relevant issues,

even though against a different adversary, . . ."  Graves v.

Associated Transport, Inc., 344 F.2d 894, 897 (4th Cir. 1965).

Thus, the requirement of determining whether the party against

whom an estoppel is asserted had a full and fair opportunity

---

8/  See e.g. Bruszewski v. United States, 181 F.2d
419, 421 (3d Cir. 1950), cert. denied 340 U.S. 865 (1950);
Lober v. Moore, 417 F.2d 714, 717 (D.C. Cir. 1969) and cases
cited in Blonder-Tongue Laboratories, supra, 325, note 13.

to litigate is deemed an adequate safeguard in lieu of mutuality.

> Although neither judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard.

Blonder-Tongue Labs. v. University of Illinois Foundation, supra, 329.

Even assuming the concept of mutuality has any vitality today after the Supreme Court's decision in Blonder-Tongue, supra, it is clear it has no applicability to the case at bar. The state chose to prosecute Abe LeBlanc in the forum of its choice for violations of state fishing regulations. Throughout the state court proceedings LeBlanc contended he had a treaty protected right to fish. He introduced documentary evidence to support his contention which the state for its own reasons chose not to rebut. 9/ However, the state vigorously contended in its briefs throughout the five year proceeding that the Chippewas had no treaty rights to fish. The nature, extent and meaning of the Treaties of 1836 and 1855 were at issue during the entire prosecution and subsequent appeals and the Supreme Court of Michigan's decision is based exclusively on treaty construction and interpretation. Even a cursory review of the decision and the supporting briefs and pleadings which led to it leave absolutely no doubt that the state had a full and fair opportunity to be heard regarding the meaning of

---

9/ "It is little wonder then, that in the face of this, and other evidence, the People did not dispute at trial that the area in which defendant had been arrested had been Chippewa country at the time of the Treaty of 1836." People v. LeBlanc, 248 N.W.2d at 207.

these treaties.  Under these circumstances, plaintiffs respectfully submit that the anachronistic concept of mutuality does not prevent the operation of the doctrine of collateral estoppel to preclude the state from relitigating the meaning of the Treaties of 1836 and 1855. 10/

      C.   The Offensive Use of Collateral Estoppel by the United States and the Indian Tribes is Permissible Under the Modern Rule.

The United States and the Indian tribes were not parties or privies to the prior State Supreme Court decision in  LeBlanc. Some courts have ruled that the doctrine of collateral estoppel may be used defensively (i.e. as a shield) only.  However, as plaintiffs will show, the better, modern decisions reject this arbitrary distinction and instead examine the circumstances in each case to determine whether the doctrine will apply.

The leading case on the subject is Zdanok v. Glidden Company, Durkee Famous Foods Division, 327 F.2d 944 (2d Cir.), cert. denied 377 U.S. 934 (1964) wherein Judge Friendly exhaustively analyzed the problem.  At issue in that case was the interpretation of a union contract.  More specifically the question was whether certain employees at a closed Glidden plant were entitled to seniority if they relocated to a new Glidden plant.  The issue was first raised in a suit brought by

_____

10/  Although not controlling, it is interesting to note that the Michigan  Supreme Court, in addressing the problem of mutuality and its role in the application of collateral estoppel, has recently reaffirmed its necessity as a condition precedent to the application of the doctrine under state law.  Howell v. Vito's Trucking and Excavating Company, 386 Mich. 37, 191 N.W.2d 313 (1971).  Cf. Mackris v. Murray, 397 F.2d 74 (6th Cir. 1968).

-12-

Olga Zdanok and four other employees.  The Court of Appeals for the Second Circuit, reversing the district court, held that the employees were entitled to seniority at the new Glidden plant and remanded the case to determine the employees' damages.  Subsequent to the Zdanok lawsuit, another group of employees (the Alexander group), not parties to the earlier suit, sued Glidden in federal court as well, seeking substantially similar relief as the plaintiffs in the Zdanok suit.  Glidden introduced evidence through the testimony of various witnesses and in the trial court and on appeal argued that because of this new testimony, the case should now be decided in its favor.  The Court of Appeals refused to consider the new testimony and held that the plaintiffs in the second suit, even though not parties to the first, could offensively use collateral estoppel to bar Glidden from relitigating the meaning of the union contract.

> . . . we hold that the ruling of liability in the Zdanok case precluded Glidden from offering new evidence to contest this not only against the five original plaintiffs but against the Alexander group as well.  We recognize that such a holding would have seemed impossible fifty years ago:  If in the Zdanok action the contract were construed as Glidden contends, this would not preclude the Alexander plaintiffs from offering extrinsic evidence to support their construction of the contract, since they had not had their day in court.  Because it was thought that estoppels must be "mutual," that "Nobody can take benefit by a verdict, who had not been prejudiced by it, had it gone contrary," Glidden would likewise not be precluded from offering new evidence against the Alexander group.

