#163

# 195 same as

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

FILED
MY 1 1977
GER...TER, CLERK
DEPUTY

- - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA, et al, )

      Plaintiffs, )

      -vs- )   No. M 26-73

STATE OF MICHIGAN, et al, )

      Defendants. )

- - - - - - - - - - - - - - - -

**79-1414**

The continuation of the Deposition of

HELEN HORNBECK TANNER, Ph.D., a witness called by Defendants,

taken before Sandra Crowley, Certified Court Reporter and

Notary Public, in the Mason Building, Lansing, Michigan, on

Tuesday, January 11, 1977, at the hour of 9:15 A.M.

      APPEARANCES:

               TERRANCE DILLON, Esq.  (P23404)
               United States Attorney
               544 Federal Building
               110 Michigan Street, N.W.
               Grand Rapids, Michigan  49502

                   In behalf of Plaintiff,
                   United States of America.

               BRUCE R. GREENE, Esq.
               1506 Broadway
               Boulder, Colorado  80302

                   In behalf of Plaintiff Intervenor
                   The Native American Rights Fund.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

195    171.

KATHRYN L. TIERNEY   (P24837)
Bay Mills Indian Community Tribal Office
Route 1
Brimley, Michigan  49715

    In behalf of Plaintiff Intervenor
    Bay Mills Indian Community.

DANIEL T. GREEN, Esq.  (P25548)
416 Ashmun Street
Sault Ste. Marie, Michigan  49783

    In behalf of Plaintiff Intervenor
    Sault Ste. Marie Tribe of Chippewa Indians.

MARIANA R. SHULSTAD
Field Solicitor
U.S. Department of the Interior
686 Federal Building
Twin Cities, Minnesota

    In behalf of Plaintiffs.

STEWART H. FREEMAN, Esq.  (P13692)
GREGORY T. TAYLOR, Esq.   (P24141)
Assistants Attorney General
Law Building
Lansing, Michigan  48913

    In behalf of Defendant State of Michigan.

FREIHOFER, HECHT, OOSTERHOUSE & DeBOER, P.C.
505 Peoples Building
60 Monroe Avenue, N.W.
Grand Rapids, Michigan  49502
By
PETER W. STEKETEE, Esq.  (P20967)

    In behalf of Defendant
    Michigan United Conservation Club.

ALSO PRESENT:

| | |
|---|---|
| JOHN SCOTT | RONALD KAISER |
| SPIKE TANNER | PHILIP MASON |
| ASA WRIGHT | CAROLE STEINBERG |
| CHARLES E. CLELAND | |

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

172.

Lansing, Michigan

Tuesday, January 11, 1977

9:15 A.M.

(R E C O R D)

MR. STEKETEE:  Just as an introductory

matter, I'm going to take about an hour and a half or so

with a lot of emphasis upon the supplemental report and

perhaps some other matters, and I will not address any

questions to her original report, leaving those matters

to the State; however, I do have a lot of questions of

Dr. Tanner on the original report, and so I'd like to

reserve time, and we may not be able to get it done today,

we'll make a decision on that today.

MR. GREENE:  While we're doing some

preliminary matters, there is a correction that

Dr. Tanner has just indicated to me, typographical error

that maybe we could all make a correction on our copies.

I'd like to have the record reflect on page 82, the

original report, there is a mistake in the footnote number

after the quoted material, single spaced quoted material

appearing near the top of the page.  Where the number 182

appears, that is incorrect; it should say "Appendix A,

page 88."  In other words, that quote comes from page 88

which is part of the Appendix, a letter from Lewis Cass

to Henry Schoolcraft dated March 14, 1836.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

173.

Also there are a couple of typographical errors, I don't know whether it's worth taking the time to deal with it, perhaps we won't.

The other thing I might add, on the supplemental, there's a date which is August 1976, and there's some confusion about that, that was a typographical error in my office, since it was submitted to everyone in December of last year, but my secretary made an error. I don't think it's an error of any consequence, but for the record --

MR. FREEMAN:  We may have a few questions on that!

MR. GREENE:  The red report was not submitted for everyone's availability until December of last year.

EXAMINATION

BY PETER W. STEKETEE, Esq.:

Q    Okay, Doctor, we're ready to go again.  Although we've been over this at great length, I'm still confused on one point, and I wonder if you have had a chance to reflect on this point, and let me ask the question one more time:  What treaty provision, Treaty of 1836, if any, is it that gives the Indians or reserves to the Indians fishing rights on any lapsed reservation contained within Article 2 or 3?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

174.

A.   I don't subscribe to the concept of a lapsed reservation,
so I can't answer that question.

Q.   All right.  Now, if there were a lapsed reservation,
however, would you believe that treaty rights, nevertheless,
are reserved in such lapsed reservation?

A.   I continuously decline to answer questions based on faulty
assumptions.

Q.   All right, you're an expert, are you not, in this area?

A.   I understand the historical background, but just as a
matter of intellectual reasonableness, I do not believe
in following an analysis that starts with a faulty
assumption.  This is a matter of what I consider as an
intellectually sound discussion; you don't ~~brood~~ build upon
faulty assumptions.

Q.   All right, now, Doctor, let me just say a couple of
things in response.  First of all, if you are an expert,
you're entitled, in fact you may be required to answer
hypothetical questions, okay?  The second point, I think,
is that although it may be based upon a faulty
intellectual exercise, the opinion in People vs. LeBlanc
does find at least one of the reservations contained in
Article Third of the Treaty of 1836 has happened by
virtue of the Treaty of 1855.  Now, without asking you to
give an opinion again on that question, I wonder, in
light of what I've just said, whether you could tell me,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

175.

as a hypothetical matter, what treaty provision in the Treaty of 1836, if any, would give Indians the right to fish under the treaty, free from State regulation or State control in a lapsed reservation, assuming that the lapsed reservation is merely a hypothetical?

A.    I will leave it to you lawyers to deal in hypothetical, legal speculation.

Q.    So you refuse to answer the question?

A.    I don't think that, I don't think that I -- yes, I think it's not proper for me to engage in legal speculation. I deal in historical documents.

        MR. GREENE:  And I would add for the record the same objection that we made yesterday, that calls for a legal conclusion from this witness, and that's beyond her competence.

Q.    (MR. STEKETEE)  All right.  Now, Doctor, can you tell me whether the Treaty of 1836 makes any distinction between full bloods and half bloods?

A.    It mentioned full bloods, it mentions half bloods.

Q.    Are half bloods treated differently than full bloods?

A.    There are some special provisions in the 1836 Treaty, I believe, referring to half bloods.

Q.    You believe that half bloods are entitled under the Treaty to share in the Reservations in Article 2 and 3?

A.    I don't think that the Treaty makes any statement on that

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

176.

point. There are historical documents that indicate that
Indian people regarded their half blood relatives as part
of their group. Social, social status of half bloods is
a subject that is just beginning to be studied by
historians in this field. I know of a doctoral oral --
only one doctoral dissertation in progress on this
subject.

Q You've said that there is some type of documentary
evidence that Indians regarded half bloods as part of
their group. Could you tell us specifically what evidence
you're referring to?

A Well, in my report I mentioned the fact that O-shaw-waw-no,
the Chief of the Sault Band, said that his wife, his wife
was a half blood.

Q Any other evidence?

A I could look through and . . . At the moment, I don't
recall a precise document, but the term "half blood" by
the 1830's, French and English and Scots personnel had
been in that area a long -- in that area a long time,
and there had been a good deal -- well, frequent instances
when the descendants of French people and Indian people
became incorporated in Indian communities. For example,
I mentioned the Cadotte family before, because I guess
they are the most prominent. The name is Cadotte; they
are of French heritage, but their family language was

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

177.

Chippewa.  Does that answer your question?

Q  I'm not sure if it does, I'll let the record speak for itself.  Would the term "mixed bloods" be more appropriate here than half breed or half blood?

A  Well, if you're talking about the society, well, mixed bloods was -- the term half blood is clearly a term that appears in, that appears in the Treaty; and it may be a matter of interest.  There is some later correspondence to the fact that Alexander Schoolcraft felt that he should make some special provision for half blood children who were orphans.  He was concerned about their protection and their support within the whole community.  It was a social welfare consideration rather than a legal consideration, I would say.

Q  All right.  Who was Alexander Schoolcraft?

A  I'm sorry, I meant Henry Schoolcraft.

Q  Doctor, are you saying to us, then, that as far as the Indians were concerned, they made no distinction between mixed bloods and full blooded Indians in 1836 when this Treaty was negotiated?

A  Of course they knew the distinction between half bloods and full bloods.

Q  All right, let me ask you this, on your reading of the Treaty, is it your interpretation of the Treaty that mixed bloods were entitled to share in any benefits

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

178.

retained or granted by Article 13?

A. If they were part -- If people of mixed heritage were part of the Indian community. You see, Indians do not think genetically; they think of people who are part of the Indian community. Some of the documents concerning this Treaty indicate that -- I believe I even covered this in my report --

Q. Could you --

MR. GREENE: You have asked her a question, will you please let her answer?

MR. STEKETEE: She's also rambling, and I would appreciate yes or no answers to some of these questions if they can be answered that way. It seems to me we don't need a dissertation on some of these questions, just a yes or no answer, please.

THE WITNESS: I have a hard time telling when you want an explanation. Some of these things can't be answered very well by yes or no answers.

Q. (MR. STEKETEE) Let me rephrase it, then. My question was very simple, in your opinion do you believe that mixed bloods are entitled to the benefits, if any, reserved or granted by Article 13? That's either yes or no.

MR. GREENE: Counsel, you're asking a question; she's answered the question. I suggest that

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

179.

maybe we keep to that format.

Q     (MR. STEKETEE)  All right, now, Doctor, what is the
answer, is it yes or no?  Now, if you say yes, I'm going
to ask you why, so you'll get your opportunity to explain.
I just want the answer so when we read the answer we know
what the answer is.

          MR. GREENE:  I wish life was that simple!
I believe you asked a question, I believe the witness is
trying to answer.

          THE WITNESS:  If the mixed bloods are part
of the Indian community, yes.

Q     (MR. STEKETEE)  All right.

A     There could be mixed bloods that lived in Montreal and
were of Ojibwa heritage, but had nothing to do with the
community for which this Treaty was designed.  You see, I
feel I have to be very guarded in any replies, because I
can never tell where a legal mind is going to take off
with historical facts.

Q     Well, now, Doctor, if this is so, this presents a fairly
serious practical problem to the State of Michigan.  How
does the State of Michigan determine today --

A     I don't see why --

Q     -- how does a person decide whether someone is a
descendant of a half blood or full blood, and if a half
blood, whether that half blood was accepted in the Indian

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

180.

community in 1836?  How do you propose that we find out

who the people are who are presumably those -- who were

entitled to the benefits of Article 13 and whose

descendants may be so now entitled?

A.   I don't see why you have to know.

Q.   Is that your answer?

A.   I don't see why you have -- I do not understand my

responsibility for solving genetic problems.

Q.   Well, is it a genetic problem to find out whether somebody

was accepted in the Indian community in 1836 or not?

A.   There are -- We've already talked about it, there are

rolls, Indian people know their ancestors.  I gather this

is -- I'm sort of baffled.  I don't understand --

Q.   Let me ask you this, assuming --

A.   -- understand what you want to find out.

Q.   Assuming it were important to determine whether somebody

we knew from genetic evidence we knew was a half blood or

mixed blood in 1836, how would one, if it were important

to do so, how would one go about proving that this person

was or was not accepted by the Indian community in 1836

as an Indian?

A.   Mr. Steketee, I made a promise to myself this morning that

I would question any question of yours that starts out

with a phrase "Assuming that".

Q.   Did any lawyer tell you not to answer my questions?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

181.

A.   Nobody told me not to answer your questions, but your
     questions don't seem real to me.  Yesterday we discussed
     at length documents that are available that provide
     information about the Indian heritage of individuals in
     this area.  We went over all of that, and I suggested
     that one important document, one important document was a
     list of allotments, and we also discussed the Durant Roll.
     Beyond that, I regard this as a practical, administrative
     problem about which I have no further suggestions.

Q.   Well, Doctor, let me say something, this is a matter of
     some seriousness; we're here in a discovery Deposition,
     and the Deposition is taken for all purposes permitted by
     the Federal Rules of Civil Procedure.  Now, you're being
     called by the United States of America, as I understand
     it; they're not instructing you, as I understand it, not
     to answer my questions.  So you have an obligation to
     answer those questions as best you can.

A.   As they deal with history.

Q.   If you don't know the answer, that's fine, you can say so.
     I do object to you refusing to answer where you may have
     some information that may be of importance to us.

A.   I'm only too glad to provide any information that I can.
     This sounds to me like an administrative, an administrative
     problem about which I have no practical recommendations.

Q.   All right, are you saying, then, that as to prior

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
823 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

182.

questions that you've refused to answer, that your answer

really is that you don't have an answer; you don't know

the answer?

A. I haven't refused to answer any -- I haven't refused to

answer questions that dealt with historical documents

which are my field.  I don't know how you would proceed

about that problem; other people have tackled it.

Q. All right.  Doctor, moving on, did the Indians in 1836

regard a person of mixed heritage as a part of the Indian

community, if such person resided in a white community

and lived in the life style of the white community?

A. Not usually, but I don't think you could make any blanket

example.  For example, one person might say that George

Johnston, who was educated and literate, was regarded as

part of the white community.  He was also very much

concerned with the Indian community and viewed as one of

their, as one of their own group.  I think this would be

very -- I don't think that any one blanket decision would

cover all instances.

Q. All right.  Now, turning back to Article 13, based on your

knowledge and research, can you tell us whether the

fishing rights that you believe were reserved by Article

13 were considered by the Indians to be exclusive or not?

A. Exclusive is not -- Exclusive is not an Indian word, is

not a word that Indian people used customarily.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

183.

Q    Did they have a word, or did they have a concept that was
     similar to exclusive?

A    They had a word that they were responsible for, that they
     were responsible for the natural resources.

Q    All right, now, let me tell you why this is an important
     question.  The question exists in this litigation as to
     whether any rights granted or retained by Article 13 were
     exclusive or were held in common with white citizens,
     all right.  Now, unless I'm badly mistaken, that question
     is a question of fact, that it depends -- may depend on
     historical evidence, if any such evidence exists.  Are
     you aware of any historical evidence which would shed any
     light at all on the question of whether Article 13 is
     intended or was thought by the Indians to be an exclusive
     privilege, or whether it was to be held in common with
     other persons?  Now, that ought to be an easy one, whether
     you are aware of any evidence or you're not.

A    It looks simple.  I gather it's quite impossible to convey
     an Indian viewpoint about the use of resources, but Indian
     people believe that these resources were theirs, and that
     they should not be usurped; that they should not be
     usurped by other people.  We went all through that
     yesterday, that they didn't want other people to --

Q    All right, Doctor, we may have --

A    They had this big confrontation with the American Fur

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

184.

Company, nobody was going to impinge or take over their

livelihood.  I thought we went all through that yesterday?

Q  All right, let's see if we can straighten it out, though.

The dispute with the American Fur Company was when?

A  1832.

Q  That was before the Treaty?

A  That was before the Treaty.

Q  All right.  So it may not shed any light at all on

Article 13, unless you can explain to me why it does?

A  Well, I don't think that the -- as far as Indian people

were concerned, that their use of their own resources

were changed by the Treaty.

Q  All right, by 1836, is it not true that there were already

people who were not Indians who were exploiting resources,

including fishing, in this part of the country?

A  A very few, and the Indian agents were trying to restrain

them, a very few.

Q  Which Indian agents?

A  Well, I recall Schoolcraft's correspondence, I don't recall

-- I don't recall anything else.

Q  All right.

A  There were no settlers, there were no settlers, there were

other people, we talked about this yesterday, too, that

Mr. Schoolcraft said that there had been some clamor from

the people in Sault Ste. Marie.  This appeared largely

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

185.

their interest in participating in the fishing, in the

fishing there at the falls itself; and Indians, Indian

people were adamant in saying that was a fishery for the

Sault Band, that the other people didn't have any right

to use this fishery.

Q    But they had a specific reservation for that fishery, did

they not, in the Treaty of 1820?

A    Yes, they did, I think that was the one under controversy.

Q    Would you not agree with me that the reaction of Indians

to the incursions of white fishermen shortly after the

Treaty of 1836 would be some evidence of the Indians'

understanding of Article 13; in other words, if the

Indians reacted very, very violently or very outspokenly

to these incursions, if there were some by white

fishermen after 1836, that would be some evidence as to

the Indians' understanding of Article 13, whereas if they

did nothing, that would also be some evidence, would it

not?

A    I think it would be more realistic to discuss that on the

basis of the existence of evidence of such incursions.

Q    I'm not asking you what would be more realistic, I'm

asking you if my statement is correct, that that would be

some evidence?

A    There you are --

Q    Or would you completely disregard it?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

186.

A.    -- in a hypothetical!  I wish we could talk about what actually happened.

Q.    But I'm asking the questions!

A.    I know it.

Q.    And I want answers to my questions, not to questions you want me to ask.  Now, can you answer the question I asked you, please?

A.    If there is an objection -- If there is an objection, if a person objects, it's an indication that he's upset.

Q.    All right, so you agree with me on that point, then.  Now, let me ask you this, can you detail for me all of the objections of which you're aware following the Treaty of 1836 by Indians over the violations of their Article 13 rights?

A.    No.

Q.    You can't?

A.    I don't, I don't know about -- I have not collected literature.  I do not, I don't, I'm not aware of a body of literature of this kind.  Indian people continued to fish, and all of the data that I have, that I have come across indicates that people in the Upper Peninsula of Michigan understood that fishing was a particular Indian skill, and that Indian people -- it was their prerogative.

Q.    All right, Would you say, then, that may be some indication that the Indians, as long as their own fishing was not

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

187.

interfered with, did not object to white fishing?

A.   There was no white fishing.

Q.   There was after the Treaty of 1836, was there not?

A.   There was, that white fishing was an encroachment, but
     Indian people have always had to tolerate a certain
     amount of encroachment.

Q.   Have they always tolerated it without saying they were
     upset?

A.   I don't know, the mechanisms by which Indian people voiced
     their objections are rare, are rare, imperfect, and this
     is a very, very remote area.  There wasn't always somebody
     that they could talk to.  For example, I was surprised to
     find --

Q.   Are you telling me that for over 100 years, no Indian
     was able to put pen to paper and voice an objection over
     violations of Article 13?

A.   I have not read, I have not read a letter.  I do not
     recall -- now, I'd be very glad to look, if I can, that
     Indians, an Indian that addressed himself to this
     subject.

Q.   All right.  Doctor, let me ask you this, we have in this
     litigation, aside from the United States, two additional
     Plaintiffs, the Bay Mills Indian Community, and I believe
     you testified yesterday that the Bay Mills is the
     outgrowth of the six Sault bands?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

188.

A    Yes.

Q    And we also have the Sault Ste. Marie Band of Chippewa
     Indians, both of which claim to be recognized Indian
     tribes under the Wheeler-Howard Act?

A    Yes.

Q    I wonder if you have any light to shed on the
     relationship between those two tribes, if any?

               MR. GREENE:  Could I ask, Counsel, I'm a
     little confused about "relationship".  Do you mean --

               MR. STEKETEE:  Well, I'm thinking
     primarily now, Bruce --

               MR. GREENE:  Blood relation?

               MR. STEKETEE:  -- of the genetic, sort of,
     you know, are these the same people; do they both come
     down from the six tribes, or is the Sault Ste. Marie
     tribe, is that a derivative of some particular band?

               THE WITNESS:  We've changed subjects!

Q    (MR. STEKETEE)  Explain to me how we have these two
     particular tribes and where they came from.

A    I gather you've changed subjects?

Q    Right.

A    There is one bit of factual data I'd like to insert in
     the record that I think might be an interesting example
     for you.

Q    Of what?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

189.

A    Of an attempt of white fishing in Indian fishing

territory.

Q    Very well.

A    On the north end, I was very much surprised that on the

north end of Beaver Island, somebody from New York somehow

got permission -- I've not been able to follow this out --

to set up a township, and invested some money in a fishery

there on Beaver Island.

Q    When was this, Doctor?

A    In 1837. *1847*

Q    But that was an Article 2 treaty, was it not -- excuse me,

an Article 2 reservation?

A    Well, it refers to the 1836 Treaty, but you aren't

interested in the Beaver Islands?

Q    Well, I'm interested in the Beaver Islands, but the

Beaver Islands are a reservation, are they not, in

Article 2?

A    Yes, they are a reservation, and the interesting fact is

that although it's a reservation in Article 2, somebody

managed to get a township set up and invest some money in

a fishery there, that encroachments of politically

influential individuals were possible in spite of the

specifications of the Treaty.  This did not last long, he

lost his shirt.

Q    And the Indians objected, did they not?

JEAN E. INGRAM & ASSOCIATES. INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

190.

A.   I have not seen any correspondence about an Indian
     objection.  I was surprised to find this in Strang's
     local history, and I was interested, it was a Methodist
     missionary who said "Why is Beaver Island not continually
     reserved for Indian people, that there are types of
     encroachment of politically influential people that
     seemed to defy the specifications of treaties.  So this
     is the reason that I'm not trying to be awkward, but
     there is a difference between the theoretical basis that
     seems to be specified in the Treaty and what actually
     happens.  That didn't continue for very long, but that
     was an encroachment.  I didn't find -- I didn't find a
     letter, I never found -- that is a, what I would regard,
     an encroachment on Indian, on Indian fishing territories;
     but I never saw a letter of objection about it from an
     Indian person.

Q    All right.  Was the outcome of this that there was some
     determination in writing that this was still part of an
     Indian reservation?

A.   I don't -- I don't know that there was any outcome about
     it at all.  This is just something that happened, and I
     only found it mentioned.

Q    The reason I ask is that these reservations in Article 13
     are five-year reservations with possibilities they may
     be extended longer.  I'm just curious whether there's any

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

191.

evidence one way or the other as to whether any official of the United States of America, or anyone else for that matter, felt at the time that this particular reservation in the Beaver Islands had lapsed?

A   I don't --

Q   You don't know?

A   I don't know.  Beaver Island Indians were still fishing there in numerous . . .

Q   After 1836, did the American Fur Company begin to fish in the Article Third reservation areas?

A   Article Third, I don't believe so.  I think their fishery, I said yesterday, was the Apostle Islands.

Q   All right, now, let's go back to this question of relationship between the two Indian tribe Plaintiffs in this case.  Can you trace that for us to the extent that you know it?

A   Trace the relationship of these two corporate, these two present day corporate bodies?

Q   I'm not so much interested in their corporate nature and how they got established, I think we can determine that from other means, Doctor.  What I'm interested in is the present day members of these two organizations, what --

A   We're back to genetics?

Q   Yes, what relationship do they have to each other?  You have testified that the Bay Mills Community, people, are

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

192.

descended from the six Chippewa tribes that were centered near Sault Ste. Marie.  Now, what about the other tribe?

A    The present Sault band, those -- I haven't, I have not -- I've never seen a membership list for the present day Sault Ste. Marie tribal group.  I do know of individual, I guess, card-carrying members of this Sault Ste. Marie -- Is it called the Sault Ste. Marie tribe now?

Q    Yes.

