IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

- - - -

UNITED STATES OF AMERICA,
ET AL.,

    Plaintiff and
  Plaintiffs Intervenor,

     vs.

STATE OF MICHIGAN, ET AL.,

    Defendants and
  Petitioner for Intervention.

    No. M 26-73 CA

    M O T I O N S

- - - -

Before

  THE HONORABLE NOEL P. FOX,

    U.S. District Judge

      Grand Rapids, Michigan
      Monday, May 16, 1977
      9:44 a.m.

APPEARANCES:

  FRANK S. SPIES, U.S. Attorney
  Federal Building
  Grand Rapids, Michigan  49503
     and
  U.S. DEPARTMENT OF THE INTERIOR, by
  ELMER T. NITSCHKE, Field Solicitor
  686 Federal Building
  Fort Snelling
  Twin Cities, Minnesota  55111

    On behalf of the United States of America

2

APPEARANCES   (Continued)

        BRUCE GREENE, Esq.
        1506 Broadway
        Boulder, Colorado  80302
             and
        MS. KATHRYN TIERNEY
        Bay Mills Community
        Route 1
        Brimley, Michigan  49715

                On behalf of Bay Mills Indian Community;

        DANIEL T. GREEN, Esq.
        416 Ashmun Street
        Sault Ste. Marie, Michigan  49783

                On behalf of Sault Ste. Marie Tribe of
                  Chippewa Indians;

        FRANK J. KELLEY, Attorney General, by
        STEWART H. FREEMAN and
        GREGORY T. TAYLOR, Asst. Attorneys General
        Environmental Protection and Natural Resources Divisions
        630 Law Building
        525 West Ottawa
        Lansing, Michigan  48913

                On behalf of State Defendants;

        PETER W. STEKETEE, Esq.
        Peoples Building
        Grand Rapids, Michigan  49503

                On behalf of Michigan United Conservation
                  Clubs, Inc.

- - - -

3

Grand Rapids, Michigan
Monday, May 16, 1977

P R O C E E D I N G S

MR. BRUCE GREENE:    Good morning, Your Honor.

THE COURT:    Good morning.

MR. BRUCE GREENE:    I will begin by, if it please the Court, addressing myself to the plaintiffs' Motion for Partial Summary Judgment this morning, and I will try to be brief, Your Honor.

As the Court is aware, the plaintiffs brought on a motion, which they filed on the 6th of April of this year, styled "A Motion for Partial Summary Judgment," asking that the doctrine of collateral estoppal be applied to preclude the relitigation of certain issues which had been decided very recently by the State Supreme Court in the case known as People v LeBlanc, which came down at the end of last year.

Today we are faced, Your Honor, with an over-riding question which I believe was properly phrased by the Supreme Court in the Blonger-Tongue decision, and I quote from it:  "The broad question is whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue." That appears at 403 U.S. 328.  This concept -- and I would add, indeed a complicated concept of collateral estoppal --

4

has been fully briefed, we believe, in our opening brief. We know from Blonder-Tongue and also from the Bernhard decision, the 1942 decision from the California Supreme Court, that there are essentially three questions to be answered in dealing with this concept of collateral estoppal: one is, were the issues decided in a prior adjudication identical to the issues presented in this case?

The second question is, was there a final decision as to those issues?

And, finally, the last question that must be addressed is, was the party against whom the plea is asserted a party to the prior adjudication?

We submit, as we have set forth in our briefs on behalf of all of the plaintiffs, that the answer to all three of these questions is in the affirmative.  The issues decided in LeBlanc were, first, did the Indians reserve rights to fish when they ceded their land and water rights away under the Treaty of 1836; and, too, if they did, did the Indians relinquish any of their reserved rights to fish because of the language contained in Article 3 of the Treaty of 1855, the so-called "release clause."

Now as to the second question, we believe again there is no doubt that it was a final decision as to the treaty interpretation.

And, finally, the last question, which we

5

believe is the most easily disposed of, is, was the State a party to that first adjudication?  And, indeed, it is clear that they were.  Not only were they a party, they were the moving party.  It was a moving party in its own judicial system.  It had the choice of forum.  Indeed, it chose a forum in which, I believe we can all take judicial notice of the fact that it has been traditionally -- State Courts have been traditionally hostile to Indian interests.

Assuming then that these three basic threshold issues are decided -- considered, rather, than decided -- unfortunately that does not end the analysis of this doctrine of the collateral estoppal.  There are two other concepts that need to be addressed:  one is this notion of mutuality of estoppal.  Again, something which we discussed in our brief.  The Bernhard decision of course in 1942 from the California Supreme Court indicates that mutuality is not necessarily required.  Blonder-Tongue also, it seems to us, answered that proposition.  That was the patent case where mutuality had typically been required.  Even in those situations after the Bernhard decision and after many Courts had dispensed with the notion of mutuality, it was still required in patent cases for some public policy reasons. But the Supreme Court said there was nothing sacred about that concept any longer in a patent case, either, and basically said that the issue, when dispensing with mutuality, is to

6

determine if there has been a full and fair opportunity to litigate the issues.  In other words, is the party against whom the plea is asserted, did that party have a full and fair opportunity previously in the first adjudication to fully litigate the issues?

The Court indicated that that inquiry, full and fair opportunity to be heard, was a significant safeguard to the doctrine's application.

The question then obviously becomes, well, what is a full and fair opportunity to be heard?  What does that encompass?  What does it mean?

We know that it has several meanings from cases subsequent and indeed some prior to Blonder-Tongue.  One indicia of a full and fair opportunity to be heard is the choice of forum issue again.  And I refer the Court to the Talcott v. Allahabad, A-l-l-a-h-a-b-a-d, cited in our brief at page 22.  And at page 462 of that decision, the following appears:  quote, "In short, a party who instigated the prior suit is in a poor position to complain about the adequacy of his opportunity to litigate in that suit."

The next inquiry to this full and fair opportunity notion is the question about incentive to litigate.  In other words, did the State in the LeBlanc decision have an incentive to litigate?  And, again, I think it is clear that it did.  That case went on for a long time.

7

It was aggressively litigated all the way up through the State's judicial system, resulting finally in the Supreme Court's decison at the end of this year.

Another inquiry about full and fair opportunity is the due process notions. Is there any argument that the State could make out that somehow its due process rights were being interferred with? And I think the answer again is, no, it cannot, because it was a party to that prior decision.

Blonder-Tongue refers to that as not presenting a due process problem, as do other cases which we have cited in our brief.

Another question is, what about additional evidence? Would the State want to adduce additional evidence? And I assume the State is going to tell you today, why, of course they would, they would love to adduce more evidence on some of these issues.

But we submit something more is needed than the desire of a losing litigant to be given just one more chance. That issue was also discussed in the Talcott decision, and I refer Your Honor to page 463 of that decision, which appears in 444 Fed 2d.

Once you dispose of these -- of the problem of mutuality, which we submit is not a problem in this case, there is another concept that floats around in this area of

8

collateral estoppal, and that pertains to the offensive versus defensive use of the doctrine. And, again, Your Honor, we have cited to you several cases which have dispensed with that. The most important of those cases is a very-well reasoned decision by Henry Friendly in the Seventh Circuit in the Zdanok case, Z-d-a-n-o-k.

We have also cited the Seguros case in the 5th Circuit, a 1969 decision; the case of United States against Webber, the 3rd Circuit in 1968; and another case with a difficult name to pronounce, S-k-r-z-a-t, Skrzat v. Ford Motor Company, a Federal District Court decision in 1975 out of Rhode Island, all allowing the doctrine to be used offensively, which is essentially the position the plaintiffs take herein.

The offensive-defensive concept, as discussed by Professor Currie, is admittedly a rule of thumb, which in many situations leads to a correct result, but it is no more than that, just a rule of thumb. And as Judge Friendly indicated in the Zdanok decision of the 7th Circuit, the inquiry again is whether the State had a full and fair opportunity to be heard with respect to the treaty interpretation issues that we are claiming they are estopped from litigating. And, again, we would refer the Court to the same analysis which I have just gone through now, about incentive to litigate, choice of forums and those kinds of

9

issues.

Now I think the -- I would like to turn for a moment to the question of the -- as a practical matter, what does it mean if the doctrine is applied, what does it mean in terms of this case, how do we proceed at this point?

Well, we know that there are two major issues which need not be tried again in this courtroom after the Michigan Supreme Court's decision:  number one, we know that Dr. Helen Tanner, who is the plaintiffs' ethnohistorical witness, will no longer be required to testify regarding the background, circumstances, and the historical setting which led up to the Treaty of 1836.

By way of refresher, Your Honor, essentially our job in the absence of LeBlanc would be the task of interpreting the treaty.  There are several ways to do that, of course.  One is to look at the treaty and read it and see what it means.  Unfortunately, that doesn't always lead you to a conclusive interpretation of the treaty.  The case law is rather clear, that you look to the surrounding circumstances, essentially you print a picture, a mosaic, if you like, of the background, historical setting which existed at the time the treaty was negotiated.  That background is then used to help us in our task of interpreting the treaty. The sort of things she would testify to would pertain not only to the nature of the relationship between the Indians

10

at that time and the Federal Government, their patterns of --
patterns and lifestyle, how they lived, what they subsisted
on, what commercial activities they were engaged in -- all
of that kind of historical background, which Dr. Tanner
would testify to would no longer be necessary at this point.
Her testimony would eventually have gone to the question,
as we see it, to the question of whether fishing was of such
vital importance to the Indians at treaty times, because of
subsistence and commercial reasons, that it would lead to
the conclusion, to the legal argument that since the Indians --
to the legal argument essentially that the Indians retained
the right, reserved the right, they did not convey it away,
they did not cede it away at the time they ceded away the
land under the 1836 Treaty.  That testimony would no longer
be needed.

