AUG 8 1979
JOHN P. HEHMAN, Clerk

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

- - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA, et al,  )
                                  )
            Plaintiffs,           )
                                  )
        -vs-                      ) No. M 26-73 C.A.
                                  )            U.S.D.C.
STATE OF MICHIGAN, et al,         )
                                  ) VOLUME III
            Defendants.           )
- - - - - - - - - - - - - - - - - -  79-1414

The Deposition of DR. HELEN TANNER,

a witness called by Defendant State of Michigan, taken

before Dorothy J. Falk, Certified Court Reporter and

Notary Public, in the 6th floor Conference Room, Mason

Building, Lansing, Michigan, on Monday, April 4, 1977, at

the hour of 10:00 A.M.

APPEARANCES:

        HUGH W. BRENNEMAN, JR.
        United States Attorney
        544 Federal Building
        110 Michigan Street, N.W.
        Grand Rapids, Michigan  49502

            In behalf of Plaintiff.

        STEWART H. FREEMAN, Esq.  (P13692)
        Assistant Attorney General
        Law Building
        Lansing, Michigan  48913

            In behalf of Defendant State of Michigan.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

357.

FREIHOFER, HECHT, OOSTERHOUSE & DeBOER, P.C.
505 Peoples Building
60 Monroe Avenue, N.W.
Grand Rapids, Michigan  49502
By
PETER W. STEKETEE, Esq.  (P20967)

 In behalf of Defendant
 Michigan United Conservation Club.

BRUCE R. GREENE, Esq.
LARRY ASCHENBRENNER, Esq.
1506 Broadway
Boulder, Colorado  80302

 In behalf of Plaintiff Intervenor
 Bay Mills Indian Community.

KATHRYN TIERNEY
Bay Mills Indian Community Tribal Office
Route 1
Brimley, Michigan  49715

 In behalf of Plaintiff Intervenor
 Bay Mills Indian Community.

ALSO PRESENT:

PHILIP P. MASON, Ph.D.
Wayne State University.

ASA WRIGHT

DR. WILSON TANNER

358.

Lansing, Michigan

Monday, April 4, 1977

10:00 A.M.

(R E C O R D)

MR. FREEMAN:  For the record, this is a continuation of the Deposition of Helen Hornbeck Tanner, Ph.D.

H E L E N   H O R N B E C K   T A N N E R, Ph.D. having been previously duly sworn, testified further as follows:

CONTINUATION OF EXAMINATION

BY STEWART H. FREEMAN, Esq.:

Q   Dr. Tanner, you're still under oath, and I guess you remember me.  My name is Stewart Freeman.  Just before we took that somewhat lengthy break at the close of the last Deposition, I was asking some questions about the circumstances and time surrounding the signing of the Treaties of 1836 and 1855.  I have still got a lot of questions in my mind about it, and I'm sure that a lot of those questions just reflect my own inadequate understanding of history, so feel free to explain any of your answers.  Don't feel compelled to give me a yes or no, because what we're searching for is knowledge.  If you prefer to give a yes or no, that's acceptable, though.

Did you, in connection with your research

359.

for this case, look at treaties involving other Indian groups, particularly the Great Lakes Indians, generally?

A. Yes. As a matter of fact, I brought along and considered copying for you a concordance I have made of Great Lakes Indian Treaties.

Q. Excuse me, that word you used?

A. Concordance, whatever, a guide to Great Lakes Treaties.

Q. Guide?

A. Indicating which treaties are only with the Sault St. Marie, which treaties are only with the Ottawa and Chippewa, which treaties refer only to Michigan, and I have reviewed most of them. I can't say I have all the provisions of all of them indelibly stamped in my mind, but I have had occasion to look over all of them. I did prepare this kind of a guide and concordance.

Q. Is there a pattern to the treaties negotiated by the United States Government with the Great Lakes Indians, and I realize how general that question is. Let me make it a little more specific in terms, say, of the, what we call the release clause in the Treaty of 1855. Is that boilerplate? Does that tend to appear in every treaty?

A. No, no. I think I indicated it was a characteristic of what I called the Manypenny Treaties, and I believe that I indicated where it was found in providing of a supplement to the report that I made.

Q. Does Manypenny utilize the same release clause in all the treaties he negotiated?

A. I don't know if they were word for word the same.  The general effort was to try to curtail the complaints and objections brought against the Federal Government.  He was trying to get things settled.  If you recall, this was a sort of new phase in Indian relations, a part of the Federal policy that Paul Prucha has not yet completely covered, but in 1849 the Bureau of Indian Affairs was transferred from the War Department to the newly formed Department of Interior.  In general Indian history, the 1850's was a period when the management of Indian Affairs seemed to become, to a certain extent, a political football, and there was a great deal of party contention about the management of Indian Affairs, and one of Manypenny's objectives was clearly to try to settle up longstanding objections of the Indians and to keep them from interminably coming to Washington where they had to be maintained at Government expense, and he was trying to get things settled, I believe.

Q. I see.

A. Does that clarify the situation somewhat?

Q. Partly.  Bear with me through a couple of more questions.  Did the other treaty negotiators seek release clauses?

A. I don't know.  I have never read of anybody seeking a

361.

release clause. I have never -- I don't know what other treaty negotiators you're talking about.

Q Well, all of the treaties are published together, are they not, all the Indian Treaties?

A Yes.

Q I have an unofficial copy in front of me of Kappler. The United States Government publishes these.

A Yes.

Q We can sit down and look at every Indian Treaty in chronological order.

A But all the release clauses, I believe I found them all, and I think they're in general characteristic of that period of time.

Q But at least if there was a pattern as between different negotiators, you didn't perceive it, is that correct?

A No, no, I didn't.

Q Now, when Manypenny went out and obtained these various release clauses, was there a pattern to how he did it, do you know?

A I think you're making an accurate assumption. When he went out and obtained a release clause, the treaties were written up by the Federal authorities.

Q I understood --

A And he wrote a rather interesting book. I don't recall I found anything very instructive in his own personal

362.

account, now that I think of it, and I don't know anything further than the fact that his objective was to try to have claims against the Government settled.

Q   Well, would you understand what I meant if I used the phrase boilerplate?  Was that something that he put into every treaty, regardless of whether it was factually needed, or was it something that he tailored to the specific situation?

A.   I have not made an individual study of the relationship of the circumstances surrounding every one of the treaties in which this clause appeared.

Q   That would be relevant, though, wouldn't it, to know whether Manypenny automatically put this into every treaty or whether he only put it in when there was a reason to?

A.   Well, I don't know what more you can find out than has already been stated.

Q   You mean by that you don't agree with me that it would be relevant?

A.   Well, I don't know what you would find out, but --

MR. GREENE:  Perhaps you might -- I'm confused as to what you mean by relevant, too.

MR. FREEMAN:  I mean historically relevant.

MR. STEKETEE:  I'm confused.

MS. TIERNEY:  I'm confused and --

MR. GREENE:  I'm interposing an objection

363.

because I don't understand.  It's relevant to history?  If that means something to you, Dr. Tanner, perhaps you can expound further.

THE WITNESS:  Why would they put anything irrelevant in a treaty?

Q   (MR. FREEMAN)  That's really what I'm asking, Dr. Tanner.

A.  I would presume that the treaty is relevant to the situation.  Otherwise, why have it?

Q   So therefore, if the Commissioners put in a release clause, it was because the Commissioners thought there was a specific reason to have a release clause in that particular treaty.

A.  They were trying -- The emphasis was on protecting the Government from future negotiations, future expense.

Q   How were the treaty negotiators compensated, do you know?

A.  No, I don't.  Usually specified as so much -- Sometimes in the letters they are told how much they'll be paid.

Q   Well, was Manypenny given piecework compensation, for so many treaties you get so much money?

A.  I doubt it.  He's a Federal employee.

Q   Then he would have had no direct financial incentive to obtain a record number of treaties?

A.  I don't see why.

Q   Well, my question is do you know?

A.  No.  This has never -- This is a most unusual line, an

364.

inventive line of thinking, Mr. Freeman.

Q  I take that as a compliment that I'm slowing becoming an historian through all these Depositions.  Do you understanding why I think that would be interesting --

A  No.

Q  -- to know?

A  I don't.

Q  Was the negotiator for the United States paid on the basis of results obtained, on efforts expended?  It certainly might have some impact on what he did and how he did it, wouldn't it?  It would certainly have an impact on a lawyer if he were told he could have $50 to draft a document or be paid by the hour to negotiate it out, I would think.  Do you understand my point?

A  I understand your point, and it seems to me -- I'm wondering now if you have read too many labor relations cases or something like that.

Q  No.  I do this for a living.

A  That knowledge would, if you have read that kind of law, that might condition your frame of mind.  The Commissioner of Indian Affairs is a Federal official, and among his responsibilities chiefly is dealing with Indian Tribes.

Q  There have been suggestions, though, that he did not treat with them fairly, in a general historical manner.

A  Yes, there have been.

365.

Q    And there certainly are suggestions in many documents, including your own report, that at times Federal officials have abused their office.  I've seen, through your report and Professor Cleland's, such words as fraudulent, unconscionable, so there was something wrong somewhere, wasn't there, and it might be relevant to know if, as to the treaties we're talking about here, if anyone involved in these treaty negotiations had an unappropriate financial interest in the outcome or had some benefit approach to it, and that's really the bottom line of my questions.  That's what I'm trying to find out.

A    Well . . .

Q    Do you know if anyone involved in these negotiations on the side of the Federal Government received something not clear on the record, something that we either have not talked about or it's not reflected in the treaty?

A    No, I don't.

Q    As Manypenny went around negotiating these treaties, did he have any kind of fulltime staff?

A    No, I do not know what his personnel, that is, entourage included.  There was usually a secretary or someone appointed to keep the records.

Q    But it wasn't the sort of thing we see on TV when General Motors and the UAW sits down, a negotiating team?

A    I don't think so.

366.

Q    As far as you know?

A    I'm sure you have read the transcript of the proceedings of the 1855 Treaty?

Q    Yes.

A    And I think that probably will tell us as much as we can find out.  I do not know of any other revealing literature other than that.

Q    There are no documents that indicate there may have been others involved?

A    Other who?

Q    By way of an example of what I'm getting at, Dr. Tanner, the Deposition we're taking right now, the record will show the people that are here.  That's what the Court Reporter is going to put down.

A    Yeah.

Q    I asked you questions, Mr. Greene sat here, Mrs. Tierney sat here, but the record will not reflect, because the Court Reporter will not know, whether or not there are two or three people out in the hall with whom I consult from time to time.

A    Oho!

Q    Is there any indication in the negotiations that Manypenny had other individuals involved in this who did not formally appear at the treaties' council and, therefore, aren't shown in the transcript?  Do we know all of the

367.

main characters, I guess, is my question?

A. Yes, I think we know all the main characters.  The one interesting thing to me has been that in the transcript there is a good deal more of the translating done by Louis Cadotte, who was brought by one of the trading firms, and he's not indicated as one of the general officials.

Q Do we know anything about him historically, and could you -- Can we flush out that name?  Do we know anything about the man?

A. Yes.  He is one of the old Cadotte family, C-a-d-o-t-t-e, whose family has been in Sault Ste. Marie since the 1670's, and he, I believe, worked for one of the trading firms.  That is one of the statements that I think was made by John Johnson later.  I have no reason to think that there is any insidious role that's being taken.  That's the only unusual circumstance that I could mention.  I think it's a very full record, that Treaty.

Q In fact, Cadotte as a descendant of one of the voyageurs, presumably would have had less bias in the United States, would he not?

A. How is that?

Q If his family had lived through French occupation, English occupation, American occupation, presumably he would have had a more objective kind of a role here than those on the payroll of the Federal Government; or is that correct?

368.

Is that correct or incorrect?

A. Every man is entitled to his own enlightened self interest and I think his interest probably lay with the firm in whose employ he was working, and it was the firm that was entitled to hand out the payment at the Treaty, but I don't think that I -- as I say, I don't attach any pro or anti-Governmental role to Louis Cadotte's presence there.

Q. Okay.

A. I don't think there are any snakes in the grass or people hiding in the woodwork who were present at the Treaty.

Q. Now, you say that Mr. Cadotte's company had an interest, though. What sort of contract did they have?

A. Well, I think, as is common every time there is a treaty, why, there are goods to be distributed as a result of the treaty.

(Whereupon, there was a short interruption.)

Q. (MR. FREEMAN) We're talking about which Treaty now, 1855?

A. I think so.

Q. I want to make sure I understand which one you're talking about. That's what you were referring to, all right?

A. Any treaty calls for goods to be paid out. In the 1836 Treaty, Henry Schoolcraft was in contact with a man named Riley in Schnectady, New York, saying we are going to order this amount of goods. That's part of a treaty.

Q. I see. Now that fascinates me, and I'll tell you why.

369.

It is my impression that the Federal law at the time required public bids in contracts.  Are you sure that Cadotte's firm held the contract prior to the time that the Treaty was negotiated and signed?

A. No, I'm not sure.  Somebody had to provide, I think, provisions for the Indians while they were there, but I should . . . . .

Q. That would be different, would it not?

A. If this has some particular -- If there is some particular import, this is a document that I should look up, but it's my recollection that Marius Barbeau had something to do with carrying out the provisions for supplies and presents under the 1855 Treaty, but this is the sort of thing that I shouldn't just speak off the cuff.

Q. You see, that's the distinction, though, don't you?  Those that had a contract to provide goods and services in connection with the treaty negotiations would have received money because they would have performed?

A. Um-hmm.

Q. And therefore, presumably, would have no financial stake in the outcome of the treaty negotiations themselves; but someone who held a contract to perform a particular service under the treaty would then have a strong financial interest in the outcome of the negotiations, would they not?

370.

A.  Yes.  Well, I think it was perfectly apparent that all the fur companies, all the firms who could claim indebtedness by Indian people had an interest in the outcome of Indian Treaties.

Q   Now, when the Indians gathered for the negotiation of the Treaty of 1855, there were other Indian groups there at the same time negotiating other treaties, were there not?

A.  Well . . .

Q   I'm thinking specifically of the treaty with the Chippewa of Saginaw.

A.  Yes.  Well, there was an attempt to try to settle up all the situation in Michigan at one time.  They had hoped even to have another treaty with the Potowatamis because there was some dissatisfaction among the Potowatamis. But they were not called to Detroit in late July of 1855 so that treaties with only -- with the west, with the Chippewa and Ottawa, were negotiated.

Q   Numerically that was a majority of Michigan Indians involved, just between two Treaties of 1855?

A.  Yes.

Q   Actually three Treaties, isn't it?

A.  Yes.

Q   Includes the one involving the fishery.

A.  The one that I would put treaty with quotation marks around because I don't consider -- I think that one is

371.

kind of dubious, but the two main treaties indeed did involve the majority of Indians living in Michigan.

Q. How did they physically handle that, do you know?  Did negotiators go from one Indian group to another?

A. No, I don't know, except that they are consecutive; they finished one, as you know, two days in advance of the other one.  They finished the treaty with the northwestern and Upper Peninsula Indians,   , the general treaty first, then dealt with the Saginaw Indian group.

Q. That was a general treaty, too, wasn't it?

A. Um-hmm.

Q. Covering a large area of Michigan?

A. (Witness nodding affirmatively.)

Q. Would it be fair to assume that they could not have written and negotiated such a complex treaty in a matter of a day or so?  Something had to be going on with the Saginaw Chippewa contemporaneous with negotiations with the Upper Peninsula Chippewa?

A. Well, I don't know whether it's necessary to assume anything.  Delegations representing these Indian groups had gone to Washington for consultations in Washington. The problems and the prospective solutions, I think, had been discussed over a period of years, so whatever treaties were finally negotiated did not have to start from scratch at that time.  I do not know of any timetable that says

372.

exactly when discussions were held with which groups.  I don't know that I have -- I'm not sure that I have read, at least recently, the proceedings for that August 2nd Treaty with the Saginaw Chippewa, but there are dates and times, as you know, for the various sessions that were held for the July 31st Treaty.

Q   Is there as complete a record of the treaty with the Chippewa Saginaw?

A.   I don't know.  I just -- Now, I hadn't beamed my research in that direction.

Q   It might tell us something, though, might it not, since all the Indians were gathered together at the same place and time when three treaties were negotiated, two of which have some similar provisions?  As a historian, wouldn't you think that we might obtain some insight from the records of the negotiations of the Chippewa of Saginaw, that might tell us something about the other treaty?

A.   No.  At that point, I think the information is specific about each treaty.  The preliminary correspondence tells us what is on everybody's mind.

Q   Well, for example, Dr. Tanner, there is a release clause, is there not, in the treaty with the Chippewa Saginaw entered in 1855?

A.   I don't know.  Maybe there is.  If you're looking at it, you can probably read it.

373.

Q.    Well, I'm not trying to give you a memory test.

A.    No.

Q.    You don't know?

A.    Offhand, I don't know.  I know I went through all those release clauses, and it would be the objective, as I have stated, to prevent further complaints and charges against the Federal Government.  Why then there should be, would normally be a release clause there.

Q.    How about the termination of the tribe as an entity recognized under Federal law?  Is that type of provision common in these treaties?

A.    Well, I haven't -- I don't have in mind the statistical run-down on that.  Again, there was an attempt, there were repeated attempts on the part of the Federal Government, by various stratagems, to force the assimilation of Indian people, and this is one of them.

Q.    It's a pretty serious one, though, isn't it?

A.    Yes, it is.  It's a pretty serious one, and none of them have ever, they have never worked, and as you know the Government finally realized it was necessary to recognize and deal with Indian people as tribes.

Q.    That's one of the issues in this case.  We'll get to it at a subsequent point, I think, with the lawyers arguing, but do you know if Manypenny, in his negotiations, sought such clauses from the Indians on a routine or regular basis?

374.

A.   I do not know.

Q.   Do you know of any treaties he negotiated with Indians in the Great Lakes Region of the country in which he allowed the tribal organization to exist subsequent to the treaty?

A.   I'm thinking of your term allow the tribal organization to exist, because it was beyond his power to destroy it. Whether or not he, the Government, was trying to avoid having to deal with Indians, it was trying to avoid having to deal with Indians as tribes.  This was the time when they were trying to suppress tribal organization.  Even, you know, they say it's one of a long series of unsuccessful attempts.

Q.   Well, the treaty, one of the treaties we're talking about, the treaty with the Ottawa and Chippewa of 1855, I'm looking at Article 5, I have an unofficial source in front of me, so tell me if this language is incorrect, but Article 5 of my unofficial source says, the tribal organization of said Ottawa and Chippewa Indians, except so far as may be necessary for the purpose of carrying into effect the provisions of this agreement, is hereby dissolved, semi-colon.

