IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

- - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA, et al, )
                                      )
             Plaintiffs,       )
                                      )
          -vs-               ) No. M 26-73 C.A. U.S.D.C.
                                        )
STATE OF MICHIGAN, et al,     ) VOLUME IV
                                      )
            Defendants.       )

- - - - - - - - - - - - - - - -

The Deposition of DR. HELEN TANNER,

a witness called by Defendant State of Michigan, taken

before Sandra Crowley, Certified Court Reporter and Notary

Public, in the 6th floor Conference Room, Mason Building,

Lansing, Michigan, on Tuesday, April 5, 1977, at the hour

of 10:20 A.M.

     APPEARANCES:

         HUGH W. BRENNEMAN, JR., Esq.   (P11175)
         United States Attorney
         544 Federal Building
         110 Michigan Street, N.W.
         Grand Rapids, Michigan  49502

            In behalf of Plaintiff.

         STEWART H. FREEMAN, Esq.   (P13692)
         Assistant Attorney General
         Law Building
         Lansing, Michigan  48913

            In behalf of Defendant State of Michigan.

510.

JEAN E. INGRAM & ASSOCIATES, INC.
MICHIGAN CERTIFIED COURT REPORTERS
623 FARMSTEAD
LANSING, MICHIGAN 48917
TELEPHONE: (517) 372-2254

BRUCE R. GREENE, Esq.
LARRY ASCHENBRENNER, Esq.
1506 Broadway
Boulder, Colorado   80302
and
KATHRYN TIERNEY
Bay Mills Indian Community Tribal Office
Route 1
Brimley, Michigan   49715

    In behalf of Plaintiff Intervenor
    Bay Mills Indian Community.

ELMER T. NITZSCHKE, Esq.
Field Solicitor
U.S. Department of the Interior
686 Federal Building, Fort Snelling
Twin Cities, Minnesota   55111

    In behalf of Plaintiff.

511.

Lansing, Michigan

Tuesday, April 5, 1977

10:20 A.M.

(R E C O R D)

MR. FREEMAN:  This is a continuation of the Deposition of Dr. Helen Hornbeck Tanner, taken by the State Defendant in this cause.

For the record, Doctor, you are still under oath.

EXAMINATION    (Continuing)

BY STEWART H. FREEMAN, Esq.:

Q.  Dr. Tanner, are you familiar with a Louis Agassiz, that's A-g-a-s-s-i-z, Louis Agassiz?

A.  Yes, he was a mineralogist, early explorer particularly of the mineral area of the Upper Peninsula, nationally recognized scientific figure.

Q.  Are you familiar with his American lecture tour of 1846 and subsequent teachings at Harvard in 1846 forward?

A.  No, I could not give a biographical sketch.

Q.  Are you familiar with his wilderness expedition to Lake Superior in 1848?

A.  No, I'm not.

Q.  Are you familiar with the account of that wilderness expedition which was published in 1850?

A.  No.

512.

Q    Have you, in researching of the history surrounding these treaties, found any references to the lectures of Louis Agassiz or his account of his wilderness expedition being considered by the United States Government in determining what there was in the area that we now refer to as Michigan?

MR. GREENE:  What there was?

THE WITNESS:  Only in --

MR. GREENE:  Do you understand the question?

THE WITNESS:  In general, history --

MR. GREENE:  The question, I didn't understand it, what there was in the nature of --

MR. FREEMAN:  Well, there had been a scientific expedition; there was an account written of the expedition.  My question is, has she, in the course of her research, found any references to any of the findings that might have been made and procedures that were used, any of the things that might have been seen. I can't ask a more specific question until I hear the answer to the first one.

MR. GREENE:  Okay, thank you.

THE WITNESS:  I have read about -- I have read about Agassiz' explorations; I have not read his own personal account of the explorations.

513.

Q.   (MR. FREEMAN)   My question was, though, did you find references to some of the characters in the drama that unfolded in this Treaty of 1855, some references to them having utilized Agassiz' findings for --

A.   No.

Q.   No references at all?

A.   No, not that I recall.

Q.   Did you find any references to financial interest in Boston making investments in the State of Michigan in the 1850's?

A.   Not that I can recall outright now.

Q.   Do you know whether or not Agassiz' lectures in the 1850's were published in any daily newspapers?

A.   No.

Q.   Did you see any references in your research to any of the historical characters in the Treaty of 1855 having been exposed to, read, listened to, whatever, the lectures of Louis Agassiz?

A.   No.

Q.   Whatever role Agassiz had, you are not familiar with it based on your research, whatever role he had, if any?

A.   Whatever role he had in the Treaty of 1855?

Q.   (Nodding head affirmatively.)

A.   That is true, I am not aware of any role he had in the Treaty.

514.

Q    Okay.  Dr. Tanner, I have in front of me a transcript of testimony in a case called People of the State of Michigan vs. Arthur Duhamel, which is File No. 1551 of the State of Michigan, District Court for the 86th Judicial District, Village of Leland, County of Leelanau.  This is a transcript of proceedings which occurred on Friday, April 25, 1975.  It records the testimony of one Helen Tanner.  Are you the same Helen Tanner that testified in that case?

A    I am.

Q    I'd like to ask you just a couple of brief questions about your testimony in that case.  I believe that I have the only copy of the transcript in the room in front of me, so if at any point, as to any of these questions, you'd like to refresh your recollection by reviewing your own testimony, just let me know.

A    I have not read that, either, and I've had no opportunity to correct it, so . . .

Q    Well, the cover page indicates that this is a certified transcript of Marian Cram, C-r-a-m, who is the official Judicial District Recorder for the 86th Judicial District, so I think we can presume that she attempted to make it accurate; but, of course, if you feel you've been misquoted at any point, just indicate to me, but as I say, these are just a couple of brief questions.

515.

On page 49 of this transcript in the Duhamel case, you were asked a series of questions relating to the methodology you had employed in researching Indian matters.  And at the bottom of the page there is an answer, which let me just read it, and if you'd like to look at it, that's fine.

