Copy mailed to attorneys for
parties by the Court pursuant
to Rule 77(d).Federal Rules of
Civil Procedures.

*-334-*

*-334-*

UNITED STATES OF AMERICA
IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

UNITED STATES OF AMERICA,
et al.,

      Plaintiffs,

v.

STATE OF MICHIGAN,
et al.,

      Defendants.

_____



79 M26-73 C.A. 14

OPINION

FILED

AUG 8  1979

JOHN P. HEHMAN, Clerk

## PREFACE

"No one can deny that the constitution of the United States is the supreme law of the land; and consequently, no act of any state legislature, or of congress, which is repugnant to it, can be of any validity.  Now, if an act of a state legislature *be* repugnant to the constitution of the state, the state court will declare it void; and if such act be repugnant to the constitution of the Union, or a law made under that constitution, which is declared to be the supreme law of the land, is it not equally void?  And under such circumstances, <u>if this court should shrink from a discharge of their duty, in giving effect to the supreme law of the land, would they not violate their oath, prove traitors to the constitution, and forfeit all just claim to the public confidence?</u>"  Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 571-2 (1832)(McLean, J., concurring) (emphasis supplied).

When matters of great public and constitutional significance involving fundamental duties of the United States come here for resolution, this court assumes an extra duty of care in explaining the reasons for its decision.  As always, the court states the factual *basis and legal* standards on which its conclusion rests so that the appellate court will know the legal grounds for this court's decision.  Equally important, however, this court assumes also an affirmative obligation to attempt to educate the public concerning the basic

principles underlying our constitutional democracy and the practical application of these principles in our public affairs.  See, Oliver v. Kalamazoo Bd. of Education, 368 F.Supp. 143 (W.D. Mich. 1973).

### ARTICLE III

Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, and the means of education shall forever be encouraged. The utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent; and in their property rights, and liberty they never shall be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall, from time to time, be made, for preventing wrongs being done to them, and for preserving peace and friendship with them. (Emphasis supplied.)

### NORTHWEST ORDINANCE

### THE NORTHWEST TERRITORIAL GOVERNMENT—1787

### THE CONFEDERATE CONGRESS, JULY 13, 1787

### AN ORDINANCE FOR THE GOVERNMENT OF THE TERRITORY OF THE UNITED STATES NORTHWEST OF THE RIVER OHIO

The above language, taken from the Northwest Ordinance, first enacted by the Confederated Congress in 1787 and reenacted by the First Congress of the United States at its very first session in 1789, is the backdrop for this action.  It will be discussed in detail in the course of this opinion.

2.

Also a backdrop of this case is the history of the American treatment of the Indians.  In 1869 President Grant appointed a commission [pursuant to Act of Congress of April 10, 1869] composed of "nine men, representing the influence and philanthropy of six leading States, to visit the different Indian reservations, and to 'examine all matters appertaining to Indian affairs.'"  Their report includes the following language:

> While it cannot be denied that the government of the United States, in the general terms and temper of its legislation, has evinced a desire to deal generously with the Indians, it must be admitted that the actual treatment they have received has been unjust and iniquitous beyond the power of words to express.
>
> Taught by the government that they had rights entitled to respect; when those rights have been assailed by the rapacity of the white man, the arm which should have been raised to protect them has been ever ready to sustain the aggressor.
>
> The history of the government connections with the Indians is a shameful record of broken treaties and unfulfilled promises.
>
> The history of the border white man's connection with the Indians is a sickening record of murder, outrage, robbery, and wrongs committed by the former as the rule, and occasional savage outbreaks and unspeakably barbarous deeds of retalitation by the latter as the exception.
>
> The class of hardy men on the frontier who represent the highest type of the energy and enterprise of the American people, and are just and honorable in their sense of moral obligation and their appreciations of the rights of others, have been powerless to prevent these wrongs, and have been too often the innocent sufferers from the Indians' revenge.  That there are many good men on the border is a subject of congratulation, and the files of the Indian Bureau attest that among them are found some of the most earnest remonstrants against the evils we are compelled so strongly to condemn.
>
> <u>The testimony of some of the highest military officers of the United States is on record to the effect that, in our Indian wars, almost without exception, the first aggressions have been made by the white man, and the assertion is supported by every civilian of reputation who has studied the subject.</u>  In addition to the class of robbers and outlaws who find impunity in their nefarious pursuits upon the frontiers, there is a large class of professedly reputable men who use every means in their power to bring on Indian wars, for the sake of the profit to be realized from the presence of troops and the expenditure of government funds in their midst.  They proclaim death to the Indians at all times, in words and publications, making no distinction between the innocent and the guilty.

3.

They incite the lowest class of men to the
perpetration of the darkest deeds against their
victims, and, as judges and jurymen, shield
them from the justice due to their crimes.  Every
crime committed by a white man against an Indian
is concealed or palliated; every offense com-
mitted by one Indian against a white man is
borne on the wings of the post or the telegraph
to the remotest corner of the land, clothed with
all the horrors which the reality or imagination
can throw around it.  Against such influences as
these the people of the United States need to
be warned.  The murders, robberies, drunken
riots, and outrages perpetrated by Indians in
time of peace -- taking into consideration the
relative population of the races on the frontier
--  do not amount to a tithe of the number of like
crimes committed by white men in the border settle-
ments and towns.  Against the inhuman idea that the
Indian is only fit to be exterminated, and the
influence of the men who propagate it, the military
arm of the government cannot be too strongly
guarded.  It is hardly to be wondered at that in-
experienced officers, ambitious for distinction,
when surrounded by such influences, have been
incited to attack Indian bands without adequate
cause, and involve the nation in an unjust war.
It should, at least, be understood that in the
future such blunders should cost the officer his
commission, and that such destruction is an
infamy.[1]/

Report of Commission of Citizens (November 23, 1869), cited in

Report of Commission of Indian Affairs, 47-48 (1869).   (Emphasis

supplied.)

4.

Senator Clay made similar points on the floor of the Senate in 1835.  Speaking of the Cherokee Indians of Georgia, he said, as reported in the <u>Congressional</u> <u>Globe</u> for February 4, 1835:

> Mr. C. said he wished to turn the attention of the Senate to the nature of the wrongs this people had suffered -- to the present condition of the Cherokees, whose lands had been guarantied by the United States. He went into the examination with the utmost feelings of sorrow and regret at the miserable state to which these tribes were reduced by the laws of the States. But he would assure the honorable Senators from Georgia he was actuated by no hostile intentions to that State. Georgia was the first that made these encroachments; she originated the plan of invading the Indian rights, and she had carried it far beyond all others.  He had not all these various laws before him.  It was not necessary to go into details; it was sufficient to notice the results.  By the first act Georgia abolished the Government of the Cherokee nation.  No nation (said Mr. C.) can exist without a Government of some kind.  These people had formed and established a Government in imitation of our own.  But it was wholly immaterial what the humble form of that Government might be.  Georgia had abolished it.  She next proceeded to divide their territories into counties, and distribute them by lotteries among their citizens -- every head of a family being entitled to the land drawn against his number.  She did indeed reserve a small pittance of a few acres for those Indians who wished to remain within her limits, but under circumstances that rendered them worthless.  She gave them no rights, no franchise, no single privilege.  They were denied the power of testifying in courts of justice.  No Indian could be a witness in favor of his fellows.

The present case is not a 14th Amendment case, as defendants advocate.  It is an Indian treaty case in which the State asks the court to abrogate the Indians' aboriginal rights which have survived for over 12,000 years and are valid to this day, and which were guaranteed to the Indians by the Treaty of Ghent and the Treaties of 1836 and 1855.  This case deals only with the jurisdiction of the Federal government over the Indians and its authority to enter into treaties which bind the states.  Const. Art. 6, cl. 2; Art. I, §8.

Michigan would take the Indians' subsistence and livelihood, their right to fish, and divide it by a modern-day lottery, the Indians being permitted to compete for licenses equally with those who have taken their rights from them.

## I.

### INTRODUCTION

On April 9, 1973, the United States of America in its own behalf and in behalf of the Bay Mills Indian Community, initiated this litigation in order to protect the tribe's rights to fish in certain waters of the Great Lakes vested in the tribe by virtue of aboriginal occupation and use, the Treaty of Ghent of 1814, and the Treaty with the Ottawa and Chippewa Nation of 1836.  In its complaint, the United States asked that the State be enjoined from interfering with the Indians' treaty-confirmed rights to fish in the Great Lakes.

The Bay Mills Indian Community intervened in the action on December 12, 1974, and added certain individual officials of the Michigan Department of Natural Resources as defendants in its complaint.  Bay Mills also expanded the scope of the complaint by alleging that it possessed a reserved exclusive fishing right in Whitefish Bay of Lake Superior and a right to fish in the remaining waters

6.

of Lake Superior free of state regulation.  Accordingly, Bay Mills asked the court for declaratory and injunctive relief to prohibit the State from interfering with these fishing rights, and an affirmative order that the State must exercise its police power to regulate any non-Indian fishing which would be in derogation of these rights. Bay Mills amended its complaint on October 28, 1975, added the Michigan Department of Natural Resources as a defendant, and again expanded the scope of the complaint by alleging a treaty-protected, reserved right to fish in all of the area of the Great Lakes ceded to the United States in a treaty signed in 1836.  This ceded area covered large portions of Lakes Michigan, Superior, and Huron.

The Sault Ste. Marie tribe of Chippewa Indians, a tribe organized in 1975 under the Indian Reorganization Act, 25 U.S.C. §476, intervened in this action and filed a complaint against the above-named defendants on December 12, 1975.  In its complaint, the tribe alleged a treaty-protected, reserved right to fish in Lake Superior free from state regulation.  On June 17, 1976, the Chippewa tribe filed an amended complaint in which it alleged an exclusive right to fish in the waters reserved to the Indians in the Treaty of 1836, and a right to fish in the ceded waters of the Great Lakes free from state regulation.

The United States amended its complaint in June of 1976 to comply with the intervenors' complaints, with minor differences. The United States did not allege that there existed "ceded waters" under the 1836 treaty, but instead alleged that the Indians had an aboriginal right to fish in the waters adjacent to the lands ceded under the 1836 treaty and adjacent to the lands reserved in that treaty.  Also, the United States did not ask for a declaratory judgment that the tribes have exclusive fishing rights in all the waters adjacent to land reservations contained in the 1836 treaty, but instead asked the court to determine that the State had no jurisdiction to regulate anyone fishing within the Bay Mills Indian Community reservation, which it alleges included Whitefish Bay.  *In effect, the United States' complaint excluded the Chippewa tribe's allegation that it has exclusive fishing rights in certain waters of the Great Lakes adjacent to 1836 treaty reservation areas in addition to Whitefish Bay.*

The plaintiffs' pleas for relief are grounded in the Supremacy Clause of the United States Constitution, Article 6, Clause 2.

The State of Michigan, in its answer, disputed the interpretation given the Treaty of 1836 by the plaintiffs, questioned the continued existence of the tribes which were signatories to the Treaty, and alleged as defenses:  (1)  that the treaty was a removal treaty, and therefore the Indians intended to relinquish any aboriginal fishing rights they may have held in 1836; (2)  a subsequent treaty in 1855 discharged all prior rights under the 1836 treaty;  (3)  this 1855 treaty was an accord and satisfaction extinguishing all prior rights;  (4)  the Indians did not have any aboriginal rights over the Great Lakes;  (5)  Article 13th of the 1836 Treaty -- which granted the Indians the right to use the fruits of the land until the land is required for settlement -- acted as a reservation upon a condition subsequent, and that condition having occurred, the use is extinguished; (6)  the land reservations made in the 1836 Treaty have expired by the terms of the Treaty; (7)  even though there may be a treaty-protected right to fish, the State of Michigan may still regulate this right in the interest of conservation or under other state police powers;  (8) the expansion of the Sault Ste. Marie Chippewa reservation may be done only with the consent of the state; (9)  the Chippewa Tribe was dissolved by the 1855 Treaty, and the Chippewa tribe from Sault Ste. Marie is not in privity with the original signatories to the treaty.

The State of Michigan set forth a counterclaim in its answer in which it asked the court to declare that the Indians involved in this action are not exempt from state regulation.  The Court views this counterclaim as a repetition of the denials and defenses set forth above, however.

The Michigan United Conservation Clubs (MUCC), a sportsman's group, petitioned this court for permission to intervene in the action. That petition was denied for reasons set forth in an earlier opinion of this court; MUCC has been permitted to act as an amicus curiae, however.

8.

After numerous pretrial motions were disposed of, trial began on February 27, 1978.  The Court heard extensive historical evidence and received voluminous documentation meant to provide a basis for interpreting the often ambiguous treaties in issue in this case.  Extensive briefs and arguments considered the issue of whether the State of Michigan or the United States alone has the right to regulate fishing by the plaintiff tribes in the Upper Great Lakes.

Before the filing of the complaint and continuously during the course of these proceedings, the State of Michigan and certain individually named state officials have acted in derogation of the vested aboriginal and federal rights of the plaintiff Indian tribes. The conflict between the state and tribal fisherman is notorious; scarcely a day goes by without an article appearing in one or more of the state's major newspapers concerning the controversy.  That it is a passionate issue is exemplified by a recent wholly improper attempt to influence this Court through the circulation of petitions amongst sports fishermen which urged that the court rule against the Indians.  The circulation of petitions is an action diametrically at odds with the methods of access to the courts mandated by the Federal Rules of Civil Procedure.  This misguided action gave thousands of people the erroneous impression that constitutional rights are a matter of popular contest.  This was a corruption of the concept of the Federal Judicial system.  In a democracy, many times people violate Constitutional and Inalienable rights.  The United States Courts exist to ensure guaranteed constitutional rights against the TYRANNY OF POPULAR MAJORITIES.  Federal Court Judges are, or ought to be, custodians of secured constitutional right.

Before giving my specific findings of fact and conclusions of law, and in the effort to foster public understanding, I present the following more exhaustive statement of the issues and law involved in this case.

9.

The United States, guided by the Nixon administration and acting in its role as trustee for the Indians, filed this action against the State of Michigan to secure Indian rights which it says were reaffirmed by an 1836 Treaty with the Ottawa and Chippewa Indians.  In so doing it was merely accepting obligations imposed by the Northwest Ordinance, supra. The Northwest Ordinance not only provided for Michigan's first government but simultaneously set the standard by which the territorial government and the United States would be obliged to deal with the Indians of the Territory.

By this enactment, the Founding Fathers declared a guardian-ward relationship between the United States and the Michigan Indians. Trained as they were in denominational schools, where their routine assignments included translation of the bible from English to Latin and from Latin to Greek, the Founding Fathers did not hesitate to found this relationship on moral and religious principles, the principles which, generally, they transformed into political principles when they formulated our present government, including them in the Declaration of Independence and the Preamble to the Constitution as well as here in the Northwest Ordinance.  It is these principles which must be applied here in interpreting the treaties and in measuring the transactions between the United States and its wards, the Indians.  To do otherwise would be in violation not only of the laws of man but also of the laws of "nature and nature's God," which are, or ought to be the Supreme law of this land.

Also, before Michigan's statehood, the United States entered into a treaty with Great Britain in which it offered its most solemn word as a nation, in formal treaty, to honor all rights of the Michigan Indians.

ARTICLE THE NINTH

The United States of America engage to put an end, immediately after the ratification of the present treaty, to hostilities with all tribes of nations of Indians with whom they may be at war at the time of such ratification; and forthwith to restore to such tribes or nations, respectively, all the possessions, rights, and privileges, which they may have enjoyed or been entitled to in one thousand eight hundred and eleven, previous to such hostilities; Provided always, That such tribes or nations shall agree to desist from all hostilities, against the

United States of America, their citizens and subjects, upon the ratification of the present treaty being notified to such tribes or nations, and shall so desist accordingly. And his Britannic majesty engages, on his part, to put an end immediately after the ratification of the present treaty, to hostilities with all the tribes or nations of Indians with whom he may be at war at the time of such ratification, and forthwith to restore to such tribes or nations, respectively, all the possessions, rights, and privileges, which they may have enjoyed or been entitled to, in one thousand eight hundred and eleven, previous to such hostilities: _Provided always_, That such tribes or nations shall agree to desist from all hostilities against his Britannic majesty, and his subjects, upon the ratification of the present treaty being notified to such tribes or nations, and shall so desist accordingly.

This provision of the Treaty of Ghent, signed on December 24, 1814 (8 Stat. 218), was not mere rhetoric; it was a compromise position secured from Britain, which threatened indefinite continuation of the War of 1812 unless the United States restored the rights of Britain's Indian allies. Both nations pledged to restore to such tribes or nations all the possessions, rights and privileges which they may have enjoyed or been entitled to in 1811, before such hostilities. Both nations assumed the guardianship of the Indians and acknowledged all aboriginal Indian rights to use land, sea and air in the New World, excluding all whites from their territory until and unless the United States had secured the lands from the Indians by valid, just humane treaties. As guardian, the United States was obliged to acquire the lands and other property not on the best terms it could get for itself, but on the best terms it could get for the Indians. At all times it was required to protect the Indians' interests. In the Treaty of Ghent, Britain effected its duty as guardian of the Indians of the lands it surrendered to the United States by securing a promise from the United States to assume a guardian relationship toward those Indians. The United States agreed to treat these Indians not as a defeated enemy, but as a ward fully possessed of all rights arising by virtue of original occupancy and use of the lands. The United States accepted this obligation in exchange for an identical promise by Great Britain and in order to end the War of 1812. Indians of the Northwest Territory who had allied with Great Britain were possessed of aboriginal rights, vested by virtue of original occupancy and use and International treaty and protected by the obligations of their guardian, the United States.

11.

In our constitutional system of government the states cannot enter into treaties with foreign governments -- only the federal government can.  When acting within its power to deal with foreign governments, the federal government can make treaties which give it authority in areas which otherwise would belong solely to the states.  In such cases the state no longer has authority in areas governed by the treaty.  Federal control of migratory waterfowl, for instance, derives from a treaty with Great Britain.  In this case the federal government has entered into a treaty with Indians, a matter which, like foreign affairs, is within its sole jurisdiction. One question presented here is whether this treaty with the Indians deprives the state of all authority to regulate matters covered by the treaty, specifically Indian fishing in certain waters of the Great Lakes.

From the earliest times the United States has been ambivalent about its assumed role as trustee for the Indians, expressing noble sentiments executed by ignoble actions.  During the 18th and 19th centuries the United States typically dealt with the Indians by treaty, as co-sovereign nations.  Typically also, the United States secured Indian lands on terms which were little short of conquest and carried out the treaty in such fashion as to complete the vanquishment.

Michigan has staked most of its case on an 1830 Act of Congress called "An Act to provide for an exchange of lands with the Indians residing in any of the states or territories, and for their removal west of the river Mississippi," (4 Stat. 411) and referred to as the "Removal Act."  Congress did nothing in this Act to lessen the obligation of the Executive toward the Indians.[2] The principal authorization of the Act is to make it lawful for the President to offer lands belonging to the United States west of the Mississippi to the Indians  who chose to exchange their present lands.  Section 7 of the Act indicates that the Act does not contemplate any variation in Indian policy: "Provided, That nothing in this act contained shall be construed as authorizing or directing the violation of any existing treaty between the United States and any of the Indian tribes."

12.

Of necessity, this court has had an opportunity to review the actions of almost every administration in the history of our country. The removal policy in question began during the Presidency of Thomas Jefferson. Piecemeal removal began during Monroe's administration but slowed down during the administration of John Quincy Adams, who had a humane and paternal attitude toward the Indians. Andrew Jackson ran for office supporting the policy and received authorization from Congress to implement it. During Jackson's term Henry Schoolcraft was appointed to secure from the Indian bands, whose progeny make up the plaintiff tribes, lands which would become the State of Michigan. During VanBuren's presidency, pressure for removal of Indians to lands west of the Mississippi waned. The Indians stayed in Michigan, but were deprived of their rights under the 1836 treaty and many others, almost as quickly as they were signed. By the time Pierce became President, even many of the eastern states wanted to keep Indians on their ancestoral homes. A new treaty was signed with the Michigan Indians during his administration which gave the Indians permanent reservations (most of which no longer exist) in exchange for releasing the United States from its unfulfilled financial and personal property obligations under earlier treaties.

In an effort to provide a perspective on the Removal Policy of the United States, I quote the following accounts of noted historians who the State's own expert testified are authoritative and reliable. (Tr. 1716.)

13.

### 3. Removal of the Eastern Indians

An American journalist who had spent several years in India, and whose small children had come to love the Indians, came home in 1958. Shortly thereafter he found the boys crying as they watched a TV "Western" because, as one moaned, "They're killing *Indians!*" Papa had to explain that these were not Indians of India but Red Indians, and that to kill them was part of the American Way of Life.

The only extenuation of American policy toward the natives of North America is that it continued an old-world process of one race or people pushing a weaker one out of an area that it wanted. Almost every European today is a descendant of Asiatic intruders into Europe; almost every North African the descendant of Arab intruders. "The country is a land for cattle," said the children of Reuben to Moses when they saw the land of Gilead, "and thy servants have cattle; wherefore, said they, if we have found grace in thy sight, let this land be given unto thy servants for a possession." In the United States, as elsewhere in the nineteenth century, this process of conquest and expansion took the form of a relatively highly developed civilization pushing out a backward people who could not or would not be absorbed, and who were too few in number and weak in technique long to resist. But some of the Indians put up a very good fight.

The problem of United States-Indian relations, which for many years had involved international rivalries, became localized after the Florida treaty was ratified in 1821. "Foreign interference" could no longer be used as an excuse for abusing the Indians. And there was no more need to placate them to prevent their siding with the British, French, or Spanish.

Efforts to maintain Indian reservations within the Eastern states were generally unsuccessful, although a few small ones, such as that of the Abnaki in Oldtown, Maine, and the Tuscarora reservation near Niagara Falls, still endure, menaced or sliced away by the bulldozer. Conditions for a reservation's lasting were a partial adoption by Indians of the American Way of Life, and a strong government service to protect them from the white man's trickery and alcohol. But, for fifty years after American independence, the Indians did not wish to conform, many federal agents were political hacks, government trading posts were unable to compete with unauthorized private traders who supplied the Indians with liquor, and frontiersmen everywhere coveted the Indians' land.

Monroe's administration bowed to demands of the West by adopting a removal policy. Plans for concentrating the tribes west of the Mississippi now began to take shape, and piecemeal removal began in the 1820's from the Old Northwest and the lower South, to segments of what had been the domains

14.

of the Caddo, the Quapaw, and the Osage. Tribesmen with well-developed farms, especially influential halfbreeds, were given the choice of removal, or staying put and becoming American citizens. Those who preferred to leave, exchanged their property for new lands in the West and were promised payment for travel expenses and the value of improvements on their relinquished property. The assent of the Indians was often merely nominal; federal commissioners bribed important chiefs and, if necessary, got them drunk enough to sign anything. "Persuasion" often took the form of urging the Indians to sell improvements for cash with which to pay off debts to white traders. This removal policy slowed down during the administration of John Quincy Adams, whose attitude toward the Indians was humane and paternal, but picked up momentum and was carried to a successful conclusion (from the white point of view) under Jackson. The President, having negotiated several removal treaties during his military career, knew very well the hardships involved, but regarded this as the only possible way to save the Indians from extinction. They were faced with the irresistible force of a white expansion which the Democrats had no intention of checking.

Soon after Jackson's inauguration, Georgia, Alabama, and Mississippi asserted jurisdiction over Indian reservations, in contemptuous disregard of federal treaties, and even set up county governments to be put in operation as soon as the rightful owners of the soil were expelled. Congress then passed an Indian Removal Act (1830), appropriating half a million dollars for this purpose. The President was authorized to grant lands in the unorganized part of the Louisiana Purchase in exchange for those relinquished in the East, to protect the Indians in their new reservations, to pay expenses of removal and one year's subsistence, and compensate them for improvements on the relinquished land.

The liquidation of Indian reservations in the Old Northwest was largely accomplished between 1829 and 1843. Mixed bands of Shawnee, Delaware, Wyandot, and others were persuaded to accept new reservations west of Missouri. Their numbers were drastically reduced by disease on the journey. Theft by federal officials of what was due to the Indians, and funeral rites for those who died en route, exhausted their resources long before this "trail of tears," as it was aptly called by later writers sympathetic to the Indians, came to an end. Many groups were unable to make the journey in one season and suffered intensely at improvised winter quarters. A cholera epidemic broke out in 1832; measles took hundreds of lives. Further trials awaited the survivors, especially those who hoped to till the soil; the cost of equipment reduced them to penury or debt long before they could raise a crop or draw upon tribal annuities. Money from the sale of improvements at the old village ordinarily went into the expenses of travel, if it did not stick in the pockets of federal agents.

At one point during these removals, hostilities broke out. Black Hawk, chief of the Sauk and Fox, who had fought on the British side in 1812, tried

15.

to retain his ancient tribal seat at the mouth of Rock river, Illinois, opposite Davenport, Iowa. White squatters encroached on the village and enclosed the Indians' cornfields. After the governor of Illinois had threatened him, Black Hawk agreed that after crossing the Mississippi for his annual winter hunt, he would never return. But his people, threatened by hostile Sioux, ran out of food. Hoping to find a vacant prairie in which to plant a corn crop, Black Hawk recrossed the Mississippi in the spring of 1832 with about 1000 members of his tribe. The governor of Illinois, assuming this to be a hostile expedition, called out the militia (Abraham Lincoln commanding a company) and pursued the starving Indians up the Rock river into the Wisconsin wilderness. It was a disgraceful frontier frolic, stained by wanton massacre of Indians, including women and children. The only redeeming feature was the chivalrous consideration of Black Hawk by Lieutenant Jefferson Davis of the regular army, when the captured chief was placed in his charge; forty years later, Davis referred to Black Hawk's rear-guard action at Wisconsin Heights as the most gallant fight he had ever witnessed. Black Hawk subsequently visited the "Great White Father" in Washington and was presented with a sword and a medal by President Jackson. But he lost his tribal lands.

The four great Indian nations of the Old Southwest, the Chickasaw, Creek, Choctaw, and Cherokee, were Jackson's particular problem. In 1830 the Choctaw of Mississippi signed a treaty providing for their removal within three years. As with others, this migration brought death, suffering, and poverty. In 1832 a treaty was signed with the Creek nation to wind up their large reservation in Alabama. Some members kept individual allotments and faced the cunning of new white neighbors who poured into their reservation before they could leave. Many died on the journey. By 1860 the Creek nation had lost about 40 per cent of its population. The rest settled in the Indian Territory, near the Choctaw. The Chickasaw of Mississippi, a fairly small group, fared better and obtained fairly good prices for their improvements, since their land was desirable for cotton plantations.

These three nations were agricultural and sedentary; some even held Negro slaves. The Cherokee, whose nation spread over northwest Georgia into Alabama and around Chickamauga, Tennessee, were even more advanced, by European standards. It had always been a white grievance against the Indians that they rejected "civilization." The Cherokee, unfortunately for themselves, took the palefaces at their word. George Gist, a halfbreed whose Indian name was anglicized as Sequoyah, provided the necessary spark. Convinced that literacy was the key to Indian survival, Sequoyah invented a simple form of writing and printing the Cherokee language; Bibles, other books and even a weekly newspaper *The Cherokee Phoenix* were printed. These Indians welcomed Christian missionaries, built roads, houses, and churches, adopted a constitution for the Cherokee nation and elected a legislature. They became more civilized than the Georgia "crackers" and "hill-billies" who coveted their lands. Nor, for that matter, do the inhabitants of Faulkner's Yoknapatawpha County appear to be an improvement over the Chickasaw whom they replaced.

16.

The independence of the Cherokee nation had been guaranteed by the United States in a treaty of 1791, but the State of Georgia had been chopping away at their lands for over thirty years, and regarded the treaty as obsolete. Discovery of gold in the Cherokee country in 1828 brought this controversy to a head, and a rough class of whites to the spot. Here was a case of federal supremacy against state rights, as clear as that of South Carolina; but President Jackson let Georgia have her own way. His secretary of war, Peggy Eaton's husband, informed the Cherokee that they were mere tenants at will. The federal troops sent by President Adams to protect the Indians were withdrawn, and Major Ethan Allen Hitchcock, sent by the war department to investigate frauds against them, made so devastating a report that the department suppressed it. Chief Justice Marshall decided, in a test case brought by a missionary (the Reverend Samuel C. Worcester of Vermont), that the laws of Georgia rightly had no force within Cherokee territory. Jackson commented, "John Marshall has made his decision. Now let him enforce it."

As Georgia held a lottery to dispose of their lands, and no friends in power appeared to help them, the Cherokee were forced to accept removal. Agents of the Indian administration negotiated a treaty with a small minority of the chiefs in 1835, but most of them refused to attend the negotiations, and few departed within the three-year limit set by the treaty. A protest to President Van Buren, signed by 15,665 Indians, was blandly ignored. So, in 1838, regular troops under General Winfield Scott rounded up the Cherokee and started them on the long trail to Indian Territory. This journey cost them one-quarter of their number, but the remainder reorganized their national government, prospered, and have retained their language and alphabet to the present day. Several hundred diehards in the Great Smokies, who resisted removal, were eventually given the Qualla reservation in North Carolina.

A similar controversy with the Seminole of Florida ended in war. A tricky treaty of removal, negotiated in 1832 with a few chiefs, was repudiated by the greater portion of the tribe, led by a brave chieftain named Osceola. Secure in the fastnesses of the Everglades, Osceola baffled the United States Army for years, and was only captured by treachery at a truce conference. Many Seminoles were rounded up and sent west, but others kept up the fight until 1842. By that time they had cost the United States some $20 million and 1500 lives. A few thousand remained in the Everglades. Their descendants, known as the Miccosukee Seminoles, are the only occupants of some 200,000 acres of swampland north of the Tamiami trail. They live, like their ancestors, by hunting, fishing, and a little agriculture. Never having made peace with the United States, they are currently threatened by drainage and development projects, and a "progress" which they do not want.

The only Western statesman to denounce these shabby and dishonorable proceedings was Henry Clay. His speech in the Senate on 14 February 1835 is the more praiseworthy because the Indians had no votes, and because his Kentucky constituents cared nothing for them. He quoted the long list of treaties guaranteeing to the Cherokee their lands, and the still longer list of acts of the State of Georgia which violated not only these treaties, but the most elementary principles of justice and decency. He drew tears from the eyes of the senators, but they did nothing for the Cherokee except to expedite their removal.

President Jackson seems to have kept a good conscience about all this, and several friends of the Indians, such as Lewis Cass and Thomas L. McKenney, head of the war department's bureau of Indian affairs, supported removal as the only alternative to extermination. Jackson's rationale of Indian removal appears in his Farewell Address of March 1837: "The states which had so long been retarded in their improvement by the Indian tribes residing in the midst of them are at length relieved from the evil, and this unhappy race — the original dwellers in our land — are now placed in a situation where we may well hope that they will share in the blessings of civilization." Lewis Cass went the General one better, piously invoking the theory that God intended the earth to be cultivated. Cherokee cultivation evidently did not count.

By the end of Van Buren's presidential term, it was assumed, at least by the Democrats, that the Indian question had been solved. All important Eastern tribes — those who, in Jackson's phrase, had "retarded improvement" (i.e. resisted white land grabbers) — had been provided for behind a barrier that ran from Lake Superior through Wisconsin and Iowa Territories, thence along the western boundaries of Missouri and Arkansas to the Red river on the Texas border. Behind this line the tribes were guaranteed possession "as long as grass grows and water runs"; and thence most of them were eventually ousted, when the tide of white settlement lapped around them and slaughtered their game. But, in a sense, the removal policy was justified by the later history of the "five civilized Indian Nations" — Creek, Cherokee, Choctaw, Chickasaw, and Seminole — in Oklahoma. Removal gave them the necessary respite to recover their morale, and until the Civil War they succeeded in keeping white men out.

Looking backward, it is now evident that, in view of the irresistible push of the westward movement, Indian removal was the lesser evil. It had to be, but, the process was carried out with unnecessary hardship to the victims.

