UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

BAY MILLS INDIAN COMMUNITY, SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS, GRAND TRAVERSE BAND OF OTTAWA AND CHIPPEWA INDIANS, LITTLE RIVER BAND OF OTTAWA INDIANS, and LITTLE TRAVERSE BAY BANDS OF ODAWA INDIANS,

Plaintiff-Intervenors / Counter-Defendants,

vs.

STATE OF MICHIGAN, REBECCA HUMPHRIES, DIRECTOR, DEPARTMENT OF NATURAL RESOURCES, CHIEF, FISHERIES DIVISION, DEPARTMENT OF NATURAL RESOURCES, CHIEF, WILDLIFE DIVISION, DEPARTMENT OF NATURAL RESOURCES, CHIEF, LAW ENFORCEMENT DIVISION, DEPARTMENT OF NATURAL RESOURCES, RESOURCE MANAGEMENT DEPUTY DIRECTOR, DEPARTMENT OF NATURAL RESOURCES, AND THE MICHIGAN NATURAL RESOURCES COMMISSION,

Defendants / Counter-Claimants.

_____

File No. 2: 73 CV 26
Hon. Richard A. Enslen

*CONSENT DECREE*

1

*CONTENTS*

FINDINGS AND ORDER ....................................................................................5

I.      Jurisdiction ................................................................................................7

II.     Parties Bound ............................................................................................7

III.    Definitions.................................................................................................8

IV.     Recognition of Treaty Rights ..................................................................11

V.      Regulation of Treaty Rights....................................................................12

VI.     Definition of the Extent of Inland Article 13 Rights .............................12

VII.    Land and Waters on which Tribal Members May Exercise Inland Article 13
        Rights .......................................................................................................13

VIII.   Commercial Harvests...............................................................................16

IX.     Sale or Trade of Live Animals.................................................................17

X.      Restrictions on Hunting and Fishing at Particular Locations .................17

XI.     Gear and Methods of Take........................................................................26

XII.    The Use of Specially Regulated Fishing Methods in Inland Lakes and Their
        Tributaries.................................................................................................35

XIII.   Disease Control.........................................................................................37

XIV.    Tagging and Reporting Requirements .......................................................37

XV.     Deer Hunting.............................................................................................38

XVI.    Wild Turkey Hunting ................................................................................39

XVII.   Species in Need of Allocation...................................................................39

        17.1    Elk ................................................................................................39

        17.2    Bear...............................................................................................40

        17.3    Lake Sturgeon ..............................................................................41

XVIII. Migratory Birds ........................................................................................................41

XIX.   Threatened and Endangered Species under State Law .....................................42

XX.    Use of State Land ..............................................................................................42

    20.1   Gathering....................................................................................................42

        (a)   Maple Sap/Sugar Bushes ...............................................................42

        (b)   Firewood ........................................................................................44

        (c)   Conifer Boughs ..............................................................................45

        (d)   Black Ash, Basswood and Ironwood ..............................................46

        (e)   White Birch Bark ...........................................................................47

        (f)   Collection of Ground Vegetation and Shrubs.................................48

    20.2   Access ........................................................................................................49

    20.3   Temporary Structures.................................................................................50

XXI.   Assessment Activities .......................................................................................51

XXII.  Restoration, Reclamation, and Enhancement Projects .....................................52

XXIII. Consultation and Exchange of Information .......................................................53

XXIV. Law Enforcement...............................................................................................54

XXV.  Wildlife Species for Which the State Does Not Currently Permit Hunting .....60

XXVI. Changes to Regulations......................................................................................61

XXVII. Dispute Resolution ...........................................................................................62

XXVIII. Modifications ..................................................................................................66

XXIX. Federal Lands and Federal Law .......................................................................66

APPENDICES

A.     Lands and Inland Waters within the Boundaries of the Territory Ceded in the
    1836 Treaty  ...............................................................................................68

B1.     Protocol for the Tribes' Authorization of Their Members' Use of Specially Regulated Fishing Methods and for Management of Tribal and State Walleye Fisheries in Walleye Lake Systems ..................................................................70

B2.     Protocol for the Tribes' Authorization of Their Members' Use of Impoundment Nets and Long Seines in Non-Walleye Lake Systems .......................................98

C.      Non-Member Assistance ....................................................................105

D.      State Shotgun Zone as of October 2006 ...............................................106

E.      Streams Designated Types 5, 6 & 7 as of October 2006 .................................107

F.      Lakes Designated Type D as of October 2006 ...............................................109

G.      Note 8 to Table 2 of the 2006 Michigan Fishing Guide (p. 10) .....................111

H.      State Fishing Regulations Existing a of October 2006 Applicable to Certain Designated Quality Lakes ....................................................................113

I.      Streams Designated Types 1, 2 & 4 as of October 2006 .................................114

J.      State Regulations for the Harvesting of Minnows or Other Bait Fish with the Use of Seines as of October 2006 ...............................................119

K.      Birds Not Protected by the Migratory Bird Treaty Act (16 U.S.C. §§ 703-712) and Mammals that Cannot Lawfully Be Harvested under State Law as of October 2006 ....................................................................120

L.      Information Sharing and Consultation Protocol ...........................................121

M.      Agreement among the Parties and Proposed Intervenors ...............................144

<u>FINDINGS AND ORDER</u>

The Court hereby FINDS:

A.      Defendants/Counter-Claimants State of Michigan, Michigan Natural Resources Commission, Michigan Department of Natural Resources ("MDNR") Director, MDNR Fisheries Division Chief, MDNR Wildlife Division Chief, MDNR Law  Enforcement Division Chief and MDNR Resource Management Deputy Director (collectively, "State") filed a counterclaim in this action, *United States v. Michigan,* No. 2:73 CV 26 (W.D. Mich.) ("Litigation"), against Plaintiff-Intervenors/Counter-Defendants Bay Mills Indian Community, Sault Ste. Marie Tribe of Chippewa Indians, Grand Traverse Band of Ottawa and Chippewa Indians, Little River Band of Ottawa Indians, and Little Traverse Bay Bands of Odawa Indians (collectively, "Tribes"), seeking a declaration that, with limited exceptions, the Tribes no longer retain the right to hunt, and the other usual privileges of occupancy, secured by Article 13 of the 1836 Treaty of Washington on lands and inland waters within the  boundaries of the territory ceded in the 1836 Treaty ("Inland Article 13 Rights") (Dkt. No. 1473), and the Tribes filed a joint reply denying the State's claim (Dkt. No. 1477).   With the exception of disputed areas lying generally between the Ford and Escanaba Rivers in the Upper Peninsula and on the Thunder Bay Peninsula in Alpena County, the lands and inland Waters within the boundaries of the territory ceded in the 1836 Treaty are depicted in Appendix A, which is attached hereto and made a part hereof.

B.      Plaintiff United States filed a supplemental complaint in the Litigation seeking a declaration that the Tribes retain Inland Article 13 Rights on lands and inland waters within the boundaries of the 1836 Ceded Territory that have not been required for settlement (Dkt. No. 1504), and the State filed an answer denying the United States' claim (Dkt. No. 1516).

C.      The Parties explored settlement of their respective claims regarding Inland Article 13 Rights, reached an agreement in principle on the terms and conditions of such a settlement, and have now stipulated to the entry of this Decree, which is intended to resolve conclusively such claims, and to provide for the protection of the resources in the 1836 Ceded Territory.

D.      The Parties were represented by attorneys of their own choosing in negotiating and drafting this Decree, which was the product of arms-length negotiations by Parties of equal bargaining power.   Accordingly, the Parties have agreed that any ambiguities in this Decree shall not be construed against any Party on the basis of the status of the Parties or by virtue of the fact that such Party drafted or assisted in the drafting of the relevant portion of this Decree.  The Parties have further agreed that, in the event of any inconsistency between the terms of this Decree and the Parties' agreement in principle, the terms of this Decree shall be controlling.

E.      Representatives of Amici Curiae (Michigan United Conservation Clubs, Coalition to Protect Michigan's Resources ("CPMR") [formerly Michigan Fisheries Resource Conservation Coalition ("MFRCC")], U.P. Whitetails Association, Inc. and Bays de Noc Great Lakes Sportsfishermen, Inc.) and applicants for intervention (MFRCC, Stuart Cheney, Robert Andrus and the Walloon Lake Trust and Conservancy) attended the Parties' settlement discussions and support the Parties' efforts to settle the Parties' respective claims regarding Inland Article 13 Rights on the terms and conditions set forth in this Decree.  The Parties' Agreement in Principle set forth an agreement among the Parties and the applicants relating to intervention motions, the terms of which are set forth in Appendix M, which is attached hereto and made a part hereof.

F.      This Decree is a fair and equitable resolution of the Parties' respective claims regarding Inland Article 13 Rights.

NOW, THEREFORE, it is hereby ORDERED, ADJUDGED, AND DECREED that this Decree shall be entered as the Court's Judgment and Decree fully and finally resolving the Parties' respective claims regarding Inland Article 13 Rights. Each Party shall be responsible for its own expenses incurred in procuring this Decree, including its attorneys' fees and costs. The Clerk is directed to enter Judgment accordingly.

## I.  JURISDICTION

1.1    This Court has jurisdiction over the subject matter of the State's counterclaim and the United States' supplemental complaint pursuant to 28 U.S.C. §§ 1331, 1345, and 1346. This Decree implements the settlement of the Parties' respective claims with respect to Inland Article 13 Rights under the 1836 Treaty of Washington.

1.2    This Court also has personal jurisdiction over the Parties. The Parties waive all objections and defenses that they may have with respect to the personal jurisdiction of the Court or to venue in this District for purposes of the entry, interpretation, modification or enforcement of this Decree.

1.3    The Court shall retain jurisdiction over the Parties and subject matter of this action to enforce this Decree and to resolve disputes arising under this Decree, subject to Section XXVII (Dispute Resolution), and to consider modifications of this Decree under Section XXVIII (Modifications).

## II.  PARTIES BOUND

This Decree shall apply to and be binding upon the Parties, their officers, employees, agencies, subdivisions, successors, and assigns and shall remain binding notwithstanding any future rulings or determinations in any jurisdiction that may be inconsistent with the provisions of this Decree.

## III.  DEFINITIONS

As used in this Decree, the following terms shall have the meanings ascribed to them in this Section III:

3.1     "1836 Ceded Territory" means the territory ceded in the 1836 Treaty of Washington, 7 Stat. 491.

3.2     "2000 Great Lakes Consent Decree" means the 2000 Consent Decree pertaining to the Tribes' Great Lakes fishing rights (Dkt. No. 1458), as heretofore or hereafter amended.

3.3      "Bow" means a bow and arrow or a crossbow and bolt.

3.4     "CFA" means Michigan's Commercial Forest Act, Mich. Comp. Laws, § 324.51101 *et seq.*

3.5     "Fish" or "Fishing" means the pursuing, capturing, catching, killing, or taking of fish, and includes attempting to pursue, capture, catch, kill, or take fish.

3.6     "Gather" or "Gathering" means  to take or acquire possession of any wild plant or part thereof or other natural resource, and includes attempting to take or acquire possession of any wild plant or part thereof or other natural resource, but does not include Hunting, Trapping or Fishing.

3.7     "Hand Net" means a net or wire mesh bag of any circumference with a handle that can be lifted by one person.

3.8     "Handicapped Hunter" means a hunter who is unable to walk due to being a paraplegic or an amputee, or unable to walk unassisted due to a permanent disability caused by other condition, disease or injury.

3.9     "Harvesting Activities" means Hunting, Trapping, Fishing, or Gathering or any combination thereof.

3.10 "Hook-and-Line Gear" means any standard angling gear that uses a hook imbedded in natural bait or an artificial lure to attract and take fish by hooking them in the mouth and that is attached to a line to pull fish in for capture. Hook-and-Line Gear includes rods and reels and tip-ups fished in open water or through the ice, but does not include a trotline.

3.11 "Hunt" or "Hunting" means shooting, shooting at, pursuing, taking, catching, Trapping, or killing any wild animal or animals.

3.12 "Impoundment Nets" means trap nets or fyke nets, which are stationary nets attached to the lake bottom that capture fish by guiding them into enclosures.

3.13 "Inland Article 13 Rights" means the right to hunt, and the other usual privileges of occupancy, secured by Article 13 of the 1836 Treaty of Washington, 7 Stat. 491, on lands and inland waters within the boundaries of the territory ceded in the 1836 Treaty.

3.14 "Lake" or "Lakes" means an inland lake or lakes of any size, including natural and artificial lakes and drowned river mouths, except where the context clearly refers to the Great Lakes.

3.15 "Lake System" means an inland Lake and its tributaries.

3.16 "Long Seine" means a seine that is at least 12 feet in length but no more than 30 feet in length, and no more than four feet in depth.