327 F.2d 944 at 954 (footnote omitted).

With respect to the offensive use of the doctrine by plaintiffs in the second case not parties to the first suit, Judge Friendly, distinguishing Zdanok from those situations

-13-

involving a single accident injuring numerous persons, 11/
held such offensive use permissible.

> Professor Currie recognizes that his
> "offensive-defensive" distinction is simply
> a rule of thumb that will usually achieve
> the right result, and concludes, supra, 9
> Stan.L.Rev. at 308, that the abandonment of

----

11/ Despite the fact that the modern trend of authority dispenses with the mutuality requirement, there are some exceptions. One class of cases wherein mutuality typically is still required for collateral estoppel to apply are the airplane and auto accident cases involving personal injuries to several persons. See e.g. Nevarov v. Caldwell, 161 Cal.App.2d 762, 327 P.2d 111 (1958); Berner v. British Commonwealth Pacific Airlines, Ltd., 346 F.2d 532 (2d Cir. 1965), cert. denied, 382 U.S. 983 (1966); and Mackris v. Murray, 397 F.2d 74 (6th Cir. 1968). Judge Friendly in Zdanok, supra, described the problem, as follows:

> The evils of such "offensive" use are
> illustrated by the case of a railroad
> accident injuring 50 people who bring
> separate successive actions. The railroad
> can achieve no benefit in future actions
> from successful defense of the first 20.
> Yet, under the letter of the Bernhard
> opinion, a loss in the 21st round, perhaps
> resulting from a jury compromise out of
> sympathy for an appealing plaintiff, would
> bind the railroad for the remaining 29.
> Currie's understandable belief that some-
> thing was wrong in that picture proved
> persuasive to a district court of appeal in
> California which, citing his article,
> refused to allow other persons injured in
> an automobile collision to avail themselves
> of a prior plaintiff's judgment. . .

Zdanok, supra, 955 (the Currie article referred to above is "Mutuality of Collateral Estoppel: Limits of the Bernhard Decision," 9 Stan.L.Rev. 281 (1957).) Cf. United States v. United Air Lines, Inc., 216 F.Supp. 709 (E.D. Wash., D.Nev. 1962), aff'd as to res judicata, sub. nom, United Air Lines, Inc. v. Weiner, 335 F.2d 379 (9th Cir.), cert. denied, 379 U.S. 951 (1964) wherein the airline was collaterally estopped from relitigating its liability for a plane crash after 24 of the 31 injured passengers recovered in the first suit and the second suit involved the remaining seven passengers only.

-14-

> the mutuality requirement is sound except (1)
> "where the result would be to create an
> anomaly such as would occur in the railroad
> type of situation, where the party against
> whom the plea is asserted faces more than
> two successive actions," or (2) where "by
> reason of his former adversary's possession
> of the initiative," he has not "had a full
> and fair opportunity to litigate the issue
> effectively."

Zdanok, supra, 956. Judge Friendly also pointed out that where the ". . . matter in issue is not a factual question of negligence subject to the varying appraisals of the facts by different juries, but the construction of a written contract by a judge" there is little chance for prejudice in applying the doctrine of collateral estoppel offensively. Zdanok, supra, 956. In LeBlanc, supra, the Michigan high court was required to interpret specialized types of contracts (treaties) not too dissimilar from the contract construed in Zdanok, supra.

In Seguros Tepeyac, S.A., Compania Mexicana v. Jernigan, 410 F.2d 718 (5th Cir. 1969), the court of appeals sanctioned the use of the doctrine of collateral estoppel offensively. There the plaintiff owner of a car was allowed to offensively assert an estoppel preventing an insurance company from relitigating the issue of insurance coverage after the company was sued by the injured party in a prior suit and lost on that issue. The court indicated that collateral ". . . estoppel has been applied both 'offensively' and 'defensively' . . . . " and that ". . . one court has gone so far as to say that 'the doctrine of mutuality is a dead letter'". Seguros, supra, 727. Since the insurance company, like the State of Michigan in People v. LeBlanc, supra, had already had its day in court, the Fifth Circuit could see no reason why it should be allowed to relitigate.

-15-

The United States Court of Appeals for the Third Circuit has also addressed the issue of the offensive application of the doctrine of collateral estoppel and has likewise sanctioned such use.  In <u>United States v. Webber</u>, 396 F.2d 381 (3d Cir. 1968), an assignee (the United States) of a general contractor, was allowed to use estoppel offensively.  The government estopped a subcontractor from relitigating the issue of whether a government contract was obtained in violation of an Executive Order prohibiting the payment of a contingent fee for securing such contracts, after that same question was litigated as between the same defendant and a different plaintiff in a prior suit initiated to recover for services rendered.  Those services included, <u>inter</u> <u>alia</u>, obtaining the government contract pursuant to a contingency fee.  The defendant successfully resisted paying the contingency fee for securing the government contract because it violated public policy as set forth in an Executive Order. Once again, the doctrine of collateral estoppel was applied offensively.