A    Whose ancestry can be traced back, I believe, to both sides, to both sides of the Straits.  Some people from Sault Ste. Marie lived, some people from Sault Ste. Marie and Waishkee Bay, the people -- the Waishkee Bay band, and Andrew Waishkee had 12 children, and those descendants are rather widespread in the Upper Peninsula and the northern part of the Lower Peninsula.  And there are some people, I know of -- I can only talk about an example of one -- no, two brothers who I know are members of the Sault Ste. Marie band, and their ancestry includes some people -- no, a grandfather, grandmother who lived in Little Traverse Bay, you know, not just --

Q    Let me explain what I'm getting at.  This is not a trick question at all.  There may come a point in time where the situs of these rights that we're talking about --

A    Situs?

Q    That the holders of these rights have to be determined,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

193.

who is it that holds the rights.  I think you testified
yesterday that you didn't have any light to shed on
whether these rights are tribal rights or individual
rights.  Do you have any views on that today?

A    Well, the treaties are with tribes.

Q    All right, is that the only evidence you have on that
question?

A    Well, people function tribally, and this sounds to me
like more or less like a legal statement, but I know that
people who are members of tribes feel that they have a
responsibility to the tribe; and that their inclusion
within the tribe is a focus of their social orientation.

Q    Now, which Chippewa tribes actually were represented at
the Treaty of 1836?

A    Well, at that time they're called bands.

Q    Is the word "band" in 1836 the same as the word "tribe"
today?

A    Not exactly, but the present -- no, no, Chippewa --

Q    What's the difference?

A    Well, a tribe in present day terminology, a tribe includes
a number of bands.

Q    All right.

A    Sault Ste. Marie tribe as a term, to me, would infer a
number of bands that are included within it; but I
actually don't know the composition of the Sault Ste. Marie

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

194.

tribe, but I do know that the Bay Mills group includes,
has included some but not all of the descendants of the
Sault Ste. Marie bands.

Q   All right.  Let me ask you this, is the word "nation"
more inclusive than the word "tribe"?

A   No, that's -- Nation is a western European term; it was
used in treaties.

Q   Was there more than one tribe represented of Chippewas in
the Treaty of 1836?

A   There -- Chippewa -- I see, ah -- within Michigan there
are two -- within Michigan, there are two groups of
Chippewa, the Sault Ste. Marie, the Upper Peninsula
Chippewa, and the Saginaw Bay Chippewa.  Now, the Saginaw
Bay Chippewa of southeastern Michigan didn't have
anything to do with that Treaty.

Q   What are the Chippewa you testified yesterday were in the
western part of the Lower Peninsula of Michigan; what
tribe were they a member of?

A   Chippewa.

Q   Which Tribe, Sault Ste. Marie or Saginaw Bay?

A   Well, they're just -- the Chippewa who were in northwestern
Michigan are part of the Ottawa and Chippewa of
northwestern Michigan.  The Indian agents at the time
described the Upper Peninsula band, they talked about --
I hate to introduce another term, but they usually talked

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

195.

about the Lake Superior Chippewa, and west of that were the Chippewa of the Mississippi, and the northwestern Michigan group was called Ottawa and Chippewa of northwestern Michigan.

Q   All right, now, let me go back to the question I was trying to get to before.  Apparently you've testified that there was but one tribe of Chippewa represented at the Treaty of 1836, namely the Sault Ste. Marie tribe, and I gather that you've also testified that both of the present day tribes that are recognized by the Federal Government, the Bay Mills Indian Community, and the Sault Ste. Marie tribe of Chippewa Indians, I think those are the correct terms, apparently derived from bands that were included within that original tribe.  Now, you have any light to shed on the question of how these two modern day tribes share whatever Article 13 rights there are, that are eventually recognized in this litigation or otherwise?

A   That seems to me a practical administrative problem.

Q   There's nothing in the historical record that indicates to you how those rights are shared, if at all?

A   Well, they come from the same, from the same common pool of ancestry; they come from the same common pool of ancestry.

Q   Let's assume as a hypothetical that some Court were to

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

196.

determine in the future that the way in which these rights

have to be apportioned related in some way to the

traditional fishing grounds that these Indians' ancestors

had used in 1836.  Would you be able to give any light as

to where the traditional fishing grounds were of the Bay

Mills' ancestors as opposed to the other tribes' ancestors?

Do you have any information on that that you can share

with us?

A.    You know I object to this word --

Q.    I know you do.

A.    "Assume", because to me that means that you're taking off

into left field in the world of unreality, and Indian

people believe in sticking firmly with the real world.

All right, --

Q.    With shadows on the ground and things of that kind?

               MR. DILLON:  Is that a question or a

comment?

               MR. GREENE:  I think it might be useful to

have the reporter read back the question or ask

Mr. Steketee to repeat it.

               MR. STEKETEE:  Let's have it read back.

               (Whereupon, the following question was read

               back by the reporter:  Question:  "Let's

               assume as a hypothetical that some Court

               were to determine in the future that the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

197.

way in which these rights have to be
apportioned related in some way to the
traditional fishing grounds that these
Indians' ancestors had used in 1836.  Would
you be able to give any light as to where
the traditional fishing grounds were of
the Bay Mills' ancestors as opposed to the
other tribes' ancestors?  Do you have any
information on that that you can share
with us?")

    MR. GREENE:  I have two problems with that
question.  I'm not sure whether I understand what you mean
by "apportioned", and I do not understand what you mean by
the use of the term "tribes" at the end of that sentence.

Q   (MR. STEKETEE)  Well, I think -- Do you understand the
question?  I guess that's the most important question.

A   My problem is with the word "opposed" that you've
interjected there.

    MR. GREENE:  Could you restate the question,
I think that might make life simpler.

Q   (MR. STEKETEE)  I'm trying to get at a very simple idea,
Doctor.  We have a practical administrative problem,
perhaps, in the State of Michigan if these reserved fishing
rights are recognized, there may not be enough fish to go
around; and there would be conflicts between these two

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

198.

'ribes how these rights are established.  I'm asking if there's any historical -- now, I've asked you to assume that a Court may some day hold that the basis on which the apportionment between the two tribes is to be made is to be based on where their ancestors fished historically. I'm asking you whether you can give us any information on that question, where the ancestors of the Sault Ste. Marie tribe fished historically, and where the ancestors of the Bay Mills Indian Community members fished historically in 1836, whether they were the same areas, or whether they were different?

MR. GREENE:  I'm going to object to that, Counsel, on the grounds that has nothing to do at all with phase one, the question of apportioning the rights between various bands and groups fishing today, admittedly as you characterize a problem for the State of Michigan, has nothing whatever to do with phase one issues which have been severed for separate trial in the case.

MR. STEKETEE:  It may have a great deal to do with phase one, because it may be this witness knows, for example, that none of the ancestors of the particular tribal members that are Plaintiffs here did any fishing at all, and that it was some other Indians that did the fishing, the Ottawas, for example, or some other group of Chippewa.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

199.

MR. GREENE:  The question I'm trying to identify, modern day holders of rights to fish today is, I respectfully suggest, a phase two issue, has nothing to do with what rights were reserved by the Treaty of 1836, which, as I understand, is at issue in phase one of this case.

MR. FREEMAN:  Will Dr. Tanner be testifying in phase two?

MR. GREENE:  Do you know if we're going to have a phase two at this point?  I do know what's been severed for phase one, and I submit to you that's not a question for phase one.

MR. FREEMAN:  There's only so far I want to go in argument at this point, but let me point out what this is all about:  I think you're beginning to assume this is some kind of a trial we're having here.  We're trying to make a decision as to whether or not we should stipulate to admissibility of reports prepared by Helen Tanner.  We're also attempting to see what areas we can stipulate to.  The more you object, the longer this proceeding gets dragged out, the more difficult it is for us on those kinds of points, because everybody's train of thought gets broken; we don't get to some of the things we wanted to.  If that's the way it goes, I'm not prepared to get into a brawl; I want to be clear what we're getting

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

200.

into.  What we're leading to is, is Helen Tanner

testifying for two or three days as opposed to what might

have been over in a day or two if we could find out a

basis --

        MR. GREENE:  Stewart, I'm not going to get

into a dialogue with you, either.  I would suggest this

is a Discovery Deposition, if you have questions for the

witness, you ask them!

        MR. FREEMAN:  I have asked one.

        MR. GREENE:  Keep your speeches to a

minimum.

        MR. STEKETEE:  Are you instructing the

witness not to answer the question?

        MR. GREENE:  I have not instructed the

witness not to answer the question.

Q.  (MR. STEKETEE)  Can you then answer it, please?

        MR. GREENE:  Do you remember what the

question is?

        THE WITNESS:  Part of --

        MR. GREENE:  Because the reporter can read

it back.

        THE WITNESS:  I can answer the last, the

last two or three questions in the compound question.

        MR. GREENE:  You don't have any obligation

to answer compound questions, Dr. Tanner.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

201.

THE WITNESS:  I know, I know what the

limitations on my information are.

Q    (MR. STEKETEE)  All right, why don't you tell us what you

know?

A    I'm aware from my reading of historical literature where

Indian people were reported to be fishing in the 1830's,

because I made a particular study.

Q    All right, where were those areas?

A    Of those particular areas, the mouth of bays and

predominantly at mouths of bays and streams flowing into

the Great Lakes and certain shoals adjacent to the islands

in Lake Michigan.  I believe those are well -- those are

well known within the Treaty area, around Grand Island at

the mouth of the Shelldrake River, Tahquamenon River,

the shoals off Naomikong Point within Whitefish Bay,

Waishkee Bay, the Sault Ste. Marie Rapids, the Little

Rapids, Neebish Rapids, around Hay Lake, Les Cheneaux

Islands off St. Ignace, Oak Point, Epoufette, shoals along

the north shore of Lake Michigan at Manistique and

surrounding all of the Beaver Islands.  This latter, as

well as Charlevoix and in Grand and Little Traverse Bay

and off Leelanau Point, in other words, I've described

some of these in both of my reports.  Now, the descendants

of the people who were fishing in those areas at the time

of the 1836 Treaty, their descendants are, I believe,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

202.

some of them, members of the Bay Mills group right now;
and some of them are -- and some of them are members of
the, of the Sault Ste. Marie tribe.  I realize I was
concentrating on the upper area; we didn't get down to
the Manistee and, you know, people were fishing where --
fishing was widespread, and it would be impossible after,
you know, 150 years to say that one group of descendants
are within one corporation, one are within the other,
because this is a very tightly knit, interrelated
population.

Q    So you're saying that the tribes that we've been
discussing are descended from the same stock of ancestors?

A    From the same population pool, yes.

Q    So that the attempt to allocate fishing rights, if that
were necessary today, on that basis, on the basis of
trying to find which areas their ancestors had used,
would be a particularly difficult venture, I assume?

A    There are those administrative problems.  The Indian
Claims Commission has, from its wide experience, had
certain administrative practices in determining present
day descendants of earlier treaties.

Q    I'm aware of that.

A    If you wanted to look for guidance in that problem, I
think it's probably in that administrative bailiwick.

Q    Let me ask you this, were all of these fishing areas you

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

203.

just mentioned used exclusively by Chippewa, or were

there some Ottawas fishing on some of those areas?

A.    Ottawa and Chippewa are intermarried, and the Ottawa, the

Ottawa and Chippewa of northwestern Michigan were fishing

in some of those areas.

Q    All right.  Which were the areas, if you can recall that

you mentioned, where Ottawas and Chippewas would both be

fishing?

MR. DILLON:  I'd like to object, I think

she's answered these questions, and specifically she

pointed out in all the settlement areas where there were

Chippewa settlement areas, there was always a minority of

Ottawa present.  And I think she went into this in great

length, specifically pointed out on the map the various

areas where the Chippewa fished as opposed to the Ottawa.

THE WITNESS:  We did discuss that

yesterday.

MR. STEKETEE:  All right.

Q    (MR. STEKETEE)  Are you aware of any historical evidence

that bears on the question of whether Article 13 of the

Treaty of 1836, assuming that the rights that it encompasses

are not exclusive, whether there's any evidence at all on

the question of how the rights of Indians are to be

allocated with the rights of other people?  Do you

understand the question?  Assuming that the rights are

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

204.

held in common --

A.    It's an unreal question.

Q.    Assuming that the Article 13 rights are held in common
with other settlers, including whites, is there any
historical evidence that bears on the question of how
those rights were to be allocated?

A.    You're starting out with a faulty assumption again.

Q.    What's the faulty assumption?

A.    That Indians' fishing rights were held in common with
white settlers, I think that's a faulty assumption.

Q.    You don't believe that these rights were held in common?

A.    No.

Q.    Why didn't you say so when I asked you that question this
morning?

A.    I didn't know you asked me that specific question.

Q.    Well, I think that's one of the questions I'd been asking
you for about an hour and a half yesterday and today.
You could have saved us a lot of time if you had said
so!

A.    Well, I have a hard time following your questions,
Mr. Steketee, and I feel as though I should hold a shield
up in front of me every time you start out, for fear I'm
going to end up in some swamp of information.

Q.    So you believe that the Article 13 rights are not held in
common with other people.  What evidence do you have of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

205.

that fact?

A.   We keep coming back to -- Article 13 indicates that
Indian people want to preserve their resources for their
own way of life.  I don't --

Q.   Can you answer the question, what evidence do you have
of the fact that these Article 13 rights are not held in
common?  You just said it was your opinion that they
weren't.  Now, what evidence do you have of that for that
conclusion?

A.   The phraseology in the Treaty, the phraseology of the --
I have never seen a statement inferring they were held in
common.

Q.   So it's the absence of any statement, rather than the --
Which is it, is it the phraseology in the Treaty, and if
so, what phraseology?

A.   Article 13 reassures Indian people they can continue to
live in their own way.  It says nothing about, about their
accommodating any possible future population.

Q.   All right, so that's your answer to my question, what
evidence you have?

A.   I guess so.  You keep coming back to it, ~~I'm~~ like a dog
gnawing a bone, and I don't know what . . . I'm perplexed
. . .

Q.   Doctor, turning to the Treaty of 1855, and in particular
to Article --

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

206.

MR. GREENE:  Peter, would you want to take a five-minute break; is it a convenient breaking point, or do you want to press on?

MR. STEKETEE:  Not really, I'd like to press on a few minutes.

MR. GREENE:  Dr. Tanner, how is that, all right?

THE WITNESS:  That's okay, shoot another arrow!

Q    (MR. STEKETEE)  Article 5 says, in part:  ". . . of the said organization of Chippewa and except so far as the purpose of carrying into effect the provisions of this agreement is hereby dissolved."  What do you think the purpose of that provision was?

A    We're leaping now to the 1855 Treaty, I gather?

Q    Yes.

A    Okay, great leap forward.  The Federal Government at this time, this is one of many attempts by the Federal Government to force assimilation on Indian people, I believe, and it --

Q    All right, in other words, you believe that the Treaty of 1855 includes as a purpose to, as you put it, force assimilation, is that correct?

A    Yes, the Federal Government tried many strategems and devices and programs to try to convert Indian people to

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

207.

living in western European or so-called American fashion.
And in the 1850's, there is a series of treaties in which,
that included this type of a clause; and it was an
administrative policy, I should say.

Q   All right.  When, if you know, was the Bay Mills Community
organized following this dissolution in 1855?

        MR. GREENE:  Counsel, I'm going to have to
ask you to explain what you mean.  You mean organized
under the Indian Reorganization Act of ~~1855~~ 1934?

        MR. STEKETEE:  No, I'm asking her whether
she knows when the Bay Mills Community was organized as a
tribe, since its tribal organization was dissolved by
treaty in Article 5.

Q   (MR. STEKETEE)  I want to find out why is it today we have
a Bay Mills tribe when we didn't have one following the
Treaty of 1855; what happened to create this tribe, if
you know?

A   I believe I discussed the derivation of the Bay Mills
tribe in my report.  At the time of the 1856 Treaty, the
word Bay Mills was not known --

Q   The 1855 Treaty, you mean?

A   Yes, the word Bay Mills was not known.  There was no mill
on the bay -- Perhaps you better rephrase your question.

Q   Well, there is a present day Bay Mills tribe, is there
not?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

208.

A.   There is a present day Bay Mills tribe.

Q.   When did it come into existence?

A.   That's a matter of incorporation of that particular --

Q.   Do you know when it was?

A.   That particular term, the Bay Mills tribe is a matter of the present day corporation.  The people who, the ancestors of the people who became part of this present day corporation had been living in Lake Superior, in the Lake Superior area that we've discussed, of course, for several centuries.  I might just comment that although the Federal Government unilaterally decreed, you know, that tribal organization -- I've forgotten the exact word -- that tribal communities continued to function as tribal communities.

Q.   What evidence do you have that a tribal community or tribal communities continued to function as before after 1855 with regard to the two tribes that we're concerned with in this case?

A.   To the people who lived in the Upper Peninsula, the Indian people of the Upper Peninsula, they continued to correspond with the Indian agents, indicating what bands they represented and where they lived, that the relationship between the Indian people and the United States Indian agents continued.

Q.   Doesn't Article 5 contemplate that, though --

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

209.

A.    The Treaty sets forth certain benefits for the Indian, that's right.

Q    And it says the tribal organization is continued, it's implied, as far as necessary for the purpose of carrying the Treaty provisions into effect.  Now, is there any evidence, aside from that, aside from any need to administer the benefits of the Treaty, that the tribal structure remain?

A.    The tribal structure remained.

Q    What is the evidence for that?  I know you've said that, I just want the evidence that it did, if you have any. If you don't have any, just say so; we can cut this short.

A.    It's hard to tell what's in your mind.  Indian people did not change their way of living as a result of this Treaty; nobody went home and said, "Gee whiz, we don't have a tribe anymore."  Everybody went on functioning as a tribe in just the same way.  This is a unilateral declaration on the part of the Federal Government that did not modify the social and community behavior of the Indian people.  The Federal Government didn't want Shaw-waw-no --

Q    But --

              MR. GREENE:  Excuse me, I believe she's trying to answer.

Q    (MR. STEKETEE)  Doctor, it clearly was not unilateral, was it, because the Indians signed this Treaty, isn't that

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

210.

correct?

A.  They didn't write it.

Q  All right, so a unilateral treaty is one in which the Indians didn't write it?

A.  Well, being legalistic, I'd say the Federal Government hoped it would not have to pay expenses for any more Indian treaties; and if the Federal Government said, "We will not recognize tribes anymore," then the Federal Government had a potential fiscal savings.  Indian affairs and Indian treaties were very, very expensive.  Both of these 1855 Treaties are considered fraudulent documents, not reflecting Indian attitudes or Indian goals.

Q  What evidence do you have that these Treaties were fraudulent?

A.  The tradition of the Indian, of the Indian people and questions about that.

Q  I thought you said you hadn't made any studies about the tradition of the Indian people, that you hadn't looked into their oral tradition?

A.  I also told you that I had introduced as evidence a 1935 Deposition, we talked about that yesterday, in which a descendant reflected what was reported to him by his grandfather.  Now, we're getting off to the side.

Q  No, no, I'm interested in that.  What was the nature of the fraud in the two Treaties of 1855?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
823 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

211.

A.  Well, fraud has a legal word -- legal meaning.

Q.  You used it.

A.  I know, and it also has a -- Indian people and lay people
can say, "I believe that this was fraudulent", and I
don't know what legal definitions of fraud are; but they
were very dissatisfied, very dissatisfied with these
Treaties.  The Treaty didn't change the way in which
Indian people behaved, but it -- that provision was
intended to help the Federal Government avoid having to
make future treaties.

Q.  All right.

A.  That's the purpose of it.

Q.  Now, did the Indians, did the Chippewa, following the
signing of the July 31, 1855 Treaty, continue to act as
one tribe or two or how many?

A.  They continued to act as a group of bands.

Q.  As one band, as you've defined it earlier?

A.  Well, tribe is a white man's term.  To them, it's a
language and linguistic affiliation, what you'd call --
they were still an associated group of bands.

        MR. STEKETEE:  All right, let's take a
break.

        (Whereupon, a recess was taken.)

        MR. STEKETEE:  Okay, back on the record.

Q.  (MR. STEKETEE)  Doctor, could you take a look at your copy

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

212.

of the 1836 Treaty?

A    Yes.

Q    And in particular, there are two instances, I believe,
     in Article 2, where a Chief is named, who is to locate
     one of the tracts that are reserved.  I see one,
     Chingassanoo, and a second one is to be located by
     Mujeekewis.  Can you tell me whether those Chiefs were
     Ottawa or Chippewa?

A    No, I can't.

Q    All right.

A    Not right off.  I think Mujeekewis was Chippewa, but
     some reference to them probably appears in the literature.
     I'd be glad to look that up.

Q    But right now, you are not sure?

A    Offhand, I don't know.

Q    All right.  Now, Article 3 makes reservations for the use
     of Chippewas living north of the Straits, and I believe
     you have some question about that, at least in your
     supplemental report, is that true, as to whether that was
     intended properly or not?  Could you explain that to me?

A    I'm sorry, I'm afraid you'll have to explain it to me,
     "intended properly"?

Q    Didn't you say that -- Well, isn't it clear from that,
     that reservations for -- on the face of the Treaty --
     are reserved for the use of Chippewas living north of the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

213.

Straits?

A    Yes.

Q    Didn't you raise a question about that in one of your
reports, either the original or the supplemental report?
I believe it was the supplemental report.

MS. TIERNEY:  Do you have a page reference,
Counsel?

THE WITNESS:  Could you refer me to a page
in the supplemental report that you wanted me to comment
on?

Q    (MR. STEKETEE)  Well, I'm not sure I can, but I'll try.
Didn't you question somewhere whether Indians from south
of the Straits were not also entitled to use the lands,
the reservations north of the Straits?  Didn't I read that
somewhere, or maybe my mind is playing tricks.

A    No.

MR. GREENE:  Are you referring to --
You're referring to the story; I believe Counsel's
referring to the story that was quoted, the quoted language
from, is it from Strang?

MRS. SHULSTAD:  On page 9.

Q    (MR. STEKETEE)  Well, all right, I'll pass by that.  I
may be able to get back to that in a minute.  What meaning,
what significance do you draw from the part of the Treaty
of 1836 that concludes that there will be no individual

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

214.

reservations for half-breeds?

A    The instructions, Henry Schoolcraft was instructed by Lewis Cass, I believe, to allow no reservations for half-breeds.  Very often in treaties, reservations in the name of half breeds was a way of paying off fur traders who were helpful in negotiating the treaties.

Q    All right, now, does the term "reservations" as you have used in this case, does that include discrete tracts of land, or does that reserve any right that would be reserved?

A    The reservations -- The half-breeds, in treaties, are discrete tracts of land.  For instance, Flint, Michigan, there were 11 reservations for -- or supposed descendants of one Jacob Smith, where it was a device.  It's generally conceded that this was a device for paying off Jacob Smith for his aid in negotiating the 1819 Treaty, and this practice of giving traders a cut in the form of half-breed reservations was one that I believe Lewis Cass was trying to bring to an end, because it had been exploited virtually to the hilt by the Potawatomis Treaty in 1833 in Chicago.

Q    All right.  Now, do you have any knowledge as to whether Cass' instructions to avoid half breed reservations would apply to the stipulations of Article 13?

A    Have nothing to do with each other.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

215.

Q    All right, so in your opinion, then, Cass' instructions to
     avoid half-breed reservations did not preclude half-breeds
     from reserving fishing rights, hunting rights, whatever
     else is reserved in Article 13?

A    I think you're drawing some kind of a legal spinoff there,
     which you're entitled to do.

Q    I don't think I'm entitled to yet.

A    The subject of half-breed reservations concerns land
     tracts, and Rix Robinson probably wanted to get some land
     probably around Grand Rapids, for example.  They did give
     one -- They did give some money to Slater, and he bought
     some -- he managed to buy some lands, so he eventually
     got his payoff.