The second major testimony, portion of testimony
that would not be required would be Dr. Tanner's testimony
with respect to the meaning of Article 3 of the 1855 Treaty.
That also was decided by the Michigan Supreme Court in
LeBlanc.  As you know, the argument goes that the '55 Treaty
operated as a release, that the Indians released, gave up,
relinquished their rights that they had reserved under the
earlier treaty.  Testimony to support the notion that that
release clause did not effect a release, that the Indians
did not give up their rights, would no longer be required.

11

We submit that that would eliminate a fairly significant amount of trial time.

Now what remains then as a result of the -- if the Court were to grant plaintiffs' Motion for Partial Summary Judgment, what remains, I think, are three broad areas of inquiry:  number one, there are issues concerning the 1855 Treaty, which the State has now raised in one of its motions pending before the Court concerning the meaning of Article 5 of that treaty.  And that is the provision which provides for the dissolution of tribal organization except as necessary to carry out the terms of the Treaty subsequent to the 1855 Treaty.  There is a disputed issue as to the meaning of that provision.  That was not addressed by the Michigan Supreme Court, and there would be no collateral estoppal effect with respect to that issue.  That issue would have to be decided here.  There is some testimony that will come in on that.

Secondly, there is a broad area of inquiry pertaining to whether the United States treated the two groups as one tribe for treaty purposes.  As you know, Your Honor, it is the position of the plaintiffs that the reserved right is a right, is a tribal right.  It pertains throughout the ceded area, and it may be exercised subject to tribal supervision and regulation by any enrolled member, properly enrolled member of either of the two intervenor tribal

12

plaintiffs.  And we would want to introduce some testimony to present to the Court the fact that the Indians, the Ottawas and the Chippewas were residing basically throughout the bulk of the treaty area.  And that would require some testimony here.

Finally, there are some factual questions concerning Whitefish Bay and whether or not that is an on-reservation site and the consequences that flow from that. And the plaintiffs' position, of course, if there is a portion of Whitefish Bay which is an official part of the Indian Bay Mills reservation, that that being an on-reservation right, it's immune from state regulation.

There is a -- I won't get into it now, but there is a different legal argument -- unless the Court would like me to -- there is a legal argument essentially dealing with the on-reservation and off-reservation rights.  We maintain that the Tribe has jurisdiction to regulate their members off the reservation, as they are going off the reservation to fish, with respect to the on-reservation right in Whitefish Bay, and that is essentially the same as a land reservation; and the Tribe would not only have the right to regulate its own members, but presumably anyone else that they license to come in onto their reservation. That is different than the off-reservation right in the ceded waters of the Great Lakes.  Some factual testimony

13

would be required as to that issue, as well.

Primarily those are the three areas of inquiry we see that would be left if our motion is granted, and we see that as being a substantial reduction in the amount of time we needed to try this case.

Finally, we have briefed also at length -- and I will just touch on it for a moment, Your Honor. There were two issues decided in LeBlanc which were adverse to the interests of the United States and the two Indian tribes, plaintiff intervenors here. As to those issues, it is our position that those issues may be litigated for the first time in this Court by the plaintiffs in that the United States was not a party to the LeBlanc decision. And there is ample law that says that the United States cannot be bound obviously to a decision which it was not a party to. Neither was the Sault / tribe, of course, a party to that litigation, nor was Bay Mills. And it is our position -- and I think it is set forth in the brief, and I will not spend much time on it -- that Mr. LeBlanc -- that Bay Mills Indian Community is not in privity with Abe LeBlanc.

And we refer the Court to the cases cited in our brief, I believe at approximately page 31. Also there is a fairly recent Supreme Court decision, the Sea-Land Services case in 1954 -- '74 -- excuse me -- decision, which indicates that while the fiduciary may be able to bind the

14

beneficiary who is not a party, that the converse situation is not true.  And so in a nutshell, essentially, since the plaintiffs are not parties or privy to the LeBlanc litigation, they are not bound by those two rulings relating to the on-reservation right and the State's authority to regulate at all; that we are not bound by those, and we would be prepared to argue those to Your Honor.

And unless there are any questions, I would like to reserve some time for rebuttal, if I may.

THE COURT:          You may do so.

MR. BRUCE GREENE:   Thank you.

THE COURT:          Mr. Freeman.

- - - -

ARGUMENT ON BEHALF OF THE STATE DEFENDANTS

MR. FREEMAN:        May it please the Court, I am Stewart Freeman, Assistant Attorney General for the defendants.

Let me apologize in advance, Your Honor.  I have had some oral surgery, which has put a cast in my mouth, so if at anytime you can't understand me, please do so indicate.

THE COURT:          I know the feeling.

MR. FREEMAN:        Essentially, Judge, we do not argue the application of collateral estoppal.  Bruce

15

Greene has given you the -- the counsel that preceded me -- has given you the law school approach, the law school lecture. We are not challenging the doctrine, we are not challenging it as though it were something new, unknown in the law that he were creating. What we are saying is, let's look at that doctrine as applied to this case and see what we get.

Now you have before you a number of defendants. You have the State of Michigan, one of the sovereign states of the Union. You have a number of individual defendants. You have a cause of action which sounds upon a supremacy theory, but also sounds under the Federal Civil Rights Act.

I have asked again and again for a clear statement of whether money damages will be sought from some of my individual defendants. I have no answer, as yet.

I asked for, exactly, in Marquette, "Could I have assurances that the latest round of amended complaints would be the end?" I got no such assurance. So far as I know, they are going to ask you tomorrow or the next day or the week after that to amend these complaints again. And I don't particularly object to that as an advocate. The first time I stood before you on this case I knew very, very little. I have learned a lot in four years. In this dispute we did not have a normal kind of dispute that one has with the Federal Government. Normally when the Michigan Attorney

16

General representing a state agency and the United States Attorney representing a federal agency find themselves at loggerheads, there are years of correspondence, arguments. They generally heat up from the lowest levels of the bureaucracy up to the top, until finally a letter comes from the Secretary of Interior or someone like that to the Governor of the state, and then if it can't be worked out, off to court you go. So you start off knowing where you are, start out understanding the issues. I am not saying that is legally required. I am simply saying that is the way it usually happens.

Now in this case somebody walked into the office of the Governor of the State of Michigan and dropped off a complaint, and a reporter for the New York Times called and said, "What are you going to do about this Indians' suit?"

The Attorney General said to me, "Well, you are head of my Environmental Protection Division. Figure it out."

I do not claim that that first day I stood before you I was an Indian expert. I wouldn't make that claim today. I had one objective then, and it is the same one I have today: if we are wrong, if the positions we have taken in the administration of our State resources somehow conflict with federal law, then this Court should tell us we are wrong, and we will change our ways. We are not standing

17

as the proverbial politician on the schoolhouse steps and saying, "No, no, you can't enforce the law here."  We are saying, "We have some doubts as to what the law is."  We don't think LeBlanc settled that question.  We don't think it settled it for a number of reasons.  And let me point out to you the one that to me -- and I do not claim to be a great scholar of the law, but to me is the most persuasive. Mr. Greene stands up here and tells you that on two of the issues in LeBlanc there should be collateral estoppal; on two of the issues he wants to submit additional evidence.

In support of that he puts a memorandum before you in which he cites testimony taken in the discovery depositions.

Now this is a Motion for Summary Judgment.  It seems to me the facts are either clear or they are not.  If they have the confidence of their position, if they really want to try this case on the State Court record, then I say, "Let's take that State Court record and let's take those treaties and let's submit this case on those briefs, the arguments of counsel."

Now they don't do that any more than I do, because that record is not sufficient to make a decision on. I knew that the first minute I looked at it, Judge.  A young assistant prosecutor, who should have known better but who was inexperienced, but artfully assisted by counsel, the

18

distinguished counsel for the plaintiffs in this case, who also should have known better, took the LeBlanc case up to the Michigan Supreme Court on a record that is almost non-existent.

So if you assume that everything they say is correct, that there is this right and the right exists and the right may be enforced under state law, there comes a point at which one of two things has to happen:  either I stand up and say, "All right.  Here is what we are prepared to do."  And if they say, "Okay," well, then I guess we have negotiated a consent judgment in open court.

But suppose they say no, when I say that.  Then this Court has to sit down and draft an order of injunctive relief.  You have to tell us what to do.  We are dealing here with a fragile resource.  We are dealing here, frankly, with a resource which we fear may not survive for future generations.  Now I say that regardless of the Indian question. I will not attempt to try before you the other cases I have in litigation, but I think there is no question but that we have in the State of Michigan and indeed in the entire Mid-west a tremendous problem of municipal water pollution, of industrial water pollution.  We have problems of unregulated fishermen.  We have problems of poachers.  This is not some resource just sitting there waiting to be tapped.  This is a resource that is in very serious danger.  We know about how

19

many fishermen can make an adequate living out on the Michigan waters, Great Lakes. And, frankly, we don't care if they are Indians or non-Indians. That is a different question for a different day. But from the posture of the State of Michigan, it is a soverign state. We don't care what the race or religion or ethnic background or anything else is of those Indians. And if you remember, it is almost four years to the day since I said that to you in this court. I said, "Judge, maybe the solution here is to sit down and give these Indians a certain number of commercial fishing licenses. We will give them exclusive areas. What we ask is for some assurance that they will not over-harvest. We need that basic breeding stock, that spawnning stock for future generations; otherwise they are going to be gone." We have never been able to work that out.

So if you rule with them on questions of law, then you have reached the difficult question of deciding where can that right be exercised, knowing full well, Judge, that if you find yourself legally required to allow them to fish in certain areas, it will be the end of fishing in those areas. Little Traverse Bay, Little Bay de Noc, we have areas like that all around the Great Lakes, many areas of fishing.

THE COURT:        Aren't you getting into the remedy now instead of the basic questions of the treaty?