          That partial quote suggests to me, Dr. Tanner, that the United States Government is saying we'll never again negotiate with you.

375.

MR. GREENE:  Is that a question?

MR. FREEMAN:  I'm asking for her reaction. Do you agree that's what Manypenny was trying to say?

THE WITNESS:  He was trying to say that. I have read this clause, naturally, and except so far as it may be necessary for the purpose of carrying into effect the provisions of this agreement, it is too long a time to carry into effect the purposes of this agreement, historically I would say they haven't really been carried into effect yet because the Indians have not received the permanent homes that were a principal objective of this agreement, and, as you know, or probably know, payment even under the Treaty continued until, I believe, 1870 or 1871, and although I have not tracked it down, in some cases patents, land patents were not handed out until, oh, 1875 or 1876.  I haven't gone on, I haven't carried my own research, as you know, in detail, past about 1880. This is a kind of an open-ended clause.  I think it's a real question of whether or not the objectives of the Treaty that were agreed upon have ever been carried in effect to this date.

Q  Now, that's an interesting question I would like to get back to in a moment, but I'm still troubled at these words:  is hereby dissolved, in reference to the tribal organization.  As I understand your testimony, there

doesn't seem to be an indication that Manypenny simply did this in every treaty.  Presumably there was a reason why he did it.  Do the records and correspondence indicate why?  Was he under orders from Washington to do this?

A.  I don't know.

Q  To negotiate for this kind of clause?

A.  I thought I made that clear.  They are trying to avoid -- It's an effort at assimilation.  It's an effort to try to avoid having to deal with Indians as tribes.

Q  This does more than that, though, and I guess that's the basis of my question:  Couldn't the United States have done that without asking the tribes to agree that their whole legal and political structure was dissolved?  Do you know if any consideration was given by the United States Government to simply say, we won't deal, the sort of thing that, in recent times, we have done with foreign powers where we simply didn't recognize their government, wouldn't deal with them?

A.  . . . I think this is partly a legal consideration.  You know that the status of Indians had been somewhat murky, but I believe at this period there was some attention given to Marshall's canons, domestically dependent wards of the Federal Government.

Q  That's not what this says, though.

377.

A.  No, that's not what this says, but there is an element of responsibility that was recognized by the Federal Government, and at the end of the treaty negotiations the Indian Chief said, we have our land and there are two ropes tied to it.  We hold one rope, and you of the Government hold the other rope.  I think that --

Q   Who said that?

A.  Shawano.  Shawano said that at the end of the Treaty.

Q   Did anyone agree with him?

A.  The Government, I suppose, could have gotten -- You're asking a question like could the Federal Government have gotten its army together and evicted them all, but the basic claim that the Indian people had to their land was very early recognized by the Secretary of War way back in 1780.

Q   You're misunderstanding my point, Dr. Tanner.  I'm not suggesting that the Army could have come in and dispossessed them.  My question is, we're looking at an evolving foreign policy in the United States.  It begins, as I understand it, with Ben Franklin going to France at the time of the American Revolution.  By 1855 it's a more sophisticated foreign policy.  To a certain extent, we view Indians as foreign powers.  Let's not get into the whole legal Constitutional question.

A.  No, we don't.

378.

Q    When negotiating treaties with them.

A.   No, we don't.

Q    We don't?

A.   No, we don't.

Q    All right.  If we don't, why are they negotiating treaties in the 1850's with Indians?

A.   Because --

Q    What is the goal of the United States in negotiating these treaties?

A.   I think I --

MR. GREENE:  I would object to that question on the grounds that it's over-broad, vague; you're suggesting there is one goal to these treaty negotiations.

MR. STEKETEE:  I think, in the context, the question is perfectly proper.

Q    (MR. FREEMAN)  The United States sends Manypenny out. Dr. Tanner testifies, as a historian, that in Washington they do not view the Chippewa of Michigan as though they were a foreign power, but one of the things he negotiates is the dissolution of their political and legal structure. My question is why are they doing it?  Do you understand that question, Dr. Tanner?

A.   Yeah.  Basically, and I think I have answered it three or four times --

379.

Q. It's possible I'm just not understanding.  I'm not
suggesting you're not answering the question.  I'm just not
comprehending it.

A. Ah . . . The special circumstances of the Indians as
original proprietors of the soil, there is a lot of
literature of the development of Federal Indian policy.
At this point in the history of the United States, as I
have said, one of their questions is, crassly,
financial.  Dealing with Indian people is expensive, costs
a lot of money.  In trying to cut down on expenditures for
management of Indian affairs and Indian relations, there
is a strong reform movement going on in the United States.
Part of this is directed towards the Indian assimilation.
Indian assimilation has been a goal since the 1700's, and
they try various strategems.  This is one attempt to try
to avoid having to deal with Indians as special tribal
entities anymore.  See, in the eastern states they're
trying, the Federal Government is trying to smooth things
off.  They don't have these repeated confrontations.  They
realize that the Indians have a great many very reasonable
claims against the Federal Government.  In Michigan, and
we're dealing with Michigan treaties -- at the same time
they're starting the beginning of real Indian warfare out
west, and the trouble along the immigrant trail, they have
got more Indian troubles than they can handle, trying to

quiet down the situation in Michigan.

Q  Were they having any trouble in Michigan?

A.  Well, there was trouble over this.  There were perpetual complaints that the Indians had not been paid money that they were due and that they had been left in, I guess a word you don't like, in an indecisive state with regard to what land should be permanently theirs.

Q  I neither like nor dislike words.

A.  And there was this problem about turning up and digging that canal.  Those were through Sault Ste. Marie.  There were a number of very legitimate complaints that the Indians had, and it was unsettling.  They felt some obligation to get it settled.

Q  So the powers that be in Washington viewed the Michigan situation as potentially explosive, if they were --

A.  I think you're exaggerating a little.  You can want to settle things without -- they weren't anticipating a rebellion or anything.  There was an obligation to settle it.

Q  Dr. Tanner, your answer, if I correctly understood it, a moment ago, was that there were actual attacks on immigrants occurring out west, and that one of the reasons that they were coming into Michigan to negotiate these treaties was because there was an Indian problem.  Was it the same kind of problem or different problem in

381.

the minds of those in Washington, based upon the historical documents you have?

A. The situation in Michigan, of course, was radically different from the situation out west. Maybe I shouldn't even have mentioned that, but they wanted to settle things up. They really did.

Q Was it to be a once and for all settlement?

A. They hoped. They really hoped they would get things settled.

Q. All right. Then I would like to go back to the other point you mentioned, the proviso in Article Five of the Treaty of 1855 where the tribal organization is dissolved except so far as may be necessary for the purpose of carrying into effect provisions of the Treaty of 1855. What did that refer to, specifically? Can you identify for me the kind of things that the United States was not finally settling up?

A. Well, there were new provisions, redefined provisions for re-locating permanent homes for the Indians, and I've written about -- I thought I had written about that. There was a long administrative procedure that was specified, and the land allotments, the selection of land and land allotment arrangements within the newly defined Reservations or reserved areas of the 1855 Treaty, those were handed out Band by Band.

382.

Q   You're referring to Article One of the Treaty of 1855, aren't you?  I want to make sure we're talking about the same thing.

A   Yes, yes, yes, that's right.  You see, those land allotments are specified by Band, and they're written out that way in the lists, the ones that have survived.

Q   So the United States' continuing obligation was to put aside land for each of the Bands?

A   For each of the Bands, it specified for the Bands and Tribes, yeah.

Q   And then individual Indians selected tracts of land from within the parcel set aside for the Band, is that right?

A   Yes.  That was the intention.  You know that this thing got frustrating and very badly administered, but that is the --

Q   Yeah,

A   That is the administrative procedure that is set forth in the Treaty, and the time calendar set forth in the Treaty was not carried out, as I explained in my report.

Q   Okay.  But I'm trying to focus on what would have been in everybody's mind in 1855 when they made this exception to the dissolution of the tribe.  So let's just focus on that period for a moment.

A   I would like to make one comment.  Where it says, you know, dissolution of the tribe, I suppose the Federal

383.

Government could refuse to recognize the tribe, but the tribe, as a social organization and as a functioning social mechanism, could not be obliterated.

Q    Well, that is often the case, is it not?

A.   Um-hmm.

Q    Certainly whatever the attitude of the United States was towards the government of China following the take-over by the Communists, there was something there, wasn't there?

A.   Yeah, but I don't think that's a comparable case.

Q    How would it differ?

A.   Well, now --

        MR. BRENNEMAN:  Objection.  I think that's getting a little far afield, don't you?

        THE WITNESS:  I don't want to go into the history of Indian policy, but Indians were not really treated as foreign nations, and there is a point in the history of Indian policy and legal decision where you can carry that out, but --

Q    (MR. FREEMAN)  Okay.

A.   -- that, I don't think, has any particular bearing on the situation.  I wouldn't admit they were parallel cases.

Q    All right.  But the obligation of the United States, then, as you understand the Treaty of 1855, was to provide land for Bands.  Now, let's stop there for a second.

A.   One of them.

384.

Q  Yeah.  I want to focus on one at a time.  If the United States had failed to provide the land for the Bands, that would have been the kind of continuing obligation, in your mind, which was exempted from the dissolution of the tribal structure, is that correct?

MR. GREENE:  Do you understand the question, Doctor?  Would you like it read back?

THE WITNESS:  Hmm . . . yes, I don't follow that.

MR. GREENE:  Could you read that back, please?

(Whereupon, last question read by Reporter.)

MR. GREENE:  Perhaps you might want to rephrase that.  I understand what you're saying.  I think the way you state it is a little confusing.  It might help the witness if you rephrase it.

Q  (MR. FREEMAN)  I'm trying to focus, Dr. Tanner, on what kind of obligations the United States was exempting when it said we are dissolving the tribal structure, or agreed with the Chippewas the tribal structure was dissolved except for carrying forth this Treaty.  I'm trying to focus on what they were talking about, what sort of things are in this Treaty that would have been exempted.

My question to you is:  Do you regard, based upon your research, a promise of land for the Bands

385.

of the Chippewa as being one such obligation?

A.   Well, providing lands for the Chippewa was one of the obligations set forth in the Treaty.  The word "exempt", I don't see . . . . . Any word that has a special legal handle, you know, I get nervous.  This says, except so far as may be necessary.  Maybe exempt is the same thing, I don't know.

Q   All right.  Well, let me use the words of the Treaty, then.

A.   The Treaty says --

Q   Article Five says, except so far as may be necessary for the purpose of carrying into effect the provisions of this agreement.  What, in your opinion, are the provisions of this agreement which are covered by those words?

A.   Well, the provisions of the agreement that the United States was obliged to promote and carry out are the land agreements and paying up the money that was owed to them.

Q   What specifically were the land and money agreements contained in the Treaty of 1855?

A.   Well, those are stated in the Treaty.

Q   I'm asking you what they are.

            MR. GREENE:  Are you asking her to read the Treaty?

            MR. FREEMAN:  No, I don't want you to read the Treaty.  Is that the only way to answer it?  Let me try the question a different way:

386.

Q    (MR. FREEMAN)  Are you saying that no historical construction or interpretation is necessary of this Treaty on those provisions?

A.   No, but I think they are most specifically stated within the Treaty itself.  The Government had a -- and I quoted some of the prior correspondence in my report, the fact that the Indians needed to have their land base clarified was one of the questions that was in the mind of the Indian people and missionaries and others who were interested, who were sympathetic to the Indian population, and I just think that it's set forth that they were going to, indeed, try to get this land problem settled to the satisfaction of the Indians and recognized that they still owed them money, and I don't know what more there is to say.  I don't understand why you are belaboring this point.

Q    The Treaty, then, in your mind, is not ambiguous as to any of the obligations of the United States on land or money items; it is clear?

A.   I think the effort was made.  The purpose of the Treaty was to clarify those matters.  Now, the administrative procedure, as I have said, was not followed as it was set forth in the Treaty, but the Treaty gives the directions.

Q    The Treaty contains very specific time limitations, does it not, as to when various things are to occur in terms of the land?

387.

MR. GREENE:  Counsel, I would object and ask that you refer to particular Articles of the Treaty. I think it would just facilitate this questioning process if you would do that.

THE WITNESS:  Hmm, yes.  It gives statements by presenting lists and it said such lists should be made and closed by the -- I'm reading now, excuse me, from Article Eight, the paragraph that is beside the sub-heading, list of those entitled to be prepared, and it states that the list should be --

MR. GREENE:  Excuse me, I'm going to interrupt you and I apologize.  You are reading from the eighth paragraph of Article One, isn't that correct, Article One?

THE WITNESS:  Oh, thank you.

MR. GREENE:  And then it lists, first, second, et cetera?

THE WITNESS:  Excuse me.  I'm under the eighth.  I'm sorry, eighth paragraph of Article One said that lists should be prepared by July 1856.  Well, as we know, the lists weren't all prepared by that time, and some of that factual information I did get out, and after one list was prepared, why, then, it was deemed unsatisfactory and it seemed necessary to prepare a second list, and considerable confusion and delay resulted.

388.

Q.   How many of those lists were actually prepared, do you know?

A.   I do not know.  I know where portions of the lists appear in the Indian correspondence.  I know where there's a manuscript, notebook, that from its interior information appears to include a complete list, not only for the Treaties of July 31 and August 2nd, 1855, but also the Lake Superior Treaty of 1854.  I regret I have had not a year to set aside to study this notebook.  I just found out.  It's a big ledger book that I located in the Michigan Historical collection.

Q.   You're three steps ahead of me.  I never heard of the book.

A.   I don't think anybody else ever heard of it.

Q.   Could you tell me how the book looks when you open it?

MR. BRENNEMAN:  Objection.

Q.   (MR. FREEMAN)  Is there lists of names of Indians?

A.   I can tell you a great deal about it.  I don't know whether you want it on the record or not.

MR. STEKETEE:  What is the name of the book, again?

THE WITNESS:  The name of this book, it's a large ledger book that has imprinted in the top the names of three treaties in different sections, and within it, as I have looked it over, there are about, I'd say, an estimated 2,000 entries.  The last entry is in the

389.

handwriting of George Betts, who was fired for his illicit dealings in lands, and,I believe, came to the Michigan Historical Collection through the papers of some subsequent Indian official in the State of Michigan who was also a lawyer in Flint.  I think it is of passing interest.  I don't think it has any -- It has interest to me as a historian; I don't think it would affect the outcome of this case.

MR. STEKETEE:  Maybe not, but can we find out what the book is?

THE WITNESS:  Yeah.

MR. STEKETEE:  What collection is it in?

THE WITNESS:  I've forgotten the name of the -- the name of the --

MR. STEKETEE:  Is there a building?

THE WITNESS:  It's in Bentley.

MR. STEKETEE:  You don't know what the name of the collection is?

THE WITNESS:  It's just a book.  It's a large ledger book.

MR. STEKETEE:  If you walked into the library, can you direct us on how you would walk down through the library to find the book?

THE WITNESS:  You just have to -- If you're very much interested, I will look through my

390.

records and find out.  I have forgotten even the precise title, but I could get ahold of it for you.

MR. STEKETEE:  Have your researches, Have you decided from your researches what the purpose of this book was when it was prepared?

THE WITNESS:  Yes, it was to record the land originally selected.

MR. STEKETEE:  In whose possession was the book?

THE WITNESS:  In the possession, I believe, of one of the later agents, a man who was a later Indian --

MR. STEKETEE:  Agent or sub-agent?

THE WITNESS:  Yeah.

MR. STEKETEE:  Where?

THE WITNESS:  In Flint.  He was also a Flint lawyer.  That is as far as I have gotten.

Gentlemen, I have opened up Pandora's box. I have been trying to get somebody to research this.  I think it's a matter of historical interest.  I don't know, I don't think that it would have any legal bearing on this case, honestly.

MR. STEKETEE:  Was it an official Government record?

THE WITNESS:  I have a feeling, I think it was.  I haven't fully identified it, and nobody -- It's

391.

just that I saw the name of the treaties on the top of this preprinted ledger book and thought I would look through them.

MR. STEKETEE: Why are we even talking about it if we don't know what it is?

THE WITNESS: I don't know. Well . . . . .

MR. GREENE: Good question, Counsel. Why are you asking questions for ten minutes about it?

MR. STEKETEE: Why did you bring it up?

THE WITNESS: I was asked, did I know of any lists of certificates of land allotments, and I am under oath. I do know about this list. It's the longest one I know about because it has -- I counted up over 2,000 entries.

Q (MR. FREEMAN) Those 2,000 entries, are those entries involving 2,000 separate Indians?

A. 2,000 separate names. I don't know whether they're individuals. Some of the names I recognized and some I didn't.

Q In 1855 do we know the population of Indians in Michigan?

MR. GREENE: Perhaps you might --

THE WITNESS: I think that appears --

MR. GREENE: What Indians? Could you be more specific? Are you talking about the Indians that were --

392.

MR. FREEMAN:  I'm talking about whatever she may know.  If she knows the number for all Michigan Indians or all Chippewas or whatever.  The question was did she know.  If she doesn't know --

THE WITNESS:  The usual statements, and I quoted this, I think, and located the information; I was asked this before,  usually considered 5,000 Indians for the area of the 1836 cession.  In general, the statement was made, a population of about 5,000 for that area, about 8,000 for the State as a whole.  Those were the type of figures that were generally used.

Q  (MR. FREEMAN)  So it's conceivable that there were perhaps 12,000 total Indians; and if we were --

A  No, 8,000.  Excuse me.  I don't see how we got to 12.

Q  If we were talking about heads of the family -- well, I'm just thinking out loud, all right.

A  8,000 population is a good round figure for Michigan Indians population in this period.

Q  What were the financial obligations of the United States, under the Treaty of 1855, which would have continued beyond a single lump sum payment?

A  . . . Seems to me there were some payments that were to be made over a five or ten year period.  The thing that, you know, sticks in my mind, now, the statement made up in Sault Ste. Marie, that when Richard Smith made their last

393.

payment in 1871, he said there was still some money due to them.

Q   Well, essentially, let me ask the question more specifically:  Except for the sums set forth in Article Two of the Treaty of 1855, is it your opinion that there are any continuing money obligations under the Treaty?

MR. GREENE:  Dr. Tanner, this seems to be a memory test of the Treaty.  Why don't you take a minute?

MR. FREEMAN:  She has the Treaty in front of her, Mr. Greene.  You made this speech 42 times.  I keep telling the witness and I keep telling you -- I'm sorry nobody believes me -- if any time she would like to look at anything, would like a five-minute break, it's perfectly acceptable.