"Question:  Would you explain to the Court the methodology of research which was required to specifically study the history of Indians in Michigan?  Answer:  Yes, there has been a great deal written on Michigan Indian history, and in the course of about 12 years of investigation, I have read extensively from printed historical sources, Michigan history, conducted research in specialized headquarters, papers of the American Revolution, and other collections of documents in the Clements Library at the University of Michigan, Burton Historical Collections, I worked at the Newberry Library in Chicago, and more recently I went through all the microfilm for all of the Indian correspondence of the Michigan Superintendency, 1820 to 1880, this is approximately 17,000 frames of microfilm, all original documents."

Part of that answer which interested me, Doctor, was your reference to the Clements Library, University of Michigan.  Have you been accurately quoted

516.

here?  Did you testify that you had utilized collections of documents in the Clements Library at the University of Michigan?

A.   I did.

Q.   The reason that interested me, Doctor, it may be my recollection is incorrect, but I believe that in an earlier point of this Deposition, we had asked you to identify the collections you utilized in researching and preparing your original and supplementary reports.  I do not recall you mentioning the Clements Library, and it may be that it's just slipped my mind, so I did want to clarify the point that you'd used it.  Could you define for us what role the Clements Library played in the preparation of your original report and supplementary report; how much did you use it; if you can recall, what sorts of information did you find there?

A.   You are comparing answers to two different questions.  In the course of 12 years research in many different Indian claims cases, the question that you have just quoted from the Duhamel case, I went over sources of research that I had used for that entire period of time.  For the particular reports in U.S. vs. Michigan, I did not use any specific documents from the University of Michigan Clements Library; so I did not make reference to it.  You understand the difference?

517.

Q. Yes, I understand what you're saying.

A. All right.

Q. The Clements Library contains a very large collection of Lewis Cass' papers. Did you utilize the Lewis Cass papers in preparing the reports, the original report and the supplementary report?

A. I did not -- I did not quote anything. I had read from those for earlier reports. I did not cite any of them, and so I did not make any reference to them for this report, for the reports in this case.

Q. How about Lucius Lyon, the Lucius Lyon papers contained in the Clements Library?

A. No, I didn't use them. If I had used them, I would have told you, and it would have appeared in my report.

Q. Doctor, wasn't Lucius Lyon present during some of the Treaty Councils involved in this case?

A. Yes, he's a signer in the 1836 Treaty.

Q. Would you explain why you view the papers of Lucius Lyon, one of the signators to the Treaty, as not being of sufficient importance to have been utilized in the preparation of your two reports?

A. Reports are written under a -- kind of a time limit. Any research can be carried on exhaustively. I felt that the story, the narrative was sufficiently disclosed by the correspondence which I had read. Lucius Lyon, I

believe, had been a surveyor earlier -- maybe he hadn't, I don't know.  I did not find it necessary; there were no questions raised by the research in the Indian correspondence that I felt would be answered by going into Lucius Lyon's papers.  There are probably many collections of papers one could go into if one wished to go on and work on this project for five years.

Q  You indicated a time limit, Dr. Tanner.  Who put the time limit upon your research of it?

A  I did in a way, because I had other things to go on and do; and there was some interest on the part of the Department of Justice -- as a matter of fact, I gave up a trip to Spain in the winter of 1974 to finish this up, to help you bring it to an expeditious trial in the spring of 1974.

Q  I presume by the "you", you're not referring to me?

A  You all.

Q  I would not have been ready to go to trial on this case in April of '74.

A  All right, well . . .

Q  When you referred in your answer a few moments ago to other collections which might have been used, were you just referring generally to other collections, or did you have in mind specific collections involving other persons who were present at the Treaty negotiations?

519.

A.  No, I know one could make a circuit of many libraries, including Sault Ste. Marie, and spend more time at the Clark Memorial Collection.  An extensive inquiry has been made previously into, you know, why I didn't do this, that and the other thing.  I stopped when I thought I had done enough to clarify the situation factually, so that a reasonable legal determination could be made.

Q.  I want you to understand, Dr. Tanner, that I do not mean, by these questions, to impugn your professional competence or integrity; but I think the State of Michigan has a right to know whether you utilized all of the sources which we consider to be relevant, and if not, why not; and that's merely the purpose of these questions.

A.  All right.

Q.  It may well be that we will conclude that you were correct in not using the Lucius Lyon papers; it may well be that we will disagree.  If we disagree, we will ask Dr. Mason or someone to look at them, so I don't want you to take this personally; but I have no other method for bringing out on the court record what you did or did not do other than by asking you.

A.  That's quite all right.  Lucius Lyon was a Senator from Michigan, as I mentioned; and he -- his name appears on the Treaty.  His name was not prominent in any of the correspondence leading up to the Treaty.

520.

Q. But Lucius Lyon might or might not, depending on what is contained in his papers, be able to shed some light for us on the meaning of certain words used in the Treaty or certain commitments made to the Indians, might he not?

A. I don't think so.

Q. Have you uncovered, in your research, anything which would reflect upon whether the Indians ascribed any particular level of veracity to Lucius Lyon?

A. No.

Q. Is it possible, Dr. Tanner, consistent with your research, that the Indians involved in the Treaty negotiations regarded Lucius Lyon as one of the more honorable and honest people involved?

A. I doubt it.

Q. Would they have regarded him, based upon your research, as an untrustworthy person?

A. I don't know, I have not done any particular research about Lucius Lyon. If my memory is correct, and had I known you were going to ask me this, I would have been glad to look up Lucius Lyon's biography. I think his background is that of being a surveyor, but at the moment, I'm not particularly sure; but I know where I've looked into that, his background. I don't think it was with Indians.

Q. I'm not sure I understood your point, Dr. Tanner, are you

521.

saying that because he was not a lawyer, his views on what the Treaty meant would be of no interest to us?

A. No, I think I'm saying I don't think he had contact with Indian people; that he was an intermediary in Indian affairs.