In many instances missionaries and other individuals managed to protect the Indians. The Ojibway or Chippewa had a reservation along the Bad river of Wisconsin, which was taken under the protection of the Reverend L. H. Wheeler, a Protestant missionary at La Pointe. When, in 1850, white pioneers began lobbying Congress to remove these Indians west of the Mississippi and acquire their lands, Wheeler visited the proposed site of the resettlement and reported that it would be a deed of mercy to shoot every Ojibway rather than send them there. Congress reconsidered, and in 1854 guaranteed these Indians three small reservations on the south shore of Lake Superior, which they still hold in 1964. Other tribes were not so fortunate. Between 1853 and 1856 the United States negotiated no fewer than fifty-two treaties, mostly with nations in the Mississippi valley or west of the great river, by virtue of which it added 174 million more acres to the public domain.

Remnants of the Six Nations who had been guaranteed possession of reservations in New York State, by treaties concluded as far back as 1784, have been fighting a losing battle. Chief Red Jacket of the Seneca long managed to preserve the integrity of his people in their reservation, which is now covered by the city of Buffalo. After his death in 1830, a group of New York speculators known as the Ogden Land Company began an intensive drive to get possession of the Seneca reservation. By bribing greedy individuals to act as "chiefs" and sign away land, this company managed to rob the tribe of almost their entire heritage. President Van Buren, to his credit, denounced the subsequent "treaty" as a steal, but it passed the Senate, by the casting vote of Vice President Johnson, the reputed slayer of Tecumseh.

Samuel Eliot Morison, _The Oxford History of The American People_ (1965) at 445-42.

Similarly, the <u>American</u> <u>Heritage</u> <u>Pictorial</u> <u>History</u> of <u>the</u> <u>Presidents</u> (1968), Vol. 1, states:

## TRAIL OF TEARS

Although the Indian Removal Act of 1830 simply authorized the President to negotiate for land, Andrew Jackson's "requests" were in fact orders. Resigned to their fate, the Choctaw and Chickasaw began the long journey from the Southeast to Arkansas and Oklahoma. But the Creek, who had disastrously encountered Jackson in 1813 and 1817, knew better than to believe his promise of guaranteed territory west of the Mississippi. Standing their ground in 1832, they extracted a treaty that said "they shall be free to go or stay, as they please." Four years later, their chiefs in chains and guns at their backs, the Creek joined the exodus. In 1832, the Sauk were driven from their Illinois villages and across the Mississippi, leaving possessions and food stores behind. When Chief Black Hawk sent his braves to negotiate with the military, their white flags were ignored. After several skirmishes, the desperate leader tried to lead his starving people back home, but they were stopped at the river. That pathetic series of events, known as the Black Hawk War, cost hundreds of Indian lives. In Georgia, the peaceful Cherokee sought and won from the Supreme Court a favorable decision, to which neither the state officials nor President Jackson paid any attention. Like the other Indian tribes, the Cherokee embarked on a long journey to the West, along a "trail of tears."

19.

During the 20th century these Indians attempted to secure rights previously denied them.  During Theodore Roosevelt's presidency, Congress passed a law which permitted them to appear before the Court of Claims to settle the ownership of monies held in trust by the United States at the time of the 1855 Treaty.  The Ottawas and Chippewas filed suit, and, in 1907, were able to show that the United States still owed them monies which were to have been paid twenty years after the signing of the original treaty.  Ottawa and Chippewa Indians v. United States, 42 Ct.Cl. 240 (1907).  In 1946, during the Truman administration, Congress established the Indian Claims Commission. The Bay Mills Indians filed suit and proved that their land had been worth approximately seven times what they were paid in the 1836 treaty. Bay Mills Indians v. United States, 26 I.C.C. 538 (1971), Indian Claims Commission Docket # 18E and 58.

20.

The present action marks the first time during the long history of these Indian peoples that the United States has not been the opposing party in their effort to secure rights granted to them by solemn treaties.  The action was initiated by the United States during the Nixon administration, was pressed during the Ford adminis-tration, and carried forward during the Carter administration.  As the case presently stands, the United States and the plaintiff Indian tribes, the parties to the two treaties here in question, have come to this court agreeing that their treaties reserved Indian fishing rights in the Upper Great Lakes.

That there are persons within the state whose rights to fish derive from federal (as opposed to state) law has been totally unacceptable to the state and its Department of Natural Resources.  The state's position on this fundamental concept was stated by its counsel in his opening argument:

> There is no question but that the State now and
> always has stood ready to provide fishing privileges
> to all our citizens, commercial fishing privileges
> to all our citizens on an equal basis, including
> Indians or others of whatever race or ethnic back-
> ground.

(Tr. 1210.)  The state obdurately adheres to this position despite the fact that the Supreme Court of the United States long ago rejected the identical contention.  In United States v. Winans, 198 U.S. 371 (1905), the Supreme Court reviewed a lower court decision which held, in effect, that the Indians were to be treated just like any other citizen of the State of Washington, notwithstanding their treaty reserved the right to fish at their usual and accustomed sites.  The Court first stated the lower court's ruling and then articulated unambiguously its disapproval:

> In other words, it was decided [by the lower court]
> that the Indians acquired no rights but what any
> inhabitant of the territory or state would have.
> Indeed, acquired no rights but such as they would have
> without the treaty.  This is certainly an impotent
> outcome to negotiations and a convention which seemed
> to promise more, and give the word of the nation for
> more.

Id. at 380.  See also Seufert Bros Co. v. United States, 249 U.S. 194 (1919).

21.

Although the United States before 1836 exercised dominion over the area which was later to become the State of Michigan, it had not as of that time taken steps to extinguish aboriginal title in the Ottawas and Chippewas.  The southern portion of the Michigan territory was becoming settled in the early 1800's and there could be no assurance of cloudless title in non-Indian settlers so long as the Indians' aboriginal title to the land remained unextinguished. While the United States had several options available to it in order to accomplish an extinction of Indian title, it chose the most common method of that time and negotiated a treaty of cession with the Ottawa and Chippewa living in the northwestern portion of the lower peninsula and eastern half of the Upper Peninsula of what is now the State of Michigan.

Central to the plaintiffs' contentions and rooted in United States v. Winans, supra, is the concept that under the treaty the Indians were the grantors of a significant land cession and the United States was the grantee.  As in any land transaction (not just those involving the Indians), the grant extends only to those interests and rights specifically conveyed and to none others.  When the Indians granted to the United States their ownership in the land and waters of the Great Lakes described in Article First of the 1836 treaty, they retained all those rights not specifically conveyed.  Among the retained rights was their aboriginal right to continue to fish in the ceded waters of the Great Lakes.

A misunderstanding quickly arises if the transaction between the United States and the Indians is thought of as the ordinary land transaction where the seller conveys all of his rights in the property he sells.  Under this interpretation, it would be necessary for the Indians to be able to show that the United States granted them the right to fish.  The transaction is better understood if the focus is upon the concept of "reservation."  The Indians gave up some rights, reserving all those not specifically conveyed.  In a Washington treaty, for instance, the Indians explicitly reserved a right to fish at "all usual and accustomed places."  They then con-veyed their land, without conveying to the United States the right to exclude the Indians from the land adjoining the places where they

fished.  The owners who purchased the land adjoining these fishing places did not have the right to exclude Indians from the land because the Indians implicitly reserved a right to cross it, there being no other way to exercise their fishing right.  The white owners only had the right to exclude non-Indian trespassers.  Likewise, certain Western Indian tribes explicitly reserved land for agricultural purposes, the treaty not specifically conveying all the water of adjacent rivers to the United States.  The tribes reserved whatever water they needed to make use of their land.  White settlers with similarly arid lands were not provided for by the treaties, and were not entitled to any water used by the Indians.  The reservation was implied from the fact that the Indians could not otherwise use their lands for agriculture.  The Michigan Indians here claim that they never granted their right to fish to the United States, but reserved it so that they could continue to exercise their way of life while living in Michigan, a right they reserved under the treaty. They are not obliged to show that the United States granted them the right to fish, but only that they reserved it.  They need not show that they explicitly reserved it.

Of course, not every treaty of cession leaves the Indian grantors with reserved fishing rights.  In order for the right to exist in the first instance, it must be shown that the Indians were in fact using the resource, i.e., that they exercised this right, subsumed within their larger, aboriginal right to their land and water.  Thus, the factual predicate for the reserved fishing right is the documented historic, ethno-historic, anthropologic and archaeologic evidence proving that commercial and subsistence fishing was of significance to the Indians during treaty times.  Plaintiffs' testimony at trial overwhelmingly established this factual predicate.  Having established these facts, the reserved right to fish arises by implication.  Thus, the Indians impliedly reserved the right to subsistence and commercial fishing because of this resource's importance to the Indian community at and before the time they entered into the treaty.

In addition to the implied right to fish, plaintiffs also rely on explicit language in the treaty in support of their claims. Article XIII provides that:

23.

> The Indians stipulate for the right of hunting on the lands ceded, with the other usual privileges of occupancy, until the land is required for settlement.

7 Stat. 495. This language constitutes an explicit reservation of a right broad enough to include the taking of fish from the Great Lakes for subsistence and commercial purposes.

Because the language of the treaties is general, vague and ambiguous, the issues before this court involve not only the treaties themselves but also the history of their negotiation and the entire history of the Michigan Indians. This is the way the case has been tried by the parties. The plaintiffs submitted evidence that, in this northern region of the present United States, where agriculture has always been difficult but fish have been in abundance, Indians have relied upon fishing as basic to their livelihood since 10,000 years before Christ. They submitted evidence that the Indians adopted gill nets from their eastern cousins shortly after the birth of Christ, and used them productively for centuries, even though, as defendants said, white men could not get a catch from such nets unless made of much finer materials. The plaintiffs presented experts who testified that the Michigan Indians grew to depend upon the fisheries to secure European goods and that their earliest participation in the European market economy rested upon their expertise at fishing. It is this sort of evidence which this court had to evaluate in order to determine whether the Ottawas and Chippewas so depended upon subsistence and commercial fishing at the time they signed the treaty of 1836 that they could not have knowingly signed away their right to fish.

The lands ceded by the treaty of 1836 were less explored than many regions of the far west. More desirable lands in Michigan had been secured by prior treaties.<u>3/</u> The lands of Upper Michigan were bypassed by settlers who sought agricultural lands further west. Only a few thousand Indians, organized into bands, inhabited the entire area along with a few traders and military men. These Indians used the land and water, seasonally migrating over the land to secure the resources of the area.

In the 1830's some of the Indians wanted to acquire annuities like their Potawatomic brothers and realized that the United States

24.

would give such payments in exchange for land.  One group indicated that it would cede Drummond Island in Lake Huron; chiefs of questionable authority offered to cede lands belonging to other Indians in order to get an annuity.  Even these groups had so little understanding of of American property law that they expected to continue using the land as before even after a cession.

Lewis Cass, Secretary of War, and Henry Schoolcraft, Indian Agent in Michigan, were not interested in such proposals. They ordered representatives of all area Indian bands to Washington, escorted by traders chosen because of their known influence over the Indians and who were rewarded by the terms of the subsequent treaty. Away from their forest homes for over four months, many for the first time in their lives, unable to engage in their ordinary pursuits, housed in buildings and transported over streets, the Indians signed a treaty written by white traders, explained to them by white inter-preters and fostered by men who had supplied them with firewater for years.  They were then permitted to return to their homes.[4/]  Before and during its negotiation and by the language of the treaty, they were assured that they could continue to use the land when they returned to their homes, as before.  Had they felt anxious about their fishing grounds before the negotiations, those fears were allayed: areas sought by whites were granted exclusively to the Indians, and no mention was made that the treaty might take any other fishing rights away.

By the terms of the treaty monies granted to the Indians for their land were assigned to traders to pay for Indian debts, and Henry Schoolcraft negotiated over $50,000 for his relatives. The Indians got their annuities, certain services, reservations at their traditional fishing grounds and a promise of land in the West.

But, the white men were not through with the Indians.  The Senate ratified the treaty with an amendment limiting the terms of the reservations to five years or longer, as the United States might permit.  This put the Indians on notice that things had not gone as they had understood them.  But, Schoolcraft allayed their fears by assuring them they could continue to use all of their lands as before, leading them to understand that this use would go on without limit. Satisfied, the Indians signed the pact.

The United States did not pay all of the annuities promised; took the most important of the fishing grounds to build a canal and permitted settlers to come into the territory to such an extent that the Indians feared they would lose their reservations and there would be no land left for them. The United States wanted to secure clear title over Indian lands so that they could be sold to settlers and to concentrate the Indians in fewer locations on less land. These motivations led to a new treaty in 1855. In that treaty, signed in Detroit, the United States granted the Indians reservations and assumed specific obligations to provide services and benefits in exchange for a release from the prior treaty financial and personal property obligations it had not fulfilled. The reservations were again placed near traditional fishing grounds. In a separate treaty, the United States offered compensation for the fishing grounds granted in perpetuity and which it had destroyed at Sault Ste. Marie.

After the 1855 treaty, the United States dealt with the treaty Indians on a local basis, no longer pretending that there was an Ottawa and Chippewa Nation. More recently, it recognized the Bay Mills tribe under the Indian Reorganization Act as an Indian tribe entitled to the benefits of prior Indian treaties. Most recently, it did the same for the Sault Ste. Marie band of Chippewa Indians.

When a court is called upon to construe an Indian treaty, the Supreme Court has mandated that it employ the following principles which flow from the guardian-ward relationship of the United States to the Indians: The treaty must be construed as the Indians would have understood it; doubtful expressions must be resolved in favor of the Indians, and treaties must be construed liberally in favor of the Indians. Generally, these principles are laid down so that Indian tribes, usually numbering little more than a few thousand, are not wholly disadvantaged by the strength and resources of the United States. In this case every justification ever given in support of these principles is satisfied. The treaty was imposed by subtle, invidious and incidious negotiators who sought only signatures without regard for whether they were a product of free consent; the treaties binding the Indians were written in English, although the Indians knew no English and their language arose out of a hunting and fishing traditon without a

concept of property; interpreters could only describe general outlines of the agreement; details were left to the good faith of the drafters; the final version of the treaty was drafted behind closed doors by Henry Schoolcraft and the traders who escorted the Indians to Washington; these men had conflicts of interest and each was rewarded handsomely by the treaty, altogether receiving over a quarter of a million dollars.

From the history of the negotiations of the 1836 and 1855 treaties, evidence of the sort of use the Indians made of the Great Lakes fisheries at the time of the 1836 Treaty, and bound as I am to construe the treaties as they would have been understood by the Indians, I am compelled to conclude that the Ottawa and Chippewa Indians, and the plaintiff tribes as their successors, reserved an aboriginal right to fish in the waters of the Great Lakes ceded by the Treaty of 1836, which right they may exercise without regulation by the State of Michigan.

Specific findings of fact and conclusions of law are contained in a following section of this opinion.

Insofar as any motion has been of significance, it has been ruled upon at the appropriate time. Certain insubstantial motions remain and will be dealt with summarily.

The State has before the court a motion to require the joinder of all necessary and indispensable parties. It argued that this order was necessary to bring into the action all Indians claiming fishing rights as descendants of the signatories to the 1836 Treaty. The court recognizes the position that the State finds itself in is difficult. However, a substantially similar argument was advanced by the State in support of its second motion for partial summary judgment. In that motion, the State asked that the court bring into the action all individuals who may possess any individual fishing rights as a result of the dissolution of the tribal organizations by the Treaty of 1855. The court denied that motion, and indicated that the present parties were sufficient to enable the court to pass on Phase I issues before it.

27.

The individual defendants have petitioned this court for the right to a jury trial. Because this action involves prospective injunctive relief sought by plaintiffs, and because plaintiffs have not presented any evidence of tortious conduct by any of the named individual defendants, there is no basis for requiring a jury trial, and defendants' motion is denied.

The State's motion for a three-judge court is likewise easily disposed of. 5/ The sole basis upon which plaintiffs have prosecuted this action is that the Indians possess an aboriginal fishing right which has been confirmed by treaty with the United States. Under the United States Constitution, Article VI, clause 2, a treaty made under the authority of the United States becomes the supreme law of the land. Consequently, because a treaty provision maintains the same status as a federal statute, the State cannot regulate what federal law preempts. This is the foundation of plaintiffs' allegation that the State of Michigan may not regulate federally protected fishing rights. Obviously, the plaintiffs are relying upon the Supremacy Clause of the Constitution to support their claim. The Supreme Court of the United States has indicated that a three-judge court is not necessary where the action is based on the Supremacy Clause. 6/ Further, any relief plaintiffs request is also premised on that constitutional ground. For these reasons, the State's motion is denied.

The State has indicated that several motions to compel discovery have not been ruled upon. To the contrary, the court ruled in an Order of July 30, 1976 that these motions were moot and need not be decided.

I have not considered plaintiffs' Exhibits P-1, P-2 or P-3 in my deliberations in this matter or in this opinion.

## II.

### JURISDICTION, ISSUES AND PARTIES

(1) Jurisdiction is vested in this Court by virtue of:

(a) 28 U.S.C. §1345, in that the United States brings this action on its own behalf and on behalf of the Bay Mills Indian Community and the Sault Ste. Marie

28.

Tribe of Chippewa Indians, federally recognized Indian tribes, in connection with its administration of Indian affairs and in fulfillment of its fiduciary duties;

(b) 28 U.S.C. §1331, in that the matter in controversy involves the fishing rights of the plaintiff tribes, which in both instances have a value in excess of $10,000, exclusive of interests and costs, which are claimed to exist and to be secured under the Constitution, laws and treaties of the United States; and

(c) 28 U.S.C. §1362, in that this action is brought by Indian tribes with governing bodies duly recognized by the Secretary of the Interior alleging violations of their rights under the Constitution, laws and treaties of the United States.

(2) Each of the plaintiffs has standing to maintain the claims asserted in this action.

(3) An actual controversy exists between each of the plaintiffs on the one hand and the defendants on the other, as to the meaning of the treaties at issue herein and the existence of any tribal right to fish in the Michigan waters of the Great Lakes under those treaties.

(4) A declaratory judgment is properly sought pursuant to 28 U.S.C. §2201 and §2202, and this court may grant such relief.

(5) Venue is properly laid in this court under 28 U.S.C. §1391(b) in that all defendants reside within the Western District of Michigan.

(6) This trial has been limited to the issues identified for separate trial by this Court in its Order of July 30, 1976, which are:

(a) Whether the Indians reserved or retained fishing rights in the Great Lakes waters purportedly ceded by them under the Treaty of 1836 (7 Stat. 491);

(b) If the Indians reserved rights to fish in those waters, were those rights abrogated in whole or in part by the Treaty of 1855 (11 Stat. 621); and

(c) Assuming those reserved fishing rights were not abrogated, does the State possess any jurisdiction to regulate the exercise of those rights by treaty tribe members?

The United States of America is a party plaintiff which brought this suit in its own behalf and in behalf of plaintiff-intervenor Bay Mills Indian Community and Sault Ste. Marie Tribe of Chippewa Indians pursuant to its federal trust responsibility toward those tribes.

The Sault Ste. Marie Tribe of Chippewa Indians is a present-day tribal entity which, with respect to the matters which are the subject of this litigation, is a political successor in interest to the Indians who were party to the Treaty of 1836. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government. This tribe is organized pursuant to Section 16 of the Indian Reorganization Act, 25 U.S.C. §476. Its membership is determined in accordance with its Constitution and By-Laws, and the membership criteria require proof that the member is an Indian of the treaty area. (Tr. 1127-29; Ex. P-120.)

The Bay Mills Indian Community is a present-day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to the Indians who were party to the Treaty of 1836. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Bay Mills Reservation. This tribe is organized pursuant to the Indian Reorganization Act, 25 U.S.C. §476. Its membership is determined in accordance with its Constitution and By-Laws and the membership criteria require proof that the member is an Indian of the treaty area. (Tr. 1059-62; Ex. P-119.)

Defendants in this cause are the State of Michigan, its Natural Resources Commission, and certain officials of the Michigan Department of Natural Resources. The State of Michigan exercises

30.

regulatory power over the Great Lakes fishery within its borders. This power is exercised by and through defendant Natural Resources Commission, which is the state administrative agency with responsibility for regulating the Great Lakes fishery.

Defendant Howard Tanner is the Director of the Department of Natural Resources. As such he is the chief executive officer of the Department, with overall responsibility for administering the state's fisheries program and enforcing state fishing laws and regulations. John Scott[7/] is the Chief of the Fisheries Division of the Department, and as such is responsible for the administration of the state's fisheries program. Louis Gray[8/] is the Acting Chief of the Law Enforcement Division of the Department, and as such is responsible for the enforcement of state fishing laws and regulations. Together those officials are responsible for administering and enforcing the statutes, regulations, orders and policies governing the Great Lakes fishery which are challenged by plaintiffs in this case.

## III.

### WITNESSES

Plaintiffs' expert witness Helen Hornbeck Tanner is an ethnohistorian who has studied American Indian tribes for approximately thirty years, and who has concentrated for the last sixteen years on the study of Indian tribes of the Upper Great Lakes. She has testified as an expert witness in other cases involving issues of Indian culture and history. Her training and experience have been concentrated in analyzing and interpreting the history, culture and lifestyle of Upper Great Lakes Indian tribes. (Tr. 53-56, 66-74; Ex. P-130.)

Plaintiffs' expert witness Charles E. Cleland is an anthropologist specializing in archaeology and ethnozoology. He has spent the majority of his professional career in personally investigating and analyzing Upper Great Lakes Indian tribes and their relationship to the animal species found in that area in historical and prehistoric times. (Tr. 658-92; Ex. P-141.)

31.

Plaintiffs' expert witness James A. Clifton is an anthropologist and ethnohistorian who has specialized in the study of Indian tribes' responses to changes in their aboriginal culture brought about by European contact and dominance. He has spent more than half of his professional career in the particular study of Indian tribes of the Upper Great Lakes and the Ohio valley, including the removal policy and its implementation in that area. Further, he has extensive experience in the analysis of Algonquian personal names as written by Europeans and Americans in order to determine the pronunciation and identity of the named persons. The testimony showed that from his early training at the University of Chicago he did not follow the traditional subject matter breakdowns of American higher education but prepared to engage in the broad, reliable cultural investigations which were especially helpful to this court. The defendants' effort to impeach him for lack of compartmentalized academic certifications was comparable to an effort to disqualify Thomas Edison as an expert on electricity. (Tr. 2058-2109; Ex. P-177.)

Defendants' expert witness Phillip P. Mason is an historian and archivist whose academic training and research have concentrated on American social and economic history. The witness is not, by either training or experience, thoroughly familiar with the culture of the Upper Great Lakes Indians. His familiarity with the facts in this case rests primarily upon his work in editing the papers of Henry Schoolcraft and upon examination of documents since being retained by defendants. The limited perspective of his experience and his academic discipline, limited as they are to written accounts of the matters in issue here, prevented him from enlightening the court as to the total circumstances of the treaties. (Tr. 1214-25, 1237-47, 1252-55, D. Ex. 291.)

Defendants' witness Asa T. Wright is a fisheries biologist who has been employed by defendants in that capacity for most of his professional career. He has no educational background or experience in either history or anthropology, nor has he been trained in the research or analysis of historic documents. This lack of training, background and familiarity permitted him to offer opinions from his field of expertise which are at odds with the facts. (Tr. 1844-53, 1859-63, D. Ex. 313.)

32.

The oral testimony of the tribal witnesses educated in the history and customs of their people by tribal elders is found to be reasonable and credible factual data regarding certain relevant aspects of Indian life at and after treaty times.  (Tr. 130-32, 776-77, 1066-70, 1095-98, 1105-06, 1113-15, 1129-33.)

IV.

FINDINGS OF FACT

A.  The Indians of the Treaty Area.

While the term "Ottawa and Chippewa Nations" is used in the treaty and by this court in its opinion, the term is a non-Indian term used to describe Indian peoples of a similar culture, and was not used by the Indians themselves in describing their political organization.  The primary unit of political and economic organization was the band, which was frequently associated with a village. Political authority was weak; decisions were usually reached by consensus, and persons became "chiefs" for ad hoc purposes based upon skill.  From both a political and Indian cultural perspective, there was no such thing as an Ottawa-Chippewa tribe or nation.  (Tr. 100-02, 596, 772-76, 779-81.)

Four different but related tribes of Indians have been associated with the area later included within the State of Michigan -- the Ottawa, Chippewa (or Ojibway), Potawatomi and Wyandot (or Huron).  (Tr. 93.)  The Ottawa, Chippewa and Potawatomi had an early tradition of closeness and referred to themselves as the Three Fires. (Tr. 93.)  The Ottawa and Chippewa share a common language.  According to Chippewa tradition, they were located originally in the valley of the St. Lawrence River and migrated westward to the northern peninsula of Michigan somewhere near the year 1500.  Some Chippewa bands moved farther west to Wisconsin. (Tr. 93.) The Ottawas, which means "traders," were historically identified with Manitoulin Island in Lake Huron, which is a part of Canada.  (Tr. 94.)  The Ottawas too advanced westward and settled in the lower peninsula of Michigan with concentrations near the Straits of Mackinac.  (Tr. 94.)  The Wyandots lived in the area of present day Detroit since at least the early 1700's.  The Potawatomis of Michigan have been identified with the southern portion of the state.

33.

Of the four tribes discussed, only the Ottawa and Chippewa were signatories to the Treaty of 1836.  (Tr. 96.) The names of the bands and their locations are as follows:  In the Upper Peninsula, there was a band on Lake Superior opposite Grand Island which bore that name (Tr. 97); the eastern end of Whitefish Bay was the home of the Tahquamenon Bay band (Tr. 97); closer to Sault Ste. Marie, but still in Whitefish Bay, was the Waishkee Bay band (Tr. 123); the Sault Ste. Marie band was located in and around the city of the same name (Tr. 97); there was a Garden River band whose members spent much time in Canada and on Sugar Island located in the St. Mary's River (Tr. 98).  Also near the St. Mary's River in Lake Huron was the Drummond Island band. (7 Stat. 495.)  On the northern shore of Lake Michigan there was a band at the Les Cheneaux Islands (Tr. 98); there were bands at Big and Little Bay de Noc (Tr. 98); at the Beaver Islands (Tr. 98); at Little and Grand Traverse Bays (Tr. 98); and on Lake Huron there were bands at St. Ignace, Thunder Bay and Cheboygan.  (Tr. 98.) The southern portion of the ceded area was the home of the Grand River bands (Tr. 98).  Included among these bands were beneficiaries of the Treaty of Ghent, which ended the War of 1812. (Tr. 1060-61, 1064, 1128, 1179.)

The bands located within the area of cession were Ottawa, Chippewa and a mixture of both.  (Tr. 98.)  Henry Schoolcraft described the Indians of the Treaty area as "intercalated," a minerological term to describe stratified layers of rock.  (Tr. 99.) In other words, there were some distinct Ottawa groups, some distinct Chippewa groups and some groups consisting of both.  (Tr. 99.) It was not possible before 1836 to draw a precise line on a map showing distinct areas occupied exclusively by either Ottawa or Chippewa.  (Tr. 100.)  The Ottawa and Chippewa lived at peace together in their intercalated relationship.  (Tr. 94-100, 177, Ex. P. 17.)

The first significant American contact with the Indians of the treaty area probably began in 1820 with the Cass expedition. (Tr. 105.)  Lewis Cass led an expedition into the northern portion

34.

of the Lower Peninsula and the Upper Peninsula of Michigan at a time before its exploration by any other Americans. (Tr. 105.)  Before the Americans, the Indians of the treaty area had contact with the French, beginning in the middle seventeenth century, followed by the British. (Tr. 106.)

The life style of the Ottawa and Chippewa during the period leading up to the 1836 Treaty was cyclical in nature. Springtime activity was devoted to the making of maple sugar. Some-times the sugar was their only source of food during the harsh months of February and March.  (Tr. 111.)  In early May, the spring fishing season started and some agricultural activities were conducted, depending upon the location of a band.  (Tr. 111.)  The 140-day growing season line extends across Michigan at a point south of Traverse City. Thus, Indians north of that line were engaged in very limited agricultural pursuits.  (Tr. 111.)

Canoe making was another springtime activity because this was the best time of the year for removing the bark from birch trees. (Tr. 111.)  In the summer, food gathering occurred. In August, those crops available were harvested and shortly thereafter berries were gathered.  (Tr. 112.)

In the fall, there was another significant fishing season and substantial time was devoted to this activity.  (Tr. 112.)  Before departing for winter hunting stations, supplies were procured from traders which were often advanced against the furs the Indians expected to trap.  (Tr. 112.)  The Indians dealt with traders on the basis of barter.  (Tr. 112.)  They traded furs and fish for supplies the traders carried.  (Tr. 112-13.)  It was not until after the 1836 Treaty with its provisions for annuities that the Indians had cash available to use for obtaining supplies.  (Tr. 113.)

Indians were traders, of course, even before European contact.  (Tr. 106.)  As previously stated, the word "Ottawa" means "trader."  One of the principal trade centers in the treaty area was at the Straits of Mackinac.  (Tr. 106.)  Early trade routes extended from Montreal down to the Gulf of Mexico and were dependent upon the Great Lakes and the Mississippi River for transportation.  (Tr. 107.)

After European contact, trading by the Indians continued and expanded because the Indians were then able to obtain manufactured goods like iron kettles, hooks, axes, hatchets, needles, awls and firearms. (Tr. 109.)

B. Role of Fishing in the Lifestyle of the Indians of the Treaty Area.

The prehistoric and historic record of the Upper Great Lakes shows a long evolutionary sequence extending back at least 12,000 years during which fishing in the Great Lakes has been of increasing importance to the Indian people of the treaty area. The nature of the fishery resource has helped to shape the Indian culture of this area. Ecologically, the Upper Great Lakes area is a transitional area between the pine forest to the north and the hardwood forest to the south. It was low in many natural resources, including mammals. (Tr. 697-98.) The Great Lakes contained a productive fishery, however, which was characterized by Rostlund in his authoritative monograph on the aboriginal fisheries of North America as the "Inland Shore Fishing Complex." This fishery (shown on the map, Ex. P-143) lies generally north at a line demarcating 140 frost-free days. As prehistoric Indian culture evolved after the retreat of the glaciers, the Indians south of that line turned increasingly to agriculture as the main subsistence activity, while those north of the line turned increasingly to fishing. Though fish did not occur in the Great Lakes in the abundance that characterized other aboriginal fisheries, the fish did concentrate in relatively small areas in the spring and fall, primarily to spawn. This bi-modal cycle with its periods of concentration allowed the Indians to utilize the fishery resource. (Tr. 699-703.)

The earliest Indians of northern Michigan were big game hunters. The first evidence of Indian fishing in the Upper Great Lakes occurs in Late Archaic Period with archaeological sites dated between 2000 and 1000 B. C. Although the Indians of this period were primarily hunters, they began coming to the shores of the Great Lakes in the spring, when spring spawners such as sturgeon were gathered, and took fish by hook, gorge and spear. (Tr. 728-30.)

Even before this time, however, a new fishing technology was being developed and applied on the Atlantic coast which would eventually alter drastically the subsistence and lifestyle of the Indians of the Upper Great Lakes. Fishing nets originated on the Atlantic coast around 6000 B. C. and began spreading slowly westward through the process of cultural diffusion. By 2500 B. C. nets were in use on the Lower Great Lakes. From there they spread to the Upper Great Lakes, where they appeared during the Middle Woodland Period at around the time of the birth of Christ. (Tr. 744-45.) As with the earlier fishing techniques, which remained in use, nets were first applied to the spring fishery. However, during the Late Woodland Period (which immediately preceded European contact), the primary fishery shifted from the spring to the fall, when species such as lake trout and whitefish were taken. With this major change the fishery continued to become more important and more productive. (Tr. 739-40.)

The introduction of nets and the shift to the fall fishery led to the development of the Late Woodland Period settlement pattern which was encountered by the first Europeans to enter the Upper Great Lakes. In the spring the Indians would gather in large fishing villages of around 200 persons, where they would remain until the onset of winter. In winter the village would break up into small family groups which would disperse inland to hunt. When spring came the cycle would be renewed. The warm weather fishing villages were located on the shores of the Upper Great Lakes throughout the treaty area in locations with convenient access to productive fishing grounds. (Tr. 121-23, 236-38, 733-43, 760-63, 825-30.)