3.17 "MDNR" means the Michigan Department of Natural Resources, its successor entities, and those authorized persons or entities acting on its behalf.

3.18 "Non-Walleye Lake System" means a Lake System that is not a Walleye Lake System.

3.19 "Parties" means, collectively, the United States, the State and the Tribes, and "Party" means any one of them.

3.20    "Protected Streams" means the Streams and Stream segments identified in subparagraphs  c(i) and (c)(ii) of Paragraph 11.7 of this Decree, subject to any modifications in such Streams or Stream segments under subparagraph (i) of Paragraph 11.7 of this Decree.

3.21    "Short Seine" means a seine that is less than 12 feet in length, and no more than four feet in depth.

3.22    "Spear" means a hand, rubber, or spring-propelled spear.

3.23    "Specially Regulated Fishing Methods" means the use of Impoundment Nets or Long Seines at any time of the year to harvest any species of fish and the use of Spears, Bows, Hand Nets and Hook-and-Line Gear to harvest walleye in a Walleye Lake System during the Walleye Spawning Season for that Lake System.

3.24    The terms "State" or "State of Michigan" mean, collectively, the State of Michigan, the Michigan Department of Natural Resources, the Michigan Natural Resources Commission, MDNR Director, MDNR Fisheries Division Chief, MDNR Wildlife Division Chief, MDNR Law Enforcement Division Chief, MDNR Resource Management Deputy, and their successors and any authorized representatives acting on their behalf, or any one of them.

3.25    "Streams" means all rivers, streams, creeks and flowages.

3.26    "Trap" or "Trapping" means the taking of wild furbearing animals by means of a trap.

3.27    "Tribes" means, collectively, the Bay Mills Indian Community, the Sault Ste. Marie Tribe of Chippewa Indians, the Grand Traverse Band of Ottawa and Chippewa Indians, the Little River Band of Ottawa Indians, and the Little Traverse Bay Bands of Odawa Indians; "Tribe" means any one of them; and "Tribal" means of or pertaining to a Tribe.

3.28    "Walleye Lake System" means any Lake System known to have a walleye population maintained either by natural reproduction or stocking of cultured fish.

3.29    "Walleye Spawning Season" means the time of year when walleye reproduce. For purposes of this Decree, the Walleye Spawning Season is March 15 to the Friday before the last Saturday in April in Walleye Lake Systems in the Lower Peninsula and April 1 to May 14 in Walleye Lake Systems in the Upper Peninsula, unless changed under Paragraph 12.6 of this Decree.

3.30    "Waters" means inland Lakes and Streams.

## IV.  RECOGNITION OF TREATY RIGHTS

For the purpose of resolving the dispute as to the continued existence of the Tribes' Article 13 Rights, this Decree recognizes the existence of, and defines the extent of, the Tribes' Inland Article 13 Rights on the following lands and Waters within the boundaries of the 1836 Ceded Territory:

(a)    Public lands and Waters (including, but not limited to, federal and State lands, which currently comprise, approximately, over 4,500,000 acres in the 1836 Ceded Territory);

(b)    Private lands and Waters that are required to be open to the public under federal or State law, such as lands enrolled in the State's Commercial Forest Act ("CFA") program (lands and waters that are open to the public under the Michigan Recreational Trespass Act because they are not fenced or posted in accordance with that Act are not required to be open under State law and are therefore not within this category of lands and Waters);

(c)    Lands and Waters owned by a Tribe, a Tribal member, or the spouse of a Tribal member;

11

(d)      Other private lands and Waters, including lands that are open to the public under the Michigan Recreational Trespass Act, which are not enrolled in the CFA program or another program pursuant to which they are required to be open to the public under federal or State law; and

(e)      All other Waters that are open to the public for Fishing under federal or state law, including such Waters open to the public that are accessible through public rights-of-way and public road crossings or otherwise accessible to Tribal members by permission granted by the landowner or authorized lessee.

## V.  REGULATION OF TREATY RIGHTS

Each of the Tribes has the right to regulate its members' exercise of Inland Article 13 Rights, the extent of which is defined in this Decree.  The State is prohibited from regulating or otherwise interfering with the exercise of such rights except as provided in this Decree.  The State is also prohibited from prosecuting Tribal members for alleged Hunting and Fishing violations that preceded entry of this Decree, *provided* that the State may refer such alleged violations to the appropriate Tribe for prosecution under Tribal law.

## VI.  DEFINITION OF THE EXTENT OF INLAND ARTICLE 13 RIGHTS

6.1      This Decree defines the extent of the Tribes' Inland Article 13 Rights and imposes certain limitations on where, when, and how the Tribes may exercise those rights.  The provisions of this Decree apply only to Inland Article 13 Rights; they do not: limit or expand the extent or exercise of the Tribes' Article 13 rights in the Great Lakes; limit or expand any provision of the 2000 Great Lakes Consent Decree; limit or expand any right (other than Inland Article 13 Rights) that a Tribe may have to authorize or engage in any activity on Tribal or trust land; or limit or expand the right of the Tribes or their members to undertake any other activity

pursuant to any other applicable law.  The extent of the Tribes' Inland Article 13 Rights and the limitations on the exercise of those rights are set forth in this Decree.

      6.2    Except as otherwise specifically provided below, the extent of the Tribes' Inland Article 13 Rights is defined as follows:

      (a)    Tribal members: (i) may Hunt, Fish, Trap, and Gather natural resources, without limitation as to the species (including non-native and artificially propagated species) targeted for harvest, the season or method of harvest, or the use of the resource harvested; (ii) may engage in other historically traditional activities (such as the construction and use of sweat lodges); and (iii) may obtain assistance from non-Tribal members to engage in the foregoing activities, as provided in Appendix C, which is attached hereto and made a part hereof; and

      (b)    Each of the Tribes may regulate the foregoing treaty-right activities of its members and enforce regulations pertaining to such activities.  The Tribes may also engage in natural resources assessment, enhancement, and restoration activities as provided in  Section XXI  (Assessment Activities) and Section XXII  (Restoration, Reclamation, and Enhancement Projects).

### VII.  LANDS AND WATERS ON WHICH TRIBAL MEMBERS MAY EXERCISE INLAND ARTICLE 13 RIGHTS

Except as otherwise provided below, Tribal members may exercise Inland Article 13 Rights, to the extent defined in Paragraph 6.2, on the following lands and Waters within the boundaries of the 1836 Ceded Territory, as depicted in Appendix A, *provided* that the Tribes shall not exercise Inland Article 13 Rights in disputed areas lying generally between the Ford and Escanaba Rivers in the Upper Peninsula or on the Thunder Bay Peninsula in Alpena County unless and until the dispute as to such areas is resolved by mutual agreement of the Parties or Court order:

(a)      Public lands and Waters that are open to the public under federal or State law for the particular activity (*e.g.*, Hunting, Fishing, Trapping or Gathering), notwithstanding any species, season, method or use limitations in federal or State law, *provided* that in State, county and municipal parks, State wildlife refuges, formally designated State wildlife research areas, and formally designated State fisheries research areas, Tribal regulations shall only permit Hunting and Fishing in such areas where and at such times when the parks, refuges, and research areas are open to the public for Hunting and Fishing, and shall be no less restrictive than other State regulations limiting Hunting and Fishing in such areas, *and provided further* that such limitations shall not apply to a new or expanded park, wildlife refuge or wildlife or fisheries research area if the creation or expansion of the area was intended to limit treaty harvesting opportunities, and *provided further* that the State shall consult with the Tribes before creating a new or expanding an existing State park, wildlife refuge, wildlife research area or fisheries research area and shall attempt to avoid or minimize any adverse impact on the exercise of the Tribes' rights under this Decree as a result of such designation or expansion;

(b)      Private lands and Waters that are required to be open to the public under federal or state law for the particular activity, such as Hunting and Fishing (but not Gathering) on lands enrolled in the State's CFA program, notwithstanding any species, season, method or use limitations in federal or state law, *provided* that*,* in the interests of social harmony, the Tribes or their members shall obtain permission from a CFA landowner in order to Hunt or Fish on his or her CFA lands outside State seasons and methods if the CFA landowner owns, in the aggregate, less than 1,000 acres in the CFA program, and *provided further that* generally applicable provisions of State law regarding the liability of CFA landowners arising from the activities of hunters or fishers on CFA lands, and generally applicable provisions of the CFA program

allowing CFA landowners to limit access to CFA lands subject to active timber harvesting operations shall apply to Hunting and Fishing by Tribal members on CFA lands, and *provided further that* nothing herein shall be construed to authorize the use of snowmobiles, all-terrain vehicles, or other motor vehicles on CFA lands if such use is otherwise prohibited under applicable law;

(c)     Lands and Waters owned by a Tribe, a Tribal member or the spouse of a Tribal member;

(d)     Other private lands and Waters owned by non-Tribal members, with permission from the owner or authorized lessee, *provided* that, in the case of private Waters, *i.e.*, a non-navigable Lake with no public access or a non-navigable stream segment on a parcel or parcels of private property, the grant of permission by a riparian owner does not violate the Michigan common law rights of any other riparian owners, and *provided further* that, except for special needs subsistence or ceremonial permits, which shall be limited in number, the Tribes shall restrict Hunting and Trapping on such lands and Waters in a manner consistent with State seasons and methods, and *provided further* that, during State seasons, permission shall be implied on lands and Waters open to the public for Hunting and Fishing under the Michigan Recreational Trespass Act, Mich. Comp. Laws, § 324.73101 *et seq.,* as now in force or hereafter amended, and *provided further* that, when permission is not implied, the Tribes shall require their members to possess written evidence of permission from the landowner or authorized lessee, or the name and phone number of the landowner or authorized lessee from whom they obtained permission, while Hunting on such lands; and

(e)     All other Waters that are open to the public for Fishing under federal or State law notwithstanding any species, season, method or use limitations in federal or State law,

including such Waters open to the public that are accessible through public rights-of-way and public road crossings or otherwise accessible to Tribal members by permission granted by the landowner or authorized lessee, but only for purposes of Fishing in such Waters, *provided* that Tribal members exercising Fishing rights within the scope of subparagraph (a) of Paragraph 6.2 of this Decree shall not place Impoundment Nets on privately owned bottom lands if doing so is in violation of the Michigan common law riparian rights of the private bottom land owner. Nothing herein shall be construed as recognizing a right to Fish on private Waters not open to the public except those owned by a Tribe, a Tribal member or the spouse of a Tribal member or on which permission is obtained from a riparian owner as provided in subparagraph (d) of this Section VII (Lands and Waters on Which Tribal Members May Exercise Article 13 Rights).

## VIII. COMMERCIAL HARVESTS

The Tribes shall not authorize their members to harvest for commercial purposes or sell wildlife, fish or other aquatic species, amphibians, reptiles, or timber, except for those species, other than timber, for which the State authorizes inland commercial harvests. Notwithstanding the foregoing, the Tribes may authorize their members: to commercially harvest fish that the State is targeting for eradication or reduction from a particular water body, and which the State does not intend to use for other fisheries management purposes, pursuant to clause (a) of Paragraph 11.2 of this Decree, *provided* that there is a mutually agreeable mechanism to assure that the harvested fish are from that particular water body; to engage in informal trade and barter within Tribal communities of any species lawfully harvested under Tribal regulations, *provided* that nothing herein shall authorize the re-sale of any fish or wildlife subject to such trade or barter; to commercially harvest furbearers and to sell furs; to Gather plants and the products thereof, such as wild berries, mushrooms, nuts and fruits, for sale or for use in producing salable

commodities, such as maple syrup, subject to the restrictions set forth in Section XX (Use of State Lands) regarding State lands; and to use the parts of harvested animals and plants for the manufacture of handicrafts and to sell such handicrafts.  Except as otherwise provided in this section, the Tribes shall not authorize their members to sell parts of harvested animals contrary to State and federal laws and regulations.

IX.  SALE OR TRADE OF LIVE ANIMALS

The Tribes shall not authorize their members to engage in the sale or trade of live wild animals except in accordance with federal or State law.

X.  RESTRICTIONS ON HUNTING AND FISHING AT PARTICULAR LOCATIONS

10.1    The Tribes shall prohibit their members from Hunting with firearms and bows within 150 yards of an occupied building, house, cabin, or any barn or other building used in a farm operation, except with the consent of the owner or authorized lessee.

10.2    The Tribes shall limit their members' use of firearms to shotguns in that part of the 1836 Ceded Territory that lies within the shotgun zone designated by the State as of October 2006 (as set forth in Appendix D, which is attached hereto and made a part hereof), as long as the State imposes such a limitation on non-Tribal members.  The Tribes shall consider whether to limit their members' use of firearms to shotguns in additional parts of the 1836 Ceded Territory that the State may designate as shotgun zones in the future, in light of the State's purpose for such designations and the effect of the limitation on Tribal members' treaty Hunting opportunities.