In another important case, <u>Skrzat v. Ford Motor Company</u>, 389 F.Supp. 753 (D.R.I. 1975) the offensive use of collateral estoppel was again approved by a district court.  There, plaintiff passenger in an automobile sought to estop the Ford Motor Company from relitigating its liability for constructing a car with a faulty gas tank.  The design defect and Ford's liability was established in a prior suit by another person injured in the same accident.

> When a conflict arises between the doctrine of mutuality and the policy behind <u>res judicata</u> and collateral estoppel against endless litigation, the modern trend of decisional law indicates that the require-ments of sound public policy should prevail over the mechanical application of the requirements of mutuality and privity.

Skrzat, supra, 757. The court there reasoned that the issues in both suits were the same even though the plaintiffs were different and not in privity. Further, the court distinguished the class of cases discussed in footnote 11, supra, i.e., those involving accidents with more than one injured person. In other words, reasoned the court, Ford had a full and fair opportunity to defend regarding its liability for faulty design in the first case and, therefore, was estopped from relitigating that issue in a second suit brought by a different plaintiff not in privity with the plaintiff in the first suit.

It is now well established, albeit not a universal rule, that mutuality of estoppel is no longer required and that the doctrine may be used offensively or defensively. 12/ The cases are replete with the notion that the doctrine should not be used if it causes manifest injustice or unfairness. There are several indicia the courts have used to determine when the doctrine applies, which will be discussed shortly, in subsection E, infra. However, before considering those cases, the law in the Sixth Circuit will be considered.

D. The Court of Appeals for the Sixth Circuit Has Also Dispensed With the Requirement of Mutuality.

A recent decision in this Circuit considered the doctrine of collateral estoppel, Bronson v. Board of Education of the City School District of Cincinnati, 525 F.2d 344 (6th Cir. 1975) and dispensed with the requirement of mutuality of estoppel.

---

12/ See also, State of Maryland v. Capital Airlines, Inc., 267 F.Supp. 298 (D.Md. 1967).

-17-

Bronson, supra, was a suit brought in behalf of all black parents and their children attending public schools in Cincinnati to challenge alleged racial discrimination. It came on the heels of prior litigation, brought by different plaintiffs and covering a different time period, but raising precisely the same issues - alleged racial discrimination in public schools. The defendants sought to prevent the Bronson litigation by interposing the defense of collateral estoppel, even though the plaintiffs in Bronson were different from those in the prior litigation. The court, relying in part on Bernhard v. Bank of America, 19 Cal.2d 807, 122 P.2d 892 (1942) applied the doctrine despite the lack of mutuality of estoppel.

One argument raised and rejected was that the doctrine ought not ever apply in school desegregation cases because of the strong policy against racial discrimination in schools. The court saw no reason to treat that kind of case differently and acknowledged the firmly established public policy against endless litigation. 13/

But more importantly, the court recognized and readopted the notion of "issue preclusion," which is precisely the kind of application of the doctrine of collateral estoppel the plaintiffs urge herein. See § III, infra.

> The proper balance between the public policy
> of requiring a finality to judgments which
> settle issues in litigation and that of
> preventing the denial of equal protection of
> the law to a generation which comes after
> such a judgment has been rendered may be
> achieved by applying the rule of "issue
> preclusion."

---

13/ See also, Schlegel Manufacturing Co. v. U.S.M. Corp., 525 F.2d 775, 778 (6th Cir. 1975), cert. denied, ___ U.S.___, 96 S.Ct. 1509.

-18-

Bronson, supra, 349 (citations omitted).

Davis v. McKinnon and Mooney, 266 F.2d 870 (6th Cir. 1959), a diversity case, is another example where the doctrine of collateral estoppel was sanctioned for defensive use without requiring mutuality.  Once again the court relied on Bernhard, supra.

The Sixth Circuit, in another diversity case, has also adhered to the exception to the emerging rule of not requiring mutuality in situations where a single accident causes injuries to numerous persons.  Mackris v. Murray, 397 F.2d 74, 81 (6th Cir. 1968).  For the same result reached in another multi-injury airplane accident case, see Humphreys v. Tann, 487 F.2d 666 (6th Cir. 1973), cert. denied 416 U.S. 956 (1974).

In summary, the Sixth Circuit has also dispensed with mutuality of estoppel as a condition to the application of the doctrine in federal question cases.  Bronson, supra.

   E.   The Instant Case Is One in Which the Doctrine of
        Collateral Estoppel Applies to Preclude the Reliti-
        gation of Certain Issues.