Q    Was Rix Robinson a half-breed or mixed blood?

A    He was a mixed blood trader.

Q    What if I could establish that I am a descendant of Rix
     Robinson, do I have some inchoate right in Article 13
     stipulations today?

A    I think that's a legal problem, what if -- anything, what
     if, is a legal problem.

Q    Well, is there any historical evidence one way or the
     other that you're aware of that would enlighten me on
     whether half-breeds like Rix Robinson were intended to be
     benefited by Article 13?

A    I don't recall of any connection with -- I don't see any

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

216.

connection between the instructions concerning avoiding

half-breed reservations and Article 13.

Q   Well, let me be very specific, do you think that Rix

Robinson was entitled to be benefited by Article 13?

A   You mean Rix Robinson, the fur trader, could fish?

Q   Yes.

A   If he was considered part of the Indian community, he

could.

Q   All right.

A   He was in Grand Rapids.

Q   I know, I know.

A   I think he may have gotten -- no, I shouldn't tell you.

Q   Do you know of any way by which it would be practical to

distinguish Chippewa, who were members of the bands who

were represented at the Treaty of 1836 who resided north

of the Straits from those who resided south?

A   That's an administrative problem.

Q   Is there any historical evidence that would help us make

that determination?

A   Probably the same treaty rolls that are in existence.

It's not a historical problem, that's an administrative

problem.

Q   All right.  Was there any person present during the

negotiations of the 1836 Treaty who was not a representative

of the United States Government who was a representative

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

217.

of some Indian band who could -- Let me start that question over again.

A.    Thank you.

Q    Was there anyone present at the negotiations of the 1836 Treaty who was not a representative of the United States Government, who was a representative of one of the Indian bands that was represented and who could speak English?

A.    I don't know, I really don't know about the language capabilities of these people.

Q    All right.  Do you know whether Andrew Blackbird was -- Was it bird or beard?

A.    Bird.

Q    Was Andrew Blackbird present at the 1836 Treaty?

A.    No, he wasn't, because his -- I doubt that he was.  His autobiography describes the fact that he was up in a tree watching the canoes take off for the people going to the 1836 Treaty.  I think he was too young; he was still alive in 1900.

Q    All right.  I wonder if you have Exhibit P-17A, which is the record of a treaty concluded with the Ottawa and Chippewa nations at Washington, D.C., March 28, 1936? Could one of your Counsel make that available to you, please?

A.    The Treaty Minutes, okay.

JEAN E. INGRAM & ASSOCIATES. INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

218.

Q    Have you got it?

A    Yes.

Q    I wonder if you would turn to page 10.  I'm looking not at the handwritten version, but at the transcription.

A    Okay.

Q    You have page 10?

A    I have page 10.

Q    Could you read the first full paragraph on that page, please?

A    "The Commissioner proposed a reservation of 100,000 acres --"

           MR. GREENE:  Hold it, I think we've got the wrong page.

           (Whereupon, off-the-record discussion.)

           THE WITNESS:  "Blackbird, speaker of delegates, mentions that he had but a few words to say, that he was opposed to the sale of their lands, and another time he would say more on this subject.  His voice was now with the Ottawas."

Q    (MR. STEKETEE)  All right.  Now, I think you testified yesterday that Blackbird was indeed fluent in English?

A    Andrew Jackson Blackbird was fluent in English; this is his father.

Q    This is his father?

A    Yes.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

219.

Q   How do you know that?

A   Well, someplace amongst the literature, he explains who

    his father is; this is Mucketypenasse, which is Chippewa

    for Blackbird.  Andrew, his biography describes as a

    little boy sitting up in the tree and watching the canoes

    take off for the 1836 Treaty.

Q   I wonder if you could refer to State Exhibit 23-A?

A   All right.

            MR. GREENE:  The witness has Exhibit 23-A

    before her.

Q   (MR. STEKETEE)  All right, tell me what this is, briefly,

    Doctor.

            MR. GREENE:  It's your Exhibit or the

    State's Exhibit.

Q   (MR. STEKETEE)  Are you able to identify it?

A   I can read what it says on the page.

Q   What does it purport to be?

A   Superintendency of Michigan, Agency Office,

    Michilimackinac, July 1836.  It's a letter to Lewis Cass,

    Secretary of War in Washington.

Q   From?

A   Henry R. Schoolcraft.

Q   Do you have any reason to doubt that this was an accurate

    transcription of a letter sent on that date by Schoolcraft

    to Cass?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

220.

A.   No.

MR. GREENE:  Counsel, I think this has been covered by answers, I think the record also shows whether we admitted that was authentic or not.  I assume since we didn't deny very many of them, that we admitted that was an authentic transcription or an authentic document with a transcription attached to it.

Q.   (MR. STEKETEE)  Doctor, could you turn to the second page of the transcription and read into the record the first full sentence on that page?

A.   You mean, "It is found"?

Q.   Yes, correct.

A.   "It is found that the Indians of Grand River use only log canoes, and cannot perform the necessary journey along the open lake to this place, which furnishes a just claim for their being paid the sum due to their numbers at that river.  The necessary census of the whole population is in process of preparation."

Q.   Does that sentence require you to modify, in any way, your testimony yesterday that the Indians were able to freely traverse the Great Lakes?

A.   No.

Q.   It does not, okay.  Now, I have a series of questions, Doctor, relating primarily to your supplemental report.

A.   Very well.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

221.

MR. GREENE:  Let the record note it's

11:10 A.M.

THE WITNESS:  We're on borrowed time, now.

Q    (MR. STEKETEE)  When did you complete this report, Doctor?

A    I completed it last August.

Q    Is that why it's dated August 1976 on the cover?

A    Yes.

Q    When was it submitted to the Defendants?

A    I don't know.

MR. GREENE:  I suggest that, Counsel, is a better question addressed to us.

Q    (MR. STEKETEE)  You don't know?  Do you know why there was a delay in submitting this to the Defendants?

A    No.

Q    Did you make any changes in your report after August?

A    Oh, yes, yes, yes, yes, there was something that wasn't clear, I believe, on the first page; and if it was -- a couple of sentences, I don't remember which, very minor changes.

Q    All right.

MR. GREENE:  Well, I'm going to register an objection.  You got the final report, anything that led up to that report I submit to you is work product. If you have questions about the report, fine.

MR. STEKETEE:  Work product if you did it.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
823 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

222.

If she made changes, I think we're entitled to find out.

   MR. GREENE:  My objection, that is work product, and I would request you restrict your questions to the final report.

   MR. STEKETEE:  All right.

Q (MR. STEKETEE)  Doctor, did you make any changes in the supplemental report following the Michigan Supreme Court opinion in LeBlanc?

A I had never read the Supreme Court decision in LeBlanc. Do you know when it was handed down?  I saw it first yesterday.

Q All right.

   MR. GREENE:  And, Counsel, she responded when you asked her whether she'd read it yesterday that she said she had not.

   MR. STEKETEE:  All right.

Q (MR. STEKETEE)  Could you turn to --

A That's a very bad insinuation you just made; I resent that, quite frankly.  Historical documents are not altered by contemporary legal decisions.

Q I wasn't insinuating anything, Doctor, I was just asking a question.

A Weighted with lead.

Q I wonder if you could turn to page 5 of the supplemental report?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

223.

A.   Yes.

Q.   There is a statement on this page that confused me, see
     if I can find it.  You say -- You're talking about
     Father Baraga --

A.   Yes.

Q.   -- in the last paragraph on the page, you say:  "The
     letter describing the founding of the new Manistique
     Mission stresses the conversion of the Indian population."
     Then you say, "The significance of the local fishing
     occupation is more evident in the county history of the
     Manistique vicinity."

          Now, is that an oblique way of saying
     Father Baraga does not mention fishing at Manistique by
     Indians?

A.   An oblique way?  Well, it's not an oblique way to do
     anything, it says -- I have written Father Baraga went
     there and talked about conversion.  Information about the,
     about the fishing is more evident.  It says just what it
     says; I'm putting together in one paragraph, as a matter
     of, I guess, literary continuity.  The subject matter of
     that paragraph is the Indian community of Manistique, and
     information about the Indian community at Ministique came
     from these two sources which I incorporated in a single
     paragraph.

Q.   All right.  Does the Baraga source include any information

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

224.

about fishing at Manistique by Indians?

A.  No, it doesn't.

Q.  All right, so the sole information of fishing at Manistique

comes from the county history?

A.  That's right, there's probably other information, but

that's what I have; that's what I've included in the

report.

Q.  When did Baraga write, when was he present in the

territory, and when did he write these various letters and

diaries?

A.  1831 is the date that he founded the Mission, but, of

course, Father Baraga was in the Great Lakes Region for,

oh, 30 or 40 years.  Baraga, in the Keweenaw Bay area, is

a town that's named for him.  His later missionary career

was in Lake Superior.

Q.  I wonder if you could turn to page 6.  On page 6, you cite,

you say:  "The Bay was noted as seasonal sturgeon fishery,"

and you cite in Footnote 8, to Manistique Centennial

Souvenir Book, Manistique, 1960.  I gather that's a

secondary source?

A.  Yes, that is a secondary source.

Q.  Do you have any primary sources tending to show that the

Bay was noted as a seasonal sturgeon fishery?

A.  No, I don't.  This supplemental report is, in a good measure,

secondary source material about local history in the --

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

225.

about local history in the nineteenth century.

Q    What about Ver Wyst, <u>Baraga</u>, is that a secondary source?

A.    Well, Ver Wyst is Baraga's biographer, and he utilized Baraga's letters, and I believe I have tried, whenever possible, to use the direct quotations from Baraga's letters; but Ver Wyst itself would be called a secondary, a secondary source.

Q    All right.  On page 6 of your report, you make reference to Little Detroit.  Where is Little Detroit, and is it in Michigan?

A.    Page 6 tells, I describe where Little Detroit is.  Little Detroit is at the head of Green Bay.

Q    Is it in Michigan or Wisconsin?

A.    It's in Wisconsin.

Q    So it's not within the Treaty territory?

A.    No, it's not within the Treaty territory.

Q    What about Summer Island?

A.    I'm not sure.

Q    You want to refer to your map and report number one?

A.    Well, as you pointed out, my map does not go, does not go over water.  We really need a larger map.  Summer Island is --

        MR. GREENE:  Is the question, where is Summer Island; or is the question, is Summer Island within the Treaty area?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

226.

MR. STEKETEE:  I know where Summer Island

is, I want to know if it's within the Treaty territory.

THE WITNESS:  If you know whether it is —

Q    (MR. STEKETEE)  I don't know whether it is; I'd be willing

to accept that of anybody in the room.

A    It's adjacent --

MR. GREENE:  Accept as truthful any

statement?

THE WITNESS:  It's adjacent to the Upper

Peninsula; it's adjacent to the Upper Peninsula of

Michigan.

MR. GREENE:  Can I interrupt, would it

assist, there are maps in the back of the supplemental

report.  Would that help you at all, Dr. Tanner, to answer

the question?  If it isn't helpful --

MS. TIERNEY:  I would refer you to

Michigan-1.

THE WITNESS:  I would judge . . . I would

judge it's within the Treaty territory.

Q    (MR. STEKETEE)  All right.  Doctor, assuming that Summer

Island, and even Washington Island on your map that's

included in your last report, are now in Michigan, I

wonder if you could tell me whether they're within the

area described in Article 1 of the Treaty of 1836, and

just to refresh your recollection --

JEAN E. INGRAM & ASSOCIATES. INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

227.

A    Apparently we need some kind of a supplementary map,
     which I'd be very glad to try to locate.

Q    I wonder if you know the answer now?  All right, once we
     get it down to the head of the Skonawba River of Green Bay,
     it's all described in the Treaty of 1836:  "Thence down
     the south bank of said river to its mouth, thence in a
     direct line, through the ship channel into Green Bay, in
     the outer part thereof, thence south to a point in Lake
     Michigan west of the North Cape, or entrance of Grand
     River, and thence east to the point of beginning, at the
     Cape aforesaid, comprehending all the lands and islands,
     within these limits, not hereinbefore reserved."

              Now, are you able to tell me -- This is not
     a trick, this is for my own information -- are you able
     to tell me where that line runs out of Green Bay?  Does it
     encompass Summer Island, does it encompass Rock Island and
     Washington Island, or does it somehow run through --

A    That's a very good, that's a very good question, and
     usually on cases like this, I bring along a map of
     Michigan. As of, you know, 1836 or 1837,  Nobody had
     surveyed this area; there's no reasonably accurate map of
     any part of this region north of the Grand River as of
     1836.

Q    Okay.

A    There is no reasonably accurate map.  I honestly don't

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

228.

know, other than the statements that were made by Indian

people, you know, at that time, that they went from the

Upper Peninsula of Michigan to Summer Island, that's the

reason it was called Summer Island, because the Chippewa

from the Upper Peninsula often spent their summers there.

Q.    All right, but you don't know, I gather, where that line

runs in that group of islands?

A.    No, but I will -- I can look that up, because I think

that there were surveys in 1839 and 1840 up in that part

of Lake Michigan.  Whether or not they made any reference

to the relationship of the islands to the Indian Treaty,

I honestly don't know that either.

Q.    Could you refer to page 7 of your report?  There's a

quotation there of Father Baraga where he says, among

other things, ". . . the people there, who depend

principally upon fishing for their living, were already

gone to their spring fishing."  All right, from the

context from which that was taken, are you able to say

whether Baraga is referring solely to full blooded

Indians?

A.    No, I can't.

Q.    Is it possible he's including half-breeds and also

possibly whites?

A.    I don't know.  It says that "These poor people are

employed by the whites . . ."  It suggests that whites

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

229.

are employers; the fishermen are poor people.

Q. But they might be poor whites as well as poor Indians?

A. I think that it would not be difficult to probably get a census of the small number of whites who were there. Poor people, I would think, more likely might refer to mixed bloods.

Q. All right. Doctor, the Treaty of 1836 refers to certain provisions for salt and fish barrels for Indians, is that correct?

A. Yes.

Q. Do you know where the salt and the fish barrels were obtained?

A. No, I don't.

Q. Do you know where they were delivered?

A. You mean at what geographical point?

Q. Yes.

A. These supplies were delivered to the Indian people.

Q. Yes, I guess what I'm asking you, were they delivered to one point, such as Sault Ste. Marie, or were they delivered to a number of discrete points; were they spread among all of the Indians that were living throughout this rather vast territory? How was that handled?

A. I don't know, but this could be -- it should be possible to get that information, because I think receipts had to be, I think receipts had to be signed.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

230.

Q    All right.  On page 8 of your report, you make reference

to a description by Strang of a population of intermingled

native American and European heritage.  Were you referring

there to intermingled in the sense that these people were

mixed bloods, or were you saying that there were Indians

fishing alongside of people of European ancestry, but

that the blood of the individuals was not mixed?

MR. GREENE:  Could you, where on that page

are you referring?

MR. STEKETEE:  Last partial paragraph.

MR. GREENE:  Thank you.

THE WITNESS:  There were, there seemed --

There's some Irish, recently arrived Irish people within

the population at that time, I believe.  There's some

names that --

Q    (MR. STEKETEE)  So there were full blooded Europeans, so

to speak, fishing at that time?

A    There was some full blooded Europeans who were up there,

yes, that's right.

Q    On page 9 of your report, you make -- you are again relying

apparently on Strang.  You say:  "As early as 1824, small

quantities of whitefish and trout began to be sent to

Buffalo for market."  All right, now, was Strang an eye

witness to matters in 1824 in the Upper Great Lakes?

A    No, he wasn't.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

231.

Q    When did Strang first get to the Upper Great Lakes?

A    I believe 1840, 1847, I think.

Q    Who was Strang, very briefly?

A    He was a Mormon who had brought a group of Mormon people
to Beaver Island, toehold in 1847.  More people arrived
in 1849.

Q    Is it a fair summary of some of the quotations from Strang,
and maybe some of your summaries of them, that Strang had
a very low regard for certain commercial fishermen on the
mainland?

A    Yes, these people were, they were Catholic, and they drank.

Q    All right.  Is there any other reason why Strang might
have had a few bad things to say about these Catholic
drinkers?

A    For him, I think that was sufficient to put them beyond
the pale.

Q    Was there ever a time when there were actual disputes,
jurisdictional disputes between these people and Strang?

A    I think you know, anybody who's read Strang's history,
they, you know, they had a local war; and he was killed.

Q    All right.  Had that war started -- or was it in the
process of -- was it visible to Strang at the time he
wrote his book?

A    Well, he wrote his book just, you know . . . I should
know, somebody tell me, I've forgotten when he died.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

232.

DR. MASON:  Fifty-six.

THE WITNESS:  He did die in 1856, this was written just before he died.  The local people regarded him as an interloper.

Q    (MR. STEKETEE)  What I'm getting at, Doctor, I will be very frank about it, I'm wondering whether Strang's view of these Irish people was prejudiced by the dispute he --

A    Of course it was.

Q    All right.  Was Strang, in all other regards, a dependable, credible kind of person?

A    I think it's very difficult to evaluate Strang.  He certainly has his own bias; on the other hand, the information that he provided, and which I quoted from extensively, is not available from any other source that I ever found, and Strang's account was republished as late as the, well, the 1890's, because he provided local history information that didn't seem to be available from other sources.  Nobody else is going to write "We got together and went out and tried to shoot up King Strang."  There's no -- This incident, the eviction of the Mormon colony, the murder of Strang, indicates the fact that you have a community that's kind of far removed ~~when~~ from what people would call the legal process, desirable legal process.

Q    Strang, in the quotation on page 9, mentions fish being taken to Mackinac?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

233.

A.    Yes.

Q.    Do you know whether those fish taken to Mackinac would
have been inspected by these fish inspectors at the Soo?

A.    If they are taken to Mackinac, I don't suppose -- I see
no reason to assume that they would go up to Soo and back
to Mackinac.

Q.    I'm not asking you whether they would have been taken to
the Soo, I'm asking you whether the fish inspector at the
Soo would have also inspected these fish?

A.    Whether the fish inspector from -- I don't know anything
about the program of the fish inspector at the Soo.  I
don't know whether he came to Mackinac or not.

Q.    I see.  All right, on page -- excuse me, Footnote 13 on
page 10, the footnote is actually back on page 30 -- see
what I'm saying?  In other words, there is a footnote 13
on page 10, and the actual footnote is published on page
30.  There you're talking about the "Sack and Fox War",
and you say in your footnote "Ruthless action against the
Sac and Fox in Illinois intimidated all the Indian
communities of the Great Lakes Region."

      What ruthless action are you referring to
in that quotation?

A.    The military, the activities of the Army in connection
with the "Black Hawk War".

Q.    Well, what did they do?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

234.

A.    Well, they captured Black Hawk and killed a number of people.

Q    Was this any more ruthless than what the Indians did to the whites in, say, Pontiac's Rebellion?

A.    What did the Indians -- relative ruthlessness.  This is a subjective matter that people can discuss according to their likes.  Pontiac's Rebellion was an endeavor to remove objectionable military conquerors from Indian territory.

Q    So if the action is taken by the Indians, it's the "removal of objectionable conquerors", if it's undertaken by the whites, it's "ruthless"?

            MR. GREENE:  Counsel, who's testifying here?

            THE WITNESS:  You can read about the Black Hawk War if you want to.  The general judgment of history is that there was some unnecessary ruthlessness in connection with Black Hawk's people, but it has nothing to do with this case.

Q    (MR. STEKETEE)  All right.  Can you tell me how, the nature of this ruthlessness was called to the attention of the Indians of the Upper Great Lakes?

A.    The moccasin telegraph.

Q    What's that?

A.    This means Indian word of mouth.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

235.

Q  Do you have any actual evidence that this occurred?

A  You mean that Indian people transferred information from one person to another to another?

Q  Well, I guess I'm more interested in whether you have any actual evidence that the Indians that were signatories of this Treaty of 1836 felt intimidated by the episode of the Sauk and Fox War?

A  Oh, I've read about this so often.  I think that, I think that the Indian horror at the Sauk and Fox War and their fear of American Army reprisal was rather widespread, and that there are documents that comment on this situation. I have not introduced one into evidence.

Q  Well, are you planning on doing so?

A  If you feel -- Do you feel you need it?  Excuse me.

Q  I'm not your lawyer, I just wanted to know.  Can you identify those documents to us now?

A  I'd have to go back through the literature.  The most obvious, if you want me to locate documents that indicate the Indians' apprehension as a result of the Black Hawk War, I can find them.  It had not occurred to me they would be pertinent to the case.

Q  Do these documents show that the Indians that were signatories to the Treaty of 1836 felt this apprehension?

A  The attitude of Indians in the 1836 Treaty is not differentiated from attitudes of Indians living near them;

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

236.

In other words, this is a universal Indian reaction.

Q    So it's universal.  On page 16, Doctor . . . yes, this is

a matter I have to . . . I can't find the record, so I'll

skip that question.

Let's go back to page 12.  You make a

reference to the island Islands on page 12.  What tribe

of Indians were the island Indians?  You may have answered

that yesterday, and if so, just indicate what the answer

is briefly.

A    The Beaver Island Indians?

Q    Yes.

A    I discussed the Beaver Island Indians yesterday.

MR. GREENE:  What's your question, Counsel?

Q    (MR. STEKETEE)  Are they Ottawas or Chippewas?

A    I think they're Ottawa and Chippewa, probably.

Q    All right.  Page 14, you say in that first full paragraph:

"The foregoing paragraph --" and I will interpolate, the

foregoing paragraph from Strang appears to be the best

published accounts of the north Great Lakes fishery and

the fishermen at the mid-nineteenth century.  The Mormon

community was a short-lived settlement, but the leader

did provide a valuable contemporary record of the

economic development in the district between 1847 and 1854.

I wonder if you can tell us why you're

relying so heavily on Strang, and what does Strang tell

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

237.

us about the Treaty of 1836 and its meaning, if anything?
What is the point of relying so heavily on Strang?

A    I've relied on Strang for the reasons I've said here,
it's the best published account of northern Lake Michigan
fisheries and Indian fishermen at the mid-nineteenth
century.  I have never found any other account that
discussed Indian fishermen in the Beaver Island area,
island by island.  He has -- The quotations that I have
made are very, very brief, and I thought they were
exceptionally detailed in locating where Indians were
fishing, and the number of Indians who came to fish in
that area.

Q    At the time at which Strang was an observer?

A    At the time, well, they fish there still.

Q    All right.  Now, Doctor, could you detail for me very,
very specifically what evidence you have that the Treaty
of August 2, 1855, was fraudulent or an imposition?

A    I can't detail very, very carefully, other than the, any
more carefully than the correspondence that I quoted in
my principal report about the continued objections of the
Ojibwa people concerning that Treaty.

Q    All right.  What's the earliest historical reference that
you've run onto that makes reference to the use of gill
nets by the Indians of the Upper Great Lakes?

A    Of the literature that I have examined, the travelers who

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

238.

came through, in my own -- the evidence that I used, I think the word gill nets appears in Reverend Pitezel.

Q    What was the date of that account?

A    He was up there in 185- -- first in 1847, 1850, the middle of the things that I quoted.

Q    All right.  I believe there's a quotation in one of your reports that speaks of Indians making gill nets?

A    That's it, they were sitting around the fire in the wintertime making gill nets, that's a wintertime occupation.

Q    Do you have any information as to what they were making those gill nets out of?

A    No, I don't.

Q    Do you have any belief that -- is it possible in your view that the materials for those gill nets might have been acquired from the whites?

A    I don't know how they were making -- I don't know how they were making gill nets.

Q    Is this at a time when the Indians might have been trading with the whites to obtain these materials?