20

You are arguing from the state of condition of the fish and the resources in that area, you are arguing pollution, you are arguing -- the waters weren't polluted at the time of the treaty.

MR. FREEMAN:        I understand that, Judge. I think I can --

THE COURT:        And the conditions that existed at the time of the treaty are far different than at the present time.  But looking at the present conditions, try to interpret a treaty or several treaties, innumerable treaties with states and the federal government at a time different from the time that is suffering the consequences of industrial revolution.  It got out of control in many areas, and what telling effect of interpretation, as to the meaning of the treaty drawn in those past -- in the past centuries -- I can't tie it in.

MR. FREEMAN:        If I might suggest, Your Honor --

THE COURT:        And I bifurcated the case to take a look at the treaties, separate and apart from today's conditions, and determine what the treaty, whether it is a valid treaty, whether it is a treaty that comes within the scope of the supreme law of the land as part of the Constitution.

Now everytime we get into court you seem to

21

drift away from the essential characteristics of the first part of the bifurcated case.

MR. FREEMAN: Well, if I might, Your Honor, I think we are being drawn off. We are being drawn off by the interjection of issues like this, like this Motion for Summary Judgment. If I might illustrate the problem from our standpoint, if I know -- and I do know, but let's make it hypothetical -- but if I know that there are certain areas of the State of Michigan where there is a desire in persons, who claim to be Indians, parts to fish; and if I believe, based upon consultation with our historical experts and other things, that there was no Indian presence at those spots in 1830, 1840, and 1850, I am going to try to put those proofs before you in Phase 1, because I am thinking ahead to Phase 2. I am trying to direct the proofs and establish a factual predicate for where we are going. If we know that there is a waterway, we are going to have a problem. We have to take a look, were there Indians there? What group were they? Were they these groups? There are other Indian groups not before the Court. Was it one of the others? In attempting to do that, we think it is important that the full facts be laid before you in Phase 1 --

THE COURT: I have ruled upon that proposition before and I am not going to rule again. You don't put all the facts before me now. We are looking at

22

the treaties, and the treaties alone, and at the time and place and under the circumstances under which the treaty was drafted, the persons who participated, the positions and the characteristics of the persons who participated, the motivations of the persons who participated at that time; not in 1977.

MR. FREEMAN: I didn't mean to suggest that we would, Your Honor. What I was suggesting was that I, as an advocate in trying to determine which were the strongest points to put before you, because, in all candor, there are thousands of documents. I am not going to bring 10,000 documents into this Court, but I am going to read those 10,000 documents --

THE COURT: I can assure you I will, too.

MR. FREEMAN: -- and determine which of the 10 or 15 are the one or ones I want you to see.

Now in making that judgment I am going to be thinking about Phase 2. I think I should be. I think that is quite appropriate for me to be thinking about it whether or not we are litigating it in Phase 1, because Phase 1 has to be the factual predicate for proceeding in Phase 2. And that is really my point. Even if you granted the relief they are asking, it seems to me you don't shorten the trial time at all, because when we get to Phase 2, we have an

23

evidentiary void.  We have nothing to fill in.  The Indians sat down twice for purposes of this case, although we know they sat down many other times, but twice, formal, the United States Government, and something happened.  We know that diaries and journals of some of the people that are there have survived to this day, and we can go read them. And if necessary, we can bring them before Your Honor and borrow them from the University of Michigan, the Burton Historical Collection and the Smithsonian and so many other places they are.

THE COURT:    If they relate to the treaties at the time, they are relevant in the instant case at the present time.

MR. FREEMAN:    That is really my point, Judge.

THE COURT:    But if they don't relate to the case at the treaty time and are related solely to the substance of the subject of the times in 1970 or from the time from the beginning of the consciousness of regulating resources, wildlife resources, by licensing and otherwise, all of this happened after the treaties.

MR. FREEMAN:    Yes, sir.  And it is continuing to happen, and that is part of my concern.

Now since the Michigan Supreme Court's decision in LeBlanc, a number of cases have been tried involving

24

persons who claim to be Indians.  And I believe some of those persons to be Indians, because some of the people at this table represent them.  This is in State Court.  In at least two cases convictions have been entered, consistent with LeBlanc in the opinion of the Trial Judge.  He didn't feel he was overruling LeBlanc.  He felt he had come down with a judgment of conviction consistent with LeBlanc, because LeBlanc, of course, ties itself into the here and now, requires the people to put on, as an element of their proofs, whether or not the activities by a particular Indian endanger the resource at a particular time.

So LeBlanc itself involved a single man fishing in the 1970's with modern equipment, and a particular place.

Now if those cases go up and the Michigan Supreme Court agrees with the Trial Judge, Mr. Greene will be back here saying, "Judge, we are not bound by this.  The United States isn't a party to this."  And I am not going to argue with that, but my point is, what have we done to the Phase 1 proceedings in this court?  We are going to have gone ahead on the assumption, forever fixed in concrete is People v. LeBlanc, and if the Michigan Supreme Court explains it, modifies it, reverses it, overrules it, under Mr. Greene's theory, you sit down and schedule a new Phase 1 proceeding. I am just saying that is no way to try a lawsuit, not an important issue like this.

25

So it seems to me that the granting of what he asks simply makes a nightmare out of this case. He is going to be offering, if I correctly understand him, Dr. Helen Hornbeck Tanner, his historical expert. Now she is going to testify whether you grant this motion or not. What he is telling you is he is going to ask her a few less questions if you grant this motion. But if you grant the motion and if he asks her a few less questions and then the Michigan Supreme Court does something with one of those many cases going up there, then we may have to reopen Phase 1, and we will call back that same witness, and I will ask her those additional questions. Now I don't see that is doing what I understand the collateral estoppal cases to be all about. The collateral estoppal cases, as I understand them, are primarily a device to make sure that Federal Courts do not endlessly retry issues that have been fully and fairly tried in State Court. It is a rule of judicial economy. The Supreme Court did not bring in the rule of collateral estoppal to save the time of the attorneys. That simply is one of the benefits we enjoy from it. The point was that the federal judiciary is being overwhelmed. There are not enough federal judges to hear all the cases being filed. So the Court is finding ways to dispose of cases something short of full trial. If you have an automobile accident and the question is the damages arising out of that automobile accident,

26

and the State Court has made findings of fact, there may be other automobile accident cases, but the fact --

THE COURT:    I am well aware of that proposition.  It is well -- precisely set forth in the decided cases.

MR. FREEMAN:    And that is my point, Judge.  I cannot find a case, and I don't believe they have cited one, that applies collateral estoppal the way they are suggesting.

Let me just go down Mr. Greene's points, if I may, very briefly, just taking a moment on them.  He says the cases say there must be a full and fair opportunity to be heard.

Did the state defendants get that?  They weren't parties there.

Now I have objected since day one to some of the biologists and others being defendants in this case.  I don't want them in this case, but they have insisted on keeping them in.  They weren't parties before the Michigan Supreme Court in the criminal case, and to say that I represented them in the course of that criminal proceeding, if there is going to be an attempt to seek money damages from those people, I think it is a denial of due process to them.

Who were the parties to the case?  Mr. Greene says the United States wasn't there.  He says he wasn't

27

there, although he argued the case, but he wasn't there on behalf of Bay Mills.  He was there on behalf of LeBlanc.

Well, he was either there on behalf of LeBlanc as a member of that Indian community, or else that case is very little precedent for what is before you, because it involves a single fisherman, a single fisherman in a line of cases to be developed later on.  We don't know how far that case is going to go.  Maybe the Michigan Supreme Court will limit LeBlanc to Whitefish Bay, **maybe** it will limit it to something smaller than Whitefish Bay.  Maybe it will en-compass all of the lakes.  I don't know, but I can tell you that they talked about Pendills Bay in that case.  And when I tried to find Pendills Bay on a map, I had to take a very unusual and detailed map.  Pendills Bay is a very, very tiny part of Whitefish Bay.

Now I think we are dealing with the scholar in the judge that wrote that opinion, and I think when that scholar said Pendills Bay rather than Whitefish Bay, which would have made more sense, because it was an area more familiar to the bench and bar -- why did he say Pendills Bay rather than Whitefish Bay?  I think because he didn't want to decide even the Whitefish Bay issue.  He wanted to decide the tiniest small issue he could, that tiny little piece. And yet Mr. Greene says to you, take that and assume he was talking about all of Lake Michigan and all of Lake Superior

28

and all of Lake Huron, I don't think that judge meant that. I don't think he would have said many of the things he said had he thought his opinion would be used that way. He intended that opinion to be guidelines for the trial judges in Michigan to try and develop a body of case law on this question, not the definitive final case.

Mr. Greene says, "Well, what about additional evidence? The State shouldn't be allowed to put in additional evidence." But that is what he wants to do. They want to offer you all kinds of additional evidence.

And in all candor, Judge, if you grant this motion or deny it, I think you will let in the evidence that we propose to offer here. Now we can bring it in by cross-examining his witness, we can bring it in by direct. We are not trying to bring in things before you that are not relevant, that are not material. We are going to bring before you, I think, some of the most fascinating historical information we have ever seen. I can tell you, frankly, I have dealt with many cases. I have never been as fascinated as I am with some aspects of this. We found the journals, we found the diaries, we found the original papers. Those dead people are speaking to us. They are recording for posterity what they were trying to do in 1836 and what they were trying to do in 1855, with or without a grant of collateral estoppal on whatever issue it is Mr. Greene is

29

talking about.  And that is my next point.  I think that is still relevant.  I think it still has to come in.  For you to grant any relief at all, there has to be a factual predicate for it.

But I think then Mr. Greene's final point was practical matter.  Well, as a practical matter, what have we got here?  We have an inadequate record based upon a criminal prosecution of one person.  If this Court makes findings of fact and conclusions of law, and if one party or the other asks the United State Court of Appeals to review those findings, under Mr. Greene's theory, all of the lawyers are going to stand there with a copy of People v. LeBlanc and argue about what is the finding and what isn't.  Justice Williams did not intend the opinion to be used that way.  I suggest if he had, we would have had a number of findings of fact and conclusions of law, something that we could have referred to some way.  We would have had specific words.