MR. GREENE:  I am reminding her of that fact.

MR. FREEMAN:  Why don't we take a break while she's reading the Treaty?

(Whereupon, there was a short break.)

MR. FREEMAN:  Back on the record.

Q   (MR. FREEMAN)  Dr. Tanner, before the break I had asked you if there were continuing financial obligations on the part of the United States set forth anywhere in the Treaty of 1855, other than Article Two.

A   I believe that Article Two includes all of the statements

394.

of payments.

Q.  Okay.  Now, I have, again, an unofficial copy of the Treaty in front of me, so correct me if my copy is incorrect.  My copy indicates an obligation to pay $538,400 to the Indians, and then in a series of paragraphs, breaks down how it will be paid and when; is that correct?

A.  I'm sorry.  I don't see that number $538,000, unless that's the sum of all of the separate items in paragraphs first through fifth.

Q.  In your copy of the Treaty, what is the first sentence of Article Two?

A.  Oh, I'm sorry.  I see it.  Yes, indeed, correct.

Q.  So that's what we're talking about, then, $538,400?

A.  Yes.

Q.  The paragraphs which break that down, again as I understand them, provide for expenditures over certain periods of years which are stated, the longest of which appears to be ten years, is that correct?

A.  Yes, yes.

Q.  That's correct, so going back to what the United States was trying to do here, in terms of the dissolution of the tribe, would it be fair to say that the contemplation must have been, at least insofar as money claims were concerned, that the United States would be totally through dealing

395.

with the Chippewa within ten years of the signing of this Treaty?

A.    They hoped.

Q    Was that in accordance with the instructions that the negotiators had received from Washington?

A.    . . . I don't know whether a time limit was included in their negotiations.

Q    If the Treaty had been fully honored by the United States, is there anything anywhere in the text of the Treaty of 1855 which suggests to you that the United States would have had any continuing obligation beyond 1865 as to land, as to money or as to any other thing?

A.    . . . . . Well, the Indians always were a special responsibility of the Federal Government.

Q    Is that reflected somewhere in the text of the Treaty?

A.    It's not reflected in the text of the Treaty.

Q    Can you identify for me any specific obligations set forth in the Treaty of 1855, performance of which was apparently contemplated during the negotiation of the Treaty to take place beyond 1865?

A.    No.

Q    Can you show any historical significance to us on that period?  Is there a reason why in 1855 they were trying to end their obligation by 1865; is there some significance to the date?

396.

A. Why it was 1865 rather than 1864 or something like that?

Q. Um-hmm.

A. No.

Q. Would I be correct in assuming that ten years just seemed like a nice round number?

A. I presume you could.

Q. Well, do the historical facts which you are familiar with indicate that there may be some other reason why ten years was selected?

MR. BRENNEMAN:  I think she has already answered that question, Counsel.

THE WITNESS:  No.

Q. (MR. FREEMAN)  That ten-year period, going back to the very complex land provisions here, is that essentially also true as to the land that, when you take all these complex provisions for this Band and that Band and this section and all of that, can we boil that down to the bottom line that all these things were supposed to happen within ten years?  Is that a fair summary of this?

A. That was the intention.

Q. Were there similar arrangements set up at this same time with the Chippewa Saginaw in their Treaty, if you know?

A. I presume so because they -- they had a similar problem with the administration of that Treaty.

Q. And from the standpoint of the United States Government,

397.

do the internal memoranda of the then predecessor of the Bureau of Indian Affairs indicate that the United States still understood this Treaty?  Did they regard the Treaty as setting forth a series of obligations which would be performed by 1865?

A.  I don't recall any end date specified in the correspondence at this moment.

Q.  How about in the records of the Senate, United States Senate in ratifying this Treaty?  Is there any indication there?

A.  Of the ten-year period?  I haven't read the correspondence, if there is any, by that committee.

Q.  Well, do you think in your mind that there would be some correspondence with the Senate?

A.  No.

Q.  That would certainly be in accordance with most of these treaties, would it not?

A.  Yes.

Q.  That there would be a packet of materials?

But whatever that says, we can't go into today because you're just not familiar with it?

A.  (Witness nodding affirmatively.)

Q.  Okay.  Were there any significant historical events occurring in 1855 in terms of transportation routes, construction of new canals or roads into Michigan, that

398.

would cast any light upon this ten-year period?

MR. BRENNEMAN:  I'm going to object to that question, Counsel, unless you can show some relevance to the particular issue here, to the Indians, for example.

MR. GREENE:  I would also like to suggest that it's a bit of a broad-base.

MR. FREEMAN:  We will get back to it another time.

MR. STEKETEE:  I don't think you ought to withdraw it, Counsel.

MR. FREEMAN:  I don't want to trouble Counsel with all this.  If they don't understand where I'm going, they will find out some day, and maybe that's soon enough.

Q   (MR. FREEMAN)  Now, you indicated, Dr. Tanner, that the United States did not perform its obligations under the Treaty, I believe.  Was that your testimony earlier, under the Treaty of 1855?

A   I testified there was a great deal of delay and difficulty in carrying out the provisions of the Treaty.

Q   Were the sums of money provided for in the Treaty of 1855 actually paid to the Indians?

A   I believe so, but this was a problem during the Civil War with the type of currency, and there was a later arrangement to correct that factor.

399.

Q.   But to the best of your knowledge, the funds were paid, perhaps belatedly, but were paid?

A.   Hmm . . . Yes, although, as I've mentioned before, one of the last letters that I read indicated that in the 1870's and 1871 the Sault Band were under the impression they still had money owed to them and, of course, it is well known that there was subsequent litigation, and on the basis of this Treaty an additional sum was given to them under the Court Decision in 1906, I believe.

MR. STEKETEE:  Is that the Court of Claims case?

THE WITNESS:  That's the Court of Claims case that gave rise to the famous Durant --

MR. STEKETEE:  What was the dispute during the Civil War, paid in greenbacks or something?

THE WITNESS:  Yes.

MR. STEKETEE:  And they objected to that?

THE WITNESS:  Well, they felt that they had been paid in devalued currency.

MR. STEKETEE:  That's what everybody felt, in greenbacks, didn't they?

THE WITNESS:  Yes.

MR. FREEMAN:  I feel that way every day.

MR. GREENE:  Some things never change.

MR. BRENNEMAN:  Speaking for the Federal

400.

Government, I'm sorry about that.

MR. STEKETEE:  You ought to be.

MR. FREEMAN:  Okay.

Q.   (MR. FREEMAN)   Now, how about the land, Dr. Tanner?  Did the United States fully perform its obligations under the Treaty of 1855, based on your historical research, in terms of land commitments they made to the Indians?

A.   No.

Q.   Did they comply as to any of the Bands?

A.   The statement of what happened about the land has never been satisfactorily researched.  That's an open question.

Q.   Well, I'm learning something about history, then, aren't I?

A.   You're on the frontier of history in these respects.

Q.   Am I correct, though, that somebody in the United States Government must know the answer to that question?

A.   You're wrong.  Nobody.  There is nobody in the United States Government that knows the answer.  There is nobody anywhere that knows the answer.

Q.   Now, that's the point I have difficulty with, and I guess I don't understand why nobody knows; so let me go back a couple of points, and perhaps I just don't understand this whole thing, but isn't it correct that the Treaty of 1855 provided certain large tracts of land to each of the Bands?

A.   (Witness nodding affirmatively.)

Q.   Okay.  Would not the United States have maintained some

kind of record, written records of what the Bands asked for and whether or not they got it?

A. What they asked for, yes; whether they got it, no. That's a matter, I think, of doing a detailed title search for two-thirds of the State of Michigan, quarter section by quarter section.

MR. STEKETEE:  Why two-thirds of the State of Michigan since the land allotments were out of specific parcels much less than two-thirds of the State of Michigan?

THE WITNESS:  Well, because there are linkages in some of the operations of real estate firms.

MR. STEKETEE:  Why can't you just take those descriptions out of the Articles, whatever they are, of the Treaty of 1855 and find out what the Federal patents are and link them up to the rolls?  Why can't the United States do that?  They have been asked to do it in Interrogatories in this case.  What's so hard about that?

THE WITNESS:  I don't know.

MR. STEKETEE:  It would be a nice job for a title lawyer.

THE WITNESS:  Yes.

Q (MR. FREEMAN)  Well, I guess that's part of my question: If you don't know the answer to these questions, Dr. Tanner, feel free to say so.

A. I don't.  What happened to the land is the 64-dollar

402.

question and I . . . . .

Q    I'm trying to focus on the Indian records.  We have looked
at many of these records, and as a matter of fact, the
United States has submitted great volumes of records,
which I presume you are familiar with, to us as Exhibits
in this case.

A.   Yeah.

Q    These records show highly meticulous record-keeping:  Two
barrels of salt shipped to this Indian Reservation, and
$2 for this guy to go out and do this, but nowhere in
your research are there documents indicating the
disposition of these land claims; they're just not there?

A.   I provided the list, the list that I had, and the hints
as to where land office -- the records of the land office
are not records that I have, that I have gone through or
researched.

Q    I understand.

A.   What land was handed out where.

Q    My question was as to the documents.  You have looked at
the records of the Federal Government relating to
Indians?

A.   No.

Q    Because that's where I would expect to find them.

A.   I think in the general land office one of the letters
indicated that in trying to decide which list of patents

403.

to follow, why, he had to go back and forth to try to make the record that he had of Indian patents conform to records of the general land office, and there have been lots of questions about procedures that were followed.

Q   Okay.  The Treaty of 1855 in Article One begins by saying: The United States will withdraw from sale for the benefit of said Indians as hereinafter provided, all of the unsold public lands within the State of Michigan embraced in the following descriptions, to-wit -- In your research did you find a document whereby the United States of America withdrew from sale lands within any of these described tracts?

A   Well, I would have to go back and look.  I think there's correspondence about what lands they would withdraw and, you know, there were -- some of these were modified by the Senate.

Q   No, I hadn't known that.

A   Well, yes, they were modified.  If you're reading Kappler, that's not the original Treaty, but there were some lands, and there is correspondence concerning the restrictions of the lands that were specified in the original Treaty.  So there was correspondence on that subject, and I hadn't paid particular attention to it.  From time to time there is a letter saying there is correspondence between the Indian Office and the general land office about withdrawing

404.

lands, about what lands are to be withdrawn.

Q   Now, I assume when they say withdrawn, that they mean that the United States would see that the land was not sold; that seems to be the intent of the wording.

A.   Yes.

Q   Did you find a document which said to Federal officials, land office folk and others:  Don't sell the following lands; it's to be held for the Indians.  Is there a piece of paper like that somewhere in the records of the United States Government, to the best of your knowledge?

A.   I think probably -- I think there probably is, but when I was going through this mountain of information, I was concentrating on fishing rights because I thought that's what the case was about.

Q   See, we're both learning something today.  So we don't know whether the Bands got what they asked for.  How about the second step, the individual land allotments to individual Indians?  Are there records on that, to the best of your knowledge?

A.   I reported records that I had come across in the Indian correspondence about surveys, about surveys of land.  I think these are fragmentary; that the ancillary documents are, again, probably in the Surveyor General's Office or general land office and are records which I have not read.

Q   Did you find any correspondence regarding the status of

405.

such lands once an individual Indian had taken it?  How did the United States then regard that land?

A.  I don't know.

MR. GREENE:  I think I'm going to object. The witness says she doesn't know, but I think that's calling for a legal conclusion, if you're asking for who owns the land.

MR. FREEMAN:  No, no, no, no.  I'm asking her how the United States described it in their documents. Let me -- Maybe I'm not being clear, Dr. Tanner.  Let me try the question again, and maybe you still won't know but at least I will have asked a question that we'll both understand.

Q  (MR. FREEMAN)  We know that when a settler went into a land office and purchased a parcel of land or obtained title to it, under whatever Federal law he was dealing with, that the United States tended to regard that land in a certain way, generally described as it's Mr. Smith's land or Mr. Jones' land, a concept of individual title. You testified earlier as to the Indian concept of title. The Indians' basic tribal concept of tribal ownership, I'm wondering how the United States regarded these individual land allotments, whether they accepted the Indian approach to it or whether they simply regarded those Indians who had acquired land allotments as they would any other white

406.

settler.  Does the correspondence give us any insight into that?

A.  No, but I think that land law probably does.  You have got title to land, you have got title to land, and by the time of the 1855 Treaty, Indian people appreciated the importance of having a piece of paper for which they asked in the Treaty Council.

Q.  I see.  And do the records of the Treaty Council or other correspondence known to you indicate that the Indians understood that this Treaty is guaranteeing to them land the way the white settlers held it, title the way the white settlers held it?

A.  They wanted to acquire the firmest title possible.

MR. STEKETEE:  Does that mean fee simple, or does that mean something else?

MR. GREENE:  Objection.

MR. BRENNEMAN:  Objection.

MR. STEKETEE:  You want to state the basis of the objection?

MR. BRENNEMAN:  Yes.  Asked and answered. Also it requires a legal conclusion.

MR. STEKETEE:  When did she answer the question?

MR. BRENNEMAN:  She has said the firmest title possible.

407.

MR. FREEMAN:  That was certainly my understanding.  Whatever lawyers might characterize it, as fee simple, absolute or whatever, that's what the Indians wanted?

THE WITNESS:  Remind me during a break. I want to ask a question.

MR. GREENE:  For the record, you're obviously entitled to draw your own conclusions about what the answers are.  I think the answer was firmest possible title or ownership possible.

Q. (MR. FREEMAN)  Dr. Tanner, do the records of the Treaty Council for the Treaty of 1855, or any other records known to you, indicate any desire on the part of the Indians that individual Bands would hold the land as set forth in the Treaty of 1855, according to traditional Indian title?

A. . . . I don't think there is anything about Indian title in the records.

Q. Is there any reference in the records to the ability of individual Indians, once they acquire these individual tracts, assuming that the United States had performed all of its obligations in terms of the ability of those individual Indians, to control who would come on to those parcels of land to hunt and to fish?

A. You're talking about the 1855 Treaty?

Q. Yes, I am.

408.

A.  It doesn't have anything.  You know, that's not, that doesn't have anything to do with fishing, really.  I don't recall any discussion coming up.

Q.  No indication at all of fishing?

A.  In the 1855 Treaty?

Q.  Yes, ma'am.

A.  No.

Q.  And no reference at all to hunting?

A.  I do not recall any discussion of it.

Q.  How about the ability of an individual Indian to dispose of the land?

A.  I think there is something about that.

Q.  In the Treaty or in the Treaty negotiations?

A.  Well, one of those Treaties there was --

Q.  Wasn't that, and correct me if I'm referring you to the wrong part here, but are you talking about that section within the Treaty of 1855 under Article One which says, after selections are made, as herein provided, the persons entitled to the land may take immediate possession thereof, and the United States will thenceforth and until the issuing of the patents as hereinafter provided, hold the same in trust for such persons.  Then it goes on and says, deleting a few words, such certificates shall not be assignable and shall contain a clause expressly prohibiting the sale or transfer by the holder of the land described

409.

therein.

After the expiration of ten years, such restriction on the power of sale shall be withdrawn.

Is that the language you're referring to?

A. I think probably.

Q. Now, is there anything in the Treaty negotiations, or in the correspondence surrounding it, which gives us any insight into whether that selection of a ten-year period was for any particular reason?

A. No.

Q. Or is that simply tied into the other ten-year period?

A. I presume so.

Q. Is there an indication in the Treaty negotiations why the individual Indians would not be allowed to sell their land for ten years?

A. No.

Q. Did the Indians object to that provision within the course of the negotiations?

A. I don't recall any record of it.

Q. Are there any records, to the best of your knowledge, of individual Indians requesting permission to sell their land in less than the ten years provided for under this Treaty?

A. I don't know of any.

Q. There is a provision in the Treaty, is there not, where an

410.

individual Indian could get permission to sell in less than ten years, but you're not aware of any Indian having exercised that?

A.  I don't recall that correspondence, but as I told you, in going through masses of information, these complicated manipulations regarding land were things that I did not attend to because that would have taken five years minimum.

Q.  Well, I don't mean these questions to sound critical of you, Dr. Tanner.

A.  Um-hmm.

Q.  I'm simply trying to understand this Treaty in its context and its times, and then compare that to what really happened and see if there is any difference between what the parties contemplated and what actually happened.

Do we know how many individual Indians might have obtained tracts of land under this Treaty, without getting into the whole land question of legal description of the parcel or something?  Are there any records that indicate just sheer numbers?

A.  I don't think they are conclusive.  I indicated what numbers of patents were intended to be distributed and were reported distributed, but the Indians kept reporting not getting them, or some were ordered sent back, so I have not come to a satisfactory, or what I would call a

411.

conclusive sum total number.

Q   Does your research indicate why some of those patents were sent back?

A   . . . Some cases the person was dead.

Q   By person, you mean the Indian?

A   Yeah, the Indian was dead, and some were ordered sent back. The whole land matter is obscure, Mr. Freeman.

Q   Okay.  Now, the Treaty of 1855 contains one more provision, I think, of interest on this question:  That says all the land embraced within the tract hereinbefore described that shall not have been appropriated or selected within five years shall remain the property of the United States, and the same shall thereafter, for the further term of five years, be subject to entry in the usual manner and at the same rate per acre, as other adjacent public lands that are then held by Indians only; and all lands so purchased by Indians shall be sold without restriction, and certificates and patents shall be issued for the same in the usual form as in ordinary cases; and all land remaining unappropriated by or unsold to the Indians after the expiration of the last-mentioned term, may be sold or disposed of by the United States as in the case of all other public lands.

MR. GREENE:  Did you identify that?

MR. FREEMAN:  I'm reading again from Article

412.

One of the Treaty of 1855. Does what I just read comport with the official copy of the Treaty, Dr. Tanner?

THE WITNESS: I presume so.

Q. (MR. FREEMAN) Are you aware of any records dealing with this clause of the Treaty? Do the records of the United States Government indicate what happened during these various periods?

A. Again there is a lot I didn't follow in detail. There were a number of measures, a number of different provisions, the Homestead Act was passed in 1863; some special exceptions were made for Indians; some special provisions for Indians; and these I have not followed in detail.

Q. How about the other side of it? How about the provisions here that after ten years the remaining lands could be sold or disposed of by the United States as in the case of all other public lands? Did the United States do that?

A. I don't know.

Q. Are you aware of any documents relating to that question, Federal documents?

A. Again, I'm sure there are a lot in the land office records. This seems to have gone on and on and on, and the fact that some of the patents weren't handed out until 1873 or '75, see, that's long after the ten-year period.