Q. For your information, that's why he interests me, because he was one of, apparently, the more objective people involved in the Treaty negotiations, not really tied in with either camp. But be that as it may, if you're unfamiliar with the problem, I will ask no more questions about that.

A. I think he had a primary interest in land.

Q. On page 63 of the Duhamel transcript, again there's one short question and answer which interests me. "Question: Who was Henry Schoolcraft? Answer: Well, Henry -- Henry Schoolcraft was the United States Indian Agent for the northern -- for Michigan, he was the very first Indian Agent in Michigan, and he had been on an exploratory trip in 1820, but had become Agent at Sault Ste. Marie in 1822, and he was very active in Indian affairs on up until the 1830's and 1840's, and is the author of probably the most authoritative publications on the Indians of the United States, six volumes."

Dr. Tanner, are you correctly quoted there in terms of your reference to Henry Schoolcraft's six

522.

volume set?

A. Probably.

Q. Do you consider that six-volume set to be the most authoritative publication on Indians of the United States?

A. I should probably have said "comprehensive early volumes."

Q. Is that how you view it today, comprehensive early volumes?

A. Yes.

Q. You changed your mind on whether or not it's authoritative?

A. No, I haven't.  I suppose it's hard to get into the subjective situation of being interrogated.  That testimony was taken at about eight o'clock at night under very difficult circumstances, and I think possibly the choice of words was not optimum; but certainly, everyone who engages in Indian research utilizes the six volumes that Henry Rowe Schoolcraft put together; they're important.

Q. But can you believe what Henry Schoolcraft wrote in the six volumes?

A. Every word?

Q. Do you believe it?

A. In some cases, I do; in some cases, I weigh the evidence. This is true of everybody.  I've been asked this before. There are many indispensable sources; no source is infallible.  It all has to be weighed against other

523.

evidence, but in any case, what Henry Schoolcraft chose to put down is worthy of consideration.

Q. The fact, then, that Henry Schoolcraft wrote something is not, in your mind as a historian, necessarily establishes that it's of any weight?

A. It depends upon the event.

Q. How would you authenticate that, do you do it subjectively, or do you go out and look for outside evidence?

A. You see, in testing any single fact, one gauges whether or not it conforms to a reasonable pattern of events or is in conflict with other data. In cases where he is the sole firsthand observer, you have the choice of take it or leave it.

Q. In preparing your report, could you characterize whether you took it or left it as far as Henry Schoolcraft was concerned?

A. I have told you I primarily relied on his day-by-day accounts and the personal memoirs which I thought was important evidence. There is no other day-to-day diary of Sault Ste. Marie of that particular period, so I used it.

Q. Are there any points, to the best of your recollection, where you, in your reports, stated something which is contrary to what Schoolcraft had written?

524.

A.   I don't know of any.

Q.   So you did not intend, in preparing your report, to depart from Schoolcraft or overrule Schoolcraft?

A.   I never took Schoolcraft as my guide; I used information provided by Schoolcraft where I thought it was advisable, helpful.

Q.   Then for purposes of this case, as to those things contained within the six volumes of Henry Schoolcraft the State may wish to utilize, for me to find out whether or not you agree with them, I would have to read you each and every passage and ask you to evaluate it, which I don't plan on doing, but am I right?  Is that the only way I could really do it, I'd have to show you the passage and ask you, in your professional opinion, if that is a historically accurate account?

A.   If you want me to review the six volumes of Schoolcraft, I guess that's what you'd have to do.

Q.   That isn't precisely my question.

A.   Well, I guess so.

Q.   The question -- Let me pick a number out of the air.  Say there are 20 points of interest to us covered in 25 pages of the six volumes of Henry Schoolcraft, and I want to know whether Helen Tanner regards those particular accounts authoritative, I'd have to show you each and every one specifically, is that correct?

525.

A.  Probably.

Q.  And then the opposite would also be true, if anyplace in your reports you have utilized Henry Schoolcraft, to know your thinking why you accepted that particular account, I'd have to ask you very, very specifically why you used it?

A.  I suppose you'd have to go to that effort if you wanted it. I have tried to include only reliable data in my report. If I put it in, I think it's important to be there.

Q.  And if you left it out, it's because you didn't think it was important?

A.  Not necessarily.

Q.  What other reason would you leave something out?

MR. BRENNEMAN:  Objection, she's already answered this question three times this morning, or at least several times this morning.  She didn't put everything in that was available.

MR. GREENE:  It might help if you had a particular point in mind, you might ask her about that in Schoolcraft's works to see if she agrees with it.

MR. FREEMAN:  That's really my question; that's really what we have to do?

MR. GREENE:  So you're asking whether she agrees with every single passage in the six-volume work? I submit that's kind of an unusual procedure.

526.

MR. FREEMAN:  I think you can make a determination, Counsel, of whether or not something is authoritative, without necessarily taking the position of each and every word is accurate, but we've covered this point enough; I simply wanted to find out if Dr. Tanner stood behind the testimony she'd given, and I understand her answer to be no, she was very tired, and she did not characterize --

MR. BRENNEMAN:  I object.

THE WITNESS:  I resent that personally!

MR. BRENNEMAN:  Counsel, if you're going to harrass the witness, I'm going to instruct her not to answer any more.  You can take an appeal to Judge Fox if you want to continue in this manner.  She's not to be harrassed; you're here to ask questions, to obtain information.

MR. FREEMAN:  Would you like to take a break?  Let's go off the record for five minutes.

(Whereupon, a recess was taken.)

Q.   (MR. FREEMAN)  Back on the record.  Dr. Tanner, I'm now looking at page 74 of the transcript of testimony in the Duhamel case.  Pages 73 and 74, you describe the incident involving Biddle and Drew which we talked about yesterday, and then, as I understand your answer, you indicate that 116 canoes full of Indians went up to Mackinac to protest

527.

the Biddle and Drew incident, is that correct?