By the time of first European contact around 1650 A. D. fishing had come to be of enormous importance to the Upper Great Lakes Indians. All traditional fishing methods were still in use, but the most productive was gill netting from canoes. The Indians caught both spring- and fall-spawning species, including sturgeon, suckers, pike, whitefish and lake trout. (Tr. 130, 758-60.) Fish was a very crucial item in the Indian diet,comprising about 65% of the usable meat consumed in the warm months. (Tr. 768-71.) British

37.

and French settlements in the same area show significantly less dependence upon fish in the European diet. (Tr. 769-71.) At first contact, as in earlier and later times, fishing was the key to understanding the subsistence and settlement patterns of the Upper Great Lakes Indians.

A written record of the Indians of the treaty area began with the arrival of Europeans, though of course this record was not kept by the Indians, but by the newcomers encountering a strange culture. Nevertheless, these European and later, American observers amply documented the continued extreme importance of fishing to the Indians. Throughout the period from first contact to the 1830's missionaries, explorers, traders, and military and government officials wrote of the Indian gill net fishery in the Great Lakes and of its importance to the Indian inhabitants. For example, the Frenchman Joutel wrote this detailed description of Indian gill netting at the Straits of Mackinac in 1687 (Tr. 784-85):

> They are very skillful at fishing and the fishing
> is very good in those parts. There are fish of
> various kinds which they catch with nets, made
> with a very good mesh; and, although they only
> make them of ordinary sewing thread, they will never-
> the less stop fish weighing over ten pounds.
> They go as far as a league out into the lake to
> spread their nets, and to enable them to find them
> again, they leave marks, namely, certain pieces of
> cedar wood which they call "aquantiquants," which
> serve the same purpose as buoys or anchors. They
> have nets as long as 200 fathoms and about 2 feet
> deep. At the lower part of those nets they fasten
> stones to make them go to the bottom, and on the
> upper part they put pieces of cedar wood which the
> French people who were then at this place called
> floats. Such nets are spread in the water, like
> snares among crops, the fish being caught as they
> pass, like partridge and quails in snares. The
> nets are sometimes spread in a depth of more than
> 30 fathoms, and when bad weather comes, they are
> in danger of being lost.

Cadillac in 1695 described the same fishery as a "daily manna, which never fails." (Tr. 785.) Many similar accounts were placed on the record. (Tr. 105-08, 154, 113-20, 782-89, 791-94.) These historic and ethnographic materials were summarized by Rostlund in his authoritative work in this fashion (Tr. 796):

> [A] gill net fishery par excellence in native
> North America was found in this region of great
> interior lakes inhabited by the whitefish family;
> and it may be added that this great food resource
> could not have been adequately exploited had the
> gill net been unknown. * * * [A]s fishermen those
> people . . . were second to none in the aboriginal
> North America.

Long before European contact, the Indians of the Upper Great Lakes had participated in a far-flung trade and exchange network which extended at least as far south as the Gulf of Mexico. (Tr. 106-07; Ex. P-142.)  This was not, however, a proper commercial network, because commercial activity requires a market economy based upon a system of exchange using understood equivalents, and such a market economy was absent from the Upper Great Lakes in aboriginal times.  The Europeans brought with them their market economy, and with it an opportunity for the Indians to participate in an entirely new aspect of the fishery -- a commercial fishery.  (Tr. 797-99.)  From that time onward, the commercial fishery as well as the subsistence fishery was important to the Indians.  As is also indicated by the Indians' adoption of nets, the Indians' participation in commercial fishing as soon as this opportunity presented itself, reveals that the Indians' participation in the Great Lakes fishery was never static, but evolved as new opportunities became available.

As early as the middle of the 18th century Indians were participating in a commercial fishery by trading fish to the French at Michilimackinac.  (Ex. P-8, 9.)  Before the 19th century, however, the main Indian commercial activity was in the fur trade.  The fur trade was on the wane in the early 19th century.  By that time the Indians had become dependent upon manufactured trade goods and needed to continue their participation in the market economy.  They naturally turned to fish as a commodity which could produce a surplus for trade. (Tr. 124, 799-801.)  In the 1830's the fur companies began to turn to fish as well.  Foremost among them was the American Fur Co., which operated a fishing enterprise on Lake Superior from 1835 through the early 1840's.  Its principal fishing operations were west of the treaty area, but it did operate fishing stations at Whitefish Point and Grand Island.  (State Ex. 309.)  The American Fur Co. and its rivals developed a market for Upper Great Lakes fish and provided a ready outlet for the purchase of Indian fish and employment of Indian fishermen.  (Tr. 153-55, 437-43, 801-07.)  The fishermen for the American Fur Co. were largely Indians, who were the major producers of fish in Northern Lake Michigan, Northern Lake Huron and Lake Superior for the entire first

half of the nineteenth century.  (Tr. 281, 803-05, 807-09, 970, 973, 1559.)  Indian names do not appear in the employee roles of the American Fur Co., however, probably because Indians fished as sub-contractors.  (Tr. 1781-82.)

The evidence firmly establishes that the Indians of the treaty area were heavily engaged in commercial fishing at the time of the Treaty of 1836, both as employees and as independent fishermen.  The Blois <u>Gazeteer</u> of 1840 described one type of Indian participation in the commercial fishery (Tr. 804):

> At Mackinac, St. Mary's Strait, and Lake Superior, the fishermen are composed of French, Indians, and Mestizoes or half-breeds.  They are generally employed by capitalists and in Lake Superior by the American Fur Company, furnished with necessary outfits, and paid in such goods as their necessities may require.

Grace Lee Nute, in her article on the American Fur Co., which was relied on by the experts on both sides, also indicates that the American Fur Co. engaged Indian fishermen (State Ex. 309, P. 489), and a contract between an Indian fisherman and the company for fishing at Whitefish Point in 1837 was also introduced.  (State Ex. 226.) Indians also barrelled their own fish and sold them to traders (State Ex. 50), and traders contracted with intermediaries like Charles Butterfield to purchase fish from Indians.  (Ex. P-176.) Indian commercial fishing is evidenced in the treaty itself as well; under the sixth provision of Article Fourth, the Indians were to receive 100 barrels of salt and 500 fish barrels annually for twenty years.

Subsistence fishing continued to be tremendously important to the Indians of the treaty area in the 1830's.  The introduction of the market economy, the fur trade and the dependence of the Indians on trade goods did not alter the subsistence dependence of the Indians on the fishery; to the contrary, as Fitting reported in his "Patterns of Acculturation at the Straits of Mackinac," those factors actually <u>increased</u> and amplified the importance of fishing. (Tr. 766-67.)  Fish remained the staple of the Indian diet.  This factor was stressed by Lewis Cass, who in 1820 wrote that for the Indians of the treaty area fish "constitute a considerable part of the

food of all the Indians upon this extensive frontier.  Deprived of this means of support, they must absolutely perish."  (Tr. P-20 and 20A.)

In 1836 the settlement pattern of the Indians was the same as it had been for centuries, since the introduction of nets: in the warm months the Indians were concentrated in large fishing villages, and in the winter the villages broke up into family groups who went inland to hunt and trap.  The Indians were living on the shores of the Great Lakes throughout the treaty area adjacent to the productive fishing grounds.  (Tr. 97-100, 121-23, 236-38, 760-68, 825-30.).  This settlement pattern is shown in the Treaty of 1836 itself -- in the location of the reservations and of the chiefs listed in the schedule supplemental to Article Tenth.  It is also shown in Henry Schoolcraft's 1837 map and census (Ex. P-125; State Ex. 311) and in similar exhibits.  (State Ex. 63, 284.)

Despite this settlement pattern and the concentration of fishing in the areas of settlement, Indian fishing was not confined to these areas.  Indians of the treaty area, before and during treaty times, traveled extensively, and to the most remote areas of the Great Lakes.  (Tr. 127-29, 753-54.)  They had various sizes of canoes, adapted to different purposes, and used these in their travels.  (Tr. 469-71.)

In sum, in 1836, fishing in the waters of the Great Lakes for both subsistence and commercial purposes was extremely important to the Indians of the treaty area.  (Tr. 559, 807, 1762-3, 1773, 1785, 1788-89, 1792-99, 1801, 1886.)  Dr. Cleland described the Indian fishery in 1836 as a "vitally important resource for the survival of those people, and upon the advent of a commercial system, a *means by which* they made their principal living during a very difficult era" and as "the primary cornerstone of their cultural being."  (Tr. 831.)

Fishing remained enormously important to the Indians of the treaty area up to the Treaty of 1855.  This is amply *documented* by a variety of sources, from the Mormon leader Strang of Beaver Island to the official reports by Indian agents.  (Tr. 120-21, 156-63, 165-75, 808-09.)  Store ledgers  of local traders and merchants indicate that

41.

Indians were obtaining cash credits for barrels of fish on both a large and small scale. (Ex. P-166, 167, 168, 169, 170, 171, 172, 173, 174, 175.) A particularly fertile source for such evidence is the annual reports of the Commissioner of Indian Affairs to Congress, which include reports of local agents, sub-agents and the like. In the report for 1842, for instance, the Indian school at St. Ignace complains of poor attendance "caused by frequent absence of families from home, pursuing their calling as fishermen." (State Ex. 269, No. 36.) The report for 1844 states that an increased demand for fish has improved the economic position of Indian fishermen. (Ex. P-66.) In 1848 the Indians of the subagency at Sault Ste. Marie sold at least 1200 barels of fish. (Ex. P-72.) In 1852 Rev. Pitezel reported to the Commissioner (Ex. P-75):

> One means of their subsistence must be, from the nature of things, fishing. Lake Superior abounds with the finest fish. As long as they reside about the lake, this occupation must be to them what the farm is to the farmer, or the trade to the mechanic.

Similar statements occur in other reports of the period. (Ex. P-67, 69, 70, 71, 73, 77, 79.) In 1855 fishing in the Great Lakes remained the primary Indian subsistence activity and was perhaps an even more important commercial activity than at earlier times. (Tr. 169-70, 824-25, 831-32.)

Fishing remained an important activity of the Indians of the treaty area throughout the remainder of the 19th century. The Mackinac Agency reported to the Commissioner of Indian Affairs in 1861: "Those bands residing near the Great Lakes still depend, to a great extent, on fishing for a livelihood." (Ex. P-98, p. 5.) In 1860 -- the first year in which Indians were counted -- the census for northern Michigan showed that Indians and half-breeds dominated the commercial fishery. (Tr. 809-14; Ex. P-156.) Indian participation remained high and actually increased slightly by the 1880 census. (Tr. 815-18; Ex. P-157, 158.) Smith and Snell's survey of commercial fishing in the Great Lakes in 1885 also showed heavy Indian participation in the fishery of the northern Upper Great Lakes. (Tr. 818-23; Ex P-4.)

42.

Indian involvement in the Great Lakes fishery has continued through this century to the present day.  The Bay Mills Indian Community is a fishing community whose members have always fished for subsistence and commercial purposes.  As one member, Don Parish, put it:  "[F]ishing was our way of life, it was our livelihood, and fishing is our living, so we just had to fish."  (Tr. 1116.) Other tribal witnesses expressed similar sentiments.  (Tr. 1064-66, 1075-79, 1094-1102, 1129-37, 1160-64, 1184-86.)  Indian fishermen still live in the same areas and fish on the same fishing grounds as did their ancestors for centuries past.  (Tr. 1064-66, 1070-74, 1075-79, 1094-1102, 1113-16, 1138-39, 1161-62, 1171-73; Ex. P-129E, 135, 135A, 136, 136A, 136B, 136C, 136D.)  Indian fishing of today is remarkably like Indian fishing in 1836, and not much different from Indian fishing two millenia before that.

C.    Negotiation of the Treaty of 1836.

When the United States negotiated treaties with the Indians of the Territory of Michigan, it was bound by certain responsibilities imposed by previous Treaties and Laws.  The first of these is the Northwest Ordinance, discussed above.  Additionally, the United States undertook certain obligations towards the Indians, and restored all aboriginal rights, through the treaty which ended the War of 1812 with Great Britain, the Treaty of Ghent, signed on December 24, 1814 (8 Stat. 218).  This Treaty was referred to by Henry Clay, Senator from Kentucky, in a speech before the Senate on a Resolution concerning the Cherokee Indians in Georgia:

> He alluded to the negotiations between Great Britain and the United States, for the termination of the late war.  The hinge on which the negotiation turned, he had a distinct recollection, was the claim brought forward by the British negotiators in behalf of the Indians, and which they held as a sine qua non to the conclusion of a treaty of peace -- that the Indians, her allies, should be included in that treaty -- that they should have a permanent boundary assigned them, and that neither party should be at liberty to purchase the lands they set apart.  But the American commissioners would not listen to the proposition so much as to refer it to their Government, informing the British commissioners that, if they did so, they were sure it would meet with the most prompt rejection. They stated that the Indians lived under their own customs, and not the laws of the United States, and that they were placed under the protection of the United States alone, whether they were subjects or otherwise.

43.

> The correspondence finally terminated in a proposition
> to which the American commissioners assented, that the
> United States should do their best endeavors to restore
> peace with the Indians with which they were at war, and
> restore to them all the rights and privileges they
> enjoyed prior to the commencement of hostilities.
> And he declared it to be his belief that, if the
> Indian rights had not been thus declared, there would
> have been a prolongation of the war.

The Congressional Globe, February 3, 1835, at 195. It should be
noted that Henry Clay was a negotiator and signatory of the Treaty
of Ghent for the United States. 9/

A treaty can be analogized to a special kind of contract
and, like all contracts, the motivations of the parties can, and
often do, differ substantially. There were two principal parties
to the treaty -- the United States and the Indians -- but each party
represented a collection of individual interests. (Tr. 132.)

Some Indians in the treaty area were interested in
obtaining annuities like their neighbors the Potawatomies. (Tr. 133.)
Others wanted to protect their special, customary fishing grounds
from non-Indian fishermen. (Tr. 133.) Still others, in particular
the Indians in the Upper Peninsula, wanted to secure blacksmith ser-
vices to make and repair metal equipment, especially implements used
for fishing. (Tr. 133.)

Representatives of the United States also had differing
motivations for treating with the Indians. Henry Schoolcraft, prin-
cipal negotiator for the United States, was concerned about national
security and wanted to secure the Upper Peninsula against British
encroachment. (Tr. 134, 163-65.) As a mineralogist, Schoolcraft
believed there were valuable mineral deposits in the area, such as
salt and coal, and he wanted to be sure there would be no impediments
to the government's exploitation of these minerals if rumors of their
existence later proved accurate. (Tr. 134.) Traders, who played
a major role in the treaty process, were owed large sums by the
Indians and a treaty was the best way to be certain these debts were
paid. (Tr. 136.) There was also significant pressure for statehood
in the early 1830's. Early Michigan leaders, like Lewis Cass and
Senator Lucius Lyons, wanted to attract settlers to the area and in

order that there be available land, the Indians' title had to be extinguished. (Tr. 135, 1305.) Michigan territory in the early 1880's was not experiencing the same settlement rate as in Ohio, Indiana and Illinois. (Tr. 1294.) Reasons included the large Indian population in Michigan and settlers' fears of confrontation with them; a lack of roads to allow settlement of the interior; harsh weather conditions, and the like. (Tr. 1294.)

The dominant motive appears to have been to cheat the Indians out of their lands and reduce their holdings to the reservations. Thereby the Indians would be deprived of their natural habit of roaming the range of the lands on their summer and winter migrations. Thereby the Indians would be deprived of their lands before they realized their eventual value. The figure received for the land -- 12 1/2 - 13 cents per acre -- indicates that the Indians were cheated out of their land. (Tr. 210, 227, 275, 2134-36, 2380-84.)

By 1836, much of the Indians' aboriginal title to Michigan land had already been extinguished through various treaties. In 1807 the United States obtained the land around Detroit under the Treaty of Detroit. (Tr. 1295.) The United States acquired land in southwestern Michigan (below the Grand River) under the 1822 Treaty of Chicago. Under the Treaty with the Saginaw Chippewas in 1819, the United States acquired land in the eastern side of the Lower Peninsula up to Thunder Bay on Lake Huron. (Tr. 1295-96.)

In the fall of 1835, a small group of Indians (primarily Ottawas) made their way to Washington, D. C. to talk to government officials about a treaty. (Tr. 136.) The arrival of this group of chiefs with limited authority provided Schoolcraft with occasion to emulate Cass in the negotiation of the Treaty of Saginaw. Having found out about this group, Schoolcraft hastily departed for Washington, D. C., as well. (Tr. 139.) The United States seized upon these events as an opportunity to purchase lands from all the Indians of the area, and quickly expanded the scope of the purchase to include all of the area of Michigan eventually ceded in the Treaty of 1836. (Tr. 135-36, 606-07, 1315-26.) Schoolcraft aggressivley sought other chiefs in order to seize another tract of "that very valuable land." In early 1836, a larger delegation of Indians was escorted to

Washington, D. C. in order to negotiate a treaty.  (Tr. 139.)
Most of the escorts were traders from throughout the area of cession.
(Tr. 139.)  The escorts were arranged for, in most instances, by
Schoolcraft and other government officials.  (Tr. 139.)  Documents
support the notion that the presence of traders was essential if the
United States was to accomplish a cession of Indian lands.  (Tr. 140;
Ex. P-46 and 46A.)  Some traders, such as Robert Stuart, John Drew and
Edward Biddle, were associated with the American Fur Co. (Tr. 141-42.)

Dr. Helen Hornbeck Tanner, plaintiffs' principal ethno-
historic witness, testified that:

> Fur traders were widely used as mediators in
> effecting Indian treaties and were usually
> present, and in some cases, beneficiaries of
> the Treaty.  Their personal contacts with the
> Indian people were important, in one way, and
> their influence over them appears to have
> been considerable.
> 10/
(Tr. 142.)

In the spring of 1836, the process of selecting Indian
representatives and transporting them to Washington began.  The
selection of the traders who accompanied the Indians was initiated
and controlled largely by the United States, acting through Henry
Schoolcraft and his agents.  Schoolcraft sent for his relatives
Waishkee and his son Waw-be-geeg to represent some of the Upper Penin-
sula bands.  (Tr. 142.)  At this same time, a power of sale was
being circulated amongst the Indians for their signatures (marks) to
be affixed.  This power of sale (Ex. P-47 and 47A) was sent to Washing-
ton and arrived while the treaty negotiations were taking place.  (Tr. 143.)
Indian delegates came from Muskegon, Grand River, Michilimackinac,
Sault Ste. Marie, L'Arbre Croche  and Grand Traverse. One group from
Grand River did not come under trader escort and a trader was summoned
to attend the negotiations.  While in Washington the Indian delegates
were placed in charge of Rix Robinson, Robert Stewart, John Drew. H. A.
Lavake, William Lasley, George Moran, Lewis Moran, Augustus Hamelin,
and Leonard Slater.  All were traders except Hamelin, an educated
half-breed, and Slater, a missionary.  (Tr. 96, 139-43, 145-47,177-79,
1326-30, 1334-47; Ex. P-15, 46, 47.)  The United States paid all of

the expenses incurred by the Indians in order to transport them to Washington (Tr. 147), including providing them with clothes and other gifts.  Once in Washington, the Indians were housed and fed at the expense of the government.

Lewis Cass was the Secretary of War in President Jackson's administration, and, being a military man, he knew full well that "Andrew Jackson's 'requests' were in fact orders," when it came to Indian matters. 11/    This attitude was in turn conveyed to Henry Schoolcraft in a letter authorizing him to treat with the Indians. (Ex. P-53.)  Cass' instructions directed Schoolcraft to obtain a cession of Indian land, in part to facilitate the advancement of non-Indian settlers.  He was told not to allow individual reservations but if reservations were provided for, the Indians should hold them in common until later ceded to the United States.  (Tr. 149.)  Other instructions required him to determine that the Indian representatives were genuine and authorized to cede land and to obtain as large a cession as possible.  No claims for debts were to be settled in the treaty itself unless the Indians insisted upon it.  Annuities of twenty years duration were to be provided.  (Tr. 148-50, 1345-49; Ex. P. 53, D. Ex. 16.)

Schoolcraft made an opening statement to the assembled group in which he explained why the treaty was to be negotiated with both the Ottawa and Chippewa rather than negotiating two separate treaties.  Schoolcraft stated the President of the United States believed the Ottawa and Chippewa to be "brother tribes."  Article First of the treaty refers to "the Ottawa and Chippewa nations of Indians."  However, the Indians did not think of themselves as "nations" nor were they organized politically at the tribal level. (Tr. 773.)  The term "nation" was coined by non-Indians to facilitate treating with the Indians.  (Tr. 101.)  Treaties, after all, were used to memorialize agreements between foreign countries.  The analogue was applied to agreements between the United States and Indians until 1871 when it was outlawed by Congress. 12/    The Indians usually referred to themselves as "the People."  (Tr. 101.)

The treaty minutes also reflect that some Ottawa bands from the Lower Peninsula did not want to sell their land while the Indians in the Upper Peninsula were more willing to sell (Tr. 178.) The treaty commissioners tried to use the Chippewa's willingness to sell to shame the Ottawas into agreeing to a cession. (Tr. 178-79; Ex. P-17A, pp. 10-11.)

Interpreters, many of whom were inefficient, were always required during treaty negotiations because the Indians, with only minor exceptions, did not speak English. Of course, they could not read or write English either and those signing the treaty did so with a mark and not a signature. (Tr. 180.) In 1838 Schoolcraft commented on the incompetence of interpreters as follows: "The department is very much in the hands of ignorant and immoral inter- preters, who frequently misconceive the point to be interpreted. Could we raise up a set of educated and moral men for this duty, the depart- ment would stand on high grounds." Personal Memoirs, p. 583, cited in Schmeckier, the Office of Indian Affairs, Its History, Activities and Organization (1927), p. 59.

The Indians referred to the treaty commissioners as "Father" which was a sign of respect. (Tr. 187.) They saw human relations in very personal terms (Tr. 187), and the term "Father" also signified the Indians' understanding that the treaty commissioners were authority figures. The Indians expected them to look out for Indian interests, as they were obliged to do as trustees for the Indians.

The 1836 treaty minutes also reveal an important matter which must not be overlooked. Discussions at the large sessions were concerned with generalities and concepts only. Each band designated its escort to sit down and formulate the actual treaty language and provisions out of the presence of the Indians. The escorts, with the sole exception of Augustus Hamelin, were all traders with a sub- stantial pecuniary interest in seeing that the treaty negotiations were consummated. (Ex. P-17A, pp. 13-14; Tr. 183-87.) Unfortunately, there are no records reflecting the nature of these closed door drafting sessions. Dr. Tanner testified:

48.

> . . . but it does appear that the Treaty was
> actually formulated when the traders got together.
> There is very little discussion in these Treaty
> Minutes, if any, about the actual provisions of the
> Treaty that was later presented to the Indian people,
> but there is no record of what transpired when the
> group of Indian traders were together in closed
> session and emerged with 13 articles of a Treaty
> that was presented to the Indians to sign.

(Tr. 183-84.)

The language in the Treaty of 1836 is the language of Henry Schoolcraft.  (Tr. 183, 1367.)  From an examination of the transcript it can be determined that he was a subtle, invidious and incidious negotiator who convinced the Indians to trust him in these dealings.[13]  (Ex. P-17.)  In shaming the reluctant Chippewas, Schoolcraft evidenced his distain for the Indians' intentions and interests.  The Ottawas declared:  "We have decided we don't want to sell our land at all."  To this Schoolcraft responded:  "Well all right. I will deal with the Chippewa, and then they will go home with presents, and you will go home with nothing and you will all be ashamed."  (Tr. 179.) Quite simply, he relied upon fraud and duress.  (Tr. 493-96.)

Judging from the amount of territory which they ceded to the United States, and the paltry sum which they received in exchange,[14] it is probable that when the Ottawa and Chippewa Indian Chiefs signed the Treaty of 1836, they were under the influence of alcohol and did not know what they were doing.  Accounts by Henry Schoolcraft and others indicate that these Indians were no longer rational when the whites made alcohol available to them.

> It is the use of ardent spirits, however (an article
> which is freely supplied), that constitutes their
> chief bane, converting that which would otherwise be
> a season of plenty and good humor, into a gloomy and
> revolting scene of riot and drunkenness, followed not
> infrequently by disease, and sometimes by death.  This
> is not the whole . . . of the evil.  The facility with
> which the Indians part with their money becomes the
> secret motive of their being advised to call on the
> agents of the Government for their vested funds; and
> they thus become dupes of the artful and designing.
> (D. Ex. 252, p. 347.)  (Emphasis supplied.)

> Could ardent spirits be kept from these unfortunate
> beings, it would be unnecessary ever to remove them
> . . . .  A considerable number have joined that church,
> and appear to walk orderly, but some of the heathen
> portion of these bands are much degraded by the baneful
> effects of whiskey.  They [sic.] American Fur Company,
> however, and some other respectable traders in that
> vicinity, have now determined to deal no  more in

> spirituous liquors themselves, and are disposed to give every aid they can to the Government to put a stop to this nefarious traffic.  (D. Ex. 269, p. 408.)

> Sir:  I have the honor to report to you that the condition of the Indians at this sub-agency has been better than during the past year.  There have been few instances of intoxication, and a greater disposition to provide for their families was evinced by many.  (D. Ex. 269, p. 411.)

In The Oxford History of American People, Morison describes the common practice at treaty signings:  "The assent of the Indians was often merely nominal: federal commissioners bribed important chiefs and, if necessary, got them drunk enough to sign anything." (At 446.)  This practice was not foreign to Michigan treaty negotiations nor to the principals responsible for the 1836 treaty.  Lewis Cass, Secretary of War in 1836, negotiated the Treaty of Saginaw in 1819 and supplied 5 barrels of whiskey to the Indians on the day of the signing.  F. Dustin, The Saginaw Treaty of 1819, 17 (1919).  One of the traders representing the Indians in Washington in 1836 had engaged in extensive liquor trade with the treaty area Indians, claiming approximately $16,000 debt for liquor at the time.  (Tr. 1621-23.) This man, Drew, and Rix Robinson, another of the escorts, were identified by Robert Stewart as the two men who were necessary for the success of the treaty negotiations.  (Tr. 142.)  In turn, Robert Stewart and Rix Robinson claimed debts for liquor on their own behalf or on behalf of the American Fur Co.  (D. Ex. 312, pp. 40, 48, 50, 55.) It is unlikely the long-standing practice of supplying liquor to Indians stopped abruptly when these traders arrived in Washington, motivated as they were by the prospect of collecting thousands of dollars of purported debts created over a period of years.  Use of liquor was one vehicle of the peonage they exercised over the Indians.

The convergence of such circumstances makes it reasonable to conclude that fueling the Indians with alcohol provided by traders was the final weapon Schoolcraft depended upon to effect the government purpose of evicting the Indians from their lands and to conquer the resistance of will he met when he sought cession of more than scattered parcels.  Schoolcraft was, in the words of Dr. Tanner, prepared to use

any means to achieve a treaty.  (Tr. 494.)  Besides using distortion, extortion and duress, he held out the carrot of silver and whiskey, relying on traders to supply whiskey during negotiations.  The Indians' assent to the treaty was, accordingly, merely nominal.

The negotiation of this treaty is rent through with deception, manipulation and double dealing.  The traders who accompanied the Indians to Washington were creditors for the Indians and would greatly profit from any provision which set aside money for the payment of Indian debts.  (Tr. 262, 1731-32.)  Some of these traders were dishonest.  The fact that most of the traders who accompanied the Indians received money in payment of Indian debts from the treaty indicates that the Indians were improperly represented at the treaty negotiations, that the treaty does not contain their wishes or represent their best interests, and that much of the payment received by the Indians for their land was dishonestly and improperly dissipated in the payment of Indian debts.  (Tr. 1616-33.)  In addition, the traders, and Schoolcraft, struck upon the device of granting their own Indian families reservations in order to receive compensation of over $48,000.  (Treaty of 1836, Article Ninth.)  The American Fur Co. was a major creditor to the Indians of the area; it had a substantial interest in the form of the final treaty; it was in a position to have intimate knowledge of the treaty negotiations and influence those negotiations.  The daughter of one of the interpreters at the treaty negotiations, John Holliday, wrote frequently, and often daily, to Ramsay Crooks, the President of the American Fur Co.  Her father was also one of the seven partners of that company.  The court takes this as evidence of improper influence over the Indians, and an indication that the terms of the Treaty of 1836 do not necessarily contain the intent or represent the true desires and agreements of the Indians. (Tr. 1333, 1340-45, 1633-36.)

Henry Schoolcraft led the treaty negotiations even though he had a conflict of interest.  In its final form the treaty provided $53,000 to relatives of Henry Schoolcraft in payments of Indian debts. Some of his relatives were traders, a fact which surely influenced him in his negotiation of the provisions of the treaty. (Tr. 1636-41.)

Further, some of Schoolcraft's relatives received payments under Article Ninth of the Treaty. It provides for payment of monies to half-breeds. Knowledge that the passage of a treaty would greatly benefit his family was inconsistent with Schoolcraft's involvement in the negotiations. (Tr. 1642-49.)

Later on in this opinion I will deal with the Indians' understanding of the treaty in greater depth. It is sufficient to note here that they apparently were led to believe that they were to receive land, not that they were to cede it away. (Tr. 321-23.) See, Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 553 (1832). It is apparent from the testimony of the witnesses and the documentary evidence that the Indians of this area were devoted to a way of life which included, and was premised upon, hunting and fishing. It is inconceivable that they would have given up that way of life and signed a treaty which they understood to make that way of life impossible. 15/ (Tr. 267-75, 831-32.)

D. Provisions of the Treaty of 1836.

The precise boundary of the cession was not known in 1836 because most of the land area was uninhabited and had not been thoroughly explored. At the time of the treaty no one knew the shape of the northwestern side of Lake Michigan. (Tr. 191.) Some interior areas near Grand and Little Traverse Bays were not surveyed until 1855. (Tr. 191.) In Article First of the Treaty of 1836 the Indians of the treaty area ceded to the United States the following area:

> Beginning at the mouth of the Grand River of Lake Michigan on the north bank thereof, and following up the same to the line called for, in the first article of the treaty of Chicago of the 29th of August 1821, thence, in a direct line, to the head of Thunder-bay river, thence with the line established by the treaty of Saginaw of the 24th of September 1819, to the mouth of said river, thence northeast to the boundary line in Lake Huron between the United States and the British province of Upper Canada, then northwestwardly, following the said line, as established by the commissioners acting under the treaty of Ghent, through the straits, and river St. Mary's to a point in Lake Superior north of the mouth of Gitchy Seebing, or Chocolate river, thence south to the mouth of said river and up its channel to the source thereof, thence in a direct line to

> the head of the Skonawba river of Green bay, thence down the south bank of said river to its mouth, thence, in a direct line, through the ship channel into Green bay, to the outer part thereof, thence south to a point in Lake Michigan west of the north cape, or entrance of Grand river, and thence east to the place of beginning, at the cape aforesaid, comprehending all the lands and islands, within these limits, not hereinafter reserved.

This area includes the waters of the Great Lakes and the connecting waterway (St. Mary's River) out to the international or state borders. The area is shown on a map attached as Appendix 1. (7 Stat. 491; Tr. 188-93; Ex. P-129, 129A.)

In Articles Second and Third of the Treaty of 1836 fourteen reservations in common were retained in the following locations: Little Traverse Bay, Grand Traverse Bay, on or north of the Pere Marquette River, on the Cheboygan River, on Thunder Bay, on the north shore of Lake Michigan between Point au Barbe and the Mille Coquin River, the Beaver Islands, Round Island in the Straits of Mackinac, the Les Cheneaux Islands and land in the Upper Peninsula adjacent thereto, Sugar Island, at the Little Rapids of the St. Mary's River, a large tract on Whitefish Bay of Lake Superior and westward in the Upper Peninsula, Grand Island and at the head of Bay Noc. These reservations are shown on the map attached hereto as Appendix 1. In addition, the reserve at the St. Mary's Rapids retained in the Treaty of 1820 was continued. In accordance with the treaty instructions, the reservations in the original treaty were of unlimited duration. (7 Stat. 491; Tr. 148-49, 193-199, 246-47, 250-51, 610-12; Ex. P-41, 53, 125, 129B; D. Ex. 311.)