10.3    The Tribes shall adopt regulations that are no less restrictive than State regulations prohibiting Fishing within 300 feet of any of the State's salmon and steelhead egg collection weirs to the extent such regulations apply to Waters and shall prohibit Fishing for

Coho salmon within 300 feet of the lower weir on the Platte River as long as the State prohibits harvests of Coho salmon in such Waters.  If the State adopts an emergency regulation prohibiting harvests of Coho salmon in other portions of the Platte River below the upper State-owned hatchery weir, in order to ensure adequate egg collections at that weir in a particular year, the Tribes shall adopt a parallel prohibition, which shall remain in effect during that year, but only until the State rescinds its prohibition or until sufficient egg collection is assured for that year, whichever occurs first. Except as otherwise agreed between the State and the Tribes, the Tribes shall prohibit the spearing of Atlantic salmon in the Torch Lake watershed.  The Tribes shall also adopt regulations that: (a) are no less restrictive than State regulations prohibiting Fishing in Rock River (Alger County) between Rock River Dam and the foot bridge downstream from M-28; (b) except as otherwise provided under subparagraph (i) of Paragraph 11.7 of this Decree, prohibit the use of Spears and Bows to harvest steelhead in the Little Manistee River from the mouth of the Little Manistee River at its confluence with Manistee Lake upstream to 300 feet downstream from the Little Manistee River Weir; (c) prohibit the take or possession of northern pike in Potagannising River (Chippewa County) below the Potagannising Dam downstream to Maxton Road from April 15 to May 15; and (d) are no less restrictive than State regulations prohibiting Fishing within 100 feet of electrical lamprey control devices while in operation and the lamprey control barrier on the Betsie River. The Tribes may authorize their members to harvest Chinook salmon in the Little Manistee River from the mouth of the Little Manistee River at its confluence with Manistee Lake upstream to 300 feet downstream from the Little Manistee River Weir in accordance with subparagraphs (a) through (e) of this Paragraph 10.3.

(a)     Any permits that are issued for the harvest of Chinook salmon in the portions of the Little Manistee River described above shall include bag and possession limits.

(b)     Each year, the total harvest limit for Chinook salmon for Tribal fishers using Spears, Bows, dip nets or hands in the portions of the Little Manistee River described above shall be 10% of the lower 95% confidence limit for the average number of Chinook salmon returning to the Little Manistee River Weir in the previous four years.  The Tribes shall only permit their members to use such gear from September 1 through November 14.  During this period, the Tribes shall limit their members' harvest of Chinook salmon using such gear in the portions of the Little Manistee River described above in each consecutive 7-day period to: 15% or less of the total harvest limit for the season in each of the first three 7-day periods; 20% or less of the total harvest limit for the season in the fourth 7-day period; and 30% or less of the total harvest limit for the season in each of the remaining 7-day periods.  If the State meets its egg-take quota for the year, the State shall immediately notify the Tribes that the total harvest limit for the season and the 7-day harvest limits may be rescinded for the current year.

(c)     The Tribes shall prohibit Fishing using Hook-and-Line Gear from September 6 through October 15, or Spears at any time, in the southern end of Manistee Lake in the vicinity of the Little Manistee River at its confluence with Manistee Lake.  The closed area is defined by a line extending from a squared red post located 100 feet southeast of the launch ramp at the MDNR Public Access Site on the east shore, extending southwesterly to a squared red post on the west shore located near the southern end of the Packaging Corporation of America's plant.  If the State meets its egg-take quota for the year, the State shall immediately notify the Tribes that the Fishing closure may be rescinded for the current year.

(d)     In order to provide sufficient egg-take to assure future statewide fish runs and to provide adequate harvest levels for all users over the long-term, the State and the Tribes shall confer in a timely manner about appropriate adjustments to State and Tribal harvests in

Waters in which fish destined for the State's egg-collection facilities are harvested if the State has concerns about securing adequate egg collection for Chinook salmon. In the event that the State demonstrates that adequate egg collection is threatened in a particular year, the Tribes shall prohibit harvest of Chinook salmon by their members in the portions of the Little Manistee River described above until such time as sufficient egg collection is assured for that year, as long as the State also prohibits the harvest of Chinook salmon by State-licensed fishers in that portion of the Little Manistee River during that period of time.

(e)    The State and the interested Tribes shall review the appropriateness of the harvest estimation methodology, harvest limits, and weekly harvest distributions described in subparagraph (b) of this Paragraph 10.3 every 5 years to determine the adequacy of harvest opportunities for Tribal needs and the impact on egg collection, and make appropriate adjustments.

(f)    The limitations on Tribal harvests in this Paragraph 10.3 shall be operative only to the extent the State imposes similar or more restrictive limits on State-licensed fishers.

10.4    The Tribes shall adopt regulations that are no less restrictive than State regulations for Fishing on trout Streams designated as Types 5, 6 or 7 as of October 2006 (as set forth in Appendix E, which is attached hereto and made a part hereof), as long as the State maintains the same or more restrictive regulations for non-Tribal members. The State shall consult with the Tribes prior to designating additional miles under its authorization to designate up to 212 miles of trout Streams as Types 5, 6 or 7. The Tribes shall consider adopting regulations that are no less restrictive than State regulations for Fishing on additional trout Streams designated as Types 5, 6 or 7 on a case-by-case basis (up to a total of 212 designated miles statewide) in light of the State's purpose for such designations and the effect of such

regulations on Tribal members' treaty Fishing opportunities.   In the event that the current designation of Types 5, 6, or 7 is changed in name only, this provision shall be applicable to the successor designation.

10.5     The Tribes shall prohibit the use of Spears to take fish on Lakes designated by the State as Type D as of October 2006 (as set forth in Appendix F, which is attached hereto and made a part hereof), and shall adopt hook-and-line regulations on such Lakes that are no less restrictive than State regulations for such Lakes, as long as these are trout-only Lakes and the State imposes such prohibitions and regulations on non-Tribal members.   The State shall consult with the Tribes prior to designating additional Type D Lakes.   The Tribes shall consider adopting regulations that are no less restrictive than State regulations for Fishing on additional Type D lakes in light of the State's purpose for such designations and the effect of such regulations on Tribal members' treaty Fishing opportunities.   In the event that the current designation of Type D Lakes is changed in name only, this provision shall be applicable to the successor designation.

10.6     The Tribes shall prohibit or restrict spearing of northern pike and muskellunge in a manner that is no less restrictive than 2006 State spearing restrictions with respect to these two species as set forth in Note 8 to Table 2 of the 2006 Michigan Fishing Guide (at p. 10) (as set forth in Appendix G, which is attached hereto and made a part hereof), as long as the State imposes similar or more restrictive limitations on non-Tribal members.   The State shall consult with the Tribes prior to adopting additional restrictions on spearing of northern pike or muskellunge.   The Tribes shall consider adopting regulations that are no less restrictive than such additional State regulations on a case-by-case basis in light of the State's purpose for such regulations and the effect of such regulations on Tribal members' treaty Fishing opportunities.

10.7    The Tribes shall adopt regulations that are no less restrictive than State Fishing regulations existing as of October 2006 (as set forth in Appendix H, which is attached hereto and made a part hereof) on the following designated quality Lakes: in Crawford County, Jones and Wakeley Lakes, and in Montmorency County, North and South Blue Lakes and Robarge (Pike) Lake, as long as the State imposes similar or more restrictive regulations on non-Tribal members. The Tribes shall consider adopting regulations that are no less restrictive than State regulations for Fishing on quality Lakes that may be designated in the future on a case-by-case basis in light of the State's purpose for such designations and the effect of such regulations on Tribal members' treaty Fishing opportunities.

10.8    The Tribes shall implement emergency closures of their members' harvesting activities that are no less restrictive than State emergency closures of harvesting activities by State licensees based on biological or public health or safety concerns.  In order to implement this provision, the State shall provide notice to the Tribes as soon as practicable when such concerns arise and shall consult with the Tribes regarding the need for such closures.  In the event that the Tribes enact emergency closures of their members' harvesting activities based on biological or public health or safety concerns, the Tribes shall notify the State as soon as practicable when such concerns arise and shall consult with the State regarding the need for closures of harvesting activities by State licensees.  In the event the Parties disagree about the need for an emergency closure, they shall jointly commit to expedited dispute resolution.  A Tribe objecting to the emergency closure shall have the burden to show that it is not necessary to close its members' harvesting activities to address the biological or public health or safety concerns identified by the State.  As used in this Decree, "public health or safety concerns" do

not include concerns arising from social or political opposition to the exercise of Indian treaty rights.

10.9     Except as otherwise provided in this Paragraph 10.9, Tribal seasons shall be no less restrictive than State seasons for Hook-and-Line Gear Fishing for walleye in Streams tributary to the bays de Noc.  The Tribes may authorize Hook-and-Line Gear Fishing and spearing for walleye between March 15 and May 15 on the Sturgeon River, a tributary to Big Bay de Noc in Delta County, the Escanaba River, a tributary to Little Bay de Noc in Delta County, the Days River, a tributary to Little Bay de Noc in Delta County, and the Rapid River, a tributary to Little Bay de Noc in Delta County.  The Tribes that authorize Hook-and-Line Gear Fishing outside State seasons and spearing for walleye on these tributaries shall establish a permit system for such Fishing, which shall include the following provisions:

(a)     The Tribal annual harvest of walleye using Hook-and-Line Gear outside State seasons and Spears under this Paragraph 10.9 shall not exceed 2,500 fish, except as provided in subparagraph (g) of this Paragraph.

(b)     Tribal regulations for Hook-and-Line Gear Fishing outside State seasons and spearing for walleye under this Paragraph 10.9 shall include a field possession limit not to exceed twice the bag limit or 10 fish, whichever is less, a minimum size limit of at least 14 inches, and a daily bag limit not to exceed 10 fish.  Tribal regulations shall require that walleye under the minimum size that are speared under this Paragraph must be retained as part of the daily bag limit without penalty to the fisher.

(c)     The total number of permits issued for Hook-and-Line Gear Fishing outside State seasons and spearing for walleye under this Paragraph 10.9 shall be distributed among the four tributaries open to such Fishing such that no more than 20% of the total permits

issued shall be available for the Sturgeon River.  In order to avoid concentration of harvest, the Tribes shall make reasonable efforts to distribute the harvest among the remaining tributaries open to Hook-and-Line Gear Fishing outside State seasons and spearing by Tribal members.

(d)     The permits required under this Paragraph 10.9 shall be limited to Hook-and-Line Gear Fishing or spearing (but not both), shall include the name of the Tribal member, the date on which the permit is effective, the tributary for which the permit is issued, and the authorized method of harvest.  The Tribes shall require their members to have a permit in possession when Fishing under the provisions of this Paragraph.  The Tribes shall not issue more than one such permit to any member for any day under this Paragraph.

(e)     The Tribes shall provide notice to the State before any use of Hook-and-Line Gear outside State seasons or any use of Spears may take place under this Paragraph 10.9, in accordance with a protocol adopted by the Parties under Paragraph 23.2 of this Decree.  The notice provided to the State shall identify the body of water, the number of fishers, and the date on which Hook-and-Line Gear or Spears will be used, and shall be provided at least seven hours (and before 1:00 pm of the same day) before the use of Hook-and-Line Gear or Spears.  The State and the Tribes shall share information on Waters where the use of Spears is permitted in accordance with a protocol adopted by the Parties under Paragraph 23.2 of this Decree.

(f)     The Tribes shall require their members to submit harvest reports for the use of Hook-and-Line Gear outside State seasons or spearing of walleye under this Paragraph 10.9 within seven days after the harvest.  The harvest reports shall indicate the date of harvest, the tributary where the harvest took place, and the number of walleye harvested.  Final reports detailing the walleye harvest under this Paragraph 10.9 that include the information identified in this sub-paragraph shall be submitted to the State no later than June 30.

(g)     Except for the Whitefish River, a tributary to Little Bay de Noc in Delta County, the Tacoosh River, a tributary to Little Bay de Noc in Delta County, and the four tributaries identified as open for Tribal Hook-and-Line Gear Fishing outside State seasons or spearing for walleye under this Paragraph 10.9, if a future estimate of abundance of adult walleye in any other tributary to the bays de Noc suggests that Tribal members may harvest walleye using Hook-and-Line Gear outside State seasons or Spears on such tributary, the State and the Tribes may mutually agree to such harvest, *provided* that it shall not exceed 5% of the estimated abundance of adult walleye in that particular tributary.