Then-Chief Justice Traynor in Bernhard, supra, articulated the criteria for determining when the doctrine of collateral estoppel applies.  First, was the issue decided in People v. LeBlanc, supra, identical with the one presented herein?  There can be no question but that the answer to this question is affirmative.  In LeBlanc, the defendant, an enrolled member at Bay Mills, was prosecuted for fishing without a license and for using prohibited gear, in violation of state law.  His defense was that he had a federally protected treaty right to fish,

-19-

which the Supremacy Clause to the United States Constitution insulated from state interference.  The state met this issue head on in its briefs and argued there were no reserved rights to fish or, in the alternative, that if the Indians reserved rights to fish, those rights ceased in 1841.  Further, the state argued that if the rights survived beyond 1841, they were released by the Indians pursuant to Article III of the Treaty of 1855 (11 Stat. 621).  The legal and factual issues raised in defense to the criminal prosecution by the state are the mirror image of the legal and factual issues raised herein by plaintiffs' complaint for declaratory and injunctive relief.  14/

Second, was there a final judgment on the merits in People v. LeBlanc, supra?  It is clear the answer to this question is in the affirmative, as well.  There can be no argument that because the Michigan high court affirmed in part, reversed in part and remanded the case that there has not been a final decision pertaining to the meaning of the Treaties of 1836 and 1855, supra.

> . . . collateral estoppel does not require a judgment "which ends the litigation * * * and leaves nothing for the court to do but execute the judgment," Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945), but includes many dispositions which, though not final in that sense, have nevertheless been fully litigated. Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2 Cir. 1961), cert. denied, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962), and cases cited.  As we there said, "'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again."

---

14/  In Berner v. British Commonwealth Pacific Airlines, Ltd., 346 F.2d 532, 540 (2d Cir. 1965) the court stated that as a matter of federal law the doctrine of collateral estoppel applies when the first judgment was in state court and it is subsequently asserted in federal court.

<u>Zdanok v. Glidden Company, Durkee Famous Food Division</u>, <u>supra</u>, 955.

The third question is was the party against whom the plea is asserted (the state) a party or in privity with a party to the <u>LeBlanc</u> litigation?  The state was the initiator of the <u>LeBlanc</u> case and is the defendant herein; thus, this third criteria is satisfied as well.

The briefs and record in the <u>LeBlanc</u> decision leave no doubt that the state had a full and fair opportunity to be heard on the issue of treaty construction.  Further, there is no question but that the case was aggressively and seriously litigated up through and including the State Supreme Court.

How can the state be heard to complain now about the application of the doctrine of estoppel when it had the sole and unfettered choice whether to initiate the <u>LeBlanc</u> case and further was able to choose its forum - state court - a forum which has historically been unfavorable to Indian litigants.  <u>15/</u>

> If the party against whom the prior judgment is asserted did have the initiative in the prior suit, however, in the sense that he instigated the suit, there would appear to be <u>no reason</u> to assume that he did not have a <u>full and fair</u> opportunity to litigate.  Thus, there is no reason to assume that he lacked sufficient <u>motive</u> to litigate when it was he himself who commenced the litigation.  Similarly, it would

_____

<u>15/</u>  "There has been recurring tension between federal and state law; state authorities have not easily accepted the notion that federal law and federal courts must be deemed the controlling considerations in dealing with the Indians."  <u>Oneida Indian Nation v. County of Oneida</u>, 414 U.S. 661, 678 (1974).  <u>See also Minnesota v. United States</u>, 305 U.S. 382 (1939) and <u>United States v. Kagama</u>, 118 U.S. 375 (1886).

> be anomalous to consider the fairness of his
> forum when it was he himself who chose the
> forum.  In short, a party who instigated the
> prior suit is in a poor position to complain
> about the adequacy of his opportunity to
> litigate in that suit.

James Talcott, Inc. v. Allahabad, Inc., 444 F.2d 451, 462

(5th Cir. 1971) (emphasis added).


The state cannot be heard to complain regarding lack of

due process either since "All that due process requires is that

the party who is now being bound was a party to the earlier

judgment."  United Banana Co. v. United Fruit Co., 172 F.Supp.

580, 588 (D.Conn. 1959); State of Maryland v. Capital Airlines, Inc.,

267 F.Supp. 298, 302 (D.Md. 1967); and Blonder-Tongue Labs., supra.


During trial, defendant LeBlanc introduced documentary

evidence to support his construction of the meaning of the

treaties, which the state chose, for its own reasons, not to

rebut.  But, the state is hardly in a position to complain now

about the record after it instigated the proceeding and chose

the forum.


> To be sure, we recognize that whenever a court
> considers applying the doctrine of collateral
> estoppel, there is always a lingering question
> whether the party might have succeeded in
> proving his point if he had only been given a
> second chance at producing evidence.  Without
> more, however, this question is not sufficient
> to outweigh the extremely important policy
> underlying the doctrine of collateral estoppel -
> that litigation of issues at some point must
> come to an end.

James Talcott, Inc. v. Allahabad Bank, Ltd., supra, 463.