A    Indians were trading with whites.  I know that Kohl, who was up there at about the same time, was describing how they used basswood, basswood fibers.

Q    Do you know of any accounts or any other evidence in which the use of gill nets made out of basswood fibers is

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

239.

clearly spelled out?

A.  The technology of fishing is not something that I'm well
-- that I'm well versed in.  Actually, I'm just now trying
to find out the difference between one kind of net and
another.  I believe one of my -- no, you asked about
basswood fibers, I really don't.  You should talk to, I
presume you had an opportunity to talk to Professor
Cleland about --

Q.  Yes, we have.

A.  -- about fishing technology, because he knows a great deal
about it.

Q.  Your testimony and Dr. Cleland's may overlap to a certain
extent, and I'm just trying to find out where the two do
overlap, and I hope you'll bear with me.

A.  No, no, that's quite proper.

Q.  Let me ask you this, the early references to gill nets,
is there any evidence of which you're aware that would
indicate whether these are the same kinds of devices that
we would call a gill net today?

A.  I don't know, I've never seen a gill net, and I don't
know whether early descriptions of Indians using nets
infers that they're other than gill nets, except for
those great big scoop nets, but I've never seen a net.
I've only seined for minnows, that's the only kind of net
I know about.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

240.

Q    Are there references in this literature to nets other
     than gill nets, aside from these scoop nets that you just
     mentioned?

A    I really don't know.

Q    What about seines or purse nets or things of that type?

A    I don't know what a purse net is.

Q    All right, what about seines, are seines mentioned
     anywhere?

A    Probably, I have not tabulated any kind of information in
     reference to different kind of fishing gear, just because,
     I guess I stopped at the point Indians were fishing.

Q    I think, Doctor, you and I have just about as much
     knowledge of the technology of fishing among ourselves as
     -- well, let me start that over again.

A    Okay.

Q    Do you have any -- Do you know how big, about how big is
     a modern gill net?

A    I don't know.

Q    Do you have any idea how big or how long these aboriginal
     gill nets were, if that's what they were?

A    No, I don't.

Q    Do you know whether this was a --

A    I think that Kohl makes some reference to, could I look
     it up, on what length some of these, some of these nets
     were.  I really don't know anything about dimensions.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

241.

Q    Before you indicated that you believed that the Blackbird who was present at the Treaty of 1836 was the father of Blackbird that was fluent in English?

A    Yes.

Q    Which was the Blackbird that signed the Treaty of 1855, the son or the father?

A    The son -- Let me correct that a little bit, Blackbird's name on the 1855 Treaty is sort of controversial, as I've mentioned, because he did not, although he was literate, he did not sign that Treaty.  There is an X marked by his name that offers an interesting subject of speculation. I think that should be pointed out.  He signed many letters, but there is an X mark on that Treaty.

Q    All right.  Is the X on the original Treaty, or is it on the copies?

A    I presume it's on the original.

Q    Have you looked at the original?

A    No, I don't know -- I have not looked at the original Treaty.

Q    All right.

A    But Indian people have a tradition on that subject; I believe I mentioned that yesterday.

Q    I think you testified on that yesterday.

A    Okay.

                    MR. GREENE:  I think -- Could we go off

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

242.

the record for a second?

               (Whereupon, off-the-record discussion.)

Q   (MR. STEKETEE)   Okay, Doctor, is it possible for a Chippewa

to become an Ottawa and vice versa, say, or was it in

1836?  Could you shift, become, you know, change your

tribal affiliation?

A.  Indian people did move from one community to another in

the nineteenth century; it was possible for a ~~Sault~~ Sioux to

become a Chippewa -- I mean the descendants of the Sault

to become a Chippewa, because the Sault -- the Chippewas

captured some and incorporated them within their tribe.

Q  How did this process take place?

A.  Well, captives become members of tribes, and -- of the

tribes that capture them.  Remember, I remarked that

every Indian tribe had minorities of other Indian

populations.  A member of one community could move from

one place to another.  Some of the Sault Ste. Marie band

people, Indians who lived in the Upper Peninsula of

Michigan, some of them moved to the Lower Peninsula and

back and forth.  One can -- One doesn't really change, I

don't suppose.  I don't know what you have in mind, it's

not like immigration and naturalization or something like

that; but Indian people can change their geographic

location.

Q  Does mere changing your geographical location turn you

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

243.

from one type of Indian to another type of Indian?

A.   No, it doesn't turn you from one type of Indian to another; it means you're an Indian that's living with a different group.

Q.   All right.  Can you tell me with regard to the Chippewa and Ottawa that were represented at the Treaty of 1836 enough about their tribal structure to let me know who did the fishing, was it the men or the women, the children, who actually did the fishing?

A.   Well, I don't know, that's a matter of an economic pursuit, not a matter of tribal structure.  I've heard chiefly descriptions of the men who had this skill.  I think women supervised drying and processing fish.

Q.   Does the modern day Chippewa woman enjoy the rights reserved under Article 13; do you have any viewpoint on that?

A.   It sounds to me like a legal viewpoint, you mean we're going to get -- oh, golly, what a question that is, that is a lulu!

Q.   I just wondered from what you said --

A.   We'll have the National Organization of Chippewa Women who will be descending upon you!

           MS. TIERNEY:  Let the record reflect laughter.

Q.   (MR. STEKETEE)  What was the status of the Indians in

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

244.

1836, were they flush, would you say, or were they in

pretty bad straits, or somewhere in between?

       MR. GREENE:  Could you be a little more

specific, Counsel?

Q.  (MR. STEKETEE)  How were they doing, Doctor?  Do you

understand the question?  Were they near starvation, or

was there plenty of game and fish available for them?

I just want to know what you know about their general

welfare in 1836.

A.  There's probably no general statement that would cover,

that would be equally appropriate for all individual

Chippewa groups.  It's well known that the fur, that the

fur resources were -- that the fur resources were depleted,

and the furs were one of their sources of exchange.

Q.  So one of the things upon which their economy was based

was severely depleted, then?

A.  Yes, that game was -- there are many accounts that game

was depleted.  I believe somebody got out of the fur

trading up there in 1834.  I think there was some --

Q.  Let me ask you this, then, who initiated the Treaty of

1836; who initiated the negotiations, the U.S. Government

or the Indians?

A.  It's not either/or; there were -- Henry Schoolcraft

himself had a prime interest, which I discussed in my

paper, and some Indians who were interested.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

245.

Q    Isn't it true that there were some Indians who had made

     overtures to the Government to sell their lands?

A    There were some Indians who made overtures to sell their

     lands.

Q    Which ones?

A    I believe the Grand River group were the first to get

     down there -- I should perhaps look back to my report.

     Indian people seldom all agree.  Some of the Grand River

     Indians wanted to, wanted to be able to receive annuities.

Q    All right.  Were any Indians from the northern part of

     the State interested in selling their lands?

A    No, not particularly.

Q    Were there no overtures by any Indians from the northern

     part of the State to sell their lands?

A    I don't believe, I don't believe so.  I think that the —

     by the northern part, you mean the Upper Peninsula?

Q    Not necessarily --

               MR. GREENE:  Well, where, Counsel?

               THE WITNESS:  Any subject like this, there

     are differences of opinion among Indian people, and there

     are factions pro and factions con.

Q    (MR. STEKETEE)  All right.  Now, let me ask you this,

     would the depletion of furs in the area of the Treaty of

     1836 provide a motive to some Indians to sell their

     lands, perhaps even to remove from the State of Michigan?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

246.

A.   I do not recall any correspondence that states that point of view.

Q.   Well, was there any Indian correspondence to speak of at this time?

A.   There were Indian — There were Indian representations. They went to Washington in person, some of them went to Washington in person.  I thought I covered the motivation behind the 1836 Treaty rather carefully.

Q.   Are you able to give me any idea what the character of the Indians was in 1836 that were involved in the negotiations of the Treaty of 1836?

          MR. GREENE:  I'm sorry, Counsel, but I'm going to object, I don't understand what "character". What do you mean?

Q.   (MR. STEKETEE)  What were they like?

A.   Moral, immoral?

Q.   Were they moral, were they immoral, did they honor their obligations?

A.   Indian people -- and I think I put this somewhere in the report -- take obligations and agreements very seriously.

Q.   Did there prevail among these Indians, a viewpoint that they could avoid their contracts if they were provoked in any way?

A.   The term "contract" is incomprehensible to an Indian; that's an Anglo term.

JEAN E. INGRAM & ASSOCIATES. INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

247.

Q    They did not believe in contracts?

A    Contracts is an Anglo term, things that you sign.
     Personal agreements understood between two people are
     always honored.

Q    Did the Indians consider these treaties as personal
     agreements?

A    Yes, they really considered them as a personal agreement
     between themselves and Henry Schoolcraft and probably
     Lewis Cass.  They considered, think of things in terms of
     personal obligations.

Q    Did the Indians who weren't actually there consider they
     were actually bound by the agreements reached by their
     representatives?

A    I don't know.

Q    Did the people who were actually there on behalf of the
     Indians consider themselves bound?

A    Yes.

Q    Did they consider the people that they were representing
     bound?

A    Indian society has no mechanism for the imposition of
     force, but the force of community obligation, that they
     would be agreeable.

Q    All right.  Are you aware of any incident in your many
     years of studying Indians, where Indians breached an
     agreement that they'd reached with the United States in

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

248.

the form of a treaty?

A    There probably is.

Q    But are you aware of any?

A    I can't think of it right now.  The question of what is, of what is a treaty and what is not an agreeable treaty is a very, very fine, very, very fine point.  We're getting into almost legalism at that point.  Personal obligations of Indian people are universally honored, and there is a great deal of literature that comments on the fact that Indian people live up to their obligations under treaties, and the white society does not.  It's very difficult to discuss in summary terms, because the Government has one policy.  The citizens in general, in America, citizens are not as faithful in observing treaties as members of Indian communities.  I don't know what you're trying to drive at.

Q    Well, what you've just said raises another question in my mind.  Let me see if I can phrase this question so that you can understand it.  Is there any distinction between different treaties that the Indians think some are binding and some are not?

A    They think some treaties are valid and some are not.  That doesn't come into this discussion; I don't know why I brought it up, it will probably take another half hour, but some Chippewas signed treaties, some Chippewas'

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

249.

signatures were procured on treaties in Ohio which Indian

people never regarded as valid treaties; but they're

always listed in the history of treaty-making.  I think

we can throw that out, because that doesn't apply to the

1836 Treaty.  They realized this is a real treaty.  Some

treaties are not real; this Treaty is a real treaty, and

-- okay.

Q   All right.  Is the 1820 Treaty a real treaty?

A   1820 Treaty?

Q   Yes.

A   Yes, that's a real treaty.

Q   And both Treaties of 1855 are real treaties?

A   I, you know, I've got my doubts, I personally have -- I

personally have my doubts about them.  I don't consider

the August 2nd Treaty a real treaty, I think that's a

shenanigans treaty.

Q   How about the earlier Treaty, the big Treaty of 1855, if

you will?

A   Well, that probably stands up, that probably does stand

up legally.  I think it's better to ask Indian people

about that.

Q   What evidence do you have that the August 2nd Treaty of

1855 was a shenanigans treaty, as you put it, or not a

real treaty?

A   We've been through that many times, that continued

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

250.

objections by Indian people, it's in the literature,
objections reported in my own report.

Q    It's this oral tradition, then, that the Indians don't
believe that the Treaty is a valid treaty?

A    Yes, and their objections to the fact that they were not
paid, which is in the literature. I don't think they've
been paid yet. Their objection --

Q    Well, is the objection to the Treaty that in some way
it's fraudulent, or is the objection that the Treaty has
not been honored? I think those are two different things.

A    I think there are objections on both grounds.

Q    What are the objections that go to the question of the
fraudulent nature of the Treaty, in which way was the
Treaty fraudulent? What is the tradition in that regard?

A    I have reported the tradition, I did yesterday; it's
written in my report, I reported it twice.

Q    Well, I still don't understand why the August 2nd Treaty
is regarded by the Indians as fraudulent.

A    Maybe I better write another report!

Q    No, just summarize for me.

A    Because they had doubts about the, about -- oh, dear,
something like this should be properly researched and
properly reported and not just given off the cuff like
this. A good deal of the difficulty is probably with the
nature of the role of the interpreters. I don't see what

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

251.

this has to do with this now.

        MR. STEKETEE:  We can do this on the
record, I would propose to try and finish the subject of
my initial remarks by 12:30; I think by then the lines
downstairs will have gotten under control.  Is that all
right?

        MR. GREENE:  It's all right with me,
assuming that that's okay with the witness.

        MR. STEKETEE:  You want to take a minute
break or a couple of minutes break?

        THE WITNESS:  I think I shall probably
live another half hour, although I have a feeling that
I've dropped back in the same rut I've plowed my way
through two or three times, and I'm trying to be patient
about it and get out the shovel and dig through again.
Okay.

        MS. TIERNEY:  You want to take a two
minute break, though?

        THE WITNESS:  No, no, no, no, no, let's
get it over with!

Q  (MR. STEKETEE)  Doctor, what information do you have on
how many Indians were in the territory that we're talking
about in 1836?

A  There's census data, there's census data available.  The
usual figure was around, was around 5,000 or five or six

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

252.

thousand people.

Q      All right.  Do you have any idea how many of those Indians were actually engaged in fishing?

A      Oh, I'd say every able body, that the able-bodied men were.

Q      Can you estimate how many that would be?

A      Well, I tell you, in Indian populations, they usually have roughly, say, five to one ratio of warriors to total population.  Using that inversely -- well, probably 20, 25 percent.

Q      All right.  Have you made any adjustment for those Indians that did not fish?  For example, did all of the Indians in the territory fish in the Great Lakes, or did some of them, were some of them inland Indians?

A      Inland Indians fished, too, everybody fished.

Q      All right, but the inland Indians fished inland, for example, the Grand River band, is there any evidence that they fished in the Great Lakes as opposed to fishing in the Grand River?

A      I think they might have gone down to the river mouth, but I, you know, I wouldn't want to make any overall statement. Most of the Indians made pilgrimages to the lake shore during fishing runs.  Everybody in the eastern part of Michigan, why, they would go to Lake Huron for fishing, for a fishing season.

Q      All right.  Who would go to Lake Huron for a fishing season?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

253.

A    Some of the Chippewa who were in southeastern Michigan, whose villages were not on the Great Lakes.  I can probably research this for you.

Q    All right.  Is there any way to estimate the annual take in 1836 or thereabouts by these Indians, these 5,000 Indians?

A    Not that I know of, but some statistical devices might be possible.  I don't know anything about that.

Q    All right.  Is the figure 5,000, is that the number of Indians within the Treaty territory, or all the Indians in the State of Michigan?

A    No, usually they say, I think estimates would be about 5,000 within the Treaty territory.  Usually they gave a figure of, you know, 8,000 or so Indians.

Q    All right, so you say about 25 percent of the Indians were fishing?

A    That's a very rough estimate.

Q    A rough estimate, I understand.

A    Somebody else might be able to do a much better job.

Q    That would be about a thousand Indians approximately?

A    Yes.

Q    How many days out of the year would they actually be fishing?

A    I don't know.

Q    Do you have any way to estimate that?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

254.

A.    No.

Q.    Would they also be the same people that were doing the hunting when the Indians were hunting?

A.    Probably.

Q.    Would they be the same Indians that were collecting sugar during the sugarbush?

A.    I think that women usually took charge of the sugarbush.

Q.    But would these same braves be present in the sugarbush, or would they be fishing; would the families separate during that time of the year?

A.    They are separated -- Indian people, you know, that they are -- I feel confident that Dr. Cleland clarified this to you, that there are major fishing seasons, and there's other incidental fishing, so that fishing goes on continuously, but is more important at two seasons, two seasons of the year.  But I don't know what you're trying . . . I presume that families were usually together for, I think, sugar making would be, you know, like two or three weeks.

Q.    All right, now, let me ask you this, do you have any way of estimating how many fish an Indian could catch per some unit of measurement?

A.    No, I don't know anything about that.

Q.    Or unit of effort?

A.    No, I don't know anything about that.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

255.

Q    Do you know anything about the storage of fish by the Indians?

A    Well, they ~~stocked~~ smoked and dried fish, is that what you call -- is that storage or processing?  I don't know, I might be confused.

Q    That's sort of what I'm interested in.  Did they eat fish all year round, because they did catch a lot of fish a couple time of the year, and then they'd process it some way so it would not spoil?

A    They smoked fish and dried fish.  As to any other storage facilities, I don't think I know about that.

Q    All right.  Do you have any way of knowing how much of the Indians' diet was fish as opposed to other forms of protein?

A    No, I don't, but I think there may be nutritional studies on this.  In the Great Lakes, I think they generally believe that a very high portion of the Indian diet was fish, and significantly enough, at least, it's significant to me, that fish are short in carbohydrates.  I think this may be the reason that they used maple sugar for seasoning many of their fish dishes, which would give them a pretty good balance.

Q    Dr. Cleland referred to net weights which were stones, I gather, that were grooved.  Do you know anything about those stones?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

256.

A    No, I was fascinated to find out about them.

Q    All right.  As far as you know, those stones could have
     been net weights, or they could have been something else;
     just as far as you know, you don't know whether they were
     net weights or not, I gather?

          MR. GREENE:  She just said she never heard
     of them before Dr. Cleland mentioned them.

          THE WITNESS:  That's not my field, I accept
     his word for it, because he's the one person who has this
     subject as his specialty.

Q    (MR. STEKETEE)  All right.  There's nobody else in the
     whole world that knows?

A    That knows as much about it as he does.

Q    Okay.

A    About the fishing activities in this particular area,
     that's his specialty.

Q    Do you know whether the Indians around the Soo paid the
     Soo fish inspector fees for inspecting fish either before
     or after the Treaty?

A    I don't know anything about that.

Q    All right.  Do you know whether the Indians fished for
     siskiwits?

A    I don't know what a siskiwits is.

Q    All right.  Do you know how deep the Indians were able to
     fish?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

257.

A.    No.

Q    Referring to the commercial fishery of the Indians in
      1836, if any, how much fish did the Indians in this
      territory, these 5,000 Indians, sell annually?

A.    I don't know, I included in my report examples of reports
      of Indian agents, and I think in the 1840's they indicated
      how many barrels of fish one little group had sold, but
      I don't know of any total.  That information might be
      available in some of the archival records, but I don't
      know it.  I just, I included examples.

Q    Does Strang ever mention an Indian commercial fishery?

A.    I think he talks about Indian fisheries, does he use the
      term "Indian commercial fishery"?  I have Strang's report,
      and it's more extensive than I quoted.  I'd be glad to
      . . . The common terminology at the time was Indian
      fishery.  There is a census someplace of Schoolcraft where
      I think he indicates how many fisheries were operated by
      certain groups of people.  I think fishery probably
      covered the term commercial fishery at that time.

Q    Well, all right, maybe I'm not making myself clear; maybe
      I'm not being very clear to myself, either.  The
      references to Strang in your supplemental report seem to
      be to fishery in which there are both whites and Indians
      and maybe mixed bloods, and to a fishery which apparently
      was not controlled by Indians in the sense of management.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

258.

Are you aware of any references in Strang that are inconsistent with that characterization?

A    I don't think -- I think that's another one of your, of your loaded questions.  These things are Indian fisheries, and if an Indian had a friendly Irishman, that he'd let him come along and fish, I'd call it an Indian fishery, and you'd probably say, "Aha, fishing alongside."  That's the difference in interpretation.  These were called, referred to as Indian fisheries.

Q    All right.  On page 17 of your supplemental report, you refer to a schooner, the Robert B. Campbell.  Is that an Indian boat?

            MS. TIERNEY:  Would you be more specific as to where that is located?

            MR. STEKETEE:  Page 17, the top of the page.

            THE WITNESS:  I don't believe that that's an Indian boat.

Q    (MR. STEKETEE)  All right.  On page 18 in the middle paragraph, you say, "Limited means of transportation and the late settlement of northern Michigan are reasonable explanations for the relatively meager firsthand reports of life in the Ottawa and Chippewa communities widely scattered throughout the entire area ceded by terms of the Treaty of March 28, 1836.  Nevertheless, observant

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

259.

newcomers to the homeland of the Ottawa and Chippewa in Michigan all commented on the fishing habits of the Indian residents and the importance of the fish resources."

Now, let me ask you something about that. Are there some newcomers to the homeland of the Ottawa and Chippewa who were not observant and do not mention fishing habits of the Indians?

A.  Probably, I think there were some illiterate people there.

Q.  Did you have some observers in mind who you believe were not observant?

A.  No, no, no, no, no.

Q.  In other words, you were passing value on the quality of the observers that you'd reviewed?

A.  No, I think I was probably just being literary. If a person is observant, then you acquire some information. I'm recalling I have a diary of my great grandfather who went to Chicago in 1840's and recorded one piece of data, haircut cost a nickel. What a loss! That's non-observant.

Q.  All right. On page 19, you say, "Before commencing the survey work in present Alpena County, Oliver and the survey team landed at Presque Isle. Describing this isolated Indian community north of Thunder Bay in 1840, Oliver wrote: 'This (Presque Isle) was a wooding station for steamboats going around the lakes, and the only inhabited spot at that time between Mackinac and Bay City.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

260.

It was also the first fishing station on Lake Huron shore,
north of Saginaw Bay.  The fishermen used hooks, seines,
and gillnets, and had a considerable trade with the boats,
furnishing them fresh fish.'"

Is it your belief, based on this, or any
other evidence that you're aware of, that the only fishery
between Bay City and Mackinac on the Lake Huron shore was
at Presque Isle?

A.   That's what it states.

Q.   And that was in 1840?

A.   Yes.

Q.   Do you believe that's true?

A.   I have no -- I have presented the information that I have
found, and that's it.

Q.   All right.

A.   He was there.

Q.   What kind of Indians were those there, Chippewas or
Ottawas?

A.   Well, that's in that Thunder Bay region, Thunder Bay, I
believe, is Chippewa; now we're up at Presque Isle -- I
don't know, I don't know why it's important, either, but
apparently it is important.  The Thunder Bay group, I
really believe, is Chippewa.

Q.   All right.  Now, on page 20, Doctor, you refer to --
unless I missed it again -- I believe there is a reference

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING. MICHIGAN 48917
TELEPHONE: (517) 372-2254

261.

to deep fishing by Indians, but only by cord.  You see

that in that quote -- okay, the first paragraph of the

quote.

A.  Yes, "with a large cord", that's right.

Q.  Are you aware of any evidence that would indicate that

the Indians, before 1850, were able to take fish in deep

water, other than with a large cord?

A.  I don't know anything about their fishing habits, I

honestly don't.  I don't even know how deep is deep.

Q.  Do you think that this description of half a dozen

wheelbarrows laden with fish four feet long weighing 50

or 60 pounds whenever a boat comes in, is an accurate

description of the nature and extent of the commercial

fishery at that point on the Great Lakes in 1850?

A.  No, this is an example of sales to tourists who are, I

mean, taking advantage of the presence of tourists to sell

fish.  They also sold a lot of game.

Q.  Well, by what other evidence is there that would help to

establish the size, nature and extent of the commercial

fishery in 1850?

A.  I don't know where economic production records of this

that would give summary amounts of data, but I think they

might well have been published in the Detroit newspapers

or appear in state summaries and almanacs and that sort

of thing.  I just don't know where the information is.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

262.

Q   In the last full paragraph on page 20, you make reference
    to a regional guide book.  Can you tell me who wrote that
    guide book?