In our motion, and which my associate, Mr. Taylor, is more familiar with that point than I am, but you will notice that our suggestion is that collateral estoppal be used for specific findings, something we can get a handle on, something we can pick up.

Mr. Greene has yet through his motion, his brief, his brief responding to our memorandum of law or his half and our argument before you, has failed yet to point to

30

the sentence, the paragraph, the phrase that he wants you to give collateral estoppal to.  He is asking you to issue some kind of a ruling that, frankly, we will argue again and again and again, because we will not understand, a ruling that the judges of the United States Court of Appeals are going to have trouble understanding when it comes before them, what has been collaterally estopped?  What finding of fact or issue of law, what words?

When the counsel that makes the motion, Judge, can't be more specific than to say, as he did in his motion, we would like you to collaterally estop the state from litigating certain issues -- that was his phrase, "certain issues" -- when that counsel that is seeking collateral estoppal can't be any more specific than that, then I suggest that even he doesn't know what he is asking for collateral estoppal on.  This just seems like a dandy issue to raise before you, and that is why if I seem to be floundering a little bit, he has filed a motion that makes no sense.  He has filed a motion he says will automatically win the case.  As I see it, it does nothing.  It does nothing but further complicate this case.  And, more importantly, it ties this case to the state procedures, so every time a state judge makes a ruling, you have to sit down and decide what impact it had.  And I don't think you should have to do that.  I think it is a federal question in a Federal Court.  I think

31

we ought to have a Federal Court trial and a Federal Court ruling, and the parties ought to live with it, as it stands, whichever way.

I thank you.

- - - -

THE COURT:        Mr. Greene, the ultimate judgment rendered by this Court can and will affect the Great Lakes basin, the several states and the Great Lakes basin and the tributaries.  Do you think the Michigan Supreme Court's opinion reaches to that extent of area, territory in jurisdiction?

MR. BRUCE GREENE:   Your Honor, I think that that fits into certainly a point that the State has tried to make here this morning.  I don't want to mislead the Court into thinking that granting this motion is going to resolve all the problems in Phase 1.  I tried to be very clear that there still is some trial time in it.  I think the important thing to keep in mind is what the Michigan Supreme Court did do was interpret the treaty, two very important parts of the treaty.  The entire treaty of 1836, I think, is essentially behind this in terms of the question of whether there were reserved rights under the treaty.  And, further, they interpreted the meaning of Article 3 of the Treaty of 1855.

And I submit, Your Honor, that even though it was a criminal case in which they were reviewing an arrest

32

of a particular individual in a particular locale, that the treaty interpretation set forth in the LeBlanc decision applies whether you are talking about the tribes or whether you are talking about an individual. And that goes to the basic motion that we brought on here. One of the conditions precedent to applying the doctrine of collateral estoppal is that the issues in the first case be precisely the same as the issues in the second case.

And as to whether the Indians received the right under the '36 Treaty, whether it was one or whether it was a thousand, and as to the meaning of Article 3 of the Treaty of 1855, whether it affected or released as to Mr. LeBlanc or released as to the Bay Mills Indian Community or the Sault Ste. Marie tribe or Chippewas, I submit the issue is precisely the same.

The thing that I think Mr. Freeman is mistaken on is the notion that somehow we are creating some kind of a renvoi, you know. First the state decides something, and the Federal Court decides something, and the state decides something -- and that is not the tennis game that I envision we are playing here, Your Honor. What I see is that we are trying to get two issues behind us. We are trying to get on to whatever other issues remain in the case, to the issues that remain in Phase 1. And if we need to, if we have to, to Phase 2. And all I am suggesting is that the Michigan

33

Supreme Court dealt with two very critical issues, the meaning of Article 3 and whether or not the Indians reserved fishing rights, i.e., did not give them away, did not cede them away when they ceded away their land rights under the 1836 Treaty.  Those issues have been decided, and I submit that, getting back to my first point, it is the same whether you are talking about one Indian, ten, or twenty, or one hundred.  It is the interpretation of the treaty that we are dealing with.

THE COURT:        The 6th Circuit looks very closely on motions for summary judgment, and if there is any residue of a disputed fact, it will be sent back.

MR. BRUCE GREENE:   Your Honor, I am aware of the fact, as you are, that there are also some risks involved in this kind of a situation, and I have thought a lot about those risks, and I have thought about the inevitability of an appeal.  And I fear that is quite likely.

At the same time, I am thinking of the Bronson decision in which the 6th Circuit adopted a doctrine of issue preclusion isolating out particular issues and saying, as to those issues, those have been decided and we are not going to relitigate them again, number one.  Number two, a Motion for Summary Judgment is not a final and appealable order.  And I referred to some authority, I think, on the first page of my opening brief that says it is not a final

34

and appealable order in the sense that it is something that can be taken up.  It is an interlocutory order.  It has to be certified by you.  It has to be accepted by the Court of Appeals.  So that this issue, unless this Court were to decide to certify it up, it is not going to the 6th Circuit until after all of the remaining Phase 1 issues have been decided.

The notion behind the motion is a simple one. I think Mr. Freeman has referred to it also as the "notion of judicial economy."

We are trying to get a couple of issues out of the way.  We have heard many times from the counsel for the defendants about how involved this case is and how there are so many documents and so many issues and it is unmanageable. I have told you many times that I don't agree with that, but at the same time I think this motion would facilitate the Court's process.  That is why we brought it on.

THE COURT:          Well, I want to make it a certainty that the only documents that will be relevant in the Phase 1 case are those that relate to the treaty and not to the economic or the -- economic or environmental condition of the present day.  And that is clear.  On the premise that that is clear, we may be able to put the issues which you raise for summary judgment at the last agenda of the evidence in the Phase 1 hearing, and at that time examine it from the

35

standpoint of whether we can grant the motion.

MR. BRUCE GREENE:    In other words, if I --

THE COURT:        Put everything else in --

MR. BRUCE GREENE:    And then see where we are at?

THE COURT:        See where we are at at that time.

MR. BRUCE GREENE:    I see.  And you might want argument at that point, and at that point you might either deny the motion and bring on some more questions.

THE COURT:        Yes, grant or deny the motion.

Mr. Freeman.

MR. TAYLOR:        Your Honor, may I inquire if Your Honor would like to hear arguments at this point on the other two motions which the State Defendants have offered? We also have submitted two specific motions on the issue of -- one on collateral estoppal seeking a partial summary judgment as to one specific finding of fact of the Indian Claims Commission.  This would be Finding of Fact Number 58, which was determined in the Indian Claims Commission in the case of Ottawa and Chippewa Indians v. U.S.  Would Your Honor like to entertain argument on that issue at this point?

THE COURT:        Mr. Greene, do you have anything to say?

36

MR. BRUCE GREENE:   Your Honor, we -- you set a briefing schedule in light of our Motion for Partial Summary Judgment.  In the interim -- and I believe time limits -- the State brought on two, not only their Brief in opposition to our motion, but brought on two separate partial motions, motions for partial summary judgment.

This morning, very belatedly, I filed a brief captioned:  "Memorandum of Points and Authorities in Opposition to the State's First Motion for Partial Summary Judgment and in reply to State's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment."  Now they have not had an opportunity to read that brief, but it is addressed to that first motion.  And, quite honestly, when it was prepared, I think we all felt that it was a little difficult to deal with their brief in opposition to our motion without also dealing with their first motion, and I would be prepared to have Mr. Taylor discuss it this morning, if it meets with your approval.

THE COURT:        All right.

MR. STEKETEE:        Excuse me, Your Honor, our Motion for -- our Renewed Motion for Intervention is, I think, also likewise intimately connected with the Plaintiffs' Motion for Partial Summary Judgment, for obvious reasons. And if after Mr. Taylor and Mr. Greene are done arguing the State's first motion, I wonder if you could indicate whether

37

we would be able to argue on our motion?

THE COURT:            If I have time, we may. But I want you to be prepared to specifically define your right and claim.

MR. STEKETEE:            I will be prepared to do so.

THE COURT:            In contradistinction with any single fisherman in the State of Michigan.

MR. STEKETEE:            I will be happy to do so, Your Honor.

THE COURT:            And that goes to whether the State of Michigan is adequate to represent all of you.

MR. STEKETEE:            Correct.  I think Mr. -- that is for a later moment, I believe.

THE COURT:            And represent some of us amateur fishermen.

MR. BRUCE GREENE:   Your Honor, I don't want to belabor Mr. Steketee's point, but I think a couple of quick points are in order.  One is that we haven't briefed his latest -- we haven't filed a brief in opposition to his latest motion.  And assuming that the Court was going to entertain the motion, we would want to do that.

Secondly, as I understand the gist of his motion, it is that if the Court grants plaintiffs' Motion for Summary Judgment, then somehow Michigan United

38

Conservation Clubs has some greater stake in the litigation and they are not adequately represented by the State and they are not bound by the doctrine of collateral estoppal as the State is. Of course we disagree with that. But the point is, Your Honor, if you don't grant our Motion for Partial Summary, in other words, at the end of the day or the end of the week or whatever, that you indicate that we are going to go ahead and go to trial and you are going to reserve ruling on the Motion for Partial Summary Judgment until the end of the testimony, then I submit there is nothing new by way of Mr. Steketee's motion.

    THE COURT:   You are correct.

- - - -

### ARGUMENT ON BEHALF OF THE STATE DEFENDANTS

   MR. TAYLOR:   May it please the Court, I didn't introduce myself before. Greg Taylor, Assistant Attorney General on behalf of the State Defendants.