Q. Um-hmm, but that strikes me as fascinating. There is no

413.

reference at all in the records to that?

A.    The Indian records?

Q    No, the record of the Federal Government relating to this Treaty.  Does that indicate or would that seem to indicate that the United States did not attempt to sell or dispose of this land?

MR. GREENE:  I believe the testimony is that she is unaware of the records.  I don't believe her testimony was that none exists.  She does not know whether there were any records.  Correct me if I'm wrong, Dr. Tanner.

MR. STEKETEE:  She has testified there was something terribly wrong with the way the land was handled. Indians didn't get the land, and apparently she has some basis for that, but . . . . .

MR. FREEMAN:  I can ask the question --

MS. TIERNEY:  Let's let her answer.

Q    (MR. FREEMAN)  Dr. Tanner, are you aware, from reviewing the correspondence of the United States Government on this, of any cases in which an Indian sought a patent to land and it was refused on the grounds that the United States had already sold that land to someone else?

A.    A specific case?

Q    Any specific cases.

A.    No, I'm not aware of a specific case.  I think all the

414.

patents may not have gotten recorded.

MR. STEKETEE:  Who would have recorded those?  Would they have been recorded before being issued to the Indian by the Government, or would the Indian have had the responsibility of recording his own patent?

THE WITNESS:  I just haven't figured out this land business, Mr. Steketee.  I'm trying to be as brief as possible.  It's one of the big puzzles.  Lands Indians placed in trust with the Governor of the State of Michigan, thinking he would help them protect it, and there were large tracts like that, too --

Q.  (MR. FREEMAN)  Was that under the Treaty?

A.  The land going to the Governor?  I don't recall any mention of that before.  I know you don't.  And in some cases, Indians bought land with their annuities, placed it in trust with the Government of Michigan, and this was land that was later assigned to them as permanent homes and lost it under tax sale.  That's just one example of what happened to the land, nothing definitive and generalized can be said on this subject.

Q.  I see.

A.  And because it's -- I have only gone through the Indian records, and I repeat, the answer to all of this means going through land office and land records that I just haven't explored.

415.

Q    Would that also be true of the provision also contained in Article One of the Treaty of 1855 for the use of some of this land for churches, schools and similar facilities for the benefit of the Indians?  Would those kinds of records also be considered land records?

A    I -- I don't know.

Q    Well, do you recall seeing such records in going through the records of this Treaty and other correspondence?

A    About the land for --?  Well, the Treaty specifies, one, the Presbyterian Church occasionally.

Q    How about records relating to settlers who claimed a right of preemption on the land?  Are those records maintained as part of the Indian records?

MR. GREENE:  I'll have to object.  What right of preemption is that?  Could you define that, what you mean by that?

MR. FREEMAN:  Well, it's used in the Treaty. It's also agreed that any lands within the aforesaid tracts now occupied by actual settlers or by persons entitled to preemption thereon shall be exempt from the provisions of this Article, provided that such preemption claims shall be proved as prescribed by law before the first day of October next.

Is that accurate out of the original Treaty?

THE WITNESS:  I presume so.  I haven't been

416.

following you word for word, Mr. Freeman.

Q   (MR. FREEMAN)   The gist of it is correct.

Are you aware of any records relating to settlers attempting to -- prior to, and I assume when they say the first day of October next, they're talking about October 1, 1856, are you aware of any records relating to settlers attempting to make such a showing prior to October 1, 1856?

A   . . . Not of that date.  Settlers' interest in preemption, I am aware of; that particular date doesn't -- I don't recall, recall anything.

Q   Well, tell us generally what kinds of records are available on that.  Were there a large number of settlers who claimed preemption as opposed to one or two individuals?

A   I don't believe so.  There weren't very many people up there.  I can't say . . . I'm not aware of it, but I just can't at this point elucidate on the subject of settlers' interest in preemption.

Q   Well, maybe I'm reading too much into this.  Let me tell you how I interpret it, and as a historian, tell me if you think it makes sense.

We have this long list of all these sections and townships and things at the beginning of this Treaty; then we get to this paragraph, and I'm assuming

417.

what the Federal people are trying to say, the Federal negotiators, in writing this Treaty, is just in case we slipped up in listing all these townships and sections before, and there's actually somebody who has settled on this land, we want them to have an opportunity to defeat any Indian claim that might be made; so we're setting up a provision whereby they can claim preemption. Does that make sense in a historical sense?

A. I suppose so. In general the pioneer settler was an admired type and his efforts were considered worthy of protection.

Q. So the United States was making it clear by this provision that they weren't attempting to shift title from a private individual to Indians by land patents; that the Indians couldn't claim land unless it was unsettled land, the title of which was still in the United States, am I right on that?

A. I think so.

Q. That gives us some insight into the priorities on all this, doesn't it, in the mind of the United States? Aren't there provisions in other treaties where the United States has provided that the Indian rights to certain lands comes first as to other Indian groups in other places? Wasn't that a clause --

A. I can't state that.

418.

Q    Well, at least here the United States and Indians agreed by treaty to recognize the rights of anybody who was there already, any settler who was there, am I correct in stating that?

A    Yes.

Q    The phrase that fascinates me out of that paragraph is where they say any lands within the aforesaid tracts now occupied by actual settlers.  I assume that there is a reason why there is no reference to title; that the United States and Indians are agreeing that if somebody is there and doing something on the land, that that is sufficient to defeat an Indian request for a patent on that tract.  Do you read it the same way?

          MR. GREENE:  I'll object to that on the grounds that that is calling for a legal conclusion that is beyond the competence of the witness.

          MR. FREEMAN:  No.  I'm not asking for a legal opinion.  I'm asking her if the Treaty seems to say that, whatever the law.

          THE WITNESS:  They wouldn't throw out a settler.  An Indian shouldn't select a piece of land and throw a settler off.

Q    (MR. FREEMAN)  That's how you read it?

A    Well, I . . . . . . I'm confused between what you're telling me and --

419.

Q. Well, I'm asking you, you see, I think you and I have said the same thing in different ways.  I just want to make sure that you agree that that is the case.

A. There's this huge big acreage up there.  Indians who select land probably should select land that -- they probably should not select land if there is somebody settled.  There are very few people up there.  It probably is an interest in protecting settlers.

Q. We know also, do we not, though, that there were vast tracts of that land which, for one reason or another, have no particular economic value unless you happened to be in the lumbering business or something, don't we?  They were remote from roads, remote from waterways, that sort of thing.

A. Not remote from waterways.

Q. Well, are all of these tracts set forth here listed in the Treaty near waterways, all of these things listed in Article One?

A. I believe so, except for one in southern Michigan.

Q. Well, I hadn't realized that.  Well, you have seen some of the land patents issued?

A. No.

Q. You have not?

A. No.

Q. Have you seen descriptions of the land given to individuals?

420.

A.   Only the lists that I told you about.

Q.   Do those descriptions indicate how they are squaring off or rounding off these parcels --

A.   No.

Q.   -- that are located on the coastline?

A.   No.

Q.   Do you understand why I asked that?

A.   No.

Q.   Well, does the Treaty require that the land be a particular shape?

A.   No.

Q.   Does it require a particular size?

A.   No.

Q.   What does it mean, then, when it says in the Treaty, the United States will give to each Ottawa and Chippewa Indian being the head of a family 80 acres of land and to each single person over the age of 20 years of age, 40 acres of land?

A.   It means that is what they're supposed to get.

Q.   But that tells you what the size of it is going to be, doesn't it?

A.   Yeah.  Yes, indeed it does.

Q.   Now, if you had a parcel that was 32 acres and an Indian wanted it located on the coast of one of the Great Lakes, was there an indication in the records of the Federal

421.

Government as to how they handled that kind of a problem?

A.  No.  There are only indications of what range, township, southwest corner, and sometimes lands for a single Indian were in two different places or two different sections on the list.

Q  Were there indications that any individual Indians received less than 40 acres?

A.  Oh . . . . . I don't recall in detail.

MR. STEKETEE:  Do you understand what Mr. Freeman is getting at?

THE WITNESS:  Not the slightest.

MR. STEKETEE:  As I understand it, when these lands were surveyed, they were surveyed in a regular grid by the United States.

THE WITNESS:  Yes.

MR. STEKETEE:  By section and quarter section on down.

THE WITNESS:  Yes.

MR. STEKETEE:  If you bought property, you could buy a regular 40 or 80, and it was part of that grid, measured off that grid.  For example, I might not buy a whole section; I might buy the northeast quarter section, follow me?

THE WITNESS:  Yes.

MR. STEKETEE:  Now, if that section happens

422.

to lie next to a lake, it wouldn't be a full section.

THE WITNESS:  True.

MR. STEKETEE:  Follow me?  If I bought the northeast quarter section and it had a lake running through it, I wouldn't get as many acres of land as I would if I bought just land, quarter section of land.  Do the records indicate how the Government and the Indians were resolving that problem in light of the language of the Treaty?  I think that's what Mr. Freeman is getting at.

THE WITNESS:  I told you in some cases there are land in two different places or from two different -- or from two different sections of land. Frankly, I don't see what difference it makes.

Q  (MR. FREEMAN)  Well, let me suggest to you why it makes a difference, Dr. Tanner.  I'm trying to understand this Treaty language.  I'm trying to put myself back in 1855 and see what all these folks are doing.  We know that some of them representing the United States of America had some knowledge of land titles, had some knowledge of the geography of Michigan, particularly the way Michigan, being surrounded by the Great Lakes, has this sort of problem Mr. Steketee has referred to all around our coastline.  You take this magic grid that the United States drew up, with all the little squares, and apply that to

423.

Michigan, you've got things hanging all over the place just because of the way our coastline is shaped, so it's a very, very real problem for persons who are attempting to negotiate the sale or purchase of land in Michigan. It's a problem, I'm assuming, negotiators for the United States were aware of, or if they were not, that somebody became aware pretty quickly when individual Indians began to apply for patents.  In trying to ascertain whether the question of hunting and fishing on these lands was considered by anybody for any purpose, it strikes me as relevant to know whether or not they squared off that 40 or 80 by shoving it out into the Lake; whether they drew that, included a piece of inland lake or one of the Great Lakes, and that's really my question.  I thought it would be too complex to lay it on you like that.  I tried to approach it question by question.  That's really my question.  Do you understand it now?

A. I understand it and the complexity of your thinking outstrips anything in anybody's mind that I ever read about in 1855.

Q. Well, is there an indication that the negotiators from the side of the United States understood the geography of Michigan?

A. Absolutely.  When they surveyed it, they say part of these sections are under water, part of this is swamp, you will

424.

have to get more land.  They knew something about the geography.

Q  Okay.  Why don't we go off the record for lunch.

(Whereupon, the noon break was taken.)

Q  (MR. FREEMAN)  Dr. Tanner, there is a provision, is there not, in the Treaty of 1855, providing for adjudication by the United States if two Indians were to claim the same tract?

A.  If you're reading from the Treaty, I will believe you.

Q  No.  I was leafing through the Treaty, trying to look for it, and thought you might know off the top of your head.

DR. MASON:  That's in Article One, I think.

THE WITNESS:  It's what page?

DR. MASON:  Section Eight.

THE WITNESS:  The provision is the third paragraph.  In case of two or more Indians claiming the same lot or tract of land, the matter shall be referred to the Indian Agent.

Q  (MR. FREEMAN)  That's the provision I was thinking about.  Did you, in the course of your research, find any reference to the Indian Agent having adjudicated such disputes?

A.  Not that I recall.

Q  The third Treaty of 1855, that with the Chippewa of Saginaw, contains a release clause of Reservations, land

425.

Reservations owned by the Chippewa of Saginaw.  Are you familiar with that provision?

A.  I suppose I have read it.

Q.  Is there a similar provision in the Treaty of 1855 of which we are concerned in this case?

A.  Not that I recall.

Q.  Do you know why the Government negotiators felt it appropriate to put such a provision into one of these treaties but not into the other?

A.  Nope.

Q.  Are you aware of any documents that might shed light on that?

A.  No.

Q.  Now, as a final point on the Treaty of 1855, you have indicated that the United States intended this to be the final action with the Chippewa and Ottawa groups involved. Was there a listing used by the treaty negotiators or sent to them as part of their instructions, of the obligations that the United States felt were owed to these Chippewa and Ottawa groups?

A.  Henry Gilbert, the Indian Agent, prepared such a list, which I refer to in my report.

Q.  I'm sorry.  I don't recall having seen that in your report.

A.  I referred to the correspondence.  I didn't quote it --

Q.  I see.

426.

A.   -- in detail, but I included a letter of transmittal that I think covers it.

Q.   Now, this listing, did it include anything other than financial obligations?

A.   No.

Q.   Did it include financial obligations arising anywhere other than under the Treaty of 1836?

A.   Yes, it included some financial obligations, I believe, arising from the 1821 Treaty.  I think I quoted the sum and substance, but there were some financial obligations arising from the 1821 Treaty, too.

Q.   So the negotiators came into the negotiations with the Indians with a list of those items that the United States Government wanted a release on.  Was that list shown to the Indians?

A.   Questioning your terminology -- came with a list of obligations which the Federal Government felt were monies owed to the Indians, and those were, if you read the Treaty proceedings, you will see how each one of those items is explained to the Indians.

Q.   So there was a full discussion of each and every item on the list with the Indians, is that correct?

A.   Yes.  You must have read it.

Q.   Well, I wasn't sure that it was ever done.  That's really the reason I'm asking these questions.

A.    Yes.

Q.    Did the Indians suggest any items, other than the items on the Government's list, as appropriate matters to be negotiated?

A.    . . . Not that I recall.

Q.    Was there any discussion as between the Indian negotiators, the Government negotiators, of any obligations of the United States Government to continue on past the Treaty of 1855, other than the items that are reflected in the Treaty that we have talked about this morning?

A.    No.

Q.    Were there any agreements made by representatives of the United States, which are not reflected in the Treaty of 1855?

A.    I don't know of any.

Q.    Did you see any reference anywhere to a secret codicil or other agreement?

A.    None.

Q.    The dollar amount that is set forth in Article Two of the Treaty of 1855, the sum of $538,400, does that represent the total of all of the items which were contained in the United States negotiators' list?

A.    I believe that was -- I believe so.

Q.    Would it then be a fair interpretation of this Treaty to say that Article One represents the attempt by the United

428.

States to assimilate the Indians into settler culture by giving them individual farms and other allotments of land and that Article Two represents the wind-up of all financial obligations which the United States perceived itself to owe to this tribe? Is that a fair summary of everything we have talked about?

A. . . . . I think it's better stated that Article One was the attempt of the Federal Government to establish permanent homes for the Indian people. That was the phrase that was repeatedly used; and Article Two was to handle the financial obligations, legal and equitable.

Q Now, when you say permanent homes, am I correct that you're drawing a distinction between what we would call a Reservation for an Indian Band or Tribe and a home in the sense that the settlers would use that term?

A. No, because the land allotments were within specific tracts. Those tracts were always called Reservations, throughout the 19th Century.

Q So the Treaty of 1855, in your view, created a new series of Reservations in Michigan?

A. It redefined the Reservations.

Q And would it be fair to say was redefining the Reservations as set forth in the Treaty of 1836?

A. Yes. That had not been -- That was obscure under the revised Treaty.

429.

Q.  Was one of the things that had happened the land description had changed in Michigan?

A.  Yes.

Q.  The Treaty of 1836 is the old description of from the big tree to the big river, whereas in the Treaty of 1855 we are dealing with these precise legal definitions, Township 12 north, range 15, so forth?

A.  Yes.

Q.  So that was one of the purposes here, to define these Reservations or redefine these Reservations in terms of legal descriptions that would make sense in terms of the land titles in use in 1855 in Michigan.

A.  Well . . . That hadn't been possible, you know, in 1836. The lands hadn't been surveyed, and so it's a more precise definition, a more precise definition of the land.

Q.  Okay.  Do you know if there have been or if there were any significant mistakes in the land descriptions set forth in the Treaty of 1855 discovered later by the Federal Government?  Is there any reference to memoranda or documents saying, "Hey, we said Section 47 but we meant Section 45," something like that?

A.  No.

Q.  So if I take a Michigan Township map of today and I look to see these descriptions in Article One of the Treaty of 1855, and I say, "Okay, on this description they tell you

430.

about this square here," I would be talking, then, about the same square they were in 1855?

A.   I believe so on these lands, although there were some lands that had to be resurveyed in the 1860's because of earlier inaccuracies.  I don't know if any of these, the lands described in the 1855 Treaty, any of them fell within the area that required resurvey.

Q.   I don't know, either, but I suppose we could check that.

A.   All right, that would be the only provision.

Q.   Okay.  Did the negotiators for the United States attach the listing of financial obligations still in effect to the original of the Treaty when they transmitted it to Washington?

A.   I don't believe so.  I think the preliminary correspondence indicated the way the sums specified in the Treaty were derived.

Q.   Um-hmm.  And the final product as from Washington, then, simply contained this release clause with the assumption being that the Indians and the representatives of the United States were satisfied as to the trade-off here, the amount set forth in Article Two versus the release clause in Article Three, is that right?

A.   They were satisfied so far as this clause, this Treaty went, with the understanding that the principal outstanding claim was that of the Chippewa at Sault Ste. Marie for

431.

their fishery that had been damaged that was still outstanding.

Q   Now, as to this specific group up at Sault Ste. Marie, you have indicated that Michigan, at that time, was sparsely populated by that time; I mean 1855, sparsely populated.  Was that also true specifically of the area around Sault Ste. Marie?

A   Michigan's population growth had been primarily in the southern part of the Lower Peninsula.  There was a small community at Sault Ste. Marie.  I don't know its population in 1855.  I think there might have been perhaps seven or eight hundred people.  I quoted the 1880 population as being about 2,000.

Q   Seven or eight hundred was a pretty large urban area for that time in this country, wasn't it?

A   Yes, it was.

Q   How much, if you know, land was there in the area of Sault Ste. Marie, that had not been occupied or settled by the French or later by the British or later by the American settlers?

A   We don't know.

Q   Have you seen any maps which depict the areas of land that were claimed in those early days, particularly in the Treaty times between 1836 and 1845, by various settlers? Are you aware of any such maps?

432.

A.  I think there was a map where they were trying to figure out what claims could be allowed by settlers prior to United States occupancy.

Q.  How about the maps concerning DeRepentigny claim; have you ever seen any of them?

A.  I did a long time ago.  That was an interesting case, but I don't really know about it.  That's one that was thrown out ultimately.