A. I don't think so, that -- I don't think that's correct. That incident is accounted most accurately in my own report, that's not an accurate report there.  I think it was a hundred some odd people in a certain number of canoes.

Q. But all of these people went, protesting this one incident of Biddle and Drew, that part is correct?

A. It so states in my report.

Q. Please, Dr. Tanner, I'm trying to find out what your opinion is as opposed to what you may have written.

A. My opinion and what I have written are identical.

MR. GREENE:  I'm going to ask you if you're going to ask her questions of the transcript, that you show it to her, because I don't think it does anybody any good to have the witness comment on some testimony in a transcript that she hasn't reviewed and stated on the record she's never even seen before.

Q. (MR. FREEMAN)  On page 66, Dr. Tanner, of the Duhamel transcript, it indicates that you said that -- and I'm quoting here:  "The Traverse City Land Office was one of the most fraudulent in the history of the country, and they sent several investigators up to investigate what was being done there."

Would you like to look at that portion of

528.

the transcript before I ask the question?

A.   All right, I think we discussed this yesterday as well, though.

Q.   I believe we did, I just have another question.

A.   You want me to read just this page?

Q.   Well, specifically, I was just going to ask you about the one answer I just read.

A.   Yes, that's what it says.

Q.   Is that correct, was the Traverse City Land Office one of the most fraudulent?

A.   Traverse City and Ionia, yes.

Q.   Now, yesterday, as I recall, we talked a little bit about the land office in Ionia.  Would your testimony be the same as to the one in Traverse City?

A.   Yes, there is evidence -- there were complaints of fraudulent dealings at the Traverse City Land Office, made by Indian people.

Q.   Did the United States Government, based upon your research, conduct an investigation into those allegations?

A.   I believe I remarked yesterday that a number of special investigators were sent out.  I cannot recall the details off the top of my head right now, but I know this occurred.

Q.   Do you recall if anyone connected with the Traverse City Land Office was indicted or convicted of any criminal offenses?

529.

A. I do not know about that.

Q. Do you know if any of the Indians who claimed fraud in connection with the operation of the Traverse City Land Office obtained any relief from the United States Government?

A. I have not made any study of the land operations.

Q. Based upon your experience in going through the records of the Michigan Superintendency, Federal records relating to the Indians, would you regard it as probably that there would be a reference in those files if an Indian had filed a complaint and had obtained some relief?

A. I'm not sure that the extent to which legal matters would be covered by the administrative correspondence of the Indian Office.

Q. Okay. Now, let me show you page 82 of the transcript of the Duhamel case. There's a very, very long answer here relating to the issuance of land patents and the list of qualified Indians and things that we talked about yesterday. I wanted to ask you a question about a reference you made in the latter part of your answer to a specific Indian losing his land, and I'd like you to refresh your recollection by looking at the incident as you testified to it.

A. I recall that incident.

Q. Now, as I understand the testimony in Duhamel, it was your

530.

testimony that the Indian's father died, he went to try and assist his family, and when he returned home, found that his own land had been taken?

A. That's my recollection.

Q. Can you give us some more details about that incident, perhaps the names of the people involved?

A. No, had I known you were interested in this, I would have tried to look up the records before.

Q. Do you recall if that Indian filed a complaint with the United States Government?

A. I do not recall anything except that it was mentioned in the administrative correspondence. I don't know anything about any legal action being taken.

Q. Do you know if there was a happy ending to the story; did that Indian get his land back?

A. I don't know, I have not followed out these land complaints. It's a compendious correspondence.

Q. But there was some reference to this particular one, to this particular Indian losing his land?

A. There was.

Q. Did you see any other accounts of that, as you recall, in your research, of specific Indians acquiring title to land, leaving the land for a short period of time on family business or whatever, and coming back to find that the land was no longer theirs?

531.

A.    I recall no other situation identical to the one that I have described in this testimony.

Q.    Well, how about roughly similar, not identical, is that a typical story, or is this a horror story?

A.    I don't know that it's a horror story; it's an unfortunate incident.  I do not know how representative it was.  The ways that Indian people lost their land were many and diverse.

Q.    Do you know enough about this particular incident to be able to tell me whether or not any State officials were involved in it?

A.    No, I don't.

Q.    All right.  You don't recall -- Are there any references anywhere in your report or supplementary report concerning this incident, do you remember?

A.    No, I didn't, I deliberately stayed away from the problems of what happened to the land.  There is one significant doctoral dissertation on the subject, written by Bruce Millstein, who got his degree at Michigan State University, a couple of years ago, and that's the only extensive study I know of on this subject, and that regards chiefly the Saginaw lands, not the lands in northwestern Michigan.

Q.    Are you familiar enough with Mr. Millstein's study to tell us briefly about the scope of it, the period of time covered, and that sort of thing?

532.

A.   No point in guessing at it, I'm not certain.  It was a 19th Century study, the dates I don't know.

Q.   But you are certain that it's at Michigan State University?

A.   Yes.

MR. GREENE:  I believe her testimony was it also pertained to territories outside the Treaty territory.

MR. FREEMAN:  I'm not asking if it's legally relevant; I'm asking where it is.

MR. GREENE:  And I'm interposing an objection on the grounds of relevance.

Q.   (MR. FREEMAN)  Now, a final couple points, Dr. Tanner, all of which relate to page 102 of the transcript of Duhamel, so let me hand you the transcript so you can refresh your recollection.  At this point you were testifying as to the amendment to the Treaty, the signing of the amendment, as I understand your testimony.

A.   Okay.

Q.   Is that transcript accurate; is that your testimony as you recall?

A.   I'm sure I don't recall, but I presume that's -- that that is what is printed.

Q.   Well, it indicates that you testified that the amendment to the Treaty was signed "under duress".

Do you believe that to be the case?

A. Yes, I really do believe it was under duress, not voluntarily.

Q. Now, where -- We went into this yesterday --

A. We did.

Q. -- but this testimony was in April of 1975. I thought I had understood you yesterday to indicate that you had changed that position a little bit, based on the research you've done in this case. Did I misunderstand you?