Two of the reservations retained by the Indians in the Treaty of 1836 specifically include the fishing grounds in the Great Lakes adjacent to the land reserve: The reserve on the north shore of Lake Michigan and the reserve on Whitefish Bay of Lake Superior. These two locations were the only fishing locations where friction had developed between Indians and whites before the Treaty of 1836. (7 Stat. 491; Tr. 236-45; Ex. P-21, 23, 27, 37.)

The reserved area described in Article Third at Whitefish Bay includes within it a portion of the Bay. There is a metes and bounds description of the land area followed by the words: " . . . including the small islands and fishing grounds in front of this reservation." Schoolcraft's 1837 map (Ex. P-125) shows a

longitudinal line extending out into Whitefish Bay.  Dr. Tanner

testified:

> It is a matter of some interest, I conclude,
> that there is discernible on this map a line
> from the mouth of the Tacquimenon [sic.] River
> out to the International Border that would en-
> compass the small islands and fishing grounds
> in front of the reservation that are referred
> to in the language of the Treaty.

(Tr. 197.)

> Q:  [By Mr. Greene]  So, in summary, then, that
> line on the Schoolcraft map adjacent to the land
> reserve at Whitefish Bay goes out into the water
> and includes some portion of Whitefish Bay, is
> that correct?
>
> A:  [By Dr. Tanner]  Yes, it does.

(Tr. 198.)

As originally negotiated there was no limitation on the

period of time the land reserves might remain Indian lands.  (Tr. 199.)

Subsequent to the treaty negotiations in March, 1836, the United States

Senate unilaterally added the following language to both Articles

Second and Third:

> Article Two, line two, after the word, "tracts,"
> insert the following words, to wit:  "for the term
> of five years from the date of the ratification of
> this treaty, and no longer;" unless the United
> States grant them permission to remain on said
> lands for a longer period.
>
> Article Three, after the word "tracts," in the second
> line, insert the following words, to-wit:
>
> "For the term of five years from the date of the
> ratification of this treaty, and no longer,
> unless the United States grant them permission
> to remain on said lands for a longer period."

(7. Stat. 497.)

In July, 1836, the Indians were summoned to Mackinac in

order to obtain their assent to the Senate's unilateral amendment.

(Tr. 202; Ex. P-57 and 57A.)  On July 18, 1836, Henry Schoolcraft

wrote a cover letter to Lewis Cass, Secretary of War, over the

Indians' assent to the unilateral Senate amendments.  In that letter

he said:

> Sir: I have the honor herein to enclose to you articles of assent to the Senate's amendments of the Treaty of the 28th of March last, concluded in a general council of the Chippewa and Ottawa chiefs convened at this agency on the 12th 14th 15th and 16th instant. The cession of the reservations at the expiration of five years has been strenuously opposed by a part of the chiefs, but was finally yielded, on a consideration of the practical operation of the provision contained in the 13th article of the treaty, which seemed to them indefinitely the right of hunting on the lands ceded, with the other usual privileges of occupancy until the land is required for settlement.

(Ex. P-18 and P-18A, p. 2.) There was considerable Indian opposition to the insertion of the language adopted by the Senate. (Tr. 204.) However, the Indians apparently assented to the Senate amendment, because even though the language was in part motivated by those persons wanting to remove the Indians from Michigan, it appears the Indians' fears were assuaged by Schoolcraft's explanation of Article Thirteenth. Thus, despite the fact that the land reservations might not last indefinitely after the Senate amendment, the right to hunt, fish and gather the fruits from all the ceded territory (not just the reservations) would last indefinitely. (See Ex. P-18A, p. 2.) In Indian tradition it is said that the Indians retained the right to fish and hunt "as long as the sun rose and the waters flowed." (Tr. 1071.)

Dr. James A. Clifton, plaintiffs' rebuttal expert on removal treaties, testified that although he had read virtually every removal treaty, he had not recalled seeing the particular language of the Senate amendment ever before. (Tr. 2267.) Relying on Schoolcraft's memoirs (State Ex. 304, p. 538), Clifton testified:

> Now his [Schoolcraft's] explanation, as nearly as I can make out what is going on here, is that Senator Hugh White [Chairman of the Indian Committee in the Senate] for personal political reasons, asserted these alterations in these Treaties, and not for any other reason . . . .
>
> These alterations were inserted in the Treaty, not because of any practical consideration or because of any need for land in Michigan, but for internal political reasons involving the Senator and President Jackson.

(Tr. 2271.)

Two of the nine tracts of land reserved by the Indians in Article Third explicitly include fishing grounds and small islands adjacent thereto -- the reserve on Whitefish Bay and two tracts of land between Point-au-Barbe and the Mille Coquin River on the north shore of Lake Michigan near the Straits of Mackinac. Dr. Tanner testified that this explicit reference to fishing grounds underscored

the importance of these fishing areas to the Indians.    (Tr. 237.)

Regarding the Lake Michigan fishing grounds, there had been a controversy in 1832 resulting from an attempt by two white traders, Edward Biddle and John Drew, to gain exclusive rights to fish there.  (See Ex. P-21 and P-21A; Tr. 238.)  The Indians were angry because Messrs. Biddle and Drew were dealing with a spurious chief and represented to the United States that the Indians would not object to the grant to them of an exclusive right to fish in this highly prized area.  Some fourteen canoes filled with Indians came to Mackinac to protest.  They were angry that Biddle and Drew claimed they had an exclusive right to fish in this area because Nabanoi, the spurious chief, did not have the authority to confer such a right on anyone:

> [T]he Indians were fully aware that the traders
> were to blame, making the application and trusted
> that their Great Father would not allow this to take
> place.

(Ex. P-23, 23A; Tr. 241; see also Ex. P-25, 25A, 27, 27A.)

A similar conflict arose in Whitefish Bay when Messrs. Ashmon and Abbott requested a permit to fish there in 1835.  They too were refused such a permit.  (Ex. P.37, 37A.)  This incident explains why the fishing grounds at Whitefish Bay were mentioned explicitly and included within the land reserved there.  (Tr. 245.)

Specific fishing grounds were not explicitly mentioned adjacent to the other Article Second and Third reserves because there were no similar controversies with traders  in these other locations.  But the location of all these reserves reflected the Indians' choice or preference and their dependence on fishing.  (Tr. 246.)  Dr. Tanner stated:

> I think I remarked earlier that all of these
> reserved areas are adjacent to or have access
> to very well-recognized fishing grounds, areas that
> I referred to this morning as being reported as
> good  fishing grounds by Strang and Baraga and
> other people later on in the 19th century.

(Tr. 246.)

The record discloses, therefore, that the United States was willing to give the Indians exclusive fishing rights in both locations where the Indians were aware that the white men were

likely to fish competitively.  The United States made no provision
to secure the Indians' fishing rights in any other areas, even
though it was aware that white men wanted the right to fish and it
was represented by traders who were parties to the original conflicts
over fishing rights.  It is likely that this negotiation gave the Indians
the impression, and was intended by the United States to give them the
impression, that the United States did not seek the fishing rights of
the Indians.  The United States was apparently unconcerned about
whether it acquired these rights from the Indians. 16/

The United States knew how to put specific language limiting
rights of hunting and fishing into an Indian treaty when it wished to
secure such rights from the Indians.  An example is found in the lan-
guage of the Treaty with the Winnebago, signed September 15, 1832
(7 Stat. 370; Ex. P-187, Article XI):

> In order to prevent misapprehensions that might
> disturb peace and friendship between the parties
> to this treaty, it is expressly understood that
> no band or party of Winnebagoes shall reside,
> plant, fish, or hunt after the first of June
> next, on any portion of the country herein ceded
> to the United States.

(Tr. 2238.)

The willingness of the United States to give exclusive fishing
rights in the areas prized by the Indians and the apparent lack of any
concern about Indian fishing rights in other areas destroys any infer-
ence which might otherwise be derived from the fact that the area of
concession included water area.  It is most likely that, recognizing
the Indians' dependence upon fishing, as noted above, the United States
intended that the Indians rely upon their right to fish to provide for
themselves while in Michigan.

Turning to Article Fourth, it provides for the payment of
annuities to the Indians for a twenty-year period.  It also provides
for education, books, teachers and schoolhouses for the Indians for
a like period.  Money was provided to purchase tools, equipment, medicine,
the services of a physician and tobacco.  Of particular importance is
the language in Article Fourth providing for " . . . one hundred barrels
of salt, and five hundred fish barrels, annually, for twenty years."
Dr. Tanner testified that the government provided barrels and salt so
the Indians could participate in the commercial marketing of fish:

> The Indians are packing fish into barrels and salting them down, because they're transported in barrels.

(Tr. 253.)

Article Fourth also provided $150,000 to the Indians, but only after they assented to the Senate's unilateral amendment limiting the land reserves to five years ". . . and no longer, unless the United States grant them permission to remain on said lands for a longer period." (Tr. 255.)

Article Fifth provided for the payment of the Indians' debts to traders. This, of course, ". . . is probably one of the principal interests the trading people have in the Treaty process." (Tr. 256.)

Article Sixth provided for payments to the half-breed relatives of the Ottawa and Chippewa. (Tr. 256-58.) The Indians had much concern for their half-breed relations and thought of them as part of their family. (Tr. 258.)

Article Seventh provided, _inter alia_, for blacksmith shops to be maintained for the Indians. This was of particular importance to them because the blacksmiths could make and repair metal goods used by the Indians to catch fish. These goods included metal hooks, ice cutters and other fishing implements. (Tr. 260.)

Article Eighth deals with the subject of removal and will be treated in a separate section of this opinion.

Article Ninth provided for land and monies to be given to certain individuals such as Leonard Slater, John Drew, Edward Biddle, John Holiday and Henry Levake, to mention a few. Many of these persons who were singled out for special gifts under the treaty were traders who escorted the Indians to Washington, D. C. and represented the Indians at the closed door sessions when the treaty articles were actually written. (Tr. 262.)

Article Tenth provided for the payment of monies to the Chiefs. This was a common practice in treaty negotiations. Further, the Indians, as a part of their culture and traditions, expected to exchange gifts after an important agreement like a treaty was negotiated. (Tr. 263.)

Article Eleventh provided for small annuities to two aged and infirm, but highly respected, old chiefs. (Tr. 263.)

In Article Twelfth the United States agreed to pay the expenses the Indians incurred traveling from their homes to Washington (and back) in order to participate in the treaty making process.

Article Thirteenth, an extremely important section of the treaty, provides:

> The Indians stipulate for the right of hunting
> on the lands ceded, with the other usual privi-
> leges of occupancy, until the land is required
> for settlement.

Dr. Tanner testified that "the usual privileges of occupancy can be interpreted to mean living in the way that the Indian people have always been in the habit of living." (Tr. 264.)

> I think that this particular type of a provision
> was of considerable importance to Indian people.
> It usually winds up a treaty and is given as kind
> of assurance to them that they can continue to live
> in the manner that they have been accustomed to, and
> have no fear that their life will be disrupted.

(Tr. 265.) Further, Dr. Tanner testified that the term "usual privileges of occupancy" includes the use of all natural resources for economic and ceremonial purposes and for travel. (Tr. 265.) It includes hunting, fishing, gathering berries, collecting grains, gathering rush for mats and the like. (Tr. 266.) Dr. Clifton's testimony corroborates Dr. Tanner's on the meaning of the term "usual privileges of occupancy." The Indians could ". . . make use of natural resources as they were accustomed to doing or had been doing." (Tr. 2278.)

Article Thirteenth was extremely important to the Indians for several reasons. (Tr. 274; see also Ex. P-44, 44A.) First, as previously stated, it was explained to the Indians to mean that their usual way of life would not change after the treaty was consummated:

> [Article Thirteenth] was to indicate and reassure
> Indian people that they could continue living the
> way they had been living.

(Tr. 278.)

Second, the Indians were very reluctant to cede all of their land and water.  Some wanted to convey only small parcels to the United States.  However, the United States wanted an extensive cession, and got what it wanted by use of "any means."  In a letter dated February 27, 1837, from Schoolcraft to his superior in Washington, the Indians' reluctance to enter into a large cession is discussed.  (D. Ex. 32 and 32A.)  The United States wanted to extinguish as much Indian title as possible.  Treaty negotiations were time consuming and costly.  The United States knew that the price they would pay for cessions in the future would be increasing over time. Article Thirteenth, therefore, was used to persuade the Indians to cede much of their Michigan land and waters on the theory that so long as the Indians were allowed to use all of the natural resources of the land and water, a large cession would not adversely affect them. (Tr. 270.)

Furthermore, Schoolcraft stated (State Ex. 32A) that not only did he explain that Article Thirteenth would allow the Indians to continue to use all of the land and water resources of the ceded area, but that since much of the ceded land was uninviting to agriculturalists, it would not be settled and the Indians could use the resources of this land _indefinitely_.  Several months earlier, in July 1836, Schoolcraft wrote a cover letter to Lewis Cass over the Indians' assent to the unilateral Senate amendment limiting their land reserves to five years unless the United States allowed them to remain longer and said that the reasons the Indians agreed to this change was because of:

> . . . the practical operation of the provision contained in the 13th article of the treaty, _which seemed to them indefinitely the right of hunting on the lands ceded_, with the other usual privileges of occupancy until the land is required for settlement.

(Ex. P-18A, p. 2; emphasis supplied.)  <u>See</u> <u>also</u> Tr. 275.

Dr. Clifton testified concerning the Indians' understanding of the term "until the land is required for settlement" and how that concept might have been explained to them._17/_  He said:

60.

I would emphasize that that specifies not a date,
not a season of the year, but a condition which is
coming. And it is coming -- it came gradually,
obviously, over the course of a long, a large
number of years. And it is very ambiguous as
to any idea by terminal point when that condition
might end.

* * *

There will also be probably some land that is not
occupied and not used and unsettled.

(Tr. 2278-79.)

With regard to the use of the term "indefinitely," which

Schoolcraft used to explain to the Indians how long their usual

privileges of occupancy might last, Dr. Clifton testified;

Now I don't know that there is any such phrasing as
"indefinitely" in either of these dialects of the
language that the people spoke. I doubt that there
is anything like it, just as we would not anticipate
to find much other correspondence between the vocabu-
lary of English and the vocabulary of this language.
The languages were constructed on very different
principles, so I wouldn't think that the Chippewa
-- the interpreter would be able to reach for in
his head and get an equivalent. . . . He might
wind up saying something like "a very, very, very
long time, many winters, or many, many seasons,"
or something to this effect, conveying the idea
that it was a long period of time.

(Tr. 2283.)

Even though Article Thirteenth reserved the right in the

Indians to hunt, fish, gather fruits of the land and use all land

and water resources, it also contains words of limitation -- ". . .

until the land is required for settlement." Dr. Tanner testified

this meant to the Indians that they could use all ceded land unless

particular parcels were occupied by non-Indian settlers:

Q: [By Mr. Greene] Well, now when might --
assuming for the moment that the language of
Article Thirteenth would have some impact on the
Indians in terms of their right to continue to
use certain lands, when do you suppose that impact
would occur? How does this Article Thirteenth --
how is it going to limit, if at all, the activities
of the Indians?

A: [By Dr. Tanner] Well, I think from taking the
statements that we have, that are translations from
the Indian people themselves, it would be until the
lands were occupied, until there appeared to be some
population pressure that would indicate a need for
that land. And all in all, I would say that some
significant population density would have to be
achieved throughout the ceded area before it would

> become apparent to Indian people that their lands
> were needed or they were required for use by any
> other people.
>
> * * *
>
> Indian people, as you know, are accommodating
> people, and if their life was not interfered
> with, they would probably not undertake to make an
> objection.  I think that the only general state-
> ment that I could make, Mr. Greene, is the one
> that I have made, that there would have to be
> some apparent density population for the need
> to use the land before there was any require-
> ment to take up the land.

(Tr. 275-76.)

Dr. Clifton's testimony on this subject was similar to

Dr. Tanner's.  He stated:

> They would see -- the Chippewa -- I will say this
> on general terms -- all of the Indians in the Great
> Lakes area saw land, and what was ever on the land,
> or streams, what was ever in the streams, that were
> not occupied and used by someone else, as open to
> their use.
>
> And this is a very ancient way of thinking, not
> easily and quickly changed by any such document
> as this.

(Tr. 2285.)

Article Thirteenth was paraphrased in a variety of ways

before the treaty was negotiated, always in the context of hunting

or occupying the land:

"the right to hunt and live on the tract, until it is

required," Henry Schoolcraft, September 23, 1835 ( Ex. P-41).

"a defined right of hunting on the lands sold," Henry

Schoolcraft, November 3, 1835 (D. Ex. 12).

"a full right to hunt on the ceded lands, as long as they

are unoccupied," William Johnston (Ex. P-43), and John Clitz (Ex. P-44),

both on November 17, 1835.

"the privilege of hunting upon the land, and of residing upon

it, until it is surveyed and sold by the government," agreement

of the Ottawa and Chippewa chiefs to cede lands, December 29, 1835

(D. Ex. 290).

"the usual privileges of residing and hunting on the lands

sold till they are wanted," Henry Schoolcraft, treaty minutes,

March 15, 1836 (Ex. P-17).

After the treaty was signed, Henry Schoolcraft para-phrased and explained the provision in similar fashion:

"the right to live on and occupy any portion of the lands until it is actually required for settlement," Memoirs . . . . , March 28, 1836 (D. Ex. 304, p. 534);

"I employed the term 'settlement' in its ordinary meaning to denote the act or state of being settled," letter of February 27, 1837 (D. Ex. 32; Tr. 266).

"While [the lands] remain the property of the United States," letter of February 27, 1837 (D. Ex. 33);

"the conditional usufructuary right," Report for 1837 (Ex. P-62, p 3).

The phrase "until the land is needed for settlement" is ambiguous as to the term of Indian occupation.  It was explained to the Indians as indicating a very, very, very long time in the future.  (Tr. 2278-84; D. Ex. 32.)  Many of the Indians of the treaty region lacked any experience base with which to understand even the "ordinary meaning" of settlement invoked by Schoolcraft.  (Tr. 2417.) In using this phrase and explaining it as they did, the treaty negotiators placed any understanding of the term of Indian occupancy beyond the comprehension of the Indians, whose sense of time was significantly different from that of white Europeans.  The Indians lived in a "continuous present."  The assurances given the Indians that settlement would not take place for a "very long time," an "indefinite time," and other phrases equally beyond the comprehension of the Indians, were successful in conveying an extended period of time to the extent that they placed the time of the ultimate devolution (if any) of the land, a condition sought by the United States, beyond the time frame within which the Indians could understand human affairs.  Since they lived in a continuous present, any such time period related to events beyond their continuous present, which, to them, would never occur.  I find this to be a fact. Accordingly, the Indians understood that they would go on hunting and fishing for as long as any Indians lived in Michigan. (Tr. 51-58, 535-7, 542-58, 2281-94, 2482-89.)  According to the Indian understanding, Michigan Indians could hunt and fish "as long as the sun rose  and the waters flowed."

The United States only intended to impose a time limitation upon Indian usafructory rights with regard to Indian use of unreserved ceded land. The United States intended to provide for settlement, an occurrence which it always expressed as happening upon the land. Article Thirteenth was designed to regulate peaceably the potential conflict between the Indians and settlers in land use. (Tr. 269-70, 274.) In the minds and comprehension of the Indians, so long as any Indians resided in Michigan, their aboriginal fishing rights would be continuing and undiminished in vitality, whatever might happen to their use of unreserved land. (Tr. 276-78.)

The Indians were incapable of understanding sale or cession of lands as understood by white Americans. They understood the treaty as a gift exchange. They would secure benefits from the United States in return for some interests in land. From the Indians' only understanding of land use, stewardship, they conceived of their gift as some particular use of the products of land, for they could not conceive of giving everything on the land. Here it is not possible to determine what particular use or uses they thought were granted to the United States because of the limited treaty minutes and the very general treaty language. In other treaties such general language hid the fact that the United States had asked the Indians for only their tops of pine trees, giving the Indians in that negotiation the impression that the Oaks remained theirs. Here we do not know what the United States told the Indians they wanted. Upon giving of their gift the Indians would understand that the United States received the Indian's land to care for it. Such a view was expressed by the Chief Pabanmitabi of L'Arbre Croche when discussing the right of the United States to cut wood on Indian land under the terms of the Treaty of Greenville: "If any wood is cut upon our land hereafter, we should be paid for it, and we authorize you to take care of our land." (Ex P-30.)

64.

In the 1836 treaty, the Ottawa and Chippewa understood that they could continue to use the land to the extent necessary to continue to live their former lives. The Indians were accustomed to accommodating settlers on their land, and the treaty obligation to accommodate them was seen as consistent with the Indians' continuing to live their lives of hunting and fishing as before. The Indians did not understand that they would have to accommodate in the exercise of their fishing right because of the concessions given them during the negotiation. (Tr. 51-58, 535-37, 542-44, 556-58, 2281-94, 2482-89.)

The 1836 Treaty did not describe the Indians' reserved fishing right as a reservation of use upon a condition subsequent, nor did the Indians have any comprehension of such a legal estate. United States v. Shosone Tribe, 304 U.S. 111, 116 (1938); Whitefoot v. United States, 293 F.2d 658, 667, n.15, (Ct. Cl. 1961), cert. denied, 369 U.S. 818 (1962).

E.    The "Removal Policy" and the 1836 Treaty.

The concept of removal, causing the migration of Indians from eastern sections of the country to the territory west of the Mississippi, has been traced by historians to Thomas Jefferson, in approximately 1803. Based on previous commitments by the federal government to assist the original colonies to extinguish Indian title within their boundaries, Jefferson as President felt obligated to some affirmative action. His effort resulted in a draft proposal to amend the Constitution creating an Indian territory in the West and officially establishing removal as a national policy. The amendment never went beyond the draft stage and although removal did not become officially authorized until the passage of the Removal Act of 1830 (4 Stat. 411), it was an item for treaty negotiation where circumstances demanded. (Tr. 2120-24.) In addition to pressure from expanding white settlement, other stated rationalizations for removal were the need to separate Indians from the evil influences of white society and also for purposes of national security in case of war. (Tr. 2133-38.) Such policy reasons for removal varied according to the region of the country involved. Population pressures were an important reason, i.e., settlers coming into an uninhabited or sparsely inhabited area and beginning to farm the land. (Tr. 2128-29.) In the southern states, the Indian societies were powerful, adept at picking up white men's

65.

civilized ways, and therefore constituted a threat to the whites living in the area who wished to exploit the Indians and their land.  Removal was seized upon as the means to rid white settlements of these advanced Indian societies.  (Tr. 2128-30.)

In the Northwest Territories, the fact that some of the Indians had previously allied themselves with the British meant that removal of these Indians from the borders would make the border with Canada more secure militarily for the United States. (Tr. 2132-34.)

Land speculation was also a factor in fueling both the removal of Indians and the subsequent population growth of a ceded area.  One form of this speculation involved the United States buying land cheaply from the Indians, and then selling it at a substantially greater price to white settlers and speculators in order to finance treaty provisions, and to raise general funds.  (Tr. 2134-36.) The true motive for the majority of whites was economic gain through exploitation of the Indian.  (Tr. 2137-41.)

Although removal was to be a voluntary act on the part of the Indians, both before and after the Removal Act, there were instances of forced removal.  Andrew Jackson, President from 1829 through 1837, made requests which were actually orders and was responsible for a forced removal involving the Cherokee and Creek. (Tr. 2138-43.)  Jackson went so far as to defy a decision of the United States Supreme Court, Worcester v. Georgia, 31 U.S. (6 Pet.) 515 (1832).  (Tr. 2151-52.)  The Removal Act of 1830 specifically provided that removal was to be allowed for "such tribes or nations of Indians as may choose to exchange the lands where they now reside and remove there" ("there" being territory belonging to the United States west of the Mississippi River).  (Emphasis supplied.)  There was opposition to the passage of the Removal Act and by 1838 the removal pressure eased substantially.  However, some removals did take place during the early 1840's.  (Tr. 2153, 2372-73, 2449; D. Ex. 310.)  Not every treaty negotiated with eastern tribes in the 1830's obligated the tribe to remove; in fact, most of the treaties of that decade did not do so.  Pressure for removal varied considerably depending upon a tribe's location.  Generally, removal pressure was strongest in the southeast and weakest in northern Michigan and Wisconsin.  (Tr. 227-28, 504-06, 2128-32, 2143, 2159-62, 2273-74.)

For analytic purposes the treaties of the 1830's may be classified in three broad categories, depending upon the degree to which they do or do not call for removal of the Indians involved:

(a)  Land base reduction treaties.  These treaties involve a cession of part of a tribe's land base, generally with retention of reservations in common of unlimited duration.  The consideration for the cession is usually payable on or near the reservations.  No mention is made of lands in the west or of removal.  These treaties are not removal treaties.  (Tr. 2162-81; Ex. P-178, 179, 180, 181.)

(b)  Permissive removal treaties.  These treaties generally follow the provisions of the Removal Act. (State Ex. 310.)  They incorporate land base reduction features, but in addition provide for the possibility of the Indians removing west if they desire to do so.  They are generally vague on the details of and the time for removal and on the location and extent of lands to be provided in the west.  (Tr. 2182-99; Ex. P-182, 183, 184.)

(c)  Obligatory removal treaties.  These treaties use language obligating the tribes to remove, and generally involve a cession of all tribal lands east of the Mississippi.  Often specifics are set forth regarding the details of the move, a deadline for removal, and the specific land in the west to which the tribe is to remove. Often payment of annuities and goods is to be made only in the west, as an inducement to removal.  (Tr. 227-28, 504-06, 601-05, 2200-22, 2226-45; Ex. P-184, 185, 186, 187 188, 189.)

With the aforestated removal concepts in mind, I turn to the situation in Michigan in 1836 and the treaty area in question. Pressure from settlers for acquisition of Indian land -- an important factor which often resulted in obligatory removal treaties -- was absent from all but the extreme southernmost portion of the treaty area, on the north bank of the Grand River.  Even the rough geography of the treaty area was unknown at treaty time.  Henry Schoolcraft *did not believe* in 1836 that settlers would enter the northern part of the treaty area for decades, if ever. (Tr. 209-10, 227-28, 274-75, 2273-74,, 2382-94; Ex. P-125, 133; State Ex. 32, 63, 251, 311.)

67.

The 1836 treaty did coincide with pressures to make Michigan a state. Because of this, there was probably reason to acquire the ceded portions in order to make the prospects of statehood more attractive in terms of territory available for settlement, industry, etc. (Tr. 2265-66.)

There is no mention of removal in the letters to the treaty delegates, treaty minutes, the treaty instructions, or in any of the other correspondence before the treaty.  The first mention of the possibility of removal is found in the treaty itself, in which the original version of Article Eighth provided:

> It is agreed, that as soon as the said Indians desire it, a deputation shall be sent to the west of the Mississippi, and to the country between Lake Superior and the Mississippi, and a suitable location shall be provided for them, among the Chippewas, if they desire it, and it can be purchased on reasonable terms, and if not, then in some portion of the country west of the Mississippi, which is at the disposal of the United States. * * *  When the Indians wish it, the United States will remove them, at their expense . . . .

(Tr. 205-06, 219-22, 504-06; Ex. P-15.)

The Senate amended Article Eighth in the following material respects (amendment language underlined):

> It is agreed, that as soon as the said Indians desire it, a deputation shall be sent <u>to the southwest of the Missouri River, there to select a suitable place for the final settle-ment of said Indians, which country, so selected and of reasonable extent, the United States will forever guaranty and secure to said Indians.</u> * * *  When the Indians wish it, the United States will remove them, at their expense . . . .

The apparent purpose of the amendment was to eliminate the option of removal to the area among the Chippewa of northern Minnesota. (Tr. 205-06, 219-21; Ex. P-15; State Ex. 17, 304, pp. 538-39.) *The Senate* amendment was not introduced into the treaty for any substantive or policy reason, but, as Schoolcraft believed, to embarrass President Jackson.  (Tr. 199-202, 538-39, 2267-72; D. Ex. 304.)

The Treaty of 1836 is a hybrid type of treaty, with characteristics of both a land base reduction treaty and a permissive removal treaty.  At most it is a permissive removal treaty, because

68.

the provision for payment of annuities is to be in Michigan (indicating an intention to stay); the language of removal in Article Eighth -- "as soon as the said Indians desire it," "[w]hen the Indians wish it" -- is permissive, not obligatory; there is no preamble stating that because of population pressures the Indians must move out west (as is common in obligatory removal treaties); there is a cession of land with specific provisions for reservations of land for the Indians; the land reservations are held in common by the Indian tribes; there is no specific parcel of land set aside for the Indians out west; and there is no removal deadline contained in the Treaty.  There is also a provision for the usage of the ceded land until some vague future time.  (Tr. 203-06, 226-28, 370-71, 504-06, 509-11, 1740-44, 2245-67.)

After the Treaty of 1836 was signed, the Indians of the treaty area never had any serious intention of removing west of the Mississippi.  It is inconceivable that, knowing that removal meant cruel travel hardships and leaving behind the most important single aspect of their life -- fishing -- the Indians would ever have agreed to remove.  (Tr. 212, 831-32; Ex. P-94.)

In 1838 an exploring party under the direction of James Schoolcraft, Henry's brother, went west to examine lands on the Osage River in what is now Kansas.  The Indians of the Upper Peninsula refused to participate in this exploring party.  In refusing to send anyone on the exploring party, they stated we "are not aware of any obligation to go west of the Mississippi." (State Ex. 92.)  The purported acceptance of lands in the west signed by the exploring party accepts the land "upon which we agree to remove in the event of our emigrating." (State Ex. 99; Tr. 218.)  The exploring party was not representative of the leadership of the treaty area of the Lower Peninsula.  (Tr. 2316; Ex. P-190.)  Just before the return of the exploring party to their homes, the members signed a document purporting to accept the land in the west that they had selected as a place for the removal of those Indians of the treaty area who wished to do so.  (Tr. 205-06, 212-18, 227-28, 2300-30; Ex. P-190; State Ex. 52, 60, 62, 63, 92, 93, 94, 97, 99, 100, 252, p. 341.)  The court doubts the validity of the exploring party's acceptance:  The delegation expressed displeasure with the

land because it contained no sugar maple trees.   (Tr. 1709; D. Ex. 92, 93.)   The selection of a party to determine whether the lands to which they would remove would seem to be an important decision for the tribes, and they would have undoubtedly sent their chiefs if they were serious about removing.   (Tr. 2322, 2495.)   There was some discrepancy even between the list of the members of the party who went out to see the land, and the list of the persons who signed the document of assent accepting the lands out west.   (Tr. 2318-19; Ex. P-190.)   It appears that James Schoolcraft, who was in charge of the exploring party, forced the party to sign the acceptance of the lands before the Indian representatives had an opportunity to go back to their bands and report to them. (Tr. 2324.)   It is probable that the Indians who went on the expedition went for ulterior motives; they wished to stall the United States on the subject of removal; the younger Indians loved to travel, and the members of the traveling party were given rewards for going, such as blankets and guns.   (Tr. 2323, 2496.)

At a general council of Indians at Michilimackinac after the return of the exploring party, the Indians opposed removal but accepted the lands in the west for whomever "may personally agree to remove."   (D. Ex. 62.)

Neither the federal government nor the Indians took any further steps toward removal.   The removal of the Indians of the treaty area was tacitly abandoned soon after the return of the exploring party, and was officially abandoned in the Treaty of 1855. No Indian from the treaty area ever removed west of the Mississippi River.   (Tr. 205-06, 227-28, 282-84, 289-91, 301-03, 509-11, 2158; Ex. P-65, 80, 89; D. Ex. 63, 251, p. 345, 352, p. 341.)   Nor did the Indians change their lifestyle as a result of the Treaty.   (Tr. 218, 620-21, 1450-52, 1697-99, 1710-13.)

70.

In summary, although the 1836 treaty was negotiated during the Removal Period and was not in conflict with the provisions of the Removal Act of 1830, by its terms it was permissive as to removal from the area ceded.  Since it was permissive and since removal from the treaty area never took place, the classification of the treaty as a removal treaty has no bearing or relevance to the issues here in question.