(h)     The State and the Tribes agree to review, consult on, and as appropriate modify by mutual agreement, the provisions of this Paragraph 10.9 every 15 years, taking into consideration walleye abundance in the tributaries to the bays de Noc, the adequacy of Tribal harvest opportunities, and other relevant factors.

10.10   In applying the walleye protocol described in Section XII (The Use of Specially Regulated Fishing Methods in Inland Lakes and Their Tributaries), the Muskegon River and its tributaries between the Croton Dam and Muskegon Lake shall be considered part of the Muskegon Lake system.  In determining maximum allowable exploitation rates and harvest levels for the Muskegon Lake system, the State and the Tribes shall allow sufficient escapement for walleye population rehabilitation and egg collection.  The Tribes shall regulate their members' harvest of walleye in a manner that ensures that no more than 50% of the Tribes' allowable harvest in the Muskegon Lake system will be taken in the Muskegon River and its tributaries between the Croton Dam and Muskegon Lake.

10.11   As long as the State imposes similar or more restrictive limitations on State-licensed fishers, the Tribes shall prohibit their members' possession of brook and brown trout in

Streams designated Types 1, 2 or 4 as of October 2006 (as set forth in Appendix I, which is attached hereto and made a part hereof): (a) from October 15 through November 30 in the Lower Peninsula; and (b) from October 1 through November 15 in the Upper Peninsula.

## XI.  GEAR AND METHODS OF TAKE

11.1    The Tribes shall: prohibit their members from Hunting with artificial lights, except when Hunting for species for which the State permits the use of artificial lights, such as coyote and raccoon; prohibit the use of toxins, live decoys, pitfalls, explosives, fully automatic firearms, and exploding bullets; and prohibit Hunting from aircraft, snowmobiles, motorized vehicles, and motorized vessels under power, *provided* that the Tribes may permit Hunting from standing motorized vehicles by Handicapped Hunters.  The Tribes shall prohibit the molestation or breaking open of the house, hole, nest, burrow, or den of a badger, beaver, mink, muskrat, or raccoon, whether occupied or not. The Tribes shall also prohibit the setting of a trap on a beaver dam or lodge unless the trap is fully submerged below the water.  The Tribes shall impose the prohibitions in this Paragraph 11.1 as long as the State imposes similar or more restrictive limitations on State-licensed hunters.

11.2    The Tribes shall prohibit their members from using gill nets or Impoundment Nets except that: (a) the Tribes may authorize the use of Impoundment Nets to harvest fish species that the State is targeting for eradication or reduction from a particular water body and may use gill nets to harvest such species if the State is targeting all fish species for eradication from a particular water body; (b) the Tribes may authorize the use of Impoundment Nets in inland Lakes in accordance with Section XII (The Use of Specially Regulated Fishing Methods in Inland Lakes and Their Tributaries); and (c) the Tribes may authorize the use of gill nets or Impoundment Nets in authorized assessment activities under Section XXI (Assessment

26

Activities), *provided* that under the foregoing exceptions to the prohibition of the use of gill nets and Impoundment Nets, gill nets and Impoundment Nets shall only be in the water during the authorized duration of the activities in question.   Nothing in this provision shall require the Tribes to prohibit the use of seines, Hand Nets, or dip nets, *provided* that the Tribes' authorization of the use of such gear shall be subject to other applicable provisions in this Decree.  The Tribes shall impose the prohibitions required in this Paragraph 11.2 as long as the State imposes similar or more restrictive prohibitions on State-licensed fishers.

11.3    The Tribes shall regulate their members' Fishing activities through the use of daily bag limits, possession limits, size limits and seasons, as well as any additional measures that may be necessary to address biological concerns.  Except when engaged in spearing through the ice, the Tribes shall require their members to submit harvest reports for trout, salmon, walleye, northern pike, or muskellunge within seven days after the harvest when spearing, Bow Fishing, impoundment netting, seining, Fishing with hands, trot line Fishing or dip netting.  The Tribes shall require that the harvest reports indicate the date of harvest, body of water where the harvest took place, and the number of fish harvested by species.  Information on lengths and weights, and, if possible, sex of fish harvested by Tribal members shall be obtained by Tribal biological staff through sub-sampling of the harvest as appropriate, taking into consideration the need for such information and the costs of such sub-sampling, after consultation with the State through an annual review process.

11.4    Except in Streams, the Tribes may authorize the use of seines (but not purse seines), *provided* that Tribal regulations shall: (a) be no less restrictive than State regulations for harvesting minnows or other bait fish with the use of seines as of October 2006 (as set forth in Appendix J, which is attached hereto and made a part hereof); (b) include a two-gallon bag limit

for harvesting smelt with the use of seines if the State adopts a two-gallon bag limit or less for the harvest of smelt under State regulations; (c) be consistent with applicable provisions of Section XII (The Use of Specially Regulated Fishing Methods in Inland Lakes and Their Tributaries) for harvesting of other species; (d) limit seines to a maximum dimension of 30 feet by 4 feet; and (e) establish a maximum stretch mesh size of one and one-half (1.5) inches for Long Seines constructed of monofilament materials. The limitations on the use of seines in this Paragraph 11.4 shall be operative only to the extent the State imposes similar or more restrictive limits on State-licensed fishers, *provided* that the Tribes may issue a limited number of special ceremonial permits for the use of seines in Streams between December 1 and March 31, subject to the other provisions of this Paragraph.

11.5    As long as the State imposes similar or more restrictive limits on State-licensed fishers, the Tribes shall: (a) prohibit the use of more than four Fishing lines during open water Fishing conditions and the use of more than seven lines when ice Fishing; (b) require that tip-ups be identified by name; and (c) prohibit unattended tip-ups.

11.6    Except as provided in Paragraph 10.3, the Tribes may authorize the spearing of salmon, provided that Tribal regulations shall include a daily bag limit and a possession limit for spearing.

11.7    The Tribes may authorize spearing of steelhead, *provided* that Tribal regulations shall include a daily bag limit and a possession limit for spearing. The Tribes may open all Streams and Stream segments to their members for the spearing of steelhead, *provided* that Tribal regulations governing spearing for steelhead in Protected Streams shall be subject to the provisions of the protocol described in subparagraph (b) of this Paragraph 11.7 and the initial protections for adult steelhead identified in subparagraphs (c) through (e) of this Paragraph,

subject to any modification of those provisions under subparagraph (i) of this Paragraph.  As used in this Paragraph, the term "Protected Streams" refers to the Streams and Stream segments identified in subparagraph (c)(i) and (c)(ii) of this Paragraph, subject to any modification in such Streams or Stream segments under subparagraph (i) of this Paragraph.

(a)     The State desires to achieve self-sustaining steelhead populations through natural reproduction.  In order to achieve this goal, the State provides protection for natural reproduction of steelhead by closing Types I and II Streams to harvest from October 1 through the last Saturday in April and by closing certain stream segments during the steelhead spawning season.  These closures are a recognition of the fact that optimal habitat for juvenile steelhead is provided in Streams that have intrinsic habitat characteristics, which include a significant contribution of groundwater and favorable temperature conditions for juvenile survival and growth.  The State believes that, in Michigan, the number of highly productive Streams or Stream segments with optimal habitat is limited and must be protected in order to provide wild fish for future generations.

(b)     The State and the Tribes shall provide protections for steelhead that spawn in Streams or Stream segments in each watershed where juvenile steelhead are most likely to become smolts and thus provide recruits to future steelhead populations.  In order to identify Streams of high production potential for steelhead smolts and to protect steelhead that spawn in such Streams, the Tribes and State agree to use and to continue the development of a protocol that includes: (a) a predictive model of the abundance of age-1 juveniles and thus future smolts as a scoping guide; (b) empirical information from field surveys and stream temperature information;  (c) the protection of adult steelhead that spawn in these Streams; (d) realistic goals for natural production of steelhead consistent with the management objectives of the Lake

Committees for lakes Michigan, Huron, and Superior; and (e) any other relevant scientific information related to steelhead. The State and the Tribes shall provide for periodic peer review of the model(s) and data being used pursuant to the protocol described in this subparagraph to ensure that the model(s) and data are scientifically valid. The initial protections to be provided by the State and the Tribes under the protocol are those described in subparagraphs (a) and (c) through (e) of this Paragraph.

(c) Based on the protocol described in subparagraph (b) of this Paragraph 11.7, the State has identified the following locations, initially, as potentially highly valuable Streams for producing and maximizing survival to smolting of juvenile steelhead. Unless otherwise noted, stream segments under protection begin at the downstream confluence of the watershed with the Lake to which the watershed is a tributary.

(i) Within the following four Upper Peninsula groups of stream segments, the Tribes shall prohibit spearing of steelhead except from April 1 to April 15 and shall prohibit harvest of steelhead by all other methods from April 1 to the last Saturday of April (except for such methods with which, and at such times at which, the State permits steelhead harvests by State-licensed fishers):

1. Black River mainstem and tributaries upstream of the confluence of Peters Creek (Mackinac County, Lake Michigan Basin);

2. North Branch of the Pine River and its tributaries upstream of the Highway 40 bridge and mainstem of the Pine River and its tributaries upstream of the confluence with the North Branch of the Pine River (Mackinac and Chippewa counties, Lake Huron Basin);

30

3. North Branch of Carp River and its tributaries, and South Branch of Carp River and its tributaries (Mackinac County, Lake Huron Basin); and

4. Sucker River mainstem and its tributaries upstream of Seney Road Bridge (Alger County, Lake Superior Basin);

(ii) Within the following 11 Lower Peninsula groups of stream segments, the Tribes shall prohibit spearing of steelhead except from April 1 to April 15 and shall prohibit harvest of steelhead by all other methods from March 15 to the last Saturday of April (except for such methods with which, and at such times at which, the State permits steelhead harvests by State-licensed fishers):

1. Cedar Creek and its tributaries upstream from River Road and Bigelow Creek and its tributaries in the Muskegon River watershed (Lake Michigan Basin, Muskegon and Newaygo counties);

2. Skeel Creek and its tributaries and North Branch of the White River above Arthur Road in the White River watershed (Lake Michigan Basin, Oceana and Muskegon counties);

3. Baldwin River and its tributaries and all tributaries upstream of M-37 in the Pere Marquette watershed (Lake Michigan Basin, Lake and Newaygo counties);

4. Little Manistee River mainstem from Spencer's Bridge upstream, including all tributaries (Lake Michigan Basin, Lake County);

5. Above County Road 600, Bear Creek mainstem and tributaries in the Manistee River watershed (Lake Michigan Basin, Manistee County);

6. Dair Creek and its tributaries and Little Betsie River and its tributaries in the Betsie River watershed (Lake Michigan Basin, Benzie and Manistee counties);

7. The mainstem of the Platte River from the upper State-owned hatchery weir downstream to Platte Lake (Lake Michigan Basin, Benzie County), *provided* that this stream segment shall be considered a Protected Stream only if the State permits passage of steelhead past the upper State-owned hatchery weir;

8. The mainstem Jordan River and all tributaries above Graves Crossing (Lake Michigan Basin, Antrim County);

9. Little Ocqueoc River and its tributaries and Silver Creek and its tributaries in the Ocqueoc River watershed (Lake Huron Basin, Presque Isle County);

10. The mainstem Pigeon River and its tributaries upstream of Webb Road (Mullett Lake, Lake Huron Basin, Otsego County); and

11. The mainstem Sturgeon River upstream of Afton Rd (a.k.a. Webb Road or Wolverine Road near Wolverine) and the West Branch of the Sturgeon River and its tributaries (Burt Lake, Cheboygan and Otsego counties).

(d) Except as modified under subparagraph (i) of this Paragraph 11.7, the Tribal annual harvest of steelhead using Spears in Protected Streams shall not exceed 450 fish. Tribal regulations for the spearing of steelhead in such stream segments shall include a daily field possession limit not to exceed twice the daily bag limit, a minimum size limit of at least 16 inches, and a daily bag limit not to exceed three fish. Tribal regulations shall require that steelhead under the minimum size limit that are speared in such stream segments must be retained as part of the daily bag limit without penalty to the fisher.

(e)     Except as modified under subparagraph (i) of this Paragraph 11.7, the total number of permits issued for spearing of steelhead in Protected Streams shall be distributed among the groups of Protected Streams in a manner that ensures that no more than 30 steelhead will be available for harvest from any one of the identified groups of Protected Streams.  In order to avoid concentration of harvest, reasonable efforts should be made to evenly distribute the available permits among the stream segments within each of the identified groups of stream segments.

(f)     The permits required for Protected Streams shall include the name of the Tribal member, the date on which the permit is effective, and the stream segment(s) for which the permit is issued.  The Tribes shall require their members to have a permit in possession when spearing for steelhead in such stream segments.  The Tribes shall not issue more than one such permit to any member for any day in such stream segments, and shall limit each permit to stream segment(s) within a particular group of Protected Streams.