Similarly, see Nickerson v. Pep Boys-Manny, Moe and Jack,

247 F.Supp. 221 (D.Del. 1965) wherein the court, in a pre Blonder-

-22-

Tongue Labs., supra, decision, departed from the then rule

requiring mutuality in patent cases and said:

> Here there are no circumstances that
> would make it unfair to hold that plaintiff
> is estopped by the judgment in Nickerson v.
> Bearfoot Sole Co. [311 F.2d 858 (6th Cir.),
> cert. denied, 375 U.S. 815, pet. for
> rehearing denied, 375 U.S. 949 (1963)] to
> relitigate the validity of his patent.
> Plaintiff selected Bearfoot Sole Co. as the
> defendant he wished to sue.  He also chose
> the forum in which to bring the action.
> The question of the validity of the patent
> was not summarily disposed of for the
> opinion covers some twenty-five pages.
> Plaintiff has not suggested that he has
> additional evidence to present to this
> Court if he should go to trial.  Plaintiff's
> chief contention is that the Bearfoot Sole
> Co. case was wrongly decided.  Considera-
> tions of public policy make it desirable to
> terminate once and for all further liti-
> gation on the validity of the patent.

Nickerson v. Pep Boys-Manny, Moe and Jack, supra, 224.

In short, if ever there was a situation where the doctrine

of collateral estoppel ought to apply, plaintiffs submit it is

here, in the instant case.

III.

THE EFFECT OF THE APPLICATION OF THE DOCTRINE

OF COLLATERAL ESTOPPEL TO THE INSTANT CASE WOULD

RESULT IN A SHORTENED PHASE I TRIAL

Should this Court conclude that the doctrine of collateral

estoppel applies to preclude the relitigation of certain issues,

a shorter trial would be required to hear the phase I issues.

Consistent with Bronson, supra, the state would be precluded from

-23-

relitigating certain issues pertaining to the meaning of the Treaties of 1836 and 1855, supra.

The Michigan Supreme Court concluded that the Treaty of 1836 had the effect of reserving certain rights to fish in the Indians.  In other words, it is well accepted that when the Indians entered into treaties with the United States whereby large land and water areas were ceded in exchange for promises of money, goods and services to be delivered by the United States, the Indians, conceptually, were the grantors in the transaction and the United States was the grantee.  Winters v. United States, 207 U.S. 564 (1908); Arizona v. California, 373 U.S. 546, 600, reh. denied, 375 U.S. 892 (1963).  The reservations set forth in Article III, for example, of the 1836 treaty were carved out of the much larger area of cession.  The Indian grantors retained certain land, water and other types of "reservations," which included, inter alia,  the land at Bay Mills and the water area in Whitefish Bay adjacent thereto and the right to fish in the waters of the Great Lakes encompassed within the cession.  United States v. Winans, 198 U.S. 37 (1905) and Alaska Pacific Fisheries v. United States, 248 U.S. 78 (1918).

The  Michigan Supreme Court likewise concluded that the Indians reserved, pursuant to the Treaty of 1836, rights to fish in the ceded waters of the Great Lakes.  The Court also believed that a complete construction of the Treaty would require it to know which portions of the ceded waters were used by the Ottawa and which were used by the Chippewa.  Since the location of LeBlanc's arrest (Pendills Bay, which is part of Whitefish Bay) was clearly within the aboriginal area occupied by the Chippewa, the Court con-cluded that it was unnecessary to delineate"...all the segments of the ceded area to which the Chippewas, as opposed to the Ottawas, had held aboriginal title."  LeBlanc, supra at 207.

The Court also determined that under the Treaty of 1836 the Indians reserved rights to fish for commercial as well as subsistence purposes, and, therefore, the state is precluded from relitigating this issue.

> Clearly too, <u>Chippewa fishing had a commercial dimension.</u>  In fact, Article Fourth of the Treaty of 1836 provided for the delivery of 10,000 fish barrels and 2,000 barrels of salt to the Indians over a twenty year period <u>to be used in the fishing business.</u>

<u>People v. LeBlanc</u>, <u>supra</u>, 248 N.W.2d 204 (footnote omitted, emphasis added).

Before turning to those issues concerning the Treaty of 1855 precluded from relitigation, one additional comment should be made.  Plaintiffs agree with the <u>result</u> of the Michigan Supreme Court's analysis of the Treaty of 1836, but not necessarily with all of the court's reasoning leading to that result. For example, the Michigan court concluded that the source of the right to fish is found in Article Thirteenth of the Treaty of 1836 <u>16</u>/, relying on <u>Menominee Tribe of Indians v. United States</u>, 391 U.S. 404 (1968) and <u>Kimball v. Callahan</u>, 493 F.2d 564 (9th Cir.) <u>cert</u>. <u>denied</u> 419 U.S. 1019 (1974).  While the court's analysis was correct, it failed to mention that the treaty reserved right to fish is implied even in the absence of Article Thirteenth.  This is because the evidence before the court demonstrated to its satisfaction that the Indians were absolutely dependent upon fishing for subsistence and commercial purposes, and reading

---

16/ "Article Thirteenth.  The Indians stipulate for the right of hunting on the lands ceded, with the other usual privileges of occupancy, until the land is required for settlement."

the treaty as the Indians understood it  17/ they would not and did not relinquish their rights to fish in the Great Lakes. As previously explained, the Indians were the grantors in the treaty transaction.  Whatever was not explicitly granted or conveyed to the United States was impliedly retained or reserved by the Indians.  Included within those impliedly retained or reserved rights was the right to fish in the ceded waters of the Great Lakes.  United States v. Winans, supra; Alaska Pacific Fisheries v. United States, supra.