A   No, I don't have any more information; I included that
    particular guide book.  I think at one point I included
    a guide book by a man named Disturnell.

Q   How do we know whether this is accurate or simply Chamber
    of Commerce dribble?

A   How do you know?

Q   How does anybody know?

A   There wasn't a Chamber of Commerce, this is --

Q   I was using that as a descriptive term.

A   This is a description --

Q   Do you know what I mean by that term, promotional --
    I drive back and forth between Grand Rapids and Lansing,
    and I hear these promotional advertisements sponsored by
    taxpayers' money and put out by the Michigan Department
    of Commerce, telling me why I should locate my factory in
    Michigan.

A   And it's probably not true.

Q   That's right, it may be true or maybe it isn't.  Now, how
    do we know this guide book is accurate?

A   Well, I don't know how you would, how you would know that.
    There are other travelers, there are whole series of
    these, of publications of this kind, and other descriptions

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

263.

of travelers who come through.

Q    On page 21, there is sort of an extended description of the Wakazoo band of Indians.  Who were the Wakazoo band of Indians?

A    Well, I thought I had explained, there is an awful lot about them in the documents.  They had lived down near, as I explained, they lived down near Grand Haven, and then moved up to the tip of the peninsula with their missionary, just like I wrote.

Q    Now, they lived down near Grand Haven.  Now, when did they make this move?

A    It says on page 21 of my report that they moved in 1849.

Q    All right.  Do you know whether they were represented at the Treaty of 1836?

A    Whether there was a Wakazoo there?

Q    Are they considered as beneficiaries of the Treaty?

A    Give me . . . I should know my geography better than this.

Q    Let me tell you this, the Grand River goes into Lake Michigan at Grand Haven.

A    At Grand Haven.

Q    The town is physically located on both sides of the river.

A    You mean Holland -- Grand Haven is on both sides of the river?  Holland is north of Grand Haven, is it?

Q    Holland is not north of Grand Haven, Holland is ten miles

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

264.

south of Grand Haven.

A.  Holland is ten miles south of Grand Haven?

Q.  That's my belief.

A.  If they were -- Apparently they moved from ten miles south of the Treaty area into the Treaty area.

Q.  All right, apparently they were not beneficiaries of the Treaty of 1836?

A.  They were not signatories to the Treaty of 1836.

Q.  All right.  Now, where are they now?

A.  I don't know, I don't know where -- I don't know of anything called the Wakazoo band right now.  I know those people moved up there at that time; I haven't traced them.

Q.  Were they Chippewas or Ottawas?

A.  I think they were Ottawa, the Wakazoo band, I think.

Q.  All right.  Is there any way that you're aware of that we can tell the Wakazoo from the Ottawa, from the Ottawa that were present within the territory when the Treaty was signed?

A.  No, that's not necessary.  Indian people -- I don't see any need for that.  Indian communities accept friends and relatives and allied Indians into their community if they're in a state of distress, which is what had occurred in the case of Wakazoo's band.  There are very strong ties between the Grand River Ottawa and the Ottawa who lived further north.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

265.

Q    All right, you referred to Judge Hatch in his centennial
     address in 1880 in a number of places, including Footnote
     45.  When did Judge Hatch make his observation, was he
     there in the 1830's to observe these matters?

A    I don't know his birth and death date, but I don't think
     he was.

Q    All right.  So his account later in the century was a
     secondary account of some type?

A    Well, it's not -- It includes information that's not
     eyewitness information.  His is a local history account.

Q    All right.  Do you remember, Doctor, on page 23, do you
     consider Belknap accurate?

A    I think -- I'm interested in Belknap's book.  I haven't
     made a great study of trying to interrelate various
     sources of information, but I was interested in it, and
     I called it to the attention of anthropologists.

Q    Was that quote on page 23, is that Belknap?

A    That is Belknap, yes.

Q    The fishing he describes, do you know?

A    He saw that.

Q    All right, he saw that.  Now, do you know whether he was
     talking about Indians or not?

A    I don't, it doesn't say if there was a community there.

Q    Well, by 1854, was there not a fur trading center there
     at Grand Rapids?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

266.

A.  Certainly, and there were other people there; the Grand River Ottawa were not moved out of that area until the summer of 1857.

Q.  Now, on page 24, I think you make reference to the Grand River band of Indians going out and fishing near Pentwater, is that right?

A.  The historian of Oceana County made that observation.

Q.  Is there any record of which you're aware of the Indians, if there were any, that then lived in Oceana and Mason County objecting to Grand River Indians coming up and fishing in their territory?

A.  No.

Q.  There's no objection?

A.  I don't recall, I haven't read anything like that.  That wouldn't be characteristic Indian behavior.  I haven't read anything about that.

Q.  Now, is there any other lake at Pentwater, other than Lake Michigan?

A.  Is White Lake there?

Q.  I don't believe so.

A.  I don't have a large enough map.  Pentwater is in a bay.

Q.  Isn't there a lake at Pentwater, an inland lake?

        MR. TAYLOR:  There sure is, Pentwater Lake.

Q.  (MR. STEKETEE)  Yes, isn't there a lake?

A.  If there is, it's on the map.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

267.

Q    Do you know if the lake that's referred to at the top of the page is Pentwater Lake as opposed to Lake Michigan?

A    No, I don't know.  I had thought, without specifying the lake, it was probably Lake Michigan.

Q    Now, this is page 24, is the start of this discussion that we couldn't find before, where you draw some, some significance from the distinction between Article 2 and Article 3 of the Treaty of 1836, Article 3 being the reservations that are held in common by both the Ottawa and the Chippewa, and Article 3 being those reserved for the Chippewa living north of the Straits.  I wonder if you could explain your point here to me?  This is not a trick question, I just want to understand what you're saying, I don't understand it.

A    Maybe I ought to reread it during lunch hour.  In writing this report, I was indicating where Indians -- my concentration was on where Indians -- reports of where Indians were fishing.

Q    All right, is it your understanding that Chippewas who lived south of the Straits were entitled to the benefit or to use reservations north of the Straits?

A    I don't think I'm making any legal judgment.  I'm describing where people's home bases were and where they fished, and in general, I would emphasize there is a good deal of mutual understanding about fishing, about

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

268.

customary fishing.

Q    Okay.  On page 25, in connection with this same question,

you make reference to an imperfection in the Treaty.

What do you mean by saying that there is an imperfection

in the Treaty?

A    On page 25?

Q    Yes, you say:  "This is evidence of an imperfection in

the Treaty," --

MS. TIERNEY:  The last sentence in the

first full paragraph on that page.

THE WITNESS:  I may have a mis- -- I better

look that over.  I think that someplace Saginaw Bay is

identified as a Grand River Indian, and other places as

a Grand Traverse Indian.  I think that in the records

that there's some inconsistency in identifying this area,

and I'd be glad to go back over and look that over.  I

think that's what I had in my mind.

Q    (MR. STEKETEE)  I'm going to try to finish up my questions

here in two or three minutes.  Could you, during lunch,

could you try to find out what the point was of that

report?

A    I think it's Grand Traverse versus Grand River.

MR. GREENE:  There is a reference of pages

53 to 56 of your report.

Q    (MR. STEKETEE)  I wonder if you might straighten that

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

269.

out during our break?

A.   Sure.

Q.   I'll try to move along here.  You indicate the allotments after the Treaty of 1855 didn't function as planned.  I gather from this report that there was quite a bit of time passed before the allotments were made and so forth. Is there any evidence, however, to demonstrate that anybody who's entitled to an allotment did not eventually get one?

A.   Oh, yes.

Q.   There is?

A.   Most of the evidence indicates that -- I think somebody said perhaps five percent of the people might have gotten their allotments.  It's an incredible morass of information and absence of information.

Q.   All right.  Do you know of any action that has been taken by the Federal Government in recent times to assure that descendants of the people who didn't get their allotments are recompensed?

A.   No, I don't.

Q.   Has the Indian Claims Commission action or actions that have been discussed in these proceedings, does that have anything to do with correcting this abuse, if it in fact occurred?

A.   I don't know of any litigation that has been instituted

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

270.

on the basis of the 1855 Treaty.  I think some of the
lawyers think they were remiss in not bringing this
matter up about 30 years ago.

Q    Aha.  On page 27, you make a reference to Indians being
used.  Is it your view that Indians, unlike other people,
are not responsible but are mere pawns for whoever
manipulates them?

A    The quality of being a pawn is not racially restricted.

Q    All right.  Well, what was it about these Indians that
made them pawns?

A    I know a couple of cases up in Northport where at least
the correspondence indicates that a couple of Chiefs were
being used as sort of fronts to promote the acquisition
of land by real estate firm in Chicago.

Q    Are you saying that Indians of doubtful moral character
were defrauding their own people?

A    I would say Indians who probably did not realize the
consequences.

Q    All right.

A    Didn't appreciate the overall results.

Q    You have a quotation here from G. W. Lee in 1878 where he
says:  "I find myself in one of the most mixed nests of
political vipers our State affords."  To who was Mr. Lee
referring?

A    I'm not sure.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

271.

Q    Why is it in the report, then?

A    Because it indicates that there are present political

vipers, and at some point or another, maybe I'll bring

out Andrew Jackson's list of 40 cases, famous 40 cases

of Indian people who have been defrauded of their lands

by tactics adopted at that time.

Q    All right.  Now, at the bottom of page 27 and going over

to the top of page 28, you say:  "In the following

summer, Lee was at Mackinac trying to untangle the

complaints of the Indians about land frauds.  He had no

plats nor field notes about the reserved lands.  He did

comment that although lands belonging to a reservation

in the region were sterile, they were 'on the lake where

there were good fisheries from which they drew their

chief support.'"

             Where you use the word "reserved land" or

"reservation", are you using those in some technical

sense; are you referring, for example, to the reservations

in the Treaty of 1836?

A    Maybe I should get out the whole, the whole letter.  I

quoted this to indicate the great, you know, obscurity

about what was going on up there.  It's as though

everybody had forgotten, had forgotten about the area

completely.  There had been an agent at Sault Ste. Marie,

I believe -- There wasn't an agent at Sault Ste. Marie

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

272.

after 1853, and in the notes I've gone through, you could go through many pages of -- or many years and never have any mention of the Upper Peninsula Indians at all.

Q  All right, but my question related to whether you were using the term "reserve" or "reserved lands" or "reservation" in the technical sense.  Were you referring to the reservations of the Treaty of 1836, or were you referring to the allotments spelled out in the Treaty of 1855, or to some other method of reservation?

A.  I think that that is virtually paralleling his own language, and I should probably, I think his term "reserved lands" was his terminology at the time, and I don't, I honestly don't know how much he knew about either of those Treaties.

Q  Isn't it fairly clear that if this does parallel his language, that he must have been referring to lands that were withheld from sale by the United States for the benefit of Indians under the allotment provisions of the Treaty of 1855?

A.  I'm not sure.  The 1855 allotments were -- It's hard to find where -- to what extent they were carried out, and it was a new subject to him.

Q  All right, that's all I have for now, and I wish to apologize for the length of time taken, Doctor.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
823 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

273.

A.    The imperfections --

Q    You want to tell us what the imperfection is now, or do you want to wait until after lunch?

A.    I think I alluded to what the subject is, but let me look it up; let me look it up.

                    (Whereupon, at 12:45 P.M., the lunch break
                    was taken.)


                    MR. GREENE:  Dr. Tanner, before lunch Mr. Steketee asked you a question that pertained to page 25 of your supplemental report, and he asked you the meaning of the last sentence of the middle paragraph, which reads:  "This is evidence of an imperfection in the Treaty, probably on account of the limited information of those who formulated the terms."

                    Is that sentence in the proper place in that paragraph?

                    THE WITNESS:  No, it's not.

                    MR. GREENE:  Could you show us where it belongs?

                    THE WITNESS:  This sentence properly belongs in the following paragraph as the second sentence in that paragraph.

                    MR. GREENE:  So that if we were to circle that sentence and show an arrow down after the word

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

274.

"known" in the paragraph below it, it would then be in the proper order, is that correct?

THE WITNESS:  Yes.

MR. GREENE:  So that -- Could you explain, then, once the sentence is put in its proper order, the first sentence of that paragraph which begins:  "The provision for a reservation on the north shore", what do you mean there?

THE WITNESS:  Yes, the sentence, the first sentence of the bottom paragraph on page 25 notes the fact that the Treaty described a reservation on the <u>north</u>, north underlined, north shore of Grand Traverse Bay. Traverse Bay actually has no north shore; on the other hand, the inaccurate maps that were prevalent in 1836 generally drew Grand Traverse Bay as projecting eastward into the Lower Peninsula of Michigan rather than southward. Schoolcraft's own manuscript map indicating where the bands in the 1836 Treaty intended to have their reserves has this characteristic inaccuracy of the drawing of Grand Traverse Bay, and I included this in the report because I've been asked a number of times to try to explain the fact that there is a reserve specified on the north shore of Traverse Bay and Traverse Bay does not appear to have a north shore; and I'm sorry that in my cut and paste type of composition, that this was

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

275.

transcribed in the wrong place.  Thank you for calling it

to our attention.

        MR. STEKETEE:  Thank you.

        MR. GREENE:  I have no further questions

on that particular subject.  I hope it helped to clear it

up.

        THE WITNESS:  I'd also like to comment,

I was talking about Rix Robinson, and I think it's his

son who is the mixed blood, not Rix Robinson himself.

There are these generation gaps that -- my statement that

Rix Robinson was a mixed blood, I have not checked on that

factor yet.

Q  (MR. STEKETEE)  All right, but we're using Rix Robinson,

assuming he was a half blood, you know, your answers would

still be accurate if we assumed that for purposes of those

questions, that he was, I think.  The reason I say that

is at one point we were using him as an example of a mixed

blood.

A  Yes.

Q  Because you had said that you thought he was.

A  That's his son, it's his son, Alexander.

Q  All right.

EXAMINATION

BY GREGORY T. TAYLOR, Esq.:

Q  Dr. Tanner, I'd like to ask you a few questions about

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

276.

your original report dated April 9, 1974.  Maybe you can
summarize for me what was the intended scope of this
report; what the purpose of the report is?

A  The purpose of the report was to bring together information
about the background of the treaties of -- the background
of the treaties and the history of the Sault Ste. Marie
Indians living in Sault Ste. Marie.

Q  In looking into the historical background of the Treaties,
was it your intent to determine how these negotiations
were seen both from the perspective of the white
negotiators and from the perspective of the Indian
involved?

A  I don't think I had in mind dual perspectives at the time.

Q  Did you have in mind a perspective from one of these
particular groups, and were you more concerned with the
perspective of the Indian from, say, from the perspective
of the white negotiators?

A  No, I don't think so.  I was explaining what was going
on at the time.  If I think that something is obscure,
as a habit over a long period of years, I try to make
clear Indian attitudes, because this is sometimes not
known to people who are not aware of Indian culture.

Q  Maybe I didn't make my question clear, I'm not saying
that you did or didn't, I'm just trying to find out, in
developing the background of the Treaty, you were concerned

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

277.

exclusively or primarily with that Treaty as seen by the

Indians, or were you concerned with that background as

seen by the white negotiators and the Indians both?

A.  I don't think I thought about either of those two things

particularly.

Q.  You had no intent, then, to have -- the scope of this is

not intended to be the background of the negotiations to

the treaties as seen exclusively by the Indians that were

present at the negotiations?

A.  I was not intending to write an attitude report; I was

intending to write a historical report.

Q.  Well, that historical report does include, does it not,

the intent of the parties as it's revealed by various

historical records and documents?

A.  It reveals what was said *about* by the Treaty before and

afterwards.

Q.  You draw no conclusions from what was said before and

afterwards what the parties intended at the time they

negotiated?

A.  Well, their objectives, we've already been into that.  I

thought that the objectives that different groups of

people wanted to achieve in the 1836 Treaty, I thought

that I -- I tried to cover that in my report.

Q.  I'm not saying you didn't, I'm just trying to find out

whether you were concerned with the objectives, then, of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

278.

all the parties to the Treaty?

A  Yes.

Q  Not just one particular group.

A  No, no, no.

Q  You indicate in your introduction that you have relied upon materials at the University of Michigan Historical Collection, the Clarke Historical Library at Central Michigan University in Mt. Pleasant, and the use of microfilm of the official U.S. Indian Office records in the National Archives, is that correct?

A  Yes.

Q  What other sources or institutions, collections have you used in preparation of this document?

A  They're all listed.

Q  Where?  I mean are they listed in the introduction?

A  You just quoted them.

Q  Did you go to any other institutions or sources?

A  Not especially for this research.

Q  Well, would there be other sources that you've seen in your other research that you would draw upon in the writing of this document that would be helpful to us?

A  I think I've listed everything that's helpful to you, and I tried to provide all the documents that would be helpful to you.

Q  Okay.  You have cited a number of cites from Schoolcraft.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

279.

Did you use the Schoolcraft papers at the Library of
Congress in preparation for this document?

A.   I didn't go to the Library of Congress, no.

Q.   Do you know who John Johnston is?

A.   There are two people named John Johnston.  John Johnston
was Schoolcraft's father-in-law; there was a John Johnston
who was his brother-in-law.

Q.   All right, are you familiar with the John Johnston papers
in the Library of Congress?

A.   No, I have not read papers in the Library of Congress.
I know there are papers there about Schoolcraft.

Q.   Do you know which John Johnston this collection refers to
in the Library of Congress?

A.   No, I don't.

Q.   Now, you used the microfilm, the official U.S. records in
the National Archives.  Did you actually use the original
records at the National Archives, in Washington, or did
you use the copies in Chicago?

A.   I used the microfilm, because the original records are
now available on microfilm, and I used the microfilm of
the records.

Q.   In Chicago?

A.   Actually, I used them in Ann Arbor, they were brought --
there is a Federal Records depository in Chicago, and
these were secured by inter-library loan.  If you're

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

280.

interested in the technicalities, you can buy them for six or seven dollars a reel if you want to have your own copy.

Q    So these would be the films in Chicago that were sent to you in Ann Arbor for your use, is that correct?

A    Yes, there's a depository, a records depository in Chicago.

Q    Are you familiar with the records of the American Board of Commissioners for Foreign Missions at the Houston Library at Harvard University?

A    I know those exist.

Q    Did you consult those in preparation for this case?

A    Mr. Taylor, I listed where I went, and that's where I got my information.

Q    You did go to Clarke Library, Central Michigan --

A    Yes, that's right.

Q    What collections of papers did you consult?

A    I looked at some American Fur Company and Gabriel Franchere; I looked through them rather briefly.

Q    You indicated that you used the American Fur Company records and the Gabriel Franchere records, is that correct?

A    Gabriel Franchere papers, yes.  I think I have footnoted the documents that I used from those sources.

Q    What's the extent of your use of the American Fur Company

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

281.

records?

A.   Very limited.

Q.   By which, you mean --

A.   I looked over them, and I did not make a great selection;

I found in my report Grace Lee Nute's article which I

made reference to, thought it was an excellent summary

of that body of information.

Q.   What about the Franchere papers, did you make extensive

use or limited use?

A.   I didn't make extensive, I didn't find a great deal of

information that I thought was pertinent to this paper

unless I wanted to make it much more lengthy than it was.

Q.   Did you use the Abel Bingham papers at the Clarke

Collection?

A.   No.

Q.   Do you know who Abel Bingham is?

A.   Yes, he was a missionary at the Soo.

Q.   Now, you've cited John Pitezel, is that correct?

A.   Yes.

Q.   And you've cited his work in your report, <u>Lights and

Shades of Missionary Life</u>.  Did you examine the Pitezel

papers of the Clarke Collection?

A.   No.

Q.   Does Pitezel have original documents that are at the

Clarke Collection?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

282.

A.  I think he may.  I was talking to the people there about Pitezel.  You must be aware that any research topic can be pursued ad nauseam from the point of view of volume and from the point of view of time.  There are records that -- There are lots of other records that could probably be gone into if you're writing a complete history of Michigan Indians.

Q.  Certainly.  Are you familiar with Reverend Isaac McCoy, have you ever heard of him?

A.  Oh, yes, oh, yes.

Q.  Who is he?

A.  He was a Baptist Missionary who first had a school in Fort Wayne, Indiana, and was associated with Carey's Mission in southwestern Michigan, but he was not active in the area that we -- in the geographical area that we have had for a focus in this legal case.

Q.  He was not -- I'm sorry, I didn't get that last --

A.  He was in St. Joseph, Michigan, adjacent to the Potawatomis Indians, and that area was ceded in the 1821 Treaty.

Q.  Which as far as you know, he doesn't have any papers or documents that would be relative, then, to this case?

A.  He might very well, because he was in Michigan in the 1820's, but I've read his books; I haven't read his papers.  He moved out to Kansas, and he knows a good deal

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

283.

about Kansas, too.

Q   Do you know if there are any of his papers in the Clarke Library of Central Michigan University?

A   No, I don't, I think there is a Directory of Manuscript Collections of the Clarke Library if anyone wants to run through what their holdings are.

Q   You did use the Graduate Library at the University of Michigan and Michigan Historical Collections in Ann Arbor, is that correct?

A   Yes.

Q   Did you use the Abel Bingham papers there?

A   No, there is a lot of interesting papers there; no, I didn't.

Q   Did you use the Bela Hubbard papers that are located there?

A   No.

Q   Did you use the Peter Dougherty papers which are located there?

A   No.

Q   Did you use the Governor -- Let me spell this first name, A-l-p-h-e-u-s Felch?

A   No.

Q   You didn't use any -- You already answered what you've used.

A   Yes, I looked through those things, and I did use the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

284.

materials that were there, being microfilmed on loan from

the Clarke Library, but I didn't incorporate everything

that I looked into into the report.

Q    Well, now, I understand that; I didn't want to imply by

my questions that the fact --

A    Whatever I used in the report, I specified the repository.

Q    You see, really what I was concerned about, whether you

eventually used some of these papers in your report.

When I asked you, for example, if you used the Abel

Bingham papers, I'm asking you whether or not you looked

at those and studied those papers in connection with

this report, whether or not you used them or not?

A    No.

Q    So that it's clear, then, that the answers that you've

given were directed to that type of inquiry?

A    That's right.

Q    Would you look at page 3 of your report, please, in the

middle -- not the map, if we look at line 4, the sentence

beginning there that says, "Tribal tradition tells the

story of a slow migration," and you go on and discuss

this migration.  What is your source of this tribal

tradition; where did you come upon this tribal tradition?

A    Well, William Warren is one of the principal sources of

tribal tradition; that's the first footnote.

Q    Is it fair to say that the traditions you discussed, then,

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

285.

in that first paragraph, you're relying upon William
Warren for that proposition?

A    Yes, chiefly.

Q    Would you look at page 8, please, in the last paragraph
on page 8.  You say:  "Up to the time of the Cass
expedition in 1820, virtually nothing was known of the
hinterland territory west of Sault Ste. Marie along the
Lake Superior shores . . . ."

   Are you including the area of Sault Ste.
Marie itself in that statement, that "virtually nothing
was known"?

A    Well, obviously French people had been at Sault Ste. Marie.
I should probably have said "virtually nothing had been",
or to make it perfectly clear, I should probably have
said, "virtually nothing had been directly observed by
American people in the area west". I'm talking about --
I'm really introducing the arrival of the Americans in
that area, and I  maybe compressed it a little too
tightly for close scrutiny.

Q    So there were, in fact, a number of French trappers and
missionaries and people of that sort in the area?

A    Yes, there is a very excellent Jesuit map of the area
that's dated 1671.

Q    How would you characterize Sault Ste. Marie in the year
1820, describe it, if you could, as far as number of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

286.

people, what was going on there, who was there?