   Your Honor, our First Motion for Partial Summary Judgment, supported by a rather lengthy brief, but the motion itself is very specific, and it deals with Finding of Fact Number 58, which was a finding of the Indian Claims Commission, which holds -- in my view, this is what it holds: that the Article 3 of the Treaty of 1855 constituted a release by the Indian plaintiffs of all former treaty

39

rights, including fishing rights.

Now as Mr. -- and let me say to Your Honor that we are not asking for a decision on this right now. As Mr. Greene has indicated, he has just filed his response. I have looked at it this morning. I think he can take care of the oral argument at this point, however, or whatever Your Honor chooses.

THE COURT:    It would be only a guide-line to the Court. It couldn't necessarily bind the Court. If the Court looks at the whole totality of the treaty and can conclude from the totality of the evidence that the Bureau was -- or, the agency was in error, so be it.

MR. TAYLOR:    All right, Judge.

THE COURT:    It would be just as a guidance. You could stipulate -- I suggest you do this: you can stipulate to the existence of the ruling and make it a part of the record for the Court to consider. But the Court, you can argue now, but the Court will not conclude, as finally binding upon this Court.

MR. TAYLOR:    All right, Your Honor. Looking at it as a guideline, I hope Your Honor will have an opportunity to examine our brief, because --

THE COURT:    I certainly will, and all briefs that are presented to me.

MR. TAYLOR:    In that brief that was

40

filed May 2nd, we have set out extensive quotes from the findings of the Indian Claims Commission and from the briefs and oral arguments of the plaintiffs in that case, which were the Ottawa and Chippewa Indians. And the reason I bring that out is I think it is quite important. In addition to the doctrine of collateral estoppal, we are talking about the doctrine of preclusion. In fact, the Indians' claims since the 1907 Court of Claims case have consistently argued that the Article 3 Treaty of 1855 was a total release, including these treaty rights, including Indian fishing rights. And I think the reason they did that is obvious. It was to their advantage.

Now we have argued in our brief and argued before you today that they are now precluded, some 70 years later after litigating and relitigating this case, to challenge, completely change their position and say now that the treaty did not give up those rights, did not release those rights. That is the real basis for our motion in this case.

As I looked through the response to that motion this morning when I received it from Mr. Greene -- I understand the pressures of time. I am not criticizing him for giving it to me today, because it wasn't scheduled to be heard today. But as I look through this, it seems to me there is no dispute in their view that they probably are

41

bound by Finding of Fact Number 58, but there seems to be a dispute as to what Finding of Fact 58 means.  And for that reason I think it is important at your opportunity that Your Honor take the opportunity to closely examine the brief that we submitted, because we have submitted portions of briefs filed by the Indians' plaintiff in the 1907 case where they said that this Article 3 released all fishing rights.  We have submitted the portion of briefs submitted by the Indian plaintiffs before the Indian Claims Commission on a Motion for Preliminary Adjudication of the United States.  And, again, the United States said Article 3 released all these rights, and again specifically mentioned Indian fishing rights.

And then we have another brief filed by the plaintiffs again, Indian Claims Commission, on the setoff fees before the Indian Claims Commission.  Once again they say they released the fishing rights in Article 3.  We have oral argument, we cited oral argument where Mr. Rodney Edwards, counsel for the Indian plaintiffs before the Indian Claims Commission, said:  "One of the things that was terminated in 1855 was the right to hunt and fish on the land that was needed until needed for occupancy."  The precise terms, of course, in the 1836 Treaty.

Again I have just quickly looked through the Memorandum submitted by the plaintiffs in response to our

42

motion, but it seems to me that one thing they are doing is they are submitting some testimony that our expert placed on the record during deposition. I haven't looked at what it is, but it seems to me that is not the issue before us now. The issue is, one, is that finding of fact binding on these plaintiffs? After relitigating this thing over the last 70 years, are they now bound by that?

And, two, what did the findings of fact say?

I think it is clear to me if we are going to acknowledge that it is binding on them, which they seem to be doing, I understand Your Honor indicated it may be a guideline in your ruling, I think we have to be clear, though, that it is our position that it should be a matter of res judicata or collateral estoppal at this point.

THE COURT:          If you say that in your briefs, I am sure I will see it and evaluate it very heavily.

MR. TAYLOR:          That is precisely what we have said, Your Honor. And I think then if the issue is what did that finding say, well, we have got the document before us. The documents are under the custody of this Court, many of them. They have been sent by the Indian Claims Commission to your clerk, Mr. Sarb. We have the original briefs that were filed by the Indian plaintiffs in the Indian Claims Commission, and any clear reading of that will show that they have consistently argued that they gave up all

43

these fishing rights in Article 3 in the Treaty of 1855.
We have got it from 1907, briefs filed by the plaintiffs, a
very clear finding from the Court of Claims in 1907.  We
have got the two briefs before the Indian Claims Commission.
We have got the oral argument before the Indian Claims
Commission.  We have got two decisions:  one on preliminary
adjudication, one on the setoff by the Indian Claims
Commission, findings of fact.  It is clear that these Indian
fishing rights were given up and released in Article 3.  And
we have got Finding of Fact Number 58.  It seems to me that
this is the kind of issue where collateral estoppal really
was meant to apply.  We have got a consistent position taken
over 70 years.  We have got the parties right here.  The
United States of America and the Indians were certainly
parties before both of those cases.  It seems to me this is
precisely where collateral estoppal should apply, and that
is what the State Defendants are asking this Court to so hold.

THE COURT:        We will consider it.

We will take a brief recess.

(A recess was taken from 10:45 a.m. to 11:06 a.m.)

MR. BRUCE GREENE:    Your Honor, I am going to
be very, very brief with respect to responding to Mr. Taylor's
argument, because obviously the Court has not had time to
read our brief, and it seems silly to spend any time on this
until you have had an opportunity to look at it.

44

So with that, with that brief introduction, let me just say that this brief was put together rather hurriedly.  It does not address itself to the issue of the collateral estoppal effect of an administrative decision, an Indian Claims Commission decision on a Federal Court. And I would be prepared to submit some supplemental brief on that issue.

With respect to the merits, let me just say very briefly, number one, the State has mischaracterized what Finding of Fact 58 says.  We don't agree with them.  We set forth at length what we think Finding of Fact 58 does say.  That issue is a threshold issue which really eliminates the necessity to get into anything else.

In addition, our second point is that the issue before the Indian Claims Commission was a different issue than the issue in this Court, and therefore one of the basic cornerstones of the doctrine of collateral estoppal could not be satisfied here, that cornerstone being the issues in both proceedings be the same.  It simply was not the same issue in the Indian Claims Commission.

In any event, we have briefed it, and it doesn't seem fair to me to continue arguing about it when the Court has not had an opportunity to read our brief.

And I will conclude at that point.

THE COURT:          All right.

45

MR. TAYLOR:          May I say one short comment, Your Honor?

THE COURT:          Yes, one short comment.

MR. TAYLOR:          I just want to stress, Your Honor, that the decision, Finding of Fact Number 58, is not a mere administrative decision or something that some bureaucrat came up with.  This was a full judicial proceeding under the Indian Claims Commission Act, which Your Honor, I am sure knows gives exclusive jurisdiction to the Indian Claims Commission to hear claims brought by the Indians, claims against the United States.  And prior to the Indian Claims Commission, of course the Court of Claims had exclusive jurisdiction in that area.  And I think you will see, if you look at the brief, this consistent position, beginning with the decision in 1907 before the Court of Claims and the additional decision in the Indian Claims Commission, both decisions coming after a full judicial hearing, full proceeding.  In the -- as Commissioner Pierce, who was one of the commissioners, wrote an interesting article recently in the American Bar Journal on the Indian Claims Commission, said in the Indian Court of Claims, which is what she believes the true title of that commission is.  So I just want to be sure this isn't some bureaucrat sitting down and making some guidelines or something.  This is a finding as a result of a complete judicial proceeding.  And,

46

hopefully, I understand Mr. Greene will be submitting some additional information to you.  I don't think it will be necessary for me to do so, although I would like the right to reserve the right to do so, depending upon what he does submit.  But I think the fact that we have completely set forth in our brief the findings and the further fact that the documents, upon which we briefed -- those documents are available to the Court.  The original document, I think that Your Honor will find it is clear that Finding of Fact Number 58 did hold indeed that Article 3, the Treaty of July 31st of 1855, released all former treaty rights, including fishing.

THE COURT:          (To Mr. Steketee)  You have 15 minutes.

MR. STEKETEE:          Thank you, Your Honor.

- - - -

ARGUMENT ON BEHALF OF MUCC

MR. STEKETEE:          On behalf of MUCC, I will now argue its renewed motion to intervene.  The motion presents the same legal questions as did the original Motion to Intervene.  The only question is whether the plaintiffs' Motion for Partial Summary Judgment changes the facts and would result in a different decision.  And it is our belief that it does, of course.

Now before we get into that aspect of the

47

argument, however, you had asked me to define for you precisely what the interest of MUCC is in this litigation. I didn't brief that extensively on reviewing the motion, because I believe the Court had decided that question in our favor previously, and that aspect of the case was not upset in any way by the Sixth Circuit in the appeal.

In any event, I would be happy to tell you what our interest is.  Your Honor's question seems to indicate, in my mind, that you are disturbed with whether a membership organization has the right or standing to represent the interests of its members, because Your Honor talked about what contra -- the contradistinctions between our right as opposed to the right of any individual fisherman.

Well, that question, of course, has been very carefully discussed and cited in favor of MUCC in Sierra Club v. Morton, which is cited in the brief, 405 U.S. 727, a 1972 case in which the Supreme Court very clearly holds that a membership organization does have standing and may represent the interests of its members.

So MUCC's interest is identical to those of its members.

So then the question becomes, what is the interest of an individual fisherman?

THE COURT:        That's exactly what I want to get at.