Q.  Do you remember the details of that case?

A.  No, I don't.

Q.  Have you seen any of the Exhibits that were filed in the United States Supreme Court on the appeal of that case?

A.  No, I haven't.  It didn't concern fishing rights.

Q.  Well, what do you base that statement on, that it didn't concern fishing rights?

A.  (No response.)

Q.  Are you saying you assume if it did involve fishing rights you would know about it?

A.  Yes.

Q.  Are you aware that one of the disputes in that case concerned the Soo fishing ground, the St. Mary's River?

A.  In the St. Mary's River?

        MR. STEKETEE:  Could you speak up, Dr. Tanner?  I'm having trouble hearing.

        THE WITNESS:  I have not read the

433.

DeRepentigny case.

Q    That would give us, though, would it not, in the Exhibits of that case, given the French claim of the other things raised in it, the documents and maps there would give us a pretty good handle on the area of Sault Ste. Marie, wouldn't it?

MR. GREENE:  Counsel, I'm afraid I'm going to have to object to that question.  You asked her if she were familiar with that case; she said she wasn't.  Now you're asking about that case.  She said she was unfamiliar with it.

MR. STEKETEE:  She said she was not familiar with the case but she testified she had read something a few years ago.  She was not familiar with it.

MR. GREENE:  And that she was unfamiliar with the case.  My objection stands.  The witness can answer.

MR. FREEMAN:  Do you want to answer that, Doctor?

MR. GREENE:  Would you like the Reporter to read the question back, Dr. Tanner?

THE WITNESS:  Yes.  No.  I don't know what it would have to do with the situation at the time of the Treaty of 1836.

Q    (MR. FREEMAN)  You're satisfied, then, that there would be

434.

no good purpose served by your reviewing the files and records, then, of that particular dispute?

A.  Yes.

Q.  Do you know where the fort that was constructed pursuant to the Treaty of 1820 was in relation to the traditional encampment grounds of the Indians on the St. Mary's River?

A.  It lay to the east of the traditional camping grounds.

Q.  Do you know about how far to the east it was, roughly?

A.  I know where the maps are that show it.  It was not far distant.

Q.  Could you give me a rough figure in feet or yards, more than a mile or less than a hundred yards?

A.  . . . I would guess it's less than a mile, although I don't know why guess, there are maps.

Q.  What sort of maps are there?

MR. BRENNEMAN:  Counsel, I noticed you were referring to a map.  You already have a map of central Michigan.

MR. FREEMAN:  I have several times.  I like to know what -- which she's looking at.

MR. BRENNEMAN:  If you're asking questions based on a map as far as distances or so forth, are these really necessary?  Are we just wasting time here?

MR. FREEMAN:  The witness has testified she has not looked at what I consider to be the best source of

435.

maps available. I would just like to ask her for the record -- which statement I wouldn't have made if you hadn't made that objection -- I simply would like to know what, generally, maps she's looked at, who prepared them, do you know?

THE WITNESS: Yes. I have looked at maps of Sault Ste. Marie that are printed in the Congressional Record serial set, where there were a number published in connection with the question of land claims that we mentioned earlier, those in the serial set, and I have had copies made of maps of Sault -- manuscript maps of Sault Ste. Marie that are in the Michigan State Archives out here on Logan Street, because I'm in the process of collecting information to map Indian towns in Michigan.

Q.  (MR. FREEMAN) Indian what?

A.  Indian towns.

Q.  Towns?

A.  In Michigan. And I have a roll of those maps. I almost brought them with me. It didn't occur to me this subject would come up. In my briefcase I have the bibliography cards.

Q.  All right. Based on your research, are the books of Henry Ross Schoolcraft historically reliable?

A.  Some points of them are questionable. His personal memoirs, I think, are extremely helpful for understanding

436.

the day by day activities in Sault Ste. Marie.

Q From reading -- Well, have you read his memoirs?  I believe you testified you had.

A Personal memoirs?

Q Yes.

A Yes.

Q From reading those memoirs, is it your conclusions that Henry Schoolcraft was hostile to Indians?

A No.

Q Could you characterize, using your own words, what you concluded his attitude was towards Indians?

A Friendly, tolerant, but he would not go and live amongst them, according to their way of life.

Q That would have been true of many of the people with whom the Indians dealt, would it not?

A Many of the -- many?  I suppose so, if you're referring to Federal officials.

Q How about Lewis Cass?  Is Cass one in whom we can feel some trust when we read descriptions of the relations with the Indians back in the 18- -- well, in the period he was there?

A He was experienced, he was a realist, he was a moralist, too.

Q Comparing his accounts to historical documents and materials you are familiar with, does it appear that he was

437.

accurately recording things as they transpired?

A.  . . . I believe so.  In many situations Cass is our sole source of information.

Q.  He held a number of posts that required him to deal with Indians, did he not?

A.  Yes.

Q.  Wasn't there a time when he was Superintendent of Michigan Affairs for the Michigan Territory?

A.  That goes with the job of being Governor.

Q.  Oh, the two are tied together?

A.  Usually.

Q.  I didn't know that.

A.  Governor and Superintendent of Indian Affairs.

Q.  So then for at least part of the period in question, Lewis Cass was the chief representative of the United States Government in its relations with the Chippewa?

A.  Yes.

Q.  Did the history of those times give us any insight into what policy Cass was following with regard to the Indians, a friendly policy, a hostile policy?  Could you characterize it?

A.  Yes.  A friendly policy always with an eye out to getting whatever lands he could.

Q.  Whatever -- I'm sorry?

A.  Whatever lands he could acquire.

438.

Q. You mean for himself?

A. No.  He negotiated the land cession --

Q. For the Government?

A. He was responsible for -- whether it's 13 or 16 land cession treaties.

Q. Do you have an indication from the materials available concerning Lewis Cass, as to whether or not it was his practice to honestly disclose to the Indians the effect of these land cessions?  Did he make an attempt to communicate it to them?

A. I don't know that he totally knew what the effect would be.  I don't recall any speech describing his view of future Indian life.

Q. He certainly understood, though, the difference between the Indian view of title to property and the settler's view.  Did he attempt to communicate that to the Indians?

A. I'm not sure.

Q. How about the Jesuit missionaries who lived among the Chippewa and Ottawa and other Great Lakes Tribes?  Comparing their writings to known historical events and other historical materials, do you think we can ascribe some veracity to the writings of the Jesuits?

A. We have, with care, and it depends what time you're talking about.

Q. Well, how about the time of 1836 to 1855?

439.

MR. GREENE:  I'll object to that on the grounds that you indicate which Jesuit you're talking about.

MR. FREEMAN:  Which specific Jesuits?

THE WITNESS:  Yes.

MR. GREENE:  We're talking about.

Q  (MR. FREEMAN)  Which specific Jesuits, Dr. Tanner, if any, did you rely upon in writing your report and supplemental report?

A.  Hmm, Father Baraga and Father Verwyst, who were in the northwestern part of the Lower Peninsula and in the Keweenaw area.  If you're talking about the 19th Century period, why, these are considered primary sources on history and on language.

Q  The short answer to your attorney was these were the Jesuits -- Most of what I know about Jesuits I learned from reading Helen Hornbeck Tanner's report.  You regard these as primary sources?

A.  Yes, I do.

Q  Were there other Jesuits whose writings you discarded in writing your reports?

A.  The era of the 17th Century Jesuits, that was much earlier, is considered far more difficult to evaluate.

Q  Now, I'm not sure I understand what you mean by that.  You mean far more difficult to determine whether they are

440.

telling the truth in their writings?

A.  Yes, or the extent to which they can be relied upon.

Q.  Would there have been a specific reason connected to their role in the Church, why the Jesuits would have distorted history in their writings?

A.  They were sometimes, in the early period, which doesn't really make any difference here, they were sometimes in conflict with the political authorities and/or with other Orders such as Recollects.  You know, that's something that doesn't really concern us here.

Q.  Well, would their bias have been for or against the Indians, if it was based upon the dispute between the Jesuits and political --

A.  I think it's for the Jesuits and which ones would be incidental.  There wasn't an anti-Indian feeling at all in that 17th Century period.  That doesn't really concern us here.

Q.  Well, it concerns us only to the extent, Dr. Tanner, I'm just trying to sort out all of the thousands of conceivable primary sources to see which ones you relied upon, which ones you considered to be valid sources.  Am I correct in understanding you, that by and large, you consider the Jesuits to be a good source of basic primary historical facts?

A.  Sometimes the only source; requiring careful evaluation.

441.

Q    Now, did all the Jesuits write in English?

A    . . . No.

Q    Have you examined those documents written by the Jesuits in languages other than English?

A    Not for this era.  I cited the works I used.  They're all printed in English.

Q    Is that an exercise of your historical judgment, the materials not written in English are less valid, or is it a time problem on your part?

A    Not at all.

Q    Not at all, which?

A    I found no -- I found no need to go to foreign language sources for materials that I cited here in my reports.

Q    My question is why not?

A    I felt that the story was adequately told with the documents that I presented.

Q    Did you actually read any of the foreign language documents in writing these reports for this case?

A    No, not of the Jesuits.

Q    Okay.  You indicated that you had testified in a State case, People vs. Robert and Jerome Peterson, Schoolcraft County District Court.

A    Yes.

Q    Do you have a copy of the transcript of your testimony with you today?

442.

A.  No, I don't.  I don't know as I have ever seen it.

Q   Well, I have one which I would like to ask you a couple of questions about some of the things you testified to here.  At any point you want to refresh your recollection by re-reading your own testimony, I will be glad to make the testimony available to you, and we'll go off the record.

A.  All right.

MR. GREENE:  I was just going to say that it appears that you have got the only copy in the room.

MR. FREEMAN:  Apparently I have the only copy.  I certainly don't want her -- to ask her to read the entire transcript, so let me ask a couple specific questions.

THE WITNESS:  I hope they got it straight.

MR. FREEMAN:  Well, of course, I don't know.  I have the highest personal faith personally in Court Reporters, who I regard as the most wonderful people going.  It's certainly possible . . . . .

Q   (MR. FREEMAN)  Let me say, for clarity on the record, I am referring to a transcript of the case of People vs. Robert and Jerome Peterson, P-e-t-e-r-s-o-n, Schoolcraft County District Court No. 74-10-2605, and 74-10-2604.  This is a transcript of testimony taken in Manistique, Michigan, on January 15, 1975.  Two witnesses testified in this case, one of whom is identified as Dr. Helen

443.

Hornbeck Tanner.  You, Dr. Tanner, are the same Dr. Tanner who testified in this case, is that correct?

A.  I am.

Q.  Okay.  I'm referring to pages 33 and 34 of this transcript. I think the easiest way is if I show you this question on 33 which you answer on page 34, and in the course of that testimony, if I correctly understood your answer, you indicate that the Indians were required, in signing the Treaty of 1836, to agree to a five-year limitation on the Reservations in order to get certain financial and trade good awards.  I would like you to read the question and your answer and tell me whether it accurately reflects your view.

A.  You want me to read this?

Q.  Just the question I pointed out to you and your answer on the next page, which is only two short paragraphs.

MR. GREENE:  Not into the record; just to herself?

MR. FREEMAN:  To herself, unless she desires to read it out loud, which is all right.

THE WITNESS:  Yes.

Q.  (MR. FREEMAN)  It does accurately reflect your view?

A.  Yes, it does.

Q.  Would you read into the record from your answer on page 34 the portion which begins, "Yes, the five-year limitation

444.

to the Reservations was a modification."

A.  Yes.  The five-year limitation to the Reservations was a modification made by the United States Congress after all the Indians -- with a capital I -- had left Washington and come back to Michigan, and one of their requirements was, at the time  that the Indians collected, to have their very first payment under the 1836 Treaty, they were forced to agree to a five-year limitation on those Reservations in order to get any of the financial and trade goods awards that were promised by the Treaty.

Q.  And the next sentence?

A.  In other words, they sat right up there at Mackinac and said, we have $150,000 in cash here waiting for you and not one nickel will be given out unless you agree to limit your treaty to a term of five years.  Hungry people gathered together can be persuaded by such terms.

Q.  Now, Dr. Tanner, upon what documents or other material do you base the assertion that the United States Government refused to give out -- that the United States Government had $150,000 in cash at that site and refused to give it out unless the Indians signed the Treaty?

A.  I recall correspondence when Schoolcraft was arranging with a man named Riley in Schnectady for having the goods prepared for handing out at the first payment after the Treaty, and I'm sure I can find the letter for you saying

445.

that, that none of it will be -- that nothing would be distributed unless the Indians signed the modified Treaty first.

Q. Is there a document which reflects that the United States Government told the Indians that?

A. Oh, I think there must be.  I can't haul it out right at the moment, but I know that this, this was a clear intention of Schoolcraft, to see that no payment, that no payments were made in 1837 until the revised treaty had been signed.

Q. Well, let's assume for a moment that your recollection is correct and there is a document on that.  That's not really the same thing you said here, is it, where you said that somebody presumably, on behalf of the United States, said to the Indians, we have $150,000 in cash here, waiting for you, and not one nickel will be given out unless you agree to limit your treaties to a term of five years?  Who said that to the Indians?

A. . . . I don't know.  It does appear melodramatic, doesn't it?  I think that situation was made clear to them, Mr. Freeman, and they were very hungry.

Q. Is it your testimony that there is a specific document which reflects that that was said to the Indians or to leaders of the Indians?

A. I can't really testify to that until I look for the document.

446.

Q. Is there a document which reflects that the negotiators for the United States Government had $150,000 in cash with them --

MR. GREENE:  That was asked and answered.

Q. (MR. FREEMAN)  -- at the time they negotiated this with the Indians?

MR. GREENE:  I object.  That was asked and I think she answered.

MR. FREEMAN:  I don't think I asked it yet. I think I just asked it.

MR. GREENE:  Perhaps I'm confused.  Would you mind reading back the last question?

(Whereupon, last several questions and answers were read by Reporter.)

THE WITNESS:  My answer is the same.  This was a number of years ago.

Q. (MR. FREEMAN)  Well, surely, Dr. Tanner, if a representative of the United States Government in 1836 had $150,000 in cash on his person, the United States Government would have maintained some record of that.

A. Yes, there are.  Yes, there are records of what they took up there in 1837 in the amount of cash.  I think they even specified in what kind of denominations, but now you've put me on the spot.  I can't say yes it was to and from at such and such a time.  I'd be glad to look for it.

447.

Q.  Is there any document which reflects --

A.  I know this was their intention.

Q.  -- Indians were given $150,000 regardless of when the negotiators may have taken it out of the public treasury, prior to signing or contemporaneous with signing the amendment for the five years?

A.  The reports of the transactions of treaty payments exists, do exist, and they are available, what was taken up there in goods and in cash, and there is, I am sure, a document that outlines exactly what denominations.

Q.  I'm not asking you for exact denominations, Dr. Tanner. What I'm asking you is whether this statement you made in the course --

A.  Um-hmm.

Q.  -- of the trial of the Peterson case is an accurate statement?  Documents I have seen have led me to believe that no money or other goods were given to the Indians until long after the assent was signed.  You have indicated it was contemporaneous.  I'm asking you if you know of any historical documents that support your testimony.

A.  . . . I can't provide you with them right now, Mr. Freeman. I think that the intent is the important part; that the intent of the Federal Government was to see that they got nothing until the agreement had been made.

Q.  Well, that's not quite the same thing as telling a bunch

448.

of hungry people that here's the money and you can go buy some food but we're not going to give you the money until you sign this piece of paper.

A. I think they sat there and waited a long time. I will be glad to go back and -- to go back and review it, now that you have raised the question.

Q. How about the question of the Indians being hungry? Are you certain of that?

A. Yes, they were apt to wait around a long time before payments were made.

Q. Were they hungry for causes attributable to the United States? In other words, did the United States just kind of lock them up and give them no food or water or something?

A. No. Usually, generally, the Indians gathered in anticipation of payment a good deal ahead of the time that the United States Agent got up there. It was a real problem. Sometimes it was delayed until September. This is just as a general situation.

Q. Why didn't the Indians just shoot a few deer or catch a few fish?

A. On Mackinac Island there were limited resources; they did catch fish.

Q. Were they all on Mackinac Island, all the Chiefs that signed the --

449.

A. Well, that's the place where they gathered for payment, but let me look back through these treaties. We have switched treaties now, haven't we?

A. Yes.

Q. Let me see the 1836.

MR. STEKETEE: Which Treaty are you referring to?

THE WITNESS: I was referring to payments in general, but --

MR. FREEMAN: Well, I'm talking about the Treaty of 1836 and specifically to the amendment of that Treaty to add in the five-year limitation.

THE WITNESS: Well, it doesn't show, it doesn't show on this one (indicating document).

Q. (MR. FREEMAN) How many Chiefs or leaders of Bands signed the amendment to the Treaty of 1836?

A. I think that was six, but I can't find a copy of it. The United States statutes at large clarifies that.

MS. TIERNEY: I'm going to show Dr. Tanner a copy of the assent to the amendment of the Treaty of 1836 as soon as I can find the correct page myself.

MR. FREEMAN: Would you like to go off the record for a second?

MS. TIERNEY: Just for a second, please.

(Whereupon, there was a short break.)

450.

MR. FREEMAN:  Back on the record.

THE WITNESS:  I believe you wanted me to search for documents in support of the statement you located in the transcript of the 1974 trial in Manistique.

MR. FREEMAN:  Oh, you found one?

THE WITNESS:  In my report on page 64 I wrote concerning the amended Treaty of 1836, delegations from all the Bands who were parties to the March 28 Treaty were summoned to Mackinac in early July to approve the amendment, with the understanding that no goods would be distributed nor payments made under the Treaty unless they agreed to the Senate amendment.  The footnote to that Treaty cites two pieces of correspondence:  One is C. A. Harris, Commissioner of Indian Affairs, to Schoolcraft, dated July 6, 1836, National Archives M-1, Roll 41, pages 9 and 10.  Also document from Harris to John Garland dated July 9, 1836, authorizing him to purchase $140,000 worth of provisions, not to be distributed unless the Ottawa and Chippewa assent to changes.  Expect to get assent by August 7th.  This letter can be found in the National Archives M-1, Roll 41, page 35,

Q  (MR. FREEMAN)  Now, do either of those documents indicate that the Indians were told that the goods would not be distributed unless they signed?

451.