A. I don't know, I don't . . .

Q. Let me ask you in a more specific fashion. Were all of the Indians who signed the amendment to the Treaty of 1836 gathered at one place in time?

MR. ASCHENBRENNER: You asked that yesterday, asked and answered, we object on that ground.

Q. (MR. FREEMAN) Well, did you know that fact, Dr. Tanner, when you testified in the Duhamel case?

A. I don't know, I don't remember anything about that testimony.

Q. When did you complete the research that went into the writing of the reports that have been filed in this case?

A. In 1974.

Q. Do you know, based upon your research, whether this is the -- whether or not this is the only Treaty that the United States Senate ever amended?

534.

A.    It amended -- No, of course it's not the only treaty they amended.

Q.    In this case, were these Indians given additional compensation as part of that amendment?

         MS. TIERNEY:  That was asked and answered yesterday.

         MR. FREEMAN:  Additional compensation was not asked.

         MS. TIERNEY:  Yes, it was.

         THE WITNESS:  That was asked in January, $200,000, I believe.

Q.    (MR. FREEMAN)  Now, you're quoted on page 120 of this transcript as saying:  "The Indians were up there, all got together, starving."  Is that a correct statement, they were all together and starving?

A.    That apparently was my impression at the time that I was asked that question.  For the precise details, it's better to utilize my report than that transcript, which isn't a very good transcript.

Q.    You mean it's not accurate?

A.    I don't think it's accurate.

         MR. BRENNEMAN:  Counsel, we don't really know the context those questions were asked of the witness at the earlier proceedings.  Is there a way we can somehow get a copy of the transcript?

535.

MR. FREEMAN:  Yes, the same way, order it, or I suppose we can make it available to you.  I can't do it today until I'm through asking questions of the transcript.

MR. BRENNEMAN:  Okay.

Q.   (MR. FREEMAN)  Dr. Tanner, do you have a copy of your supplementary report with you?

A.   I do.

Q.   On page 2 of your report, the first full paragraph which begins on page 2, in the middle of that paragraph is the sentence:  "The status of Indian reserves in Michigan required some resolution as a consequence of Senate amendments to the 1836 Treaty and subsequent changes in Congressional policy on the removal plans for Michigan Indians."  Do you see that sentence?

A.   Yes.

Q.   What are you referring to when you say "subsequent changes in Congressional policy"?

A.   We've been through that, too.  They, the Congress, decided they didn't want to remove the Indians; they'd rather have them stay in Michigan.

Q.   You're saying that Congress specifically decided that?

A.   I think so.

Q.   By what public act or resolution did they so decide?

A.   I can't quote that now, I do not have the -- I do not know

536.

the number of the statute.

Q. But it's your testimony that there is such a statute?

A. It's my testimony there is such a policy. The discussion of that policy is reflected in the proceedings for the 1855 Treaty.

Q. Oh, you're talking about the approval of the 1855 Treaty by the United States Senate, now?

A. I'm discussing the Treaty negotiations, the proceedings of the Treaty negotiations of the 1855 Treaty.

Q. I just want to make sure I understand you. Then as used in this report on page 2, the phrase "subsequent changes in Congressional policy", is a reference to the ratification of the Treaty of 1855 by the United States Senate, is that correct?

A. No.

Q. No? Then I do not understand you, I'm sorry. Could you try it again?

A. In writing this report, this supplementary report, I was trying to collapse a number of things into, into concise language, you know. And I know, we all know, that the Government decided they did not want to move the Indians out of Michigan. I simply made a reference to this change in policy; I did not refer to any specific legislation. If you feel that requires a footnote, I'd be glad to look one up.

537.

Q. Doctor, I'm not trying to hassle you, you've repeatedly referred me to your report, and I'm asking you what portion of your report mentions that. Now, that sentence makes a specific reference to the Senate amendment of the 1836 Treaty, and my question is the following words which say "and subsequent changes in Congressional policy," is that a reference to the Senate's action on the Treaty of 1855, or is it a reference to something else? If your answer is something else, that's good enough; I'm not going to pin you down to a page, unless you know it off the top of your head.

A. I think it's most likely a reference to the amendment.

Q. The amendment of which Treaty, the Treaty of 1855 was also amended by the Senate, was it not?

A. Yes, I can't offer any further comments on -- I cannot at this moment elaborate on Congressional policy or refer you to a place where that would be expanded upon.

Q. On the next paragraph on page 2, you have a reference to the traditional base of the Ottawa Indians being Manatoulin Island, then on page 3 you refer to an Andrew Blackbird as being the best known traditional historian of the Michigan Ottawa. On page 4, you again refer to Blackbird and to certain incidents. Are there any other published sources for the things that you quote Blackbird as saying?

538.

A.  Not that I know of.

Q.  Do you accept everything that Blackbird said as being authoritative?

A.  No, I don't accept everything that he says as authoritative.

Q.  Do you weigh Blackbird the same way you indicated you were weighing Lewis Cass in your earlier testimony -- or excuse me, Schoolcraft is who you were weighing, Schoolcraft.  Did you weigh Blackbird the same way, in utilizing his writings?

A.  I weigh everything.  In this case, I think this -- I thought this account would be of interest to you, so I included it.

Q.  On page 3 of your report, there's a sentence commencing the fourth line down from the top.  The sentence reads, and I'm quoting:  "The earliest report in English of fishing and hunting practices of the Indians of northwestern Michigan is found in the writings of Alexander Henry."  What's the significance, Dr. Tanner, of the earliest report in English?

A.  Well, that's the beginning of English accounts; prior accounts were usually in French.

Q.  Did you review the earlier accounts?

A.  We talked about that yesterday, some of them I did, and secondary works utilizing French accounts, I used.

539.

Q  What about the accounts by fur traders, the Jesuit Fathers, military men, which might have been in languages other than English?

A  We talked about that yesterday, too; whatever I read, I cited.  I did not make an exhaustive search.