F.   <u>1836 to 1855</u>.

From the Indians' perspective, the period between the two treaties was marked by dissatisfaction with the government's implementation of the earlier treaty and confusion regarding the status of the Article Second and Third land reserves.  (Tr. 282.) The Indians of the treaty area were given tacit permission by the federal government to remain on the reservations beyond the five-year period -- the reservations were withheld from sale and continued in existence until another provision was made in the Treaty of 1855. (Tr. 230-35, 282-84, 301-03; Ex. P-65, 89.)  Nonetheless, the insertion of the Senate amendment regarding the longevity of the Article Second and Third reserves created apprehension and uncertainty in the minds of Indians and non-Indians alike.  (Tr. 284.)   One way the Indians attempted to cope with this uncertainty was to buy land in fee.

71.

The missionaries encouraged these purchases and some Indians used annuity money from the 1836 treaty to buy land. (Tr. 285.)

In the Sault Ste. Marie area, there was a local problem related to the destruction of the important fishing site and encampment at the St. Mary's rapids caused by the construction of the canal and locks there. (Tr. 285.) Construction began in 1853 and displaced those Indians permanently encamped there. (Tr. 285; see also Ex. P-81, 81A.) The canal and locks were completed and opened to traffic in 1855, about one month before the Treaty of August 2, 1855 was negotiated. (Tr. 287.)

In 1853, Henry C. Gilbert, the Michigan Indian agent, wrote to his superior, George Manypenny, Commissioner of Indian Affairs (Ex. P-80, 80A), and stated that the Ottawa and Chippewa would never consent to removal and it would be difficult to forcibly remove them because they ". . . are divided into so many independent bands, and are scattered from one extremity of the state to the other." Gilbert's recommendation was to allow the Indians to remain in Michigan, set aside land reserves for their benefit and convey parcels to individuals in fee ". . . as they become sufficiently enlightened to be capable of taking charge of themselves." Gilbert also said that the residents of the state would not object to the Indians remaining there. (Tr. 291.) Shortly thereafter, in March 1854, Gilbert again wrote to his superior expressing his views on the policy the government should adopt to permanently benefit the Ottawa and Chippewa of Michigan. (Ex. P-82, 82A.) In that communication, Gilbert listed several claims the Indians had under the 1836 treaty. He advocated that certain tracts of land, far removed from the whites, be set aside for the Indians and be subject to restraints on alienation which subsequently could be removed whenever it was deemed expedient.

The Indians' dissatisfaction with the implementation of the 1836 treaty is reflected in part by a message prepared by a delegation of Ottawa and Chippewa who visited Washington, D. C. in February 1855. (Ex. P-87, 87A.) At that same time, this delegation sent another letter to the Commissioner of Indian Affairs inquiring about certain promises of goods and services under the 1836 treaty

72.

and asking whether those promises had been carried out.   (Ex. P-86, 86A.)

In May 1855, the Commissioner of Indian Affairs wrote to his superior, the Secretary of the Interior, and said:

> Firstly, as regards the Ottawas and Chippewas in the State of Michigan, that I am of the opinion that an officer or officers of this Deparment should be designated by the President to negotiate with the Indians with a view of adjusting all matters now in an unsettled condition, and making proper arrangements for their permanent residence in that state.
>
> * * *
>
> It was anticipated that after a few years, these Indians would remove southwest of the Mississippi. Hence the provision of a home for them there, as per article 8 of the treaty and the Senate's amendment thereto; but they were not limited by the treaty to any time within which they should remove to avail of the homes thus promised.
>
> They have never emigrated west, but have continued to hold the reservations described in the 2d and 3d articles of the treaty -- which have accordingly been withheld from sale to accommodate the Indians.
>
> Measures should now be taken, in my judgment, to secure permanent homes to the Ottawas and Chippewas, either on the reservations or on other lands in Michigan belonging to the Government, and at the same time, to substitute as far as practicable, for their claim to lands in common, titles in fee to individuals for separate tracts.
>
> * * *
>
> It may also be considered of some value to the United States to have the Indians relinquish their right to a home west of the Mississippi, although in my judgment, it would not be unjust to deny them the benefit of that right, as they have not heretofore, nor is it to be supposed they will here-after, avail themselves of it.   The amount that should be allowed them for its relinquishment, ought not, in my opinion, to exceed the value of lands they might receive for homes in Michigan. (Emphasis supplied.)

(Ex. P-89A, pp. 1-2; see also Tr. 301-03.)

In summary, then, the 1855 treaty was negotiated to address two principal issues: first, the provision of permanent homes for the Ottawa and Chippewa in Michigan; and second, the settlement and consolidation of monies and services owed to the Indians under previous treaties and in particular the Treaty of March 28, 1836.   (Tr. 295-97.)

G.  Meaning of the Treaty of July 31, 1855.

Article 1 of the Treaty of July 31, 1855 (11 Stat. 621) designated certain land to be withdrawn from sale from which the Indians were to select homesites.  (Tr. 304.)  Tracts were withdrawn for particular bands and are depicted on [Ex. P-129C] a map and overlay prepared to illustrate Dr. Tanner's testimony.  From these withdrawals, band members were to select 80 acres if they were the head of a household and 40 acres if single.  (Tr. 306.)  After the land was selected, it was not to be alienable for a period of at least ten years after which the restriction on alienation, in certain circumstances, could be removed.  (Tr. 307.)  The procedure set forth in Article 1, however, was rarely followed and many Indians never received an allotment notwithstanding the treaty provisions requiring the same.  (Tr. 307.)

These promises proved to be as etheral to the Indians as the promises which they replaced.  The Indians relied upon them to their detriment as they had on the promises before.

The land reserves under the 1855 treaty correspond, for the most part, with the land reserves provided for under the 1836 treaty. (Tr. 312.)  Dr. Tanner testified that the land reserved under the 1855 treaty redefined the 1836 land reserves.  (Tr. 312.)

Article 2 provided for the delivery of certain goods and services to the Indians, including monies for education, agricultural and carpentry tools, cattle, household furniture and the like.  The Indians were also to receive annuities (paid over a fourteen-year period), and the services of blacksmiths.

Article 3 of the treaty provided:

> ARTICLE 3.  The Ottawa and Chippewa Indians hereby release and discharge the United States from all liability on account of former treaty stipulations, it being distinctly understood and agreed that the grants and payments hereinbefore provided for are in lieu and satisfaction of all claims, legal and equitable on the part of said Indians jointly and severally against the United States, for land, money or other thing guaranteed to said tribes or either of them by the stipulations of any former treaty or treaties; excepting, however, the right of fishing and encampment secured to the Chippewas of Sault Ste. Marie by the treaty of June 16, 1820.

(11 Stat. 624.)  This release clause categorizes the Indians' claims into legal and equitable.  The legal claims of the Indians pertained

to certain goods, services and annuities promised to them under the 1836 treaty, but which were never delivered.  (Tr. 319.) Equitable claims, by contrast, related to removal (Article Eighth of the Treaty of 1836) which was never implemented.  (Tr. 320.)

Plaintiffs' Ex. P-19 and P-19A are the treaty minutes, which is a long and comprehensive document.  In that document are examples of those claims the treaty commissioners considered to be legal, as opposed to equitable.  Before considering those claims, the purpose for the treaty was made clear by Commissioner Manypenny early in the proceedings:

> Com. Meanypeny [sic].  There were two delegations of Ottawas and Chippewas at Washington last winter, each making nearly the same inquiries concerning the affairs of their people.  They each had the impression that there was unsettled business under the older treaties running back as far as 1795.  . . .  The examination I made led me to the conclusion that there was little foundation for many of the claims the delegates made, while they were at Washington.  I directed the acting Commissioner, when I left Washington from which place I have been absent four or five weeks, to examine & if he found any default in the fulfillment of the old treaties by Government, to advise me of it.  The fact in relation to your business, accords with the fair presumption, because it is a fair presumption, that when the Treaty of 1836 was made all questions, growing out of previous treaties, of an unsettled character, were adjusted.  With this general remark I now say, that notwithstanding this fair presumption, if it shall appear that there is still anything actually due to you under the old treaties, you may rely upon my efforts to obtain it for you.

(Ex. P-19A, pp. 10-11.)

Examples of legal claims the Indians had for promises made by the United States included the following:  The Indians inquired about whether annuities promised under the 1836 treaty were paid. They wanted to know if the money for agricultural implements, school houses and books, medicines and vaccines, and annuities for half-breeds, had been paid.  (Tr. 294-97, 318-21, 323-24; Ex. P-19, pp. 14, 17-22, 27-28, 52.)

Contrasting with these "legal" claims are those the treaty commissioners referred to as "equitable:"

As-sa-gon. At the treaty of 36-- in ceding lands there was a provision made for lands to Indians, who wished to remove West of the Mississippi. A year of two after a delegation of the tribes went West of that river & were told the land on which they stood was theirs. What is to be done with that land?

Heamlin Intpt.

Com. Meanypeny [sic]. The Indians never having removed they hold not land West of the Mississippi. The question however, is of an equitable character & will be considered.

Heamlin Intpr.

Agt. Gilbert - explains that the treaty simply provides for a suitable home west of the Mississippi, if they desire to go there.

Heamlin Intpt.

As-sa-gon. We next wish to call your attention to where the government, in the Treaty of 1836, provides that it will remove the Indians. We wish to claim the amount of the expense of removal, out-fit & one years subsistence.

Heamlin Intpt.

Com. Meanypeny [sic]. Those provisions relate to events that have not taken place & are consequently dependent upon contingencies that have never transpired. We may regard them equitably; but legally & strictly the Indians have no rights under them.

(Ex. P-19A, pp. 22-23.)

Com. Meanypeny [sic]. As I remarked to you yesterday you have no legal right to the lands West of the Mississippi unless you remove. Your rights, while you remain here are entirely equitable in their nature. Having determined that you will not remove it is now a question how you will settle your affairs here. It is vain to request money for those lands. We will not give it. I cannot listen to it.

(Ex. P-19A, p. 32.)

Com. Meanypeny [sic]. . . . I do not understand that the Indians have any right under the treaty to commutation for the expense of removal, subsistence & outfit. That was in consideration of your removal. It was no part of the price of your land. I feel inclined, however, to be liberal with you in the adjustment of these equitable matters.

(Ex. P-19A, p. 47.)

Waw-be-geeg . . . . You promised if you took me West of the Mississippi to give me lands, outfit and subsistence for a year. The land West of the Mississippi is better than the land here. You have kept a large amount of money in your pocket by not removing us. We wish you to give us what is equitable.

<u>John Johnston, Intpt.</u>

<u>Com. Meanypeny</u>.  I admire the ingenuity of Waw-be-geeg & I doubt not that this speech will impress our minds.  I wish it understood though that the government is not <u>indebted</u> to the Ottawas and Chippewas for that removal and subsistence matter.  It is time we saved some money by not removing you, but it was not yours but the government's money that we saved.  <u>We have been ready to remove you.  You thought it best to stay & you were right.  We think we may say in view of the equities of the subject that we will allow some sum in commutation</u> . . . . (Emphasis supplied.)

(Ex. P-19, p.43)

In summary, "equitable" claims the Indians had against the United States arose from Article Eighth (removal) of the 1836 treaty.  (Tr. 323-34.)  "Legal" claims of the Indians related to specific sums of money the United States had explicitly promised to pay under the 1836 treaty, but had not in fact been delivered to the Indians.  The Indians were asking for an accounting from the United States.  (Tr. 323.)  They wanted to be certain the lengthy list of monies earmarked for particular purposes had in fact been expended as promised.

Dr. Tanner testified that a review of the 1855 treaty minutes (Ex. P-19, 19A), reveals no mention whatever of fishing or fishing rights. (Tr. 326.)  She also testified Article 3 had no impact whatsoever on the fishing rights the Indians reserved under the earlier treaty of 1836.  (Tr. 326.)  Further, Dr. Tanner could discern nothing from the body of correspondence she reviewed or from any other source which would lead her to believe that Commissioners Gilbert and Manypenny thought that Article 3 of the 1855 treaty had any impact on Indian fishing.  (Tr. 327.)  The only mention of fishing in the treaty relates to the St. Mary's rapids; however, at the time of the 1855 treaty, this important fishery had been destroyed due to the construction of the canal and docks.

A.    [By Dr. Tanner]  This [the 1855 treaty] is an accounting Treaty.  They are trying to consolidate the debts of the Government to the Indian people, what Indian people are owed. They are interested in money and in getting permanent homes, and the Sault bands, of course, are interested in getting money for their fishery that has been damaged, but there isn't any other discussion about fishing at all.

Q:    [By Mr. Greene]   Is that a reference to the last
      portion of Article 3 of the 1855 Treaty?

A:    Yes, that is the only claim.   The damage claim of
      the Sault bands, . . . but that is the only
      item that is not handled by the terms of the
      July 31, 1855 Treaty.   That is the only out-
      standing claim.

Q:    And is that the subject of another treaty?

A:    Yes, that is the subject of a separate Treaty
      on August --

Q:    When was that Treaty negotiated?

A:    On August 2nd.

Q:    So it was two days after the July 31st Treaty?

A:    Yes, two days later.   It was a separate discussion.

Q:    And as to the claim there, that is for the fishery
      that had been destroyed at the Sault Rapids, is
      that it?

A:    Yes, that's it.

Q:    And how was it destroyed?

A:    By digging the canal . . . .

(Tr. 325-27.)   Neither the legal nor the equitable claims released

by the third article of the treaty included the Indians' right to fish

in the waters of the Great Lakes.   (Tr. 294-97, 318-24; Ex. P-19, pp.

2-5, 14, 20, 22-23, 27-28, 32, 47, 52; Ex. P-82, 87.)   Only financial

obligations were released.   Apart from the issue of compensation

for the diminishment of the fishery at the Sault rapids -- itself

a financial matter -- the Treaty of 1855 had nothing whatever to do

with fishing or the fishing rights of the Indians of the treaty area.

There is nothing in the written records of the treaty councils or other

accounts of discussions with the Indians to indicate that fishing

rights were discussed at all, or that the Indians were told that their

existing fishing activities would be in any way curtailed or restricted

by the treaty.   (Tr. 326-28; Ex. P-19.) [18/]   The treaty had no impact

on any fishing rights the Indians might have had prior to the 1855

treaty.

It is probable that the Indians at these treaty negotiations

did not understand such legal terms as "legal and equitable," "satis-

faction of claims," and "release and discharge."   Tr. 1482-84, 1490-91.)

Article 5 of the 1855 treaty provides:

ARTICLE 5.  The tribal organization of said Ottawa
and Chippewa Indians, except so far as may be neces-
sary for the purpose of carrying into effect the
provisions of this agreement, is hereby dissolved;
and if at any time hereafter, further negotiations
with the United States, in reference to any matters
contained herein, should become necessary, no general
convention of the Indians shall be called; but such as
reside in the vicinity of any usual place of payment,
or those only who are immediately interested in the
questions involved, may arrange all matters between
themselves and the United States, without the con-
currence of other portions of their people, and as
fully and conclusively, and with the same effect in
every respect, as if all were represented. (11 Stat. 624.)

Article 5 must be understood in the context of the Treaty
of 1836 and the culture of the Indians of the treaty area.  The
Treaty of 1836 was formally entered into by an entity called "the
Ottawa and Chippewa nation of Indians."  However, neither the Ottawa
nor the Chippewa was politically organized at the tribal level.  The
primary unit of political and economic organization was the band, a
more localized entity frequently associated with a village.  From
both a cultural and a political perspective, there never was such an
entity as the Ottawa and Chippewa nation -- it was put together by the
federal government for the purpose of obtaining a cession in 1836.
(Tr. 100-02, 772-76, 779-81.)

After the Treaty of 1836, however, this artificial entity
had an existence at least to the extent that there were problems
regarding implementation of the Treaty of 1836.  The federal govern-
ment in 1855 wished to put an end to the myriad financial problems
which had arisen.  A new treaty also was a good opportunity to put
an end to the "Ottawa and Chippewa nation."  The Indian problems of the
era were of a localized and specific, rather than a broad and general,
nature, and dealing with these problems with the large artificial group
was costly, time-consuming and unwieldy.  By means of Article 5,
the federal government was able in the future to deal with the tribes,
bands or communities of the treaty area more cheaply, efficiently
and effectively on matters of local concern.  There was no change
in the way in which the Indians of the treaty area functioned
politically or in the way in which they were dealt with by the

federal Indian agents after the treaty, save one:  they were never again convened or dealt with as one entity -- not even to assent to the Senate amendments to the treaty.  (Tr. 331-35, 779-81; Ex. P-19.)

The Indians of the treaty area also had strong reasons for wanting Article 5.  Though they were closely related, the Ottawa and the Chippewa were never happy at being lumped together as one entity.  Megis Ininne, an Ottawa chief from the Grand River, complained of the inclusion of the Chippewa in the Treaty of 1836 during the negotiation of that treaty.  (Ex. P-17 and 17A, p. 9.)  The same objection was raised in the negotiations in 1855, this time by Waw-be-geeg, a Chippewa chief from the Upper Peninsula:

> At the Treaty of 36, our fathers were in partner-
> ship with the Ottawas, but now the partnership
> is finished and we who come from the foot of
> Lake Superior wish to do our business for our-
> selves.

(Ex. P-19 and 19A, p. 33.)  This concern was reported by Waw-be-geeg near the end of the negotiations and was met by Commissioner Manypenny, who explained the effect of Article 5 during this exchange:

> Waw-be-geeg.  * * *  I told you when I first came
> that I wanted to be separated from the Ottawas
> and you have not answered me.  We have sat here and
> heard you talk to the Ottawas -- while you paid no
> attention to us.

> Com. Meanypenny [sic].  * * *  The very case you
> suggested is met in the treaty -- you are separated
> as you desire.  This treaty you and the Ottawas must
> sign together is because the old treaty of 36 was
> made in that way, but here we have followed your
> suggestion and provide . . . that no general
> council shall be called.

(Ex. P-19 and 19A, p. 69.)  Thus, the Indians, like the federal government, sought and obtained in Article 5 an  end to the artificially constructed "Ottawa and Chippewa nation."  (Tr. 331-35.)

H.   Tribal Fishing Regulation.

The Sault Ste. Marie Tribe of Chippewa Indians regulates the fishing of its members in the waters of the Great Lakes within the treaty area and requires its members who fish commercially to have a tribal fishing license and a treaty fishing identification card issued by the United States Department of the Interior pursuant to 25 C.F.R. part 256.  The tribe enacts its own fishing rules and

regulations subject to the review of the Secretary of the Interior, imposes and collects a license fee, imposes restrictions on time, manner and place of taking, and requires its fishermen to submit catch reports.  (Tr. 1139-40; Ex. P-120, 165.)

The Bay Mills Indian Community regulates the fishing of its members in the waters of the Great Lakes within the treaty area and requires its members who fish commercially to have a tribal fishing license and a treaty fishing identification card issued by the United States Department of Interior pursuant to 25 C.F.R. part 256.  The tribe has a conservation code and a conservation committee which includes ex-officio members from the Michigan Department of Natural Resources and the United States Fish and Wildlife Service.  The committee promulgates rules and regulations governing fishing.  The tribe imposes and collects a license fee, imposes restrictions on the time, manner and place of taking, and requires its fishermen to submit catch reports.  (Tr. 1080-81; Ex. P-162, 163.)

Members of the tribes which are parties to this action can trace their lineage to the Ottawa and Chippewa tribes which were beneficiaries of the Treaty of Ghent and whose leaders signed the Treaties of 1836 and 1855.  (Tr. 1060-61, 1064, 1128, 1179.)

<u>V.</u>

<u>CONCLUSIONS OF LAW</u>

A. <u>Parties</u>.

Ancestors and members of the plaintiff tribes have continuously exercised Indian fishing rights since the 1836 Treaty without abandonment. <u>Williams</u> v. <u>Chicago</u>, 242 U.S. 434 (1917). By organizing the tribes under the provisions of the Indian Reorganization Act, 25 U.S.C. §471, <u>et</u> <u>seq</u>., approving their constitutions, and issuing tribal treaty fishing identification cards to their members pursuant to 25 C.F.R. part 256, the Secretary of the Interior has recognized the plaintiff-intervenor tribes as the modern tribal successors to the Indians who were signatory to the Treaty of 1836. The Bay Mills Indian Community and the Sault Ste. Marie Tribe of Chippewa Indians are Indian tribes which are political successors in interest to the Indians who were signatory to the Treaty of March 28, 1836 (7 Stat. 491). <u>United</u> <u>States</u> v. <u>John</u>, ___ U.S. ___, 57 L.Ed.2d 489 (1978); <u>United</u> <u>States</u> v. <u>Jackson</u>, 280 U.S. 183 (1930); <u>United</u> <u>States</u> v. <u>Sandoval</u>, 231 U.S. 36 (1913); <u>United</u> <u>States</u> v. <u>Holliday</u>, 70 U.S. (3 Wall.) 184 (1866); <u>United</u> <u>States</u> v. <u>Washington</u>, 520 F.2d 676 (9th Cir. 1975); <u>United</u> <u>States</u> v. <u>Wright</u>, 53 F.2d 300 (4th Cir. 1931).

B. Canons of Treaty Construction.

Certain axioms of treaty construction must be applied when interpreting Indian treaties to determine the extent of the rights reserved thereunder.  First, the courts have held that treaties with Indians must be interpreted as the Indians would have understood them.  This rule is first set forth in Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 581 (1832) (concurring opinion of Justice McLean).19/

> The language used in treaties with the Indians
> should never be construed to their prejudice.
> If words be made use of, which are susceptible
> of more extended meaning than their plain import,
> as connected with the tenor of the treaty, they
> should be considered as used only in the latter
> sense . . . .  How the words of the treaty were
> understood by this unlettered people, rather than
> their critical meaning, should form the rule of
> construction.

Some of the reasons for this rule of construction are expressed in Jones v. Meehan, 175 U.S. 1, 10-11 (1889):

> In construing any treaty between the United States
> and an Indian tribe, it must always . . . be borne
> in mind that the negotiations for the treaty are
> conducted, on the part of the United States, an
> enlightened and powerful nation, by representa-
> tives skilled in diplomacy, masters of a written
> language, understanding the modes and forms of
> creating the various technical estates known to
> their law, and assisted by an interpreter em-
> ployed by themselves; that the treaty is drawn up
> by them and in their own language; that the Indians,

83.

on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.

Accord, Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970); Choctaw Nation v. United States, 318 U.S. 423 (1943); Tulee v. Washington, 315 U.S. 681 (1942); Starr v. Long Jim, 227 U.S. 613 (1913). And in another treaty case the Court stated:

In treaties made with them the United States seeks no advantage for itself; friendly and depen- dent Indians are likely to accept without dis- criminating scrutiny the terms proposed. They are not to be interpreted narrowly, as sometimes may be writings expressed in words of art employed by conveyances, but are to be construed in the sense in which naturally the Indians would understand them.

United States v. Shoshone Tribe, 304 U.S. 111, 116 (1938).

The Court of Claims has also addressed this issue:

The treaty was dictated by white conquerors of a subjugated race. It is inconceivable that there was the kind of arms-length bargaining as to terms which would have made relevant as ascertainment of the Indian intention [sic]. Naturally the Indians wanted the unattainable -- to be left alone. It is doubtful that the untrained Indian mind under- stood the ambiguities of Article III even though the white representatives went to some pains to explain the provision. A great and unbridgeable void existed between the language and culture of the two races. When one considers that the meaning of Article III was sufficiently in doubt as to require the interpretative services of the Supreme Court and several lesser courts in subsequent years, one can readily forgive the Indians for any lack of perspicacity or, indeed clairvoyance.

Whitefoot v. United States, 293 F.2d 658, 667, fn.15 (Ct.Cl. 1961), cert. denied, 369 U.S. 818 (1962).

In the context of Indian fishing rights, the Supreme Court long ago rejected contentions that Indians obtained no greater rights by virtue of a treaty than non-Indian citizens:

This [that the Indians acquired no rights but those they would have without a treaty] is cer- tainly an impotent outcome to negotiations and a convention which seemed to promise more, and give the word of the nation for more. And we have said we will construe a treaty with the Indians as "that unlettered people" understood it, and "as justice and reason demand, in all cases where power

84.

> is exerted by the strong over those to whom they owe care and protection," and counterpoise the inequality "by the superior justice which looks only to the substance of the right, without regard to technical rules." . . . How the treaty in question was understood may be gathered from the circumstances.

United States v. Winans, supra at 380-81 (citations omitted). See also the United States Court of Appeals' decision in United States v. Washington, 384 F.Supp. 312 (1974), aff'd, 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086 (1976), wherein the court stated: "In treating treaty Indian fishermen no differently from other citizens of the state, the state has rendered the treaty guarantees nugatory."

In holding that the State of Washington could not exact a fishing license fee from Indians fishing outside their reservation because of the special off-reservation fishing rights secured to them by treaty, the Supreme Court followed a similar approach. It stated:

> From the report set out in the record before us of the proceedings in the long council at which the treaty agreement was reached, _we are impressed by the strong desire the Indians had to retain the right to hunt and fish in accordance with the immemorial customs of their tribes. It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people._

Tulee v. Washington, 315 U.S. 681, 684-85 (1942) (citations omitted). (Emphasis supplied.)

A second principle of Indian treaty construction is that doubtful expressions are to be resolved in favor of the Indian parties. See, e.g., McClanahan v. Arizona Tax Com'n, supra at 174; Carpenter v. Shaw, 280 U.S. 363, 367 (1930).

The rule of treaty interpretation that requires unclear phrases in treaties with Indians to be resolved in their favor was well stated in an important Indian water rights case:

> By a rule of interpretation of agreements and treaties with the Indians, ambiguities occurring will be resolved from the standpoint of the Indians. And the rule should certainly be applied to determine between two inferences, one of which would support the purpose of the agreement and the other impair or defeat it. On account of their relations to the government, it cannot be supposed that the Indians were alert to exclude by formal words every inference which might

86.

> militate against or defeat the declared purpose
> of themselves and the government, even of [sic]
> it could be supposed that they had the intelligence
> to foresee the "double sense" which might some
> time be urged against them.

Winters v. United States, supra at 576-77.  Followed in Arizona

v. California, 373 U.S. 892 (1963).  Accord, Alaska Pacific Fisheries

v. United States, 248 U.S. 78, 89 (1918); Moore v. United States,

157 F.2d 760, 762 (9th Cir. 1946), cert. denied, 330 U.S. 827 (1947);

Standing Rock Sioux Tribe v. United States, 182 Ct. Cl. 813 (1968).

In this case, if there is any question about the meaning

of any of the treaty phrases, the interpretation must be that which is

most favorable to the Indians.  Thus, the meaning does not depend

upon today's conditions, Indian policies of the past, or what is

best to effect an accommodation between non-Indians and Indians.

Rather, courts are charged with the responsibility of interpreting those

phrases most favorably to Indians.

Finally, the courts have prescribed that treaties should

be construed liberally in favor of the Indians.  The United States

Supreme Court said in Choctaw Nation of Indians v. United States,

supra at 431-32:

> Of course treaties are construed more liberally
> than private agreements, and to ascertain their
> meaning we may look beyond the written words to
> the history of the treaty, the negotiations, and
> the practical construction adopted by the parties
> . . . .   Especially is this true in interpreting
> treaties and agreements with the Indians; they are
> to be construed, so far as possible, in the sense
> in which the Indians understood them, and "in a
> spirit which generously recognizes the full obliga-
> tion of this nation to protect the interests of
> a dependent people."  (Citations omitted.)

In Antoine v. Washington, 420 U.S. 194 (1975), Justice Douglas,

concurring, recalled the still-operative language of Choate v.

Trapp, 224 U.S. 665 (1912) as expressing the general rule of

construction governing contracts or agreements with Indians:

> The construction, instead of being strict, is
> liberal; doubtful expressions, instead of being
> resolved in favor of the United States, are to be
> resolved in favor of a weak and defenseless people,
> who are wards of the nation, and dependent wholly upon
> its protection and good faith.  This rule of construc-
> tion has been recognized, without exception, for
> more than a hundred years . . . .

Accord, Tulee v. Washington, 315 U.S. 681 (1942); United States v.

Shoshone Tribe, 304 U.S. 111 (1938).

To adjust for the circumstances under which treaties were negotiated with Indians and to compensate for the advantage of the non-Indian parties in those negotiations, the canons of treaty construction set forth above were developed by the United States Supreme Court and other courts called upon to interpret Indian treaties.  Only the clearest language depriving Indians of the rights which they had prior to the treaties will limit their rights today.  Menominee Tribe v. United States, supra at 413.  Therefore, a full understanding of Indian fishing as it existed at the time of the treaties is required to discover the meaning of the treaty in this case and the full extent of the fishing rights which were reserved by the treaty language in question.

If construction of the treaties in this light results in a meaning which seems to deprive today's non-Indians of privileges which they thought were theirs, it only points up the great injustice which has been done to treaty Indians during the many years they have been deprived of their full rights for the sake of others without rights.[20]

The rules of treaty construction which dictate such a result are the product of the circumstances in which the treaties were negotiated:

> The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction.  Rather, treaties were imposed upon them and they had no choice but to consent.

Choctaw Nation v. Oklahoma, supra at 630-31.

Several of the factors relied upon by courts in applying the canons of construction to treaties exist in the present case. Virtually none of the Indian participants to the treaty spoke English. All affixed an "X" mark in place of their signature.  The Indians had to rely on interpreters for an explanation of concepts, most of which were foreign to their culture.  Dr. Clifton testified about the lack of correspondence between English and the Ottawa and Chippewa languages.  Only general concepts were discussed, not the precise meaning of particular words.  Under these circumstances, to interpret particular words in the treaty so as to defeat or diminish a reserved right would be flatly contrary to these canons of construction.

It is also noteworthy that the Indians did not draft the treaty provisions. Rather, that was done out of their presence and behind closed doors by the treaty commissioners and the traders who escorted the Indians to Washington. It would be unconscionable, as the state has urged from time to time, to construe words in the treaty against the Indians when the facts establish that the Indians were not responsible for their selection.

The record is also clear regarding Schoolcraft's and the traders' conflicts of interest vis-a-vis the Indians. The traders were anxious that a treaty be negotiated in order that the Indians' debts to them be paid. Altogether the traders received over $220,000 as a result of the treaty. Five of the traders who escorted the Indians to Washington and wrote the treaty out of their presence -- John Holiday, John Hulbert, Robert Stuart, Rix Robinson and Henry Levake -- received in the aggregate of $57,000. (Tr. 1633; D. Ex. 312.)

Members of Schoolcraft's family -- James Schoolcraft, William Johnston, Susan Johnston, George Johnston and the estate of John Johnston -- received approximately $53,000 in payment for debts owed them by the Indians. Further, there is evidence that Schoolcraft knew about the existence of these debts before the treaty was negotiated. (Tr. 1652.)

In addition to the payments to traders, Article Ninth provided for payments to certain individuals in lieu of individual reservations. Those persons included Rix Robinson, John Holiday, Mary Holiday, William Lasley, Henry Levake and others. (Tr. 1643.) These persons received almost $50,000 under this article of the treaty.

Before their arrival in Washington and afterward, the trader-escorts engaged in liquor trade with the Indians, and other of the principals had provided liquor to the Indians. It is probable that Schoolcraft relied upon them to provide liquor at the time of the treaty signing.

Combining these factors and considering the conflicts that Schoolcraft and many traders had, there can be little doubt but that the canons of treaty construction should be adhered to rigorously in this case.

This court adopts the meaning of the 1836 treaty consistent with the canons of construction. Under the 1836 treaty of cession, the Indians granted a large tract of land and water area to the United States. At the same time they reserved the right to fish in the ceded waters of the Great Lakes.

Because of the documented evidence demonstrating that the Indians were absolutely dependent upon fishing for subsistence and their livelihood, and reading the treaty as the Indians must have understood it, they would not have relinquished their right to fish in the ceded waters of the Great Lakes. Since the treaty does not contain language granting away the prior right to fish, that right remains with the Indians and was confirmed by the 1836 treaty.

The language contained in Article Thirteenth of the Treaty of 1836, by its own terms could not have limited the Indians' right to fish in the waters of the Great Lakes because these large bodies of water could not possibly be settled by homes, barns and tilled fields. While the Indians might have been willing to give up their right to hunt on various parcels of land as that land became occupied with settlers, the vital right to fish in the Great Lakes was something that the Indians understood would not be taken from them and, indeed, there was no need to do so. The western movement of non-Indian settlers could be accommodated without requiring the Indians to relinquish their aboriginal and treaty rights to fish. While the United States has the power to abrogate treaties by subsequent treaty or statute, it must do so expressly and emphatically. No such abrogation of the reserved treaty right to fish can be found.