(g)     The Tribes shall provide notice to the State before any use of spears to harvest steelhead may take place in Protected Streams, in accordance with a protocol adopted by the Parties under Paragraph 23.2 of this Decree.  The notice provided to the State shall identify the body of water, the number of fishers, and the date on which spears will be used to harvest steelhead, and shall be provided at least seven hours (and before 1:00 pm of the same day) before the use of spears.  The State and the Tribes shall share information on Waters where the use of spears to harvest steelhead is permitted in accordance with a protocol adopted by the Parties under Paragraph 23.2 of this Decree.

(h)     Unless the State and the Tribes mutually agree otherwise, the Tribes shall require their members to submit harvest reports for spearing of steelhead in accordance with

Paragraph 11.3 of this Decree, including the particular stream segment on which each fish is harvested. Information on lengths and weights, and, if possible, sex of steelhead harvested by Tribal members in Protected Streams shall be obtained by Tribal biological staff through sub-sampling of the harvest as appropriate, taking into consideration the need for such information and the costs of such sub-sampling, after consultation with the State through an annual review process.

(i)    The State and the Tribes shall annually review, consult on, and as appropriate modify by mutual agreement the protocol described in subparagraph (b) of this Paragraph 11.7 and the specific provisions set forth in subparagraphs (a) and (c) through (e) of this Paragraph, based upon the results of the periodic peer review as required in subparagraph (b) of this Paragraph, additional information obtained through research or assessment by either the Tribes or the State regarding smolt production and/or abundance of adults within any stream, the effects of downstream (including Great Lakes) harvests or post-spawning harvests, or any other relevant scientific information related to steelhead, *provided* that the Tribes shall not be required to impose any additional restrictions on their members' harvests of steelhead in the following Streams in the Manistee River watershed: (1) Pine Creek and its tributaries and (2) below County Road 600, Bear Creek and its tributaries, including Cedar and Beaver Creeks and their tributaries, unless the State and the Tribes determine, by mutual agreement, that such restrictions should be adopted in exchange for mutually agreeable Tribal opportunities to harvest steelhead with Spears and Bows in the portion of the Little Manistee River described in Paragraph 10.3 of this Decree.

11.8    The Tribes shall adopt the following standards applicable to Impoundment Nets that may be used in inland Lake Systems.

(a)     The Tribes shall prohibit the use of monofilament material in any part of an Impoundment Net.

(b)     The Tribes shall prescribe the following maximum dimensions for Impoundment Nets:

(i)  Pots shall not exceed eight feet in length by five feet in width by six feet in height.

(ii)  Leads shall not exceed 150 feet in length or six feet in height.

11.9     As long as the State imposes similar or more restrictive limitations on State-licensed fishers, the Tribes shall close the following tributaries to Lake Superior to spearing: (a) Chocolay River; (b) Mosquito River; (c) Big Two Hearted River; (d) Little Two Hearted River; and (e) Anna River from its mouth upstream to the railroad crossing by Wagner Falls in Section 14, Township 46 North, Range 19 West.

11.10   The Tribes shall prohibit their members from snagging fish or retaining a fish not hooked in the mouth while engaged in Hook-and-Line Gear Fishing.

## XII. THE USE OF SPECIALLY REGULATED FISHING METHODS IN INLAND LAKES AND THEIR TRIBUTARIES

12.1     The Tribes may authorize their members to use Specially Regulated Fishing Methods in all Waters as provided in this Section XII, *provided* that the Tribes shall not authorize their members to use Impoundment Nets or Long Seines in tributaries to inland Lakes except where the use of such gear is permitted by State law or Paragraph 11.4 of this Decree. Nothing in this Section XII shall restrict the Tribes' authorization of their members' use of Short Seines.

12.2     Except as provided in Paragraph 12.7 of this Decree, the Tribes' authorization of their members' use of  Specially Regulated Fishing Methods in Walleye Lake Systems shall be

subject to the provisions of the protocol set forth in Appendix B1, which is attached hereto and made a part hereof. The Tribes and the State shall manage their respective fisheries for walleye in Walleye Lake Systems in accordance with the protocol set forth in Appendix B1.

12.3    The Tribes' authorization of their members' use of Impoundment Nets and Long Seines in non-Walleye Lake Systems shall be subject to the provisions of the protocol set forth in Appendix B2, which is attached hereto and made a part hereof.

12.4    The Tribes shall require all Impoundment Nets used by a Tribal member for Fishing to be marked with at least two buoys, one attached to the end of the lead and the other attached to the pot. In addition, if the nets have wings, the Tribes shall require additional buoys to be attached to the end of each wing. The Tribes shall require the member's Tribal affiliation and identification number to be displayed on the buoys.

12.5    The Tribes shall provide notice to the State before any use of Spears in a Walleye Lake System during the Walleye Spawning Season for that Lake System or any use of Impoundment Nets may take place under a Tribal permit in accordance with the procedures set forth in a protocol adopted by the Parties under Paragraph 23.2 of this Decree. The notice provided to the State shall identify the body of water, the number of fishers, and the date(s) and 24-hour period(s) during which such gear may be used, and such notice shall be provided at least seven hours (and before 1:00 pm of the same day), prior to the use of Spears and at least 24 hours prior to the use of Impoundment Nets. The State and the Tribes shall share information on waters where the use of Spears or Impoundment Nets is permitted in accordance with a protocol adopted by the Parties under Paragraph 23.2 of this Decree.

12.6    The Walleye Spawning Season for Walleye Lake Systems in the Lower Peninsula or the Upper Peninsula may be changed by mutual agreement between the State and the Tribes.

12.7     The Tribes' authorization of their members' use of Spears, Bows, Hand Nets, or Hook-and-Line Gear to harvest salmon, steelhead, or sturgeon in accordance with other provisions of this Decree shall not be subject to any restrictions in this Section XII or in the protocols set forth in Appendix B1 and Appendix B2.   The Tribes' authorization of their members' use of Spears or Hook-and-Line Gear to harvest walleye in tributaries to the bays de Noc in accordance with Paragraph 10.9 shall not be subject to any restrictions in this Section XII or in the protocols set forth in Appendix B1 and Appendix B2.

## XIII.  DISEASE CONTROL

As long as the State enforces the following prohibitions, the Tribes shall prohibit their members from: (a) using bait as a method of take in the Hunting of deer and elk where prohibited by the State for the purpose of controlling disease;  (b) importing live deer or elk into the State; (c) importing the carcass of a deer or elk into the State from a state or province in which Chronic Wasting Disease has been documented (unless the carcass is boned out and carved up); or (d) importing live turkeys, mute swans, skunks, or raccoons into the State.   The Tribes shall also adopt regulations that are no less restrictive than State regulations that restrict the movement of ash products from emerald ash borer quarantine and eradication areas.   In the event that fish or wildlife resources are threatened by diseases in the future, the Parties shall work cooperatively to take necessary measures to address the problem.

## XIV.  TAGGING AND REPORTING REQUIREMENTS

The Tribes shall impose tagging and reporting requirements for bobcat, otter, fisher and marten, as long as the State imposes such requirements.   The State shall cooperate with the Tribes in insuring that the Tribes have sufficient CITES tags for species subject to the

Convention on International Trade in Endangered Species, as listed in 50 C.F.R. Part 23, Appendices I, II, and III.

## XV.  DEER HUNTING

15.1.   Except as provided below, the Tribes shall impose the following restrictions on deer Hunting by their members as long as the State imposes similar or more restrictive limits on State-licensed hunters: (a) deer Hunting shall be limited to the period commencing the day after Labor Day and ending on the Sunday of the first full weekend in January (the "Tribal Deer Hunting Season"); (b) deer Hunting with firearms shall be prohibited during the period commencing on November 1 and ending on November 14; (c) each Tribal member shall be limited to a bag limit of five deer, no more than two of which may be antlered deer (*i.e.*, deer with at least one antler of three inches or more), during the Tribal Deer Hunting Season as a whole; and (d) each tribal member shall be limited to a firearm bag limit of two deer, no more than one of which may be an antlered deer, during the period commencing the day after Labor Day and ending on October 31. Notwithstanding the foregoing, the Bay Mills Indian Community may annually establish a collective bag limit for the total number of deer that may be harvested by Tribal members, which shall not exceed five times the number of Tribal members authorized by the Tribe to harvest the species.  Another Tribe may adopt a quota number applicable to all of its licensed hunters in lieu of the foregoing bag limits, but only after further consultation with and agreement of the State.

15.2   Notwithstanding the foregoing, the Tribes may issue a reasonably limited number of special needs permits for subsistence deer Hunting and a reasonably limited number of special ceremonial permits that authorize their members to harvest deer for ceremonies (including, by way of example but not limitation, ghost suppers, weddings, or funerals) at any time.  Deer

harvested pursuant to special ceremonial permits shall not count toward the bag limits set forth above.

## XVI.  WILD TURKEY HUNTING

The Tribes may authorize a spring male only wild turkey season beginning no earlier than April 15 and closing no later than June 15.  For the fall either sex season, the Tribes may authorize a beginning date of no earlier than October 1 and a closing date of no later than November 14.  The Tribes may authorize additional wild turkey harvest opportunities if the State authorizes such additional opportunities for State-licensed hunters.  In addition, the Tribes may issue a reasonably limited number of special ceremonial permits that authorize their members to harvest wild turkey for ceremonies (including, by way of example but not limitation, ghost suppers, weddings, or funerals) at any time.

## XVII.  SPECIES IN NEED OF ALLOCATION

The Tribes shall limit their members' harvests of certain species for which current population levels necessitate an allocation of harvest opportunities, as provided in this Section XVII.

17.1  **Elk**.  The State currently limits the harvest of elk through the issuance of a limited number of permits each year in designated elk management units.  Each permit authorizes the opportunity to harvest a single animal; some of the permits are for either sex and some are for cows only.  Except as otherwise provided below, the Tribes shall limit their members' harvest of elk in a given year to: (a ) the number of elk of either sex equal to 10% of the either-sex permits issued by the State in such year; and (b ) the number of female elk equal to 10% of the number of cows-only permits issued by the State in a year.  Fractional numbers shall be rounded up to the next whole number in applying this provision.  If the State issues less than a total of 101 permits

but more than 50, then the Tribes shall limit their members' harvest to a maximum of five elk of either sex and five female elk.  If the State issues less than a total of 51 permits, the Tribes shall limit their members' harvest to a maximum of five elk in the same ratio of either-sex and cow-only permits that are issued by the State.  The Tribes shall adopt regulations that are no less restrictive than State regulations governing the elk hunt, *provided* that the Tribes may allow tribal members to Hunt elk for up to 15 days after the closure of the State's last elk season.  The Tribes may also transfer Tribal elk Hunting permits among Tribal members.  The Tribes shall consult with the State before issuing Tribal elk permits in order to ensure that the geographical distribution of the permits is consistent with the State's management objectives.

17.2   **Bear**.  The State authorizes harvests of limited numbers of bears in designated bear management units.  The State and the Tribes shall consult regarding appropriate harvest levels for each bear management unit that encompasses lands within the 1836 Ceded Territory and make best efforts to achieve a consensus regarding such levels.   The Tribes shall authorize their members to take no more than 10% of the available harvest in each such unit, *provided* that, if tribal members harvest 10% of the available harvest in any such unit in any year, the Tribes may authorize their members to take up to   12 ½%  of the available harvest in that unit in subsequent years.  The Tribes shall limit the harvest of bears to a  season commencing no sooner than the beginning of the State's bear season and ending no later than the last day of the State's bear season.   The Tribes may transfer Tribal bear permits among tribal members.  Notwithstanding any other provision in this Paragraph 17.2, each Tribe may permit the harvest of up to two bears per year for ceremonial/medicinal purposes, which shall not count against the harvest limits set forth above.   The Tribes may permit bears harvested for such

ceremonial/medicinal purposes to be harvested at any time (except that the Tribes shall not permit bears to be harvested in dens or in the visible vicinity of a cub).

17.3 **Lake Sturgeon**. The State of Michigan has a State-approved Lake Sturgeon Rehabilitation Strategy that outlines the status of lake sturgeon populations and recommends management actions, and the Little River Band has a Tribally approved Nmé (Lake Sturgeon) Stewardship Plan for the Manistee River that recommends management actions for reclamation and restoration activities. The State and the Tribes shall discuss strategies for rehabilitating sturgeon populations and, except as otherwise provided below, shall negotiate allocations of sturgeon harvest when sturgeon recovery provides for such harvest, including an allocation of sturgeon harvest in Black Lake when the sturgeon population, as determined by Tribal and State biologists, includes 750 mature fish (*i.e.*, 750 fish capable of breeding). The Tribes may authorize their members to harvest sturgeon in Otsego Lake as long as they impose a bag limit that does not exceed the bag limit imposed by the State. If a harvestable sturgeon population is developed in the Manistee River, the Tribes may authorize their members to take up to 50% of the harvestable amount.