Plaintiffs also disagree with the Michigan Supreme Court's analysis regarding the need to distinguish Ottawa fishing areas from those fished by the Chippewa.  The United States treated the two Indian nations as one for purposes of obtaining a land and water cession.  In fact, as plaintiffs will show at trial, it was not possible, during treaty times or modernly, to unequivocally delimit all areas within the land and water cession as Ottawa versus Chippewa.  As a matter of law plaintiffs will also show that once the outer perimeter of the aboriginal area of a tribe or tribes has been established, and it has been determined that fishing rights were reserved pursuant to treaty, it is wholly unnecessary to prove that each and every tract of land  within the cession area was "used" by the Indians involved.  Properly enrolled and licensed members at Bay Mills and of the Sault Tribe, (those tribes are the present day repositories of the reserved treaty rights) are entitled to exercise their fishing rights throughout the ceded waters.

---

17/  Treaties with Indians must be interpreted as the Indians would have understood them.  Choctaw Nation v. Oklahoma, 397 U.S. 620, reh. denied, 398 U.S. 945 (1970); Jones v. Meehan, 175 U.S. 1 (1899); United States v. Shoshone Tribe, 304 U.S. 111 (1938).  Doubtful expressions in treaties are to be resolved in favor of the Indian parties.  McClanahan v. Arizona Tax Commission, 411 U.S. 164 (1973); Carpenter v. Shaw, 280 U.S. 363 (1930).  Treaties must be construed liberally in favor of the Indians.  Choctaw Nation of Indians v. United States, 318 U.S. 423 (1943); Tulee v. Washington, 315 U.S. 681 (1942); United States v. Shoshone Tribe, supra; Settler v. Lameer, 507 F.2d 231 (9th Cir. 1974).

With respect to the Treaty of 1855, Article Three, the state is also precluded from relitigating whether that provision operated as a release of any fishing rights retained by the Indians pursuant to the earlier treaty.  The Michigan Court unequivocally concluded that the language of Article Three did not operate to release retained fishing rights.

> An examination of the minutes of the negotiations preceding the Treaty of 1855 clearly indicate that the interpretation of Article Three of that treaty asserted by the People would conflict not only with the rules of construction mandated for Indian treaties, but also the clear intent of the parties.

People v. LeBlanc, supra, 248 N.W.2d 210.

> There is not the slightest indication in this portion of the negotiations, or in the minutes of the negotiations in their entirety, that the Treaty of 1855 would affect hunting or fishing rights reserved under the Treaty of 1836.

Id. at 211.

> People such as these [the Indians] certainly would not have expected the white men whom they perceived as wise, trustworthy and concerned about their best interest, to terminate important rights preserved in the Treaty of 1836 without so much as mentioning such termination.  Given, then, the rules of construction mandating that a treaty should be interpreted as the Indians understood it, and that the language of the treaty should not be read to the prejudice of the Indians, we will not strain the language of Article Three of the Treaty of 1855 to mean that reserved fishing rights pursuant to the Treaty of 1836 were terminated.

Id. at 212.

In summary then, the state is precluded from relitigating whether the Indians reserved or retained fishing rights pursuant to the Treaty of 1836 and whether the language of Article Three of the Treaty of 1855 was meant to release the reserved or retained rights embodied within the earlier treaty.

There remains for trial the issues of whether the Chippewas were interspersed thoughout the bulk of the treaty area; whether the Ottawas were interspersed with the Chippewas in a substantial portion of the treaty area; whether the federal government treated the two groups as one; whether the Bay Mills Indian Reservation includes some or all of Whitefish Bay; and whether the state possesses any jurisdiction to regulate the treaty tribe members in the exercise of their federally protected fishing rights.

IV.


THE UNITED STATES AND THE INDIAN TRIBES WERE NOT PARTIES

OR IN PRIVITY WITH THE PARTIES IN PEOPLE V. LEBLANC

AND ARE NOT BOUND BY THE DECISION


A.   Introduction.


The Michigan Supreme Court decided two issues against Mr. LeBlanc which plaintiffs herein believe are incorrect.  First it refused to recognize that a part of Whitefish Bay was itself a reservation in the area adjacent to the present day Bay Mills Indian Reservation.  Second, it held that the state had certain limited authority to regulate the federal right, but only pursuant to precise standards set forth in the opinion.  For purposes of plaintiffs' motion for partial summary judgment, it is not necessary to elaborate on the standards of permissible state regulation.  Suffice it to say that the court was clear that the state may not treat the Indian fishermen like the non-Indian fishermen.  18/

---

18/   If the Indians were regulated under the same standards as non-Indians, that would have the effect of treating them as if there was no treaty at all.