A.   I think that the only accurate way, that the best report
is probably the report of Cass and Schoolcraft
expedition itself; that I don't know how much of that
appears in evidence, but they reported there were Indian
people living there, and fishing was important, and they
were still very staunchly British, and it was an important
summer gathering place.  There is a good deal of
description in Henry Schoolcraft's travels about the
situation that he observed.

Q.   Was this primarily populated by Indians?

A.   Exclusively populated by Indians, except in 1820,
including the traders who were, I think Indian people
regarded them as part of their service personnel.

Q.   Were these traders French?

A.   John Johnston wasn't French.

Q.   Who were the traders, then, ethnically?

A.   Ethnically, ethnically they're usually Scots or Irish.

Q.   Any American citizens?

A.   Oh, no, no, no, no, no, no, they're still flying the
British flag.

Q.   Okay.  Would you look at page 10, please.  Now, you talk
about the fact, in the first full paragraph there, that
Schoolcraft married Jane Johnston in 1823, and that she
had been educated in Ireland, is that correct?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

287.

A    Yes, that's a statement that has been made.  Somewhere

     I've run across some comments questioning the extent of

     her education in Ireland.  I don't know how long she

     spent there.

Q    That was going to be my next question.

A    I don't know.  I've seen an article on that subject, and

     I don't recall.

Q    How does Jane Johnston fit into, I guess what we've been

     talking about as far as half bloods?

A    She is a half blood.

Q    Whether she identified with the Indians or with the

     whites, or just how would you categorize Jane Johnston?

A    Jane Johnston was a half blood who was married to Henry

     Schoolcraft.

Q    Right, that's all you can say about her?  That's not

     really what I'm asking, that was in your report.  What

     I'm wondering about, for example, was she trusted by the

     Indians, would you say?

A    I have no evidence that she wasn't mistrusted, that she

     wasn't mistrusted by the Indians.  Her mother was a very

     -- Her mother and all of her family were there, were

     there around her.

               MR. STEKETEE:  Excuse me, did you say

     trusted or mistrusted?

               MR. DILLON:  Wasn't mistrusted, I think.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

288.

THE WITNESS:  No, she was part of the local community.  I think, in point of fact, at that time, there is a community -- and people don't talk about "Are you full blood or are you half blood", and there are virtually no references to what a person's heritage is. This is something that we're conscious of now, and we go back and look into, but at that time she was Jane Johnston, part of the Sault Ste. Marie community.

Q  (MR. TAYLOR)  Is this prior to her marriage to Schoolcraft; did her marriage to Schoolcraft change this at all?

A  I don't think so, I don't think so.

Q  Okay.  Would you say that she herself empathized with the Indians?

A  It would be impossible for me to describe Jane Johnston's empathizing.  There wouldn't -- There is a single community, I think as I say, it's very difficult now -- this is a single community, and I do not -- and I believe that the unity of the community is the thing that is important to bear in mind; it's a single community.

Q  Was Jane Johnston part of that single community?

A  Yes, I think she was part of that community.

Q  You indicate in that same paragraph that the entire John Johnston family was helpful in negotiating the 1820 Treaty?

A  Yes.

Q  Is that your understanding of it?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

289.

A.   That's my understanding.  I think, based on Schoolcraft's

     description, that they helped prevent any untoward

     incident taking place at the time.

Q.   Wasn't it Schoolcraft's description that it was his wife

     that helped, but that there was no reference -- Is there

     reference to the entire family in Schoolcraft's

     description?

A.   I don't know whether there is part of that impression may

     have come from some of the correspondence from George

     Johnston on that subject.

Q.   Okay, we've got these John Johnstons, who is George?

A.   That's Jane's brother.

Q.   That's Jane's brother, and what relationship is he to

     John Johnston?

A.   He's a son of the elder John Johnston; brother of the

     younger John Johnston.  Should I draw a diagram?  Maybe

     it would help.

           MR. STEKETEE:  Let's draw it on a piece

     of paper.

           THE WITNESS:  A geneaology?

           MR. STEKETEE:  On a piece of paper, and

     then we can introduce it as an Exhibit for your

     Deposition.

           (Whereupon, off-the-record discussion.)

           THE WITNESS:  (Drawing at blackboard.)

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

290.

The vital data is all on page 10, but — the vital data is there.  I do not recall the Indian spelling of John Johnston's wife, but it appears in the Indian Treaty literature.  Jane is married to Henry Schoolcraft; Jane has three brothers named George, John and William.

DR. MASON:  There are actually eight children, four brothers, four sisters.  I didn't mean to interrupt, but there were eight children, four girls and four boys.  Henry James married Eliza Johnston, Jane's sister; John Hobick married another girl.

THE WITNESS:  I remarked yesterday that we can probably provide more geneaological information than can readily be processed.  I was going to limit this to the people who are principal figures in the discussion that we have.  I believe that one of the daughters married the Reverend -- that one of Jane's sisters also married the Reverend Gilbert McMurray on the English side, but since the Reverend Gilbert McMurray is not a primary figure in this operation, I have tried to suppress extraneous relatives, since there are so many.

Q    (MR. TAYLOR)  That's probably a good idea, it's beginning to sound a little like a soap opera!

A    But we do have the principals up there.

MR. STEKETEE:  Continue, but don't suppress anything.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

291.

Q    (MR. TAYLOR)  And when we look at what you have on the board and we talk about the negotiations of the 1822 Treaty, who are you talking about of the people listed on the board?

A    Well, I'm probably thinking primarily of George and Jane and their father and their mother.

Q    The father being John, and the mother being --

A    Woman of the Green Prairie.

Q    Okay, thank you.  Dr. Tanner, your Counsel prepared a copy of what you've put on the board; and I'd like you to examine it, and if it accurately represents what's on the board, we'll introduce it in evidence.

A    I'm changing only the name Johnston.  We'll give it a Roman Numeral and add a footnote, these are not all the relatives, but only the relatives --

Q    That will be clear from the record.  Why don't we introduce it as Deposition Exhibit No. 1, we haven't had any Deposition Exhibit No. 1.

     Would you turn to page 17, Dr. Tanner? Right at the top of the page, the first beginning sentence you say, "But in 1853, the canal project was sanctioned by Act of Congress."

     What canal project are we talking about?

A    The Sault Ste. Marie canal project.

Q    Did the Government sanction, is it implicit in that

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

292.

statement that the Government sanctioned the destruction of Indian reservations and fisheries at the rapids of the Soo, in your opinion?

A    No, it's not.

Q    Did the Government, in fact, sanction the destruction of the fishery there, in your opinion based upon your research?

A    Well, the situation is different in 1853 than it was in 1837. In 1837, United States troops prevented any canal digging. I think I made this statement, though I'm now wondering whether sanction has a legal meaning. In 1853, the military authorities at Sault Ste. Marie did not stop the canal digging, because the one project was a state project, and the second project was a Federal project. I haven't investigated whether or not Congress had approved the legislation for the canal, knew exactly where the 400 men were going to dig.

Q    I think you've answered that. You're not trying to imply that Congress, by an Act of Congress, sanctioned the destruction of the fishery, are you?

A    No, I just meant that -- I was just trying to indicate why the troops weren't out again.

Q    Okay. Turn to page 18. In the second paragraph, you say, "The principal objective of the 1855 Treaty, aside from settling financial accounts from previous treaties, was

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

293.

to establish permanent homes in the State of Michigan

for the Ottawa and Chippewa Bands living in northwestern

Michigan and the eastern Upper Peninsula."

Now, first of all, what is your source

for that position that that was the principal objective?

A. Well, I'm the source. From reading the literature, from

reading the correspondence leading up to that Treaty,

this is the way I summarized the correspondence.

Q. And what is the principal correspondence, if you could

just indicate what correspondence you're referring to?

A. This is the correspondence between the Indian agents, the

Mackinac Indian agent and the Commissioner of Indian

Affairs in Washington, explaining the objections that the

Indian people are raising, the objections that Indian

people are raising and the need for a treaty. Now, I

should probably have said not only correspondence, but

efforts of Indian people to personally bring their

grievances to the attention of officials in Washington.

Q. Would you see this also as the principal objective of

the United States in the Treaty? You seem to be talking

about the objectives of the Indians. Does the United

States --

A. All the way around, no, and I believe I quoted the

documents, the Indian agent -- the Indian agent himself

felt it was very important to get these questions settled

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
823 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

294.

and called attention to the fact that people were being -- were beginning to move into the northern part of Michigan, and that the question of the land for Indians should be settled before the population expanded any further. So at the impetus of the Indian agent himself, Henry Gilbert, it's a good deal of his correspondence.

Q    Do you think the objective of both of the parties were pretty much the same, then? You're talking about the principal objective of the 1855 Treaty, and I'm not trying to trick you at all; I'm just trying to find out if both parties are looking at this?

A    They want things settled, things have been hanging, the treaty provisions of previous treaties have not been carried out; and there's an interest in having this -- a mutual concern in having this, these problems settled on the part of both Indian people and on the part of the Federal Government. They wanted to quiet the clamor.

Q    And they want to establish permanent homes in the State of Michigan for the Ottawa and Chippewa bands?

A    Yes, indeed.

Q    Now, was the desire to settle permanent homes, establish permanent homes for the bands or for the individual Indians, in your view?

A    For the bands.

Q    Okay, let's skip over a number of pages and go to page 43.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

295.

Do you have something --

A.  Well, I realize this is one of the first treaties where there's an experiment with individual allotments, and in view of the fact that there was a good deal of uncertainty about the reserves under the 1836 Treaty, missionaries were impressing upon Indian people the fact that under the American system, it's important to get a title in fee simple.  So some Indians were being introduced to property law, and some of them realized that under the American system, it was important to try to get land in fee simple, and some Indians, I believe, had purchased land with annuity money.  So I say on the part of the bands, the interest is on the part to get the bands settled.  There's some interest, too, that was carried out in the 1855 Treaty, in having land individually allotted.  I don't know whether that's a helpful added remark or not.

Q.  It kind of confuses me actually.  Your first response was that the purpose was to establish the permanent homes for the bands?

A.  Yes, and although eventually certificates were issued for individual allotments, they were always issued by bands; so that the allotments -- or the certificates for all one band were within a specific area.  In other words, the arrangements are by bands, but some people are very much

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

296.

interested in this business of a title in fee simple.

Q   Okay.  Let's take a look at page 43, please.  Okay, on page 43 in the third paragraph there, you discuss Gabriel Franchere -- Did I pronounce that correctly?

A   Yes.

Q   We discussed him a few minutes ago, and you say that he was in charge of the American Fur Company operations at Sault Ste. Marie, made agreements with 12 men to handle the fishing at Whitefish Point in the spring of 1835, some on wages, and the rest were paid $4 for every hundred fish delivered.  Who were these 12 men, do you know?

A   No, I don't.  I may have quoted a -- I don't know whether I quoted a single agreement from one of these individuals. I do not know the identity of the personnel that he had there.

Q   You're not intending, then, to imply that these 12 men are necessarily Indians?

A   They are not necessarily Indians; they're probably Indians of mixed blood, because those were the people who carried on these activities.  I found one agreement that was signed with -- I found one individual agreement that was signed with an Indian name; I don't know whether I used that as a footnote reference or not, I should look through it.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

297.

Q    Well, are you saying that these people, these 12 men
     probably were Indians?

A    They are probably Indians or mixed bloods, because that
     was the group -- Indians or mixed bloods associated with
     the Indian community, because those were the people who
     were the fishing class.

Q    What's your evidence for that, that these would be
     Indians rather than somebody else?

A    Because they are predominantly Indians and French Canadians
     predominantly, and Indians with some French mixture,
     usually called Canadians who were the population at the
     time.  And from literature that I have read, that the
     fishing knowledge and fishing technology was an Indian
     skill.  People commented that it was an Indian skill.

Q    What literature is that, that says that it's an Indian
     skill?

A    Oh, comments of travelers.

Q    Could you be more specific?

A    Observers -- right now, right now I can't.  I'd regard
     that as a matter of common knowledge at the time.

Q    It's your testimony, then, that these 12 men are probably
     Indians because of common knowledge that this was an
     Indian skill and the fact that the population there was --

A    That was the population, this is an Indian --

Q    Sault Ste. Marie in 1835, what was the composition of the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

298.

population?

A.   I think it was predominantly Indian.  I don't know how many fur traders or missionaries or military personnel there were there, but it was primarily an Indian community.

Q.   Were there French Canadians there?

A.   Yes, probably, they are people with French names.

Q.   Were some of these also Indians, these people with French names?

A.   People with French names are often -- People with British names, like -- I'm thinking now, I guess, of the women, but I know that, you know, Jean Johnston, Hester Crooks -- I can't think of any others right now, but everybody, insofar as I can determine, is of Indian heritage except for a very few administrative and governmental personnel or missionaries.

Q.   You think it's fair to say we really don't know whether these 12 men are or are not Indians?

A.   No, we don't know, but on the basis of the people who were there, the probability is strong in the direction in which I've indicated.

Q.   Was it your intent, then, to imply that these 12 men were Indians in this?

A.   Of Indian heritage.  The time when -- well, I know you've gone over this with Dr. Cleland.  The advent of European

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

299.

immigration is not of, you know, Swedes, Finns or even Irish is not until the late nineteenth century.

Q   Has your research indicated to you whether or not the names of the men that were hired by the American Fur Company are in the American Fur Company's records?

A   I don't know, I don't know who they were, and I don't think --

Q   I'm not asking you who they were, I'm asking you if your research has shown you whether or not the people who were hired by the American Fur Company, whether or not their names are contained within the records of the American Fur Company?

A   I found one agreement that had an Indian name cited as being hired on some basis.  I was going to try to find out who his relatives were.  I don't know how extensive these literature -- I don't know how extensive these records are.

Q   Okay.  Now, the last paragraph on page 43 says:  "The importance of commercial fishing can be seen by the inclusion in the 1836 Treaty of a clause providing an annual supply of 100 barrels of salt and 500 fish barrels for the Ottawa and Chippewa."  Why does that, to you, indicate the importance of commercial fishing, rather than, for example, the importance of preserving fish for sustenance?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

300.

A.  I believe that barreled fish was the form in which it
    was marketed commercially.

Q.  Is your testimony that the Indians did not use barrels
    to preserve fish for their own use?

A.  Frankly that never had occurred to me, because I've read
    so many, I've read these accounts of the -- I believe I
    quoted one -- of an agent telling how many barrels or
    half barrels of fish that the Indians sold in a specific
    year.  I've never read an account of an Indian home with
    a barrel of salted fish sitting around, barrels of
    salted fish.  I'd assume this is a commercial packaging
    form at that time.

Q.  The Indians did preserve fish, did they not?

A.  Yes, they did.

Q.  For their own use?

A.  I believe that they smoked -- It's my impression that
    they smoked and dried it for their own use, and that
    salting fish was a new form of technology.  I don't know
    at exactly what time that was introduced, but . . .

Q.  Well, do you have any evidence that would lead you to
    believe that the inclusion of this clause regarding the
    barrels supports the idea that commercial fishing is
    important any more than it supports the idea that they
    needed the barrels to preserve fish for their own use?

A.  I thought I'd answered that?  To me, barreled fish is

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

301.

commercially packaged fish, because the Indian agents reported how many barrels and half barrels of fish the Indians produced for sale.

Q    So it's your testimony, then, that the Indians did not use the barrels to preserve fish for their own use?

A    It's my testimony that I have not run across records of Indians barreling fish for their own use.

Q    How did they preserve their fish?

        MR. DILLON:  Asked and answered, smoked and dried.

        MR. TAYLOR:  Are you going to start testifying now, or are you going to let the witness?

        MR. DILLON:  I objected.

        THE WITNESS:  I did say that, smoked and dried.

Q    (MR. TAYLOR)  Is that the only way?

A    They froze it, that's from the literature I've read, that's my impression.

Q    Never used salt in barrels for their own use?

A    There isn't --

        MR. DILLON:  Asked and answered.

        MR. TAYLOR:  This isn't before a Court and jury --

        MR. DILLON:  I don't want to be here until six.  The question was asked and answered.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

302.

MR. FREEMAN:  If I could just jump in between the witness and a counsellor, one would assume one never uses salt in preserving anything?

THE WITNESS:  I'm not saying anything, I just -- Do you want me to answer whether they used salt for preserving fish, I don't know.

Q    (MR. TAYLOR)  Did they use barrels in storing salted fish?

A    I don't know.

Q    How big were these barrels that were provided for in the 1836 Treaty?

A    I don't know, I don't remember their size being specified. I think I was asked that earlier.

Q    You weren't asked this, wouldn't the size of the barrels have some influence about your conclusion that this clause is evidence of an importance of commercial fishing?

A    No.

Q    It wouldn't make any difference to you whether these barrels contained 10 pounds or 10,000 pounds?

A    A 10,000 pound barrel?  I don't think that's reasonable.

Q    Well, what is reasonable?

A    I don't know, I thought -- I've seen rain barrels; I thought all barrels were the size of rain barrels, and that -- maybe I've made some inaccurate assumptions.

MR. STEKETEE:  Could you slide down your rain barrel?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

303.

THE WITNESS:  It's your basement door you slide down!

MS. TIERNEY:  Maybe my age is showing, I don't understand the reference.

THE WITNESS:  There's a song.  I'm sorry?

MR. GREENE:  There's no impending question, Dr. Tanner.

Q  (MR. TAYLOR)  What dates were you referring to, Dr. Tanner, when you said you read accounts or you saw accounts that the Indians sold fish in barrels commercially?

A  I'm certain that I ran across the statistic from one of the Indian agent's reports, and at this point, I don't see it in my report.

Q  Let's go on to something else, then.  Would you look at page 44, please?

A  Yes.

Q  In the first full paragraph there, it says:  "The American Fur Company's fishing industry ended in 1842, when the firm failed as a result of business depression, but commercial fishing at the Sault continued under the direction of other firms."

What other firms?  What were those other firms?

A  I don't know the names of, the names of other firms, but

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

304.

I've read accounts of barrels being provided for Indians by people who, I judge, being expected to market them. Maybe I should have said just "other people".

Q    What were those sources, what other accounts are you referring to here?

A    Just something -- somewhat of the many things that I've read.

Q    Could you be specific?

A    I can't, I can't cite you a document right now.  Anything you want me to look up, I'd be glad to.

Q    Well, really what I'd like to find out is either what are these other firms, or what is it that led you to believe that there were other firms that took over when the American Fur Company failed in 1842?

A    That other . . . well, commercial fishing, commercial fishing continued and actually, I cannot cite you a document.  I believe that the history of the fishing industry was going to be handled in great detail by Dr. Cleland, and I know I've read about people supplying Indians with fish barrels, and I cannot recall the specific document that created this impression, at the present time.

Q    By the way, what was the population of the Soo in 1842, if you know?

A    I don't know.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

305.

Q    Could you look at page 47, please, Doctor?  On 47 you

talk about, you're citing a guide, and you're talking

about "The same guide also noted that in 1871, a total

of 36,199 barrels of salt passed through the Canal into

Lake Superior; and exports included 59,325 half-barrels

of fish."

First of all, do you know how large a

half-barrel is?

A    (Shook head negatively.)

Q    Okay.  Do you have any idea who caught those fish that

made up that 59,325 barrels?

A    No, I don't have any information at all.

Q    You're not trying to imply that these are all caught by

Indians, are you?

A    In 1871?

Q    Yes.

A    I'm not implying who caught -- no, I'm not implying they

were all caught by Indians.

Q    Okay.

A    But I still believe that the knowledge of the fisheries

was Indian, primarily, an Indian knowledge, and other

people gradually may have found out something about it;

but I have great respect for the Indian adaptation to that

environment and their skill in fishing, and I don't know

at what point other people began to acquire some of their

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

306.

information.

Q    You don't really know if any of these 59,000-plus pounds were caught by Indians, do you?

A    I do not; there is no statement of who caught those fish.

Q    What was the answer to my question?

A    I don't know who caught those fish.

Q    Okay.  On page 27, also another reference to the famous dried and smoked fish as an item of exchange in the Indian trade before Europeans came to the Upper Peninsula. That's on the last sentence there in the paragraph that begins "In summary".

A    Yes.

Q    You've offered testimony on that a great deal about the smoked and dried fish and the fact they were used as a medium of exchange, both between the Indians and with the Europeans later.  Can you refer me to any source or document for that proposition that dried and smoked fish were an item of exchange for the Indian prior to the Europeans coming?

A    That would come at the beginning of the chapter.  The summaries are not documented -- The documented part of the report is in advance of the summary, the documented part to which the summary refers.

Q    Yes, I'm aware of that.  I just -- When I was looking at the earlier part, I don't remember seeing any sources for

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

307.

that proposition.

A.  Well, the very first footnote, Footnote 85, is one of the -- is a French account, one of the very first French accounts of that area that describes traditional --

Q.  Is there anything in there about smoked and dried fish?

A.  Yes, "The savages --" On page 35, I'm talking about fish: "The savages dried it over a fire, on wooden frames placed high above, and keep it for winter.  They carry on an extensive traffic in this fish at Michilimackinac, where both the savages and the French buy it at a high price."

Q.  Okay.  You say it really doesn't talk about the European trade prior to the Europeans coming to the UP, does it?

A.  This describes traditional traffic that was in existence. It just didn't spring into being because a Frenchman came to report it; these traditional trade lines, lines of trade are also described by George Hunt in his book, The Wars of the Iroquis, which I cited previously.

Q.  Okay.  The next paragraph on that same page, Doctor, it says:  "Fish from Lake Superior and the St. Mary's River were salted and packed in barrels in the nineteenth century, when steamship navigation made it possible to ship products to the lower Lake ports of Detroit and Cleveland."

Now, are we talking about the Indian

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

308.

fishery here or the white fishery or a combination of the two?

A.    I'm referring to the marketing arrangements for the fish, and I don't recall any contemporary documents that talk about Indian fisheries or white fisheries; they just talk about the fisheries, although near an island, a particular geographical location might be identified as an Indian fishery, as I pointed out this morning.

Q.    Okay.

                    MR. GREEN:  Off the record.

                    (Whereupon, off-the-record discussion.)

                    (Whereupon, a short recess was taken.)

Q.    (MR. TAYLOR:  I'm going to move on now to the area of your report dealing with the Treaties of 1820, 1836 and 1855, which have some importance in this case. Beginning right at the bottom of page 51, you're reciting the instructions given Schoolcraft by Lewis Cass:

". . . if it should be found necessary to allow particular bands to remain upon reservations, those reservations must be held upon the same tenure as the Indians now hold their country, that is, to allow them to retain possession of it 'till it shall be ceded to the United States."

                    Now, that's the instructions to the 1836 Treaty, correct?

A.    (Nodded head affirmatively.)

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

309.

Q    Have you formed an opinion or done any research on the last phrase there "'till it shall be ceded to the United States"?  What, in your opinion, or what has your research indicated to you was intended to convey to -- Cass intended to convey to Schoolcraft in that instruction?

A    I find the language quite clear; I don't know any other phraseology that would be any more clear than Cass stated in that quotation.

Q    Does that quotation indicate to you that at least Cass was of the opinion that this land indeed would be ceded to the United States?

A    I don't know.

Q    Pardon me?

A    I hadn't thought, I hadn't though about that, "'till it shall" . . . There's some suggestion that this phrase implies that it would be ceded, does that --

Q    That's what I'm asking you.

A    I hadn't thought about it.

Q    It could be interpreted that way, could it not?

A    I suppose so.

Q    Well, if you haven't thought about it, I'm not going to press you to make up some thoughts about it at this point, let's move on.