48

MR. STEKETEE:          Now moving on to that question, I think it is necessary to delve somewhat into some of the other issues in this case to try to answer that question with as great clarity as possible.

The State in its recent briefs, one of its recent briefs, has cited to you the Federal Submerged Lands Act.  In fact, it is on page 23 of their Brief in Support of Second Motion for Partial Summary Judgment in May 2 of this year.  The Submerged Lands Act is found generally at 43 U.S.C. 1301.

Now the Submerged Lands Act sets forth, I think, the way in which these assets -- these fish, I am speaking of now -- are owned and held under Federal law and under State law, as well.  There is no inconsistency here between Federal law and State law.  It is very clear that the fish in this fishery, which is, by the way, a re-constructed fishery, as you know, and it is largely planted fish paid for by sportsmen license fees and taxed -- in other words, MUCC's members and other fishermen paid for these fish.  The fish, however, are owned by the State of Michigan. They aren't owned by the Indians, they aren't owned by MUCC or its members.  They are owned by the State of Michigan.

THE COURT:          That is the question to be resolved before the Court.

MR. STEKETEE:          Well, there is nothing to

49

be resolved. It is very clear. There is a Federal statute that says what the answer is. It is 43 U.S.C. 1311, which says that "Title to an ownership of the lands beneath navigable waters within the boundaries of the respective states, and the natural resources within such lands and waters are owned by the State."

THE COURT:    But, Mr. Steketee, if I decide the supreme law of the land is the Indian treaty, the statutes of the Congress have to yield to that judgment.

MR. STEKETEE:    Well, Your Honor, that is not correct. That is a 1953 statute. It is very, very clear. Under the case law -- I am referring now to the Cherokee Tobacco case, and even to the Rosebud Sioux, which was decided by the Supreme Court just the other day -- that a subsequent later legislative act by the Congress supersedes an inconsistent provision in a treaty. That question of law has been settled. If there is any inconsistency between the treaty, in this case, and the Submerged Lands Act, the Submerged Lands Act controls. I suggest that the Submerged Lands Act sets forth the ownership of these assets.

THE COURT:    Now, what then is MUCC's interest in these assets, and how is it distinguished from the interests of the Indians?

MR. STEKETEE:    Well, neither party owns the resource while it is out in the water. And I suppose --

50

I remember the first case I read in Property Law in law school was an old English case in which a man grabbed onto a -- there was a dispute between two hunters as to the ownership of a fox that had been shot or captured or something, and I remember the doctrine of manu caption. In order to maintain property interest in a wild animal, you have to grab it, so to speak. And I suppose that's still the law today. If I go out hunting or fishing, I don't own the fish until I capture it. And I think the law is the same with regard to the Indians as it is to anybody else.

Now that doesn't mean that a hunting right is not a valuable and protected right. For example, the Interior Department, represented here by Mr. Nitzschke and Mr. Spies, uniformally bring condemnation actions when acquiring lands under the Migratory Bird Conservation Act. And you might want to take a look at Swann Lake Hunting Club v. U.S., 381 F.2d 238, a Fifth Circuit decision in 1967 where the hunting rights and the ownership of the land fee were different. And the Government brought a condemnation action against the hunting clubs, the owner of the hunting clubs as distinguished from the ownership of the fee, in order to acquire those rights under the Migratory Bird Conservation Act, which, as you know, is an act that is intended to enforce an international treaty.

Now, by the same token, the fishing rights in

51

this case are a valuable right that are protected by State and, I believe, Federal law.  The Fifth Amendment, the Fourteenth Amendment protect this right.  It cannot be taken away arbitrarily.  It cannot be denied to one person and given to another on the basis of race, religion, or things of this kind.  It is a protected right.  It is subject to licenses, as are many rights.

I can't practice law without a license, but my right to practice law is a valuable and protected right. And so, too, the right to fish is a valuable and protected right.

If I were standing up here and representing commercial fishermen whose very lives depended on their ability to continue to fish as opposed to commercial fisher -- as opposed to recreational fishermen, there wouldn't be any question.  And I think, however, in the case of the recreational fisherman, the right is just as important in many respects, as you yourself know, it gives untold millions some of the greatest pleasure of their lives, to go out and fish or hunt, to enjoy their leisure.  And that right is potentially affected here, and that is the right which we have the ability and the standing to represent.

Now turning to the question of -- now passing that question and going to the question of whether we have a right to intervene under the circumstances, we first must

52

have the right, which I talked about.  Secondly, there must be no -- that right must be affected by the litigation.  I don't think there is any question about that here.

And, thirdly, the right must not be adequately represented by any other party to the litigation.

And the argument has always been that the State is adequately representing MUCC's interest.  Well, if the State is bound by so-called "factual determinations" in the LeBlanc case, then -- and those factual determinations are so critical that the whole case depends upon how they are resolved, then I think the whole question of whether the State is adequately representing MUCC's interest is turned around, and it becomes very clear, if it wasn't already, that the State is not adequately representing MUCC's interest. If, for example, the State is barred from litigating the question of the meaning of the Treaty of 1836 and the meaning of the Treaty of 1855, then, for all practical purposes, as far as we are concerned, that is it as far as Phase One, the Phase One litigation is concerned.

The two critical questions, or two of the most critical questions, are determined adversely to the State, and MUCC, which was not a party to the LeBlanc case, which had no say in the bringing of that case, which did not appoint that assistant prosecutor, which had no say in what evidence would be submitted and what would be withheld or

53

anything of that kind, clearly cannot have been bound by that criminal case.

Now the question is, is it fair to bind it now in this litigation by denying intervention to it?  And I suggest that there could be no less fair result that could be arrived at in this case.  You have millions of people who are directly and potentially very severely affected by this litigation, who had no say in the other case, who are now potentially to be left out in the cold by the operation of collateral estoppal in this case.

Now turning to the procedural problem, which Your Honor is -- as I perceive it -- an inclination here -- creates for MUCC -- let me just summarize where I think we stand:

As I read what you said this morning, Your Honor, you are proposing to take these plaintiffs' Motion for Partial Summary Judgment under submission; to proceed to the point of trial, perhaps to even go through part of the trial before deciding the question.

Now I think you can see, from a practical stand-point, that leaves MUCC in a very peculiar position, because if we are right, if we have a right to intervene, and the State's inadequate protection of our interests, what happens if halfway through the trial or on the morning of the trial, for that matter, the Judge, Your Honor decides that the State

54

is collaterally estopped and the trial need not proceed except on those residual issues that may be left?  At that point MUCC's motion ripens into a matter of grave seriousness, and yet at that point MUCC will not be -- I won't say we won't be prepared to proceed with trial, but it would certainly be very unfair to ask us to proceed to trial on that kind of notice.

So I think the Court's -- although it is very proper for the Court to take whatever amount of time it believes necessary to decide this important question, I think also that in fairness to MUCC, it ought to be given -- its motion ought to be decided on the assumption that the State may be bound by collateral estoppal, whether the Court has decided that or not.  In other words, to let MUCC in now on the possibility that the State may be bound, so that MUCC may begin its preparations for trial and be as prepared as anybody else when the day of trial arrives.

Now in terms of prejudice to the defendant -- or, rather, to the plaintiffs, there never has been any prejudice to the plaintiffs in allowing MUCC to intervene. The Court has separated out the Phase One issues.  MUCC's intervention is not going to expand those issues unless the Court issues another order expanding them himself.  MUCC has participated in discovery.  The Court allowed it to in its order denying its intervention.  And we have participated.

55

We haven't played the sleeping dog.  We are as ready to proceed as any of the parties.  There will be no delay in allowing MUCC to intervene.  All MUCC's intervention can do is to allow it to participate in the trial as a party, which it really should have always had the right to do, in any event, in my opinion, because the interests which it represents are so important, they are shared by so many people, that the addition of one additional lawyer, where you have, you know, how many lawyers have we seen on the plaintiffs' side in this case?  There are at least three parties.  They have had dozens of lawyers that have entered appearances in this case.  Presumably all three parties, the United States and two tribes will be allowed to participate fully in the trial, cross-examine and so forth.  The State has -- there is only the State on the other side.

What possible prejudice, what possible delay or inconvenience could result from the addition of one additional lawyer on a side arrayed with the State?  There can be none.

And the Court holds, of course, very broad power to prevent any abuse that might result in allowing an additional party in.

So I have never seen any reason for denying MUCC's intervention.  I think, regardless of the legalities involved, where you have at stake interests of this great

56

importance that are held by people with tremendous fervor, the right to fish. I don't care what legally it is. I am talking about psychologically to the guy in the factory line or to the executive working in the office. This is something that cuts across all social strata in our society. It is something that is of extreme importance to people. It is something they hold in their minds when they are doing other things that they may not like to do as well. The right to go hunting, the right to go fishing is a very precious thing. People order their whole lives around it. People come to Michigan so they can fish and hunt --

THE COURT:         I don't know whether I told you, at one time when I was on the State bench the wife in a divorce case asserted the grounds of deer hunting, and I held that that wasn't a ground for divorce, and I said, "If I were to so hold, that the turmoil and cry of the hunters could be heard from the  Straites of Magellan to the Straits of Mackinaw."

So I know a little bit about the emotional proposition involved.

MR. STEKETEE:         Well, where you have --

DEPUTY CLERK:         Well, Mr. Steketee, would you wrap it up, please. Your 15 minutes has lapsed.

MR. STEKETEE:         Where you have rights this precious and this fervently held, I think it behooves the

57

Court, the administrative agencies, anyone dealing with people, that we are dealing with people here --

THE COURT:            Your time has expired.

MR. STEKETEE:        It behooves them to bend over backwards to allow participation.

And that's what we are asking.

THE COURT:           Anything else?

MR. BRUCE GREENE:    Would the Court -- we would be prepared to brief Mr. Steketee's new motion, if you think it is necessary.  We would prefer not to, if you don't think it is necessary.