A.   I can't find that from these documents.

Q.   The earlier letter, the Harris letter is dated July 6th, 1836?

A.   Yes.

Q.   Had all of the Indians, by that time, signed the assent?

A.   No, I don't -- I'm not sure.

Q.   In fact, Dr. Tanner, didn't the Indians sign the assent at various places and times?

A.   That's why I was looking for the other Treaty.  I think that they got some of the assents.  They later got some assents from groups that were not, had not come to Mackinac by that time.

Q.   Is it possible that a majority of assents were obtained at places and times other than that particular meeting on Mackinac Island?

A.   I would have to look that up.

Q.   The reference in your footnote to $140,000 worth of trade goods.

A.   Yeah.

Q.   Is that the same item you refer to in your testimony as $150,000 in cash, or were those two separate items?

A.   Ah . . . I don't know.  It's possible that 100 and whatever, 50,000, should have said cash and goods.  I just don't know.  I had not read that statement until you showed it to me, but I think what was in my mind was the documents that

452.

I have quoted to you.

Q  There was a difference, was there not, as I recall your report, between the group of Indians that signed the original Treaty of 1836 and the group of Indians who assented to the modifications?  Weren't there more Indians involved in the second avenue?

A  Yes.  There were more Indians who signed the assent than went to Washington to negotiate the 1836 Treaty.

Q  Now, as to those Indians who signed the assents but not the original Treaty, who were not at Mackinac Island, were they also hungry?  Were they also starving at the time they signed the assents?

A  I don't know.

Q  Do you know if that kind of information is available?

A  Right now, I couldn't say.

Q  At another point in your testimony in the Peterson case, at page 9 you say, or at least the record indicates you said, and I'm quoting:  The very early history depends, of course, on Indian tradition.  An Indian tradition that has been recorded by part Chippewa writers in the 1830's, and this tradition is that the Chippewa people originally, prior to 1400 perhaps, were on the St. Lawrence River and were forced out westward by the Iroquois Nation.  Now, I'm deleting the rest.  Is that a correct statement?  Is that what you testified to?

453.

A.    Well, apparently.  I think that date should probably be 1850 rather than 1830.  There is a tradition to that effect that when the Chippewa moved back eastward again, they were reclaiming land that they had lived in earlier.

Q.    The reference that interested me was your referring to part Chippewa writers.

A.    That's William Warren, whom I quoted in -- probably William Warren who appears as a footnote in the early pages of my report.  He was a descendant of Lyman Warren.

            MR. STEKETEE:  Was he more than one writer or --

            THE WITNESS:  William Warren is --

            MR. STEKETEE:  He's an individual?

            THE WITNESS:  Yes.

            MR. STEKETEE:  Then there must have been somebody else you were referring to.

            THE WITNESS:  This tradition crops up in other . . . This reference to this tradition of eastward movement comes out in other writers, too.  I think it might even be in Andrew Blackbird.

            MR. STEKETEE:  He was an Ottawa, was he not?

            THE WITNESS:  Yes, but the common tradition of moving from one part to another, of moving eastward from the St. Lawrence --

Q.    (MR. FREEMAN)  Is Warren authoritative?  Do you consider

454.

Warren's writings to be historically accurate?

A.    Yes.  Nobody is infallible, but he is indispensable for understanding Chippewa history.

Q.    Are there any other Chippewa writers that you described the same way as indispensable to understand the Treaty times?

A.    . . . No, I don't think -- I won't add anybody to the list.

Q.    Okay.  On pages 7 and 8 of the Peterson transcript again, the transcript reflects that you said, and I'm quoting:

I have made a very detailed study of Chippewa Indian history insofar as it is revealed by public records.  In doing this research I went through all of the micro-films, all of the original correspondence of the Federal Indian Agency covering the years 1818 to 1880, period.  I think this is about 17,000 microfilms frames of correspondence, period, end quote.

                    Is that correct?

A.    I think so.  I counted up the frames on some of them.  It started adding up.

Q.    I'm surprised at the smallness of the number, Dr. Tanner.  There are, in your opinion, only 17,000 frames which would be relevant to the study of these two Treaties?

A.    That comprises the number of frames under microfilm M-1 and microfilm M-234, covering the Indian Agency of Michigan for this period.

Q    Well, are there other microfilm designations containing correspondence for this period?

A.    This is letters received in the office of Indian Agency. There are letters sent from the office of Indian Agency, letters sent out from the office of Indian Agency.

Q    Those would be somewhere else?

A.    Those are in a different microfilm number.

Q    How about records of the treaty negotiators, things like that?  Are they under the microfilm references you're referring to?

A.    Most of that I found in M-234.

Q    Have you made an attempt to look at all of the original correspondence, whether it involves correspondence coming to Washington or going from Washington, insofar as it relates to the Indian Agency in Michigan Territory, and later in the State of Michigan, for the period of 1818 to 1880?

A.    I think it's really covered . . . I think that the story can be adequately covered by these, by the papers in microfilm M-1 and M-234.

Q    Do you base that upon a review of the other documents, or is it based upon assumptions you have made concerning the documents you have read?

A.    Assumptions I have made concerning the documents I have read.

456.

Q.   Then if some Government file clerk accidentally filed something the wrong place, it's possible that there were relevant documents that you have not seen?

A.   It's always possible.  It's always possible there is a statistical probability something else may come up.

Q.   Were all of Henry Schoolcraft's papers within the 17,000 frames you examined?

A.   Heavens no.

Q.   How about Lewis Cass' papers?

A.   No.

Q.   By all their papers, I mean all their papers relevant to this period and these times, by the way; I should be more precise in my questions.  Are all the papers of Schoolcraft and of Cass that might be relevant to those two Treaties within the two microfilms which you have looked at?

A.   I'm not sure.  The official correspondence concerning the Treaties were.

Q.   By official correspondence, you mean the letters to the Treaty negotiators and responses back?

A.   (Witness nodding affirmatively.)

Q.   But correspondence, for example, relating to the desirability of using release clauses generally in treaties, or something like that, might not necessarily be with those groups, would it?

457.

A.   You're jumping to a later year, now.  I don't know where it might be.

Q.   On page 16 of your testimony in the Peterson case, you indicate, as I understand your answer, that the Indians in the period of 1820 to 1840 fished exclusively on the Great Lakes off the shores and on the shoals.  Do I correctly understand your testimony, and if so, is that a correct statement of your view?

A.   I don't recall.  I'd like to see it.

Q.   I think Mr. Greene has it.

MR. GREENE:  Didn't I give it back to you?

MR. FREEMAN:  Did you give it back? Excuse me.

MR. GREENE:   (Indicating.)

MR. FREEMAN:  Mr. Greene has pointed out page 16, beginning line 3 of the transcript of Dr. Tanner's testimony in the Peterson case.

THE WITNESS:  Exclusively always causes trouble, doesn't it?  I have tried to get that word out of my vocabulary.  The emphasis is on -- so Great Lakes fishing off the shores and shoals, yes, the principal fishing.

Q.   (MR. FREEMAN)  The Indians, then, in your view, based on your review of available materials, did not fish the inland lakes of Michigan.

458.

A.  Yes, they fished the inland lakes of Michigan, the Soo.

Q.  But there was no emphasis --

A.  Ah . . . no.  The great fishing resources were in the Great Lakes for the Sault Ste. -- particularly for the Sault Ste. Marie Upper Peninsula Indians.

Q.  Now, that's what fascinates me, and let me tell you why it does, and then if you have a reaction, I would be curious to hear it.  It fascinates me because, as I understood Dr. Cleland's testimony, it was his view that the Indians primarily fished -- the Indians in the Soo area primarily fished the fishing grounds on the St. Mary's River; that it was easier to go out and fish in a river than it was to go out in the hazardous weather conditions of the Lake.

A.  Well, what he said is true, too, but they were all . . . I believe I cited various places along the shore where Indian people gathered, and in his report he cited the long range significance of a place like Naomikong Point and Whitefish Point.

Q.  Well, did you misspeak yourself, then, in the Peterson case in testifying that primary emphasis was on the Great Lakes?

A.  No.  I guess I don't think of the St. Mary's -- I think of that as part of the Great Lakes.  To me the St. Mary's River is a part of the Great Lakes chain, and it's

different from going and fishing in Higgins Lake.

Q   I see.  You're combining, then, inland streams into the Great Lakes chain.

A.  Well, I guess.  I don't even think of the St. Mary's as an inland stream like the Grand River.  To me the fishing there at the Soo Rapids was an integral part of that shoreline system.  I didn't differentiate.

Q.  What is the oldest literature available concerning the Indian trade in fish?

A.  The oldest literature, printed literature that I know about, and I've stated, are some of the Relations of the Jesuit missionaries who were here in the 17th Century.

Q   There is a reference on page 16 of your testimony in the Peterson case, to the oldest literature of the Upper Great Lakes, quote, tells of a trade route managed by Huron in the Ontario peninsula that went up almost to the Arctic Circle.  The traders came down to Sault Ste. Marie, aiming to arrive here in the early fall of the year, and they did trade in dried fish, period, end quote.

Is that accurate?  Is that what you testified to?

A.  I presume that's what I said.  That trade circuit is described in George Hunt's War of the Iroquois that I cited in my report.

Q   He had Indians from Michigan going all the way up to the

460.

Arctic Circle?

A.    The trade circuit, the primary traders were the Hurons over in the Ontario peninsula, but the entire trade circuit included Indians who were up close to the Arctic Circle.  Indians from Hudson Bay in Historic times came to Mackinac to trade.

Q    Who did they trade with?

A.    Well, traders at Mackinac.

Q    I mean, Indian traders or French traders or English traders?  Who were they trading --

MR. BRENNEMAN:  Excuse me, I find this fascinating myself.  I think it's very educational historically, but what is the relevance of traders from Huron and Hudson down to Mackinac Island?

MR. FREEMAN:  The relevance is to the assertion by the United States that there was an established commercial fishery by Indians in the early Michigan Territory.

MR. BRENNEMAN:  Well, perhaps we should put this in a time frame, then.

MR. FREEMAN:  Early fishery would presume customers.  My question relates to how that worked, based upon earlier testimony that --

MR. BRENNEMAN:  Maybe we should have a time frame, then, because --

461.

MR. FREEMAN:  Well, what time frame were you referring to in this testimony in the Peterson case?  You indicated the oldest literature of the Upper Great Lakes.  Did you have something specific in mind?

THE WITNESS:  Yes.  The oldest literature of the Upper Great Lakes in the Jesuit Relations and information about trade circuits and the contribution of dried fish to this exchange is in George Hunt's Wars of the Iroquois, and I quoted the earliest documents I could find in my own report.

Q.  (MR. FREEMAN)  Are you talking about your first report or your supplementary?

A.  My first report.

Q.  The first one.  Did you quote all the documents you considered relevant or cite all of the documents you considered relevant in your first report?

A.  I'm not sure.  I think I selected the best documents, best documentary evidence I could find.  How much more there is, I don't know.

Q.  How about the French?  Didn't the French explorers, prior to 1670 or so, come into the area and write accounts of what they saw and what they did?

A.  That's kind of early.  The statement that I quoted came from -- was based on Perrot, as I stated, who was supposed to have been here in the 1630's.

462.

Q    I think you had better spell Perrot.

A.    P-e-r-r-o-t, but his recollections were reported by somebody else.  I extracted whatever I could to put in the report.

Q    Well, have you reviewed -- Were there records of the early French explorers, and if so, did you review them?

A.    No, I think I took my . . . I took my material from whatever sources I have cited.  I am mind-weary at this point.

Q    Okay.

         MS. TIERNEY:  Mrs. Tanner, do you want to take a break or something?

         THE WITNESS:  No, I would rather hold out and get through this, if I can find some point to it all.

         MR. STEKETEE:  We would be happy to take a five-minute break, if you would like.

         MR. FREEMAN:  Maybe we ought to do that.

         THE WITNESS:  Okay.  We'll take a break.

         (Whereupon, there was a short break.)

         MR. FREEMAN:  Back on the record.

Q    (MR. FREEMAN)  Dr. Tanner, on pages 17 and 18 of your testimony in the Peterson case, the transcript shows that you testified that, quote, the most highly contested fishing grounds at one point in the 1830's was the area by Brevort, B-r-e-v-o-r-t.  Then you go on and testify in a

rather long paragraph, which I will be happy to show you if you need to refresh your recollection, that the American Fur Company tried to get exclusive right to fish that particular area.  Do you remember testifying to that effect?

A.  No.

Q.  I ask you to look at pages 17 and 18 of the transcript of your testimony in the Peterson case.

A.  (Witness looking at document.)  If it will hurry things up, it's a subject covered in my report.

    MR. GREENE:  Are you referring to the question beginning down toward the bottom of the page, last question on the page by line 18 and an answer that starts a few lines below there (indicating)?

    MR. FREEMAN:  Yes.

    MR. GREENE:  Okay.

    THE WITNESS:  (Reading document.)  I have read that paragraph.

Q.  (MR. FREEMAN)  Are you correctly quoted on pages 17 and 18?

A.  I suppose so.  It reads a little bit free-wheeling.

    MR. STEKETEE:  What do you mean by that?

    THE WITNESS:  I mean it doesn't sound as precisely stated as one does in written discourse, and this is a subject that I covered in my report, and I am

464.

trying to find the pages.

Q   The point that interested me in that section, Dr. Tanner --

A   Yes.

Q   -- was the question of whether a request by John Drew, D-r-e-w, and Edward Biddle, B-i-d-d-l-e, to fish at Brevort, constituted a request by the American Fur Company. Is there historical evidence, documentary letters or whatever, indicating that Drew and Biddle were not simply out on their own; that, in fact, they were there as agents for the American Fur Trading Company?

A   Ah . . . I'm sorry, my blood pressure is at the point where I don't hear particularly well, even at this point, but on pages 52, 53 and 54 of my report, I have written the principal document setting forth the facts about the fishing rights controversy at Mackinac begin with Robert Stuart, an agent of the American Fur Company in Mackinac, to Lewis Cass, Secretary of War, December 3rd, 1832, beginning:  I am requested by Messrs. Edward Biddle and John A. Drew and William Sylvester, who are connected with the American Fur Company, to represent to you, et al, meaning then the letter goes on.  I think this indicates --

Q   Are you interpreting that letter to mean, Dr. Tanner, that because Robert Stuart, S-t-u-a-r-t -- because Robert Stuart represented to Lewis Cass --

A   Yes.

465.

Q    -- that Biddle and Drew were, quote, connected with, end quote, the American Fur Company --

A.    Yes.

Q    -- that, in fact, Biddle and Drew were representing the American Fur Company in this instance?  Is that how you are interpreting that language?

A.    I suppose so.

Q    Are you aware of anything which indicates that they were, in fact, agents for the American Fur Company in this endeavor?

A.    I think you're being awfully technical.  I will just quote: If Robert Stuart, who is the agent of the American Fur Company, says that they are connected with the American Fur Company, then insofar as I am concerned, they are part of the American Fur Company.  Anybody else is considered outsiders or opposition.

Q    Well, certainly, would it not be possible, Dr. Tanner, to refer to one of your attorneys, say, Bruce Greene over there, as being connected with --

            MR. BRENNEMAN:  Objection.  Calls for speculation on the part of the witness and is argumentative.

            MR. FREEMAN:  I certainly wouldn't want to argue with anybody.

Q    (MR. FREEMAN)  All right.  This is the one and only

466.

document you're basing that upon?

A.  Yeah.

Q.  Is that correct?  And the words "connected with"?

A.  Yes.

Q.  Have you reviewed the records of the American Fur Company to see if they contain any documents relating to this question?

A.  No.

Q.  Now, as I understand it, and I have in front of me your report pages you referred to, 52, 53, 54, 55; as I understand it, in 1833 the attempt by Biddle and Drew to establish this proposed fishery was denied by the United States Government, is that correct?

A.  Yes.

Q.  So in 1833 the United States Government took action to prevent what they regarded as an intrusion in Indian fishery, is that correct?

A.  I guess so.

MR. STEKETEE:  What was your answer?  I didn't --

THE WITNESS:  I guess so.

Q.  (MR. FREEMAN)  Are you aware of any other instances, prior to the Treaty of 1836, in which the United States took action to keep non-Indians from fishing the waters of the area generally ceded by the Treaty of 1836?

467.

A. No, except to recall in passing, as you know, that licensing was required. That protective device was in existence.

Q. Yeah, but I'm talking about denials.

A. Denials? No, I don't know.

Q. In the Biddle and Drew incident?

A. No.

Q. You're not aware of any? Are you aware of any denial by the United States Government subsequent to 1836?

A. Not at the moment.

Q. Do you think you ever were aware of such incidents?

A. (No response.)

Q. I mean, do you have a vague recollection that you're not sure on? Is that what you mean by your answer?

A. No. I don't know of any that I can think of.

Q. Do you know if non-Indians, subsequent to 1836, did fish the same waters that Biddle and Drew had sought permission to fish?

A. No, I don't.

MR. GREENE: Were you referring to a specific time period, or just anytime from 1836 forward?

MR. FREEMAN: I can break it up, if it will help the answer.

MR. GREENE: I mean, I think that -- you know.

468.

Q    (MR. FREEMAN)   1836 to 1841.

A.   No, I don't know anything more about what happened at those two spots.

Q.   How about any other spot within the area ceded by the Treaty of 1836?  Do you know of any attempt by the United States Government, from the period of 1836 to 1841, to keep non-Indians from fishing?

A.   . . . No.

Q.   How about 1841 to 1855?

A.   No.

Q.   Do you know of the relationship, if any, between the area that Biddle and Drew wanted to fish and those areas described in the Treaty of 1855, the redefined Reservations of 1855?

A.   The area where Biddle and Drew -- The shoreline areas adjacent to the waters where Biddle and Drew wanted to fish were not included in the area of permanent homes for the Indians insofar as I can recall.

Q.   Thank you.

            MR. STEKETEE:  Doctor, I have a couple of questions on this Biddle and Drew incident before Stew moves on to something new.

                        EXAMINATION

BY PETER W. STEKETEE, Esq.:

Q    Can you tell me what the significance of that incident is

469.

to you?  I notice you ascribe some importance to it; you put it in your report.  What is the importance of it?

A.  To me the importance of it was the fact that the authorities in the central government indicated that the agent on the spot had the responsibility for protecting the interest of the Indian people.

Q.  And that's --

A.  That's what he said.

Q.  The Indian Agent had this responsibility?

A.  Yes.

Q.  All right.  Have you read Dr. Prucha's book on early development of early American Indian policy?

A.  I have.

Q.  All right.  Is it your understanding that this license, that was requested under the controlling version of the Non-Intercourse Act then in effect?