Q  My question goes to the significance of your statement in the report, then your statement that the earliest report in English, simply indicates that that was the earliest one used, that there's no other significance to the fact that the report happened to be in English?

A  There's significance in the fact that Alexander Henry was one of the earliest of the English fur traders to arrive in the territory that had previously been French.  He actually arrived in the area before the land cession and the settlement under the Treaty of Paris.

Q  I see.  On page 6 of your report, there is a reference to a fishery near Manistique.  Then you end the first few lines at the top of page 6 with a reference to Footnote 8, which I notice is something called the Manistique Centennial Souvenir Book in 1960.  Who wrote this book, do you know?

A  No, I don't.

Q  In your opinion, is it carefully researched?

A  I think so, I think this was -- it's not the historian's favorite type of source material, but I found this book

540.

at the -- little booklet at the Bentley Library.

Q. Well, do you consider this Manistique Centennial Souvenir Book to be reliable?

A. I think so.

Q. Is it the only source available on these points?

A. I don't know, it's the only one I found in looking through the local records there.

Q. Did you look to see if there were any contemporary sources on this same sort of event?

A. I did.

Q. Were there any?

A. This is what I found; if I had found anything earlier than this, I would have used it. This and Baraga is all I found. I shouldn't -- The population of this area was very, very skimpy, and recollections of local history are often helpful.

Q. But this history -- and this is the reason for the question -- this history, as I understand it, was prepared in the 1950's and published in 1960?

A. It was.

Q. So it's written more than 100 years after the event. Does that bother you as a historian?

A. No, sometimes the only sources of information are through recollections.

Q. But since we don't know who authored this, do we know

541.

whose recollections are involved?

A. No, we don't.

Q. At the bottom of page 6, Dr. Tanner, the last complete sentence, you say: "In the same passage, the author noted . . ." I'm having some difficulty understanding which author you're referring to, could you clarify that for me? Is that a reference back to Zebulon Pike, who you cite in Footnote 10 which follows that sentence?

A. I believe . . . I believe so. I might lay that out for you, I think Robert Dickson's account might have mentioned the fishery along that Manistique area, too, as I recall. Yes, that Footnote 10 covers the previous paragraph, except for the portion that's footnoted to Baraga, that's right.

Q. So, then, in the last sentence when you say, "The author noted", you're referring to Zebulon Pike?

A. No, no, I'm not referring to Zebulon Pike, I'm referring to Robert Dickson.

Q. Dickson quoting Pike?

A. Yes.

Q. Or recounting what Pike told him, okay.

A. No, no, let's get it straight, the author, Robert Dickson, this is information that Robert Dickson gave to Zebulon Pike. Robert Dickson is a wellknown trader.

Q. Okay. Then it would be fair for me to understand

Footnote 10 as encompassing the authors that you've referred to in that sentence -- as I say, I'm not trying to ask you something about it, I'm just trying to understand it.

A. No, no.

Q. On page 7 of your report, you refer to the Federal Government making a small contribution to the Indians as part of the consideration for the land cession in the 1836 Treaty. Do you see that portion below the quote in the middle of the page?

A. Yes.

Q. What are you referring to by the phrase "small contribution"?

A. Fish barrels and salt. The previous sentence, you know, there was a provision in the 1836 Treaty whereby the Federal Government would provide them with a certain amount of fish barrels and salt.

Q. It was the word "contribution" that confused me. I understood that to mean a gift; you're referring to the negotiated exchange of land cession?

A. Yes.

Q. For barrels and other things, then?

A. The provision --

Q. Is that correct?

A. -- among the items that are recounted in the 1836 Treaty

543.

are for fish barrels and salt; and in this sentence, I characterized that as a contribution to the Indians' needs.

Q. Do you know if the Indians' need exceeded the contributions of the Federal Government, do you have any records on that?

A. No, I don't.

Q. Are you aware of any documents which would indicate whether or not the Indians actually used more than the Government supplied?

A. No, but my impression certainly has been that the Government did not supply the total volume of barrels of salt utilized.

Q. Do we know with precision what the Federal Government supplied? My impression is that you testified earlier that we did not. Do we know with specificity how many barrels were delivered where by the Federal Government?

A. I don't know that we do. I think these records exist, but I haven't -- I haven't quoted them. They're in some of those financial vouchers, I presume, someplace.

Q. In your experience, based on looking at all of these various records in the Federal Government, it's likely, is it not, that if the Federal Government actually delivered barrels to the Indians, there would be a specific piece of paper reflecting that in the files of

544.

the Federal Government, would there not?  Wouldn't that have been the common practice; there would have been some kind of document?

A.  There would, whether it's survived, we aren't sure.  You know, I don't know whether it's 1860 or 1870, Richard Smith, who was then serving as an Indian Agent, was drowned in a big -- in a catastrophe in Lake Huron.  I'm under the impression that some certain volumes of records perished with him, so surviving extant records, I'm not sure about.  This is an archival problem with which Mr. Mason is familiar.

Q.  Also on page 7, the Baraga quote itself, which is in the center of the page, you indicate that Baraga made these observations in the spring of 1859?

A.  Yes.

Q.  Was the Federal Government still supplying barrels to the Indians pursuant to the Treaty of 1836 in 1859?

A.  I don't believe so, I think --

Q.  So the barrels that Baraga observes in 1959 may or may not be the barrels covered in the Treaty of 1836 which you refer to in the next paragraph, is that right?

A.  Yes, that's true.

Q.  They might have been different barrels?

A.  Oh, they probably were.

            MR. GREENE:  I think we have established

545.

that, haven't we?  She's answered your question three times.

Q.  (MR. FREEMAN)  On the top of page 8, there's the sentence, "Beginning in 1839, Protestant Missions were extended into the area of the Lower Peninsula ceded by terms of the 1836 Treaty."  Do you see that line?

A.  Yes.

Q.  Were there any Protestant Missions in the Lower Peninsula of Michigan in the 1836 Treaty area before 1839?

A.  I think there was an Ottawa . . . I think there was an Ottawa Mission near Grand Rapids on the edge of the Treaty area.