C. <u>Reserved Fishing Rights.</u>

Guiding this court is a key concept essential to a proper interpretation of the treaty. This concept is deeply rooted in federal Indian law and was very recently reaffirmed by the Supreme Court in <u>United States</u> v. <u>Wheeler</u>, ___ U.S. ___ 55 L.Ed.2d 303 (1978). In <u>United States</u> v. <u>Winans</u>, 198 U.S. 370 (1905), the United States sought to enjoin non-Indians from obstructing certain Indians from exercising their treaty rights to fish in the Columbia River. The Indians under their treaty reserved the right to fish at their usual and accustomed sites. However, in order to reach those sites it was necessary to cross land which, subsequent to the treaty, was acquired by private individuals. The Court stated:

> . . . <u>the treaty was not a grant of rights</u>
> <u>to the Indians, but a grant of rights from</u>,
> <u>them, -- a reservation of those not granted.</u>
> And the form of the instrument and its lan-
> guage was adapted to that purpose. Reser-
> vations were not of particular parcels of land,
> and could not be expressed in deeds, as dealings
> between private individuals. The reserva-
> tions were in large areas of territory, and the
> negotiations were with the tribe. They
> reserved rights, however, to every individual
> Indian, as though named therein. They imposed
> a servitude upon every piece of land as though
> described therein.

198 U.S. at 381 (emphasis supplied.) <u>See also</u> <u>Seufert</u> <u>Bros.</u> <u>Co.</u> v. <u>United States</u>, 249 U.S. 194 (1919), which affirmed <u>Winans</u>, <u>supra</u>. The conceptual framework, then, for interpreting the treaty is that the grant or cession in the treaty is not made from the United States to the Indians. Rather, the Indians were the grantors of a vast area they owned aboriginally and the United States was the grantee. The grant from the Indians must be narrowly construed, espec-ially in light of the wardship relationship existing between the Indian grantors and the grantee United States.

In addition to providing a conceptual framework for interpreting the treaty, _Winans_ also teaches that reservations in treaties are not limited to land. Although the term "reservation" is commonly thought to pertain to land, other valuable rights not relinquished when Indians convey their aboriginal title are also reservations. The Indians can, and have, reserved rights to cross private land to reach traditional fishing sites as in _Winans_, _supra_, and _Seufert_, _supra_. In _Winters_ v. _United States_, 207 U.S. 564 (1908), the Indians reserved or retained water sufficient to irrigate their land reserve. The agreement creating the Fort Belknap Reservation out of a much larger tract occupied by the Indians was silent regarding rights to water from the Milk River. Both the area of cession and the smaller land reserve within it were arid and of little use without water:

> And this, it is further contended, the Indians knew [that the lands were arid], and yet made no reservation of the waters. We realize that there is a conflict of implications, but that which makes for the retention of the waters is of greater force than that which makes for their cession. The Indians had command of the lands and the waters -- command of all their beneficial use, whether kept for hunting, "and grazing roving herds of stock," or turned to agriculture and the arts of civilization. Did they give up all this? Did they reduce the area of their occupation and give up the waters which made it valuable or adequate?

_Winters_ v. _United States_, _supra_ at 576. _See also_ _Cappaert_ v. _United States_, 426 U.S. 128 (1976); and _Arizona_ v. _California_, 373 U.S. 546, _reh._ _denied_, 375 U.S. 892 (1963).

During the last term of the Supreme Court, _United States_ v. _Wheeler_, _supra_, was decided. There the Court was faced with the issue of whether a tribe had authority to criminally prosecute an Indian despite the lack of a congressional act authorizing such prosecution. The Supreme Court, reaffirming the _Winans_ concept,[21/]
stated:

> That the Navajo Tribe's power to punish offenses against tribal law committed by its members is an aspect of its retained sovereignty is further supported by the absence of any federal grant of such power. If Navajo self-government were merely the exercise of delegated federal sovereignty, such a delegation should logically appear somewhere. But no provision in the relevant treaties

> or statutes confers the right of self-government
> in general, or the power to punish crimes in
> particular, upon the Tribe.

United States v. Wheeler, supra at 315.   Thus, modernly the Winans doctrine is "alive and well" and applies not only to reserved rights to land, but to reserved rights to fish, reserved rights to water and reserved or retained rights of sovereignty, i.e., the right to tribal self-government.  Equally important is that reserved rights, as in Winters, arise by implication.  And those notions are buttressed by the canons of treaty interpretation requiring a narrow construction of the grant made by the Indians.

The Indians' claim to reserved fishing rights here depends upon their having possessed such rights at the time of the cession. The legal predicate to this holding is a holding that they possessed aboriginal rights in the area of cession.  European nations coming to the New World claimed title to lands which they discovered and conquered.  See, Tee-Hit-Ton Indians v. United States, 348 U.S. 272 (1955), Johnson v. M'Intosh,  21 U.S. (8 Wheat) 543, 5 L.Ed. 681 (1823).  Yet, the European nations generally, and Great Britain in particular, recognized an Indian right to occupy and use the lands claimed by these nations because of the Indians' aboriginal possession of the land.  This right, a right of Indians to occupy land until the right is expressly extinguished by the claiming nation, was recognized by the United States in the Nineteenth century and is still recognized today. Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483 (1832); Johnson v. M'Intosh, 8 Wheat 543, 5 L.Ed. 681 (1823).  Termination of this right is a political question. Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 339 (1945).  The Indians' right of occupancy, his "Indian title" is "as sacred as the fee simple of the whites."  Mitchel v. United States, 9 Pet. 711, 746 (1835).

The Confederated Congress recognized Indian aboriginal rights when it passed the Northwest Ordinance.  These were then reaffirmed in the Treaty of Ghent.  During the War of 1812 with

the British, certain members of the Chippewa tribes fought in the War on the side of the British. The British suffered a series of defeats during the war, but Britain was determined not to permit this to affect her Indian allies. 22/ Britain recognized Indian aboriginal rights during her occupation of the New World. She was resolved not to submit the Indians under her care to American sovereignty without treaty assurances that their rights would be absolutely respected. As noted by Senator Henry Clay and discussed above, Britain insisted that the Indians' rights not be interrupted, that this matter be included in the treaty ending the War of 1812, and made this demand a _sine_ _qua_ _non_ to the conclusion of a peace treaty with the Americans. The Treaty of Ghent guarantees the Indians all the possessions, rights, and privileges which were recognized before the war.

As is clear from the history of these Indians in Michigan, the Chippewas and Ottawas actually, exclusively and continuously used and occupied the ceded areas for the "long time" required to establish aboriginal possession. Although Chippewas predominated in the Upper Peninsula and the Ottawas predominated in the southern areas of the ceded lands, these peoples inhabited the region in joint and amicable possession. _Strong_ v. _United_ _States_, 518 F.2d 556 (Ct.Cl. 1975); _United_ _States_ v. _Pueblo_ _of_ _San_ _Ildefonso_, 513 F.2d 1383 (Ct.Cl. 1976); _Turtle_ _Mountain_ _Band_ _of_ _Chippewa_, _Inc._, v. _United_ _States_, 490 F.2d 935 (Ct.Cl. 1974); _Sac_ _and_ _Fox_ _Tribe_ v. _United_ _States_, 315 F.2d 896, 903, n.11, 161 Ct.Cl. 189, 202 n.11 (1963). These facts were implicitly and explicitly recognized by the United States when it negotiated the 1836 treaty.

As Dr. Tanner testified, the Indians' aboriginal occupation included not only a large land area but a significant portion of the Great Lakes. Accordingly, the cession is described as "all that tract of country . . . to the boundary line _in_ _Lake_ _Huron_ between the United States and the British province of Upper Canada . . . ." Further into Article First, the ceded area is described as:

> ". . . to a point in Lake Superior . . . thence south to the mouth of said [Chocolate] river . . . thence, in a direct line, _through_ _the_ _ship_ _channel_ _into_ _Green_ _bay_ . . . thence south to a point _in_ _Lake_ _Michigan_ . . . [and] comprehending _all_ _the_ _lands_ _and_ _islands_ _within_ these limits . . . . [Emphasis supplied.] 23/

The important decision of the Michigan Supreme Court in _People_ v. _LeBlanc_ 399 Mich. 31, 248 N.W.2d 199 (1976) reached precisely the same conclusion regarding Article First:

> Moreover, the area described in Article First, that being the territory ceded by the Ottawas and the Chippewas to the United States, extends well into the Great Lakes.  For example, the ceded area is bounded in part by a line traveling from the mouth of the Thunder-bay river, "thence northeast to the boundary line in Lake Huron . . . thence northwestwardly, . . . through the straits, and river St. Mary's, to a point in Lake Superior north of the mouth of Gitchy Seebing, or Chocolate River . . . ."

_People_ v. _LeBlanc_, 248 N.W.2d at 206 (emphasis in original, footnote omitted).

In exchange for this large cession of land and water the Indians received certain monetary payments and other goods and services from the United States.  Within the area of cession the Indians reserved certain land parcels and rights under the treaty.  In particular, they reserved nine land areas on the Upper Peninsula and five areas on the Lower Peninsula.  The issue in question here is whether the Indians also possessed a right to fish in the waters ceded which they did not grant to the United States but reserved for themselves.

The right to fish is one of the aboriginal usufructuary rights included within the totality of use and occupancy rights which Indian tribes might possess.  _Menominee Tribe_ v. _United States_, 391 U.S. 404 (1968); _Kimball_ v. _Callahan_, 493 F.2d 564 (9th Cir. 1974); _People_ v. _LeBlanc, supra_; _State_ v. _Tinno_, 94 Ida. 759, 497 P.2d 1386 (1972).

The factual predicate giving rise to the reservation or retention of the right to fish in the Great Lakes is a showing of the Indians' dependence upon that resource.  The evidence relating to Indians' use of the fishery resource, as related above, is overwhelming.

Dr. Tanner testified about the life cycle of the Indians during treaty times which included two major fishing seasons, spring and fall, as well as ice fishing in the winter.  Dr. Cleland placed the _treaty Indians'_ use of the resource into a historic and prehistoric context.  All Indians of the Upper Great Lakes, including the Ottawa and Chippewa, were fishing peoples.  The settlement patterns of native peoples of the Upper Great Lakes, including the treaty Indians in the

case at bar, were strongly influenced by available resources, especially fish. It is no mere coincidence that the Articles Second and Third land reserves are all located on the Great Lakes and all adjacent to important fishing grounds. It is also noteworthy that most major archaeological sites in the Upper Great Lakes are near or within Article Second and Third land reserves. In order to reach a conclusion that the Indians were not dependent upon this valuable fishery resource, the court would have to ignore hundreds of years of recorded testimony and thousands of years of prehistoric information.

That the treaty Indians were commercial, as well as subsistence, fishermen is also well documented and beyond dispute. The Indians caught fish and traded them for goods available to them from the European market. They were employed by the American Fur Co. to catch fish. Indians operated their own commercial outfits and sold their catch to the American Fur Co. as well. Years after the treaty, Smith and Snell (Ex. P-4) reported that most of the fishermen they surveyed were of Indian heritage. Right down to today a significant proportion of commercial fishermen on the Great Lakes included within the area of cession are of Indian heritage.

The Michigan Supreme Court decision in People v. LeBlanc, supra, also supports plaintiffs' contentions regarding the commercial dimension of the Indian fishery:

> The record below [which was much less detailed
> than the record here] clearly indicates that
> fishing was central to the Chippewa way of
> life at the time the Treaty of 1836 was neogita-
> ted.
>
> * * *
>
> Clearly, too, Chippewa fishing had a commercial
> dimension. In fact, Article Fourth of the Treaty
> of 1836 provided for the delivery of 10,000 fish
> barrels and 2,000 barrels of salt to the Indians
> over a twenty year period to be used in the fishing
> business.

People v. LeBlanc, 248 N.W.2d at 204 (footnote omitted).

The State would have this court find that the Indian fishery had no commercial aspect because, in effect, they did not own and operate the American Fur Co. But even the State's own witness testified that the Indians did not have the capital or the business

experience to start such a venture.  (Tr. 1770.)  Besides, the American Fur Co. was "one of the most successful economic companies in the early American history, one of the prime examples of big business at this early period." (Tr. 1770.)  This type of business activity simply has no analogue in the society of the Ottawa and Chippewa.  If the standard the tribes are required to meet is that they too controlled a business like the American Fur Co. -- the General Motors of the Great Lakes -- then plaintiffs have failed. (See Tr. 1884.)  However, there is no such burden on the Indians. Plaintiffs have shown that treaty Indians relied upon the resource for subsistence purposes and that their fishery had a substantial commercial dimension as well.  From the beginning of the commercial market, as we understand and use that term today, the Indians were participants. Obviously they could not participate in a European-type market economy until there was one.

On the basis of the findings of fact above, which concluded that the Ottawa and Chippewa Indians of northern Michigan have relied upon the catching of fish in the Great Lakes for subsistence and for commerce for centuries, and that such a reliance has been the one most important single aspect of their lives from a time at least one hundred years before any contact with Europeans right up until the time of the signing of the Treaty of 1836, this court rules as a matter of law that the Indians who are plaintiffs in this action held an aboriginal and treaty right under the Treaty of Ghent to catch fish in the Great Lakes at the time of the 1836 Treaty.  United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941).

Under Winans, supra, Indians retain whatever rights they possess which are not relinquished by treaty or taken by Congress. Rights are reserved by implication if they are not expressly relinquished and a contrary conclusion is inconsistent with the use of the resource by the Indians at the time of the treaty.  United States v. Wheeler, ___ U.S. ___, 55 L.Ed.2d 303 (1978); Cappaert v. United States, 426 U.S. 128 (1976); Arizona v. California, 373 U.S. 546 (1963); Winters v. United States, 207 U.S. 564 (1908); United States v. Winans, supra.

On the basis of the following facts: (1) the treaty of 1836 contains no language expressly relinquishing the aboriginal right of the treaty Indians to fish in the ceded waters; (2) at the time of the 1836 treaty subsistence and commercial fishing was essential to the livelihood of these Indians and for them to have relinquished fishing rights would have been tantamount to agreeing to a systematic annihilation of their culture, and perhaps of their very existence; (3) both parties to the negotiation were aware that the Indians had no way of sustaining themselves in Michigan except by fishing, and (4) the Indians did not understand the treaty to limit their right to fish, it is clear that by the Treaty of 1836 the Indians impliedly reserved a right to fish commercially and for subsistence in the ceded waters of the Great Lakes.  _Winters_ v. _United States_, 207 U.S. 564 (1908); _United States_ v. _Winans_, 198 U.S. 371, 381 (1905).  This holding is required by the above findings of fact and conclusions of law and by the rules of construction set forth in the beginning of this opinion.  Further, however, in view of the dismal history which generally surrounds the dealings of the United States with these first inhabitants of this land, and the history of this specific treaty negotiation, punctuated by numerous instances of underhanded and perfidious dealings with these trusting and gentle people, simple justice requires that this court begin to put an end to the unfairness which has plagued the Indians in their dealings with the white man from their first contact with him, and restore to the Indian that which was by nature his, and now by right also.  The holding does not go so far as to void the treaty because of lack of consent.  _See_, _e.g._, _Lone Wolf_ v. _Hitchcock_, 187 U.S. 553 (1903), where the Court held that it could not consider the validity of an agreement allegedly obtained by fraudulent misrepresentation because the question of the validity of the agreement belonged to Congress.  The language of the treaty does grant territory to the United States. _DeCoteau_ v. _District County Court_, 420 U.S. 425 (1975); _United States_ v. _Choctaw Nation_, 175 U.S. 494, 531 (1903). Were it not for _Lone Wolf_, _supra_, and _DeCoteau_, _supra_, which proscribe invoking the canon that legal ambiguities are to be resolved to the

98.

benefit of the Indians to the extent of disregarding clear expressions of tribal and Congressional intent, this court, would, on the record before it, identify this as an invalid treaty because it was the product of fraud, duress, conflicts of interest, coercion, and was very likely produced by the alcohol of liquor peddlers who sought to keep the Indians from knowing what they were doing.

D. Article Thirteenth as Protection of the Right.

As the court ruled in People v. LeBlanc, supra, the language of Article Thirteenth embraced the right to fish even though fishing is nowhere specifically mentioned in the language of the treaty article:

> Given the central position of fishing, both subsistence and commercial, in the Chippewa culture during the time period of the Treaty of 1836, there can be little doubt that the Indian stipulation in Article Thirteenth "for the right of hunting on the lands ceded, with the other usual privileges of occupancy" was understood by the Chippewas to include the right to fish.

People v. LeBlanc, supra, 248 N.W.2d at 205.

The construction of the treaty language is consistent with numerous state and federal decisions. In Menominee Tribe of Indians v. United States, 391 U.S. 404, 405-6 (1968), the Supreme Court held that the Treaty of Wolf River which created a home for the Indians" '. . . to be held as Indian lands are held . . .'" included the right to hunt and fish:

> Nothing was said in the 1854 treaty about hunting and fishing rights. Yet we agree with the Court of Claims that the language "to be held as Indian lands are held" includes the right to fish and to hunt. The record shows that the lands covered by the Wolf River Treaty of 1854 were selected precisely because they had an abundance of game. See Menominee Tribe v. United States, 95 Ct.Cl. 232, 240-241 (1941). The essence of the Treaty of Wolf River was that the Indians were authorized to maintain on the new lands ceded to them as a reservation their way of life which included hunting and fishing.

391 U.S. at 406 (footnotes omitted). See also Kimball v. Callahan, 493 F.2d 564 (9th Cir. 1974), cert. denied, 419 U.S. 1019 (1974), and State v. Tinno, 94 Ida. 759, 497 P.2d 1386 (1972).

Both Drs. Tanner and Clifton testified regarding the Indians' understanding of Article Thirteenth and said that the term "usual privileges of occupancy" included the use of all of the ceded area including the Great Lakes fishery.

The phrase of Article Thirteenth which purports to limit the right -- "until the land is required for settlement" -- was discussed above in the findings of fact.  It is ambiguous as to any definite period of Indian occupancy.  Since it was understood by the Indians not to affect their aboriginal and treaty rights to fish, but to leave them with the right to fish "as long as the sun rose and the waters flow," it cannot operate to terminate these fishing rights. It was only intended by the United States to limit Indian use of particular plots of land.

The Supreme Court of Michigan came to an analogous con- clusion in People v. LeBlanc, supra, when it stated:

> Undoubtedly this clause ["until the land is required for settlement"] was intended to protect the right of non-Indians to settle in the ceded area without interference from Chippewas claiming "the usual privileges of occupancy," and has limited the rights of the Chippewas to hunt. However, the ceded water areas of the Great Lakes have obviously not been required for settle- ment, and therefore the fishing rights reserved by the Chippewas in these areas have not been teminated.

People v. LeBlanc, supra, 248 N.W.2d at 207.  The Michigan Supreme Court relied upon the fact that any other conclusion would contort the English language.

I expressly adopt this holding as an additional ground for the conclusion that the limiting clause of Article Thirteenth does not impose a temporal limitation upon Indian aboriginal and treaty fishing rights in the Great Lakes.

In summary, the wellspring of the reserved right to fish in the ceded waters of the Great Lakes rests on its implied reservation from the grant of land from the Indians to the United States and also on Article Thirteenth.  The right is implied because it was never explicitly ceded away by the Indians; thus, they retained it.  The reason it was not granted was because the Indians were too heavily dependent upon fish as a food source and for their livelihood to ever relinquish this right.

It must be remembered that one of the principal purposes behind the 1836 treaty was to pave the way for anticipated population growth caused by the westward and northward movement of settlers. Clearly this could be accomplished without the Indians surrendering their pre-existing rights to fish in the Great Lakes.

In addition to the Indians' implied reservation of this aboriginal right protected by the 1836 Treaty and their right under the Treaty of Ghent, the express language of Article Thirteenth protects the Indians' right to fish in the ceded waters of the Great Lakes.

E. Scope of the Present Indian Fishing Rights.

The scope of the Indian right to fish at the present time is defined by the character of Indian fishing at the time of the treaty. Accordingly, the retained aboriginal right is not limited to any geographical area within the ceded area. Evidence has revealed that the Indians of 1836 fished extensively over the entire ceded area. They had the means to cover the entire ceded area and went where the fish were to be found. Therefore, the right cannot be limited in any artificial manner to imaginary and unrealistic boundaries within the area of cession. Choctow Nation of Indians v. United States, 318 U.S. 423, 431-32 (1943).

Similarly, the means used to fish were not restricted by the Treaty of 1836 nor by the Indians in any other agreement with the United States. The Indians' right to fish, like the aboriginal use of the fishery on which it is based, is not a static right. The reserved fishing right is not affected by the passage of time or changing conditions. The right is not limited as to species of fish, origin of fish, the purpose of use or the time or manner of taking. The right may be exercised utilizing improvements in fishing techniques, methods and gear. It may expand with the commercial market which it serves, and supply the species of fish which that market demands, whatever the origin of the fish. Peterson v. Christenson, 455 F.Supp. 1095 (E.D. Wis. 1978); United States v. Washington, 384 F.Supp. 312 (W.D. Wash. 1974); State v. Gurnoe, 53 Wisc.2d 390, 192 N.W.2d 892 (1972).

F. The Removal Act.

The State endeavored to show that the Treaty of 1836 obligated the Indians to remove from Michigan to lands west of the Mississippi and that consequently the Indians were not concerned to preserve their aboriginal rights. Testimony was adduced through the State's witness, Dr. Mason, to the effect that removal was tantamount to an accomplished fact and that all persons associated with the treaty, including the Indians, knew that removal would take place at the time the treaty was negotiated.

The State's position in this matter ignores the history of the Michigan Indians, the Removal Act, and the language of the treaty here in question.

First and foremost it must be remembered that removal of the Ottawa and Chippewa never occurred. Indeed, descendant Indians and successor tribal groups to those signing the 1836 treaty have remained in Michigan to this date and are party plaintiffs in this litigation. So long as the Indians remain in the area of the cession, they may continue to exercise their reserved aboriginal and treaty rights to fish in the Great Lakes.

The Removal Act of 1830 does not mandate that the President negotiate treaties requiring removal. It is permissive in nature. Congress did nothing to lessen the obligation of the Executive toward the Indians.[24/] The principal authorization of the Act is to make it lawful for the President to offer Indians who chose to exchange their homelands, lands west of the Mississippi belonging to the United States. The Act did nothing to relieve the United States of prior treaty obligations toward any Indian tribes. Section 7 of the Act declares: "Provided, That nothing in this act contained shall be construed as authorizing or directing the violation of any existing treaty between the United States and any of the Indian tribes."

When the removals took place under this Act, it was at the "request" of President Jackson. It was at Jackson's behest that Cass and Schoolcraft sought to have the Indians of Northern Michigan remove. They were not successful, however. The language of the 1836 treaty does not mandate removal of the Indians. It stated that ". . . as soon as

the said Indians desire it . . ." and later in the Article ". . . when the Indians wish it, the United States will remove them . . . ." To argue that this language mandates removal is patently absurd. Similarly, many of the treaties negotiated during the 1830's did not mandate removal.

Government officials and the United States Senate knew how to select language mandating removal when they desired.[25/] Comparing the language of the 1832 Treaty with the Winnebago and the 1833 Treaty with the Chippewa to the language employed in Article Eighth in the Treaty of 1836, the conclusion is inescapable -- the Treaty of 1836 did not require, obligate, or mandate removal of the Indians to lands west of the Mississippi.

None  of the critical correspondence between government officials leading to the 1836 treaty mentions the word "removal." The treaty instructions to Schoolcraft from Lewis Cass dated March 11, 1836 (Ex. P-53, 53A) did not mention the word "removal." The treaty minutes (Ex. P-17, 17A) are devoid of that word as well. The first time the term "removal" appears is in the treaty itself, and then only in the context of permissiveness.

Dr. Tanner testified regarding the Indians' objections to removal.  The Indians in the Upper Peninsula did not even regard removal to be a threat.  They refused to send delegates to travel with James Schoolcraft to view the land west of the Mississippi. Those Indians who went were largely from the Lower Peninsula and did not represent the Indians throughout the area of cession.  With the exception of one person, none of the Indians were designated as first, second or third class chiefs in the list attached to the *Treaty* of 1836.  (See Ex. P-190).  Those Indians who went on the James Schoolcraft exploring party did not agree to remove, assuming arguendo they were clothed with authority to represent all Indians throughout

103.

the ceded territory. They agreed to accept the land they visited, but only if any Indians personally chose to remove. (State Ex. 62, 99.)

Straining these facts to their limit and beyond would not demonstrate that the parties to the treaty knew that removal was an accomplished fact at the time the treaty was negotiated. At best the facts demonstrate that the treaty commissioners were planning for future contingencies. If settlement of the state occurred at the pace anticipated, which it did not, and if Indians requested removal, which they did not, it was possible that removal might occur at some time in the future. There was not even a time certain at which removal was to occur.

The fact that the Indians stayed in Michigan expresses their intentions more eloquently than any other fact which has been presented to the court. The Indians did not remove. Because the Indians stayed in Michigan and it has been previously determined that they retained their aboriginal rights and Treaty of Ghent rights to fish in the Great Lakes, they retain the right to fish in the waters of the Great Lakes today.

G. The Fishing Rights Reserved by the Treaty of 1836
   Were not Relinquished by the Treaty of 1855.

   1. A Treaty Right May be Abrogated or Extinguished
      Only by the Most Explicit and Unequivocal Act
      of Congress.

Through the interweaving of thousands of statutes, treaties and court decisions, a complex relationship has developed interrelating the respective powers of Indians tribes, the federal government and the states. From the founding of this nation to the present, however, certain principles governing those relationships have held firm. One such principle is that Indian tribes retain all powers of self-government, sovereignty and aboriginal rights not explicitly taken from them by Congress. McClanahan v. Arizona Tax Com'n, supra; Williams v. Lee, 358 U.S. 217 (1959); United States v. U.S. Fidelity & Guaranty Co., 309 U.S. 506 (1940); Ex parte Crow Dog, 109 U.S. 556 (1883). Another principle is that the federal government, acting

primarily through Congress, has plenary authority over Indians and Indian tribes.  Warren Trading Post v. Arizona Tax Com'n, 380 U.S. 685 (1965); Williams v. Lee, supra; United States v. Nice, 241 U.S. 591 (1916); United States v. Rickert, 188 U.S. 432 (1903); United States v. Kagama, 118 U.S. 375 (1886).

These two principles -- plenary federal authority over Indians and retention of tribal powers -- interface in the doctrine surrounding abrogation of existing treaty rights.  While Congress has the plenary authority to abrogate the fishing rights reserved by the Treaty of 1836, it must do so expressly and unequivocally.  The intention to abrogate or modify a treaty provision will not be lightly imputed to Congress.  Menominee Tribe v. United States, supra; Pigeon River Improvement Slide & Boom Co. v. Cox, Ltd., 291 U.S. 138 (1934); United States v. White, 508 F.2d 453 (8th Cir. 1974); Kimball v. Callahan, supra.  Congressional acts purporting to abrogate or modify treaty rights are subject to the same canons of construction as are Indian treaties.

An important case applying the express abrogation doctrine to hunting and fishing rights is Menominee Tribe v. United States, supra.  In that case the Supreme Court was faced with the issue of whether the tribe's hunting and fishing rights, which were reserved by the Treaty of Wolf River, had been abrogated by a later congressional act terminating the reservation.  Under the act (Menominee Indian Termination Act of 1954, 68 Stat. 250, 28 U.S.C. §§ 891-902), the reservation was taken out of federal ownership and federal supervision over the tribe and its members ended.  Because the language of the termination act did not explictly mention the extinguishment of hunting and fishing rights, the Supreme Court held that those treaty rights survived termination. Thus, tribal members were free to hunt and fish, pursuant to their treaty, even though the United States no longer considered them to be its wards.  See also, Kimball v. Callahan, supra.

105.

Defendants have argued that the Treaty of 1855 abrogated the Indians' reserved fishing rights. This contention has centered in Articles 3 and 5 of the Treaty. Neither of those articles had any effect whatever on the reserved fishing rights.

2. <u>Article 3 of the Treaty of 1855</u>.

As the record amply demonstrates, the "liabilities" and "legal and equitable claims" released by Article 3 were <u>financial</u> -- and <u>only</u> financial -- matters, and did not include the reserved fishing right. Given those facts, it is clear that the Michigan Supreme Court was correct when it held that the fishing rights secured by the Treaty of 1836 were not released or abrogated in Article 3 of the Treaty of 1855. <u>People</u> v. <u>LeBlanc</u>, <u>supra</u>. As that Court said:

> While it is conceivable that the United States intended "claims . . . for other things" in the Treaty of 1855 to refer to fishing rights reserved by the Chippewas in the Treaty of 1836, such seems highly unlikely given the complete absence of any discussion of the termination of such rights in the treaty negotiations.
>
> In any case, it is clear that the Chippewas and the Ottawas would not have understood Article Three of the Treaty of 1855 to terminate hunting and fishing rights reserved in the Treaty of 1836 given the absence of any mention of such prospect.
>
> * * *
>
> Given, then, the rules of construction mandating that a treaty should be interpreted as the Indians understood it, and that the language of the treaty should not be read to the prejudice of the Indians, we will not strain the language of Article Three of the Treaty of 1855 to mean that reserved fishing rights pursuant to the Treaty of 1836 were terminated.
>
> Our conclusion is buttressed by the directive of the United States Supreme Court that "the intention to abrogate or modify a treaty is not to be lightly imputed." Menominee Tribe v. United States, supra, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697.

248 N.W.2d at 211-12.

This interpretation of Article 3 is also supported by the decision of the Court of Claims in Ottawa and Chippewa Indians v. United States, 42 Ct.Cl. 240 (1907).  There, the Indians sued the United States to recover $19,000 plus accrued interest which represented the $1,000 per year mandated by the 1836 treaty to be invested in stock of the Treasury Department.  The United States set the money aside each year beginning in 1836 and ending in 1855 when it "covered" the money into the Treasury.

The government in that litigation contended that Article III of the 1855 treaty operated to release the United States from the Indians' claim to the $19,000 plus accrued interest. The Court of Claims disagreed because the treaty released the United States from delivering various goods, services or annuities in the future.  Thus, as to the consideration flowing from the United States to the Indians which had been promised under old treaties but not yet delivered, Article III operated as a release.  However, the $1,000 annuity appropriated by Congress and in fact set aside was not released by Article III because it was not an executory promise of the United States.  Rather, it was an executed promise, a promise already performed by the United States and, therefore, not released by Article III of the 1855 treaty.

The Court of Claims' analysis is consistent with plaintiffs' contention herein and with the Michigan Supreme Court's decision in LeBlanc.  A reserved "right" is not a "legal or equitable claim or liability."  Article 3 operated to release the United States from those promises previously made to the Indians, but not fulfilled, for goods, services and monies; it did not release the United States from promises made and in fact performed.  Ottawa and Chippewa v. United States, supra.  The fishing "right" originated in and remains to this day with the Indians; the right did not originate with and was not given to the Indians by the United States.  The United States could not release a right it did not own.  It was the Indians alone who had the power to release their fishing rights and this they have never done.

107.

As we have seen, the Treaty of 1855 constituted a formal abandonment by the federal government of any effort to remove the Indians of the treaty area from Michigan. (See, e.g., Ex. P-89 and 89A.) One of its avowed purposes was to provide the Indians with permanent homes in Michigan. It would have been wholly illogical to allow the Indians to stay in Michigan but prohibit them from engaging in their fishing practices in the Great Lakes. Such a prohibition would have left the Indians destitute and deprived them of a traditional activity vital to their subsistence and commercial pursuits.

Since the reserved right to fish in the ceded waters is not a "liability on account of former treaty stipulations" or a "legal or equitable claim" within the meaning of Article 3 of the Treaty of 1855, as set forth above, the Indians did not cede, surrender or relinquish their fishing right by Article 3. People v. LeBlanc, supra, 248 N.W.2d at 211-12. See also, Ottawa and Chippewa Indians v. United States, 42 Ct.Cl. 240 (1907). The right to fish was not even discussed in the treaty negotiations. The restriction of Indian rights proposed by the State will not be implied from such general treaty language. Menominee Tribe v. United States, 391 U.S. 404 (1968). Article 3 had nothing whatever to do with fishing rights and no impact whatever upon them.