17.4 For any species subject to allocation under this Section XVII, or for any species determined in the future to require allocation, each Tribe shall be entitled to one-fifth of the Tribal allocation, *provided* that the Tribes shall develop mechanisms to share the available Tribal harvest when a Tribe is unable to fully utilize its one-fifth share.

## XVIII. MIGRATORY BIRDS

The Tribes shall regulate their members' harvests of migratory birds in accordance with the processes established for regulating Indian treaty harvests under the Migratory Bird Treaty

Act, 16 U.S.C. §§ 703-712, and its implementing regulations, as now in force or hereafter amended.

## XIX.  THREATENED AND ENDANGERED SPECIES UNDER STATE LAW

The Tribes shall provide for the protection of species listed as threatened or endangered under state law.  This provision shall not prevent the Tribes from authorizing their members to harvest threatened or endangered plants for personal use for medicinal, ceremonial, or subsistence purposes.

## XX.  USE OF STATE LAND

20.1    **Gathering.**  The Tribes may authorize their members to Gather plant materials and other natural resources on State lands for personal, medicinal, cultural, or traditional craft use, *provided* that such natural resources Gathered on State lands shall not be used for commercial purposes except as specifically provided in this Paragraph 20.1, and *provided further* that nothing herein shall authorize the excavation or mining of sand, gravel or other minerals on State lands.  As described below, the State and the Tribes shall seek to avoid user conflict and other resource concerns arising from certain Gathering activities on State lands through a consultative process involving the local offices of the MDNR and the Tribes.

        **(a)**    **Maple Sap/Sugar Bushes.**

        (i)    The Tribes and the State shall work cooperatively through local MDNR and Tribal offices to determine the location of areas suited for the collection of maple sap and the production of maple sugar or maple syrup (collectively, "sugar bush operations") on State Forest land.

        (ii)    The Tribes and the State shall work cooperatively to designate mutually acceptable areas for sugar bush operations through the use of the MDNR "Special

Conservation Area" (SCA) program. The Parties recognize that SCA designations for sugar bush operations may change over time. If a Tribe and the State are unable to designate mutually acceptable areas for such operations through the SCA program, they shall make good faith efforts to identify other mechanisms to designate areas for such operations. The designation of areas under the SCA program or another mechanism for sugar bush operations shall not preclude the use of such areas for other activities, such as MDNR timber and wildlife management practices, Hunting and Fishing, and other management activities.

(iii)    The Tribes shall not permit their members to engage in sugar bush operations on State lands other than those designated under subparagraph (a)(ii) of this Paragraph 20.1, except as otherwise agreed by one or more Tribes and the State to accommodate one-time or occasional (as opposed to annual) use of a limited number of trees (no more than a total of twelve).

(iv)    The Tribes shall require their members to obtain a Tribal permit before engaging in sugar bush operations on State Forest land. The Tribes shall develop and adopt regulations detailing the permit process. Before issuing permits for sugar bush operations involving more than a total of twelve trees, a Tribe shall negotiate with MDNR an agreed number of permits to issue, the number of trees and trees per acre that can be tapped, and the number of temporary structures that may be erected.

(v)    Tribal regulations for sugar bush operations on State lands shall: prohibit the use of tubing; prohibit construction of new trails to access sugar bushes; prohibit permanent structures; and require that temporary structures be removed by the end of the maple syrup season.

(vi)　　The State shall not charge a fee for sugar bush operations pursuant to permits issued by the Tribes.

(vii)　　The Tribes may authorize their members to engage in personal sale of modest levels of maple sugar and/or maple syrup produced from State lands.

**(b)**　　**Firewood.**

(i)　　The Tribes and the State shall work cooperatively through local MDNR and Tribal offices to designate areas suitable for firewood collection, and to determine local restrictions that apply within MDNR Forest Management Units. The designation of areas for firewood collection under this subparagraph shall not preclude the use of such areas for other purposes.

(ii)　　The Tribes shall not permit their members to collect firewood on State lands other than those designated under subparagraph (b)(i) of this Paragraph 20.1.

(iii)　　The Tribes shall require their members to obtain a Tribal permit before collecting firewood on State lands. The Tribes shall develop and adopt regulations detailing the permitting process.

(iv)　　Tribal regulations for collecting firewood on State lands shall: prohibit Tribal members from cutting or Gathering trees except those that are dead and down; prohibit firewood collection within State timber sale contract areas unless written permission is obtained from the timber sale contractor; prohibit cutting or Gathering of trees marked with paint; prohibit cutting or Gathering of cedar and hemlock trees, *provided* that this provision shall not prohibit Gathering of cedar or hemlock boughs as provided below; provide that the collection of firewood is for personal use only and prohibit the sale of firewood; provide that firewood permits shall be issued for five standard cords per permit, and that only one permit per household

per year shall be issued; and require that Tribal members have a Tribal permit in their possession when collecting firewood.

   (v)  The State shall not charge a fee for collecting firewood pursuant to permits issued by the Tribes.

  **(c)**  **Conifer Boughs.**

   (i)  The Tribes and the State shall work cooperatively through local MDNR and Tribal offices to designate areas suitable for conifer bough collection. The designation of areas for conifer bough collection under this subparagraph shall not preclude the use of such areas for other purposes.

   (ii)  The Tribes shall not permit their members to collect conifer boughs on State lands other than those designated under subparagraph (c)(i) of this Paragraph 20.1.

   (iii)  The Tribes shall require their members to obtain a Tribal permit before collecting conifer boughs on State lands. The Tribes shall develop and adopt regulations detailing the permitting process.

   (iv)  Tribal regulations for collecting conifer boughs on State lands shall: prohibit collection of conifer boughs within 20 feet of the edge of roads, designated trails, or Streams; prohibit the establishment of new trails or roads to access collection areas; prohibit Tribal members from cutting down trees for the purpose of Gathering conifer boughs, removing boughs from trees less than 12 feet in height, or removing boughs from the upper half of a tree; prohibit Tribal members from Gathering cedar or hemlock boughs except for modest quantities for personal medicinal or limited ceremonial uses; prohibit collection of boughs for commercial

use, except for individuals making traditional handcraft items; and require that Tribal members have a Tribal permit in their possession when collecting conifer boughs.

(v)     The State shall not charge a fee for collecting conifer boughs pursuant to permits issued by the Tribes.

(d)     **Black Ash, Basswood and Ironwood.**

(i)     The Tribes and the State shall work cooperatively through local MDNR and Tribal offices to designate areas suitable for collection of black ash, basswood and ironwood.

(ii)     The Tribes shall not permit their members to collect black ash, basswood or ironwood on State lands other than those designated under subparagraph (d)(i) of this Paragraph 20.1.

(iii)     The Tribes shall require their members to obtain a Tribal permit before collecting black ash, basswood or ironwood on State lands.  The Tribes shall develop and adopt regulations detailing the permitting process.

(iv)     Before issuing permits for the collection of black ash, basswood or ironwood on State lands, the Tribes shall negotiate with MDNR an agreed number of permits to issue, and the number of trees and trees per acre that can be used.

(v)     Tribal regulations for the collection of black ash, basswood and ironwood on State lands shall: prohibit commercial use, except for individuals making traditional handicraft products; and require that Tribal members have a Tribal permit in their possession when collecting black ash, basswood, or ironwood.

(vi)     The State shall not charge a fee for collecting black ash, basswood or ironwood pursuant to permits issued by the Tribes.

46

(e)     **White Birch Bark.**

(i)     The Tribes and the State shall work cooperatively through local MDNR and Tribal offices to designate areas suitable for white birch bark collection.

(ii)    The Tribes shall not permit their members to collect white birch bark on State lands other than those designated under subparagraph (e)(i) of this Paragraph 20.1.

(iii)   The Tribes shall require their members to obtain a Tribal permit before collecting white birch bark on State lands.  The permits shall contain provisions to prevent permanent damage to the trees, such as seasonal limitations and limitations on the quantity of bark that may be removed.  The Tribes shall develop and adopt regulations detailing the permit process. The Tribes shall provide copies of permits issued for the collection of white birch bark to the MDNR.

(iv)    Before issuing permits for the collection of white birch bark on State lands, the Tribes shall negotiate with MDNR an agreed number of permits to issue, and the number of trees and trees per acre that can be used to collect white birch bark.

(v)     Tribal regulations for the collection of white birch bark on State lands shall: prohibit collection of white birch bark within 33 feet of the edge of roads or designated trails; prohibit collection of white birch bark for commercial use, except for individuals making traditional handicraft items; and require that Tribal members have in their possession a Tribal permit when collecting white birch bark.

(vi)    The State shall not charge a fee for collecting white birch bark pursuant to permits issued by the Tribes.

(vii)    The Tribes and the MDNR shall annually review the impact to the resource resulting from this activity, and shall determine whether modification of birch bark harvest is required to protect birch trees on State land.

**(f)    Collection of ground vegetation and shrubs.**

(i)    The Tribes shall provide for the protection of species listed as threatened or endangered under state law, as provided in Section XIX (Threatened and Endangered Species under State Law).

(ii)    Tribal members may Gather plants and the products thereof, such as wild berries, mushrooms, pine cones, nuts and fruits, for producing modest levels of commodities for personal sale and may use the parts of harvested plants for the manufacture and sale of handicraft products.

20.2   *Access.*

(a)    The Tribes shall require their members to follow MDNR general camping registration procedures, including payment of camping fees, and all other applicable rules and regulations when camping in a developed campsite within a State Park or State Forest campground.

(b)    The Tribes may authorize dispersed camping on State Forest land at least one-half mile away from a State Forest campground or the boundary of a State Park, except in those areas specifically closed to all camping by order of the Director of the MDNR.  The Tribes shall require their members to post a cost-free MDNR camping permit on site and to follow State land use rules when camping on State Forest lands.  The MDNR shall provide such permits to the Tribes at no charge for issuance to their members.

(c)     In areas where the only public access to a Lake or Stream segment is located on lands owned or managed by MDNR, and a Tribal member is engaged in the exercise of a Tribal treaty-related Hunting, Trapping, Fishing, or Gathering right, the State shall waive any fees or launch costs associated with the Tribal member's use of such facilities, provided that space is available. To be eligible for the fee waiver, the Tribes shall require their members to:

(i)     provide Tribal identification at the entrance to the area and post an approved Tribal identification placard or sticker in the window of their vehicle; and

(ii)     comply with all applicable rules and regulations for the launch site.

(d)     In a Michigan State Park where a Tribal member is engaged in the exercise of a Tribal treaty-related right (consistent with the terms of this Decree) the State shall waive any entrance fees associated with the Tribal member's use of such facilities.   At other times and for other purposes, fees shall be required. To be eligible for the fee waiver, the Tribes shall require their members to:

(i)     provide Tribal identification at the State Park entrance and post an approved Tribal identification placard or sticker in the window of their vehicle; and

(ii)     comply with all applicable rules and regulations for the site.

(e)     State park rangers may enforce State park regulations within State parks.

(f)     The MDNR shall notify and consult with the Tribes before permanently closing an approved access road or trail.   In the event that the MDNR establishes a program for seasonal closures of approved access roads or trails, the MDNR shall notify and consult with the Tribes before implementing any such seasonal closure.

20.3     ***Temporary Structures.***   The Tribes shall only authorize their members to place structures on State lands as provided in this Paragraph 20.3.

(a)     With the exception of Hunting blinds, the Tribes shall not authorize their members to construct any structure on State lands from non-native, processed materials, such as dimensional lumber, plywood, siding or roofing, *provided* that the Tribes may authorize their members to use canvas tarps and the like on temporary structures if removed from the site after use.

(b)     The Tribes may authorize their members to construct a temporary structure, such as a sweat lodge, which occupies up to 100 square feet, using on-site native materials, on State Forest lands, *provided* that the Tribes shall require their members to post a cost-free dispersed camping permit on site in accordance with subparagraph (b) of this Paragraph 20.2.

(c)     The Tribes may authorize their members to construct a temporary structure, which occupies more than 100 square feet, using on-site native materials, on State Forest lands, *provided* that the Tribes shall require their members to post a cost-free dispersed camping permit on site in accordance with Paragraph 20.2, subparagraph b , and *provided further* that the Tribes shall not issue such permits to their members under this subparagraph without first consulting with and obtaining the concurrence of the local MDNR forest manager.

(d)     The Tribes shall not permit their members to leave a temporary structure on State Forest lands for 15 days or more unless the Tribes first consult with and obtain the concurrence of the local MDNR forest manager.