> This does not imply that the Chippewas are in
> the same position as all other citizens of
> Michigan with regard to their fishing rights.
> The sources of the fishing rights of Chippewas
> and the rest of the citizenry of Michigan are
> different, and as stated in Puyallup Tribe,
> "[t]o construe the treaty as giving the Indians
> 'no rights but such as they would have without
> the treaty' (198 U.S. at 380, 25 S.Ct. at 664)
> would be 'an impotent outcome to negotiations
> and a convention, which seemed to promise more
> and give the word of the Nation for more.'"
> 391 U.S. 392, 397, 88 S.Ct. 1725, 1728, 20
> L.Ed.2d 689.  See also, Antoine v. Washington,
> infra.

People v. LeBlanc, supra, n.17 at 214.

-28-

These two issues are pending before this Court and are encompassed within the phase I matters. Plaintiffs are not bound by LeBlanc for the simple reason that neither the United States nor the Indian tribes were parties to the state case and neither the United States nor the Indian tribes were or are privies to Mr. LeBlanc. Further, even if Bay Mills is deemed to possess a kind of community of interest with Mr. LeBlanc, or that a relationship exists which is analogous to privity, it is clear that, unlike the state, Bay Mills never had any opportunity to present its views. Under these circumstances it cannot be said it had a full and fair opportunity to be heard on the issues before the Michigan courts. There is even less of a basis by which the United States and the Sault Tribe could be deemed privies. Therefore, plaintiffs may litigate, for the first time, the on-reservation and state jurisdiction issues before this Court.

### B.  Privity Is Limited to Several Distinct Situations.

Privity is usually premised on one or more of the following three relationships. First, concurrent relationship to the same right of property. National Bondholders Corp. v. Seaboard Citizens National Bank, 110 F.2d 138 (4th Cir. 1940). Second, privity is found when there is a successive relationship to the same right of property. Bay City Shovels, Inc. v. Schueler, 245 F.2d 73 (6th Cir. 1957). Both of these relationships to a right of property are subsumed within the general doctrine of privity of estate. Third, privity is also found when more than one interest of the same person is represented.

It is important to note that there is no privity between a shareholder and a corporation in the usual situation. See Hornstein v. Kramer Bros. Freight Lines, Inc., 133 F.2d 143 (3d

-29-

Cir. 1942). 19/ Only certain specific relationships between a corporation and its stockholders can create privity. One of these concerns shareholder derivative suits wherein the primary cause of action belongs to the corporation and the shareholder's claim derives therefrom. In this situation, it has been established that the shareholder is a privy in estate to the corporation so that his action is barred by an adjudication against the corporation's primary cause of action. See, Dana v. Morgan, 232 Fed. 85 (2nd Cir. 1916). But, the converse situation does not establish privity - the corporation is not privy to the shareholder in the derivative suit as it does not derive its claim from the shareholder. See Greenberg v. Giannini, 140 F.2d 550 (2nd Cir. 1944).

Typically, tribal property rights are shared by members on a communal basis. Fishing rights are reserved by tribes, which previously bargained as entities during treaty negotiations. The members are the only persons capable of exercising the right, but they have no individual "title" to the right, as that term is usually understood. United States v. Washington, 520 F.2d 676, 688 (9th Cir. 1975).

The individual member's communal participation in a tribally-held property right has been likened to the rights

---

19/ "In Macan v. Scandinavia Belting Company, 1919, 264 Pa. 384, 107 A. 750, 5 A.L.R. 1502, it was not only held that majority ownership of corporate shares was insufficient to establish identity between that owner, who was also the corporate president, and the corporation for the purposes of res judicata, but the court went on to say that even ownership of the entire issue of stock would not establish such identity." Hornstein, supra, at 145. With every rule there are always exceptions. E.g., see United States v. Webber, supra, wherein privity was found as between two individual partners and a corporation formed and wholly controlled by them; however, the court appeared to rely more on the concept of piercing the corporate veil than on a theory of privity.

of a shareholder in a corporation:

> . . . It is clearly established that where
> legal or equitable title to real or personal
> property is vested in the tribe it is not
> vested in the individual members thereof,
> and yet these individual members are not
> entirely without legal or equitable rights
> in such property.  The right of the individual
> Indian is, in effect, a right of participation
> similar in some respects to the rights of
> a stockholder in the property of a corporation.

F. Cohen, Handbook of Federal Indian Law, 183 (1942, reprinted 1971).

Thus, a shareholder of a corporation derives certain rights from the corporation and an Indian specific rights from his or her tribe.  The shareholder is a privy to the corporation so that a derivative action is barred by an adjudication against the corporation's primary claim and an Indian is privy to the tribe and a derivative claim is likewise barred by an adjudication against the tribe's primary claim.  But, like the analogy to corporate law, just as the conduct of a shareholder does not bind his corporation, the conduct of an Indian does not bind his tribe.