A    That Indians retained possession of it until something else happens in the course of . . .

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

310.

Q    Yes, until it shall be ceded to the United States.

A    Until it shall be ceded to the United States.  I can see the implication is there that at some future time the Indians might engage in another land cession.

Q    You hadn't really looked at it from that point of view, then, is that correct?

A    No, I hadn't.

Q    Okay.  Now, on this same page, you indicate that this Treaty of 1836 was amended without their prior consent, to restrict the time of land use -- Let me find that. Yes, it's on the same page, "Yet they had little security in the possession of these lands because the Treaty was amended without their prior consent to restrict the time of land use to: '. . . the term of five years . . .'" et cetera.

      I can't remember if you testified to this or not, what was your source for the proposition there was no consent to this amendment?

A    I said there "their prior consent".  The Indian people didn't amend it, the Senate amended it down in Washington; and the Indian people didn't find out the Treaty had been amended until after the Senate had taken that action.

Q    But after the Senate had made the recommended changes, didn't that come back to the Indians, and didn't they indeed ratify the amendment, the Indians themselves?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
823 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

311.

A. They ratified it, they ratified -- they signed, they signed the changed form of the Treaty in 1837. They did not -- I think that's clear they didn't consent to the changes before they were made.

Q. But they did after they were made?

A. They did after they were made.

Q. Okay.

A. Under a great deal of pressure, they did.

Q. What was the pressure?

A. Well, I think I've described that, too; they all gathered together, were waiting to get the annuities and were told that the promises made to them at the Treaty of 1836 would not be carried out unless they agreed to changes in the Treaty of 1836.

Q. What was your source on that?

A. Well, that's in the, that's in the documents of -- That's in Henry Schoolcraft's comments and observations at this point. I admit I'm a little bit frazzled, but Henry Schoolcraft made it clear that Indians get nothing as a result of the 1836 Treaty unless they consent to the changes that the Senate had made in the Treaty.

Q. Isn't it also true that if the Indians would consent to this change, which they did, that they would receive additional compensation?

A. Yes.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

312.

Q    How much additional compensation?

A.   We've discussed that yesterday.

Q    Did we?

A.   $200,000, yes.

Q    Okay.  I'd refer you to page 58 of your report.  We're still talking here about the 1836 Treaty.  Towards the latter part of the next to the last paragraph, you say: "Schoolcraft himself left Washington in early November 1835, after sending his brother-in-law, William Johnston, to get approval for the sale of Drummond Island, the most easterly American island in Lake Huron, and other lands of the Sault Bands."

Who was it that first raised the idea of the sale of Drummond Island, was it Schoolcraft or some other American, or was it the Indians themselves?

A.   I believe it was, I believe it was Schoolcraft.  Schoolcraft was interested in securing Drummond Island, because it's the island that's on the borderline with Canada, and we must remember that he has a very personal concern with national defense and preventing British influence among American Indians.  Drummond Island had been a point from which British presents to the Indians were distributed, and when Drummond Island was declared to be in American waters, the British moved their point of giving presents over to St. Joseph Island, very very

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

313.

close by; but he wanted to be certain -- I believe that
he wanted to be certain that he had Drummond Island
secure within the area of American territory; I believe
this was a national defense idea of his.

Q    You would not agree the Indian delegation from Drummond
Island first approached Schoolcraft and offered to sell
the island to the United States Government?

A    I don't think -- I don't recall that, maybe there's
something . . . I remember reading letters about his
sending William Johnston to try to get authorization.

Q    What was your source here for the idea that it was the
United States and Schoolcraft that instituted this idea
of purchasing Drummond Island, rather than the other way
around?

A    It's one of the letters that Schoolcraft wrote, urging --
asking that the consent of the Drummond Island -- that
consent for the sale of Drummond Island be secured.

Q    Is that the footnote, Schoolcraft to Herring, October 30,
1835, is that the document you're referring to?

A    No, no, that's not it.  It's more likely this document,
the footnote 1- -- documents referred to in Footnote 127.

Q    Now, would that document indicate who actually came up
with the idea first of buying or selling this land,
whichever way you want to look at it?

A    I think that it would.  I believe that it would, I'd be

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

314.

glad to look those up.

Q    Okay, we can take a look at it.

A    I've tried to, I guess, for the sake of simplicity, I
tried to use as few documents as possible; and in other
cases, fill in with general impressions from reading a
whole body of documents rather than create an unwieldy
amount of literature for you to read.  That was my original
intention before I realized that an unwieldy amount of
literature was going to be submitted anyhow.

Q    Let's look at page 59.  The first full paragraph there
states:  "Michigan coordinator for sending the Indian
delegation to Washington was Charles C. Trowbridge,
Detroit businessman who became a candidate for Governor
in the 1837 election."  And you talk about some other
people that were concerned, involved in this whole
transaction.  Now, Trowbridge was something in addition
to being a Detroit businessman in this whole thing, wasn't
he; is it not true that Charles C. Trowbridge was a
sub-Indian agent located at Detroit?

A    In 1836?

Q    Yes.

A    Maybe he was.

Q    Do you know if he was or not?

A    I don't recall that, I know that he was in correspondence
with Schoolcraft; I don't recall his official, if he had an

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

315.

official position in the Indian agency at that time, maybe
he did.  He was very knowledgeable about Indian matters.

Q    I don't want to interpret what you've got here, could you
tell me the intent of the paragraph that starts "The
Michigan coordinator" and ends over on page 60; what were
you trying to convey there?

A.   I was trying to convey the impression that the American
Fur Company felt that it probably had the power to make or
break a treaty.

Q    I guess that's the intent that I thought you were trying
to make, and that's why I think it seems important that
you put down that Charles C. Trowbridge is a Detroit
businessman and failed to mention the fact that he was a
sub-Indian agent at Detroit, which would seem that would
be quite proper for him to be engaging in these activities,
wouldn't it, in that position?

A.   Well, it's proper for him anyhow.  I don't believe that
Charles -- I certainly didn't intend to infer that
Charles Trowbridge was part of the American Fur Company.
If he was a sub-Indian agent at that particular time, I
was not aware of that from the correspondence, but maybe
he was.  He was certainly facilitating the transfer of
people going through Detroit to Washington.

Q    Then in that same paragraph but over on page 60, you talk
about our old friend, Rix Robinson.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

316.

A.   Yes.

Q.   And you categorize him as "a relative newcomer in the Michigan Indian trade".  Now, do you know when Robinson first came to this area?

A.   I think it was in 18- -- I think it was in 18- -- I think it was in the 1820's, I don't know, I don't know exactly.

Q.   And you're talking here about something that is taking place in 1835?

A.   Yes.

Q.   Would you consider that to be a relative newcomer?

A.   He wasn't -- The old firms were -- The old traders were the French traders, and I was thinking of the difference in, the difference between Rix Robinson's experience in the Indian trade in that area, and somebody like old Louie Campeau.  The old firms were the Frenchmen, the Campeaus and the Godfreys, and people with French names. I don't know, I think you're getting some instructions there; I don't want to interfere.

Q.   No, I don't take instructions from Mr. Steketee.

          MR. STEKETEE:  Suggestions maybe, but not instructions.

          THE WITNESS:  Excuse me.

Q.   (MR. TAYLOR)  Why don't we go on to something else I want to ask you.

A.   Rix Robinson had recently purchased the fur company post

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

317.

at Ada outside Grand Rapids.  Perhaps I should have introduced that, that Robinson -- the American Fur Company post that was closest to Grand Rapids out at Ada had been operated by Madam LaFramboise, who was an Ottawa woman; and I don't think I included the exact date at which this was -- Rix Robinson became her successor, but anyhow, he did not have as long a period of familiarity as the old French traders, and that's the difference I wanted to show.

Q  Do you think he was a relative newcomer?

A  Yes, in relation to the French traders, he was.

Q  Page 61, when did he arrive; you indicated him as an example of someone who was a relative newcomer.

A  The name Campeau comes back to the -- There's a street name by that in Detroit.  I don't know how long the Campeaus go back.

Q  Who were you referring to when you said, you indicated to me that this Robinson was a newcomer compared to Campeau, for example.

A  Whose family had -- Who comes from a French trading company that had been operating in that area, I believe, since the early part of the eighteenth, -- early part of the eighteenth century.  And I think there's reference to the fact that some of the Grand River Indians wanted to take old Louie Campeau along.  He was a wellknown local figure.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

318.

Q    Do you have any idea when Louie Campeau arrived on the scene?

A    Not precisely, no.

Q    Really what I'm getting at by asking you about Robinson and Trowbridge, and now I'm going to ask you about Schoolcraft, is you have for some reason, you've chosen to categorize these people, Trowbridge as a businessman; Robinson as a relative newcomer; on page 61 you categorize Henry Schoolcraft, Commissioner for the Treaty and mineralogist by profession.  Now, did he ever earn his living as a mineralogist, Schoolcraft?

A    Yes, I think one of his earliest assignments for the Federal Government was in connection with some -- I'm just trying to give some thumbnail identifications without going into a lengthy biographical account of every one of these people.  Maybe I should have included biographical accounts of every one, but Schoolcraft's first assignment for the Federal Government, I believe, was an investigation of something like lead mines in Missouri.

Q    Well, would it be usual for a historian to, in giving a thumbnail sketch of anyone like Henry Schoolcraft, to indicate that he's a mineralogist by profession?  Do you think that's really -- Is that the thumbnail extent of Henry Schoolcraft's profession?

A    Well, I thought it was -- I thought that was interesting

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

319.

to me, and the Federal -- the Government was interested in the mineral resources of the Upper Peninsula. I don't see anything unusual about that.

Q    Okay. Would you look at page 70, please, right in the middle of the page there you have a quote attributed to Lewis Cass: "No one can touch their land without their consent. It can't be taken from them any more than a white man's can."

You didn't indicate where you got that quote from Cass, can you tell me now?

A    I think that's at the Treaty Council; I think the beginning of that, of that paragraph indicates that the focus is on the 1855 Treaty Council, and that quotation is covered by Footnote No. 152.

Q    Would this be the Minutes, then, to the --

A    Yes.

Q    -- the Minutes to the 1855 Treaty Council?

A    Yes.

Q    Okay. Would you turn to page 75, please, Doctor. On page 75 you go into some detail here, and on subsequent pages, on the term "stipulation" and the context of the 1855 Treaty, concluding that the term "stipulation" in the context of the Treaty is an accounting term ~~using~~ used in appropriation bills and budgets submitted by the Indian agents.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

320.

First of all, I'd ask you of this idea
that "stipulation" is an accounting term is something
original with you, or are there other historians that
share that view, that you're aware of?

A    I'm not aware of any other person ever dwelling on this
subject.

Q    It's original with you, then?

A    I believe I am the first person who -- I'm the only person
I know of who went through this body of literature and
read about all these documents that are about ~~filing~~ fulfilling
treaty stipulations.  Other people may very well have
been through the same roll of mircofilm, I shouldn't say
I'm the first person that's been through that roll of
microfilm.

Q    In your theory regarding stipulations, does this theory
refer to just the 1855 Treaty, or is it your theory that
the term "stipulation" in the treaties that you're
familiar with is generally used as an accounting term?

A    No, there are many words that have more -- that have more
than one meaning.  Since the 1855 Treaty is, I call it an
accounting treaty similar to trying to consolidate all of
your debts and all of your payments in one great big
payment; and I found that repeatedly these accounting
sheets that were turned over to the Federal Government in
which the word "stipulation" is used and refinement of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

321.

accounting procedures was one of the chief refinements
and improvements of accounting procedures and fiscal
matters, was one of the chief objectives of the Trade and
Intercourse Act of 1834. So I believe that it was
something that was very important in the Indian Office.
They seemed very budgetarily conscious.

Q    Let me get back to my question, maybe I didn't make it
clear, you're saying that the term as used in the Treaty
of 1855 is an accounting term as you just described it?

A.    Yes.

Q    You've talked about the Trade and Intercourse Act of 1834
as an example. And my question is, is this term
"stipulation" under your theory, is this accounting
concept of the term "stipulation" confined to this 1855
Treaty, or is it present in other treaties that you're
familiar with?

A.    I don't know how . . . I don't know that I've ever studied
the word in a number of treaties. We always know --
We're all familiar, I think, with the verb "to stipulate";
"They stipulate that such and such took place." And I
think that the word, that the word "stipulation" has more
than one definition, but in this case --

Q    How do we know?

A.    In this case, I think you know the meaning because of the
prior, because of the prior correspondence, and all of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

322.

these account records that are submitted to the Bureau of Indian Affairs, I cited an example of the appropriation, this appropriation bill, and in Footnote 165 I cited that appropriation bill as an indication of the accounting use of the term "stipulation". In some cases, it can seem to be a synonym for provision.

Q    In some cases in the 1855 Treaty, or is it always used in the accounting sense in the 1855 Treaty?

A    Well, I don't know how many times -- I don't know how many times it's used. I'm talking about this Article, 3 that is more clear Article 3, that I believe was compressed and abridged to the point that the meaning was obscure; and because I recognize the obscurity in the document itself, I went back to the correspondence, and I think that in the correspondence there is a lengthier description of Article 3, is more clear than Article 3 itself.

Q    You seem to be limiting it further, and I'm just trying to find out what you're saying. Are you trying to convey in this portion of your report, where you say that "stipulation" in the context of the Treaty is an accounting term, are you trying to limit that, then, to the use of the term "stipulation" in Article 3 of the July 31st, 1855 Treaty?

A    Yes.

Q    You're not commenting upon how that term might be used

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

323.

elsewhere in that Treaty or in other treaties?

A.  No, I know that it has -- that "stipulation" can also be a synonym for provision, but I think the accounting meaning is clearly indicated in this particular Article.

Q.  Okay, and the reason that you say in this Article 3 of the 1855 Treaty, the reason that you give for that conclusion is what, again?

A.  The number of times that "stipulation", "fulfilling stipulations", amounts of money used to fill stipulations, appears in the accounting records.

Q.  What accounting records?

A.  The accounting records that make up a large part of the correspondence of the Indian agents with the central office of Indian Affairs in Washington.

Q.  I still don't see the jump from that to your conclusion here.

A.  All right, in preparing for the 1855 Treaty, Henry Gilbert did a job of accounting, indicating what sums were owed to Indian people under which treaty provisions.  Now, money due under treaty provisions can also be said "monies to be paid under the stipulations of the Treaty", and I think that, I think that much is clear.  I think if you'll read the letter that I provided in the back, that it's perfectly clear.

Q.  What letter are you referring to?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

324.

A.   The letter that was sent after the Treaty was concluded --
no, the important paragraph, I put the whole thing on
page 74 and 75, at the bottom of page 74 and at the top of
page 75.  I believe that the language in that paragraph
clarifies the meaning of Article 3.

Q.   Now, you've reproduced this in your Appendix, have you not,
this whole letter; this is the letter of transmittal that
you're citing here, is that correct?

A.   Yes, the entire letter of transmittal to me is an
accounting document.

Q.   And that appears on page 89 of your report in full?

A.   Yes.

Q.   Let's take a look at that letter, then.  Now, if we look
at the third paragraph there, it says:  "It was further
stipulated by the Treaty aforesaid, and the amendments
thereto, that the United States would furnish a home for
the Indians, southwest of the Mississippi River for their
final settlement, and which when selected of reasonable
extent, the United States agreed to guarantee to said
Indians forever . . ." and so forth.

          Now, is that -- There they're talking
about stipulated there.  Is that the same accounting
sense that we get?

A.   No, that's a verb, stipulated.

Q.   I see.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

325.

A    You'll find "stipulation" in the other form letters on
page 90 in the second paragraph.

Q    In the second full paragraph?

A    Uh-huh.

Q    "They were further informed that they had an equitable
interest in lands west, the stipulation to furnish them a
home there being considered a part of the consideration
for the lands ceded in Michigan, and that their
improvements in the ceded lands should also be paid for,
it being understood that at the end of five years from the
ratification of the Treaty of 1836, they were dispossessed
and deprived of them by those who entered the lands."

Now, you're saying that's an example of
being a stipulation being used in an accounting sense?

A    No, no, no, that's not used in an accounting sense.  There
are many, you know, there are many words that have more
than one meaning, like the term 'convention'.  Convention
has, you know, can be the American Legion Convention,
and convention can also mean the Geneva Convention, that's
an international document.  And I think that one of the
sources of difficulty has been that the term "stipulation"
has more than one meaning.  I'd be glad to provide a lot
of these documents that talk about monies to fulfill --
monies assigned for various treaty stipulations.

Q    Can you point to anywhere else in the Treaty of 1855 or

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

326.

the letter of transmittal where this term "stipulation"

has this unique meaning?

A. No, I can't, and I don't think there's any confusion.

The Treaty stipulations in Article 3, Treaty stipulations

imply monies to be paid to the Ottawa and Chippewa.

Q. That's where it's used in the accounting sense, right?

A. Well, yes, Treaty stipulations, or you could say on account

of former Treaty provisions; but they imply, you know,

that money is to be paid to the Indians.

Q. Well, isn't that true of a number of provisions in several

treaties?

A. Yes.

Q. It doesn't make it an accounting term, does it?

A. Well, I thought --

Q. It's a term of agreement?

A. (No response.)

Q. Let me ask you this, Dr. Tanner, you have already indicated

that this seems to be more or less your theory; you are

the first one that's really looked into Article 3 of the

1855 Treaty and come up with this meaning. What prompted

your coming up with this idea?

A. Well, I was trying to understand Article 3, and I was

also interested in why all of these accounting records

said "sums of money needed for treaty stipulations", and

"treaty stipulations" I realized implied monies expended.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

327.

Q   Is this your first thought, or did you ever think when you first read this or started looking at it that for Article 3 they used to release and discharge the United States from all liability on account of ~~40~~ all former treaty stipulations, that the word "stipulation" only referred to accounting items, monetary items?

A   Well, I wasn't sure, I wasn't sure at the beginning.  I read the Treaty, and I thought "My goodness, that is hard to understand."  Then I went back and started to read all of the correspondence leading up to the Treaty, and then I went back to Article 3 and realized that if you broke the sentence up properly, that it was perfectly, was perfectly comprehensible; but as I wrote down here, it had been compressed so that it's hard to read by itself.

Q   Well, what was the problem with comprehending it by reading "stipulation" in the way it's ordinarily used and the way it's used in most other treaties; what was your problem with that?

A   Well, most --

          MR. GREENE:  I'm not sure, Counsel, it's been established how it's been used in all other treaties, and what its ordinary sense is as you characterized it. I'm not sure you've laid a proper foundation for your question.

Q   (MR. TAYLOR)  Dr. Tanner, you say the use as you've

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

328.

defined it in an accounting sense which seems to be pretty much limited to Article 3 of the 1855 Treaty is not the ordinary sense of the word "stipulation" as used in treaties.  I think you indicated that, haven't you?

A.   Yes, that's right, but it's the only way, I think, they were indulging -- that they were indulging in some kind of shortcuts here, because they had been over these accounts of amounts that were due by the Federal Government to the Indian people for so long, that they all knew that they were paying -- that they were paying Indian people amounts of money that had been stipulated in various provisions of former treaties.

Q.   You say "they", now, you're talking about the drafters of the Treaty?

A.   Yes, yes, that's Henry Gilbert, and I think that is perfectly apparent in the Minutes of the Treaty that they -- that the Federal Government wants to make it abundantly clear that the Government representatives want to pay the Indians everything that is due to them under the provisions, under the provisions of the former treaties; and they want to have the financial account -- they want to have the financial account clear.

Q.   I understand your theory on it, but my question is going to this, what was it that prompted you to go that far, to come up with these ideas when -- what was it that

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

329.

would be incomprehensible about reading the term

"stipulation" the way one would ordinarily read it and

the way it would be ordinarily used; what was it that

prompted you not to just read that that way?  What was it

that prompted you to develop this new theory?

A.    Well, I'm not -- The more I think about it, the more I

don't think it is -- I don't think that it's particularly

new.  I think maybe I made the thrust of it the

difference, read the whole thing as liability on account

of all former treaty provisions.  It's still monies that

the Federal Government owes to the Indians.  I was -- '

Q.    What about the, where it's talking about equitable claims?

A.    Well, equitable claims, as I explained, refer to monies

that are due the Indian people on account of Article 8.

Q.    In any event, is it your testimony, then, that this is

the only place in this Treaty where that term is used in

that accounting sense, is that correct?

A.    Well, I think that you can substitute provisions for

stipulations in this clause just as well, and the --

Q.    What clause?

A.    In Article 3, and the meaning is unchanged.  I guess what

I should get is a bunch -- in Article 3, that the term

"treaty stipulation" appears at the heading of all of the

accounts that are sent in; this is the reason that I said --

Q.    Doctor, I guess that falls under the category of asked and

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

330.

answered, that's not what I'm asking you.  I understand

your theory of it; you've explained it, I don't want you

to go over it again, I don't think it's necessary.  Just

as a final topper on this subject, I just wanted to be

clear that this is the only place in the 1855 Treaty where

that term is used in that sense, is that correct?

A.   Yes, I don't call it a theory, I call it a summary

observation based on many documents about how terms were

used in 1855.

Q.   Have you ever shared this summary observation with any

other historian via a publication of this idea or any

other way?

A.   No.

Q.   And you have indicated that as far as you know, there is

no other historians that have interpreted the term that

way, is that correct?

A.   No.

Q.   No meaning that is correct?

A.   I don't know of anybody else.  I don't think it's novel,

though, or unusual.

Q.   All right.  It would seem to be novel or unusual if

you're the only one that has ever come to that

conclusion, wouldn't it?

A.   I'm the only person who has addressed myself to that

subject, I guess.  Anybody else who goes through the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

331.

literature that I went through will come to exactly the same conclusion; there's no doubt about it.

Q   And to your knowledge, no one has come through --

A   That's right, nobody else.

Q   -- the documents and so forth that you've gone through?

A   With this purpose in mind.

Q   The purpose being?

A   To clarify the 1855 Treaty.

Q   And to make a definition of the term "stipulation" as used in that Treaty, is that correct?

A   To identify the reason for the term "stipulation" appearing in this clause.

Q   Okay.  Will you stipulate we can go on to something else now besides stipulations?

        MR. DILLON:  What meaning -- no, never mind!

        THE WITNESS:  No, no, it's all right, I'll be happy to.

Q   (MR. TAYLOR)  Okay, let's go to page 79.  We're talking now about "The August 2, 1855 'Agreement' bearing the names of 12 Sault Ste. Marie Chippewa . . ." and you have a long cite there from, is that George W. Lee, is that cite from him, or --

A   Yes, it is.

Q   All right.  I don't seem to find exactly what I'm looking for there, maybe we can skip over that.  Oh, I guess what

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

332.

I wanted to ask you about was the first paragraph there which says:  "The August 2nd, 1855 'Agreement' bearing the name of 12 Sault Ste. Marie Chippewa is not discussed candidly in the Indian Office correspondence until George W. Lee visited the Sault Bands in 1877 and 1878."

What's your source for that statement?

A.  My reading of the correspondence.  I found no --

Q.  George Lee's correspondence?

A.  In going through all the correspondence for the Mackinac agencies subsequent to 1855, this is the first letter that I found that gave a candid description of what was, what was going on.  I told you there's very little said.

Q.  Was this the earliest letter you found on the subject?

A.  The earliest candid letter that I found.

Q.  Was it the earliest letter that you found?

A.  No, no, no.

Q.  Well, what made this candid whereas the others were not?

A.  Well, the other letters were objections about payment, the others seem official, and this, this letter, I felt, gave some behind-the-scene insight into the situation. I'm a great fan of George W. Lee; I think he was a good agent, and in his correspondence revealed a great deal about what was going on in the Indian country you don't

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

333.

find out from earlier people.