THE COURT:           If you prefer not to, it is not necessary.

MR. BRUCE GREENE:    There are some scheduling matters, if you think that is appropriate now.

THE COURT:           All right.  Let's take a look at that.

MR. BRUCE GREENE:    The last time we were before you we had asked you about a trial date.  There are a few things that have arisen since then, obviously.

What I would like the Court to order, if it agrees with our position, is that, number one, there be a final date for pretrial motions.

Number two, that I presume the State would like to have its motion, second motion for partial summary judgment,

58

heard, and presumably some kind of a briefing schedule should be established for that, as well.

Finally, I think we have had some discussion about stipulations.  And, frankly, Your Honor, it has been difficult to arrive at any kind of agreement with the State on stipulations, and it mostly, I think -- in my mind, I think I have slowed that process down a bit.   And what I would like to propose now is that we try to speed that process up, and I think the way to do that would be for the Court to set a date upon which cross-stipulations would be served.  In other words, a date 30 days from now, or whenever, when both sides would be required to submit to each other proposed stipulations.  And I think that would facilitate the process.

Right now it appears to me as if I am waiting for Mr. Freeman and Mr. Freeman is waiting for me, and I don't think we are going to get it done that way.

And, finally, I would propose a trial date be set, in light of these other suggestions that I have made.

I could try to be more specific about dates, if that would help.  I have worked that out.

I guess the first thing would be a date for your motion, I presume.

The next thing, I think, would be a cross-stipulation date.

59

And then, finally, I think there ought to be a final date on pretrial motions, and then the trial date.

MR. FREEMAN:        May it please the Court, I have never charged I am waiting for Mr. Greene on stipulations. I frankly think that exchanging stipulations, like ships in the night, is not going to be helpful in a case like this.

As I indicated to Your Honor, although I felt as defendant it was not our burden, I was willing to assume it, and I still am.  I have not begun putting stipulations together and sending them to Mr. Greene, because I do not have, as yet, all the transcripts from the depositions.  But I am willing to go first.

Thirty days, frankly, would be a bit much, though, Judge.  We are talking about thousands of pages of depositions.  We are talking about many, many documents. But I am willing to accept responsibility for the State to go first on that.  I think we can come up with a list of stipulations that the plaintiffs will agree to.  If we can't do that, well, at least we tried.

I think a more troublesome issue is our second motion, which we didn't attempt to argue today.  We recognized counsel needed more time to get prepared for it.  But what we are trying to raise there is there is a problem that is a very deeply felt one in our side.  We are not sure all the right parties are before the Court on the plaintiffs' side.

60

From our standpoint, that raises a possibility of a multiplicity of litigation. But, frankly, the State of Michigan will find enough money to pay my salary. With or without a multiplicity of litigation, we will proceed. I feel badly if this Court's time is tied up in having to try the same case more than once. As an officer of the Court, I don't want to see this happen, but I feel most badly for some people who tell me that they are being denied due process by not being here.

Now the person who said that -- and I allege it in the motion. I am an officer of the Court and I understand what my signature on a motion means, and I wouldn't lie to this Court. A young lawyer that I hold in considerable respect tells me that his clients are being denied due process, that none of the people sitting here represent his people, but they are descendants of the signatories.

I would like a decision on that, Judge. And I am not really in an adversary position on it. I am just trying to put the question before you, because if all the people are not here, I would like to see them here. If they are all here, then I guess I should be saying to those others that call me, "Well, you are not Indians. Judge Fox has held the Indians are before him. You are poachers. I will deal with you under State law." And maybe that is what I should be doing, but I think that one Mr. Greene said to you, "Well,

61

we will just kind of polish off that motion and go on and set the trial date." I think the issues reflected in that motion are worthy of some study. I think the Court may well want to rule on that motion before you make a decision on when we ought to go to trial. And that is why I filed it, because Mr. Greene the last time said, "Hey, let's set a trial date." And in the course of the exchange with you, you asked him about Peshawbestown Indians.

Well, I did some research on the Peshawbestown, and that is one of the groups I am talking about. Maybe I just don't understand Indian law, maybe I just am not grasping this, but there are a bunch of people out there that tell me they are the great grandchildren of people who signed this treaty; but all these folks say they are not Indians. To my eye, they look like Indians, their lawyer says they are Indians. And I think that is an important issue that ought to be resolved before we set a trial date, because if you determine those people are in, I think the first thing their lawyer is going to say to you is "I need some time to get prepared."

Now I don't need any further time to get prepared. I just need time to get the stipulations together.

THE COURT:          Are you suggesting a class action for Indians?

MR. FREEMAN:          I am not sure, Judge. That

62

is why I wanted to raise it by motion, because I think it comes down to this:  if the tribal power is now vested only in these two groups, the Bay Mills group and the Sault Ste. Marie group, then I guess until and unless the Federal Government sets up another group, that's it.

But this is where the use of LeBlanc becomes so interesting, and that is why I felt that motion should be partially in response to their Motion for Summary Judgment, because LeBlanc is not dealing with some great tribal right or some federally recognized group.  It was a man, a man and a boat, and our Supreme Court found a right.  Now if that man and a boat had a right, I don't know how many thousands of people are out there that may have that same right, but I think we ought to know, because if you determine there is a right to fish, then I think every citizen of the United States that is entitled to that right ought to be able to exercise it.  And I don't want to go through years of litigation trying to figure out who they are.  I would like to know.  I think the burden of trying to figure that out, if you agree with my approach to my motion, is on that gentleman, but the Department of Interior and the United States Government, they ought to know who is involved in all this.  If they can't figure it out, then maybe we do need something like a class action or maybe something, at the very least, we need somebody sitting here amicus curiae just

63

to protect the rights of those people.  But my point really is, I did not intend to argue that motion, and I don't think it would be fair for me to do so at this time until they have had a chance to respond.  My point is, to set a trial date with a question like that hanging -- frankly, I think Mr. Greene is grandstanding.  This case is not going to be ready to go to trial this year, as he knows, but I think we can get to trial the early part of next year, if the lawyers work hard on the stipulations of fact and if we attempt to narrow the issue.  And, as I say, if the State is willing to assume the burden of that, I just tell you, frankly, I am going to need some transcripts not yet typed, I am going to need some time to think about it.  I am sure it will take me 60 to 90 days to get together any decent kind of stipulation. Now I can do the sort of thing he is talking about where I can fire off eight pages of stuff at him and he fires eight pages at me, we both disagree with each other's stuff.  I can do that next week.  But I mean something meaningful, something geared to try and save precious trial days of this Court's time.  It is going to take me sometime to do it, but I am willing to go first.

          THE COURT:         Do you want to respond?

          MR. BRUCE GREENE:   I don't really want to reargue the same thing we argue before you every time we come here, which is about how many years this case is going

64

to take to try, because we have heard it, and I don't think it is necessary to go into it.

Could I -- I have worked out a proposed schedule which I would like to set up as a trial date, if I can.

THE COURT:          All right.

MR. BRUCE GREENE:   June of --

THE COURT:          I asked about the Peshawbest Indians and others, and I am concerned about whether we have all of the persons who are disadvantaged and who, by reason of their disadvantage, are not here.

MR. BRUCE GREENE:   Your Honor, the plaintiff intervenors are, of course, the Sault tribe and the Bay Mills tribe, and their members are the members we are talking about -- not all of them fish -- who would presumably be people fishing subject to tribal regulation, if plaintiffs' view of the case is sustained.

THE COURT:          Now would the fact that the United States, the Government of the United States and its agencies, who are parties to this action, be sufficient to protect the rights of those persons?

MR. BRUCE GREENE:   Well, Your Honor, this gets into something that can be somewhat involved.  I will try to be speedy about it.

THE COURT:          I am sure it is involved.

65

It is very involved.

MR. BRUCE GREENE:   The Interior Department, by delegation from Congress, is the principal agency for implementing the trust responsibility.  In the process of implementing that responsibility, they have to make some decisions about who is the beneficiary of that trust relationship.  In other words, who is federally recognized generally and who isn't.

Right now the only federally recognized tribes that are -- that the United States has brought this lawsuit in behalf of are the Bay Mills Indian Community and the Sault Ste. Marie tribe, the Chippewas.  There may be some questions about, for example, some Indians in the State who have a substantial amount of Indian blood who clearly are Indians.  There may be some questions about where they sit with respect to some decision which is made by this Court. But you can't decide all of those things at this particular point in time.  There are some difficult issues about that. But, in the first instance, it seems to me that if there are some people, say Indian people who feel that somehow the United States is not discharging its trust relationship and its trust obligation to them, that they have a vehicle for complaining about that, for coming to the Interior Department and asking for recognition.  It goes on all over the United States now.

66

The Interior Department is making -- is re-thinking this whole question of federal recognition right now.  It has been raised in the context of another case affecting another tribe in Washington.  And I cannot say to you that your decision is going to tie down and resolve every single loose end.  I can say to you that it is the state's interest to try to demonstrate to you that there is -- that that is your obligation, to  somehow deal with all of these other problems that, frankly, aren't part of this lawsuit. I think that once we get past the initial question of treaty interpretation and the fact that these particular tribes indeed are before you and are presenting their views to you, that there may be some other problems down the road which you may have to deal with, but I don't think that is going to be next week or next month, and a lot of it depends on what relationship ultimately some individual people work out with the Federal Government in terms of, you know, whether they are federally recognized, whether they are entitled to the benefits of the trust obligation.  This is not a problem unique to Michigan.  It goes on in a lot of different places.

THE COURT:         I understand.  I have been in communication with some of the judges at conferences, the judge from Maine and the judge from Washington.

MR. BRUCE GREENE:   I would certainly be prepared to try to articulate in a more precise way, in the

67

way of a brief, some of these issues.  I am sure the United States would want to do that, as well, and Mr. Nitzschke may want to comment to you now, but I think it might facilitate the process a bit if we discuss this again at some time when the Court wants to hear arguments about it.