A.  Frankly, I don't remember.

Q.  Well, in 1833, this part of Michigan would have been Indian Country, would it not?

A.  It was Indian Country.

Q.  It wasn't ceded until 1836, was it?

A.  True.

Q.  Wasn't it necessary, under the Non-Intercourse Act, to obtain a license to even go into Indian Country?

MR. GREENE:  I'm going to interpose an

470.

objection. I don't believe she is qualified to testify about the laws, the effect of the Non-Intercourse Act, for example. I think that's calling for a legal conclusion on her part.

MR. STEKETEE: Are you saying that she doesn't know what the law said?

MR. GREENE: I'm saying that is beyond her competence. We are not holding her out here as an expert on the Non-Intercourse Act.

Q. (MR. STEKETEE) You don't know anything about the Non-Intercourse Act, Doctor?

A. I know there was a series of them, starting in the 1790's, and I do not have, at my command, the intimate details of the way this developed.

Q. All right. Generally speaking, one purpose of the Act was to limit contacts between whites and Indians, was it not?

A. Yes, it was.

Q. And the way this was accomplished was to define Indian Country and to keep whites out except through a system of licenses, wasn't it?

A. That was one of the mechanisms that was adopted.

Q. Was this incident anything more than one of a number of such incidents that revealed this policy and its workings?

A. There was an enormous demonstration as a result of this incident and the fact that all of these hundred or so

471.

people came to Mackinac to launch a dramatic protest. It seemed to me that it indicated a great statement of Indian people in defense of their fishing rights and their resentment against the device that Biddle and Drew had adopted in purporting to get permission from a spurious, a spurious Chief.

Q   All right.  When did this demonstration take place?

A   . . . In 1833, I believe.  Yes.

Q   And specifically, what document do you cite to that reveal this demonstration?

A   There are the footnotes from my pages about 54 through 56 of my report.

Q   Footnotes 117, 118, 119, 120, 121, and 122?

A   . . . Yes, I think that would --

Q   Any other references?

A   I think that probably covers it.

MR. STEKETEE:  I have no further questions. Thank you.

EXAMINATION   (Continuing)

BY STEWART H. FREEMAN, Esq.:

Q   On page 24 of your testimony in the Peterson case, Dr. Tanner, you testified, as I understand it, that Henry Schoolcraft wanted control of the Upper Peninsula because he resented the interference of the Canadian authorities with the Upper Peninsula Indians; is that a

472.

correct summary of what you said there on page 24?

A. Yes.

Q. In what way did the Treaty give the United States a better ability to control the interference of the Canadian authorities?

A. I think that the land cession was influential.  I think I indicated this in my report.  He very much wanted to get hold of Drummond Island, which had been a base for British influence and for dispensing British presents and was very, very close to Canadian territory.

Q. Were there any historical documents you have seen in your research, indicating that the Government of Canada, which at that time, I believe, was the King of England, was it not?

A. Yeah.

Q. The King of England did not accept our land claims as to the Upper Peninsula of Michigan.  Was the King of England saying, because you haven't dealt with the Chippewa, I won't recognize your land title?

A. I don't think so.

Q. Then why, in your view, would the Canadian authorities have paid any more attention to a treaty with the Indians than they were paying to the treaty that had terminated the War of 1812 between us and them?

A. Well, I don't follow you exactly.

473.

Q   I'm trying to understand why you seem to be saying that Henry Schoolcraft thought that a treaty between the United States and Indians would have some impact on Canadian authorities?  I don't understand why you apparently believe that Schoolcraft believed that.

A   Well, because I read his letters saying that it was very important for him to get a cession of Drummond Island, and I have read other correspondence of his indicating that he thought it was important to get a cession of this land for national defense reasons.  That's what he said.

Q   The national defense of the United States, in even Henry Schoolcraft's view, would be better served by a treaty than by the Fort at Sault Ste. Marie and Mackinac Island, the forts and cannons we already had there?  Was that --

A   I can't say.  I cannot lay out the national defense strategy.  I can only say that Schoolcraft thought it was important to get a cession of Drummond Island, and he was always fearful of the machinations of the British Indian Agents among Michigan Indians.

Q   Did Schoolcraft's writings reveal anything else as being of importance to him, geographic areas other than Drummond Island?

A   The northern boundary land.  I believe Drummond Island, in particular.  Nothing else engraves itself on my mind at the moment.

474.

Q    So Schoolcraft negotiated a removal treaty to take care of the problem with the Canadian authorities, is that a correct statement?

A.   No.

Q    How is it incorrect?

A.   That's just one part of the picture.  Again, I have written about this in my report, indicating all the different things everybody was interested in.  National defense was one point that Schoolcraft was interested in.

Q    Does Schoolcraft indicate in his writings how this would serve the national defense, other than Drummond Island?

MR. BRENNEMAN:  Objection.  I don't see the relevance of that to the issues.

MR. GREENE:  It's been asked and answered about five times.

MR. BRENNEMAN:  This material contained in the report, would you like an opportunity to read it over?

MR. FREEMAN:  Would you care to indicate the pages in the report, Dr. Tanner?

MR. BRENNEMAN:  I think what I was saying to you --

MR. FREEMAN:  Counsel, if you want me to look at the pages of the report, I will be glad to.  She has to give me the page numbers.

MR. BRENNEMAN:  Counsel, I don't know if

475.

that particular question is in the report, but it seems like we're going over and over material she has already submitted in the reports. I don't know what you can discover further that is relevant here. I think we're getting to be awfully abrasive of this witness, and she has expressed that, both on the record and off the record.

MR. FREEMAN: If you would like to conclude the questioning for today, because the witness is tired, or for your own convenience, or any other reason, I am agreeable to that, but I, frankly, am beginning to resent the repeated inferences as though I have got nothing in the world to do but take a Deposition of Helen Tanner. I think it's important that we take a Deposition in this case. I'm not asking for months or years of taking such a Deposition, and I'm sorry if I'm inconveniencing all of you people, but maybe you could just draw straws and have one attorney sit here and represent you, if you are all that bored. But I do think these questions are relevant. If you want to refer me to a page in the report, that's okay. I may have a question or two about that page in the report, which I also think is legitimate in a Deposition under the Federal Rules of Procedure.

THE WITNESS: All right. The background

476.

on the Treaty I began discussing on page 61 and 62.

Q   (MR. FREEMAN)   I'm having difficulty locating the paragraph or footnote you're referring me to, Dr. Tanner. Could you be a little more specific?

A.   Page 61, beginning in its approach, the second paragraph is the background on the 1836 Treaty.

Q   Was influenced by the policy to remove all Indians --

A.   Yes.

Q   -- territory west of Mississippi River.

A.   There are questions of Indian removal, defense, the new found mineral springs, and there were other points that we have been discussing, this sentence reading, in the field of border diplomacy Schoolcraft said that annuities from the American Government would diminish the influence of the British whom he suspected were promoting discontent among Michigan Tribes, and one of the footnote references indicated that as many as 15,000 Indians from the Upper Great Lakes were gathering to receive presents from the British.

Q   The real point of this is in the first couple lines in that paragraph, isn't it, the way they were going to achieve a secure national border was by removing the Indians, isn't that really the point?

A.   No, I don't think so.  I don't think there was any national defense element in the removal part, in the interest in

477.

removal. There were many different elements to this Treaty of which this present litigation involves only one, but I tried to include all the elements and all the interests.

Q The gifts, annuities, these were the only things that were related to national defense, or were there others?

A These were -- This was an instrument by which American authorities could influence the Indians to think more kindly of the American Government when, historically, they had been anti-American and pro-British.

Q Can you define for us the point in time, if any, which the United States changed their view about the things they could buy with those annuities?

MR. GREENE: I don't understand that question.

Q (MR. FREEMAN) Did the United States, in fact, buy the annuities under the Treaty of 1836?

MR. ASCHENBRENNER: You have asked that question about an hour ago, you asked whether or not the payments had been made under the Treaty of 1836, and she went into some detail as to whether they had or hadn't.

MR. STEKETEE: I think that was the Treaty of 1855.

MR. FREEMAN: I think that was the Treaty of 1855.

478.

MR. ASCHENBRENNER:  Is that right?

THE WITNESS:  Okay.  Yes, to a certain extent, they were paid.

Q    (MR. FREEMAN)  But they didn't pay them all, is that correct?

A    They didn't pay them all.

Q    Then my question isn't as stupid as Mr. Greene wanted it to sound, is it, because if one of the intentions was to pay annuities to the Indians to buy peace --

A    Yes.

Q    -- and yet some of the annuities were not paid, it would seem to make sense that somebody in Washington changed their mind.  My question is are you aware of any documents or letters which would seem to indicate who changed their mind and when?

A    I don't think anybody changed their mind.  Carrying out treaties has many administrative flaws.  The emphasis on maintaining Indians in a peaceable status was constant.

Q    Were there any other national defense consideration involved, other than the ones we have talked about?

A    Not that I'm aware of.

Q    Okay.  On page 51 of your testimony in the Peterson case, you have several references to fraudulent activities of the United States officials involved in the land offices.  Do you recall so testifying?

479.

A.  I don't recall it, but if it's printed here, I will believe it.

Q.  Let me -- Let's depart from the transcript, then, for a moment.

A.  All right.

Q.  Limiting your answer to Michigan, to lands within Michigan, have you, in the course of researching this matter, uncovered what appears to be evidence of fraudulent activities by the United States Government in the land offices?

A.  I have uncovered what I believe is fraudulent evidence by land office agents.

Q.  Did you find that any of those persons were tried or convicted for criminal offenses in connection with those kinds of activities?

A.  . . . Not that I recall, but I think there may have been a case in the Saginaw area.  I'm not -- That's in the back of my mind.  In the area that we're concerned with, I do not recall.

Q.  Do the documents indicate that officials in Washington were aware of fraudulent activities by their representatives here?

A.  Yes.  Periodically, inspectors were sent through to check on the situation.

Q.  Did any of those inspectors, in reports which you have

480.

seen, report a dishonest or apparently illegal activities as having occurred here?

A. They certain raised some questions. I think I quoted a letter where they said somebody was not concerned with fraudulent activities. There were a number of letters indicating that the land offices in Ionia and Traverse City were suspected of questionable dealings, but I'm not prepared now to offer any general details, but there is a great deal of correspondence which I did not dwell on at length, of Indian people who thought that they had been divested of their land. In the reports I covered the case of Shawano because that was particularly concerned with the Sault Ste. Marie Tribe. This is widespread, not limited to Michigan.

Q Do you know if the Federal Government conducted any investigations in Michigan at the request of the Indians or of persons friendly to the Indians?

A. I think they may have, but I'm not . . . I'm not sure how this came out. I remember one fellow that got to the point of making, I think, some real discoveries, and he got a telegram calling him off the job.

Q He was a Federal official?

A. Yeah. And the telegram was from his superiors in Washington.

Q And was he investigating problems involving Indians?

481.

A.   Yes.  Well, there is a lot about this.  If you wanted to research it, you could go back to contemporary papers, but I haven't made any specialized study; I just indicated the problem existed.

Q    I understand that.  I'm just trying to --

A.   Yes.

Q    -- get an overview of it.  The incident of the official coming out, starting to do an investigation, being ordered off by his superiors, is that the worst example you came across in your research, or is that perhaps typical of the Federal Government's --

A.   No.

Q    -- role in these issues?

A.   No, it's not typical.  There were always people trying to correct errors.

Q    Were there any, as best you remember, understanding that you have not attempted to master this area, were there any marked increase in complaints concerning the Federal land offices about five years after the signing of the Treaty of 1836?

A.   I can't shed any light on that.

Q    That would have been the period where, apparently, the Reservations lapsed.

Do you know if whatever the legal aspects of all that may be, which we can approach as among the

482.

lawyers, do you know if the white settlers or Federal officials or others attempted to take advantage of that situation?

A. I really don't know anything about it. The area which we are primarily concerned, the pressure of settlers didn't come until the 1870's.

Q. Is there something significant about the 1870's?

A. Well, that's just the time that I, in reading correspondence, began to read documents that indicated there was pressure of white settlers up in the Upper Peninsula of Michigan, and that was the time when they were just beginning to hand out patents.

Q. By anything significant, I meant a new railroad coming in or something. That just happens to have been the era or the time when the pressure became noticeable?

A. Yes. And probably a number of economic reasons like railroads and --

Q. There were pretty extensive mining operations?

A. And mining.

Q. And timber operations by then, weren't there?

A. Timber operations. The mining operations were, in general, outside the area of cession.

Q. That's right. They were covered by the other Treaty?

A. They were, yes.

Q. How did the, if you know, if the record reflects, how did

483.

the Indians within this Treaty area view the pressures of mining as they began to develop the other side of the Upper Peninsula?  Were they concerned about that many settlers coming in and all the activities that they were getting into?  Did they see it as a threat to themselves?

A.    Not entirely.  Sometimes it provided employment for Indians as loggers.

Q.    Were there extensive numbers of Indians involved in the logging industry?

A.    I don't really know, but the tradition is that this was -- or the recollection is that this was one of the forms of employment that Indians found.

Q.    I'm not sure I understand you.  What do you mean by recollection?  You just used the word.

A.    Well, the local histories and things like that, any type of local economic history will mention the fact that Indians were loggers.

Q.    Could you give me an example?  You mean like a county history?

A.    Yes, um-hmm.

Q.    All right.  Those are of varying accuracy, aren't they?

A.    Those are of varying accuracy regarding Indian people. There are pictures extant that I have seen of Indians as loggers.

Q.    Did they still wear the traditional dress of the Chippewa

484.

in those pictures?

A.   No.

Q    I don't mean this to sound like I'm hasseling you, but if they weren't wearing traditional dress, how do you know they were pictures of Indians?

A.   Because it said -- My recollection is reading, seeing pictures of a Chippewa logging camp.

Q    Drawing quite an appropriate conclusion for a layman that, therefore, it must be Indians, okay.

Those are all the questions I have about anything except Dr. Tanner's supplementary report, of which I have a number of questions.  It's up to you Counsel; do you want me to start a new area now, or do you want me to stop today and come back tomorrow?

MR. GREENE:  First, how do you feel?

THE WITNESS:  Oh, well, I'm never going to feel any better until I get it over with.

MR. FREEMAN:  I consider it unlikely I will be able to finish today.

MR. GREENE:  See, I'll tell you, I'm mindful of two things:  One, I think Dr. Tanner is getting tired.  We don't need this on the record. Let's go off.

(Whereupon, off-the-record discussion.)

MR. STEKETEE:  Let's go on, then.

485.

EXAMINATION

BY PETER W. STEKETEE, Esq.:

Q. Doctor, who was Manypenny?  Who was he?

A. He was a Commissioner of Indian Affairs.

Q. For what period?

A. He was active in the time of the 1855 Treaty.  I do not recall the total number of days, the total period of which he occupied that position.

Q. I believe you testified that one of the characteristics of the Treaty he negotiated was a release clause of the kind we see in the Treaty of 1855, is that correct?

A. Yes.

Q. All right.  Do you know of any court decisions in which any of those release clauses have ever been interpreted?

A. No.  Now, just a minute.  Just a minute.  I think there was a 1907 Court of Claims Decision, wasn't there?

Q. Involving this particular release --

A. Involving this particular Treaty.  It wasn't concerning a clause, but I believe that I recall reading an interpretation of the clause in that Opinion.

Q. I'm referring generally to release clauses, in general, that Manypenny might have inserted in other treaties.

A. Nope.

Q. Do you know of any court decisions interpreting those clauses?

486.

A. No.

Q. Did the lawyers for the United States or either of the Indian Tribes call to your attention any such cases?

A. I don't recall discussing it.

Q. All right. In any event, you didn't rely on any court interpretations of those clauses in coming to the particular theory that you have got, that you have expressed in your report and supplemental report?

A. Not a theory, sir, an interpretation of documents.

Q. All right. But let's go back to the question: Can you answer the question? Did you rely on any court interpretations in arriving at your view?

A. No, but I might have been influenced by reading the Court of Claims Decision in 1906 or '07 or whatever it was. I know I read that at some point.

Q. All right. Now, you have also testified somewhat today on the termination clause in the Treaty of 1855, the clause which, in effect, terminated the tribal status of the Chippewa and Ottawa Tribes for certain purposes, is that correct?

A. The attempt, yes, that's right.

Q. All right. I believe your testimony was that that clause was not as frequent as the release clause, is that also correct?

A. I really don't know.

487.

Q   All right.  Are you aware of any court decisions which interpret this particular termination clause or any similar clause?

A.   No.

Q   Have you relied on any such cases in coming to any theories that you may hold about the meaning of that clause?

A.   No.

Q   Doctor, could you tell me what the meaning of the term Indian Trust Land is?

MR. ASCHENBRENNER:  Objection.

MR. STEKETEE:  Do you know what that term refers to?

THE WITNESS:  I don't know for a fact.  I assume it refers to lands held in trust by the Federal Government for Indian people.

Q   (MR. STEKETEE)  Does that mean that the title to the land, if you went to the land office, is actually in the Federal Government's --

MR. GREENE:  Objection, Counsel.  That's a fairly complicated matter.  There are lots of different legal statuses to Indian lands, and I just would suggest that this witness isn't qualified to respond.

MR. STEKETEE:  Noting your objection on the record, I wonder if she can inform me what she does know.

488.

THE WITNESS:  I have told you I believe the term refers to lands held in trust by the Federal Government.  Just how this mechanism works, I honestly don't know.

Q   (MR. STEKETEE)  Would it, then, be your impression that after the Treaty of 1836, the lands that were ceded would not be Trust Lands?

A.   I don't know.

Q   You don't know?  What about lands that were reserved in the Treaty of 1836?

A.   I don't know that terminology.  I don't know of that terminology being used.  They were usually called Reservations.

Q   All right.  What do you know about -- Tell me what you know about the creation of Trust Lands and the Governor.  Can you tell me when that occurred, and you referred to this earlier in your testimony.  I would like to know something about it.

A.   I wish I knew more about it.  I have just read the statement in Indian correspondence, which I quoted, that they had lands that were placed in trust with the Governor of Michigan, and the only piece that has survived and is still in trust with the Governor of Michigan is the Athens Reserve.

Q   Is the what Reserve?

489.

A.    Athens Reserve.

Q.    What is --

A.    Down south of Battle Creek.  That is still a Reserve held in trust with the Governor of Michigan, much to his amazement.

Q.    On trust matters involving the Governor, who represents him as far as legal representation is concerned?

A.    I don't know.

Q.    You don't know?

               MR. FREEMAN:  It isn't me, I'll tell you that.