Q.  Would it be fair to say that Reverend Leonard Slater established a mission in the Treaty area --

A.  Yes.

Q.  -- prior to 1839?

A.  Yes.

Q.  So this sentence is not precisely correct, is it?

A.  Well, I should have said "further into the Treaty area."

Q.  I just wanted to check my information versus yours.

A.  That was set up under provisions of the 1821 Treaty.

Q.  Now, on page 9, you refer to Strang, and I understand we've asked you a great many questions about Strang. There were a couple that bothered me that, frankly, I think we asked, but I'm not sure, and I say that for the

546.

benefit of Counsel, because if we did, in fact, ask them and they can show me the page in the Deposition, I won't ask it.  It's probably just as simple to re-ask it, because it's bothering me.

As I understand your report, you indicate that on page 8 of your report that Strang's colony was set up in 1847.  On page 9 you quote Strang concerning the fishery of 1824.

A.   Yes.

Q.   Do you know what Strang's sources were and whether or not they were authoritative?

A.   I do not know.

Q.   Did you attempt to do an independent evaluation to see if what Strong wrote in/1850's about the situation in 1824 was correct?

A.   No, I did not.

MR. GREENE:  Just for your own information, Counsel, you might look at 231.

MR. FREEMAN:  You're too late, I've already asked the question.

MR. GREENE:  Very well, now you'll have a record, handy reference, cross reference to all of your questions that you asked her today.

Q.   (MR. FREEMAN)  On page 12, you refer to Strang again in terms of the fisheries of 1853.  Why did you view that as

547.

significant for purposes of this report?  What, in your view as a historian, is the relevance of fisheries of the 1850's?

A.  I have been aware through listening to Depositions of and reading the Depositions of Charles Cleland, that there was a great deal of attention given to the report, I believe, of Smith and Snell, that reflected a situation later in the 19th Century; and since this information described a situation of several decades earlier than that of Smith and Snell, I thought it was worthy of inclusion.

Q.  Do you consider this account to be as authoritative as Smith and Snell?

A.  I don't know, they're of different areas.  Since Mr. Strang was in the midst of this area, was an intelligent but certainly religiously biased individual, as I have said, and I'm sure I stated before, there is nothing else comparable to his statement of the location of the fisheries and the activities.  Since writing this report, and in connection with my other reseach, I have found an early survey map of the Beaver Island group, in which fisheries are legend, in the legend of the survey at locations that Strang indicated were fisheries.  The discovery of this survey map has reinforced my confidence in Strang's report.

548.

Q.   So you do regard Strang as authoritative on the question of fisheries?

A.   I regard him as offering valuable information; an ultimate authority, no one can be, but I think this account is important.  Indian tradition also indicates Gull Island as an important fishing island.

Q.   And you included this information to flesh out the situation in view of your reading of the Cleland Deposition?

A.   I included this information because the subject of my report was fishing in areas adjacent to the 1836 Treaty.

MR. GREENE:  I'm going to have to interpose an objection here, I'm looking at page 237 of Dr. Tanner's Deposition transcript, there is a question asked:  "I wonder if you could tell us why you're relying so heavily on Strang, and what does Strang tell us about the Treaty of 1836 and its meaning, if anything?  What is the point of relying so heavily on Strang?"  And there follows an answer by Dr. Tanner.

MR. FREEMAN:  I don't recall a reference in that answer to the Deposition of Dr. Cleland.  I'm simply trying to put it all together, and I'm sorry if I'm annoying you; but if you were aware, prior to the time of this moment, that there was an interrelationship between Smith and Snell and Strang, you were way ahead of me in

549.

the case.  I'll admit I didn't see it until the last few seconds.

Q. (MR. FREEMAN)  Doctor, would you turn, please, to page 14 of your supplementary report.  The last sentence of the second full paragraph on that page says:  "Population growth in the northern counties was negligible until about 1860."  I assume in making that statement, you utilized some kind of census tracts or other information.  Could you tell me where you obtained that information or generally describe to me the source you base that sentence on; in other words, do you know which census, could you indicate, were they Federal censuses, or were they something else?

A. As a matter of fact, I could have, but I did not base that on census information; I based that on reading -- principally on impressions drawn from reading the Indian correspondence of the point at which references were made to the existence of settlers.

Q. Now, did you compare that impression gathered by those documents with such things as number of land transactions?

MR. GREENE:  I'm going to have to object --

THE WITNESS:  No, I didn't.

MR. GREENE:  Do you understand the questions, "number of land transactions"?  I didn't understand that.  Do you understand that?

550.

THE WITNESS:  Well --

MR. GREENE:  Could you explain?

Q.  (MR. FREEMAN)  The number of people that were buying land. What I'm asking her, when she says "Population growth was negligible", is she talking about people actually there; is she talking about people that might be elsewhere or had purchased land and fully intended to come in and settle it?

A.  I'm talking principally about the Indian Office correspondence and the time at which correspondence creates the impression that there are settlers about.  In the 1836's is the beginning of the lumbering era, I mention roads, mail is still carried by Indians following a footpath.  It's still a frontier area, that's the impression I'm endeavoring to create, is that this is still a frontier area.

Q.  I'll tell you what bothers me about that, and it's probably a misconception in my own mind, so maybe you can straighten it out for me.  In reading the documents which the United States submitted as Exhibits, and I assume you're familiar with them, I had gathered the impression that one of the pressing things in the mind of some people in the negotiation and in the Treaty of 1855 was a belief that all the good land was going to be taken by settlers if something wasn't done for the Indians relatively

551.

quickly.  Now, I base that impression on documents from 1853, '54 and '55, and yet as I understand what you're saying here, there really weren't very many people up there until after 1860; so apparently my impression is wrong?

A.  No, I don't think you're wrong at all.  There's pressure to grab land by the Sault Ste. Marie Falls Land Company, by railroads by speculators, by western investors, by land searchers, it's a procedure that goes in advance of settling it.