3. Article 5 of the Treaty of 1855.

It is clear that Article 5 has no effect either upon fishing rights secured by the Treaty of 1836 or the modern political successors to the treaty Indians -- Bay Mills and the Sault Tribe.

Article 5 of the Treaty of 1855 was inserted in that treaty for the convenience of the United States in its future dealings with the Indian bands.

108.

This clause was intended to accomplish two goals: to relieve the United States of the burden of convening general councils in the event local matters required attention in the future, and to satisfy the Ottawa and Chippewa's desire to be treated separately. Article 5 had no impact on the governmental structure of the bands. There was no change in the way in which the Indian agents dealt with them after the treaty, except that they were never convened again as one group. (Tr. 331-35.)

Like Article 3, Article 5 has nothing whatever to do with reserved fishing rights. Although this issue was not raised in the LeBlanc litigation, the Michigan Supreme Court's reasoning concerning Article 3 is dispositive. The Court refused to construe the release clause as an abrogation of reserved rights because there was no discussion of fishing rights during the treaty negotiations, because the Indians would not have understood Article 3 to terminate hunting and fishing rights and because construing the language as an abrogation would be wholly contrary to the canons of treaty construction.

This same reasoning applies to Article 5. But the meaning of Article 5 can be easily discerned from the four corners of the treaty. There are no ambiguities to be resolved in favor of the Indians. The United States wanted to handle disputes arising as a result of the 1855 treaty on a localized basis and sought to avoid the need for calling a general convention of the Indians to resolve future problems, and the Indians of the treaty area wished to be treated with locally, and not as an artificial "Ottawa and Chippewa nation." This -- and only this -- is what Article 5 accomplishes.

Article 5 also has no effect upon the plaintiff-intervenor tribes, Bay Mills and the Sault Tribe. Both tribes are modern political successors in interest to the Indians who were party to the Treaty of 1836. Both are recognized by the United States as currently functioning Indian tribes maintaining tribal governments. Both tribes have reservations held in trust for them by the federal government -- reservations which are within the boundaries of the reservations retained in the Treaty of 1836. Each tribe is organized pursuant to Section 16 of the Indian Reorganization Act, 25 U.S.C. §476, and operates under a constitution and by-laws adopted pursuant to that

section. The membership criteria embodied in the constitutions of both tribes require that tribal members be Indians of the treaty area. (Tr. 1059-62, 1127-29; Ex. P-119, 120.)

The federal government, through the Department of the Interior, has recognized and confirmed that Bay Mills and the Sault Tribe are political successors in interest to the Indians of the treaty area. The Department is holding reservations in trust for the tribes, approving tribal constitutions and issuing treaty fishing identification cards to tribal members pursuant to 25 C.F.R. Part 256. The proclamation of a reservation and the approval of a tribal constitution are acts of recognition and acknowledgment of a federal relationship. United States v. John, ___ U.S. ___, 57 L.Ed.2d 489, 500 (1978). Courts will not disturb what Congress or the executive have done in terms of organizing or recognizing the political authority of Indian tribes. United States v. Sandoval, 231 U.S. 28 (1913); United States v. Holliday, 70 U.S. (3 Wall.) 407 (1867); United States v. Washington, supra. As the agency charged with the administration of laws affecting Indians, actions and interpretations of the Department of the Interior are entitled to "great weight." United States v. Jackson, 280 U.S. 183 (1930).

Even if the federal relationship with Indian tribes or bands is not continuous, this does not destroy federal rights or bar the recognition of present tribal groups as political successors in interest. United States v. John, supra. Even if the Treaty of 1855 were the only source of the tribe's federal relationship, the treaty provision would not end aboriginal federal rights or prevent recognition of a modern tribal group as a political successor in interest. United States v. John, supra. See also, United States v. Wright, 53 F.2d 301 (4th Cir. 1931), cert. denied, 283 U.S. 539 (1931).

110.

H. <u>Whether a Reservation exists in Whitefish Bay is not</u>
<u>Before the Court in this Phase of the Trial.</u>

   Phase One of the trial in this case was limited to
questions about fishing rights.  The question of whether a
reservation continues to exist in Whitefish Bay has implications
for whether the Bay Mills tribe has exclusive fishing rights in that
area of Lake Superior, but this question goes beyond whether the
Indians retained aboriginal and Treaty of Ghent fishing rights in
the Treaty of 1836 which were not abrogated by the 1855 treaty.  Accor-
dingly, at the present time I decline to consider the evidence presented
on this issue and do not rule on the questions of law involved.

I. <u>The State of Michigan Cannot Regulate Indian Treaty Fishing</u>
<u>in Accordance with Existing Principles of Indian Law.</u>

  1. <u>The State's Power to Affect Treaty Rights</u>
<u>Fishermen is Preempted by the Supremacy Clause.</u>

   A fundamental principle of federal constitutional law is that
a state may not enact or enforce any statute or regulation in conflict
with treaties between the United States and Indian tribes.  The
Supremacy Clause of the United States Constitution (Article VI,
clause 2) states just that:

> This Constitution, and the Laws of the United
> States which shall be made in Pursuance thereof;
> and all Treaties made, or which shall be made,
> under the Authority of the United States, shall
> be the supreme Law of the land; and the Judges in
> every State shall be bound thereby, any Thing in
> the Constitution or Laws of any State to the
> Contrary notwithstanding.

The Supremacy Clause is applicable to international treaties and
Indian treaties alike.  <u>See</u> <u>United</u> <u>States</u> v. <u>43</u> <u>Gallons</u> <u>of</u> <u>Whiskey</u>,
108 U.S. 491 (1883); <u>United</u> <u>States</u> v. <u>Lariviere</u>, 93 U.S. 188 (1876);
<u>Worcester</u> v. <u>Georgia</u>, <u>supra</u>.  It is equally well established that
a matter generally within the exclusive power of a state, such as
fish and game management, is preempted by the federal government when
a federal purpose, as evidenced by a treaty or statute, is dominant

111.

and would otherwise be frustrated.  See Douglas v. Seacoast Products, Inc., 431 U.S. 265 (1977).  The Ninth Circuit in United States v. Washington, supra, at 684, cogently summarized these principles in a treaty fishing rights case:

> By virtue of its police power, the state has initial authority to regulate the taking of fish and game.  Geer v. Connecticut, 161 U.S. 519, 61 S.Ct. 600, 40 L.Ed. 793 (1896).  The federal government, however, may totally displace state regulation in this area . . . .
> The Federal government may also preempt state control over fish and game by executing a valid treaty and legislating pursuant to it.  Missouri v. Holland, 252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641 (1920).  Furthermore, such a treaty may preempt state law even without implementing legislation; a treaty guaranteeing certain rights to the subjects of a signatory nation is self-executing and supersedes state law.  Asakura v. City of Seattle, 265 U.S. 332, 341, 44 S.Ct. 515, 68 L.Ed. 1041 (1924).  Consequently, the state may enact and enforce no statute or regulation in conflict with treaties in force between the United States and Indian nations.

To paraphrase the Ninth Circuit's analysis, the issue in this case is not whether the federal government has the power to preempt Michigan fishing laws and regulations (since it clearly does), but whether the federal government has done so by entering into the treaties of 1836 and 1855 and by their subsequent implementation.  See, e.g., Menominee Tribe v. United States, supra; Puyallup Tribe v. Dept. of Game (Puyallup I), 391 U.S. 392 (1968); Tulee v. Washington, supra; United States v. Winans, supra; Worcester v. Georgia, supra; Kimball v. Callahan, supra; Skokomish Indian Tribe v. France, 320 F.2d 205 (9th Cir. 1963), cert. denied, 376 U.S. 943 (1964); Maison v. Confederated Tribe of the Umatilla Indian Reservation, 314 F.2d 169 (9th Cir. 1963).

Although generally state law is often applicable to Indians outside a reservation, there can be no application where it would "impair a right granted or reserved by federal law."  Mescalero Apache Tribe v. Jones, supra at 148.  A treaty guaranteeing a right to fish distinct from that enjoyed by other citizens is such an express federal law.  United States v. Washington, supra, 520 F.2d at 684.  As is clear in this case, the Michigan Indians had both aboriginal rights and rights guaranteed by the Treaty of Ghent when they signed the 1836 Treaty.  They retain these rights.  Other citizens of Michigan possess

only a privilege to fish.  That they possess a mere privilege is recognized by Michigan law.  M.C.L.A. 308.1 (Supp. 1978).  The Treaty of March 28, 1836 (7 Stat. 491) guarantees a right to fish which is distinct from the privilege to fish enjoyed by other citizens of the State of Michigan.  United States v. Winans, 198 U.S. 371, 380-81 (1905); United States v. Washington, 384 F.Supp. 312 (1974).

The point of the preemption doctrine, simply stated, is that state regulation in an area where the federal purpose is dominant and state regulation would be at cross purposes with federal objectives is violative of the Supremacy Clause and must fail even where Congress has not explicitly proscribed the reach of state law.  The principle is especially important where federal purposes are expressed not by mere legislation but by a solemn exercise of the treaty power and where the exercise concerns Indians, a subject manifestly within the ambit of federal powers.[26]

It is well established that the usual right of a state to manage game within its boundaries[27] is not infringed by a federal treaty and regulations under it concerning taking game within the state, because the sovereign power of the state must yield to paramount federal power.[28] Missouri v. Holland, 252 U.S. 416 (1920).  In Holland, the court rejected a challenge by the state to federal enforcement of certain game regulations promulgated in furtherance of the Migratory Bird Treaty on the ground that it would be an unconstitutional interference with the state's sovereign power.  While recognizing that the subject matter -- game regulation -- is generally a state prerogative, the court found that "a treaty may override its power," 252 U.S. at 434, because "[H]ere a national interest of very nearly the first magnitude is involved. It can be protected only by national action in concert with that of another power."  252 U.S. at 435.

The circumstances in this case bear out the tremendous national importance placed upon the treaties at the time the United States sought to negotiate them.  Legal authorities support the proposition that it continues to be in the national interest to observe and enforce treaty obligations owed to Indians.  Fulfilling

these obligations to Indians is no less lofty a national priority than the protection of migratory birds.

The line of cases dealing with treaty fishing rights secured by the "Stevens treaties" of the Northwest, such as <u>Puyallup Tribe</u> v. <u>Washington</u> (<u>Puyallup I</u>), 391 U.S. 392 (1968) and its progeny, which have allowed a sharply limited power in the state to regulate the exercise of off-reservation treaty fishing rights, must be distinguished from the present case.

In <u>Puyallup Tribe of Indians</u> v. <u>Washington</u>, 391 U.S. 392 (1968) (<u>Puyallup I</u>), and <u>Washington</u> v. <u>Puyallup Tribe</u>, 414 U.S. 44 (1973) (<u>Puyallup II</u>), the United States Supreme Court ruled that because of the language contained in the Indian treaty with the Puyallup Indians, the state had a right to regulate Indian fishing for purposes of conservation of the fishing resources, provided that those regulations did not discriminate against the Indians.

However, there appears to be some inconsistency within the Court's two opinions on the right to regulate treaty rights. In <u>Puyallup I</u> the Court seemed to be making a distinction between the treaty right to fish in certain places, and the right to fish in a particular manner. It appears that the Court saw the first right -- the right to fish in accustomed places -- as being a Treaty right, and the second as a right which was held in common with the rest of the citizens of the State, and therefore subject to the ordinary state police power, i.e., regulation for conservation purposes. The second right was not seen as being a treaty right.

For example, in <u>Puyallup I</u>, the court states: "the right to fish 'at all usual and accustomed' places may, of course, not be qualified by the State . . ." 391 U.S. at 398. Thus even though the Indians may hold this right in common with the non-Indian citizens of the state (e.g., Indians and non-Indians may fish side-by-side at the same spot), since this is an express <u>Treaty</u> right, it may not be regulated by the State.

However, it appears that the Court in <u>Puyallup I</u> saw the manner of fishing as being outside the rights conferred by the treaty:

> [T]he manner in which the fishing may be done and its purpose, whether or not commercial, are not mentioned in the Treaty. We would have quite a different case if the Treaty had preserved the right to fish at the"usual and accustomed" manner. But the Treaty is silent as to the mode or modes of fishing that are guaranteed.

391 U.S. at 398.  Again, later in the Opinion, where it was speaking of a similar case which it had advanced in support of this distinction, the court states:

> In other words, the "right" to fish outside the reservation was a treaty "right" that could not be qualified or conditioned by the State.  But "the time and manner of fishing necessary for the conservation of fish," not being defined or established by the treaty, were within the reach of state power.
>
> The overriding police power of the State, expressed in nondiscriminatory measures for conserving fish resources, is preserved.

391 U.S. at 399.

The Court in Puyallup I appears to be saying that the treaty right is the right to fish at accustomed places, and being a treaty right, it is not subject to regulation by the State.  The right to fish in a certain manner is not a treaty right, however, and thus is subject to the usual police powers of the State.

In Puyallup II, however, the court appears to shift ground. First, it states that the manner of fishing is now also a treaty right: "Our prior decision recognized that net fishing by these Indians for commercial purposes was covered by the Treaty."  414 U.S. at 48. However, there is no language in Puyallup I which indicates that Indian commercial fishing was protected by the Treaty.  In fact, the language in Puyallup I indicates that the Court recognized that Indian commercial fishing existed at the time of the signing of the Treaty, but the Court nevertheless went on to draw its place-manner distinction:  "But the manner in which the fishing may be done and its purpose, whether or not commercial, are not mentioned in the Treaty."  391 U.S. at 398.

It appears that instead of acknowledging that its definition of the Indian treaty fishing rights was too narrow in Puyallup I though, the Court let that decision stand while implicitly modifying it in Puyallup II.

A second major shift in Puyallup II from the opinion in Puyallup I is that the Court indicates that the Treaty rights may now be restricted by the State police power:

> Rights can be controlled by the need to conserve a species; . . . the police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.

115.

414 U.S. at 49.  Thus the Court changed the legal framework of the situation.  It went from a treaty right to fish a certain location, totally free from state regulation, plus an ordinary right to fish in a certain manner, subject of course to the state police power, to a scenario where all aspects of Indian fishing are now treaty-granted rights, but that the state has an undefined right to regulate this treaty right to "conserve a species."

In United States v. Washington, 384 F.Supp. 312 (W.D. Wash. 1974), Judge Boldt noted that dicta followed by the United States Supreme Court in cases approving state police power regulation of Washington Indians' treaty right fishing is not sound in legal logic or principle.  Before Puyallup I was decided, 391 U.S. 392 (1968), there were no cases which provided judicial analysis or citation of a non-dictum decision supporting police power state regulation of the exercise of Indian off-reservation treaty fishing. 384 F.Supp. at 336.  See, Tulee v. Washington, 315 U.S. 681 (1942); Lacoste v. Department of Conservation, 263 U.S. 545 (1924); Patsone v. Pennsyl-vania, 232 U.S. 138 (1913); United States v. Winans, 198 U.S. 371 (1905); Ward v. Race Horse, 163 U.S. 519 (1896); Geer v. Connecticut, 161 U.S. 519 (1896).  Kennedy v. Becker, 241 U.S. 556 (1919), involved a treaty which contained a fishing clause "fully satisfied by considering it a reservation of a privilege of fishing . . . ." At 563.  (Emphasis supplied.)  The conveyance there was not to the United States; the lands passed directly into private ownership, the Indians retaining a right against the grantees and all who might become owners of the lands.  Here the Indians assert, and this court has held that they re-tained an aboriginal right to fish, confirmed and reaffirmed by treaty, when they conveyed their lands to the United States.  There can be no contention that this right was a mere privilege.  The Indians did not submit to the sovereignty of the State when they made their conveyance, nor did they retain rights only relative to a private owner.

The district court in United States v. Washington, 384 F.Supp. 312 (1974), also commented on the lack of supporting authority in the Supreme Court's decisons:

116.

[T]hat the exercise of such [an Indian fishing] right may be limited in any way by the police power of a state, without having previously received authority to do so from Congress, seems to be diametrically opposed to relevant treaty law and personal civil rights decisions, particularly those of recent years.

In the Puyallup-II decision, . . . it was stated (414 U.S. p. 2, 94 S.Ct. p. 332):

"The sole question tendered in the present cases concerns the regulations of the Department of Game concerning steel head trout."

Other than by recital or quotations from *Puyallup-I* and State Supreme Court decisions, in *Puyallup-II* there was no discussion of or ruling upon the basis of state police power to regulate off reservation treaty right fishing unless it be derived from the next to the last paragraph in the opinion of Justice Douglas (pp. 5–6, 94 S.Ct. p. 333):

"We do not imply that these fishing rights persist down to the very last steel head in the river. Rights can be controlled by the need to conserve a species; and the time may come when the life of a steel head is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. The police power of the State is adequate to prevent the steel head from following the fate of the passenger pigeon: and the Treaty does not give the Indians a federal right to pursue the last living steel head until it enters their nets."

Whatever the above quoted statement may have added to or taken from the right to exercise the off reservation treaty fishing rights of the plaintiff tribes, to the present time there never has been either legal analysis or citation of a non-dictum authority in any decision of the Supreme Court of the Land in support of its decisions holding that *state* police power may be employed to limit or modify the exercise of rights guaranteed by national treaties which the federal Constitution mandates must be considered and applied as "the supreme Law of the Land."

384 F.Supp. at 337-38.

117.

The district court also questioned whether or not Congress was the only one permitted under the Constitution to restrict treaty fishing rights:

> It also appears that the United States Supreme Court has exercised a prerogative specifically reserved by and to Congress in the treaties. Congress has never exercised its prerogative to either limit or abolish Indian treaty right fishing. In recent years it declined to do the latter by three times failing to enact proposed legislation for the termination of Indian treaty fishing rights. It may be that the refusal or failure of Congress to exercise a specific prerogative, by enactment of legislation, would legally justify judicial exercise of that particular prerogative. If so, it has never been stated or indicated in any United States Supreme Court decision as the basis or source of authority for the federal judicial decisions authorizing state regulation of off reservation treaty fishing rights.
>
> [16] Since Congress has the power to qualify or revoke any treaty or any provision thereof, unquestionable federal authority is available to provide federal regulation, or to authorize state regulation, for the protection of fishery resources against any threatened or actual harm that might arise from off reservation treaty right fishing by tribal members limited *only* by tribal regulation. In these circumstances it is unfortunate, to say the least, that state police power regulation of off reservation fishing should be authorized or invoked on a legal basis never specifically stated or explained.

Id. at 338-39 (footnotes omitted.)

However, because it was construing the same Indian treaty language which the Supreme Court had before it in the Puyallup cases, the district court in United States v. Washington, supra, was constrained to follow the Supreme Court decisions. Id. at 339.

This court believes that the older Supreme Court decisions holding that federal treaty rights cannot be restricted by the states are the better reasoned cases. Were it construing the Puyallup treaty, however, it would also find itself bound to follow the Supreme Court's interpretations of that treaty.

This court is not construing the Treaty found in Puyallup, though. In that treaty, the operative language read:

> The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the territory, and of erecting temporary houses for the purpose of curing, . . . .

The United States secured the right of non-Indians to fish alongside the Indians. The Indians' right of taking fish in that Treaty is explicitly shared with the citizens of the state, and it is this aspect which may have led the Supreme Court to conclude that the state police power is applicable to both parties.

This language is not contained in the Treaty of 1836. The Indians' aboriginal rights and Treaty of Ghent rights to fish in the Great Lakes is not shared with non-Indians through treaty provision. Consequently, this court holds that the State of Michigan does not have any right to regulate Ottawa and Chippewa Indian fishing on the Great Lakes in exercise of their rights, because the Treaty of 1836 and the Treaty of Ghent do not permit state regulation of these Indian fishing rights.

2. **The State's Power to Affect Treaty Right Fishermen is Preempted by Federal and Tribal Regulation.**

In this case state regulation has been preempted not only by virtue of the treaties, but by virtue of federal regulation and Indian self-regulation as well.

In 1967, the Secretary of the Interior took steps to implement the exercise of treaty rights to fish when he enacted 25 C.F.R. Part 256. These regulations are detailed and explicit and provide a means by which off-reservation fishing rights may be regulated in order to meet conservation goals. This provision gives full deference to

tribal rights as opposed to state regulation, for it takes into account state regulations only insofar as they govern "persons not fishing under treaty rights." A state may itself initiate the regulatory procedure via a request from its governor. The State of Michigan has thus far ignored this federally-sanctioned approach to the very type of regulation which it purports so ardently to desire. The Secretary is presently operating under these regulations since he has issued tribal identification cards to treaty right fishermen which are signed by both tribal and federal officials. Here again, the federal government, acting in cooperation with the tribes, occupies the field of regulating treaty right fishermen, thereby preempting state regulation over these same persons.

Part 256 of 25 C.F.R. is the very sort of pervasive federal regulation which was found to preempt state jurisdiction in <u>Warren Trading Post</u> v. <u>Arizona Tax Com'n</u>, 380 U.S. 685 (1965). In that case the United States Supreme Court held that the federal government had promulgated such a pervasive system of regulation of retail trading on Indian reservations that no room was left for any state regulation. On its way to this conclusion the court said: "[F]rom the very first days of our Government, the Federal Government had been permitting the Indians largely to govern themselves, free from state interference." 380 U.S. at 686-87. The federal regulation found in 25 C.F.R Part 256 is hardly less pervasive than that found in <u>Warren Trading Post</u>. Moreover, unlike the regulation of retail trading on Indian reservations, here the federal government has specifically provided a means by which a state may participate, should it so desire. It is clear, therefore, that the federal government has preempted state regulation of off-reservation Indian fishing rights secured by treaty. Unfortunately, the state consistently refuses to accept the principle that treaty tribe fishermen enjoy unique rights derived from federal law and, therefore, are not subject to the rules and regulations governing citizens who do not enjoy such rights. The State maintains simplistically that a disparity of treatment between Indian fishermen and citizens fishing as a matter of privilege under state law would constitute unlawful discrimination prohibited

by the Fourteenth Amendment.  If the state were correct, however, Indian fishermen would derive nothing from their treaty.  Indeed, it would be as if there were no treaty at all.

The Supreme Court rejected the State's discrimination contention long ago, but reiterated it recently in Morton v. Mancari, 417 U.S. 535 (1974).  The issue there concerned the constitutionality of a federal law affording job preference within the Bureau of Indian Affairs to Native American applicants.  The Court said:

> Literally every piece of legislation dealing with Indian tribes and reservations, and certainly all legislation dealing with the BIA, single out for special treatment a constituency of tribal Indians living on or near reservations.  If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 USC) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.

417 U.S. at 552.  Clearly then there are no constitutional impediments to treating Indian fishermen differently than other state citizens. To the contrary, the Supremacy Clause mandates different treatment because Indian fishermen derive their rights (not privileges) under federal law.

Relying upon a similar claim of denial of equal protection, fishermen licensed by the State of Michigan would on the basis of their payment of an annual $5.25 fee, assert a right to preempt the Indian fishing right proclaimed here, a right acquired over a period of 12,000 years.  From the evidence received by this court, during the entire period for which the Indians alone exploited the Great Lakes, there was no diminution of the fishery, no need to replenish it by artificial means nor any anxiety to stock it with unnatural species. These are the conditions which the fee is intended to address. The licensed fishermen would obliterate the Indians' record, appropriate their rights and conquer them anew by paying yearly dues of five dollars, so long as they are interested in participating in dispoiling the Indians.  Under the proposed theory, so long as someone is interested in paying the fee, the Indians' right to fish is accordingly limited.

A comparison might be made to bring this theory into relief. By the treaty of cession, the state received deposits of oil and natural gas. Under the system by which these resources are administered, the average household in this state pays many hundreds of dollars a year to acquire an allotment of these resources. Yet, no one appears to be so bold as to assert that by virtue of his payment he alone, or he in conjunction with others, acquires a right to exploit the resource, a right which is superior to the rights of utility companies and the state acquired by purchase or cession. The state admittedly owns the resource. It is peculiar, then, to hear of a supposed interest in the fish which arises by paying a minimal fee and which forecloses the rights of the prior owner of the right to exploit the resource, an owner who acquired his interest not by virtue of purchase or cession, but by "the Laws of Nature and of Nature's God."

Sportsmen and non-Indian commercial fishermen cannot raise the issue of equal protection without showing entitlement founded upon use and occupancy similar to that of the Indians. But the white man is a late comer to the Great Lakes fisheries when it is considered in the light of centuries. Payment of an annual fee is not a sufficient predicate to permit an abridgment of the Indians' right to fish. This case is not an equal protection case under the Fourteenth Amendment or the Declaration of Independence; it is an Indian treaty case, supplemented with a full panoply of aboriginal rights acquired and preserved over the centuries and existing in full to the present.

The fishing right reserved by the Indians in 1836 and at issue in this case is the communal property of the tribes which signed the treaty and their modern political successors; it does not belong to individual tribal members. United States v. Washington, 520 F.2d 676 (9th Cir. 1975); Settler v. Lameer, 507 F.2d 231 (9th Cir. 1974); United States v. Three Winchester 30-30's, 504 F.2d 1288 (7th Cir. 1974); Whitefoot v. United States, 293 F.2d 658 (Ct.Cl. 1961); Montana Power Co. v. Rochester, 127 F.2d 189 (9th Cir. 1942). The right is presently exercised by the plaintiff tribes under extensive tribal regulation which preempts state regulation.

Both Bay Mills and the Sault Tribe have adopted constitutions and by-laws under the Indian Reorganization Act of 1934. (Tr. 1060, 1127; Ex. P-119, 120.) Both constitutions authorize the tribes to regulate and protect resources under their control. Further, both constitutions authorize the tribes to regulate the internal relations of their members. Pursuant to the constitutions and by-laws, the tribes have developed conservation codes and fishing regulations. (Tr. 1080, 1139; Ex. P-162, 163, 165.) Pursuant to this constitutional and ordinance authority, the treaty fishing activities of the Indians in the area ceded by the Treaty of 1836 are comprehensively regulated and enforced.

Federal law provides that Indian tribes retain the inherent sovereign right to regulate and enforce the internal affairs of their members, including hunting and fishing rights. United States v. Wheeler, supra; McClanahan v. Arizona Tax Com'n, supra at 173; United States v. Mazurie, 419 U.S. 544 (1975); Byran v. Itasca County, supra at 388; Williams v. Lee, supra at 221-22; Menominee Tribe v. United States, supra at 409-10; United States v. Washington, supra at 520 F.2d 686; Settler v. Lameer, supra at 237; and Quechan Tribe of Indians v. Rowe, 531 F.2d 408, 411 (9th Cir. 1976).

In United States v. Wheeler, supra, the United States Supreme Court stated:

> The powers of Indian tribes are, in general "inherent powers of a limited sovereignty which has never been extinguished." F. Cohen, Handbook of Federal Indian Law 122 (1941)(emphasis in original). Before the coming of the Europeans, the tribes were self-governing sovereign political communities. See McClanahan v. Arizona Tax Comm'n, 411 U.S. 164 172, 36 L.Ed.2d 129, 93 S.Ct. 1257. Like all sovereign bodies, they then had the inherent power to prescribe laws for their members and to punish infractions of those laws.
>
> Indian tribes are, of course, no longer "possessed of the full attributes of sovereignty." United States v. Kagama, supra, at 381, 30 L.Ed. 228, 6 S.Ct. 1109. Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised. By specific treaty provision they yielded up other sovereign powers; by statute, in the exercise of its plenary control, Congress has removed still others.

> But our cases recognize that the Indian tribes have not given up their full sovereignty.  We have recently said that "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory . . . . [They] are a good deal more than "private, voluntary organizations," United States v. Mazurie, 419 U.S. 544, 577, 42 L.Ed.2d 706, 95 S.Ct. 710; see also Turner v. United States, 248 U.S. 354, 355, 63 L.Ed. 251, 39 S.Ct. 109; Cherokee Nation v. Georgia, supra, at 16-17, 8 L.Ed. 25.  The sovereignty that the Indian tribes retain is of a unique and limited character.  It exists only at the sufferance of Congress and is subject to complete defeasance.  But until Congress acts, the tribes retain their existing sovereign powers.  In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

55 L.Ed.2d at 312-13 (emphasis supplied)(footnote omitted).

Similarly, in Williams v. Lee, the Supreme Court observed:

> Implicit in these treaty terms as it was in the treaties with the Cherokees involved in Worcester v. Georgia, was the understanding that internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed.

358 U.S. 221-22 (emphasis supplied).

The Ninth Circuit Court of Appeals in Settler v. Lameer, supra, dealt expressly and in detail with the question of tribal control over fishing rights which under the tribe's treaty allowed members to travel great distances from their reservation to fish in common with citizens of the State of Washington.  The Ninth Circuit agreed with the Indians that included within their treaty right to fish was tribal authority to control and regulate its members fishing off its land reservation.

> This conclusion is supported by the nature of the fishing rights.  As set forth in Whitefoot, supra, 293 F.2d at 663, the fishing rights reserved in the Treaty of 1855 are communal rights of the Tribe, even though the individual members benefit from those rights.  The determination of when and how the rights may be exercised is an "internal affair" of the Tribe.  As the district court correctly pointed out, "One of the last remnants of sovereignty retained by the Yakima Indian Tribe is the power to regulate their internal and social relations."

507 F.2d at 237 (emphasis supplied).

124.

Subsequently, the Ninth Circuit in <u>United States</u> v. <u>Washington</u>, <u>supra</u>, confirmed the authority of Indian tribes to control the internal relations of their members, including the exercise of treaty fishing rights:

> Preservation of fishery resources is of vital importance to Indians as well as to other citizens. <u>At the same time, regulatory inter-ference by the state with treaty fishing is obnoxious to the treaty tribes.</u> These tribes have the power to regulate their own members and to arrest violators of their regulations apprehended on their reservations or at usual and accustomed fishing sites. Settler v. Lameer, 507 F.2d 231 (9th Cir., 1974).

520 F.2d at 686 (emphasis supplied).

In so holding that Indian tribes have the power to regulate the treaty fishing activities of their members and to enforce those regulations through arrest and seizure of equipment, the Ninth Circuit determined that the right to fish retained by the Indians in the Treaty with the Yakima (12 Stat. 951) was understood by them to include the power to control the exercise of that right through tribal regulation of members:

> We conclude that by the Treaty of 1855 the Yakima Indian Nation retained regulatory and enforcement powers with respect to tribal fishing at all "usual and accustomed places" off the reservation. No act of Congress, including the Washington Enabling Act, 25 Stat. 676 (1889), has qualified these reserved powers. The powers therefore continue to exist.

<u>Settler</u> v. <u>Lameer</u>, <u>supra</u>, 507 F.2d at 239.

The court was also concerned with the effect upon the fishery resource if tribal self-regulation did not exist:

> The Yakima Nation may be in a better position than the State of Washington to regulate off-reserva-tion fishing. The Tribe possesses the knowledge of its individual members and their fishing sites, and only the Tribe has the authority to revoke a Tribal member's fishing privileges.

<u>Id</u>. at 240, n.21.

> In view of the strict limitation on the power of the state to regulate Indian off-reservation fishing, there would be no effective regulation and enforce-ment of a broad range of fishing activities if enforcement powers are denied to the Tribe.

<u>Id</u>. at 239, n. 18.

The right of the Bay Mills Indian Community and the Sault Ste. Marie Tribe of Chippewa Indians to regulate the off-reservation treaty fishing activities of their members was not given up when the Indians signed the Treaty of 1836. As cited supra, the law of treaty construction is clear that rights not expressly relinquished in the treaty are retained by the Indians. The tribes have asserted their right to regulate by promulgating fishing regulations and enforcing them.

The right of the treaty tribes herein to regulate tribal members fishing in the area ceded by the Treaty of 1836 is no less than the rights of Indians elsewhere. The courts have been careful to preserve treaty rights even when the lands ceded were later privately owned, so long as the interests of private landowners are not ignored. For example, in Kimball v. Callahan, supra, the court held that the Kalmaths may exercise:

> . . . treaty hunting, trapping and fishing rights free of state fish and game regulations on lands constituting their ancestral Klamath Indian Reservation, including that land now constituting United States National Forest land and that privately-owned land on which hunting, trapping or fishing is permitted.