(e)     The Tribes may authorize their members to use Hunting blinds on State land in accordance with the following provisions:

(i)     The Tribes shall require Hunting blinds of man-made materials on state land to legibly display, in letters at least 2" high, the name and an indication of Tribal

membership of the owner (as mutually agreed by the State and the Tribes).  The Tribes shall not permit non-portable ground deer blinds utilizing man-made materials to be placed on State lands before November 6.  The Tribes shall require that deer blinds be removed from State land within 10 days of the end of the last open day for Tribal firearm deer Hunting.

(ii)     The Tribes shall not permit the placement of blinds of man-made materials in State Parks.

(iii)     The Tribes shall require that portable blinds be removed from State land at the end of each day's Hunt.

## XXI.  ASSESSMENT ACTIVITIES

The Parties recognize that the Tribes may desire to engage in assessment activities within the inland portion of the 1836 Ceded Territory in addition to, or in coordination with, assessment activities conducted by the State.  The Parties shall meet at least annually to review State and Tribal assessment activities in order to minimize or avoid duplication of effort and to prevent interference with such activities.  The State may object to a proposed Tribal assessment activity, *provided* that the State shall not object to such a proposed assessment activity without fully consulting with the Tribes and articulating a legitimate State interest for doing so within 60 days of being notified of the proposed activity.  For purposes of this  Section XXI, a "legitimate State interest," which might form the basis of the State's objection to such a proposed assessment activity, is limited to the following: (a) material biological harm to a resource; (b) a threat to public health or safety; (c) material interference with ongoing research projects; or (d) unreasonable redundancy of effort.  In the event the State makes such an objection after fully consulting with the Tribes, the Parties shall jointly refer the matter to binding arbitration to be resolved within the next 60 days.  The issue in the arbitration shall be whether the State has a

"legitimate State interest" for objecting to the proposed activity as defined in this Section XXI. The Tribes shall defer commencement of a proposed assessment activity during the 60-day period in which the State might object to such activities and, if the State does object, pending resolution of the objection by arbitration (but need not defer implementation pending an appeal of the arbitration award, unless otherwise ordered by the Court). An arbitration award under this Section may be vacated, modified or corrected on appeal only on the grounds set forth in the Federal Arbitration Act, 9 U.S.C. §§ 10-11, as now in force or hereafter amended. In carrying out assessment activities, the State and the Tribes shall utilize qualified biologists or other appropriately trained personnel. Tribal and State assessment activities shall be conducted in a manner consistent with accepted scientific principles using non-lethal methods whenever appropriate.

XXII.  RESTORATION, RECLAMATION, AND ENHANCEMENT PROJECTS

The Parties recognize that the Tribes may desire to engage in activities designed to restore, reclaim, or enhance fish, wildlife or other natural resources within the inland portion of the 1836 Ceded Territory through stocking, rearing, habitat improvement, or other methods. The Parties shall meet annually in order to minimize or avoid duplication of, or interference with, restoration, reclamation, and enhancement activities. With the exception of habitat projects on federal lands, which shall be subject to federal approval under applicable law, or on lands that are owned by the Tribes or their members, the Tribes shall not undertake new restoration, reclamation, or enhancement projects without State approval, *provided* that the State shall not withhold its approval without fully consulting with the Tribes and articulating a legitimate State interest for doing so within 60 days of being notified of the proposed project. In carrying out restoration, reclamation, and enhancement projects, the Tribes shall utilize qualified biologists or

other appropriately trained personnel.  Restoration, reclamation, or enhancement projects that involve stocking or rearing of fish that migrate to the Great Lakes and back into streams, such as the Little River Band's Manistee River sturgeon enhancement project, shall be subject to the provisions of the 2000 Great Lakes Consent Decree and any successor thereto, rather than this Decree, *provided* that the State and the Tribes shall provide each other with a reasonable opportunity to review and comment on any proposal to initiate, alter or discontinue a restoration, reclamation or enhancement project that may affect harvest opportunities under this Decree.

XXIII.  CONSULTATION AND EXCHANGE OF INFORMATION

23.1    The State and the Tribes shall establish one or more committees to facilitate consultation and the exchange of information among the Parties.  In addition to those matters set forth above, the State and the Tribes shall at least annually exchange: proposals for assessment activities; the results of assessment activities; a summary of State and Tribal licenses and permits issued and harvest and effort data pertaining to the inland portion of the 1836 Ceded Territory; and a summary of any other data and a copy of any reports regarding the condition of the resources in the inland portion of the 1836 Ceded Territory.

23.2    The Parties shall develop a protocol for these purposes, which shall provide for at least one annual meeting among the Parties or their representatives.  The initial protocol to be adopted by the Parties is set forth in Appendix L, which is attached hereto and made a part hereof.  The Parties may amend the protocol from time-to-time in accordance with its terms.  The protocol, as initially adopted or hereafter amended, shall be enforceable as a component of this Decree.

23.3    The State and the Tribes shall work in good faith to coordinate resource assessment, restoration, enhancement, and harvest monitoring activities.

23.4    The State and the Tribes shall notify each other at least annually of proposed regulatory changes (including changes in management units or methodologies for determining the allowable harvest of any species) before they take effect (except where, due to an emergency or other matter beyond the control of the Parties it is not possible to provide advance notice) and seek to resolve any concerns arising from such changes before implementing them.   Upon request, the State and the Tribes shall share information regarding the rationale for such changes and their anticipated effects (*e.g.*, changes in species abundance, distribution, or age or sex ratios).   Upon request, the State and the Tribes shall provide similar information for any existing regulation, management unit or allowable-harvest methodology.   The information provided shall be sufficiently detailed to enable the other Parties to fully understand the regulation, management unit or allowable-harvest methodology at issue and any underlying data associated with it, and to enable them to make constructive suggestions for improvements to such regulation, management unit or harvestable surplus methodology.

## XXIV.  LAW ENFORCEMENT

24.1    As a general principle, prosecutions of alleged violations of fish and game laws and regulations by Tribal members in the inland portion of the 1836 Ceded Territory shall be heard in a Tribal forum.   This provision is predicated on: (a) the enactment of Tribal fish and game laws and regulations that are consistent with this Decree; and (b) the existence of a Tribal forum with subject matter jurisdiction to hear prosecutions of alleged violations of fish and game laws and regulations.   As used in this Section XXIV, Tribal forum means either a Tribal Court or another mutually acceptable Tribal tribunal.   In any Tribal forum in which such a prosecution is heard, upon request of a law enforcement agency whose officer will be a witness, the law

enforcement officer's testimony shall be presented by a tribal prosecutor or other trained legal advocate.

24.2    Except for the categories of violation specifically otherwise noted in this Decree, if the predicate requirements are met, the State shall be precluded from initiating prosecutions of the Tribes' members in State courts for violations of State law or regulations pertaining to Hunting, Trapping, otherwise taking any species of wildlife, Fishing, or Gathering, when such acts are within the scope of this Decree or subject to Tribal regulations that are consistent herewith. This preclusion shall apply to the following statutes and their implementing regulations, as now in force or hereafter amended, and other similar statutes and regulations:

(a)    endangered species protection [Part 365 of Art. III, Chap. I, Natural Resources and Environmental Protection Act (NREPA), Mich. Comp. Laws, § 324.36501 *et seq.*];

(b)    wildlife conservation [Part 401, Art. III, Chap. II, NREPA, Mich. Comp. Laws, § 324.40101 *et seq.*];

(c)    Hunting and Fishing licenses [Part 435, Art. III, Chap. II, NREPA, Mich. Comp. Laws, § 324.43501 *et seq.*];

(d)    Fishing with Hook and Line Gear [Part 453, Art. III, Chap. II, NREPA, Mich. Comp. Laws, § 324.45301 *et seq.*];

(e)    frogs [Part 455, Art. III, Chap. II, NREPA, Mich. Comp. Laws, § 324.45501 *et seq.*];

(f)    mussels [Part 457, art. III, Chap. II, NREPA, Mich. Comp. Laws, § 324.45701 *et seq.*];

(g)     fish shanties [Part 465, Art. III, Chap. II, NREPA, Mich. Comp. Laws, § 324.46501 *et seq.*]; and

(h)     spearing fish in Houghton Lake [Part 485, Article III, Chap. II, NREPA, Mich. Comp. Laws, § 324.48501]

(i)     sport Fishing [Part 487, Art. III, Chap. II, NREPA, Mich. Comp. Laws, § 324.48701 *et seq.*].

24.3     This Decree does not preclude the State from prosecuting in State court alleged violations by Tribal members of the provisions of the Michigan Penal Code, Mich. Comp. Laws, § 750.1 to 750.568, as now in force or hereafter amended.  Violations of State or Tribal law pertaining to safety zone closures near occupied dwellings, trespass or recreational trespass, and hunter harassment, as defined in State or Tribal law or regulations consistent with this Decree, shall be concurrently enforceable by State and Tribal officers, with prosecution to occur in either State or Tribal courts, *provided* that nothing herein shall be construed as creating a right of a defendant to seek removal of a prosecution from State court to Tribal court or from Tribal court to State court, and *provided further* that Tribal members shall not be prosecuted in State court under circumstances in which non-Tribal members would not be prosecuted for the same offense.  If the State issues a citation to a Tribal member for a violation of State law under this Paragraph 24.3 or Paragraph 24.5 of this Decree, it shall provide notice of the citation to the Tribal member's Tribe on the next business day or as soon thereafter as practicable.  In the event that it is not practicable to provide notice of the citation to the Tribal member's Tribe on the next business day, the State shall explain in writing the reasons that the provision of such notice was impracticable.  Notwithstanding the foregoing, the State's failure to provide notice of a citation

or a written explanation for such failure to the Tribal member's Tribe shall not constitute a defense to the citation.

24.4    Tribal members operating off-road vehicles, snowmobiles, boats or other vessels who are engaged in the exercise of a treaty-related Hunting, Trapping, Fishing or Gathering activity, shall not be subject to State vehicle or vessel registration requirements, provided that the Tribal member satisfies Tribal license requirements for the activity in question, is in compliance with applicable Tribal Hunting, Trapping or Fishing season limitations in Tribal law adopted pursuant to this Decree, and possesses evidence of being currently engaged in Hunting, Trapping, Fishing or Gathering, such as fish, game or common items related to Hunting, Trapping, Fishing or Gathering such as Fishing rods, tip-ups, firearms, traps, or nets.

24.5    On non-Tribally owned lands, operation of an off-road vehicle, snowmobile, or boat or vessel by a Tribal member in a manner that creates a threat to public safety or damage to the environment is enforceable by both State and Tribal officers under provisions of State or Tribal law or regulation, with concurrent jurisdiction in both State and Tribal court.

24.6    The provisions set forth in subparagraphs (a) through (c) of this Paragraph 24.6, by which State law enforcement officers shall have the authority to enforce Tribal regulations on non-Tribal lands, shall be effective only if, and only for so long as, the Parties are able to identify a mechanism by which Tribal law enforcement officers shall have the authority to: stop hunters and fishermen in the field in order to determine whether they are Tribal members; enforce Tribal regulations with respect to Tribal members; and, to the extent they are deputized under applicable law, enforce State regulations with respect to non-Tribal members.  The State shall not be liable for the acts or omissions of Tribal law enforcement officers in the performance of their duties under this Decree and the Tribes shall not be liable for the acts or omissions of the

State's law enforcement officers in the performance of their duties under this Decree.  Moreover, nothing in this Decree shall be construed to mean either that Tribal law enforcement officers are agents of the State or that State law enforcement officers are agents of the Tribes.

(a)     Conservation officers of the MDNR are authorized to enforce a Tribe's regulations pertaining to Inland Article 13 Rights on non-Tribal lands and to institute proceedings in a Tribal forum through the issuance of a citation upon satisfaction of the following requirements:

(i)     certification as a law enforcement officer by MCOLES, or its successor agency; and

(ii)     successful completion of a cultural awareness program  approved by the State and the Tribes.

MDNR shall provide the Tribes with updated lists of officers meeting these criteria.

(b)     In order to assure professional, fair, and reasonable enforcement of the Tribes' regulations, any Tribe subject to this Decree may initiate a complaint of unprofessional conduct against a Michigan conservation officer, by means of filing the standard form available from the Law Enforcement Division of the MDNR.  In order to assure transparency in the investigation of such charges, the chief law enforcement officer of the Tribe initiating a complaint shall be invited to:

(i)     participate in the investigation of such charges; and

(ii)     participate as a member of the review board that reviews the investigation, determines the validity of such charges and establishes any corrective or disciplinary actions that may be appropriate if officer misconduct is established.