People v. LeBlanc, supra, was a criminal prosecution against an individual Indian involving the extent of a property right (treaty fishing) which was vested in his tribe (Bay Mills). But Bay Mills did not participate in the state's prosecution of LeBlanc nor is the tribe in privity with him.  Therefore, Bay Mills is not bound by the determinations in LeBlanc, supra, concerning its tribally-held treaty fishing rights.

-31-

C.  The United States Had Nothing to Do With the State Case.

It is well established that the United States owes a trust duty to its Indian wards, which requires it to act consistent with the highest and most exacting standards of a fiduciary. See e.g., Pyramid Lake Tribe of Indians v. Morton, 354 F.Supp. 252 (D.D.C. 1973); Manchester Band of Pomo Indians, Inc. v. United States, 363 F.Supp. 1238 (N.D. Cal. 1973); Worcester v. Georgia, 6 Pet. 515 (1832); United States v. Candelaria, 271 U.S. 432 (1926); United States v. Rickert, 188 U.S. 432 (1903).  While it is true that a fiduciary acting in a representative capacity can bind a non-party beneficiary with respect to a suit regarding his or her beneficial interest in trust property, the converse is not true.  Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573 (1974).

It is also clear that an Indian allottee who has leased land for oil and gas development has standing to sue regarding that lease even though the legal title to the allotment is in the United States and cannot be alienated without its consent. Poafbybitty v. Skelly Oil Co., 390 U.S. 365 (1968).  Similarly, the United States is not an indispensable party to a suit brought by an Indian tribe against third parties to recover tribal land, Choctaw and Chickasaw Nation v. Seitz, 193 F.2d 456 (10th Cir. 1951), cert. denied, 343 U.S. 919 (1952), and it cannot be bound by any judgment obtained in litigation to which it was not a party.  See also, Carlson v. Tulalip Tribes of Washington, 510 F.2d 1337 (9th Cir. 1975); Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp., 418 F.Supp. 798, 810 (D.R.I. 1976).

Since the United States was not a party to the LeBlanc

-32-

proceedings, since a beneficiary-tribe cannot bind it in litigation to which it was not a party, and since an individual beneficiary cannot bind his or her trustee, the United States cannot be deemed a privy to any of the parties in the state case. [20]/

Finally, even if there be some argument that functional privity exists between LeBlanc and the Bay Mills Indian Community, an argument which plaintiffs vigorously resist, there can be no similar argument made with respect to the Sault Ste. Marie Tribe of Indians or the United States.  Since both the United States and the Sault Tribe will challenge the state's jurisdiction to regulate treaty fishermen and the United States will litigate the issue of the extent of the Bay Mills reservation, there would be no practical effect to a decision barring Bay Mills from litigating issues previously considered by the Michigan high court.

A recent Supreme Court decision supports the trend of according tribal litigants the same status as the United States, i.e. as if the United States had joined as a plaintiff with the tribe.  Moe v. Salish & Kootenai Tribes of the Flathead Reservation, ___U.S.___, 48 L.Ed.2d 96 (1976).  Here, the United States has joined as a party plaintiff with its tribal wards. Since the United States cannot be considered a privy to the parties in LeBlanc, neither can the tribes be deemed to be privies.

---

[20]/  See also United States v. Pan-American Petroleum Co., 55 F.2d 753, 776 (9th Cir. 1932), where the court stated that rules regarding splitting causes of action are to be interpreted with "great liberality in favor of the sovereign."

V.

CONCLUSION

The effect of granting this motion for partial summary judgment will be a shortened trial on the phase I issues now severed for early consideration.  Plaintiffs fail to see on what basis the state can complain that collateral estoppel is not applicable herein.  It was the state that initiated the prosecution of LeBlanc, in a forum of its own choosing.  It was the state's highest judicial body that interpreted the Treaties of 1836 and 1855.  Having been a party to that proceeding and losing there, it may not now relitigate those same issues in this federal forum.

For the reasons expressed herein, plaintiffs respectfully urge this Court grant its motion for partial summary judgment.

Respectfully submitted,

FRANK S. SPIES
United States Attorney
J. TERRANCE DILLON
Assistant United States Attorney
United States Department of Justice
Western District of Michigan
544 Federal Building
Grand Rapids, Michigan 49503

Attorneys for United States of
America

KATHRYN TIERNEY
Bay Mills Indian Community
Route One
Brimley, Michigan  49715

BRUCE R. GREENE
LAWRENCE A. ASCHENBRENNER
ARLINDA F. LOCKLEAR
Native American Rights Fund
1506 Broadway
Boulder, Colorado  80302

JAMES JANNETTA
Upper Peninsula Legal Services, Inc.
416 Ashmun Street
Sault Ste. Marie, Michigan 49783

Attorneys for Bay Mills Indians
Community

-34-

DANIEL T. GREEN
416 Ashmun Street
Sault Ste. Marie, Michigan 49783

Attorney for Sault Ste. Marie
Tribe of Chippewa Indians

By: _____

Frank S. Spies
United States Attorney

Dated:  April 6 , 1977.

-35-