Q    How are you using the term "candidly" there; what's your
     definition of -- It has more than one, as "stipulation"
     and a number of other words do.  Are you saying this is
     the first honest and open discussion of what went on,
     is that how you're using the term?

A    I think this is the type where you get sort of behind the
     scenes information, say candid as opposed to sort of
     unofficial -- as opposed to unofficial letters.  Maybe it
     would be better if I would have said, "The first revealing
     letter".

Q    How about "the first unofficial letter", that seems to be
     the way you're using the term?

A    Well, this is the first letter that is not -- this is not
     an official protest on the part of the Indian people.
     I have a feeling that George Lee found out information
     that previous agents had not found out.

Q    Was he present at the negotiations?

A    No, he was not.

Q    So the first candid discussion we get is from someone
     that wasn't even present at the negotiations, is that
     correct?

A    That's right, that's right.

Q    Let's take a look at page 80.

A    But he's talking to somebody about somebody who was there.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

334.

Q    Now, we're still talking, I guess, about the August 2nd,
     1855 "Agreement", and you have a sworn statement which
     apparently was in the Probate Court of Chippewa County
     on August 21st, 1935?

A    Yes.

Q    Now, who is this that's giving this statement?

A    It says on page 80 it was Charles Showano, grandson of
     Lee's informant.

Q    Now, is this Showano -- Who is this Charles Showano
     other than being grandson of Lee's informant as far as
     his Indian connections?

A    He is grandson of  O - Showano.

Q    Who signed the Treaty or did not?

A    Yes -- well, his objection is that  O - Showano's name
     is on the Treaty, but that  O -Showano said he did not
     sign the Treaty; and that his signature was a forgery,
     that's what it says in that sworn statement.

Q    Are you familiar with any correspondence between Showano,
     O- Showano, obviously not in 1935, and Manypenny, dated
     July 9, 1857, and entered as an Exhibit in this case,
     Government Exhibit 94-A?

                    MR. GREENE:  You're talking about P?

                    MR. TAYLOR:  Let's go off the record until
I find it.

                    (Whereupon, off-the-record discussion.)

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

335.

Q    (MR. TAYLOR)  Back on the record.  Do you have that

     Exhibit 94-A in front of you?

A    Yes, I do.

Q    And it's entitled at the top, "Sault Ste. Marie, July 9,

     1857," is that correct?

A    Yes.

Q    All right.  It says:  "The undersigned Chiefs and Headmen

     of the Sault Ste. Marie Band of Chippewa Indians take the

     liberty to request of you as having been the officer who

     on the part of the United States transacted the business

     of adjusting our claim for damages on our Sault Ste. Marie

     Reserve in form respecting the claim of that adjustment

     and amount awarded the time and manner of the recumbents

     if any.

          "We have yet heard nothing from the

     Department on the subject and we feel ourselves under

     much obligation to you for the desired information

     confiding in a continuance of our known affability and

     the kindness that has ever marked your intercourse with

     us on many former occasions we presume to make the request."

          And who is the first -- the first

     signature?

A    That's Showano.

Q    Now, is that the same fellow that we're talking about

     here in your report?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

336.

A.   I think quite possibly, this -- on page 80, the name
     O-shaw-waw-no-Ke-wan-ze, I have tried to sort out
     O-shaw-waw-no and O-shaw-waw-no-Ke-wan-ze a number of
     times, not always with success; and I, since this just
     says Shawano, I'm not sure it's the same one, but it
     might be.  I think O-shaw-waw-no-Ke-wan-ze was the son of
     O-shaw-waw-no.  This is another one of those generation
     problems that I've tried to work out.  I don't know
     whether it's significant or not.

Q    Let me try to trace it back up.  The quote here, "Charles
     Showano, grandson of Lee's informant" and his statement
     states his grandfather, one of these O-shaw-waw-nos made
     a statement in the presence of his father, Ed Shawano,
     that he did not sign the Treaty of August 2nd, 1855.  Now,
     is this Showano that didn't sign the Treaty in 1855 the
     same Showano that signed this letter which is Exhibit P-94A?

A.   I'm not sure, it might have been his father.

               MR. STEKETEE:  Excuse me, I hate to butt in,
     what do you mean, "it might have been his father", who
     might have been who's father?

               THE WITNESS:  Showano who signed as
     Showano as the 1857 document might have been the father
     of O-shaw-waw-no-Ke-wan-ze.

Q    (MR. TAYLOR)  This document that's 94A signed by Shawano
     seems to indicate, wouldn't it, that Showano and the

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

337.

others signing this document are claiming some type of money or right under the Treaty?

A    Yes, they are, right.

Q    August 2nd, 1855?

A    Definitely.

Q    Would you say it would be unlikely for someone who claimed that such a Treaty was forged, to two years later send a letter to the Government asking for their compensation or some other benefit under a Treaty that in their opinion was forged?

A    Regardless of the Treaty, the Indian people felt that compensation was due for damages.  Manypenny had gone up to the Soo --

Q    I'm listening.

A    I believe Manypenny, I think it was Manypenny himself went up to the Soo and was supposed to have evaluated the damages, made an evaluation of the damages, and the Indian people felt they were due money for damages.  This is the one item that was not covered in the July 31st Treaty.  I don't know whether it's unlikely or not.

Q    You see nothing inconsistent with the claim on the one hand that a person never signed the Treaty, and then his claim two years later that he's entitled to some type of compensation under that same Treaty?

A    If it's the same person.  No, Indian people felt they're

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

338.

due money regardless of the Treaty, of the "Treaty".

Q.   Of any treaty, regardless of any treaty?

A.   I'm talking about this Treaty.  Sault people, Sault Indians felt that they were due -- that they were due damages.  Now, I do not know who wrote this letter for them, but money was still due to the Sault band because their fishery had been damaged, and they kept calling this to the attention of the authorities in Washington.

Q.   Would that money be due them if there were no treaty?

A.   It would be due them under -- even under the 1820 Treaty.

Q.   Let's go on to something else, because I think Showano has got me totally confused.

         The second paragraph on page 82 says: "Subject of fishing rights was not raised in the July 31, 1855 Treaty, except to indicate in Article 3 that the claim of the Sault bands based on the 1820 Treaty was not covered."

         Now, actually Article 3 went a little further than that, didn't it; Article 3 actually said more than "it's not covered", it said that there is a right there that shall remain, didn't it?  Is that the same thing?

A.   Article 3, we're now discussing Article 3 of the 1855 Treaty?

Q.   Right.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

339.

MR. DILLON:  I'd like the record to
reflect page 82 of Dr. Tanner's report is in the nature
of summary of previous data and information compiled in
the said report.

MR. STEKETEE:  Are you testifying, Counsel?

MR. DILLON:  I just said I'd like the
record to reflect that.

MR. TAYLOR:  It will.

MR. DILLON:  Thank you.

THE WITNESS:  I believe this same question
was asked me yesterday by Mr. Steketee.

Q.  (MR. TAYLOR)  What did you say, I can't remember.

A.  I said that Article 3 indicates that monies due by the
United States to the Indian people are all -- are paid up
for all the Indian claims except the claim of the Sault
bands because of the 1820 Treaty, that's the only -- that
their damages, that the damages due to -- that the
compensation for damages to their fishery have not been
paid off by the July 31st Treaty.

Q.  Well, I'm not going to go over it again, I guess we get
back into the old "stipulations" definition.

A.  That's right, that's the one unpaid item.

Q.  Some of these areas Mr. Steketee has been over, so I'm
just going to skip these; I don't want to go over the
same ground.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

340.

Dr. Tanner, would you look on page 94 of your report. This, again, is the letter of transmittal to the Treaty of August 2nd, 1855. That first paragraph says: "By the Treaty of June 18th, 1820" --

MR. STEKETEE:  Sixteen.

Q    (MR. TAYLOR)  Excuse me, "By the Treaty of June 16th, 1820, with the Chippewa Indians a right to encamp and fish at the falls of St. Mary's River was guaranteed to them in perpetuity.

"In the agreement with the Ottawa's and Chippewa's of the 31st of July last, we took a release of all claims and demands of these tribes or either of them against the United States except this grant to encamp and fish, secured to the Chippewa's."

Now, when I read that, it sounds to me like that release is going to cover everything that was covered in any previous treaties except for that specific grant at the falls of St. Mary's. Do you agree with that interpretation?  If not, why not?

A    Because it's clear that in the 18- -- in the July 31st Treaty, that they're talking about amounts of money that the Federal Government owes the Indians, claims that the tribes against the Government -- demands of the tribes against the Government.

Q    Including fishing claims, isn't it, fishing rights?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

341.

A.    Fishing rights was never mentioned.

Q.    The first paragraph of this letter of transmittal mentions them, though, does it not?

A.    They're talking about this knotty problem at Sault Ste. Marie, that's a special local problem.

Q.    I guess there's no sense pursuing it.  Just to be sure I understand, in the second paragraph where it says, "We took a release of all claims and demands of these tribes or either of them against the United States except this grant to encamp and fish, secured to the Chippewa's." It's your testimony that the release of all claims and demands is solely related, then, to accounting or monetary claims, is that correct?

A.    Yes, it's a financial settlement.

              MR. TAYLOR:  Okay, thank you, Dr. Tanner, I have nothing further at this time.  I think perhaps Mr. Freeman may have a few questions for you.

                    EXAMINATION

BY STEWART H. FREEMAN, Esq.:

Q.    Dr. Tanner, I'm puzzling over part of this, and I'm sure it's confusion in my own mind, so bear with me in my questions.

              As I understood your testimony of early yesterday, you were commissioned by the United States to attempt to review these treaties from the perspective of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

342.

the Indian signatures.  Did I understand you correctly on that point?

A    I don't think I ever said that.

Q    Well, how did you approach these treaties; what were you doing in writing these reports?  Use your own vocabulary rather than mine.

A    I think that's the same question Mr. Taylor just asked at the beginning of his inquiry, is it not?

Q    Well, if you'd rather not answer it, that's all right.

A    I thought I stated my objective of my endeavors in the beginning.  I wanted to explain what went on at these treaties and give some history of Indian fishing.  I knew that the focus was on Indian fishing, and so I wrote about Indian fishing and the treaties.

Q    This is just a generalized approach, then?

A    I tried to provide information that I thought would be most useful for an inquiry into this subject.

Q    I guess that's where my confusion is arising.  I don't want you to re-explain your position on "stipulation", I think we've gone through that; but what's troubling me is trying to understand how you're concluding that the Indian signatories could possibly have understood the word "stipulation" in the manner you're describing.

A    Oh, I don't suppose that they did, I don't suppose that they could.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

343.

Q    Then the theory you're giving us is not intended to
     present the perspective of the Chippewas at the time the
     treaties were negotiated?

A    No, all this talk just, I guess, stems from the fact that
     our lengthy discussion of the term "stipulation", I
     realized that a very complex subject in the 1855 Treaty
     had been compressed to the point that it was susceptible
     to misunderstanding.

Q    Well, let me stop you there, now, because I'm trying to
     focus on a different issue.  I'm trying to understand what
     the Indians who signed these treaties thought they meant,
     and I'm trying to approach it from two perspectives, if
     we can.  Now, I recognize we are trying to reconstruct
     history, being careful not to rewrite it; so there just
     may be no evidence on particular points, but I'm trying
     to approach it from two perspectives:  What would the
     Senate of the United States have thought, and what did the
     Indian leadership, those who signed the particular document
     think.  Is it your belief, based upon a historical review
     of this matter, that either the Senate or the Indians
     would have understood the word "stipulation" as you've
     been explaining it?

A    I think that's the way -- I think this is the way the
     term -- I think that this is the way that the term was
     used in all their correspondence, and I don't know any

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

344.

other thing to do except for me to extract from the microfilm a number of accounting reports.  I don't think that, that my own interpretation of this clause has in any way twisted even the conventional understanding, but just to point out that it gets kind of -- that it got to be a kind of shorthand.

Q    Let me explain to you the difficulty I'm having with that, at least you'll understand my problem in whatever answer you make.

A    All right.

Q    I understand what you're saying, you looked at the documents, and you interpreted certain documents that use the word "stipulation" in an accounting sense.  But my lawyer's mind tells me that we cannot accept that in interpreting these treaties unless we have some evidence to believe that the Indians either saw this same documentation you have seen or used the word in the same way from the Indian perspective.  From the perspective of the Senate, we would apply the same principle:  Would the Senators of the United States have, in voting on this Treaty, have been aware of the correspondence you've seen?  Presumably not, unless you're aware of some evidence I'm not.  Does the Senate normally look at a bunch of accounting documents in determining whether or not to ratify a treaty?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

345.

A.    I quoted from legislation, you know, from an act to

fulfill, an act to fulfill treaty stipulations, a budget

act.

Q.    But you would agree, would you not, that that's an

appropriation act, as I recall?

A.    Yes, that's an appropriation act.  I thought that

clarified the use of the -- the use and common appearance

of the term in financial and budgetary conversation.

Q.    Is it inconsistent with the title that appropriation act

ascribed to the word "stipulation" in its normal meaning?

A.    Well, I don't think I would ascribe to it an abnormal

meaning.

Q.    Did you make any attempt to see how the word "stipulation"

was used in Court opinions or opinions of the Attorney

General of the United States or other documents about this

matter?

A.    No, I think this whole discussion is probably getting out

of hand.  Maybe we should just go through it phrase --

Q.    No, I'm not asking you to do that.

A.    -- phrase by phrase.

Q.    Dr. Tanner, I want you to understand what I'm trying to

do.  I'm trying to look at a document, if we can, from

two separate perspectives, the Senate and the Indians;

and I'm trying to see as to some of these words that you

have offered definitions of, whether in fact those would

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
823 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

346.

have been the definitions in the minds of those people
to the extent that we can historically look back and find
documentation or oral tradition of the Indians, whichever
may happen to have been available.  Is there anything that
you're aware of which accompanied either the Treaty of
1836 or the Treaty of 1855 to the Senate of the United
States which presented any definitions of terms other
than the documents which are already a part of this case?

A.  I don't think that would be necessary, no; I don't think
that was necessary.

Q.  Are you aware of any journals, diaries or other documents
put together by persons who were present at the Treaty
negotiations which indicated any representative of the
United States Government or other person present,
interpreter or whatever, defining such words as a
"stipulation" to the Indian persons who were present?

A.  No, I'm quite sure that Indians understood the situation
just in terms of numbers, "You get paid this amount of
money that we owe you because of these provisions of the
Treaty."  And I think that those -- that the Treaty
Minutes indicate clearly that they went -- that every one
of the items and the sum was explained to the Indians so
that they understood what provision of what treaty was the
basis for the money being owed still to the Indians by the
Federal Government.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
823 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

347.

Q   Is there any basis for believing that the Indians considered the Treaty obligations of the United States to them as an Indian group to consist only of money obligations; in fact, they didn't view it at all that way, did they?

A   No, not entirely.

Q   They thought of blacksmiths and other obligations?

A   That's true, but this Treaty, I repeat, appears to be concerned with money obligations, some tag ends that were left hanging from previous treaties.

Q   And yet significantly, the Treaty of 1855 contains land allotments to individual Indians?

A   That's true, that's the other aspect, that's the other unfinished business from the 1836 Treaty.

Q   Is that what you consider to be a financial matter or accounting matter?

A   No, that's -- I believe I stated that there were two principal purposes to this Treaty.  We've concentrated so on the accounting matter that I momentarily lost track of the important business of permanent home.  That's right, the land situation had been left in an indecisive state.

Q   The word "indecisive", I'm not sure I understand what you mean by the use of that word.  Could you explain that?

A   Indecisive means unclear.

Q   What was unclear about the land situation in Michigan in

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

348.

1855?

A.  I think you know that the Treaty included some provisions
for removal. No removal was carried out, so the Indian
people were still occupying the reserves that had been
specified in the 1836 Treaty, but --

Q.  You consider that --

A.  -- they were -- that's indecisive.  I think that the
situation was indecisive; it had not be resolved.

Q.  But where was the indecision, was it on the part of the
United States or on the part of the Indians?

A.  On the part of everybody.

Q.  So the Indians then believed at the time of the Treaty
conference in 1855 that there was still a possibility that
they would be removed?

A.  No, one of the purposes of the 1855 Treaty was to give
them permanent homes and remove any fears or apprehensions
on that subject.

Q.  That's why your use of the word "indecisive" bothers me;
that's where I see an inherent inconsistency to your
approach to this.  Did the Indians really believe, in 1855,
that the outcome of those Treaty negotiations would be
anything other than some kind of land arrangement with
them by individual allotment or by reservation?

A.  The statement was in the Treaty that it was to provide
permanent homes for Indian people.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

349.

Q    But I'm not focusing on the Indians now.  Is there

sufficient historical terms to draw a conclusion as to

what the Indians thought that Treaty negotiation was all

about?

A    There is the journal, and I think I quoted one of the

final statements, I believe the Indians believed that

indeed they would have permanent homes.

Q    All right, so it really wasn't indecisive from that

standpoint, was it?

A    No, I said the situation prior to the Treaty was indecisive.

That's one of the reasons that the Treaty was needed.

Q    But if, and again if I'm putting words in your mouth,

correct me.  If the Indians came into the Treaty

negotiations anticipating that permanent homes would be

provided for them and thinking that the basic question was

where these homes would be, but with the anticipation

that these homes would be somewhere close to the areas

they were then living in, that doesn't seem a situation

one would characterize as indecisive; it would suggest

that there were great questions.  The point was to clear

up the legal title to land and give Indians pieces of

paper to show they had title, wasn't that the idea of that

negotiation?

A    There was no Treaty provision that specified permanent

homes for Indian people prior to the 1855 Treaty.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

350.

Q    But these people were still, were they not -- or perhaps
     your testimony is they'd become so civilized then,
     weren't they really the same people who you had testified
     earlier had no real concept of settlers' system of land
     titles, people who had their own concept of property?

A.   Traditionally they did, but I also testified that the
     appearance of missionaries among them impressed upon them
     the importance of titles, and reflects also this 1855
     Treaty includes some people who were very close to the
     frontier of civilization, and people who, I guess, were
     primarily concerned with being away from the frontier
     civilization.  They didn't want -- The Government wanted
     to insure the Indians that they would not be removed, and
     that they would have permanent homes within the State of
     Michigan.

Q    But it's your testimony, then, that in the period,
     somewhere within the period between 1820 and 1855, the
     Indians accepted the settlers' view of property and went
     into the 1855 negotiations intending to secure property
     in the settlers' sense, in the title sense, is that right,
     do I understand you?

A.   Some of the Indians, Indian people have never accepted
     the white view of property; but some of them became aware
     of the need to cope with the system.  Under the advice of
     missionaries, a number of them had purchased property with

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

351.

annuities.  I haven't been able to find out where that was, because I think they lost it, but they had, under the guidance of missionaries, some of them had purchased property.  It was the objective of the Federal Government to try to get them settled on individual allotments, although the land assignments were by bands, I think I said that yesterday, too.

Q    Is there evidence as to why the United States, in dealing with this particular Indian group, decided to go with the individual land allotments?  Was there any specific reason shown by the historical records?

A    I think I said that, too, they were trying to -- they're trying to avoid any future dealings with Indians as tribes or any dealings with Indians, any further obligation for the payment of Indian treaties, I said that, too.

Q    Maybe I misunderstood, I thought that was the reason they dissolved the tribe.  Is that necessarily the same reason there was individual land allotments, do you suppose, say, in Minnesota, for example, didn't the Federal Government create a large reservation by treaty and then simply left it up to the Indian tribal organization to decide who could live there and how the land would be used?

A    Yes, they did that, too.

Q    Well, is there any reason shown in the historical records why that sort of approach was not used in Michigan?

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

352.

A.    No.

Q.    Does the record show whether or not the Indians requested that kind of treatment in Michigan?

A.    I don't believe they requested any kind of special treatment, except they wanted to know where their land was going to be, and they wanted to have the money paid to them that was owed them.

Q.    And they wanted individual allotments?

A.    I don't think they requested that.

Q.    Did they protest?

A.    I don't know, I don't know.  They wanted land in some form that would be secure.

Q.    Secure from intrusions by the settlers?

A.    Secure from intrusion, secure from intrusion, land that wouldn't be slipped away from them.

Q.    Did the United States make it clear to the Indians, does the record reflect this, that one of the consequences of that individual land allotment type of approach was that it would thereafter be a state matter, a state problem as to land title and taxes and all those kind of associated problems?

A.    I don't believe so.

Q.    Did the representatives of the United States discuss the question of property taxes with the Indians?

A.    I don't know, I don't believe they did.  The areas

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

353.

described in the 1855 Treaty, as I pointed our before, when they were surveyed, were described as reserves. There's very inadequate information about the subsequent history of those laws.

Q. But you understand the point I'm trying to get at?

A. I understand the point you're trying to get at.

Q. They are regarded as reservations?

A. They are still called reserves by everybody who lived around them. The land in Pentwater was called the Pentwater -- down in Oceana and Mason County it was called the Pentwater reserve.

Q. But I'm correct, am I not, that in a true reserve, using that term as you would probably use it in many other situations dealing with other Indian groups, in a true reserve, the reserves could not be broken up or sold off without formal tribal action?

MR. GREENE: Counsel, are you asking for her legal opinion about the status of the reservation?

MR. FREEMAN: I'm asking historically is it true that the United States set up reserves so that it would take both Federal and Indian action, wherein an individual allotment, the person was free to sell the land, was he not?

THE WITNESS: I really don't know. I really don't know.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
823 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

354.

MR. GREENE:  I object, that's calling for legal conclusion, and I think you're just muddying up the record.

THE WITNESS:  I'm not sure.

MR. STEKETEE:  We certainly wouldn't want to muddy up the record!

MR. GREENE:  You're asking for the legal status of land, whether it can be conveyed or not, or whether --

MR. FREEMAN:  No, I'm not, you didn't listen to the question, either that or I stated it improperly.  I'm not asking her as to a legal conclusion as to a parcel, I'm asking her if there are two different approaches reflected in different treaties, one approach being the reserve.

THE WITNESS:  I really don't --

Q.  (MR. FREEMAN)  Reserve which had some Federal protection, and the other being the individual land allotment?  Well, is there any indication in the record, Dr. Tanner, anywhere in the Treaty negotiations or anywhere else, other than those points you've already discussed of limitations being placed on the individual land allotments?

A.  I don't recall, I don't recall any.

Q.  For example --

A.  Although my recollection, I'm at my lowest ebb of

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

355.

information retrieval at this point, and I don't recall any.

   MR. GREENE:  Why don't we take a break, it's been about an hour and a half since the last one. Could we take a five-minute break?

   (End of Record.)

STATE OF MICHIGAN )
       )  SS
COUNTY OF INGHAM )

   I, Sandra Crowley, Certified Shorthand Reporter and Notary Public in and for the County of Ingham, State of Michigan, do hereby certify that the foregoing continuation of Deposition was taken before me at the time and place hereinbefore set forth.

   I further certify that said witness was by me duly sworn in said cause; that the testimony then given was reported by me stenographically, subsequently dictated by me, and transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

   IN WITNESS WHEREOF, I have hereunto set my hand and seal this 4th day of February, 1977.

*Sandra Crowley*
Sandra Crowley, Certified Shorthand Reporter and Notary Public, County of Ingham, Michigan.

My Commission Expires:  1-22-79.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE (517) 372-2254

356.

sp