And I do have a schedule which I could --

THE COURT:           Let's look at your proposed schedule.

MR. BRUCE GREENE:   Okay.  I am talking about, the plaintiffs would file a brief in opposition to the State's Second Motion for Partial Summary Judgment on the 6th of June; all argument to take place one week thereafter.

Then I propose June 30th as the date for submission of cross-stipulations by both parties to each other, first set.  I would propose July 11th as the last day to file pretrial motions, followed by the 25th of July for arguments with regard to those motions, and also have that be the last day to file a final set of stipulations and also final pretrial conference, and talk about three weeks after, August 15th, a trial date.  That is kind of a mouthful. I can go through it quickly again.

June 6th would be when the plaintiffs would file their brief in opposition to State's Motion for Partial Summary Judgment.  That would be about three weeks from now. That is on a Monday.

68

And one week later on the following Monday would be oral argument on that.

And then the last day of the month is the proposal, approximately two and a-half weeks thereafter, the proposal of cross-stipulations to be filed.  And then about two weeks later, July 11th, which is another Monday, would be the last date to file pretrial motions, all pretrial motions would be due then.  Then two weeks thereafter would be arguments on any of those motions and file pretrial conference and the last day to file the final stipulations.  And then approximately three weeks thereafter, August 15th, on a Monday, would be trial.

THE COURT:        On the 31st of May I start the Benton Harbor School Desegreation case.  That could be two to three to four weeks.  It involves multiple school districts, cross-district busing.  It looks like the entire month, balance of June I will be tied up in that litigation.

The problem is we have just too many cases like this, and all of the superimpositions of TRO's.

MR. BRUCE GREENE:   Well, Your Honor, could I make a suggestion?

THE COURT:        Yes.

MR. BRUCE GREENE:   Either, if you thought there was say a two-hour period during trial that you could hear argument on the State's second motion during June, fine.

69

If not, fine, you are the best judge on that.  We could try to push this whole schedule after by 30 days starting in July.

THE COURT:          Yes.

MR. FREEMAN:          Your Honor, just one point:  counsel may sound like we filed this motion as a delaying tactic or something like that.  Now I want you to understand the position I am in.  I have a group of people who claim to be Indians, who claim certain treaty rights, claims which are identical to some of the claims that are before you.  The United States Government is telling me to prosecute those people for fishing without a state license. The attorney for those people is saying, "How about a stipulation pending a decision by Judge Fox?"  I don't know whether or not I can negotiate with them, because I don't know whether they are in this case or out.  Now that is not to me some academic issue.  That is not an issue, "Well, we will decide it some place, but let's set a trial date now." If those people have a right to be in this case, then I think they ought to be here.  And if the United States Government is going to pay for the representation of all these other groups, I am not sure it is an answer to say to a couple of the groups outside of the area, "Well, you are not favored groups, so we are not going to pay expenses for you.  You poverty stricken groups have to find your own

70

money."

And that is really what the issue is, who is going to pay for a lawyer for who?

So I think it is an important issue.  And, frankly, what I am trying to do is to hold back, to the extent I can, arrests under State law, to give this Court a chance to sort it out.  I have done everything I can to avoid the necessity for someone coming in to you and saying, "Judge, it is an emergency.  We need an injunction against the State."  In so doing, I have caused a breach between the State and the Michigan United Conservation Club that has led to their coming in here and wanting separate representation.  But it is not an issue just thrown up to delay this case, Judge.  It is a very real one.

We will accept your ruling.  All we want is you to make that ruling.

And I am sorry that Mr. Greene thinks that we are trying to delay the case, but I think there can be no more fundamental issue in the case than who are the parties.  And I can tell you, if that treaty were with the Ottawas and the Chippewas, the United States Court of Claims in 1907 found an Ottawa tribe.  There is a bunch of people out there that tell me they are the Ottawas, but there is no Ottawa at this table.

If it is your ruling that the Ottawas do not

71

exist, are not entitled to be represented in this case, I will accept that. All I ask is before we schedule a trial date, I think those issues should be disposed of.

Now I raised that once before, as you may remember. It is about three and a-half years ago I stood up here and said, "Judge, I don't think all the right parties are here." And the then United States Attorney, Mr. Milanowski, stood up and said, "Judge, everybody who ought to be here is here." Well, I wasn't going to stand up and argue with the United States Attorney. I was no Indian expert. But I have done some work. I think I have found some law. I certainly have found some people. I took a deposition -- my associate, Mr. Taylor, took a deposition of a woman who says she is a leader of the Ottawas. Now either there are Ottawas or there are not. Now if there are, I want to see them here, or if they are not here, I would like to see them exercise a knowledgeable decision not to be here. And I think that is probably the most fundamental issue that you can now reach in this case, because we have got to know, for purposes of stipulations, for purposes of motions, who to serve, who are the appropriate parties. If there is any chance of settling the case -- and there appears to be no interst on their side. And one never knows, but I am interested in settling. I will tell you, frankly, I am not blindly sitting down and signing a paper that says the treaty says such and such, but we have

72

some interest in an internal negotiation.  I stood up in open court on Whitefish Bay and did that some four years ago.

I have to know what to say to these people. Are they part of this case, or not?  I cannot figure out, based on the documents before you, based upon what we have uncovered in the discovery, where the Ottawas are, except we know there are a few hundred people out there that tell us they are the Ottawas.

So that is why, if Your Honor has to set a priority in the case, if that is your desire, I suggest that the priority, because some place, somehow the Court may want to do something for those people by class action, by appointing an attorney to represent them.  I don't know how, but I think you may want to do something for those people, Judge, and I would like that to happen before we set a bunch of firm dates for trial.

THE COURT:        The tribes are, in a sense, a class action.  They may not be named that way, but they just don't represent the tribe as an entity.  They represent the people within the tribe.

MR. FREEMAN:        If anyone on the plaintiffs' side would have said that, Judge, I would not have filed the motion we filed.

THE COURT:        Go ahead, Mr. Spies.

73

MR. SPIES:          If it please the Court, the concern that I see is that no one has sought to enter this case as an intervenor, no one has petitioned the Department of the Interior for status to be represented by the United States, and I am **much** more attracted to Mr. Greene's proposal to get this case decided than I am to Mr. Freeman's proposal to expand it and continue it for as many more years as possible.

Now I have been reading in the media every once in awhile that the State's assertion of what this case is about is to get the Indians hunting rights and the rights to all the minerals in Michigan, and aside from fishing rights, which are proscribed in the Complaint in this case. And I keep reading this, that this is what this case is about.

And it is not.  This case is about these, the plaintiffs, who are intervenors, and the United States seeking certain fishing rights.  And if that is the case in front of this Court, until the posture is changed, I think this is the case that should be tried.  And I think this case can be tried fairly promptly, expeditiously, and a decision can be rendered.

THE COURT:          Is it in fact just the fishing rights, limited to fishing rights?

MR. SPIES:          That is what it says.

74

MR. BRUCE GREENE:    This is correct, Your Honor.  This is a question of reserved right to fish in ceded waters of the Great Lakes, period.  That is all.

MR. FREEMAN:        May it please the Court, I suggest that the distinguished counsel for the United States read his own complaint.  As I remember the phrase, it is "To hunt, to fish, and to gather fruits of the land."

Now I am not saying he is going to win that, Judge.  I am just saying that is what he is asking for. That is not just fishing.  That is hunting, fishing, and gathering the fruits of the land.  "Fruits of the land," I assume, is something more than blueberries.  I am not clear what.  But some place you are going to have to make a decision.  That is what they are asking you to decide, and that is why I am saying we have to know who the parties are. If we are going to be talking about the right to hunt in Grand Traverse County, I want to know if the Peshawbestown Indians are Indians or not, because if they are not, then I guess I have got an obligation to tell State enforcement officials to arrest those people when they go hunting.  If they are Indians, then I say to the State law enforcement officials, "The matter is before the Federal Court, so let's avoid any untoward incident pending the Federal Court decision."

That is all I am asking for, which way should

75

I go with these groups?

MR. BRUCE GREENE:    Could I try another schedule of dates, Your Honor?

THE COURT:          Yes.

MR. BRUCE GREENE:    I tried, in light of your last statement -- how would June 17th to file briefs with the brief of the plaintiff in opposition to the State's second motion, second Motion for Partial Summary Judgment; July 8th, all argument, re that motion.  And then July 29th, cross-stipulations, first --

THE COURT:          Let's see.  July --

MR. BRUCE GREENE:    First set, August 15th, last date to file pretrial motions.  And August 29th --

THE COURT:          August 29th -- I am at July 8th.

MR. BRUCE GREENE:    I am sorry.  July 8th was oral argument, re State's second Motion for Partial Summary Judgment.  And then we move to July 29th, and that would be the date upon which cross-stipulations are filed, first set.

Then August 15th would be the last date to file pretrial motions.

And then I jump to August 29th, and that would be file pretrial, final day for stipulations to be submitted and argument on any motions, assuming there are any motions that have been filed by the 15th of August.

76

And then trial September 12th.

THE COURT:        Well, I will try to work out a list having these in mind, the dates, and see what I can come up with.

All right.

MR. BRUCE GREENE:    Thank you.

MR. SPIES:        Thank you, Your Honor.

THE COURT:        The Court is in recess.

(At 12:00 o'clock noon on Monday, May 16, 1977, the proceedings were adjourned.)

- - - -

REPORTER'S CERTIFICATE

I, James L. Reinardy, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, U.S.C., Section 753, do hereby certify that the foregoing is a full, true and correct transcript of proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

5-23-77

James L. Reinardy, CSR-RPR
U.S. District Court Reporter
652 Federal Building
Grand Rapids, Michigan  49503

- - - -