Q.    (MR. STEKETEE)  The State of Michigan holds this piece of land, you think?

A.    There's a file with this title in the State Archives, which you can peruse at your leisure out on North Larch.

Q.    Doctor, what provision, if any, of the Treaty of 1855, deals with the continuing right of the Indians to fish in the Great Lakes?

A.    I think the Treaty as a whole -- We have been through this before, Mr. Steketee.  The Indians didn't digest treaties article by article; they came to an understanding, which was they could continue to live the way they had always lived, but there were supposed to be permanent land bases provided for them.  There was nothing about fishing rights in the 1855 Treaty.

490.

Q.    There was nothing about fishing rights?

A.    That's true.

Q.    So there is no provision in that particular agreement that relates to fishing rights?

A.    No.  It should be understood as a supplement or a revision of the 1836 Treaty.

Q.    All right.  Now, then, insofar as the tribal organization of the Ottawa and Chippewa is concerned, in Article Five that organization is dissolved, as I understand it, except insofar as may be necessary for the purpose of carrying into effect the provisions of this agreement.

A.    Yes.

Q.    Is it your view, then, that Manypenny -- Let me start over again:  Is it your view, then, that the United States did not consider a tribal organization necessary to administer the Reserve fishing rights which you believe continued in effect after this Treaty was signed?

A.    I don't really follow that.  The administration of fishing rights is not relevant to the 1855 Treaty.

Q.    Well, all right.  Let me see if I can make myself clear:  At least insofar as the United States was concerned, there was an effort to dissolve the legal tribal status of the Indian Tribes, is that correct?

A.    There was an effort, true.

Q.    Insofar as the United States was concerned, they weren't

491.

going to deal with these Indians any more as Tribes, correct?

A.  That's right.

Q.  All right.  Except insofar as carrying into effect the provisions of this particular Treaty.

A.  That's what the Treaty says.

Q.  And I believe you have testified that fishing rights was not one of the provisions covered by this Treaty?

A.  That's right.

Q.  So that wasn't one of the things that the United States had in mind when it created this exception, is that correct?

A.  (No response.)

Q.  Do you follow me?

A.  With difficulty.  You know, we're all talking negatively. If you're talking about the 1855 Treaty, forget fishing rights.

Q.  Well, all right.  Let me see if I can pin this down.

MR. FREEMAN:  That's what we have been trying to do for four years.

Q.  (MR. STEKETEE)  When the United States carved out this exception in Article Five, it must have had in mind some provisions that had to be carried out subsequent to the effective date of the Treaty, isn't that correct?

A.  Yes, primarily the complicated administration of the lands

492.

probably.

Q   And the payment of monies?

A   Yes.

Q   But not the administration of any Indian fishing rights?

A   (Witness shaking head negatively.)

Q   Let the record show that she waved her head negatively.

A   I have said negative, negative, four times, nothing about fishing rights.

Q   Now, then, assuming that these fishing rights continued to exist, how were they to be held after the Treaty of 1855, do you know?

            MR. GREENE:  I would object.

            THE WITNESS:  No, I don't know.

            MR. GREENE:  I object.  That is calling for a legal conclusion from this witness as to how the Treaty fishing rights are held.

Q   (MR. STEKETEE)  Well, are you aware of any documents or other evidence that indicates how the Indians believed that these rights were to be held after 1855?

A   I have repeatedly stated the Indians expected to continue living the way they always had lived and had no particular statements or had nothing else in view.  It was not anything that was up for discussion.  Nobody questioned it.  Nobody doubted it.

Q   All right.  So far as you're aware, then, there is nothing

493.

in the historical record that would indicate these rights were to be held by a Tribe, as such, or by individuals?

A.  The record is silent.

Q   The record is silent, all right.  Is the record silent as to who was entitled to share in these rights?

A.  The record is silent.  The subject was never mentioned, didn't come up.

Q   Do you have any knowledge that Article Five was negotiated separately from the rest of the Treaty of 1855, or that it was inserted after the fact by the United States, without the knowledge of some or all of the Indian signatories?

A.  Article Five?  Let me see; which one is that one?

MR. ASCHENBRENNER:  That's 36.

MR. GREENE:  No, 55.  That's the purported dissolution.

THE WITNESS:  No, I don't have any knowledge.

Q   (MR. STEKETEE)  Does Article Five appear to be an integral part of the Treaty?

A.  It appears to me to be an integral part of the Treaty.

MS. TIERNEY:  I would like a clarification. What does "integral part of the Treaty" mean?

MR. STEKETEE:  The witness apparently understands.  She answered the question.

MR. GREENE:  You can catch the meaning over

494.

four, five questions, as it gets restated four or five times.

MS. TIERNEY:  Okay.  I'll wait.

Q.  (MR. STEKETEE)  What do you know about the tribal organization of the Chippewa Indians following the Treaty of 1855?

MR. GREENE:  You wouldn't care to be a bit more specific, would you?

Q.  (MR. STEKETEE)  Well, how was the tribal organization carried forward, assuming there was one?  Did the Indians incorporate under Michigan law?  Did they form a partnership?  What did they do?

A.  You know perfectly well, Mr. Steketee, they didn't have any lawyers to help them with their affairs.

Q.  I don't know that, but you're telling me this.

A.  I'm sure you know that.  They went right on with their same Band organizations just the way they had, no change.

Q.  And is this right on up to the present day?

A.  In a good measure, the same way.  The people who --

Q.  All right.  Did they ever -- Did they ever formally incorporate under Michigan law, as far as you know?

A.  Under Michigan law?

Q.  Yes.

A.  I don't know.  I don't know of any Michigan incorporated Indians.

495.

Q   All right.  Did they incorporate under any Federal chartering provision?

A   You know the answer to that one, too.  You know the Sault Ste. Marie Tribe organized.  You know that more recently; that prior to that time there was the Bay Mills Tribe.  These are the IRA.  These are the Tribes that I know of that are organized under the Indian Reorganization Act of 1934, that are involved in the area of this litigation.

Q   All right.  Now, between 1855 and the incorporation of Bay Mills --

A   Yes.

Q   -- under any Indian reorganization, do you know of any documents or any other evidence that would indicate the Federal Government recognized Bay Mills or any other Chippewa or Ottawa Tribe of Indians within Michigan within this Treaty territory.

A   The Indian Agents were in constant contact, and I have quoted the letters from the agency, from the Indian Agent up through, up through 1880, there was still an Indian Agent out here.

Q   There were still Indians, too, weren't there?

A   There were still Indians, yes.

Q   But there wasn't any tribal organization insofar as the Federal Government was concerned after 1855?

496.

A. I believe that there was. From the point of view of the contact that went on, there didn't seem to be any change. They hadn't finished administering the law. These land provisions, they were still hanging fire, and we have been through all that.

Q. Well, what I'm trying to find out is, we have established that Manypenny, at least, thought that he was ending the tribal organization of these Tribes. Now, what I'm trying to find out now is what happened between 1855 and 1934 that changed that? That's a perfectly legitimate line of inquiry. I'd like to find out what happened, if you know.

A. Yes. One of the main things that happened was the Miriam Report of 1928 that indicated that it was perfectly futile to try to stamp out Indian Tribes and they might as well recognize them again because they were extant anyhow.

Q. That resulted in the Indian Organization, didn't it?

A. True.

Q. So the next thing that happened was the passage of the Indian Reorganization, then?

A. From the point of view of national legislation, that's the next thing that happened.

Q. Is there any document issued by the Indian Office, or by anyone else, that purports to recognize either of these Tribes before the passage of the Indian Reorganization?

A. I don't know what you call recognize. The Government

497.

dealt with these Indian groups repeatedly, recognized their existence, knew who they were.

Q   Was there any legislation, that you're aware of, that modified the --

A   I'm not aware of --

Q   -- Treaties?

A   -- legislation that modified the Treaties.

Q   Is it your understanding that Congress has the power to modify these Treaties?

A   I never know what Congress is going to do.  I shouldn't think they could modify a Treaty without having another treaty council, but I don't know.

Q   Turning to Article One of the Treaty of 1855, Article One states, at the very beginning, the United States will withdraw from sale for the benefit of said Indians as hereinafter provided, all the unsold public lands within the State of Michigan embraced in the following descriptions, to-wit -- and then there is a series of descriptions, the first one of which, for example, says for the use of the six Bands residing at and near Sault Ste. Marie, and then it gives a rather long legal description.

Now, is it your understanding of the Treaty of 1855 that this constituted a Reservation or an allotment for those Bands?

498.

A.   It's my understanding that this area was referred to invariably as a Reservation, and that the Indians interpreted the individual allotments as being assignments of individual lands within a larger reserved area.

Q    All right.  So you believe that's the white man interpreted the provisions of this Treaty?

A.   Which white man?

Q    Well, for example, the men who negotiated.

A.   I'm not sure, but I think that this may very well have been the understanding because the term "Reservation" was so universally used within Michigan to refer to these described areas.

Q    All right.  Now, so as I understand your testimony just now and earlier this morning --

A.   Yes.

Q    -- the lands within these larger descriptions set forth in the first part of Article One, became Reservations held by the Tribe or held by the United States in trust for the Tribe, one of the two, is that correct?

A.   I don't know.  I don't know.  These were designated, these are the Reservations for permanent homes for the Indians, since these were the areas reserved for permanent homes for the Indians.  How this goes title-wise in trust or so forth, I wouldn't know.

Q    All right.  Just in the language we know that these lands

499.

were thought by the United States to be owned by the United States, correct?  We have to know that because the United States says they will withhold from sale. They certainly aren't going to sell lands that they think they don't own.  We can assume that, can't we, Doctor?

A.    I suppose so.

Q    All right.  So we start with the presumption that the United States believes that it owns these lands.  It's going to withhold them from sale, correct?  That's what it says, is that correct?

A.    Withhold them, but there is one thing you're jumping -- In the original 1836 Treaty, the lands that were reserved were held under Indian title, and I think it would be better to say that United States is designating these lands.

Q    All right, now --

A.    because -- this may be overly technical.  The United States is designating these lands as the lands that are going to be for permanent homes for the Indians.  We're getting some weasely idea of land ownership here which I'm not certain might come up.  All right.

Q    Let's try to be friendly, Doctor.

A.    Very good.

Q    We'll get along with each other just fine.

A.    All right.

500.

Q. Let me see if I can see what your view on this is: I think there is at least two ways of looking at this provision, and I want to see which one it is you hold. One way of looking at it would be to believe that the United States, when it withheld these lands, created a Reservation of some kind out of which Indians would come in and take individual allotments, okay? The question then would be what was the status of the land left over after the individual allotments had been taken, all right? Another way of looking at this provision would be to assume that an area was set aside by the United States, out of which individual allotments could be picked. Once everyone who was entitled to an allotment had picked his allotment, the remaining leftover land would be free, would be freed up for sale to anybody under the public land laws of the United States. You understand the distinction between those two views?

A. Yes.

Q. Now, which of the two do you ascribe to?

MR. ASCHENBRENNER: If any.

THE WITNESS: I would not -- It makes no matter what I ascribe to. The question is, what was the understanding and what was the statement of the Indian people. The Indian people believed that the leftover land should remain set aside to be designated for Indians

501.

as they came to be 21 years of age, and there is correspondence to indicate that that is what the Indians believed.

Q  Well, don't the provisions of the Treaty expressly negate or countervail that viewpoint?

A  There are statements in the Treaty that make that difficult. Nevertheless, this was the understanding of the Indian people, and there is correspondence to indicate that that is what they believed.

Q  All right.  So you think that there is a misunderstanding between the United States and the Indians on that particular point, is the essence of your testimony?

A  The understanding of the Indians is not -- yes, there is some difficulty about the language of the Treaty.  The language of the Treaty and the understanding of the Indians does not appear to be identical.

Q  All right.  Is it your understanding that the Indians in this case claim that they have some right in the lands that were reserved from sale, or withheld from sale, that were not allotted to them?

A  I don't know about that.

Q  You don't?

          MS. TIERNEY:  It's a good point; I think I'll have to go back and research that and see if we should sue.

502.

MR. FREEMAN:    Okay.    Maybe we will help you.

Q    (MR. STEKETEE)   Now, going back to my question a few minutes ago, can you tell me, I'm having trouble phrasing a question for you that you will --

A    I'll try to be friendly.

Q    -- answer for me on this because I know how difficult this is.   I'm not criticizing you, Doctor.   This is a very murky area.   I'm very concerned about the status of these Indian fishing rights after the Treaty of 1855, and without asking you to state a legal conclusion, I would like to ask you a couple of questions about that:   Have you done any work as a historian into the philosophy of law jurisprudence?

A    (Witness shaking head negatively.)

Q    Do you know anything about that subject?

A    No.

Q    As a personal matter, do you have a belief as to whether legal rights ∧ exist here, in the heavens, or whether they are of some other, some other method of existence?

A    No, I don't, Mr. Steketee.   I'm only interested in the margin between what's legal and what's just.

Q    All right.   There is a philosophy of law ascribed to some which believes that legal rights exist out in the firmament somewhere.   I think the Declaration of

Independence can be put in the class of documents that seem to hold that view. Other theories of the jurisprudence hold that legal rights, to the extent that they exist at all, exist only through the process of law; in other words, through their recognition by the courts, the Legislature, and so forth, and that any rights that aren't recognized in some such way, that don't appear in a case or document, just simply don't exist other than as they may exist as aspirations in the hearts of men. Now, what I want to know is where were these rights after 1855?

(Laughter.)

THE WITNESS:  I gather they're either in the firmament or in the hearts of man.

Q    (MR. STEKETEE)  All right.  Now, I don't know how we're going to be able to pierce through the murky veil and look at the firmament, but assuming that we can talk about human institutions after 1855, where did these rights reside?

MR. ASCHENBRENNER:  What rights are you talking about?

THE WITNESS:  The rights to fish in the Great Lakes.

Indian people had the rights to continue living the way they had always lived.  That is a human right.

504.

Q    (MR. STEKETEE)  A human right.

A    Yeah.  That's just from me to you, having nothing to do with anything that's legal, but just explaining the Indian point of view.

Q    So the Indians ascribed to the viewpoint of the Declaration of Independence in that certain rights are inalienable.

A    That is ridiculous.

MR. BRENNEMAN:  Objection.

MR. STEKETEE:  I don't think it's objectionable.

MR. BRENNEMAN:  Arguing with the witness. The first objection has to do with the fact you're asking her to take her expertise on Indian affairs and put them into some legal philosophy that you have suggested to her. The second objection is that you're arguing with her when she doesn't agree with your legal philosophy and how it fits in.  I think this is getting a little late in the hour.  I wonder if we could get past the legal philosophy part.

MR. STEKETEE:  I don't think this is a silly inquiry at all.  I think it's highly significant to find out where these rights exist, if they did exist. Whereas this witness is not a lawyer, and we're not asking her to become a lawyer, I do think it's important to find

505.

out what historical evidence may exist that might shed some light on whether these rights were recognized by any human institutions.  That's basically what I'm asking you, Doctor.

THE WITNESS:  The Indians rights to continue living the way they had lived was not questioned at the time that the Indian -- was not questioned within the society within which the Indians were functioning, and I think that --

Q  (MR. STEKETEE)  All right.

A  -- that's probably the best explanation that there is.

Q  All right, now, is it equally consistent with that fact, assuming it is a fact, that there was no conflict between those rights that are now asserted at this particular time, after 1855 up until recent times, as it is to assume that everybody believed that the Indians held these rights?

MR. GREENE:  Do you understand that question?

MR. STEKETEE:  Do you follow me?

THE WITNESS:  No, I don't follow you.

Q  (MR. STEKETEE)  Let me be very specific, then.

A  The questions you raise come from an Anglo legal mind and make no sense to Indians whatsoever.

Q  Well, I don't think my question presupposes one way or

506.

the other what the Indians believe. I think my question is more fundamental than that. I think it's significant in this case to find out if there is any evidence, after 1855, of the recognition of these rights by anybody, whether Indians or white men. Now, one place to look for evidence, I gather, would be in human institutions, law suits that recognize these rights, complaints by the Indians that their rights were being infringed, actions by people that are consistent with the recognition of these rights or inconsistent with them, things of this sort. This is objective evidence that we can weigh and evaluate. Now, until the fishery was destroyed in this century, there were plenty of fish, presumably, for everybody, so it didn't make any difference whether the Indians were fishing by permission of the white man, by deference or pursuant to some fishing rights. Now, is there anything in the historical record, of which you are aware, that indicates that the Indians held these rights; that they were recognized by white society, by the Federal Government, by anybody, in fact, and which evidence is consistent only with the theory that the Indians hold these rights arising out of the Treaty of 1836?

MS. TIERNEY: In what time frame?

MR. STEKETEE: 1855 to 1970, let's say.

THE WITNESS: The question was not at

507.

issue. Indian fishing was traditionally an Indian occupation, and I do not know of any litigation of the kind you're looking for.

Q. (MR. STEKETEE) Any other evidence?

A. No.

Q. So the fact that Indians fished is just as consistent with the view that white people simply allowed them to fish or considered that anybody had the right to fish, as it is with the view that the Indians held some special rights reserved under the Treaty of 1836.

A. Indian rights weren't special rights, they were traditional rights.

Q. Well, all right. Let's use your terms, traditional rights. Is there anything in the historical records that indicates that any human institution recognized those traditional rights after 1855 up until 1970?

A. I know of no institution that questioned it.

Q. Do you know of any institutions that recognized it?

A. (No response.)

MR. BRENNEMAN: I think she just answered that question.

THE WITNESS: I don't know. I don't know that the subject ever came up.

Q. (MR. STEKETEE) All right.

MR. GREENE: This does have something to do

508.

with the phase one issues that have been set for separate trial, I presume, Counsel.

MR. STEKETEE:  I think it does, yes.

That's all I have.

THE WITNESS:  Okay.  Thank you.

MR. STEKETEE:  Thank you.

MR. FREEMAN:  That will be all for today.

(END OF RECORD)

_____May 25, 1977_____                    _Helen Hornbeck Tanner_
Date                                      Helen Hornbeck Tanner, Ph.D.

                        *       *       *

STATE OF MICHIGAN )
                  ) SS
COUNTY OF INGHAM  )


I, Dorothy J. Falk, Certified Shorthand Reporter, do hereby certify that the foregoing Deposition was taken before me at the time and place hereinbefore set forth; and that the testimony so recorded was subsequently dictated by me and transcribed under my direction and supervision; and that the foregoing is a full, true and accurate transcript of my original stenotype notes.


_____Dorothy J. Falk_____
Dorothy J. Falk, C.S.R., C.P., R.P.R.
Notary Public, Ingham County, Michigan.
My Commission Expires:  5-23-78.

509.