Q.  So then it would be your position that both statements would be correct, the good land was being taken, but there weren't actually that many people there?

A.  Yes, and a good deal of the interest was in the -- immediate interest was in the area immediately along the Grand River at the southern portion of the State, the southern portion of the land cession involved in 1836.

Q.  On page 27, I recognize we've talked about this point several times, the first full paragraph which begins: "A full account of what happened to the land reserved --" Is this what you were referring me to, this passage, when I asked you some questions yesterday and earlier this morning and you referred me to your report?

A.  No.

MR. GREENE:  Could you be more specific

552.

than that, what questions are you referring to?

MR. FREEMAN:  I was asking questions about what happened to the land reserved for the Indians, charges of political deals and corruption and other things. Was this the portion of your report you were referring to?

THE WITNESS:  It's the portion of this -- of this report, yes.  At the moment, I'm uncertain as to whether page 27 is a duplication of comments I may have made in my first report, but for this report, this page contains the references to some of the land problems.

Q. (MR. FREEMAN)  Okay.  In the middle of that paragraph there is a sentence, "There is a good deal of evidence of political deals serving private interests and general chicanery."

Where can I locate that "good deal of evidence"?

A. In picking through the microfilm rolls.  I would be glad to look up specific frame references from my original research notes, if you're interested.

Q. You weren't referring, then, to a specific study or volume or something here, you're talking about unrelated pieces of paper you've seen, is that right?

A. I'm talking about references that occur at intervals throughout the correspondence.

Q. And would your answer of earlier that you didn't know of

553.

any indictments or prosecutions also be true on this page?

A. That's true.

MR. FREEMAN: I've only got a couple more points, why don't we take a five-minute break here and let me collect my thoughts and make sure I've got it all, and then we'll stop for lunch, how's that?

THE WITNESS: Fine.

MR. FREEMAN: Any Counsel object?

MR. GREENE: No.

THE WITNESS: I'm overjoyed. I'd like to point out you skipped over 15 pages, maybe you'd like to go back?

MR. FREEMAN: If you'd like me to.

(Whereupon, a recess was taken.)

12:10 P.M.

MR. FREEMAN: Back on the record.

MS. TIERNEY: Before we begin, Dr. Tanner, I believe you'd like to make a correction as to the name of the person who wrote the doctoral dissertation that you referred to earlier this morning.

THE WITNESS: That's right, the correct author is Bruce Rubenstein.

MR. FREEMAN: Bruce Rubenstein?

THE WITNESS: Rubenstein.

Q. (MR. FREEMAN) In deference to the objection of asked and

554.

answered, which I'm sure Mr. Greene would offer and I believe might be appropriate as to the question I was going to ask you, I won't ask the question I was going to ask before the break; instead, just one final question, Dr. Tanner.  Is your research continuing; does the supplementary report represent the sum total of your research you will do in preparation for this case?

A. My research is continuing, because my professional work in Chicago involves Great Lakes Indian history, and in the course of this research, I do come across some information that I think is of interest.

Q. I've asked you this in the course of these Depositions, Dr. Tanner, some very, very specific questions about the kinds of sources you were using, how you used them.  If you have occasion to commence use of sources we have not talked about, in other libraries or other collections or other works, I would appreciate it if you would, through your Counsel, alert me to that fact, so that we can then make a decision whether further Interrogatories or further Depositions would be in order.  I do not request any notice if you simply re-cover materials we've talked about; I make that request only as to new collections, new libraries, new doctoral dissertations, or whatever may come to your attention, and as I say, I would appreciate it if you would give me such notice through Mr. Greene.

555.

Do you contemplate writing any further reports for purposes of this case?

A.   No, I do not.

Q.   Do you now have in mind any documents which have not been offered as Exhibits in this case which you intend to rely upon in testimony you offer at trial?

A.   It's possible.

MR. BRENNEMAN:   I offer an objection, I think it's speculative since she does not know what she'll be asked at trial.

MR. FREEMAN:   If that's her answer, I'm presuming you or someone will cover that with her.

Q.   (MR. FREEMAN)   Let me ask it this way, Doctor, if you have occasion to decide, as decisions are made as to what you will be testifying to, to utilize specific documents which have not either been referred to in this Deposition or copies provided to us previously, I would also appreciate some notice of that.

A.   I mentioned yesterday that I had been utilizing archival resources here in Lansing since I wrote the supplementary report.

Q.   I understand that, Dr. Tanner, and I simply want you to understand that it's very difficult for me to know what documents you might be using, so that's . . . these are decisions, obviously, your attorneys have to make.

556.

I simply mention them because I want you to understand the problem. I have attempted to read every document which I believe you will be relying on for testimony. You can understand the problem from my viewpoint, if I suddenly find out there's a thousand additional documents you will be referring to that I haven't seen, I simply want some lead time to go out and read them or borrow copies or whatever. So I simply ask if your research continues, if you uncover documents as to a particular point of testimony you believe you'll be referring to, if you would bear in mind that it's my hope that I can receive notice of that through your Counsel.

On that basis, I have no further questions.

THE WITNESS: Thank you.

MR. FREEMAN: Any questions by other Counsel?

MR. GREENE: Not I.

MR. BRENNEMAN: I don't have any.

MR. GREENE: I think we're done.

(Whereupon, the Deposition concluded at 12:20 P.M.)

(End of Record.)

_May 25, 1977_
Date

_Helen Hornbeck Tanner_

557.

STATE OF MICHIGAN     )
                      )     SS
COUNTY OF INGHAM      )

I, Sandra Crowley, Certified Shorthand Reporter, do hereby certify that the foregoing Deposition was taken before me at the time and place hereinbefore set forth; and that the testimony so recorded was subsequently dictated by me and transcribed under my direction and supervision; and that the foregoing is a full, true and accurate transcript of my original stenotype notes.

_____
Sandra Crowley,
Certified Shorthand Reporter.

558.