493 F.2d at 569-70. And in Leech Lake Band of Chippewa Indians v. Herbst, supra, the court found that the Indians have the "right to hunt and fish and gather wild rice on public lands and public waters of the Leech Lake Reservation free of Minnesota game and fish laws." Similarly, in State v. Tinno, supra, Chief Justice McQuade, concurring, specially said:

> . . . the fishing right was reserved by treaty to protect a source of tribal subsistence and to preserve an integral part of the native American culture. These purposes may be given meaningful effect in 1972, when many fishing streams have been dammed, depleted or polluted, only if the treaty is interpreted liberally to extend to any unoccupied federal land where fishing opportunities remain.

497 P.2d at 1395.

Both Bay Mills' and the Sault Tribe's treaty rights include the power to regulate their members so long as they are fishing under tribal regulation and in the area ceded by the Treaty of 1836. Both

126.

tribes presently exercise that power and regulate the fishing activities of their members. This regulation preempts any state authority to regulate the fishing activity of the tribal members.

Under the Supremacy Clause of the United States Constitution, state regulation of Indian fishing rights secured by the treaties here in question, and implemented by Federal and tribal regulations, is preempted. Any regulation must be by Congress or Congressional authorization. Any different understanding of the Supremacy Clause, that part of the Constitution which governs the relationship between the states and the federal government and makes our system of interrelated state and federal governments possible, must come from the Supreme Court. That Court presently has before it several cases growing out of United States v. Washington, supra. These cases could revise the present understanding of the Supremacy Clause as related to Indian treaties. Under the law as it presently stands, only Congress has the power to regulate Indian treaty right fishing in the areas of the Great Lakes covered by the treaties before this court.

J. The Submerged Lands Act Did Not, as a Matter of Law, Repeal by Implication the Indians' Treaty Fishing Rights.

Amicus MUCC argued that Congress sub silentio abrogated the Indians' treaty fishing right by the passage of the Submerged Lands Act, 43 U.S.C. §1301 et seq. This Act was not intended to, nor did it have, such an effect.

The Submerged Lands Act does not expressly deal with Indian fishing rights. Any abrogation of Indian fishing rights would be by implication. The intention to abrogate or modify a treaty is not to be lightly imputed to the Congress. Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968).

The impetus behind the Submerged Lands Act seems to have been several Supreme Court cases holding that off-shore oil belonged to the federal government rather than to the individual states. United States v. Texas, 339 U.S. 707 (1950); United States v. Louisiana, 339 U.S. 699 (1950); United States v. California, 332 U.S. 19 (1947). The Act restored the rights to the submerged land and its resources to the individual states.

The specific language of the Submerged Lands Act gives "title to and ownership of "the submerged lands,"and the "Natural resources within such lands and waters," and "the right and power to manage, administer, lease, develop, and use the said land and natural resources" to the states. At one time legal opinion had held that the states held title over this off-shore land and resources, but the Supreme Court held otherwise in United States v. California, supra. Thus, this legislation "recognized, confirmed, established and vested in and assigned to the respective states" the rights to the submerged lands. In essence the Act said that the federal government recognized the states' interests if they had such interests, and gave the states those interests if they in fact had none under prior law.

The definition of natural resources contained in the Submerged Lands Act includes fish. 43 U.S. C. §1301(e). However, natural resources such as oil and minerals were the main target of the legislation. Biological resources were included in the definition by Congressmen who were worried that traditional state regulation of the ocean shrimp, lobster, and clam industries, etc., would be adversely affected unless these items were also included within the definition. Legislative history reveals that the inclusion of fish in the definition of "resource" is strictly a secondary consideration of the Act. 2 U.S. Code Congressional and Administrative News, (1953) at 1385.

A recent Supreme Court case, Douglas v. Seacoast Products, Inc., 431 U.S. 265 (1977), re-established important principles while considering this act. Before the Court in that case were laws enacted by the State of Virginia governing the commercial taking of fish within its waters. Those laws required that persons seeking licenses be citizens; that corporations seeking licenses be owned 75 percent by citizens; and placed certain restrictions on non-residents. Seacoast claimed the state laws did not limit its right to fish commercially in Virginia waters because it was a licensed United States flag ship pursuant to federal law and that under the Supremacy Clause of the Constitution, Virginia's prohibition against its fishing in state waters could not stand.

The Court first looked to federal law to determine the rights granted to Seacoast. It ruled that Seacoast had a federal license to carry on a fishing business in Virginia waters. Because state law conflicted with federal statutes, the former could not prevail under the Supremacy Clause.

The state argued that the Submerged Lands Act required a different result. The court conceded that the state has the right to manage lands beneath navigable waterways and has title to those lands, but nonetheless ruled against the state:

> But when Congress made this grant [ownership of the lakebeds] pursuant to the Property Clause of the Constitution, it expressly retained for the United States "all constitutional powers of regulation and control" over these lands and waters for purposes of commerce . . . . Since the grant of the fisheries license is made pursuant to the Commerce power, the Submerged Lands Act did not alter its pre-emptive effect. Certainly Congress did not repeal by implication, in the broad language of the Submerged Lands Act, the Licensing Act requirement of equal treatment for federal licenses.

Douglas v. Seacoast Products, Inc., supra at 284 (citations omitted). This case is significant for several reasons. First, it reaffirms the obvious -- the Supremacy Clause as a matter of constitutional obligation requires the state to refrain from interfering with a federal right. Second, it reaffirms the well-established notion that abrogations by implication are not favored. In Seacoast, supra, the court refused to rule that the 1953 Submerged Lands Act repealed by implication the 1792 Licensing Act.

The present case involves a federal right established by treaty. Under the Supremacy Clause the state may not interfere with such a federal right. Section 1313(b) of the Submerged Lands Act speaks of lands or interests held therein for the benefit of Indians and excludes these lands from the operation of the Act.

> [There is excepted from this grant:]
> (b) such lands beneath navigable waters held, or any interest in which is held by the United States for the benefit of any tribe, band, or group of Indians or for individual Indians;

129.

MUCC assumes that fishing rights are not interests in land and argues that the exclusion of the rights mentioned by 1313(b) is an inclusion of all other rights within the operation of the Act. Granting this assumption, the argument is not persuasive.  This section merely reflects the principle concern of the Act -- title to submerged land and the oil and other resources it contains.  The Act was intended to restore submerged, off-shore land and its resources to the states, thereby effectively reversing <u>United</u> <u>States</u> v. <u>California</u>, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).  Neither the language of the Act nor its purposes are in conflict with the Indians' retention of fishing rights. The state may own the resources of these lands, even the fish, but this does not necessarily abrogate the Indians' right to fish.  <u>Seacoast</u> <u>Products</u> makes clear that a federal license to fish does not interfere with the state's rights.

However, it does not appear necessary to grant the assumption. If not, the Indian rights asserted here are within the terms of the exclusion.  Indian title to lands has never been a fee; it has always been a right to use and occupy lands claimed by the United States. This interest in land gives the tribes holding it the right to fish, hunt, gather fruits and cross the land.  It is analogous to a profit  a prendre or an easement.  <u>Winans</u> v. <u>United</u> <u>States</u>, <u>supra</u>.  The Indians reserved such an interest in land by the Treaty of 1836. If this is so, then this interest is excluded from the conveyance of the Submerged Lands Act by the terms of that Act.

If this court had any hesitation in determining whether the Submerged Lands Act abrogated the Indians' fishing right, it would be overcome by the fact that an even stricter standard *than was used* in <u>Seacoast</u> must be applied to legislation purporting to abrogate Indian treaty fishing rights.  <u>See</u> <u>Morton</u> v. <u>Mancari</u>, 417 U.S. 535 (1974); <u>Menominee</u> <u>Tribe</u> v. <u>United</u> <u>States</u>, 391 U.S. 404 (1968); <u>Squire</u> v. <u>Capoeman</u>, 351 U.S. 1 (1956); <u>Pigeon</u> <u>River</u> <u>Improv.</u> <u>Slid</u> & <u>B</u> <u>Co</u>. v. <u>Cox</u>, 291 U.S. 138 (1934); <u>Kimball</u> v. <u>Callahan</u>, 493 F.2d 564 (9th Cir. 1974), <u>cert.</u> <u>denied</u>, 419 U.S. 1019 (1974).  In <u>Menominee</u> <u>Tribe</u>, supra,

the statute which assertedly abrogated the treaty fishing right dealt specifically and drastically with the tribe by abolishing the federal existence of the very entity which held the fishing right. Nevertheless, the Court held that individual Indians continued to possess the right to hunt and fish on their ancestoral lands.  The repeal by implication was not made out, even where the legislation directly affected the particular tribe in question.  The Submerged Lands Act only remotely relates to the subject of Indian fishing rights and does not approach the standard which must be met to establish abrogation of an Indian treaty right.  As in Morton v. Mancari, 417 U.S. 535 (1974), where the issue was whether the Civil Rights Act amendment of 1972 prohibiting discrimination in the federal government implicitly abrogated an earlier federal statute giving hiring preference to Indian applicants for employment in the Bureau of Indian Affairs, the later statute was "designed to deal with an entirely different . . . problem [from the Act argued to be repealed]. Any perceived conflict is thus more apparent than real."  417 U.S. at 550.

## EPILOGUE

Justice is a virtue which cannot be exercised apart from love of neighbor.  Love is, indeed "superior" to justice. At the same time love of neighbor proves itself in the form of justice. If justice is weakened, love itself is jeopardized.  No man can profess to adhere to the greatest of all commandments -- Love thy neighbor -- if he should visit violence upon fellow men who would exercise centuries-old fishing rights which have been recently confirmed, little more than 150 years ago, and again 130 years *ago*, by most solemn promise of our nation.

Dated:        May 7, 1979.

Noel P. Fox, Chief Judge
United States District Court
Western District of Michigan

131.

FOOTNOTES

1/ Violence against Indians who would exercise their rights is not a ghost in a history book nor a deed which we can ascribe to long dead, anonymous ancestors.  The threat of violence today was documented in a recent article by Tom Opre in the Detroit Free Press, which is reproduced in part below:

DETROIT FREE PRESS/SUNDAY, AUG. 27, 1978



Tom Opre

Confrontations have come close so far. Rock and bottle-throwing incidents, boat sinkings and swampings; torn and stolen gillnets and innumerable heated verbal exchanges along with pushing and shovings are the limit so far in the Charlevoix area. Coast Guard patrols had to protect Indian boats in some incidents. Both sides have armed themselves prior to this in Upper Peninsula incidents earlier, but no shots were fired.

(It's reported reliably, though, that one Indian netter, launching in Round Lake and moving under the channel bridge to Lake Michigan, was very accurately bombed by local white fishermen and their families. The bombs? Bagged up contents from camper porta-potties. Police agencies are now patroling the bridge.)

"We don't want Indian gear destroyed or anyone — on either side — hurt," Washington emphasized. "We don't want any more Wounded Knees on our hands," a reference to South Dakota troubles a few years ago where both Indians and federal officers were killed.

A DNR observer at Charlevoix told me the situation had cooled somewhat in the past week, though.

"Indians seemed to have backed off a bit," he said. "Maybe that's because most of the boat launching sites are closed to them now." Indians operate from small boats launched by hand at the lakeshore. The operations are efficient, though. DNR estimates of the best single day's catch off Norwood was 14,000 pounds, most of it whitefish. Lake trout and salmon are taken regularly, though.

The heinous deeds of our ancestors appear no further from us than our present ability to restrain the "frontiersmen" lost in our more civilized and more self-righteous society.

2/    *American Heritage Pictorial History of the Presidents*, Vol. 1.
      P. 224 (1968).

3/    The Treaty of Saginaw of 1819, 7 Stat. 203 (1819), secured
      the area around the thumb of the lower peninsula.  The
      negotiation of that treaty is not only typical of treaty
      negotiations, but also reveals how General Lewis Cass,
      Secretary of War in 1836, dealt with the Indians in 1819,
      when he was a commissioner.  When General Cass was leaving
      for the negotiations in which he planned to "procure a
      cession of that valuable territory," he realized he had
      a very difficult assignment because the Indians had not
      received the annuity they had been promised in an 1807
      Treaty.   Treaty of Nov. 17, 1807 (7 Stat. 105.)   Accor-
      dingly, he secured a personal bank loan for the amount
      of the "annuity" (which was in fact a grant) so that he
      might have silver to place before the Indians during
      the negotiation.  As Cass put it, he got the money so
      that he would "be able to comply with past engagements
      before I call upon the Indians to perform others."
      F. Dustin, The Saginaw Treaty of 1819, 8 (1919).
      He displayed the silver during the negotiations and gave
      it to the Indians only after they signed the new treaty.
      Thus, the consideration from the first treaty served to
      secure not only the first treaty, but the second also.

      Although Cass had made extensive preparations to ensure that
      the Indians would be there when he arrived, few Indians had
      come.  He sent out runners to gather missing chiefs and
      tribal leaders, but did not wait for them to arrive.  He
      began negotiations at once.  S. Gross, *Indians*, *Jack and
      Pines*, 1962, at p. 17.  Cass' actions were an aggressive
      pursuit of his objective of acquiring "that valuable land."

      The Indians were primitive and uncivilized, but they knew
      what they wanted, and they did not want to move out of
      Michigan beyond the Mississippi.  They wanted to stay on
      their hunting grounds.

      The Chief, O-Ge-maw-ke-to, addressed Cass' proposal of cession
      as follows:

      " 'You do not know our wishes.  Our people wonder what has
      brought you so far from your homes.  Your young men have
      invited us to come and light the council fire.  We are here to
      smoke the pipe of peace, but not to sell our lands.  Our American
      Father wants them.  Our English Father treats us better.  He has
      never asked for them.  Your people trespass upon our hunting
      grounds.  You flock to our shores.  Our waters grow warm; our
      land melts like a cake of ice.  Our possessions grow smaller and
      smaller.  The warm wave of the white man rolls in upon us and
      melts us away.  Our women reproach us.  Our children want
      homes.  Shall we sell from under them the spot where they spread
      their blankets?  We have not called you here.  We smoke with
      you the pipe of peace.'

      History of Saginaw County, 151 (1881).

The account of Cass's speech reads as follows:

"To this the Commissioner replied with earnestness, reproving the speaker for arrogant assumption, that their Great Father at Washington had just closed a war in which he had whipped their Father, the English king, and the Indians too; that their lands were forfeited in fact by the rules of war, but that he did not purpose to take them without rendering back an equivalent, notwithstanding their late acts of hostility; that their women and children should have secured to them ample tribal reserves on which they could live, unmolested by their white neighbors, where they could spread their blankets and be aided and instructed in agriculture."

History of Saginaw County, 151 (1881).

This humiliation was in fact contrary to the provisions of the Treaty of Ghent with Great Britain ending the War of 1812. Under that treaty the Indians regained in full the rights which Cass, impelled by the zest of his heroism, declares do not exist. After this initial session, negotiations continued in the presence of Cass' soldiers and 60 other whites, until a treaty was signed in ceremony for which Cass supplied 5 barrels of whiskey. Saginaw Treaty of 1819, 17 (1919).

To meet the resistance brought about by the Indians' desire to retain their hunting grounds, Cass assured them they could continue to hunt in the forests. S. Gross, supra, at 17. By this deception and by granting them the silver vested under the earlier treaty, Cass induced the Indians to believe, mistakenly, that they had won a victory and could retain their lands and their earlier treaty rights.

It is reported that in other negotiations Cass told Ohio Indians he would take a cession of their lands from Michigan Indians if the Ohio Indians did not sell. He brought the Michigan Indians to Ohio for the negotiations. (Tr. 493.)

4/ Similar coercion was effected in different fashion in treaty negotiations with the Osages:

On the 8th of November, 1808, Peter Chouteau, the United States' agent for the Osages, arrived at Fort Clark. On the 10th he assembled the Chiefs and warriors of the Great and Little Osages in council, and proceeded to state to them the substance of a treaty, which, he said, Governor Lewis had deputed him to offer the Osages, and to execute with them. Having briefly explained to them the purport of the treaty, he addressed them to this effect, in my hearing, and very nearly in the following words: "You have heard this treaty explained to you. Those who now come forward and sign it, shall be considered friends of the United States and treated accordingly. Those who refuse to come forward and sign it shall be considered enemies of the United States, and treated accordingly." The Osages replied

in substance, "that if their great American father wanted a part of their land he must have it, that he was strong and powerful, they were poor and pitiful, what could they do? He had demanded their land and thought proper to offer them something in return for it. They had no choice, they must either sign the treaty or be declared enemies of the United States." George C. Silbey, factor at Fort Osage, cited in Schmeckebier, the Office of Indian Affairs, Its History, Activities, and Organization (1927), pp. 59-60.

5/ Because this action commenced before the repeal of 28 U.S.C. §2281 on August 12, 1976, that statute and interpretative case law applies to this motion. See, Pub. L. 94-381, §7.

6/ Swift v. Wickham, 382 U.S. 111, 122, 124-29 (1965); see also, Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 481 n.17 (1976).

7/ The Department of Natural Resources officers were sued in their official capacities. Names of the current holders of the positions have been substituted for those named in the Amended Complaint. See Fed.R.Civ.P. 25(d)(1)

8/ Id.

9/ The above comment on the negotiations on the Treaty of Ghent was placed in historical perspective by Samuel Eliot Morison in The Oxford History of the American People (1965) at 397-98:

To the astonishment and distress of the American peace commissioners . . . their opposite numbers were instuced to admit neither impressment nor neutral rights as even subjects of discussion. The United States must abandon all claims to the Newfoundland fisheries, the northeastern boundary must be revised to provide a direct British road between St. John, N.B., and Quebec; and the northwest boundary must also be rectified to give Canada access to the upper Mississippi. Finally, the old project of an Indian satellite state north of the Ohio river was revived. Adams, an experienced diplomat, expected the negotiations to terminate on this point, and prepared to go home. Henry Clay, untrained in diplomacy but an expert poker player, was confident the British would recede, as they did. On 16 September, the British commissioners were instructed to drop the Indian project.

10/ Defendants' Exhibit 312 contains a detailed list of the claims traders submitted for payment under the treaty. For example, Edward Biddle received more than $45,000 (Ex. 312, Claim No. 63, Tr. 1621). Rix Robinson, Robert Stuart, John Holiday, John Hulbert and Henry Levake received, in toto, approximately $57,000 as claimants under the treaty. (Ex. 312, Tr. 1625-33.) Altogether, claimants or creditors received $220,954.57 under the treaty. (Ex. P-321, Tr. 1633.) All these persons played a major role in the treaty process, including accompanying

various bands to Washington, D.C.  Most of these persons were listed at the end of the treaty signifying their attendance and participation in the negotiation process. Perhaps the most prominent figure in the treaty process was Henry Schoolcraft.  His family members received approximately $53,000 under the treaty as creditors to the Indians.  (Ex. P-132; Tr. 1636-42.)

11/    American Heritage Pictorial History of the Presidents, Vol. 1, p. 224 (1968).

12/    25 U.S.C. §71.

13/    Schoolcraft's behavior as a negotiator is also shown in another Michigan treaty.  During the negotiations of an 1837 treaty with the Saginaw Chippewas Schoolcraft met an impasse.  The Indians would not sign unless the treaty granted 640 acres to a doctor who served them during a small pox epidemic.  It did not; they refused to sign and left.  Schoolcraft later recalled them and assured them the proposed version of the treaty contained the provision.  They signed on the basis of this representation.  It still did not.  History of Saginaw County (1881) p. 157.

14/    The price per acre of ceded land happens to coincide with the price traders charged per quart of whiskey at the time.  (Tr. 245.)

15/    The dedication to the Indian way of life is illustrated by the Chippewa and Ottawa reaction upon seeing the land west of the Osage River to which the government wished the Indian tribes to remove.  Once they saw that there were no "sugar bush," or sap bearing maple trees, an important part of their life, the Indians refused to consider removal any further.  (Tr. 1414, D. Ex. 62, 95.)

16/    In addition, it should be noted that the granting language of the treaty is quite limited: "The Ottawa and Chippewa nations of Indians cede to the United States all the tract of country within the following boundaries: . . . . " (Emphasis supplied.) Notably absent are the words such as "all their right, title, and interest."  Cf. Treaty of August 3, 1795, with the Wyandots, Delawares, Shawanoes, Ottawas, Chippewas, Potawatimes, Miamis, Eel River, Weea's Kickapoos, Piankashaws, and Kaskaskias, 7 Stat. 49 (cede and relinquish forever, all their claims to the lands); Treaty of May 31, 1796 with the Seven Nations of Canada, 7 Stat. 55 (cede, release and quit claim . . . forever, all the claim, right, or title . . .; Treaty of November 17, 1807, with the Ottaway, Chippeway, Wyandotte, and Pottawatamie Nations, 7 Stat. 105 (agree to cede, and forever quit claim . . . all right, title, and interest which said nations now have, or claim, or ever had, 1823, with the Florida Tribes, 7 Stat. 224 (do cede and reqlinquish all claim or title which they may have . . . .); Treaty of June 2, 1825, with the Great and Little Osage Tribes, 7 Stat. 240 (do cede and relinquish to the United States, all their right, title, interest, and claim, to lands . . . .); Treaty of October 23, 1826, with the Miami Tribe, 7 Stat. 300 (cede to the United States all their claim to the land).

17/    Dr. Clifton has a background in the field of descriptive linguistics and is familiar with languages spoken by the Ottawa, Chippewa and Potawatomi.

18/ The financial claims released by Article 3 are well documentd in the record.  They are specifically enumerated a number of times.  One key document is a letter from Henry Gilbert, the Indian Agent for Michigan, to the Commissioner of Indian Affairs, of March 6, 1854, in which he lists the claims of the Indians which should be settled in a new treaty (Ex. P-82 and 82A):

> The Indians of Michigan are principally of the Chippewa tribe.  There are also remaining small remnants  of the Ottawas & Pottawatomies.  Their business with the Government is mainly based upon the stipulation of the Treaty of Washington of March 28th, 1836.  The Annuities due by this Treaty will expire with two more payments in 1855.  The only remaining claims of the Indians under it upon the General Government will then be --
>
> 1.  For amount withheld & invested in stocks, $1000 per annum for 20 years.  See Art. 4. - $20,000 to which sum the accrued interest should be added.
>
> 2.  For amount due the Indians for limiting their reservations by Senate Amendment to Art. 4 - $200,000.
>
> 3.  A reasonable commutation for lands west of the Mississippi to which they would have been entitled had they removed thither & in estimating this item the expenses of removal & subsistence, all which has been saved to the United States should be taken into account.
>
> All other Treaty stipulations for the benefit of the Michigan Indians are permanent in their nature & under them small annuities have been paid for many years.  They are as follows --
>
> 1.  To the Ottawas under the provisions of the Treaties of 1795 - 1807 - 1818 & 1821                                        $1700.00
>
> 2.  To the Chippewas of Saginaw & of Swan Creek & Black River, under the Treaties of 1795, 1807 & 1819 -                      2500.00
>
> 3.  To the Pottawatomies under the Treaty of July 29, 1828                                      1587.50
>
> 4.  To the Pottawatomies of Huron Treaty of Nov. 17, 1807 -                              400.00
>
> The Chippewas of Saginaw have also a claim upon the government under the Treaty of Detroit of Jan. 14, 1837 & which was modified & explained by the Treaty of Flint of Dec. 20, 1837 & the Treaty of Saginaw of Jan. 23, 1838 for the proceeds of the lands ceded by that Treaty whenever the  same shall be sold.
>
> There is also an annual appropriation under Art. 8 Treaty of 24th Sept. 1819 of -                                            2000.00

I am of the opinion that all these claims
of every description may be settled and compro-
mised with the Indians, with great benefit to
them & advantageously to the United States.

In valuing the various claims against the United States for
purposes of arriving at a settlement figure, agent Gilbert,
who was also a treaty commissioner, made the following cal-
culation during the negotiations (Ex. P-19 and 19A, pp. 51-
52):

> Agent Gilbert: My Brothers I want to say a word
> to you. The Commissioner thinks that we can
> put this money matter into a shape that will enable
> you between now & Monday to arrive at a conclusion.
> I give you then the following amounts.
>
> | Reservations | $200,000 |
> |---|---|
> | Annuity Retained | 26,000 |
> | Imprt. Fund | 50,000 |
>
> In conceding the last amount as a basis for
> your deliberations, if the Commissioner on his
> return to Washington finds the amount more or less,
> you will be paid accordingly. Our impression is
> that, that is what is due. You may further estimate
> the sum of $30,000 for equitable claims on the removal,
> outfit, & subsistence matter. You may further estimate
> the annuity of $1700 at $30,000 which seems to us its
> value. This makes in all $336,000. That is the amount
> the Commissioner is willing you should take as the
> basis of your calculations.

As a final example, the treaty commissioners explained
the claims in their letter of transmittal of the treaty
in the following terms (Ex. P-19 and 19A, pp. 4-5):

> In consideration therefore of the differ-
> ence in the value of the western lands, and
> the home now secured to the Indians in
> Michigan and in the release and discharge of
> the United States from all claims or demands
> on account thereof, or on account of the claims
> for "articles and equipments to each person"
> and also in discharge and full satisfaction of
> the $200,000 stipulated to be paid them in lieu
> of the reservations by the Senate's amendment
> to the 4th Article of the treaty of 1836, and
> in like discharge of the sum which has accum-
> ulated from the investment of the $1,000 per
> annum, provided for by the 4th Article of the
> treaty aforesaid, and in discharge of the $1,700
> permanent annuity due to the Ottawas and here-
> tofore specifically alluded to; in fact, in lieu
> and satisfaction of all claims, legal or equit-
> able, on the part of said Indians jointly and
> severally against the United States for land,
> money or other things guaranteed to them by the
> stipulations of any former treaty or treaties
> (excepting the rights of fishing and encamp-
> ment secured to the Chippewas of Sault Ste. Marie
> by the treaty of June 16, 1820) the United States
> are to pay to them or expend for their benefit,
> the sum of $538,400 in manner following, viz: ---

Thus, even though on several occasions the legal and equitable claims released by Article 3 were carefully enumerated, there is not the slightest hint that the fishing right was included. Aside from the issue of compensation for the impairment of the reservation and fishery at the Sault rapids, dealt with separately in the Treaty of August 2, 1855 (11 Stat. 631) -- which was itself a financial matter -- the Treaty of 1855 had nothing whatever to do with the fishing rights of the Indians of the treaty area. There is nothing in the treaty minutes or other documents to indicate that fishing rights were discussed at all, or that the Indians were told that their existing fishing activities would be in any way curtailed or restricted by the treaty. (Tr. 326-28.)

19/ "The most celebrated opinion written by Justice John McLean of Ohio during his thirty-one years on the Supreme Court was his dissent in Dred Scott v. Sandford. His biographer states that McLean's dissent was perhaps the most important of all of the opinions in the case because it 'expressed the northern consensus on the slavery question and was eventually written into the Constitution by the Civil war and the fourteenth amendment.'" History of the Sixth Circuit, a Bicentennial Project, at 51. (Cites omitted.)

20/ See Settler v. Lameer, supra; United States v. Ahtanum Irrigation District, 236 F.2d 321, 327 (9th Cir. 1956), cert. denied, 352, 388 (1957), reh. denied, 338 F.2d 307 (9th Cir. 1964), cert. denied, 381 U.S. 924 (1965).

21/ This Court has referred to treaties made with the Indians as "not a grant of rights to the Indians, but a grant of rights from them -- a reservation of those not granted." United States v. Winans, 198 U.S. 371, 381, 49 L.Ed. 1089, 25 S.Ct. 662.

22/ The British record with regard to treatment of the American Indians is remarkably better than that of the United States. For an Indian expression of this viewpoint, see the speech of O-Ge-Maw-Ke-to, n.3, supra.

23/ In Choctaw Nation v. Oklahoma, 397 U.S. 620, 623, reh. denied, 398 U.S. 945 (1970), the Supreme Court was required to interpret certain treaties to determine whether a reservation included the streambed of the Arkansas River. The Court concluded that the language ". . . then down the main channel of the Arkansas River" was purposefully included and ruled that the tribe did have title to the bed of the river. If the United States had wanted to exclude the streambed it could have described the cession by reference to the north side or bank of the Arkansas River.

24/ 4 Stat. 411. American Heritage Pictorial History of the Presidents, Vol. 1, p. 224 (1968).

25/ The language of two removal treaties introduced into evidence clearly establishes this point. The 1833 Treaty with the Chippewa (Ex. P-188) includes the following language:

> And it is further agreed that as fast as the said Indians shall be prepared to emigrate, they shall be removed at the expense of the United States, and shall receive subsistence while upon the journey, and for one year after their arrival at their new home. It being understood, that the said Indians are to remove from all that part of the land now ceded, which is within the State of Illinois, immediately on the ratification of this treaty, but to be permitted to retain possession of the country north of the boundary line of the said State, for the term of three years, without molestation or interruption and under the pro-tection of the laws of the United States.

The 1832 Treaty with the Winnebago (Ex. P-187) provided in pertinent part:

> The exchange of the two tracts of country to take place on or before the first day of June next; that is to say, on or before that day, all the Winnebagoes now residing within the country ceded to them, as above, shall leave the said country, when, and not before, they shall be allowed to enter upon the country granted by the United State, in exchange.

Later in that same treaty, Article XI provided:

> Article XI: In order to prevent misapprehensions that might disturb peace and friendship between the parties to this treaty, it is expressly understood that no band or party of Winnebagoes shall reside, plant, fish, or hunt after the first day of June next, on any portion of the country herein ceded to the United States.

26/ See McClanahan v. Arizona Tax Com'n, supra at 172. See also Byran Itasca County, 426 U.S. 373 (1976), where the Supreme Court construed a federal statue authorizing states, under certain circumstances, to assume civil and criminal juris-diction over reservation Indians so as not to include state or local taxing authority to affect Indian lands or Indian income derived from activities within reservations.

27/ Geer v. Connecticut, 161 U.S. 519 (1896).

28/ Cf. New Mexico State Game Com'n v. Udall, 410 F.2d 1197 (10th Cir. 1969), cert. denied sub nom., New Mexico State Game Com'n v. Hickel, 396 U.S. 961 (1969); Lacoste v. Department of Conservation, 263 U.S. 545, 549 (1923); Hunt v. United States, 278 U.S. 96, 100 (1928).

ONTARIO

LAKE SUPERIOR

KEWENAW BAY

WHITEFISH BAY

PENDILLS BAY

L'ANSE
MARQUETTE

WHITEFISH POINT

SAULT STE. MARIE

GRAND I.

8

TAQUAMENON R.

LITTLE RAPIDS

SUGAR ISLAND - 5

1842

1836

6

DRUMMOND I.

WISCONSIN

9

ESCANABA

BAY DE NOC

1

PT AU BARBE

LES CHENEAUX IS.

MACKINAC I.

ROUND I.

DATES AND
BOUNDARIES OF
MAJOR INDIAN LAND
CESSIONS IN MICHIGAN

2

BEAVER IS.

LITTLE TRAVERSE BAY

10

12

GREEN BAY

13

ALPENA

11

THUNDER BAY

LAKE HURON

TRAVERSE CITY

AU SABLE
RIVER

1836

807 - CEDED BY OTTAWA, CHIPPEWA, WYANDOTT AND POTAWATOMI

819 - CEDED BY THE CHIPPEWA

821 - CEDED BY OTTAWA, CHIPPEWA AND POTAWATOMI

836 - CEDED BY OTTAWA AND CHIPPEWA

842 - CEDED BY CHIPPEWA ON LAKE SUPERIOR

ADAPTED FROM C.C. ROYCE, U.S. BUREAU OF ETHNOLOGY ANNUAL REPORT, 1896-97; WASHINGTON, 1899.

14
MANISTEE

MICHIGAN

RIVER

BIG RAPIDS

1819

SAGINAW

MUSKEGON

MUSKEGON

GRAND RAPIDS

GRAND RIVER

LANSING

1821

1807

DETROIT

ONTARIO

LAKE MICHIGAN

1828

1817

RESERVATIONS OF THE OTTAWA AND CHIPPEWA OF MICHIGAN

TREATY OF MARCH 28, 1836

APPENDIX 1