(c)     A MDNR conservation officer may:

(i)    conduct routine inspections of boats, wagons, trailers, vehicles, snowmobiles, containers, packages, or other containers utilized by a person in a Harvesting Activity authorized by Tribal law;

(ii)    stop and board any boat and stop any vehicle or snowmobile if the officer reasonably suspects there is a violation of Tribal law;

(iii)    execute any process for enforcement of the provisions of Tribal law;

(iv)    with or without a warrant, open, enter and examine boats, wagons, trailers, vehicles, snowmobiles and packages and other containers, in which the officer has probable cause to believe that contraband wild plants, wild animals, fish, or carcasses or parts thereof may be contained, or as part of a routine inspection authorized under subparagraph (c)(i) of this Paragraph 24.6; and

(v)    if a violation occurs in the officer's presence, seize, with or without a warrant, any article which is subject to forfeiture under applicable Tribal law, or which may be required as evidence of a violation of applicable Tribal law, *provided* that any article so seized shall be delivered within 5 working days of the time of seizure into the custody of the Tribal member's Tribal forum, unless said article is immediately delivered into the custody of an officer of the Tribal member's Tribe.   Officers shall exhaust all other practical means of gathering required evidence prior to seizing an article under this subparagraph.

24.7    The records of a Tribal court related to State or Tribal citations or arrests of Tribal members for alleged violations related to Hunting and Fishing under this Decree, including records of court dispositions of such citations or arrests, shall be accessible to MDNR conservation officers during normal business hours.

24.8   Each Tribe shall prepare an annual summary of citations and arrests of Tribal members for alleged violations related to Hunting and Fishing under this Decree, showing the date of violation, the agency initiating the citation or arrest, the location by county of the alleged violation, the charge filed, and the status or disposition of each incident.  The report shall be provided to the State no later than the last day in February of the following year.  Upon request, the State shall provide a Tribe comparable data for Hunting and Fishing violations prosecuted by the State.

24.9  If Michigan law is amended or modified in the future to provide the opportunity for the deputization of Tribal conservation officers by the MDNR, the State and the Tribes shall work together to develop a process to provide for deputization of such officers.

### XXV.  WILDLIFE SPECIES FOR WHICH THE STATE DOES NOT CURRENTLY PERMIT HUNTING

Except as otherwise provided in Section XVIII (Migratory Birds), the Tribes shall not authorize their members to harvest wildlife species that cannot lawfully be harvested under State law as of October 2006 (as set forth in Appendix K, which is attached hereto and made a part hereof), *provided* that if any such species is biologically capable of withstanding harvest and the Tribes express interest in such harvest, the State and the Tribes shall make best efforts to reach consensus regarding Tribal harvest of such species, and *provided further* that in the event such consensus is not obtained, the Parties shall utilize the dispute resolution process under this Decree to determine whether Tribal harvests may be permitted.  For species designated as game species under Michigan law as of October 2006 (as also set forth in Appendix K), the issue shall be whether the State has a reasonable basis for prohibiting such harvests taking into consideration the Tribes' interest in allowing such harvests, *provided* that no harvest of moose shall be permitted by the State or the Tribes unless the State and the Tribes agree that such

harvest is appropriate and agree on an allocation of such harvest.  For all other species, the issue shall be whether the State has a basis for objecting to the Tribes' proposed harvest regulations under Paragraph 26.2 of this Decree.  Notwithstanding the foregoing, if in the future the State permits the harvest of any species that cannot lawfully be harvested under State law as of October 2006, the Tribes may also permit the harvest of such species. The State agrees to consult with the Tribes on issues of mutual concern regarding such species, including allocation.

## XXVI.  CHANGES TO REGULATIONS

26.1    The Parties agree that management and regulation of fish, wildlife and other natural resources must be dynamic and respond to changing conditions.  Accordingly, from time to time the State and the Tribes may change their harvesting regulations, provided that all such changes shall be consistent with the provisions of this Decree.  The State and the Tribes agree to consult with each other about such changes in accordance with this Section XXVI and Section XXIII (Consultation and Exchange of Information).

26.2    The State may object to a proposed Tribal regulatory change, *provided* that the State shall not object to such a change unless, within 60 days of being notified of the proposed change, it consults with the Tribes and demonstrates that: (a) the change would cause demonstrable harm to the conservation of the resource at issue or a demonstrable threat to public health or safety; and (b) prohibiting the change is reasonable and necessary to prevent such conservation harm or public health or safety threat.  If the State makes such an objection after fully consulting with the Tribes, the Parties shall jointly refer the matter to binding arbitration to be resolved within the next 60 days.  The issue in the arbitration shall be whether the State has satisfied the foregoing standards.  The Tribe or Tribes proposing the regulatory change shall defer implementation of the proposed change during the 60-day period in which the State might

object to the change and, if the State does object, pending resolution of the objection by arbitration (but need not defer implementation pending an appeal of the arbitration award, unless otherwise ordered by the Court).   An arbitration award under this Paragraph 26.2 may be vacated, modified or corrected on appeal only on the grounds set forth in the Federal Arbitration Act, 9 U.S.C. §§ 10-11, as now in force or hereafter amended.

26.3    In the event that a reduction in fish or game populations requires more restrictive State regulations, the Tribes and the State shall consult regarding appropriate adjustments, if any, in Tribal regulations.   The State may object to a Tribe's decision not to make such an adjustment in its regulations, *provided* that the State shall not make such an objection without consulting with the Tribes and demonstrating that: (a) a failure to make the adjustment would cause demonstrable harm to the conservation of the resource at issue; and (b) the adjustment is reasonable and necessary to prevent such conservation harm.   If the State makes such an objection after fully consulting with the Tribes, the Parties shall jointly refer the matter to binding arbitration to be resolved within the next 60 days.   The issue in the arbitration shall be whether the State has satisfied the foregoing standards.   An arbitration award under this Paragraph 26.3 may be vacated, modified or corrected on appeal only on the grounds set forth in the Federal Arbitration Act, 9 U.S.C. §§ 10-11, as now in force or hereafter amended.

## XXVII.  DISPUTE RESOLUTION

27.1    Any dispute relating to the interpretation, application or enforcement of this Decree shall be resolved by the procedures set forth in this Section XXVII.   However, the decision of a Party not to agree or not to give its consent with respect to a matter identified in this Decree as requiring the mutual agreement or consent of the State and one or more of the Tribes shall not be subject to dispute resolution under this Section.

27.2    Negotiation

(a)    It is the intent of the Parties that any dispute be resolved informally and promptly through good faith negotiations among the Parties.  Should any dispute or controversy arise, the steps outlined in this Paragraph 27.2 shall immediately be taken.

(b)    If the dispute involves any matter which is subject to an information sharing or consultation provision under this Decree or which is addressed by the Information Sharing and Consultation Protocol entered into pursuant to Paragraph 23.2 of this Decree, the Party raising the dispute must first comply with the applicable information sharing and consultation requirements and attempt to achieve consensus.   If consensus on the matter is not achieved, or if consensus on components of the dispute does not resolve the entire dispute, the Party may proceed with the next step in dispute resolution under this Section.

(c)    Any Party may initiate negotiation proceedings by sending written notice to the other Parties setting forth the particulars of the dispute, the provision of this Decree involved, and a suggested resolution of the problem.  The recipient Parties involved in the dispute must respond within 20 days of receipt with an explanation and response to the proposed resolution, which response shall be sent to all other Parties.

(d)    If correspondence does not resolve the dispute, the Parties involved in the dispute and any other Parties who desire to attend shall meet on at least one (1) occasion within fifteen (15) days after the response by the recipient Parties and attempt to resolve the matter.

(e)    If the dispute is not resolved by negotiations within fifteen (15) days after the Parties' first meeting, or within any extended period of time to which the Parties agree, the matter shall be referred to the Executive Council established under the Information Sharing and Consultation Protocol entered into pursuant to Paragraph 23.2 of this Decree.  The Executive

Council shall meet either in person or by teleconference within thirty (30) days of the referral to address the matter.

27.3    Mediation

(a)    In the event that the entire dispute is not resolved at the meeting of the Executive Council, the Party raising the dispute may proceed to mediation. Unless the Parties agree to a different mediation procedure, Voluntary Facilitative Mediation ("VFM"), pursuant to W.D. Mich. LCivR 16.3, as now in force or hereafter amended, shall govern the mediation process; provided, however, that notwithstanding those rules: (i) the Parties hereby consent to mediation  in accordance with this Section; and (ii) the Parties may agree to select a mediator with background and experience in the subject matter which gave rise to the dispute, even if said agreed-upon mediator is not on the list of Court-certified mediators.

(b)    In the event the Parties cannot agree upon a mediator within ten (10) days after the party invoking mediation has initiated the process by written notice to all Parties, the mediator shall be selected by the Court's ADR Administrator.

27.4    Judicial Resolution

(a)    If the Parties do not resolve the matter through mediation, or if the Parties agree to waive mediation, a Party or Parties may seek relief from the Court as provided by the Federal Rules of Civil Procedure and the Local Rules of the Western District of Michigan.

(b)    A Party desiring to initiate judicial resolution of the dispute shall file a notice pleading with the Court containing a concise description of the matters in dispute, a certification that the Party seeking relief has complied with the dispute resolution procedures of this Decree, and a description of the relief requested.  The other Parties may file a responsive pleading within thirty (30) days.

(c)     Unless the Parties agree that the dispute can be resolved by motion without the need for discovery or an evidentiary hearing, they shall request a scheduling conference under W. D. Mich. LCivR 16.1, as now in force or hereafter amended, to establish a timetable for disposition of the dispute.

(d)     In the event of an emergency involving this Decree posing a threat of immediate irreparable harm to a resource or a Party, a Party may seek immediate or temporary relief under Fed. R. Civ. P. 65, as now in force or hereafter amended, and applicable local court rules without following the procedural steps set forth in this Section.

27.5    Arbitration.

(a)     The provisions in Paragraphs 27.1 through 27.4  of this Decree shall not apply to disputes that are subject to binding arbitration under Section XXVI (Changes to Regulations) or Section XXI (Assessment Activities).  However, a Party must comply with the applicable information sharing and consultation provisions of Section XXVI, Section XXI, and the Information Sharing and Consultation Protocol adopted under Paragraph 23.2 of this Decree, before invoking arbitration.  If a Party invokes binding arbitration under Section XXVI or Section XXI, the arbitration shall be conducted pursuant to W.D. Mich. LCivR 16.6, as now in force or hereafter amended; provided, however, that notwithstanding those Rules:  (i) the Parties hereby consent to binding arbitration whenever this Decree calls for arbitration, which arbitration shall be final, binding and non-appealable; (ii) the provisions of the Federal Arbitration Act, 9 U.S.C. §§ 10-11, as now in force or hereafter amended, shall apply to any arbitration award or decree; and (iii)  the Parties may agree to select an arbitrator with background and experience in the subject matter which gave rise to the dispute, even if said agreed-upon arbitrator is not on the list of Court-certified arbitrators.

(b)      In the event the Parties cannot agree upon an arbitrator within 20 days after the Party invoking arbitration has initiated the process by written notice to all Parties, the arbitrator shall be selected by the Court's ADR Administrator.   The arbitration proceedings shall be concluded within the time period specified in this Decree.

## XXVIII.  MODIFICATIONS

Except as otherwise provided by federal law applicable to the modification of consent decrees, modifications to this Decree shall be made only by mutual agreement among the Parties and approval by this Court.  In the event the Parties desire to modify this Decree, the Parties shall present to this Court for its consideration a stipulation and a proposed order for modification of the Decree.

## XXIX.  FEDERAL LANDS AND FEDERAL LAW

29.1    To the extent a particular activity on federal land under the jurisdiction and control of the U.S. Forest Service, the U.S. Fish and Wildlife Service, the National Park Service, or any successor agency is otherwise subject to State regulation, the exercise of Inland Article 13 Rights on such lands shall be governed by the terms of this Decree and applicable federal laws and regulations.  To the extent a particular activity on those federal lands would not otherwise be subject to State regulation, the exercise of Inland Article 13 Rights on those lands shall be governed by memoranda of understanding between the Tribes and the Forest Service, Fish and Wildlife Service, or Park Service, or any successor agency, respectively, and by applicable federal laws and regulations.  The exercise of Inland Article 13 Rights on lands under the jurisdiction and control of any other federal agency shall be governed by memoranda of understanding between the Tribes and the agency or its successor and applicable federal laws and regulations.

29.2    Issues concerning the applicability of particular federal laws or regulations to the Tribes' Inland Article 13 Rights shall be determined in accordance with prevailing law governing the applicability of federal law to Indian treaty rights.  The Parties do not intend this Decree to limit or expand the application of federal law, including but not limited to the Endangered Species Act, to Indian treaty rights as determined under prevailing law.

Dated: November 2, 2007                    /s/ Richard Alan Enslen
                                           RICHARD ALAN ENSLEN
                                           SENIOR UNITED STATES DISTRICT
                                           JUDGE