UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | No. 2:73-cv-26 |
| | ) | |
| and | ) | Honorable Paul L. Maloney |
| | ) | |
| BAY MILLS INDIAN COMMUNITY, SAULT STE. | ) | |
| MARIE TRIBE OF CHIPPEWA INDIANS, GRAND | ) | |
| TRAVERSE BAND OF OTTAWA AND CHIPPEWA | ) | |
| INDIANS, LITTLE RIVER BAND OF OTTAWA | ) | |
| INDIANS, and LITTLE TRAVERSE BAY BANDS | ) | |
| OF ODAWA INDIANS, | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| STATE OF MICHIGAN, et al., | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION REGARDING THE APPROVAL OF THE 2023 GREAT LAKES FISHING DECREE

On December 11, 2022, six parties in this case—the United States of America, the State of Michigan, Bay Mills Indian Community, Grand Traverse Band of Ottawa and Chippewa Indians, Little River Band of Ottawa Indians, and Little Traverse Bay Bands of Odawa Indians (collectively, "the Stipulating Parties")—filed the proposed successor decree ("the Proposed Decree" of "the Decree") to the 2000 Great Lakes Fishing Consent Decree ("the 2000 Decree") (ECF No. 2042). One party to the 2000 Decree, the Sault Ste. Marie Tribe of Chippewa Indians ("the Sault Tribe" or "the Sault"), did not stipulate to the entry

of the Proposed Decree.[1] Instead, in accordance with the Court's orders permitting the Sault Tribe and any *amici curiae* to file objections to the Proposed Decree (*see* ECF No. 1985 at PageID.11681; No. 2021 at PageID.12006–07; No. 2053 at PageID.12396), the Sault Tribe has filed 139 objections to the Proposed Decree (ECF No. 2077). Additionally, one *amicus*, the Coalition to Protect Michigan Resources ("CPMR"), has filed eleven objections (ECF No. 2062).

After a review of the objections to the Proposed Decree, on May 24 and 25, 2023, the Court heard oral argument on all of CPMR's objections and on forty-one[2] of the Sault's objections (*see Minutes*, ECF Nos. 2110, 2113). At the end of the objections hearing, the Court inquired as to whether any of the parties would like to present expert testimony on or in response to the objections, but no party requested an expansion of the record (*see* ECF No. 2114 at PageID.14376; No. 2120 at PageID.14818–20).[3] Instead, the Court permitted the Stipulating Parties, the Sault Tribe, and CPMR to each file proposed findings of fact and conclusions of law (ECF No. 2114 at PageID.14376). They have each filed such proposed findings of fact and conclusions of law (ECF Nos. 2123, 2124, 2125, 2126).[4]

Upon the Court's review of the record, including but not limited to, all objections, responses, proposed findings of fact and conclusions of law, and supporting documents and

---

[1] Throughout this Opinion, the term "the Parties" shall refer to all seven parties—the United States of America, the State of Michigan, Bay Mills Indian Community, Grand Traverse Band of Ottawa and Chippewa Indians, Little River Band of Ottawa Indians, Little Traverse Bay Bands of Odawa Indians, and the Sault Ste. Marie Tribe of Chippewa Indians—that will be bound and subject to the terms of the Proposed Decree.

[2] The Sault's objections that the Court heard oral argument on are listed in ECF No. 2106.

[3] Notably, the Stipulating Parties and CPMR filed multiple affidavits from asserted expert and fact witnesses—and other documentary evidence—supporting their positions on the objections (*see* ECF Nos. 2062-1, 2084-1, 2085-4, 2086-1, 2096-1, 2103-1, 2104-2, 2104-3). Only the Sault Tribe chose not to file expert/fact witness affidavits.

[4] The Grand Traverse Band of Ottawa and Chippewa Indians ("GTB" or "Grand Traverse") filed an additional set of proposed findings of facts and conclusions of law on issues that are unique to only GTB (ECF No. 2126 at PageID.15014).

exhibits, the Court finds that the approval and entry of the Proposed Decree is in the best interest of the fishery, the Parties, and the *amici*. The Proposed Decree respects and promotes Tribal fishing rights and opportunities, yet it also preserves the Great Lakes fishery and recognizes the shared nature of the resource. For the following reasons, the Court will overrule all the objections to the Proposed Decree and enter the Proposed Decree as the 2023 Great Lakes Fishing Decree, to be effective for twenty-four years following the date of entry.

## I.     The Law of the Case

In 1973, The United States initiated this case against the State of Michigan for the benefit of the Bay Mills Indian Community ("Bay Mills") to protect the Tribal right to fish in Lakes Michigan, Superior, and Huron.[5] This case arises out of the 1836 Treaty of Washington[6] ("the 1836 Treaty" or "the Treaty") and another 1855 Treaty,[7] where the Grand Traverse Ottawas and Chippewas[8] ceded much of their land to the United States but retained their hunting rights in the ceded land, as well as their fishing rights in the waters off the Leelanau Peninsula, northern Lake Michigan, and Grand Traverse Bay. After holding a trial, in May 1979, Judge Fox—a predecessor to the undersigned—held that the 1836 Treaty reserved the Tribal signatories' right to fish in the waters governed by the Treaty. *See United States v. Michigan*, 471 F. Supp. 192, 216 (W.D. Mich. 1979), *mod. in part*, 653 F.2d 277

---

[5] Bay Mills and the Sault Tribe intervened as plaintiffs in this case in 1974 and 1975, respectively. Grand Traverse, the Little Traverse Bay Bands of Odawa Indians ("Little Traverse"), and the Little River Band of Ottawa Indians ("Little River"), which are all successors in interest to the signatories of the 1836 Treaty, each intervened as plaintiffs in this case following federal recognition (*see* ECF No. 2104 at PageID.14120 n.1).

[6] Treaty of Washington, 7 Stat. 491 (Mar. 28, 1836).

[7] Treaty With the Ottawas and Chippewas, 11 Stat. 621 (July 31, 1855).

[8] The Grand Traverse Ottawas and Chippewas were the predecessors to Grand Traverse.

(6th Cir. 1981), *cert. denied*, 454 U.S. 1124 (1981).  ("I am compelled to conclude that the Ottawa and Chippewa Indians, and the plaintiff tribes as their successors, reserved an aboriginal right to fish in the waters of the Great Lakes ceded by the Treaty of 1836, which right they may exercise without regulation by the State of Michigan."). Consistent with this holding, Judge Fox issued a Declaratory Judgment and Decree ("the 1979 Decree"). The 1979 Decree provided that the State had no power to regulate Tribal fishing in a manner inconsistent with the Treaty. *See id.* at 281 ("Congress has not authorized the state or its agents to regulate the exercise of the treaty fishing rights of the Indians of Michigan. To the extent that any laws or regulations of Michigan are inconsistent with the treaty rights of the Michigan Indians, such laws and regulations are void Ab initio and of no force and effect as to the plaintiff tribes and their members."). *Id.* at 278. Further, paragraph 25 of the 1979 Decree established this Court's continuing jurisdiction over this case "for the life of this decree to take evidence, to make rulings and to issue such orders as may be just and proper upon the facts and law, and in the implementation of this decree." *Id.* at 281.

While Judge Fox's 1979 decision confirmed the Tribal right to fish the Treaty waters, it did not establish a regulatory scheme governing the fishery. Thus, the State appealed, arguing that state regulation of Tribal gill net fishing—which had been established and implemented prior to Judge Fox's decision—was necessary to prevent irreparable harm of the fishery. *See United States v. Michigan*, 623 F.2d 448, 449 (6th Cir. 1980). The Sixth Circuit stayed Judge Fox's decision and remanded the case back to this Court to determine whether federal regulations governing gill net fishing preempt state regulation. *See id.* at 450; *United States v. Michigan*, 653 F.2d 277, 278 (6th Cir. 1981). Meanwhile, the United States,

through the Secretary of the Interior, issued "comprehensive regulations governing Indian fishing in the Great Lakes, including gill net fishing." *United States v. Michigan*, 520 F. Supp. 207, 208 (W.D. Mich. 1981).[9]

While the case was on remand and Judge Fox had begun taking evidence on the preemptive effect of the Secretary of the Interior's regulations of gill net fishing—but he had not yet ruled on the issues relevant to remand—the Secretary of the Interior's regulations lapsed. *See Michigan*, 653 F.2d at 278. Consequently, the State filed an emergency motion with the Sixth Circuit to set aside the Circuit's remand order, reverse Judge Fox's order, and allow the State's emergency regulations to be effective. *See id.* In response, the Sixth Circuit modified its remand order. *See id.* The Sixth Circuit concluded that, "[t]he treaty-guaranteed fishing rights preserved to the Indians in the 1836 Treaty, including the aboriginal rights to engage in gill net fishing, continue to the present day as federally created and federally protected rights." *Id.* However, the Circuit also noted that "[t]he right of the Indians to engage in gill net fishing is not absolute," and "[i]n the absence of federal regulation, that right is subject to the type of state regulation outlined by the Michigan Supreme Court in [*People v. LeBlanc*, 248 N.W.2d 199 (Mich. 1976).]" *Id.* at 278–79 [hereinafter "the *LeBlanc* Standard"]. Consistent with the *LeBlanc* Standard, the Sixth Circuit held that unilateral state regulation restricting Tribal fishing rights secured by the 1836 Treaty, including gill net fishing, "(a) must be a necessary conservation measure, (b) must be the least restrictive alternative method available for preserving fisheries in the Great Lakes from irreparable

---

[9] The Sixth Circuit later confirmed that, during the pendency of appeal, the Secretary of the Interior's regulations, rather than state regulations, controlled. *See United States v. Michigan*, 712 F.2d 242, 242 (6th Cir. 1983).

harm, and (c) must not discriminatorily harm Indian fishing or favor other classes of fishermen." *Id.* at 279. In accordance with these findings, the Sixth Circuit noted that its previous remand order, *Michigan*, 623 F.2d at 448, was "continued in effect as modified by this order." *Michigan*, 653 F.2d at 280.

Following this guidance from the Sixth Circuit, on remand, Judge Fox reiterated that, absent federal regulation, the *LeBlanc* Standard applies to the State's attempt at regulating gill net fishing and retained jurisdiction to "consider and decide in accordance with the principles outlined in [*Michigan*, 653 F.2d at 277] and in *People v. LeBlanc* . . . the propriety of any future attempts by the State to impose regulations upon treaty fishers." *United States v. Michigan*, 520 F. Supp. 207, 211 (W.D. Mich. 1981). Thus, it was settled that, in the absence of federal regulation, any unilateral state regulation of Tribal fishing rights secured by the 1836 Treaty was subject to the rigorous *LeBlanc* Standard.

In 1982, the parties negotiated to draft new regulations implementing the 1979 Decree (*see* ECF No. 2076-1 at PageID.12801). However, when they failed to reach an agreement, the Sault Tribe, Bay Mills, and Grand Traverse moved to implement intertribal regulations, to which the State objected (*see* ECF No. 2104 at PageID.14121). Following a hearing, over the objections of the State, Judge Fox allowed the Tribes' regulations to become effective, finding that they "provide[d] adequate protection for the resource," "were simpler to understand and enforce" than prior regulations, and addressed the "changing role of the Interior Department and the dynamic nature of the fishery resource" (ECF 2076-1 at

6

PageID.12803).[10] For the 1983 fishing season, the parties reached an agreement on the applicable regulations, and the Court entered such stipulated regulations governing both Treaty and non-Treaty fishers (ECF No. 2104 at PageID.14122).

In late 1983, the Sault Tribe, Bay Mills, and Grand Traverse moved to allocate the fishery based on the Court's continuing jurisdiction; the Court's inherent power to implement and modify its prior declaratory judgment; and the Declaratory Judgment Act, 28 U.S.C. § 2202, which provides for "further necessary or proper relief based on a declaratory judgment or decree" (ECF No. 2080-1 at PageID.12877). The Tribes argued that, because the fishery resource had significantly depleted since the enactment of the 1979 Decree, allocation was "required to implement fully the Court's [1979 Decree]" and "allow[] treaty fishers the full exercise of their federal rights" (ECF No. 2104-1 at PageID.14172–74). The State opposed the allocation of the fishery, arguing that the issue of allocation could not be adjudicated because the Tribes had failed to raise the issue in the initial stages of the case and because the Court lacked jurisdiction to consider the issue unless the Tribes established an injury (*see* ECF No. 2080-1 at PageID.12878).

Judge Enslen—Judge Fox's successor and the undersigned's immediate predecessor—rejected the State's arguments and found that the Court had jurisdiction to allocate the fishery (*see id.* at PageID.12890–91). Specifically, the Court held that (1) pursuant to paragraph 25 of the 1979 Decree, the Court could exercise its continuing jurisdiction to "[e]nsure that the

---

[10] The Court also affirmed its continuing jurisdiction in this order: "[T]his [C]ourt has power to modify the current fishing regulations because of the mandate of the Court of Appeals, this [C]ourt's prior orders, and basic equitable principles." (ECF No. 2076-1 at PageID.12802).

subject of the declared treaty rights—the fishery resource—is protected";[11] (2) it had inherent equitable authority to "modify a decree in light of changed circumstances, or in view of experience indicating the decree is not adequately adopted to achieving its purposes"; and (3) the Declaratory Judgment Act, which provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing," authorized the Court to allocate the fishery (*Id.*).

Based on these rulings, the Court determined that it would allocate the fishery, and it allowed the parties and *amici curiae* to file independent allocation plans and objections to one another's plans. Judge Enslen also set a hearing for April 1985 (*see* ECF No. 2104 at PageID.14123). Prior to the hearing, the parties and *amici* negotiated an agreement ["the 1985 Agreement"] regarding the allocation of the fishery and signed a stipulation for entry of a consent judgment (*see* ECF No. 2040 at PageID.12149). However, after the Court entered the consent order approving the 1985 Agreement, the Bay Mills General Tribal Council rejected and objected to the Agreement, and Bay Mills proposed an alternative allocation and management plan (*Id.*). Judge Enslen was then tasked with adopting the allocation plan contained in the 1985 Agreement or the alternative plan proposed by Bay Mills. *See United States v. Michigan*, 12 I.L.R. 3079 (W.D. Mich. 1985), *available at* ECF No. 1890-1.

After substantial briefing and holding a hearing, the Court adopted the allocation plan contained in the 1985 Agreement. *See id.* Judge Enslen stressed the Court's ultimate duties in presiding over this case: protection of the 1836 Treaty rights and protection of the Great

---

[11] The Court noted that this power had "been invoked in the past to approve new tribal regulations . . . and to entertain motions for modification of the joint use of the resource arising out of conservation concerns" (ECF No. 2080-1 at PageID.12890).

Lakes fishery. *See id.* at 3080. He noted that he must choose the "fairest and most equitable management plan for the Great Lakes," and that he could choose one of the two plans or reject both—the latter alternative requiring a full trial on the allocation issues. *See id.* Additionally, Judge Enslen appreciated that the resource was shared by many users, not just the Tribes. *Id.* at 3079 ("While the Treaty, as interpreted by this court, protects [T]ribal fishing rights, the resource is shared other user groups."). Although the Court's overarching goal was to "reach a fair and equitable decision in keeping with the reserved rights of the Tribal fishermen and the preservation of the resource," Judge Enslen also considered fifteen specific factors in choosing a proposal:

> Preservation and conservation of the resource; impact of the plans on all three tribes; consistency of the plan with the tribal right to fish and the recognition that the resource is shared; reduction of social conflict; feasibility and methods of implementation; protection of Indian fishermen from discrimination in favor of other classes of fishermen; proximity; access; species of fish stocks available; harvestability of fish stocks; the economic impact on Indian fishermen; stability of the fishery; contaminant levels; management and marketing concerns; and flexibility versus predictability of the fishery.

*Id.* at 3081. Upon consideration of these factors, the Court found that the 1985 Agreement was "in the best interests of all [T]ribes involved, specifically Bay Mills." *Id.* at 3088. In adopting the 1985 Agreement over the objection of one Tribe, the Court affirmed that its continuing jurisdiction to do so adhered to "this court's powers as a court of equity," *id.* at 3080, as well as Supreme Court precedent, which "endorse[d] the court's power to allocate a fishery in order to effectuate a treaty," *id.* (citing *Washington v. Fishing Vessel*, 443 U.S. 658 (1979)).[12] The 1985 Decree was effective for the next fifteen years.

---

[12] As the Court has previously indicated, Judge Enslen's 1985 opinion regarding the differing allocation plans is among the law of this case (*see* ECF No. 2040 at PageID.12149).

As the expiration of the 1985 Decree neared, the parties began negotiating a successor decree. During negotiations, the parties utilized the Court's continuing jurisdiction to oversee negotiations and, if necessary, hold hearings on proposals and objections (*see* ECF No. 2104 at PageID.14124). Ultimately, all seven parties reached an agreement, and on August 8, 2000, the Court entered the stipulated 2000 Decree (ECF No. 1458). The 2000 Decree was to be effective for twenty years (*Id.* at PageID.3334–35). The 2000 Decree also contained a provision regarding the Court's continuing jurisdiction over this case "for purposes of enforcing this Decree, the Tribal Plan, and the CORA Charter" (*Id.* at PageID.3336).

Toward the end of 2019, the parties, along with several *amici*, began negotiating a successor decree to the 2000 Decree.[13] When it was apparent they would not reach agreement by the time the 2000 Decree expired, the parties moved to extend the 2000 Decree (ECF No. 1879). The Court granted the extension (ECF No. 1892). Over the course of the next few years, facing the worldwide coronavirus pandemic and complex negotiations in light of the interests of seven different sovereigns, the Court granted numerous extensions of the 2000 Decree (ECF Nos. 1892, 1903, 1912, 1945, 1963, 2014). Many of these extensions were over the objection or opposition of the Sault Tribe. Following the latest extension, the 2000 Decree is effective "until all objections to a proposed successor decree have been adjudicated" (ECF No. 2027 at PageID.12022).

---

[13] Many *amici* participated extensively in the negotiations of the Proposed Decree. While the parties were engaging in the final stages of negotiations and drafting the Proposed Decree, two *amici*, CPMR and the Bay de Noc Great Lakes Sportsfishermen, Inc., moved to intervene in this case to achieve party-status (ECF No. 1964). This Court denied their motion (ECF No. 1985), and CPMR appealed (ECF No. 2019). On May 23, 2023, the Sixth Circuit Court of Appeals affirmed the Court's denial of CPMR's motion to intervene. *See United States v. Michigan*, 68 F.4th 1021 (6th Cir. 2023).

On December 11, 2022, the Stipulating Parties filed the proposed successor decree to the 2000 Decree (ECF No. 2042). The Sault Tribe and CPMR, an *amicus*, objected to the entry of the Proposed Decree, and, in accordance with this Court's orders, filed their written objections to the Proposed Decree (ECF Nos. 2062, 2077). The Court heard oral argument on the objections on May 24 and 25, 2023, and it allowed the Stipulating Parties, the Sault Tribe, and CPMR to each file proposed findings of facts and conclusions of law. The Proposed Decree is now ripe for the Court's review.

## II.    Standard of Review

"Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). "A consent decree has attributes of both a contract and of a judicial act." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983). The entering of a consent decree "places the power and prestige of the court behind the compromise struck by the parties" and the court is required to "protect the integrity of the decree with its contempt powers." *Id.* A court may therefore not enter a consent decree "for an agreement which is illegal, a product of collusion, or contrary to the public interest." *Id.*

All parties affected by a decree should "be afforded a full and fair opportunity to consider the proposed decree and develop a response" at a hearing. *Id.* at 921; *see also Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 552 (6th Cir. 1982) (citations omitted), *rev'd on other grounds*, *Firefighters Loc. Union No. 1784 v. Stotts*, 467 U.S. 561 (1984) ("The determination of whether the decree is adequate, fair, and reasonable should only occur after the court has had an opportunity to hold a hearing to consider objections to the decree.").

A court should consider whether a "consent decree is consistent with the public interest." *Vukovich*, 720 F.2d at 923. "The ultimate issue the court must decide at the conclusion of the hearing is whether the decree is fair, adequate and reasonable." *Id.* at 921. Objectors to a decree bear the "heavy burden of demonstrating that the decree is unreasonable." *Id.*

With respect to this specific case, the law of the case from Judge Enslen's 1985 opinion dictates the standard of review that the Court should utilize when reviewing the Proposed Decree. *See generally Michigan*, 12 I.L.R. 3079, *available at* ECF No. 1890-1. The Court's paramount concern "at all times when sifting through the complex and conflicting evidence [must be] the desire to reach a fair and equitable decision in keeping with the reserved rights of the Tribal fishermen and the preservation of the resource." *Id.* at 3081. Although not all factors should be given equal weight, the Court should consider fifteen factors in choosing whether to adopt the Proposed Decree:

> Preservation and conservation of the resource; impact of the plans on all three tribes; consistency of the plan with the tribal right to fish and the recognition that the resource is shared; reduction of social conflict; feasibility and methods of implementation; protection of Indian fishermen from discrimination in favor of other classes of fishermen; proximity; access; species of fish stocks available; harvestability of fish stocks; the economic impact on Indian fishermen; stability of the fishery; contaminant levels; management and marketing concerns; and flexibility versus predictability of the fishery.

*Id.* The Stipulating Parties bear the burden of establishing that the Proposed Decree "satisfies the appropriate standards." *Id.*

### III.    The Sault Tribe's Objections

The Sault Tribe has raised two "general" objections as well as 137 "specific" objections to the Proposed Decree (ECF No. 2077). Unlike the Stipulating Parties and

*amicus*, the Sault Tribe did not support its positions with affidavits from expert witnesses or other documentary evidence.[14] The common themes throughout the Sault Tribe's objections are that the State has exceeded its regulatory power of the Tribes and that the State has no authority to impose these regulations on the Tribes, but especially on the Sault Tribe, which does not consent to the approval of the Proposed Decree. Because the Sault's objections are not rooted in the law of this case, misunderstand the terms of the Proposed Decree, and simply express disagreement with the Proposed Decree without adequate evidentiary support, the Court will overrule all of the Sault's objections.

### A. General Objections

**General Objection 1:** The Court does not have the authority to approve the Proposed Decree over the objection of a party.

First, the Sault Tribe argues that the Court may not enter the Proposed Decree—which the Sault characterizes as a "consent" decree—without the consent of the Sault (*Id.* at PageID.12806–07) ("Here, the Sault Tribe does not consent to the proposed decree – while at the same time the proposed decree purports to bind and significantly restrict and limit the Sault Tribe treaty rights. This is an unlawful violation of Sault Tribe treaty rights and not a

---

[14] In response to the Sault Tribe's objections, the United States has provided affidavits from two asserted experts: Scott R. Koproski of the United States Fish and Wildlife Service (ECF No. 2104-2) and Dr. Kevin McDonnell of the United States Fish and Wildlife Service (ECF No. 2104-3). The State of Michigan has also provided two affidavits from asserted experts: Dr. David Caroffino of the Tribal Coordination Unit in the Michigan Department of Natural Resources ("MDNR") (ECF No. 2103-2) and Thomas M. Goniea, the Commercial Fish Program Specialist in the Fisheries Division of the MDNR (ECF No. 2103-3 at PageID.14078). The Court has thoroughly reviewed these affidavits and the affiants' qualifications and finds that these individuals meet the standard under Fed. R. Evid. 702 to be considered experts in their respective fields. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702); *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997). Specifically, the Court finds that Dr. Caroffino, Mr. Koproski, Dr. McDonnell are all qualified to give expert testimony regarding the Great Lakes fishery, biological principles of the fishery, the management framework of the fishery, and the relationship between the fishery and the Decrees. Mr. Goniea is qualified to give expert testimony on the licensing process and regulatory scheme for the State fishery. The Sault Tribe has not challenged these individuals' qualifications as experts, nor has it provided its own competing or contradictory expert testimony that would undermine the Stipulating Parties' expert testimony.

permissible use of consent decree authority."). True, "a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree." *Local Number 93, International Assoc. of Firefighters v. Cleveland*, 478 U.S. 501, 529 (1986). But the Proposed Decree is not necessarily a "consent" decree; rather, it is a judicial decree in the ordinary sense of this legal term. *Compare Decree*, Black's Law Dictionary (11th ed. 2019) ("Traditionally, a judicial decision in a court of equity . . . A court's final judgment."), *with Consent Decree*, Black's Law Dictionary (11th ed. 2019) ("A court decree that all parties agree to."). Indeed, unlike the 2000 Decree—which all the Parties stipulated to the entry of— the Stipulating Parties have not included the word "consent" on the first page of the Proposed Decree (*see* ECF No. 2042-1 at PageID.12167).

Moreover, the Sault fails to recognize that this case has a robust history in which this Court has retained jurisdiction over the case for the purpose of allowing the Court to issue orders to protect the resource. *See Michigan*, 471 F. Supp. at 281 ("The court retains jurisdiction of this case for the life of this decree to take evidence, to make rulings and to issue such orders as may be just and proper upon the facts and law, and in the implementation of this decree."). This retention of jurisdiction has been interpreted broadly to allow this Court to issue orders necessary to protect the resource and the Treaty rights. *See Michigan*, 653 F.2d at 280 (acknowledging this Court's retained "jurisdiction to determine the rights of the parties under treaties of the United States"). This Court has previously exercised its continuing jurisdiction and equitable powers to enter orders regulating the fishery. *See, e.g., United States v. Michigan*, 534 F. Supp. 668, 669 (W.D. Mich. 1982) (treating a motion to adopt proposed Tribal regulations as "a motion for a

modification of a previous order or injunction"). And most importantly, the Court has also exercised its continuing jurisdiction to modify the existing decree, or enter a new decree, over a party's objection after providing the objecting party with due process (*see* ECF No. 2076-1); *Michigan*, 12 I.L.R. at 3790.

Because the Court can, and must, exercise its continuing jurisdiction to protect the Great Lakes fishery and the Treaty rights, the Court has the authority to enter the Proposed Decree over the Sault's objections.

> **General Objection 2:** The Proposed Decree improperly limits Tribal treaty fishing rights because the State does not have the power to impose such regulations pursuant to the *LeBlanc* Standard.

The Sault's second objection concerns the State's regulatory power and what standard the State must meet in order to regulate the fishery. The Sault Tribe asserts that, in order for the State to impose any regulations on Tribal fishing rights in Treaty waters, the State must meet the *LeBlanc* Standard, which the Sixth Circuit endorsed in describing how the State may regulate the fishery in the absence of federal regulations:

> As provided in *LeBlanc*, any such state regulations restricting Indian fishing rights under the 1836 treaty, including gill net fishing, (a) must be a necessary conservation measure, (b) must be the least restrictive alternative method available for preserving fisheries in the Great Lakes from irreparable harm, and (c) must not discriminatorily harm Indian fishing or favor other classes of fishermen.

> Thus if Indian fishing is not likely to cause irreparable harm to fisheries within the territorial jurisdiction of the State of Michigan, the state may not regulate it. The state bears the burden of persuasion to show by clear and convincing evidence that it is highly probable that irreparable harm will occur and that the need for regulation exists. In the absence of such a showing, the state may not restrict Indian treaty fishing, including gill net fishing.

*Michigan*, 653 F.2d at 279. The Sault argues that the State has not met this rigorous burden with regard to most of the regulations in the Proposed Decree.

Conversely, all of the Stipulating Parties assert that the *LeBlanc* Standard is inapplicable to the present matter. The Stipulating Parties, including the other four Tribes, agree that the *LeBlanc* Standard only applies when the State seeks to unilaterally and independently regulate the Tribes (*see* ECF No. 2103 at PageID.14017; No. 2095 at PageID.13637; No. 2104 at PageID.14131). Indeed, "[i]f the District Court should find after hearing evidence that *state regulation and control* of Indian treaty fishing is necessary to preserve the fish of Lake Michigan as a resource, then the District Court should sanction state regulation." *See Michigan*, 653 F.2d at 279 (emphasis added). Here, the State is not unilaterally imposing regulations on the Tribes. "Rather, the Proposed Decree is a negotiated agreement that directs how the parties will cooperatively manage and regulate the fishery. The Proposed Decree sets forth the framework for that cooperative management, and the State and the Tribes manage their own fisheries within that framework" (ECF No. 2103 at PageID.14018). Because the Proposed Decree is the product of negotiation and not a unilateral regulation by the State, the Court need not consult the rigorous *LeBlanc* Standard in reviewing the Proposed Decree.

Instead, as explained above, the standard of review that the Court will consult when reviewing the Proposed Decree is the standard articulated by Judge Enslen outlining the fifteen relevant factors:

> Preservation and conservation of the resource; impact of the plans on all three tribes; consistency of the plan with the tribal right to fish and the recognition that the resource is shared; reduction of social conflict; feasibility and methods

of implementation; protection of Indian fishermen from discrimination in favor of other classes of fishermen; proximity; access; species of fish stocks available; harvestability of fish stocks; the economic impact on Indian fishermen; stability of the fishery; contaminant levels; management and marketing concerns; and flexibility versus predictability of the fishery.

*Michigan*, 12 I.L.R. at 3081. And "at all times," the Court should "desire to reach a fair and equitable decision in keeping with the reserved rights of the Tribal fishermen and the preservation of the resource." *Id.* Thus, (1) preservation of the resource, and (2) preservation of Tribal fishing rights, are the Court's most important concerns when determining whether to approve the Proposed Decree. *See id.*

Because the *LeBlanc* Standard applies only in situations where federal regulations inadequately regulate the fishery and the State attempts to independently impose its regulations of the fishery on the Tribes—not in situations where the parties have negotiated a decree—the Court will also overrule the Sault Tribe's second general objection.

## B.  Specific Objections

In addition to its "general" objections, the Sault Tribe has raised 137 "specific" objections,[15] which take issue with specific provisions or language in the Proposed Decree. The Court has sorted these specific objections into eight categories: (1) the State is overregulating/exceeding its regulatory authority; (2) the challenged provision is overly burdensome on the Sault Tribe; (3) the challenged provision is beyond the scope of the Proposed Decree; (4) the challenged provision is vague/unclear/impossible to enforce; (5) objections regarding the other Tribes' zones; (6) the provision is different from the 2000

---

[15] While the Sault did not originally number its objections, the Court did so for ease and clarity. The Sault's list of objections and their corresponding numbers in numerical order is available at ECF No. 2106-1.

Decree; (7) the Sault Tribe disagrees with the challenged provision; and (8) the provision fails to protect the resource. The Court will overrule all of the Sault Tribe's specific objections for the reasons outlined below.

### 1.  The State is Overregulating/Exceeding its Regulatory Authority

**Objection 3: Section IV – Commercial Fishing Zones:** In general, the proposed Consent Decree inequitably places significant restrictions and regulations on sovereign Tribes in comparison to insufficient regulation and restriction on State-licensed fishers. The Sault Tribe also objects that traditional gear such as spears and set hooks should be expressly permitted in the decree.

In multiple objections, the Sault Tribe argues that the Proposed Decree imposes many more regulations on Tribal fishing than State fishing. With respect to this objection and the regulation of Tribal commercial fishers versus State commercial fishers, the Stipulating Parties sufficiently explained why the subsection regulating State commercial fishers is shorter than the subsection regulating Tribal commercial fishers: the magnitude of State commercial fishing is significantly smaller than Tribal commercial fishing (*see* ECF No. 2120 at PageID.14692–96). Today, the State only has seven commercial fishers licensed in Treaty waters (*see Goniea Affidavit*, ECF No. 2103-3 at PageID.14080). Notably, that is a significant decrease from the fifty-five State-licensed commercial fishers in Treaty waters in 1984 (*see id.*). Moreover, under the Proposed Decree, State-licensed commercial fishers cannot use gill nets and cannot retain lake trout, and the State also will not be permitted to issue new commercial fishing licenses in Treaty waters (ECF No. 2120 at PageID.14694–95). Put simply, the State does not have as many commercial fishing rights as the Tribes under the Proposed Decree, so, logically, there need not be as many regulations on State commercial fishing. In the Court's judgment, the Proposed Decree sufficiently regulates both

18

State and Tribal commercial fishing. And in any event, the structure of the regulations on State commercial fishers compared to Tribal commercial fishers mirrors the structure of the 2000 Decree, to which the Sault Tribe consented (*see* ECF No. 1458 at PageID.3223–42).

Also under this objection, the Sault Tribe takes issue with the fact that the Proposed Decree does not allow the Tribes to use "traditional gear," such as spears and set hooks. However, the Sault Tribe has provided no evidence that Tribal fishers intend to use such gear. Without proper support, the Court finds that this argument is waived. *See, e.g., United States v. Keller*, 498 F.3d 316, 326 (6th Cir. 2017) (explaining that arguments made in a "perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); W.D. Mich. LCivR 7.1(b) ("When allegations of facts not appearing of record are relied upon in support of or in opposition to any motion, all affidavits or other documents relied upon to establish such facts shall accompany the motion.").

> **Objection 22: Subsection IV.A.1.d – Lake Michigan Northern Development Zone:**
> This subsection is unnecessary and inappropriate to have in the Consent Decree. The Tribes' authority to issue permits for their fishermen is not subject to State control.

It is not totally clear why the Sault argues that it is "unnecessary and inappropriate" to have this provision, which places specific regulations on commercial fishing in the Lake Michigan Northern Development Zone, in the Proposed Decree. The regulation of this Tribal commercial fishing zone appears to be reasonable, and the fact that these reasonable

regulations are contained in the Proposed Decree recognizes the shared nature of the resources and promotes transparency among all the Parties. The Court accepts the Stipulating Parties conclusion of law regarding this objection:

> The Sault Tribe fails to develop its claims that it is "unnecessary and inappropriate" to include this zone in the Proposed Decree and that the provision is State usurpation of Tribal permitting authority. It is appropriate to include all zones within the Proposed Decree to facilitate feasible implementation, encourage cohesive management, and recognize the resource is shared.

(ECF No. 2124 at PageID.14927).

> **Objection 43: Subsection IV.A.1.g.ii.b – Southern Lake Michigan Development Zone Regulations:** These provisions effectively adopt for the duration of the Decree restrictions that were intended to apply for only a three-year introductory period in the 2000 Consent Decree. This unduly restricts Tribal fishing.

Under the Proposed Decree, the Southern Lake Michigan Development Zone will be "open to fishers from all Tribes" (ECF No. 2042-1). And unlike the 2000 Decree, the Proposed Decree allows for limited gill net opportunity in this zone (*compare* ECF No. 1458 at PageID.3232, *with* ECF No. 2042-1 at PageID.12185). Although the Proposed Decree allows for only one trap net operation and one small mesh gill net operation targeting bloater chubs in this zone, the Sault Tribe has failed to show that these regulations "unduly restrict[] tribal fishing," especially given that the Proposed Decree appears to expand Tribal fishing opportunity in this zone compared to the 2000 Decree.

> **Objection 44: Subsection IV.A.1.g.ii.c – Southern Lake Michigan Development Zone Regulations:** These provisions effectively adopt for the duration of the Decree restrictions that were intended to apply for only a three-year introductory period in the 2000 Consent Decree. This unduly restricts Tribal fishing.

The Court overrules this objection for the same reasons articulated under the previous, identical objection.

**Objection 50: Subsection IV.A.2.c.ii.a – Sault Tribe Lake Huron Zone Regulations:** The Sault Tribe regulation states: "At all other times, these waters shall be part of the Northern Lake Huron Inter-Tribal Fishing Zone." That language is singularly contained in the Sault Tribe fishing zone, but is not found in provisions regarding other Tribal zones, such as the LTBB and GTB salmon zones. Language should be applied consistently to reduce ambiguity.

While this objection purportedly raises a legitimate argument at first glance, it is important to read the Proposed Decree holistically. The Sault Tribe objects because its salmon zone contains different language from the Grand Traverse and Little Traverse salmon zones, which causes the Sault's exclusive salmon zone to be exclusive to the Sault only "for a short period of time" (ECF No. 2120 at PageID.14674). However, the key distinction in the Sault Tribe's exclusive salmon zone (during the salmon season) is that it is within an intertribal zone (*see* ECF No. 2042-1 at PageID.12187). Of course, that intertribal zone is open to intertribal fishing during all non-salmon-season times, which is the basis for the language that the Sault Tribe takes issue with. Conversely, the Grand Traverse and Little Traverse salmon zones are either tribe-specific zones or non-tribal zones outside of their salmon season (*Id.* at PageID.12270–72). Therefore, they need not contain the language the Sault Tribe objects to here. When reading the Proposed Decree holistically rather than subsection-by-subsection, the language to which the Sault Tribe objects regarding it salmon zone is reasonable and logical. The Court therefore overrules this objection.

**Objection 52: Subsection IV.A.2.d – Southern Lake Huron Trap Net Zone:** The description of this zone fails to resolve the dispute about the boundaries of the zone. The shifting of two grids here into intertribal waters provides little benefit to Indian Tribes as these are deep water grids far offshore. It should be up to the sovereign

Tribes to decide what areas they will fish in; the Treaty does not require Indian tribes to ask the State for permission to fish in a Treaty area.

As argued at the objections hearing, this objection concerns the Parties' failure to resolve the issue of the "Disputed Zone," which is an area in Lake Huron that the Parties disagree as to the boundaries of the Treaty lines (*see* ECF No. 2120 at PageID.14684); (*see also* ECF No. 2103 at PageID.14032) ("The Sault objects to the permit requirement for Tribal commercial fishers in an area of Lake Huron referred to as the 'Disputed Zone.' The area is so named because a dispute exists as to whether this area is within 1836 Treaty waters and, thus, whether the treaty right applies there."). The Sault objects that the Proposed Decree fails to resolve this boundary dispute because it permits State enforcement of an area "which would not otherwise be subject to State jurisdiction and enforcement" (ECF No. 2120 at PageID.14684). But as the State explained, the permit requirement for this zone—without explicitly determining whether these waters are Treaty waters—was a compromise reached in the 2000 Decree and which is continued into the Proposed Decree (*see* ECF No. 2103 at PageID.14032). The Sault has failed to establish why this compromise was unreasonable under the 2000 Decree or that continuing the "Disputed" Zone violates the Treaty rights. Notably, the alternative option would be to litigate the boundaries of this zone, which would not be in the Parties' best interest, nor is litigation something that the majority of the Parties wish to engage in (*see* ECF No. 2120 at PageID.14687) ("[A]ll of us wanted to make an agreement, none of us wanted to litigate that issue and postpone however long that might be, a determination as to that point. And so mostly our fishers wanted to fish there, and the only way that that could be done is to call it a [D]isputed [Z]one, say that only the people who

were already licensed by the [Sault and Bay Mills] tribes . . . would be eligible for a permit and that it would be issued by the State.").

> **Objection 55: Subsection IV.A.2.d.ii.g – Southern Lake Huron Trap Net Zone:** This new provision is again an unwarranted intrusion on Tribal sovereignty and Treaty rights and beyond any authority that the State would have regarding tribal fishing. It should not be maintained.

The Sault's objection that this provision is "an unwarranted intrusion on tribal sovereignty and treaty rights" is an incorrect interpretation of the Proposed Decree. As the Stipulating Parties point out, this provision actually *increases* the lake trout bag limit for trap nets to 200 pounds, which is double what the 2000 Decree allowed (ECF No. 2124 at PageID.14944). Again, this objection fails to read the Proposed Decree holistically and the Court overrules it for that reason.

> **Objection 57: Subsection IV.B – State Commercial Fishing Zones:** The Sault Tribe notes that the regulation of State commercial fishing takes up less than one page of the Decree while regulation of Tribal commercial fishing is exceptionally and unreasonably detailed, taking up 13 pages of the Decree, and provides far more authority to the State than is permissible under federal law and the Treaty.

The discrepancy between the number of pages in the Proposed Decree regulating Tribal commercial fishing compared to State commercial fishing is discussed above under Objection 3. To reiterate, when viewing the Proposed Decree holistically and taking the regulations of the respective party into context, the Sault Tribe's argument that the Tribes are subject to more regulation because there are more pages in the Proposed Decree dedicated to Tribal regulation than State regulation is misguided. The State has far fewer commercial fishers than the Tribes, and many fishing opportunities—such as the use of gill

nets—are not available to State commercial fishers, meaning certain regulations need not apply to State commercial fishers (*see* ECF No. 2103 at PageID.14043–44).

> **Objection 60: Subsection IV.C.1 – Closed Commercial Fishing Zones, St. Mary's River:** The Sault Tribe objects to the closure defined in this subsection, as it consists of a traditional fishing area of the Sault Tribe. The Sault Tribe objects to the geographic boundaries of this closed area as the current definition unreasonably restricts Tribal fishing opportunity.

Despite the Sault's contention that the St. Mary's River is a "traditional fishing area of the Sault Tribe," this closure is not new to the Proposed Decree—it is identical to the 2000 Decree (*see* ECF No. 2103 at PageID.14032; No. 2104 at PageID.14153). The Sault Tribe acknowledges that the St. Mary's River area was also closed under the 2000 Decree, but it objects to this closure because that area is "right on the doorstep" of the Sault's territory (*see* ECF No. 2120 at PageID.14698). However, the Sault Tribe fails to acknowledge that this area, which encompasses both the Soo Locks and a route for the Drummond Island ferry, is extremely busy and would impose navigational hazards for international shipping traffic if it was opened for commercial fishing (*see* ECF No. 2120 at PageID.14699–700). The dangers associated with opening the St. Mary's River region to Sault Tribe commercial fishing far outweigh the benefits, and the Sault Tribe has failed to adequately support its argument that the closure of this region should not continue.

> **Objection 67: Subsection V.C – Harvest Estimation:** These "harvest estimation" provisions place inadequate obligation on the State to account for the impact of State fisheries. In contrast, the Tribes are imposed with significant reporting burdens and obligations. The Decree is inequitably favored toward the State and violative of Treaty rights.

The provisions in the Proposed Decree to which the Sault Tribe objects under Objection 67—which are the same as the 2000 Decree—concern the State's obligations to

24

estimate the *recreational* fishing harvest by State fishers. The Sault complains that Tribal *commercial* fishers are subject to more significant reporting requirements than these State recreational fishers. As the Court opined at the objections hearing, comparing the reporting requirements for commercial and recreational fishers is like comparing apples to oranges (*see* ECF No. 2120 at PageID.14716). Of course, recreational fishers, who harvest significantly fewer fish than commercial fishers, are not subject to the same reporting requirements as commercial fishers. Moreover, when comparing the reporting requirements for State *commercial* fishers and Tribal *commercial* fishers, the Sault would realize that they are subject to the same reporting requirements (*see* ECF No. 2103 at PageID.14033–34).

> **Objection 68: Section VI – Regulation of the Fishery:** More than five pages are dedicated to regulation of the fishery, with nearly all of it related to regulation of the Tribal fishery, and only one small paragraph is related to the State (in Subsection VI(B)). This micromanagement of the Tribal fishery in this document is not consistent with governing principles of federal law, the Treaty right, Tribal sovereignty, and the very limited authority that the State could assert over Indian Tribes re fishing activity absent this Decree.

This objection is simply inaccurate. The first two-and-a-half pages of this section relate to Tribal fishing—specifically, to the Tribes' regulation of their own fishery—followed by a paragraph regarding the State's regulation of its own fishery. However, the remainder of the section establishes gear restrictions and spawning closures that apply to *both* Tribal and State fishers (ECF No. 2103 at PageID.14038). Moreover, the language to which the Sault objects was also incorporated in the 2000 Decree, and the Sault has failed to show that it hindered Tribal self-regulation (*see* ECF No. 2124 at PageID.14899).

> **Objection 83: Subsection VIII.A – Management of Salmon:** This restriction on Tribal harvest is beyond what the State could impose under its own authority and will unnecessarily reduce Tribal fishing opportunity in contradiction to federal law and

the Treaty. Nor is there any basis to prohibit the retention of salmon caught in trap nets.

This objection concerns the incidental catch policies for salmon, and the Sault argues that this provision is too restrictive because salmon are increasingly caught as bycatch in both gill nets and trap nets. Under the Proposed Decree, 200 pounds of gill net bycatch may be retained per vessel per day (ECF 2042-1 at PageID.12203–04). According to one of the Stipulating Parties' experts, this restriction is well within the likely bycatch rates for gill nets, largely because salmon do not congregate at the depth which large mesh gill nets are set, and the limit was infrequently reached under the 2000 Decree (*see Kornis Affidavit*, ECF No. 2086-5 at PageID.12807–08); (*see also McDonnell Affidavit*, ECF No. 2086-7 at PageID.13227–38). The Sault Tribe has failed to demonstrate that this 200-pound retention limit per vessel per day of salmon caught as bycatch in gill nets is inadequate or restricts its Treaty rights.

With respect to salmon caught as bycatch in trap nets, retention of salmon caught in commercial trap nets is prohibited because, unlike in gill nets where the fish become ensnared and are more likely to be killed, trap nets capture fish in "pots" where they swim freely until the net is lifted (ECF No. 2104 at PageID.14150). Trap nets allow fishers to release non-targeted fish back into the waters.

Allowing the Tribes to retain salmon caught as bycatch in gill nets promotes Tribal fishing rights, but prohibiting the Tribes to retain salmon caught as bycatch in trap nets promotes the preservation of the resource. The Court views these provisions as a compromise and finds that they recognize the shared nature of the resource (*see* ECF No.

2120 at PageID.14756) ("This provision is carried over from the 2000 decree and it's consistent with the grand bargain that has driven the co-management to the fishery and meaningful exercise of the treaty rights for the past 40 years.").

**Objection 85: Subsection VIII.F.1.b.i – Management of Walleye:** Grids 309, 409, and 410 should be included; failure to include them will unnecessarily reduce Tribal fishing opportunity.

The Sault objects because these three grids are not open to Tribal commercial fishing targeting walleye. This argument is curious, considering Grid 309 is largely within Canadian waters, and Grids 409 and 410 are only partially within Treaty waters (*see* ECF No. 2104 at PageID.14150). Additionally, compared to the 2000 Decree, the Proposed Decree greatly expands Tribal opportunity to target and harvest walleye, and the Sault's conclusory objection fails to demonstrate that the walleye fishing opportunities in the Proposed Decree are inadequate under the Treaty rights.

**Objection 89: Subsection VIII.G.2 – Management of Yellow Perch:** This provision increases restriction on Tribal fishing as compared to the 2000 Consent Decree as there is currently targeted retention of yellow perch allowed in a small area of MM-1.

The Sault Tribe objects because, under the Proposed Decree, yellow perch may no longer be retained in a small area of MM-1 in northern Lake Michigan. However, the State contends that the Sault Tribe has never retained yellow perch in this area (*see* ECF No. 2103 at PageID.14052) (citing *Caroffino Affidavit*, ECF No. 2103-2 at PageID.14072, ¶ 9). The Sault Tribe has not provided any evidence that its members would indeed target and retain yellow perch from this area, and thus, the Sault has provided no evidence that its Treaty rights are restricted by this provision.

**Objection 99: Section XI – Subsistence Fishing:** The Sault Tribe generally objects to the restrictions imposed on subsistence fishing which is a core of the Tribal Treaty fishing right. The restrictions in Section XI unduly and unlawfully restrict the Tribal Treaty fishing right.

Subsistence fishing is a "means of obtaining food for sustenance, not commercial activity" (ECF No. 2103 at PageID.14055). The Tribes utilize subsistence fishing to "feed their families" and "put food on their table[s]" (ECF No. 2120 at PageID.14764); (*see also* ECF No. 2042-1 at PageID.12174) ("'Subsistence Fishing' means a Treaty Fishing Activity solely to provide fish for personal or family consumption and not for sale or commercial exchange, but does not include recreational fishing as described in Section V."). Only the Tribes, not State fishers, possess the right to subsistence fish under the Proposed Decree (*see* ECF No. 2042-1 at PageID.12208–10). The Sault argues that the regulation of subsistence fishing is "something that should be left to the [T]ribes" and is far too detailed (ECF No. 2120 at PageID.14764–66).

The 2000 Decree and the Proposed Decree prohibit the commercial sale of subsistence-caught fish because these fishers are not intended to have the same privileges as commercial fishers. Although much of the language in the Proposed Decree regarding subsistence fishing is nearly identical to the 2000 Decree, some language was improved to "ensure that commercial fishers do not circumvent commercial harvest limits via purported subsistence harvest" (ECF No. 2104 at PageID.14161). Indeed, the sale of fish caught by subsistence fishers has been a problem in the past: In 2010, MDNR law enforcement officers estimated that more than 72,000 pounds of walleye and other fish were illegally harvested from Little Bay de Noc by subsistence fishers and then sold into the commercial market

during a five-year period (*see* ECF No. 2093-7). Accordingly, the regulations regarding subsistence fishing in that area have been amended specifically to prevent a recurrence of this illegal activity. Contrary to the Sault Tribe's claim, there is a "legal or factual basis to support the imposition of these restrictions on tribal subsistence fishing" (*see* ECF No. 2103 at PageID.14055-56).

> **Objection 110: Subsection XIV.B – Information Sharing re Commercial Harvest:**
> These information sharing requirements are unduly burdensome on the Tribes and are far beyond what the State could impose under its limited authority related to Tribal fishing. There is no need for this level or frequency of information sharing to manage the fishery. Only end harvest data is necessary in order to show whether the Parties stayed within their harvest limits. If this provision is included in a decree, there should be a provision clarifying ownership and appropriate uses of data in this subsection to prohibit unauthorized uses by Parties to whom the information is shared.

In the Court's judgment, the information sharing provisions under the Proposed Decree are vastly improved from the 2000 Decree. Transitioning from the paper reporting system under the 2000 Decree to the electronic reporting system under the Proposed Decree modernizes the information sharing system, reduces the likelihood of reporting errors, allows for more frequent data sharing among the Parties, promotes the preservation of the resource, and recognizes the shared nature of the fishery. The Court believes the information-sharing subsection is one of the most improved sections in the Proposed Decree compared to the 2000 Decree.

The Sault's objections to the information sharing provisions are not based on law or logic. Ironically, the Sault argues that the new information sharing provisions are "overburdensome," but one of the purposes of the new electronic reporting system is to alleviate the burden of reporting via paper and pencil (*see* ECF No. 2120 at PageID.14774).

Increasing the frequency in which commercial fishers must report their catch data—both State and Tribal commercial fishers must report their catch data twice a month under the Proposed Decree compared to once a month under the 2000 Decree—will improve data accuracy and will help all the Parties co-manage the fishery.[16] Moreover, the Sault objects to the electronic reporting system because it is "not something that should be mandated for the [T]ribes to use if they don't want to" (ECF No. 2120 at PageID.14770). This argument is nonsensical and unsupported—"because we don't want to" is not a sufficient reason to object to the Proposed Decree. Technology has improved significantly since 2000, and there is no reason to maintain using an archaic paper-and-pencil reporting system when technology allows for a more efficient and accurate electronic reporting system.

Finally, the Sault objects because "there should be a provision clarifying ownership and appropriate uses of data . . . to prohibit unauthorized uses by parties to whom the information is shared." The Sault appears to be concerned that the catch data will be shared with law enforcement in the event of overfishing (*see* ECF No. 2120 at PageID.14771). However, Subsection XIV.B.3 of the Proposed Decree, which states that the Parties "will not use an individual Tribal fisher's catch report as the basis for issuing a ticket or citation to the reporting fisher," specifically addresses this concern (ECF No. 2042-1 at PageID.12215). At the objections hearing, the Sault argued that this provision was not sufficient to protect Tribal fishers because "there is skepticism whether or not that provision will be actually implemented as drafted" (ECF No. 2120 at PageID.14773). The Sault's contention that the

---

[16] Not only will commercial fishers have to report their catch data: Subsistence fishers must submit monthly catch reports to their Tribes, and separate reporting requirements will be implemented for retail sales of commercial catch, state and Tribal-licensed wholesalers, recreational fishers, and charter boat harvest (ECF No. 2104 at PageID.14156–57).

provision will not be implemented as drafted is mere conjecture, and the Sault has provided no support that the Parties—who have specifically agreed to the Proposed Decree—will ignore their obligations under the Proposed Decree. Additionally, the Sault has provided no proposed language that will supposedly remedy their concern with the language in the Proposed Decree.

In sum, the information-sharing section of the Proposed Decree promotes the Tribal right to fish, while also ensuring that the resource is protected from overfishing and recognizes the shared nature of the resource. For these reasons, the Court rejects the Sault's objections to this subsection of the Proposed Decree.

> **Objection 111: Subsection XIV.B.1 – Electronic Reporting of Commercial Harvest:**
> These information sharing requirements are unduly burdensome on the Tribes and far beyond what the State could impose under its limited authority related to Tribal fishing. The Decree should not mandate Indian Tribes to use an electronic reporting system; that is a decision for the Tribes pursuant to their sovereignty. There is no basis or need, in fact or law, to specify that CORA will be the entity that owns and operates the Tribes' reporting system. That is a decision for the Indian Tribes. The statement that "Tribal staff may assist fishers" use the reporting system is inappropriate for a federal court decree and not tied to any issue of fact or law in dispute. Nor is there any basis to require the fisher license number or the name of the person entering the data; such a requirement is far outside anything the State could require under its limited authority. The frequency of reporting is far more than necessary to implement fishery management. The mandated frequency of reporting is simply a tool for the State to exert unwarranted control over tribes. There is no check or ability for Indian Tribes to enforce State reporting or State reporting errors. The last sentence regarding finalization of harvest data within two reporting periods is superfluous and unnecessary, and without any legal or factual basis.

For the reasons articulated under the previous objection, the Court rejects the Sault Tribe's arguments under Objection 111 as well. The Court endorses the electronic reporting system and more frequent reporting requirements to promote cooperative management of the fishery among the Parties.

31

With respect to the Sault Tribe's objection to CORA[17] owning and operating the Tribes' reporting system, the Sault argues that such a decision is one for the Tribes to make. But the Tribes, excluding the Sault Tribe, have made this decision. The four other Tribes have agreed to CORA's role in the Tribes' electronic reporting system, and the Sault has provided no articulate reason why CORA should not operate the electronic reporting system, nor has the Sault suggested an alternative entity that should assume this role instead.

As for the Sault's objection that there is no basis to require the fisher license number or the name of the person entering the data, the Court disagrees. While the Court fully endorses the use of the modernized electronic reporting system, the Court also understands that the transition from the old reporting system to the electronic reporting system will be a big change for many fishers. As such, the Proposed Decree allows for fishers to have someone help them input their data, but they must record the name of the person entering the data to ensure the accuracy of the report (*see* ECF No. 2120 at PageID.14774).[18] But if the fisher himself is the person entering the data, he will simply have to enter his license number. This information is not to be used for the purpose of issuing single tickets or citations when a fisher inadvertently overharvests (*see* ECF No. 2042-1 at PageID.12215), but rather to ensure that the Parties have "a complete picture of the fishery," and for limited law enforcement purposes, "such as when a pattern of misreporting becomes apparent

---

[17] "CORA" refers to the Chippewa Ottawa Resource Authority, an organization formed by the Tribes which has been delegated certain management and regulatory authority (ECF No. 2042-1 at PageID.12172). It carries out intertribal regulation under the 2000 Decree.

[18] If someone inputs catch data on behalf of the fisher, the person doing the data entry will need the fisher's license number, which is not public. Therefore, because the fisher's license number is required to enter data to the system, fishers are protected from a stranger purposefully entering incorrect data on their behalf (*see* ECF No. 2120 at PageID.14779).

through comparing catch reports with wholesale reports" (*see* ECF No. 2104 at PageID.14158). Requiring the fishers to input the license number or the name of the person entering the data promotes accurate reporting.

> **Objection 112: Subsection XIV.B.2 – Implementation of Electronic Reporting System:** These information sharing requirements are unduly burdensome on the Tribes and are far beyond what the State could impose under its limited authority related to Tribal fishing. There is no need for this level or frequency of information sharing to manage the fishery. Nor will the reporting data be possible to obtain, compile, and transmit on such a frequent basis. Only end harvest data is necessary in order to show whether Parties stayed within their harvest limits. It is unpracticable to demand each sovereign to have their systems running by July 1, 2023.

In addition to repetitive arguments the Court has already addressed, the Sault Tribe generally objects to the implementation of the electronic reporting system. At the time of the objections hearing, the Parties asserted that the electronic reporting system would be ready to launch by July 1, 2023. Although the Court has not received an update as to whether the system was ready by that date, the Proposed Decree allows for the Tribes to use paper reporting until the new system is live, so delay will not impact harvest reporting (*see* ECF No. 2104 at PageID.14156–57). The Court overrules all the Sault Tribe's objections to the new electronic reporting system, as the system has numerous benefits for all the Parties.

> **Objection 118: Subsection XIV.D – Retail Sales Records:** These provisions, which apply only to the Tribes and not the State, are unduly burdensome and far beyond any requirement that the State could impose under its limited authority regarding Tribal fishing. There is no reciprocity; the requirements are placed only on Tribal fishers with no justification. It is vague and ambiguous what would happen if this provision is not complied with. This is beyond the scope of any disputed issue of fact or law and should not be in the Decree.

This provision was essentially included in the 2000 Decree (ECF No. 1458 at PageID.3311). But unlike the 2000 Decree, the Proposed Decree contains additional

language that protects Tribal fishermen by requiring a copy of the sales receipt to be filed with the fisher's Tribe (*see* ECF No. 2042-1 at PageID.12216). Because retail sales records have been required in both the 1985 and 2000 Decrees, which the Sault Tribe approved, it is unclear why the Sault Tribe now objects to similar requirements. Requiring the Tribes to record retail sales records does not hinder the Tribal right to fish, but rather, appreciates the shared resource and helps reduce social conflict.[19]

> **Objection 119: Subsection XIV.E – Tribally-Licensed Fish Wholesaler Reports:** These provisions, which apply only to the Tribes and not the State, are unduly burdensome and far beyond any requirement that the State could impose under its limited authority regarding tribal fishing. It is vague and ambiguous what would happen if this provision is not complied with. This is beyond the scope of any disputed issue of fact or law and should not be in the Decree.

The Sault Tribe objects because this provision of the Proposed Decree, which requires Tribally-licensed wholesalers to submit purchase reports to the electronic reporting system, applies only to the Tribes. The Court is perplexed by this objection, as the very next subsection imposes almost identical requirements on State-licensed wholesalers (*see* ECF No. 2042-1 at PageID.12217). Moreover, such requirements were "successfully implemented under the 2000 Decree" (ECF No. 2124 at PageID.14967). The Sault has failed to establish that the requirements under Subsection XIV.E, which also apply to the State under Subsection XIV.F, unduly inhibit the Treaty rights.

> **Objection 124: Subsection XV.B – Information Gathering & Work Plans:** These provisions are unduly burdensome and far beyond any requirement that the State could impose under its limited authority regarding Tribal fishing. It is vague and

---

[19] The Court also notes that Objections 118, 119, 124, and 125 are examples of throwing the kitchen sink at the relevant sections of the Proposed Decree without making any particularly specific, persuasive arguments as to why the challenged sections do not comply with the law of the case or the 1836 Treaty. The Sault does not meet its burden in showing that the Proposed Decree is unreasonable merely by raising conclusory, unsupported objections.

ambiguous what would happen if this provision is not complied with. This is beyond the scope of any disputed issue of fact or law and should not be in the Decree.

This provision of the Proposed Decree requires all the Parties to share information about planned fisheries work. It is unclear why such a requirement is problematic, as it will help the Parties co-manage the resource, reduce social conflict, and promote stability of the fishery (*see* ECF No. 2042-1 at PageID.12219) ("The [Technical Fisheries Committee] shall meet and discuss the exchanged information in order to maximize collaboration, leverage resources, minimize or avoid duplication of effort, and prevent interference with such activities."). Further, according to one of the State's biologists, a similar provision has been successful in the Parties' 2007 Inland Consent Decree (*see Caroffino Affidavit*, ECF No. 2103-2 at PageID.14070). The Court accepts Dr. Caroffino's assertions regarding the success of sharing work plans under the 2007 Inland Consent Decree, and the Court has no reason to doubt that similar provisions will also be successful under the Proposed Decree.

> **Objection 125: Subsection XV.C.1.b – Information Gathering & Assessment Fishing:** These provisions are unduly burdensome and far beyond any requirement that the State could impose under its limited authority regarding Tribal fishing. It is vague and ambiguous what would happen if this provision is not complied with. This is beyond the scope of any disputed issue of fact or law and should not be in the Decree.

With respect to assessment fishing, which essentially allows an agency, biologist, or commercial fisher to conduct and study a fishing opportunity on a trial basis pursuant to a permit, the Sault objects to the provision requiring the Parties to share the details of their planned assessments to the other Parties and the Technical Fisheries Committee ("TFC"). Requiring the Parties to share their planned assessments with the other Parties recognizes the shared nature of the resource and promotes co-management. The Sault has not

articulated any reasonable basis as to why a party's planned assessment should not be disclosed to the other Parties or reviewed by the TFC.

> **Objection 127: Subsection XV.C.1.d.ii – Information Gathering & Assessment Fishing:** This provision effectively provides the State a veto power over certain tribal fishing activities and is far beyond any requirement that the State could impose under its limited authority regarding tribal fishing.

The Sault claims that, under the Proposed Decree, the State possesses "veto power" over Tribal assessment fishing because any party, including the State, can object to a proposed assessment. This objection fails to recognize that the Tribes also possess this so-called veto power over assessment fishing proposed by the State. But in any event, the Sault's characterization of an objection to a proposed assessment as a "veto" is inaccurate. If a party objects to a proposed assessment, the objection is subject to the dispute resolution process; objecting to a proposed assessment does not end the effort to conduct the assessment (*see* ECF No. 2103 at PageID.14041). Additionally, such limitations on assessment fishing conducted by commercial fishers (rather than a biologist or agency staff member) are necessary to protect the resource and ensure that "these activities do not morph into long-term, non-agreed-upon commercial fishing opportunities" (*Id.*). Because assessment-fishing opportunities under the Proposed Decree appear to be reasonable, respect the Tribal right to fish, and ensure the conservation of the resource, the Court finds that such provisions comply with the 1836 Treaty.

> **Objection 137: Subsection XXIII.A – Duration:** No mention is made of the effect on State rules relating to State fishers. As made clear throughout, the Proposed Decree is focused nearly exclusively on regulation of tribal fishing and will unreasonably and unduly infringe on Tribal Treaty rights.

This challenged provision states that there will be no change in Tribal regulations until thirty days after the entry of the Proposed Decree (ECF No. 2042-1 at PageID.12232). The Sault objects because there is no reciprocal provision for State fishers, but this objection ignores the fact that State law imposes the same thirty-day effective date (*see* ECF No. 2104 at PageID.14164 n.42; No. 2124 at PageID.14902).

### 2.   The Challenged Provision is Overly Burdensome on the Sault Tribe

**Objection 70: Subsection VI.D.2 – Walleye Spawning Closures:** This regulation is overly burdensome and will be impossible to meaningfully enforce. In addition, there is no rationale for it, and it imposes undue and unlawful restriction and burden on Tribal fishing beyond what the State could lawfully impose absent this decree. Nor is there any comparable regulation on State fishers.

To the extent that the Sault Tribe objects to the existence of the spawning closure for walleye, the Court rejects such an objection. Conversely to the Sault's contention, there certainly is rationale for closing certain areas during spawning season to ensure that the respective species, including walleye, sustains its population (*see Koproski Affidavit*, ECF No. 2104-2 at PageID.14204). And the Sault's assertion that the spawning closure for walleye does not apply to State fishers is patently false—the spawning closure applies to all commercial fishers, including State commercial fishers (ECF No. 2103 at PageID.14045–46).

Further, at the objections hearing, the Sault raised, for the first time, a specific argument regarding a potential ambiguity in this provision: The closure periods for Lower Peninsula versus Upper Peninsula waters are slightly different,[20] and, pursuant to the

---

[20] To protect spawning walleye, no more than fifteen pounds Round Weight of walleye may be retained per license per day from March 15 through the Friday before the last Saturday in April in Lower Peninsula waters, and from March 15 through May 14 in Upper Peninsula waters (ECF No. 2042-1 at PageID.12198). The reason for this discrepancy is

Proposed Decree, "[t]he location the fishing vessel is launched and the fish are landed will delineate the Upper Peninsula and Lower Peninsula closure" (ECF No. 2042-1 at PageID.12198). The Sault argues that this language is ambiguous because a vessel could launch and land fish in different waters—i.e., launch in Upper Peninsula waters and land fish in Lower Peninsula waters—meaning that it is unclear what closure period applies to the vessel (*see* ECF No. 2120 at PageID.14720–21). Because the Sault Tribe failed to raise this argument in its objections and raised it for the first time at the hearing, this argument is waived. *See Baum v. Metro Restoration Servs., Inc.*, No. 3:15-CV-00787-CRS, 2019 WL 6971369, at *3 (W.D. Ky., Dec. 19, 2019) (citing *United States v. BWXTY-12, LLC*, 525 F.3d 439, 450 n.6 (6th Cir. 2008)) ("It is well established that a party who raises an argument for the first time at oral argument waives the issue."). Nevertheless, at the objections hearing, the Stipulating Parties responded that the Sault's potential scenario of a fisher "rig[ing] the system" and launching out of a specific port to avoid a certain closure is not going to be a significant issue, as the fisher will be forced to travel long distances, which is not feasible (*see* ECF No. 2120 at PageID.14726). And even if a few fishers do attempt to "rig the system," law enforcement officers can take care of such fishers (*Id.* at PageID.14724). Although the language in this provision of the Proposed Decree could likely be improved, the Court does not find that it is ambiguous enough to reject the provision, nor is the Sault's speculative scenario likely to come to fruition.

> **Objection 71: Subsection VI.D.3 – Yellow Perch Spawning Closures:** This regulation is overly burdensome and will be impossible to meaningfully enforce. In addition, there is no rationale for it and it imposes undue and unlawful restriction and burden

---

because spawning occurs at different times of the year depending on the temperature of the water, and southern waters warm up before northern waters (*see* ECF No. 2120 at PageID.14725).

on Tribal fishing beyond what the state could lawfully impose absent this Decree. Nor is there any comparable regulation on State fishers.

The Sault objects to this provision because the Proposed Decree incorporates spawning closures for yellow perch that apply to (both State and Tribal) commercial fishers, and such closures do not apply to State recreational fishers (*see* ECF No. 2120 at PageID.14721). But, as the Court opined above, comparing the commercial fishery to the recreational fishery is like comparing apples to oranges. Commercial and recreational fishers have a totally different impact on the fishery, given that commercial fishers harvest significantly more fish than recreational fishers. Further, the Sault fails to see the whole picture. Under the Proposed Decree, Tribal commercial fishers can still retain fifteen pounds of yellow perch per license per day during the spawning season, which is higher than the State bag limit for recreational fishers (*Id.* at PageID.14725). As the State's counsel succinctly summarized, "while there is not a [yellow perch] spawning closure for State recreational fishers, [T]ribal commercial fishers will be able to retain more [yellow perch] than State recreational fishers . . . even during the closure" (*Id.*).

> **Objection 91: Subsection VIII.J – Species Not Authorized for Commercial Harvest:** The restriction on twenty-five pounds per vessel per day is overly restrictive and unnecessary given the increasing abundance of some of the predator populations described in this subsection. Atlantic Salmon should be removed from the list as they are becoming increasingly common and can sometimes be difficult to tell apart from other salmon.

This provision of the Proposed Decree states that Muskellunge (except in Lake Michigan), Splake, Brown Trout, Brook Trout, Rainbow (Steelhead) Trout, Atlantic Salmon, Largemouth and Smallmouth Bass, and Northern Pike are not to be targeted for harvest nor offered for sale or exchange when caught as bycatch (ECF No. 2042-1 at

PageID.12206). This provision is unchanged from the 2000 Decree (*see* ECF No. 14598 at PageID.3288–89). Under the Proposed Decree, when caught as bycatch in gill nets, each vessel is permitted to retain only twenty-five pounds per day of these species. The Sault generally objects to the twenty-five-pound gill net bycatch limitation, but it provides no evidence that bycatch is likely to exceed twenty-five pounds per vessel per day, nor does it provide any evidence that these species are abundant enough that the twenty-five-pound gill net bycatch limitation is unnecessary. *See Stewart*, 628 F.3d at 256; *Smith v. Palmer*, No. 1:08-cv-26, 2010 WL 233858, at *10 (W.D. Mich. Jan. 13, 2010) (overruling an objection that "lack[ed] evidentiary support"); *Salser v. Dyncorp Int'l, Inc.*, No. 12-10960, 2016 WL 1042536, at *2 (E.D. Mich. Mar. 16, 2016) (overruling an objection merely "based upon unsupported conjecture").

With respect to the Sault Tribe's specific objection that Atlantic Salmon should be removed from the list of species not authorized for commercial harvest, again, the Sault has provided no evidence that Atlantic Salmon are "becoming increasingly common." *See Stewart*, 628 F.3d at 256. And the Sault's contention that Atlantic Salmon are difficult to distinguish from other types of salmon is unpersuasive. First, it is the fishers' obligation to identify the species they are catching (*see* ECF No. 2120 at PageID.14760). Second, the Court accepts Dr. Caroffino's unrebutted assertion that Atlantic Salmon are "easily distinguished" from Chinook and Coho Salmon (*Caroffino Affidavit*, ECF No. 2103-2 at PageID.14075). And even if Atlantic Salmon are misidentified, they are most likely to be misidentified as Brown Trout—another species not authorized for commercial harvest and subject to the same twenty-five-pound gill net bycatch limitation—which most closely

40

resemble Atlantic Salmon (*see id.*). This objection is unsupported, conclusory, and unpersuasive on the merits.

> **Objection 92: Subsection VIII.J.3 – Species Not Authorized for Commercial Harvest:** The Tribes should not have to demonstrate that their stocking efforts "have substantially contributed to a commercially harvestable adult population." Tribes that invest the time, money, and infrastructure to develop the fishery should not be subject to discretionary approval about their opportunity to harvest that species. This provision unduly and unnecessarily restricts Tribal sovereignty and authority. Once a fish is stocked into waters with Treaty fishing rights, those fish are available for harvest by any Treaty Tribe.

For the species of fish not authorized for commercial harvest, the Sault Tribe objects that the Tribes must demonstrate that stocking efforts "have substantially contributed to a commercially harvestable adult population" before the Executive Council will consider Tribal commercial fishing opportunities for that species (*see* ECF No. 2042-1 at PageID.12206). Importantly, "[n]on-commercial species are important for the State recreational fishery and have long been delegated to that fishery under the decrees" (ECF No. 2103 at PageID.14053). The Sault's objection to this provision fails to recognize the shared nature of the fishery. Without the language requiring a Tribe to demonstrate that its stocking efforts "have substantially contributed to a commercially harvestable adult population," a Tribe could simply seek to harvest non-commercial species—species that are important to State recreational fishers—based on unsuccessful or insignificant stocking efforts. The Court overrules this objection because "[t]his provision protects the resource and the efficacy of costly, time-consuming stocking efforts by ensuring fishing is sustainable prior to harvesting newly stocked populations" (ECF No. 2124 at PageID.14954).

> **Objection 98: Subsection IX.E – Whitefish Stocking Evaluation:** No other fish stocking provision has similar language binding the Parties to establish the need for

stocking and future stocking. The language places undue burden on sovereign Tribal government stocking operations. There is no legal or factual basis for the State to have a role in these Tribal stocking operations.

At the outset, under this provision of the Proposed Decree, Tribal stocking efforts are treated the same as State stocking efforts (*see* ECF No. 2042-1 at PageID.12208) ("*The Parties* shall continue to evaluate the success of stocking Lake Whitefish as a possible means of recovering stocks . . . *the Parties* shall collaborate regarding experimental design, evaluation, and program modification, including adjustments to the number and life stages stocked. . . .") (emphasis added). Further, it is reasonable and biologically supported to treat lake whitefish stocking differently than other stocking efforts. It is undisputed that lake whitefish populations in the Great Lakes have declined dramatically since the entry of the 2000 Decree, and to date, no effective solution for rehabilitating this species has been identified (*see* ECF No. 2103 at PageID.14040). This provision commits the Parties to continue collaborating to determine whether lake whitefish stocking is a viable solution, and it recognizes the Parties' shared commitment to rehabilitating the lake whitefish population. Further, this provision will reduce duplicative or conflicting stocking efforts as well as social conflict. The Sault has raised no cognizable reason why it should not work with the other Parties to rehabilitate the lake whitefish population, which is traditionally the most important species for Tribal commercial fishers.

> **Objection 102: Subsection XI.C – Subsistence Fishing Possession Limits:** Subsistence fishers should be allowed to barter without it being considered an impermissible "exchange for value" The restriction on no more than two subsistence fishers being on the same vessel is an overly burdensome and unfounded regulation on Tribal fishing. There is no legal or factual basis for such a restriction on Tribal subsistence fishing activity.

42

First, the Sault Tribe objects to the provision of the Proposed Decree prohibiting subsistence fishers from selling or "otherwise exchang[ing] for value any fish of their catch or any other subsistence fisher's catch" (ECF No. 2042-1 at PageID.12209). As explained above under Objection 99, the Tribes may issue subsistence fishing licenses for the purpose of catching fish for consumption and feeding their families. Bartering fish caught by subsistence fishers is clearly an action outside the scope of a subsistence fishing license, and allowing such action could lead to subsistence fishers essentially trading—or in other words, selling—their fish for something of value. Moreover, the Sault Tribe has not demonstrated the need for subsistence fishers to barter their catch.

Second, the Sault Tribe objects to this provision because it allows only two subsistence fishers to fish from a single vessel at the same time (*Id.*). However, the Sault Tribe fails to mention that the 2000 Decree limited subsistence fishing operations to one fisher per vessel (ECF No. 1458 at PageID.3303). Thus, the Proposed Decree actually expands subsistence fishers' opportunities compared to the 2000 Decree.

> **Objection 105: Subsection XI.E.1 – Subsistence Fishing Reporting Requirements:** Reporting by the 15th of every month is unduly burdensome and imposes requirements far beyond what the State could require under its own authority. Current reporting obligation under the 2000 Consent Decree is every six months. Imposing additional reporting and tracking will burden Tribal fishing and impair the Treaty right.

The Sault Tribe objects to the reporting requirements under the Proposed Decree for subsistence fishers because they will be required to report their catch once a month rather than every six months like under the 2000 Decree (ECF No. 2042-1 at PageID.12210). As the Court detailed under Objection 99, the illegal sale of catch by subsistence fishers was a

serious problem under the 2000 Decree. Thus, the increased reporting requirements will allow the Parties to more accurately track the catch of subsistence fishers and ensure that they are complying with their rights under the Proposed Decree (*see* ECF No. 2103 at PageID.14057). The increased reporting requirements are based on biological and conservationist purposes, and the Sault has failed to establish that these reporting requirements are overly burdensome.

> **Objection 106: Subsection XI.E.2 – Subsistence Fishing Reporting Requirements:** This weekly reporting obligation is unduly burdensome and imposes requirements far beyond what the State could require under its own authority. Nor is there any justification for this obligation. Imposing additional reporting and tracking will burden Tribal fishing and impair the Treaty right.

Notwithstanding the monthly reporting requirements discussed in the previous objection, the Proposed Decree imposes weekly reporting requirements for subsistence harvest in Little Bay de Noc from March 1 to May 14 (ECF No. 2042-1 at PageID.12210). The reason for this more-frequent reporting requirement is because "[d]uring the 2000 Decree, discrepancies commonly existed between reported subsistence harvest and effort and the observations of subsistence fishing activity made by MDNR staff in Little Bay de Noc" (ECF No. 2103 at PageID.14057) (citing *Caroffino Affidavit*, ECF No. 2103-2 at PageID.14072-73, ¶ 10). Thus, contrary to the Sault's assertion, there is a justification for this obligation.

### 3.  The Challenged Provision is Beyond the Scope of the Proposed Decree

> **Objection 2: Section III – Intertribal Agreements:** Intertribal agreements are beyond the scope of this Consent Decree and any reference to them should be removed. Tribes may enter into agreements amongst themselves without them being subject to the terms of a federal court Consent Decree.

Although the Sault objects to the provision regarding intertribal agreements, nearly identical language was included in the 2000 Decree (*see* ECF No. 1458 at PageID.3223), to which the Sault stipulated to the entry of. Additionally, the other four Tribes have agreed to this provision being contained in the Proposed Decree, and inclusion of this provision is crucial for the cooperative management of the resource shared by seven governments (*see* ECF No. 2103 at PageID.14042).

> **Objection 72: Subsection VII.A – Lake Trout and Whitefish Management:** The Sault Tribe objects to the lake trout allocation. The management regime in this subsection should replicate the Harvest Regulation Guideline that has been used by the Tribes for decades. This system uses models but also uses any data that is available to make informed decisions and provides better management data than what is contained in this document or what has been proposed by other Parties. This is another example of where Tribal management, outside the confines of this Decree, will provide superior results for the fishery and be more consistent with the Tribes' Treaty entitlement.

With respect to the assertion that the management framework should consider "any data that is available to make informed decisions," the Proposed Decree does so. It builds upon the 2000 Decree and allows for consideration of "relevant data," in addition to fish population models in setting harvest limits (*see* ECF No. 2103 at PageID.14308). Moreover, the Sault Tribe's vague objection to the lake trout allocation is unsupported. It is unclear why the Sault Tribe objects to the lake trout allocation, and without a specific argument, the Court deems this objection waived. *See Stewart*, 628 F.3d at 256.

> **Objection 80: Subsection VII.C – Lake Trout and Whitefish Management:** There is no basis to include provisions dictating how the Indian Tribes will manage their own fisheries in this decree; nor is there a basis for Indian Tribes to provide the notice required in the last sentence. There is not similar or corresponding notice obligations placed on the State. This fails to respect Indian Tribes as sovereign and equal governments to the State.

The Proposed Decree obligates the Tribes to give notice within two weeks of establishing HRGs (harvest regulation guidelines) for non-shared management units, and the Sault objects because there is no similar requirement for the State. However, this provision applies to only non-shared management units, and the State has no non-shared management units; thus, there is no need for this provision to apply to the State (ECF No. 2103 at PageID.14046).

As for the Sault Tribe's assertion that "there is no basis to include provisions dictating how the Indian tribes will manage their own fisheries," the Court rejects this legally incorrect assertion. As this Court has stated numerous times throughout the history of this case, the fishery is a shared resource—it is not owned by any one party. True, the Tribes have the unequivocal right to fish in 1836 Treaty waters, but the Court also has the duty to ensure that the Parties are co-managing the shared resource so that it is a viable, sustainable fishery for many years to come. Therefore, the Parties should work together to manage the entire Great Lakes fishery, and the Proposed Decree promotes that goal.

> **Objection 81: Subsection VII.F.1 – Trap Nets:** There is no basis for the Decree to dictate how the Tribes internally manage their own fisheries. So long as they are within the Tribal allocation, the State has no authority to dictate harvest rules or limits. Sault Tribe also objects to the bag limit.

This objection misrepresents the terms of the Proposed Decree. The State has not unilaterally "dictated" harvest rules or limits. Instead, regulations surrounding harvest rules and limits are the product of extensive negotiations to which six out of the seven Parties have agreed. Moreover, the Court rejects the Sault's unsupported objection to the bag limit imposed in this subsection. The Proposed Decree protects the resource while balancing the

protection of the Treaty right by incorporating trap-net bag limits for Tribal commercial fishers at 200 pounds in areas in which trap nets alone are authorized, and allowing CORA to set bag limits for areas in which both trap nets and gill nets may be used (ECF No. 2124 at PageID.14915).

> **Objection 97: Subsection IX.D – Disease Considerations:** This provision is unnecessary as it is already being done by Sault Tribe, other Tribes, and the State in the best interest of the lakes. As with many other aspects of the Decree, this kind of provision is not necessary to be included in a federal court order.

The Sault provides no support for its assertion that the specific requirements in the Proposed Decree regarding monitoring the fishery for diseases are "already being done by the Sault Tribe." Including this provision in the Proposed Decree obligates the Parties to monitor the fishery for diseases, which promotes the preservation and sustainability of the fishery. Further, even if the Sault is implementing these exact regulations already, then, logically, there should be no problem with including these regulations in the Proposed Decree.

> **Objection 100: Subsection XI.A – Subsistence Fishing:** This provision is unnecessary for a federal court order. The Sault Tribe has been doing this for decades but it is not within the scope of issues before the Court.

As with the previous objection, the Sault Tribe has provided no support for its alleged standardized reporting and sampling system. This provision promotes cooperative management of the resource, facilitates the Proposed Decree, and promotes conservation by requiring the Parties to gather and share important data. Additionally, this exact language was incorporated into the 2000 Decree, so it is unclear why the Sault now chooses to object to such language (*see* ECF No. 1458 at PageID.3302).

**Objection 101: Subsection XI.B – Subsistence Fishing Licenses:** The Tribes have authority to regulate the subsistence fishing of their members outside the bounds of federal court decree and under inherent sovereignty. There is no basis for this subsection in the decree and certainly no basis for Indian Tribes to provide the State with copies of permits or licenses provided to its members. This provision goes far beyond what the State could impose under its limited authority related to Tribal fishing.

As explained under Objection 99, the Court rejects the Sault Tribe's challenges to the subsistence fishing regulations in the Proposed Decree. As for the Sault's specific objection to the Tribes providing the State with copies of its permits and licenses, the Court also rejects this objection. Subsistence fishing is a Treaty-protected activity that is only available to Tribal fishers. These licensing requirements ensure that only Tribal members partake in subsistence fishing and "allow easy identification of properly authorized subsistence fishers on the water, which eases the burden on both fishers and regulators" (ECF No. 2103 at PageID.14056–57). The subsistence fishing licensing requirements seek to prevent the exploitation of subsistence fishing for commercial gain, reduce social conflict by making subsistence fishers easily identifiable, and ensure the conservation of the fishery.

**Objection 104: Subsection XI.E – Subsistence Fishing Reporting Requirements:** This reporting provision is not needed in a federal court decree. Each Tribe has sovereign authority to require reporting from its subsistence fishers. The federal court need not be supervising this.

The necessity for subsistence fishers to report their catch is thoroughly discussed under Objection 99. Contrary to the Sault's assertions, a federal Court clearly does need to supervise subsistence fishers, as the Stipulating Parties have provided unrebutted evidence that subsistence fishers have been illegally selling their catch during the implementation of the 2000 Decree.

**Objection 108: Subsections XII.C.7; XII.C.8 – Tasks and Responsibilities of the TFC:** The sovereigns do not need to have the federal court order dictate when they meet to discuss management issues; nor should the State or federal governments have authority under this decree to review Tribal estimating and reporting systems. The Tribes are co-equal governments and should be treated as such in this Decree if it is entered. Section XII(C)(7) should be deleted and removed from the Decree.

Like the 2000 Decree, the Proposed Decree provides for the creation of the TFC, which is "the primary body for consultation and collaboration on biological issues under this Decree" (ECF No. 2042-1 at PageID.12210). The TFC will consist of the Biological Services Division Director ("BSD"),[21] and one biologist from each of the Tribes, the MDNR, and the United States (*Id.*). Subsection XII.C defines the TFC's tasks and responsibilities (*Id.* at PageID.12211). One of those duties is that the TFC will "[m]eet jointly with the [Law Enforcement Committee], as needed, to facilitate information exchange and discussion related to management and enforcement of fishery regulations in the 1836 Treaty area" (*Id.*). Also, at least every six years, the TFC shall "provide for review and continuous improvement of harvest estimating and reporting systems to assure that each Party is submitting valid harvest estimates or reports" (*Id.*).

The Sault Tribe objects to these two duties of the TFC, arguing that the Tribes are capable of discussing management issues on their own timeline and because the United States and State need not review Tribal harvest reporting and estimating systems. Like many of the Sault's other objections, this objection fails to recognize the shared nature of the resource. Indeed, outlining the tasks and responsibilities of the TFC in the Proposed Decree "recognizes the importance of cooperative decision-making by ensuring all Parties have the

---

[21] "'BSD' means Biological Services Division, which is the biological staff of CORA" (ECF No. 2042-1 at PageID.12172).

ability to review other Parties' harvest estimation and reporting systems in order to promote accurate information collection for biological decision-making. By incorporating discrete TFC tasks into the Proposed Decree, the Parties promote efficient biological review and decision-making and ensure important tasks are carried out." (ECF No. 2124 at PageID.14900). The Sault Tribe has been very vocal about how the declining fish population has harmed its citizens, so it is curious that the Sault objects to provisions that seek to, in part, promote conservation of the fishery and accurate data collection.

**Objection 109: Subsection XIII.A – Notice of Proposed Regulatory Action:** There is no basis or need, in fact or law, to dictate the means and methods of Tribal regulatory actions in this Decree.

The Sault Tribe objects that the Proposed Decree should not dictate the means and methods of Tribal regulatory actions. This objection totally mischaracterizes the terms of the Proposed Decree. This subsection merely requires both the Tribes and the State to provide *notice* of regulatory action—which means a change in the Tribal Plan, Tribal Code, or State law—relating to or affecting fishing in Treaty waters (ECF No. 2042-1 at PageID.12212). It does not "dictate the means and methods of Tribal regulatory actions," contrary to the Sault's objection. Further, this provision is nearly identical to the relevant provision in the 2000 Decree (ECF No. 1458 at PageID.3307–08).

**Objection 116: Subsection XIV.B.4.b – Disclosure of Commercial Harvest Data:** Restrictions on CORA's ability to release data to non-Parties need not be in a federal court decree as it is not related to any disputed issue of law or fact.

This objection is puzzling. The Sault Tribe objects that CORA may not release confidential commercial harvest data to non-Parties. The Sault Tribe has not articulated any legitimate reason why this confidential data should be released to non-Parties, and the Sault

Tribe further ignores that the 2000 Decree also provided that commercial harvest data was confidential and not subject to disclosure (*see* ECF No. 1458 at PageID.3310–11).[22]

> **Objection 120: Subsection XIV.H – Recreational Harvest by State-Licensed Fishers:** The vast majority of the State fishery comes from its recreational fishery. Yet, unlike the frequency of Tribal reporting, the State only has to report once per year and has three months to prepare it. This is a clear example of the inequitable and non-reciprocal nature of the Decree when you compare the frequency of Tribal reporting (which is beyond State authority to require) to the infrequency of State reporting.

Again, the Sault Tribe attempts to compare the regulations regarding the Tribal commercial fishery versus the regulations regarding the State recreational fishery. The Sault Tribe objects because the State is only required to report its recreational harvest data once a year and it has three months to prepare the report, while Tribal commercial harvest data must be reported twice a month. As explained above under Objection 110, Tribal and State commercial fishers are subject to the same bi-monthly reporting requirements. And when comparing Tribal and State recreational reporting requirements, Tribal recreational fishers are subject to much less stringent reporting requirements than State recreational fishers (*see* ECF No. 2042-1 at PageID.12215) ("CORA shall provide to MDNR and USFWS such data as it possesses on Tribal recreational fishing."). Finally, the March 31 deadline for the State to share its recreational catch data is an improvement from the 2000 Decree, which did not provide any deadline for the State to report this data.

---

[22] Even more curiously, in Objection 115, The Sault Tribe seeks assurance from the State that commercial harvest data is not subject to disclosure under the Freedom of Information Act. This objection is contradictory to Objection 116: The Sault wants CORA to be able to release commercial harvest to non-parties (Objection 116), but it seeks assurance that the State cannot disclose commercial harvest data to the public (Objection 115). There is no logical way to align these contradictory objections.

#### 4. The Challenged Provision is Vague/Unclear/Impossible to Enforce

The Court is not persuaded by any of the following objections regarding the specific word usage in the Proposed Decree. These objections are nitpicky, and much of this language is carried over from the 2000 Decree, to which the Sault did not object. Moreover, as the Stipulating Parties contend, there are always ways to improve the wording of a document, but absent a showing that the chosen language is so ambiguous that it is unenforceable, the choice of wording or verbiage is not a legitimate reason to reject the Proposed Decree (*see* ECF No. 2103 at PageID.14063).

> **Objection 14: Subsection IV.A.1.b.ii.a.ii.a.4 – Sault Tribe Bay de Noc Zone:** The provision is misleading and unclear as written. The assumed intent is that the Tribes can harvest walleye freely at all other times of year (outside of January 1 through May 14), but as written it appears that the Tribes can harvest only 15 pounds of walleye and only during the January 1 – May 14 time period.

The Sault Tribe claims that it can "harvest walleye freely at all other times of year (outside January 1 through May 14)." It is not clear why the Sault has this general belief, as the targeting of walleye depends on many factors, such as gear restrictions, depth restrictions, and spawning closures (*see* ECF No. 2042-1 at PageID.12204). When looking at this specific subsection of the Proposed Decree to which the Sault Tribe objects, this subsection concerns Tribal commercial fishing in the Bay de Noc Zone (Map 9 of the Proposed Decree, *id.* at PageID.12269) in Lake Michigan, which is open to Little Traverse and Sault commercial fishers (*Id.* at PageID.12175). Notably, the Bay de Noc Zone is a part of Statistical District MM-1 (*see id.* at PageID.12261), where walleye generally may not be targeted by commercial fishers, notwithstanding other provisions in the Proposed Decree (*Id.* at PageID.12204). However, the Sault Tribe is permitted to harvest fifteen pounds of walleye per day per large

mesh gill net license in the Bay de Noc Zone from January 1 through May 14 (*Id.* at PageID.12177). When reading the relevant subsections together, it appears that targeting of walleye by commercial fishers is generally not permitted in the Bay de Noc Zone, except from January 1 through May 14 where the Sault Tribe and Little Traverse may harvest fifteen pounds of walleye per day per large mesh gill net license (*Id.* at PageID.12176–77). The Court again stresses the importance of reading the Proposed Decree holistically. While certain provisions may appear to be unclear when read in isolation, consulting the other relevant provisions in the Proposed Decree may provide context to these provisions, eliminating any purported ambiguity.

> **Objection 15: Subsection IV.A.1.b.ii.a.ii.a.5 – Sault Tribe Bay de Noc Zone:** The regulation regarding the depth of large mesh gill nets will be difficult, if not impossible, to enforce or comply with, creating compliance disputes.

This subsection of the Proposed Decree requires large mesh gill nets in the Bay de Noc Zone to be set at the bottom of the water at a minimum of fifty feet deep, except in October and November, where the minimum depth for these nets shall be thirty feet (ECF No. 2042-1 at PageID.12177). The Sault claims that these regulations will be "impossible" to enforce. This contention ignores the prevalence of sophisticated depth finders on commercial vessels, as well as the presence of law enforcement on the water. These depth regulations are important restrictions that help conserve the resource, without negatively impacting the Tribal right to fish, by minimizing the likelihood of bycatch of non-targeted species (*see* ECF No. 2124 at PageID.14922).

> **Objection 51: Subsection IV.A.2.c.ii.b – Sault Tribe Lake Huron Zone Regulations:** This provision for stocking in "the St. Martin's Bay zone of Lake Huron" is too broad and could be read to allow the State to move stocking to areas other than Nunns

Creek. Nor does this provision need to be included as a "regulation" of Tribal fishing. It is an obligation of the State not a regulation on the Tribe.

This provision of the Proposed Decree, which obligates the State to annually stock 250,000 spring fingerling Chinook Salmon "in the St. Martin's Bay zone of Lake Huron," is not too broad. The State stocking site within the St. Martin's Bay zone is specifically Nunns Creek (*see* ECF No. 2104 at PageID.14154) (citing *See* MDNR Fish Stocking Database, Search: Mackinack, Chinook Salmon, May 2022 https://www2.dnr.state.mi.us/fishstock/ (last visited Aug. 11, 2023)). Further, this provision, which is undertaken by the State to benefit the Sault Tribe, uses effectively the same language as in the 2000 Decree (*see* ECF No. 1458 at PageID.3291; No. 2104 at PageID.14154).

**Objection 58: Subsection IV.B.2 – State Commercial Fishing Zones:** The word "refrain" is insufficiently definite to impose an enforceable obligation on the State.

The Proposed Decree provides that the State shall "refrain" from issuing a commercial fishing license or permit within the waters of WFH-05 (whitefish management unit) that are within the Disputed Zone. The common definition of the word "refrain" is that "one is prohibited from undertaking the action" (ECF No. 2124 at PageID.14946–47). It is not clear what else the word "refrain" could possibly mean in this context. Moreover, the Sault has provided no evidence that the State does not intend to abide by its obligation to refrain from issuing commercial fishing licenses in this area.

**Objection 76: Subsections VII.A.5.b.i; VII.A.6.c – Review of Target Mortality Rates:** The document is internally contradictory. In VII(A)(5)(b)(i), it says that target mortality rates will be reviewed and evaluated by the TFC every six years, but in VII(A)(6)(c), it says reviews will happen every three years.

This objection exemplifies a misreading of the Proposed Decree. Subsection VII.A.5.b.i requires the review of mortality for possible adjustment every six years (ECF No. 2042-1 at PageID.12200), and Subsection VII.A.6.c allows for research and review of mortality rates every three years (*Id.* at PageID.12201). Moreover, mortality rates are to be reviewed and adjusted (if necessary) at a minimum of every six years, but there is nothing in the Proposed Decree prohibiting a more frequent adjustment period. The Proposed Decree is not contradictory.

> **Objection 79: Subsection VII.B.c – Lake Trout and Whitefish Management:** The sentence starting with "On average . . ." is too vague and ambiguous to be meaningfully enforceable. What does "on average" mean and what are the consequences for violation by the State?

The language in this subsection to which the Sault objects is carried over from the 2000 Decree (*see* ECF No. 1458 at PageID.3263), and the Sault has provided no evidence that this language caused problems during the duration of the 2000 Decree. As for the Sault Tribe's objection that there are no consequences for violations by the State, the Sault Tribe has provided no evidence that violations by the State have been a problem in the past or that the State intends to exceed its apportioned harvest opportunity in the future. Indeed, the State has shown a willingness to cooperate and work with the other Parties to implement the Proposed Decree. This objection is speculative and unsupported.

> **Objection 84: Subsection VIII.B.2 – Management of Salmon:** This provision is vague, ambiguous, and unenforceable as written. The word "reasonable" is qualitative and subject to interpretation. This will result in unwarranted disputes and conflict and harassment of Tribal fishers by State enforcement officers.

The Proposed Decree provides that "Salmon nets shall be set in a manner that permits reasonable ingress and egress by shoreline residents" (ECF No. 2042-1 at

PageID.12204), and the Sault Tribe objects to the use of the word "reasonable" in this subsection. The exact language in this subsection to which the Sault Tribe objects is carried over from the 2000 Decree (*see* ECF No. 1458 at PageID.3275). Again, the Sault Tribe has failed to provide evidence that this provision led to "unwarranted disputes and conflict" in the now twenty-three-year duration of the 2000 Decree. Further, this subsection seeks to prevent social conflict "by ensuring shoreline residents are able to move around nets set near the shoreline" (ECF No. 2124 at PageID.14915).

> **Objection 86: Subsection VIII.F.1.b.ii – Management of Walleye:** This provision contains date restrictions that are contradictory and in conflict with other provisions in the Decree, specifically the Southern Lake Huron section says closure occurs in November.

Contrary to Objection 86, when looking at the Proposed Decree in its entirety, it is not contradictory. The Southern Lake Huron Trap Net Zone—which contains Grids 509–512, a part of 606, 607–611, 709, and portions of 612, 613, 710, 711, and 810—allows for the Tribes to harvest walleye and yellow perch in trap nets in this zone only from October 1 through November 5 and November 30 through December 31, subject to other provisions in the Proposed Decree (ECF No. 2042-1 at PageID.12187). The Proposed Decree further provides that in, Grids 509–511, a part of 606, 607–613, 709–712, and 810–811, Tribal commercial fishers may target walleye only from October 1 through December 31, subject to other limitations in the Proposed Decree (*Id.* at PageID.12204). While these two subsections overlap with respect to many grids, not all grids are mentioned in each subsection. For example, Grid 811, which is only mentioned in Subsection VIII.F.1.b.ii, is open to Tribal commercial walleye fishing from October 1 through December 31, and it is

not closed for trap net commercial walleye fishing from November 5–30 under Subsection IV.A.2.d.ii.e. As for the grids that are specifically mentioned in each of these subsections, the Proposed Decree is not contradictory, as each subsection specifically states that they are subject to other provisions within the Decree. Therefore, for those grids that are mentioned in both Subsection VIII.F.1.b.ii and Subsection IV.A.2.d.ii.e, such grids are clearly closed for Tribal commercial trap net fishing for walleye from November 5–30.

**Objection 87: Subsection VIII.F.2 – Management of Walleye:** This provision is contradictory and in conflict with other provisions in the Decree, specifically the Bay de Noc zone.

This objection is essentially the reciprocal of Objection 14. As explained above, when reading the Proposed Decree in its entirety, Subsection IV.A.1.b.ii.a.ii.a.4 and Subsection VIII.F.2 are not in conflict with each other (*see* ECF No. 2124 at PageID.14924) ("The Sault Tribe's objections that walleye regulations in Section VII[I] conflict with Bay de Noc Zone provisions in Section IV fail to understand these provisions in the context of the Proposed Decree, which states that closures in Section VII[I] are subject to other provisions in the Decree such that the provisions in Section IV govern Section VII[I].").

**Objection 88: Subsection VIII.G.1.b.ii – Management of Yellow Perch in Lake Huron:** This provision contains date restrictions that are contradictory and in conflict with other provisions in the Decree, specifically the Southern Lake Huron section says closure occurs in November. It is also not clear why the geographic description here is different than in the related subsection regarding walleye (VII)(F)(1)(b)(ii).

This objection regarding the purported discrepancy in the closure for commercial fishing of yellow perch mirrors Objection 86, which concerned the same purported discrepancy regarding walleye. The reasoning under Objection 86 applies here as well, and the Court reiterates that the Proposed Decree is not contradictory.

The Sault Tribe also argues that it is "not clear why the geographic description [for yellow perch] is different than in the related section regarding walleye." Walleye are captured by large mesh gill nets in deeper waters and yellow perch are harvested by small mesh gill nets in shallower waters (*see Kornis Affidavit*, ECF 2086-5 at PageID.13207–10). Thus, harvest geography varies by depth of various management units, and geographic descriptions vary by species.

> **Objection 95: Subsection IX.B.1.c.iii – Changing the Stocking Table:** As drafted, the language is inadequate and confusing about when a decrease in stocking limits or number needs responsive action from the TFC.

The Court is puzzled with what language in Subsection IX.B.1.c.iii of the Proposed Decree the Sault Tribe finds "inadequate and confusing." The Proposed Decree is crystal clear: Whenever a party wishes to change the maximum stocking number of fish allowed per species per zone, it must submit a proposal to the TFC, and the Parties must respond (*see* ECF No. 2042-1 a PageID.12207; No. 2124 at PageID.14955). Ironically, it is the Sault's objection that is not only unclear but also unsubstantiated.

> **Objection 96: Subsection IX.B.3 – Stocking Process:** The words "reasonably intended" are too vague and ambiguous to provide enforceable and binding obligations. The word "and" between "lower-most fish passage barriers" and "reasonably intended to spend the majority of their lives in the Great Lakes" should be "and/or" because many streams do not have lower-most fish passage barriers, and if they do, there is no consistency as to how far upstream they are located. Also, this provision should also apply to Rainbow Trout, as Rainbow Trout may be stocked in a tributary but ultimately migrate to the Great Lakes.

The language to which the Sault objects is "sufficiently broad to allow for flexibility and adaptability, based on the circumstances" (ECF No. 2124 at PageID.14955); (*see also* ECF No. 2104 at PageID.14155 n.29) ("The phrasing 'reasonably intended' refers to the

purpose of the stocking to improve the Great Lakes fishery, and thus refers to stocking done in furtherance of the decree."). The Sault Tribe has further failed to develop its argument that "and" should be changed to "and/or," and that such a change would meaningfully change the intent or implementation of the Proposed Decree.

With respect to the Sault Tribe's objection that Rainbow Trout should be included in this provision, the Sault fails to account for the fact that Rainbow Trout and Steelhead are the same species. Because Steelhead are specifically included in this provision, Rainbow Trout are impliedly included in this provision (*see* ECF No. 2124 at PageID.14955).

> **Objection 107: Subsection XII.B – Technical Fisheries Committee Membership and Authority:** The first sentence says that membership will include a biologist from the United States, but below it says the federal biologist will be from USFWS. It should be clarified and made consistent in the text.

Shortly after Subsection XII.B, in Subsection XII.D, the Proposed Decree states that the United States' biologist in the TFC will be from the United States Fish and Wildlife Service ("USFWS") (ECF No. 2042-1 at PageID.12211). Obviously, the biologist from the United States mentioned in Subsection XII.B will be from the USFWS. The language to which the Sault objects is identical to the 2000 Decree, further exemplifying that, like the past twenty-three years, the United States' biologist in the TFC will be from the USFWS (*see* ECF No. 1458 at PageID.3304). Changing the language in Subsection XII.B to specifically reference a biologist from the USFWS would be unnecessary and would not change the implementation of the Proposed Decree.

> **Objection 113: Subsection XIV.B.3 – Electronic Reporting & Citations/Tickets:** The State assertion that law enforcement will not use individual Tribal fisher's catch report to issue tickets is largely unenforceable. If law enforcement does write a ticket in such circumstances, is it per se invalid? How will the Tribal fisher know that the ticket is

invalid? What recourse do they have to challenge a ticket that is not in compliance with this section? The State should be required to pay any costs Tribal fishers incur that are associated with issuance of invalid tickets under this subsection.

The rationale behind the language in Subsection XIV.B.3 is discussed above under Objection 110, and it was thoroughly discussed at the objections hearing (*see, e.g.*, ECF No. 2120 at PageID.14771–73, 14777–78). The Court reiterates this rationale, as succinctly asserted in the United States' response to the Sault's objections:

> [I]n order to protect tribal fishers from undue harassment based on *de minimis* overfishing, the State is strictly prohibited from using individual catch reports as a basis for the issuance of citations for minor, one-time or isolated infractions. The State may only use reports to support an investigation or prosecution based on a pattern of unlawful conduct. If the [latter] takes place, State enforcement is cabined by the Proposed Decree's law enforcement provisions, which clarify that Tribal courts have "exclusive jurisdiction over enforcement of Tribal laws or regulations governing the fishing activities of Tribal Citizens in 1836 Treaty waters" (ECF No. 2042-1 at PageID.12221–25). Any citation of a tribal fisher based on a pattern of misconduct must be based on violations of Tribal regulations and adjudicated in Tribal court. In short, the cooperative law enforcement provisions, in tandem with the reporting provisions, protect tribal fishers from undue prosecution while improving data collection to protect the resource.

(ECF No. 2104 at PageID.14158–59) (internal citations omitted). In sum, all the Parties appear to be concerned about the State's targeting of Tribal fishers for *de minimis* overfishing. The intent behind this provision was to protect Tribal fishers, not make it easier for the State to prosecute Tribal fishers (*see* ECF No. 2120 at PageID.14777). The Court commends the Stipulating Parties' cooperation on this issue, and it rejects the Sault's baseless objection, which, if sustained, would be disadvantageous for the Tribes.

**Objection 114: Subsection XIV.B.4 – Confidentiality of Commercial Harvest Data:**
Sharing data with the "United States" as a whole is too broad; specific agencies with a verifiable need for the data should be specifically identified. Similarly, "state agency

staff" is overly broad and should be narrowed with specificity to those agency staff with verifiable need for the information.

Clearly the intent behind the Proposed Decree is not to share confidential commercial harvest data with the United States or the State of Michigan as a whole. This data will be shared with the USFWS and the MDNR (*see* ECF No. 2104 at PageID.14159), which are both defined in the definitions subsection of the Proposed Decree (ECF No. 2042-1 at PageID.12173, 12175).

> **Objection 121: Subsection XIV.H.2 – Recreational Harvest by State-Licensed Fishers:** This provision places no actual obligation on the State to modify its reporting system. The provision is vague and unenforceable.

This provision of the Proposed Decree commits the Parties to studying the State's current methodology for gathering information about and estimating recreational harvest (ECF No. 2042-1 at PageID.12218). While the Sault Tribe objects that this provision places no obligation on the State to modify its reporting system, the intent of this provision was not to require changes, but to require a study to determine whether changes are needed and, if so, to recommend what changes should be made (*see* ECF No. 2103 at PageID.14061); (*see also* ECF No. 2124 at PageID.14967) ("[Objection 121] disregards that the Proposed Decree for the first time requires investigation of the efficacy of State recreational catch reporting in order to draft improvements and recognize that study is needed to support feasible policies and implementation."). This objection presumes that changes are needed without offering any support for that presumption.

> **Objection 122: Subsection XIV.K – Tribal Charter Boat Harvest:** The provisions of the Decree relating to State and Tribal charter boat harvest, respectively, should be placed next to one another in the Decree for clarity and consistency.

This objection does not raise a substantive argument with respect to this provision of the Proposed Decree; it merely argues that this provision should be moved to a different place in the Decree. This provision is sufficiently clear without moving it, and changing the placement of this provision would not change the effect of or the Parties' implementation of the Proposed Decree (*see* ECF No. 2124 at PageID.14968).

> **Objection 123: Subsection XIV.M – Environmental Contaminants:** The language "in a timely manner" is vague and ambiguous. It is imperative that data regarding environmental contaminant levels be shared immediately for protection of human health and to ensure accurate information releases to the public.

The Proposed Decree requires the Parties to "share with each other in a timely manner any data concerning environmental contaminant levels in fish in 1836 Treaty Waters" (ECF No. 2042-1 at PageID.12218). The Sault argues that the language "in a timely manner" is ambiguous and should be changed to "immediately." This language is identical to the 2000 Decree (*see* ECF No. 1458 at PageID.3313), and the Sault Tribe has not identified any enforcement issues with such language. Moreover, this language "promotes feasible implementation by not incorporating more stringent timelines for this provision because acquiring data often takes coordination with nondecree agencies" (ECF No. 2124 at PageID.14970). The Court has no doubt that the Parties will not delay in sharing crucial information regarding environmental contaminants with the other Parties, as such information is critical to ensure the preservation of the fishery.

> **Objection 126: Subsection XV.C.1.d.ii – Assessment Fishing:** These grounds for objection are qualitative, vague, ambiguous, and unenforceable. Allowing such qualitative grounds for objection will lead to disputes and unreasonably burden Tribal fishing.

Under the Proposed Decree, Parties who object to a proposed assessment may object on only the certain bases identified in Subsection XV.C.1.dii (*see* ECF No. 2042-1 at PageID.12220). This subsection is an improvement from the 2000 Decree, which did not describe any specific bases upon which Parties could object to a proposed assessment (*see* ECF No. 1458 at PageID.3314–16). Further, the Sault's argument that allowing Parties to object based on "such qualitative grounds" will lead to disputes ignores the very next subsection of the Proposed Decree, which provides that objections to a proposed assessment will be resolved pursuant to the dispute resolution process outlined in Section XVIII and that the assessment will not commence until the dispute is resolved (ECF No. 2042-1 at PageID.12220). Because the Proposed Decree properly incorporates a procedure for resolving objections, which may be based on only certain criteria, the Court does not find this provision to be vague and unenforceable.

> **Objection 134: Subsection XXI.A.1 – MDNR Public Access Sites:** The statement that "use charges may be collected for amenities provided to Tribal Citizens" is vague and ambiguous and will lead to disputes about the authority, basis, and purpose for such fees.

This provision of the Proposed Decree ensures that Tribal citizens may access 1836 Treaty waters, via State public access sites, without having to pay a fee or cost associated with the use of such property, such as boat launching or parking fees (*see* ECF No. 2042-1 at PageID.12229). The intent behind this provision is to protect the Treaty right by ensuring that Tribal citizens have free access to Treaty waters (*see* ECF No. 2104 at PageID.14162) ("The purpose of Section XXI is to provide free access for all tribal fishers to State-maintained access sites in order to ensure the tribal fishers have unencumbered access to

treaty fishing waters. Eliminating fees for access site use helps remove financial barriers to tribal fishing."). However, should a Tribal citizen choose to use an amenity at the public access site, the State may collect the fee for such amenities. The Court finds that this compromise is more than reasonable, and it certainly does not restrict the Tribes' right to fish the Treaty waters. Nor is this provision "vague and ambiguous." Indeed, Tribal citizens may use the State's public access sites to Treaty waters free of charge, but they may not use the site's amenities free of charge. This language is sufficiently clear.

> **Objection 135: Subsection XXI.A.2 – MDNR Public Access Sites:** This subsection and the preceding subsection ambiguously and inconsistently reference "Tribal citizen" and "Tribal fisher." The provision regarding fees and costs should be made clear to avoid conflict and prejudice to Tribal fishers exercising Treaty rights.

The Sault Tribe objects to the Proposed Decree's "inconsistent" use of the terms "Tribal citizen" and "Tribal fisher." Obviously, these terms are used interchangeably. The Proposed Decree defines Tribal Citizen as "an enrolled member of any one of the five (5) Tribes" who are Parties to the Decree (ECF No. 2042-1 at PageID.12174), and a Tribal fisher is clearly a Tribal Citizen who is licensed by a Tribe to fish the Treaty waters.

### 5.  Objections Regarding the Other Tribes' Zones

The following objections all concern the rights and regulations related to the other Tribes' commercial fishing opportunities. These objections raise arguments on behalf of the other Tribes to provisions that the Tribes agreed. Given the gist of the Sault Tribe's objections as a whole—that each Tribe possesses sovereign authority to regulate its own fishery without intervention from the State—these objections are ironic. To reiterate, the other Tribes *have agreed to* these provisions, yet the Sault attempts to raise objections on

their behalf, undermining and disregarding each Tribe's own sovereign authority. The Court declines to entertain such arguments, and it is not convinced the Sault Tribe even has standing to raise them. Nevertheless, each objection fails on the merits and is addressed below.

> **Objection 6: Subsection IV.A.1.b.ii.a.i – Little Traverse Bay de Noc Zone:** The Sault Tribe objects that Little Traverse gains two licenses and gains gill net opportunity as compared to the 2000 Consent Decree.

This objection is contradictory to the Sault's numerous assertions that the successor decree "must be focused on protection and enhancement of the treaty right" (*see* ECF No. 2077 at PageID.12806). Permitting Little Traverse to possess two additional licenses and gill net opportunity in Bay de Noc from the 2000 Decree certainly enhances and promotes the Treaty right, and the Sault has failed to provide a specific reason—such as that these additional fishing opportunities—will biologically harm the fishery. The Court finds that this argument is waived. *See Stewart*, 628 F.3d at 256.

> **Objection 7: Subsection IV.A.1.b.ii.a.i.b – Little Traverse Bay de Noc Zone:** The provision is misleading and unclear as written. The assumed intent is that Tribes can harvest walleye freely at all other times of year (outside of January 1 through May 14), but as written it appears that the Tribes can harvest only 15 pounds of walleye and only during the January 1 – May 14 time period.

The provision to which the Sault objects here, which concerns Little Traverse's commercial fishing opportunities in Bay de Noc, is the same language that the Sault objected to in Objection 14 regarding the Sault Tribe's commercial fishing opportunities in Bay de Noc. To reiterate, it appears that targeting of walleye by commercial fishers is generally not permitted in the Bay de Noc Zone, except from January 1 through May 14 where the Sault

Tribe and Little Traverse may harvest fifteen pounds of walleye per day per large mesh gill net license (*Id.* at PageID.12176–77). This provision is unambiguous.

> **Objection 8: Subsection IV.A.1.b.ii.a.i.c – Little Traverse Bay de Noc Zone:** The regulation regarding the depth of large mesh gill nets will be difficult, if not impossible, to enforce or comply with, creating compliance disputes.

This objection is identical to Objection 15, which is discussed above. The Court overrules this objection for the reasons articulated under Objection 15.

> **Objection 9: Subsection IV.A.1.b.ii.a.i.d – Little Traverse Bay de Noc Zone:** The prohibition on fishing with small mesh gill nets is a new restriction on Tribal fishing not contained in the prior decree.

The Sault Tribe argues that the Proposed Decree's prohibition on fishing with small mesh gill nets in the Bay de Noc Zone is a new prohibition not included in the 2000 Decree. This objection is factually incorrect, as small mesh gill nets also were not permitted in this zone under the 2000 Decree (*see* ECF No. 1458 at PageID.3224-25); (*see also* ECF No. 2124 at PageID.14922).

> **Objection 17: Subsection IV.A.1.c – Little Traverse Lake Michigan Tribal Zone:** Tribal exclusive zones are properly negotiated between the sovereign Tribes and should not be included within the scope of this decree.

The Court is mystified by this objection. Without the zonal plan established by the decrees throughout the history of this case, the regulatory scheme of the Great Lakes fishery would have been in disarray. Indeed, the Sault Tribe's "opposition to tribal zones directly threatens the well-being" of the Tribes, the State, and the fishery (*see* ECF No. 2126 at PageID.15014). The Court cannot imagine a scenario in which a zonal plan for the Treaty waters does not exist—the Great Lakes fishery would be a free-for-all, and the Court has no

doubt that a lack of a zonal plan in the Decree would lead to the demise of the fishery in its entirety.

Putting aside the fact that this objection is totally undeveloped, unsupported, and likely waived, the Court feels compelled to detail what the Sault Tribe is really advocating for. If the Court declined to accept the zonal plan in the Proposed Decree—which all of the Parties except the Sault Tribe have endorsed—this case would likely be headed toward trial-like proceedings to litigate the allocation of the fishery. There exist substantial risks to the Tribes if this case went to trial (*see* ECF No. 2119 at PageID.14620–21). In accordance with *People v. LeBlanc*, which the Sixth Circuit has held to be the appropriate standard governing the Treaty waters in the absence of federal regulation, *see Michigan*, 653 F.2d at 279, the Tribes would be forced to prove that they actually occupied the area in question (i.e., the waters they seek to fish) before their signatories signed the 1836 Treaty. *See LeBlanc*, 248 N.W.2d at 204 (affirming the reversal of a Chippewa Tribal member's conviction for fishing without a commercial license and with a prohibited gill net in the Pendills Bay of Lake Superior because the district court record supported the conclusion that "the Chippewas did in fact hold aboriginal title at least to the area in which defendant LeBlanc was arrested"); *see also id.* (defining "aboriginal title," which is "sometimes called Indian title," as "the non-treaty possessory rights of American natives to territory which they had continually occupied before the advent of white civilization"). If, at trial, the Tribes failed to prove that their respective Tribe "had long occupied" certain areas of the 1836 Treaty waters, then, pursuant to *LeBlanc* and absent an agreement among the Parties, they would have no right to fish such waters. *See id.* at 206 ("Unfortunately, it is not at all evident from the language of the treaty which

ceded areas had been occupied by the Ottawas and which by the Chippewas. In such a circumstance, the existence of aboriginal title in a particular Indian tribe becomes a question of fact involving a judicial determination that the tribe claiming such title occupied exclusively the territory at issue."). Entering the Proposed Decree with its zonal plan eliminates this risk.

There is no question to the Court that the Proposed Decree's zonal plan should be adopted, to the benefit of all the Parties, and especially the Tribes. No one, including the Sault Tribe, would benefit from litigation. Under the Proposed Decree, the Sault Tribe has an exclusive zone, in addition to multiple shared Tribal zones, that State fishers cannot access. The Court does not truly believe that the Sault wishes to risk these exclusive zones, as well as the extensive commercial fishing rights that the Proposed Decree secures for the Sault Tribe, for a trial that may result in the Sault Tribe being allowed to fish a smaller area of the Treaty waters than what the Proposed Decree guarantees (*see* ECF No. 2119 at PageID.14620–21) ("Well, if we have a trial, the risk is that the -- not necessarily this Court, but an appellate court could look at the *LeBlanc* decision not only as embraced by the Sixth Circuit on the issue of regulations, but perhaps with respect to the nature of the treaty right. And that decision . . . requires a tribe claiming treaty rights to prove historic occupancy of the area where such rights are claimed. It is conceivable that if we were to follow the path that has been requested of having a trial and going up on appeal, that we may find that tribes that occupy very small areas of the Upper Peninsula may find themselves precluded from being able to fish in waters that are now open to fishing."). The Court understands the other Tribes' vehement opposition to this objection.

Moreover, the Sault Tribe is likely estopped from making this argument in the first place (*see* ECF No. 2119 at PageID.14621–23). In 1983, the Sault Tribe—along with the Grand Traverse and Bay Mills Tribes—moved to allocate the fishery and advocated for the zonal plan during the 1985 trial before Judge Enslen (*see* ECF No. 2080-1; No. 2096 at PageID.13655). Judge Enslen endorsed the Tribes' position, and, following a trial, adopted the zonal allocation plan contained in the 1985 Decree (*see* ECF No. 2096 at PageID.13565–59); *Michigan*, 12 I.L.R. at 3089–90. The adoption of the zonal allocation plan, which the Sault endorsed, is what has allowed the Sault Tribe to obtain its exclusive Tribal commercial fishery throughout the 1836 Treaty waters, free of competition from State commercial fishers. Today, the Sault is likely precluded and estopped from making the opposite argument (*see Transcript of 1985 Trial*, ECF No. 2096-2 at PageID.13696) (showing that the Sault's Tribal Chairperson testified in favor of the zonal allocation plan: "I think the best plan is without question, and it has been, my efforts have been directed toward that, have been the zonation plan"). The effectiveness of the zonal plan—and its value to the Tribes—has been proven throughout the history of this case (*see* ECF No. 2096 at PageID.13658–59) (explaining that "approximately one-tenth of the state commercial fishing licenses in existence in 1985 remain authorized to fish within the 1836 Treaty cessation waters today"); (ECF No. 2119 at PageID.14623) ("[W]e had a trial, that the zonal plan was adopted, it has worked well. We continue that in 2000 with the consent of all, and today we are proposing to you that you embrace for the next 24 years a continuation of the framework of that decree."). The Court has no desire to entertain the Sault Tribe's self-destructive argument that seeks to dissolve the zonal plan, which the Sault is precluded from arguing anyway.

In sum, the zonal plans of the decrees, including the Proposed Decree, are some of the most important—if not *the* most important—provisions preserving the Treaty rights in the decrees. The zonal plans contained in the Proposed Decree reduce social conflict, preserve the fishery, promote the Treaty rights, appreciate the shared resource, and ensure feasible implementation of the Proposed Decree. The Court has no doubt that overruling this objection benefits all the Parties to the Decree.

> **Objection 18: Subsection IV.A.1.c.i – Little Traverse Lake Michigan Tribal Zone Description:** Objection relating to the size of this zone; hearing is necessary to adjudicate the appropriate size of respective zones in consideration of respective Tribal fishing capacity.

The Sault fails to articulate why Little Traverse's Lake Michigan Tribal Zone is an inappropriate size or that fishing capacity should dictate the size of Tribal Zones. And for the reasons explained above, litigating the sizes of the grids within the zonal plan is not in any Tribe's best interest. The Court accepts the Stipulating Parties' rationale for the size of this zone: "The Proposed Decree protects Little Traverse fishing opportunity by delineating its zone at a reasonable size that considers proximity, access, and harvestability of fish stocks. The Proposed Decree protects Sault Tribe fishing opportunity by providing exclusive Sault Tribe zones elsewhere in other areas of the Decree." (ECF No. 2124 at PageID.14925–26). Also, the size of this zone is unchanged from the 2000 Decree (*see* ECF No. 2103 at PageID.14048).

> **Objection 19: Subsection IV.A.1.c.ii.a.ii.a – Little Traverse Lake Michigan Tribal Zone Regulations:** The basis for the latitude and longitude descriptions is not disclosed and those latitude and longitude descriptions are not agreed upon by the Sault Tribe.

The Proposed Decree incorporates the use of latitude and longitude throughout to further define a geographic area or more accurately define a geographic area. The 2000 Decree did not use latitude and longitude; instead, sometimes it referenced ambiguous, physical boundaries (*see, e.g.*, ECF No. 1458 at PageID.3226) (allowing large mesh gill net fishing in Little Traverse's Lake Michigan Tribal Zone "west of a line running from Townline Road on the south to the Stuttsmanville Road tower on the north" during certain times of the year); (*Id.* at PageID.3237) (defining the Sault Tribe's Cordwood Point Zone as: "from Cordwood Point south to a point one-half (0.5) mile north of Hammond Bay harbor light"). The purpose of using latitude and longitude in the Proposed Decree was to modernize the Decree and define more accurate boundaries, not significantly change the size of these boundaries (*see* ECF No. 2103 at PageID.14061–62). Today's GPS technology allows for fishers to abide by latitude and longitude boundaries, and it allows for easier enforcement of these boundaries. Because the purpose of using latitude and longitude to define certain boundaries in the Proposed Decree, including the provision objected to here, is sufficiently clear and ensures the protection of proper Tribal fishing, the Court will overrule this objection.

> **Objection 20: Subsection IV.A.1.c.ii.a.ii.b – Little Traverse Lake Michigan Tribal Zone Regulations:** Objection that the restrictions on large mesh gill net fishing are more restrictive than in the 2000 Consent Decree and more restrictive than State authority to regulate would permit.

At the outset, the regulations on large mesh gill net fishing in Little Traverse's Lake Michigan Tribal zone are not, contrary to the Sault's assertions, regulations by the State. Rather, they are negotiated and agreed-upon regulations to which Little Traverse has agreed.

Further, the Sault's characterization of these restrictions—that they are more restrictive than the 2000 Decree—is factually incorrect. While these regulations in the Proposed Decree are worded differently than the 2000 Decree (*compare* ECF No. 1458 at PageID.3225–26, *with* ECF No. 2042-1 at PageID.12177–78), the large mesh gill net season is expanded upon in this zone from its duration in the 2000 Decree (ECF No. 2124 at PageID.14926).

> **Objection 21: Subsection IV.A.1.c.ii.b – Little Traverse Lake Michigan Tribal Zone Salmon Regulations:** There should be specific reference that intertribal fishing shall be allowed in this zone the rest of the year.

It is unclear why the Sault Tribe believes that the Little Traverse Lake Michigan salmon zone is an intertribal zone during non-salmon season (*see* ECF No. 2103 at PageID.14031) ("Inter-tribal fishing [in this zone] is not allowed under the 2000 Decree and will not be allowed under the Proposed Decree.") (internal citation omitted). Perhaps the Sault raises this objection because its exclusive salmon zone is within an intertribal zone, and the language regarding the Sault's salmon zone makes clear that the zone is an intertribal zone during non-salmon season. *See supra* Objection 50; (ECF No. 2120 at PageID.14682) (arguing that the Sault's salmon zone under the Proposed Decree receives "differential treatment" than the other Tribes' salmon zones). But, for the reasons explained under Objection 50, the Sault's salmon zone is not subject to "differential treatment," and because Little Traverse's salmon zone is not within an intertribal zone, the provision regarding Little Traverse's salmon zone need not contain the language that the provision regarding the Sault Tribe's salmon zone contains (*see* ECF No. 2104 at PageID.14150) ("The Grand Traverse and Little Traverse Zones are either tribe-specific zones or non-tribal zones outside of their salmon season . . . Therefore, they lack the language Sault Tribe objects to here.").

**Objection 23: Subsection IV.A.1.e – Grand Traverse Tribal Zone:** Tribal exclusive zones are properly negotiated between the sovereign Tribes and should not be included within the scope of this Decree.

For the numerous reasons outlined under Objection 17, the Court overrules this objection as well.

**Objection 24: Subsection IV.A.1.e.ii.a – Grand Traverse Lake Michigan Tribal Zone Trap Net Operations:** The regulation and limitations on bag limits are not within State authority to impose on Tribal fishers and should not be imposed on Tribal fishers in this Decree.

Contrary to the Sault's objection, this bag-limits provision "protects the resource by decreasing the likelihood of lake trout overharvest while still supporting the exercise of the treaty fishing right" (ECF No. 2124 at PageID.14929). Again, this provision is not a State regulation; it is a negotiated agreement between Grand Traverse and the other Parties.

**Objection 25: Subsection IV.A.1.e.ii.b.i – Grand Traverse Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** The basis for the latitude and longitude descriptions is not disclosed and those latitude and longitude descriptions are not agreed upon by the Sault Tribe.

The rationale for using latitude and longitude in the Proposed Decree is discussed above under Objection 19, and this objection is overruled for the same reasons.

**Objection 26: Subsection IV.A.1.e.ii.b.vi – Grand Traverse Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** The restrictions and level of management contained in this subsection are confusing and an unprecedented micromanagement of Tribal fishing practices. It should not be approved in the Decree as it is inconsistent with Tribal principles of self-management and beyond State authority to regulate.

The Sault Tribe claims that this provision, which generally regulates large mesh gill net fishing by Grand Traverse, is "confusing," yet it fails to explain what is confusing about this provision. Therefore, the Court finds that this argument is waived. *See Stewart*, 628 F.3d at 256. Moreover, these regulations regarding gill net fishing, to which Grand Traverse has

73

agreed, reduce social conflict by incorporating restrictions on the use of gill nets (which will be utilized by Grand Traverse Tribal fishers in certain areas for the first time in decades) and protect the resource from overharvesting, yet also recognize that gill net fishing is a protected Treaty right and traditional means of fishing by the Tribes.

> **Objection 27: Subsection IV.A.1.e.ii.b.vi.c – Grand Traverse Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** The restrictions in Grid 714 are not within State authority to impose on Tribal fishers and should not be imposed on Tribal fishers in this decree. The restriction severely restricts Tribal fishing in a month with favorable fishing conditions and forces the majority of fishing to occur in months where weather is not conducive to fishing.

"Grand Traverse has agreed to this restriction, which limits only its own citizens' commercial fishing opportunity, not that of any other Tribe" (ECF No. 2124 at PageID.14929). This reasoning alone is sufficient for the Court to reject the Sault Tribe's objection to this provision regulating Grand Traverse gill net operations. However, the Court also acknowledges that this provision, which imposes seasonal limitations on Tribal lake trout harvest, sufficiently protects the resource and recognizes the shared nature of the fishery by limiting Tribal harvest during important recreational fishing season for the State (*see id.*).

> **Objection 28: Subsection IV.A.1.e.ii.b.vi.d – Grand Traverse Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** The restrictions in Grids 813 and 814 are not within State authority to impose on Tribal fishers and should not be imposed on Tribal fishers in this decree. The restriction severely limits Tribal fishing in a month with favorable fishing conditions and forces the majority of fishing to occur in months where weather is not conducive to fishing.

This objection is identical to the previous objection, except that it concerns Grids 813 and 814 rather than Grid 714, and the provision objected to in this objection is nearly identical to the provision in the previous objection. Therefore, Objection 28 is overruled for the same reasons as Objection 27.

**Objection 29: Subsection IV.A.1.e.ii.b.vii – Grand Traverse Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** Requiring a Tribal government to provide the State with copies of permits issued in advance is a violation of sovereignty and beyond State authority to require.

The Proposed Decree requires Grand Traverse to provide the State with copies of certain permits issued for large mesh gill net operations (*see* ECF No. 2042-1 at PageID.12181) ("Grand Traverse shall provide to the State copies of permits issued under subs. (b)(v) and (vi). . . ."). For many of the grids covered under this permit-sharing requirement, gill net fishing will be allowed in them for the first time since at least the implementation of the 2000 Decree (*compare* ECF No. 1458 at PageID.3227–29 (not allowing large mesh gill net fishing in Grids 813 and 814), *with* ECF No. 2042-1 at PageID.12179–80 (allowing limited large mesh gill net fishing in Grids 813 and 814)). In the Court's judgment, the requirement for Grand Traverse to provide copies of these permits to the State in exchange for the State allowing gill net fishing in these grids appears to be a fair compromise. Further, the permit-sharing requirement, to which Grand Traverse agrees, will reduce social conflict by ensuring the Parties have complete information about gill net fishing in the Grand Traverse Lake Michigan Tribal Zone.

**Objection 30: Subsection IV.A.1.e.ii.c.iii.a – Grand Traverse Lake Michigan Tribal Zone Small Mesh Gill Net Operations:** This regulation is ambiguous and confusing. While the regulation matches the large mesh regulations, it excludes the part restricting lake trout habitat. In subsection (v) of this part, lake trout harvest is allowed with small mesh from Nov. 30 – Oct. 14. It is not clear whether this counts or not against the large mesh catch limits in subsection (b)(vi) regarding large mesh fishing.

This objection is another example of the Sault Tribe failing to read the Proposed Decree as a whole. The Sault objects because it is "ambiguous and confusing" whether lake trout caught in small mesh gill nets count toward the lake trout harvest limits outlined in

Subsection IV.A.1.e.ii.b.vi. Regardless of gear used or whether lake trout is targeted, all harvested lake trout must be counted toward the lake trout harvest (*see* ECF No. 2124 at PageID.14929).

> **Objection 31: Subsection IV.A.1.e.ii.c.iii.d – Grand Traverse Lake Michigan Tribal Zone Small Mesh Gill Net Operations:** Requiring a Tribal government to provide the State with copies of permits issued in advance is a violation of sovereignty and beyond State authority to require.

Like Objection 29, the Sault Tribe objects to Grand Traverse's agreement to share with the State permits issued for certain small mesh gill net operations. And like the permit-sharing requirement for large mesh gill net fishing, many of the grids covered under the permit-sharing requirement for small mesh gill net fishing will allow gill netting in these areas for the first time in decades (*compare* ECF No. 1458 at PageID.3229–30 (not allowing small mesh gill net fishing in Grids 813 and 814), *with* ECF No. 2042-1 at PageID.12182 (allowing limited small mesh gill net fishing in Grids 813 and 814)). Again, sharing permits with the State in exchange for opening these areas up to gill net fishing appears to be a reasonable and fair compromise.

> **Objection 32: Subsection IV.A.1.e.ii.d – Grand Traverse Lake Michigan Tribal Zone Salmon Regulations:** This provision provides a smaller salmon zone than compared to the 2000 Consent Decree and is beyond State authority to require.

Although the geographical area for salmon harvest is smaller than under the 2000 Decree, the salmon fishing season is extended, providing for a more meaningful fishing opportunity (ECF No. 2124 at PageID.14930). And, given that Grand Traverse has agreed to this provision, the smaller salmon zone is not something the State is "requiring" from Grand Traverse.

**Objection 33: Subsection IV.A.1.f – Little River Lake Michigan Tribal Zone:** This definition of the Little River Tribal Zone adds a row of fishing grids, substantially expanding its zone. Tribal exclusive zones are properly negotiated between the sovereign Tribes and should not be included within the scope of this Decree.

The Sault Tribe's objection to the existence of the zonal plan included in the Proposed Decree is rejected for the reasons articulated under Objection 17. With respect to the Sault Tribe's objection to the expansion of the Little River Lake Michigan Tribal Zone, the Court is puzzled by this objection, as the Sault Tribe has generally advocated for the expansion of Tribal fishing opportunities throughout its objections. Nevertheless, the Sault fails to explain how the expansion of this zone—into what was previously part of the Southern Lake Michigan Development Zone—impacts Sault Tribe fishers, nor does the Sault Tribe claim that its citizens have fished in this area in the past (*see* ECF No. 2124 at PageID.14932). Put simply, the expansion of the Little River Zone does not impact the Sault Tribe in any way.

**Objection 34: Subsection IV.A.1.f.ii.c.ii – Little River Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** The provision for a fifteen (15) fish daily bag limit per vessel for salmon is too low and will most likely result, in most cases, of less than one salmon being able to be retained.

The Sault Tribe should have read this provision of the Proposed Decree more carefully. The Sault objects that the "fifteen (15) *fish* daily bag limit" per vessel per day for salmon in this zone is too low because it will only allow a fisher to retain fewer than one salmon (*see* ECF No. 2077 at PageID.12811) (emphasis added). This is not a fifteen-pound daily bag limit; it is a fifteen-*fish* daily bag limit. Obviously, if this zone provides for a fifteen-fish daily bag limit per vessel for salmon, the vessel can retain more than one salmon per day. Indeed, it can retain up to fifteen (*see* ECF No. 2042-1 at PageID.12183).

**Objection 35: Subsection IV.A.1.f.ii.c.iii – Little River Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** The provision for fishing by non-Tribal independent contractors is not proper. Tribes cannot issue a license or permit to fish to someone who is not a Tribal member under their jurisdiction.

The Sault Tribe argues that Little River can hire a non-Tribal independent contractor to operate a Tribally owned fishing vessel, and it objects to such an ability. This objection is factually incorrect. This provision clearly states that "Little River Band may operate one Tribally owned Large Mesh Gill Net vessel *to be operated by a Tribally Licensed Fisher* who is either a Little River Band tribal employee or an independent contractor to the Band. . . ." (ECF No. 2042-1 at PageID.12183) (emphasis added). A "Licensed Fisher" is defined as "a person who is licensed by a Tribe to fish by commercial, subsistence, or recreational means" (*Id.* at PageID.12173). The Proposed Decree therefore impliedly provides that Little River Band may only allow Tribal members to operate Tribal fishing vessels (*see* ECF No. 2103 at PageID.14036).

**Objection 36: Subsection IV.A.1.f.ii.c.iv – Little River Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** This provision unnecessarily leaves Little River members unable to fish with large mesh gill nets absent unnecessary and unwarranted State intrusion. This kind of regulation is not appropriate in the Consent Decree as it is beyond what the State can impose under its authority and unduly restricts Tribal sovereignty.

This subsection provides that Little River "may authorize a second Large Mesh Gill Net vessel to be operated by a Tribally Licensed Fisher . . . to conduct a survey of commercial fish species to better understand their distribution and population dynamics" (ECF No. 2042-1 at PageID.12183–84). Further, even though the purpose of this second large mesh gill net operation vessel would be to conduct research, the Proposed Decree allows for the "harvest unneeded for th[e] goals [of the study program to] be sold" (*Id.* at PageID.12184).

In the Court's judgment, this subsection appears to present a reasonable compromise: Little River may operate a second large mesh gill net vessel in this zone solely for research purposes (which protects and conserves the fishery), but that vessel also may sell the fish unnecessary for the research program (which enhances the Treaty right) (*see* ECF No. 2124 at PageID.14933). This subsection appropriately balances conservation efforts with the appreciation for Tribal fishing.

> **Objection 37: Subsection IV.A.1.f.ii.c.v – Little River Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** A requirement that an Indian Tribe notify the State sixty days prior to fishing in the first instance and ten days prior to fishing in each other year is an unlawful intrusion on Tribal sovereignty and far beyond State authority to require. These kinds of provisions should not be included in the Consent Decree as they inherently reduce Tribal sovereignty vis-à-vis the State and will create a precedent and expectation with regard to Tribal-State relations to the prejudice of all Tribes. Will failure to notify the State violate the Decree leading to enforcement action in this Court? Notably, the State is not required to notify the Tribes when its fishers fish.

This objection inappropriately characterizes this provision—which requires Little River to provide the State with notice before it launches the vessels to be used for the research program described in the previous objection [hereinafter "the Program"][23]—as State regulation. Rather, this agreement between Little River and the State promotes communication between the Parties, research efforts, and Tribal fishing. Further, the Sault Tribe is incorrect that this provision "will create a precedent and expectation," as the Proposed Decree explicitly states that it "shall no longer govern the Parties in any manner" upon its expiration (*Id.* at PageID.12232).

> **Objection 38: Subsection IV.A.1.f.ii.c.vi – Little River Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** It is not important for this Court to impose via a

---

[23] The Program is more thoroughly described in Subsections IV.A.1.f.ii.c.iii, IV.A.1.f.ii.c.iv of the Proposed Decree (ECF No. 2042-1 at PageID.12183).

consent decree a requirement on an Indian Tribe to "undertake other measures" that the State and federal governments "consider essential." It is the Tribe itself that has sovereignty to make these decisions without the mandate of a court order.

Again, the Sault Tribe mischaracterizes the provision to which it objects. This provision does not allow the United States or the State to unilaterally require Little River to undertake measures promoting the success of the Program. Instead, it expressly states, "MDNR, USFWS, and Little River Band *shall collaborate* on public education and outreach efforts aimed to avoid operational conflicts and promote mutual trust and understanding and *undertake any other measures the Parties consider essential* to the success of the Program" (ECF No. 2042-1 at PageID.12184) (emphasis added). Based on the plain language of this provision, Little River must only undertake measures that all three sovereigns deem necessary (*see* ECF No. 2124 at PageID.14934).

> **Objection 39: Subsection IV.A.1.f.ii.c.viii – Little River Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** The requirement to share coordinates of nets, and the provision to make their coordinates available to the public, is far beyond State authority to require of Tribal fishers and is more than the State requires with regard to its own fishers. Again, this provision is a blatant violation of Tribal sovereignty that should not be imposed via a decree. And again, such a provision would set a precedent to the prejudice of all tribes. Vandalism of publicly available net locations is likely.

Again, this is not a violation of Tribal sovereignty via unilateral State regulation, given that Little River has agreed to the provision requiring it to share GPS coordinates of large mesh gill nets with the MDNR and the public (*see* ECF No. 2042-1 at PageID.12184). And again, this provision does not set precedent, as clearly stated in the Proposed Decree (*Id.* at PageID.12232). The Sault's concerns about gill net vandalism are addressed below under Objection 128.

With respect to the Sault's substantive challenge to the sharing of GPS coordinates, this provision is included in the Proposed Decree in an effort to modernize the Decree by utilizing current technology. Little River's agreement to sharing GPS coordinates to the MDNR and public is merely a pilot program, and it has no effect on Sault Tribe fishers (*see* ECF No. 2084 at PageID.12978); (ECF No. 2119 at PageID.14559).

> **Objection 40: Subsection IV.A.1.f.ii.c.ix – Little River Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** This regulation is ambiguous and confusing. Does it mean that nets cannot be set or that the vessel literally cannot operate in the waters? The Decree should not be approved with such ambiguity.

This provision is not ambiguous and confusing. It clearly prohibits large mesh gill operations in this zone during certain times of the year (*see* ECF No. 2042-1 at PageID.12184). The Sault Tribe's argument that the provision could be interpreted to mean the vessel itself is not permitted to operate in these waters is an unrealistic interpretation of the Proposed Decree.

> **Objection 41: Subsection IV.A.1.f.ii.c.x – Little River Lake Michigan Tribal Zone Large Mesh Gill Net Operations:** The dates and timetables here are not consistent with other regulations in this section, rendering the obligations unduly confusing and ambiguous. In addition, these notification and consultation requirements could not be imposed on sovereign Tribes outside the confines of this decree. Thus, the provision should be stricken as inconsistent with and beyond State authority to require.

This provision of the Proposed Decree provides for certain dates as to when the Parties "shall confer in good faith and consider whether the provisions of this subsection warrant modification" (ECF No. 2042-1 at PageID.12185). The Sault claims that these dates—i.e., thirty days prior to the first occurrence of fishing under subsection (c) and upon the conclusion of any period of three consecutive years of fishing under subsection (c)—are

not consistent with other regulations in this Section, but it fails to identify which regulations are supposedly contradictory. Further, this provision promotes consultation and communication among the Parties, who will jointly decide whether modification to certain regulations of Little River's Lake Michigan Tribal Zone is necessary. This provision will allow the Parties to co-manage the fishery and make changes when necessary to promote Tribal fishing opportunities (*see* ECF No. 2124 at PageID.14934–35).

> **Objection 45: Subsection IV.A.1.g.ii.d – Southern Lake Michigan Development Zone:** This provision will prohibit any large mesh gill net fishing if Little River Band sets 6,000 feet within its zone.

The Sault objects to this provision, arguing that if Little River sets 6,000 feet of large mesh gill net in its Lake Michigan Tribal Zone, then it will have used up its allowed large mesh gill net opportunity and no more could be set in the Southern Lake Michigan Development Zone. The State explained why this assertion is incorrect:

> Little River is authorized to operate two vessels in its Tribal Zone, each of which can set up to 6,000 feet of large mesh gill net. (Proposed Decree, §§ IV.A.1.f.ii.c.iii and iv, PageID.12183–12184.) Little River may choose to operate one of its vessels in the Southern Lake Michigan Development Zone and fish up to 4,000 feet of large mesh gill net. (*Id.* at IV(A)(1)(g)(ii)(d), PageID.12185.) The net that is fished in the Southern Lake Michigan Development Zone counts toward the 6,000-foot limit for that vessel in the Tribal Zone. (*Id.*) So if Little River sets 6,000 feet of large mesh gill net in its Tribal Zone, then an additional 6,000 feet of net would be available to be fished by a second vessel, only 4,000 feet of which could be fished in the Southern Lake Michigan Development Zone.

(ECF No. 2103 at PageID.14036). The Court accepts the State's interpretation of this provision, which is how the Parties intend to enforce it.

> **Objection 47: Subsection IV.A.2.b – Bay Mills Lake Huron Tribal Zone:** The size of the zone is significantly changed from the 2000 Consent Decree. It is not clear what the basis is, in law or fact, for changing the size of this or any of the fishing zones in

the Decree, or of imposing Tribal fishing zones at all. The changes in zone size will correspondingly reduce the potential open water for other Tribes, without legal or factual justification.

The Sault Tribe objects to the reconfigured size of the Bay Mills Tribal Zone. However, "[t]he size of this zone was changed to provide more opportunity in light of the changed fishery[, and] this change does not reduce the area available for other Tribes," particularly the Sault Tribe (ECF No. 2103 at PageID.14049). Further, this objection fails to interpret the Proposed Decree as a whole, which increases the size of the Northern Lake Huron Inter-Tribal Fishing Zone, providing expanded opportunities for Bay Mills commercial fishers (*see* ECF No. 2124 at PageID.14938). This provision protects the Treaty fishing right by providing Bay Mills with exclusive fishing opportunities, while also providing exclusive opportunities for the other Tribes in separate provisions of the Proposed Decree (*see id.*).

> **Objection 48: Subsection IV.A.2.b.i – Bay Mills Lake Huron Tribal Zone Description:** The basis for the latitude and longitude descriptions is not disclosed and those latitude and longitude descriptions are not agreed upon by the Sault Tribe.

The rationale for using latitude and longitude in the Proposed Decree is discussed above under Objection 19, and this objection is overruled for the same reasons.

### 6.  The Challenged Provision is Different From the 2000 Decree

> **Objection 5: Subsection IV.A.1.b.ii – Bay de Noc Zone Regulations:** The trap net retention of perch is removed, to the prejudice of the Sault Tribe.

Although the Proposed Decree eliminates the commercial harvest of yellow perch via trap nets in Grid 508, yellow perch harvest is expanded elsewhere in the Proposed Decree (*see* ECF No. 2124 at PageID.14920) ("[Y]ellow perch harvest in MM-123 is expanded from

twelve grids to forty-one grids as compared to the 2000 Decree."). Moreover, during the duration of the 2000 Decree, no fisher <u>ever</u> reported harvesting yellow perch from this area (*see Caroffino Affidavit*, ECF No. 2093-3 at PageID.13582, ¶ 9). The Sault Tribe has failed to establish that this provision prejudices its fishers.

> **Objection 11: Subsection IV.A.1.b.ii.a.ii.a – Sault Tribe Bay de Noc Zone:** The prior consent decree allowed additional Sault Tribe trap net operations to be authorized in the future by CORA based on data collected during previous years. This provision fails to reflect that possible increase in Sault Tribe fishing capacity.

Although the 2000 Decree allowed CORA to permit additional trap nets in this area if data showed additional viable fishing opportunities were sustainable (*see* ECF No. 1458 at PageID.3224-25), the Proposed Decree removes this provision because the number of trap net operations, and their potential expansion, must be limited to make room for new gill net operations (*see* ECF No. 2104 at PageID.14139). Gill net fishing—a core Treaty right—is a more economical and efficient means of fishing given the state of the fishery, and it is greatly expanded in the Proposed Decree in exchange for removing some trap net opportunity (*see* ECF No. 2120 at PageID.14421–22). This specific provision does not even remove the Sault Tribe's four trap net licenses that were allowed under the 2000 Decree—it simply removes CORA's ability to authorize additional trap nets in this zone (*compare* ECF No. 1458 at PageID.3225, *with* ECF No. 2042-1 at PageID.12176). And in any event, CORA never authorized an additional trap net in this zone during the 2000 Decree, despite its ability to do so (*see* ECF No. 2120 at PageID.14643). For these reasons, the Court will overrule this objection, as the Sault Tribe has failed to provide any evidence of past, present, or future

fishing capacity that would support the need to retain the provision from the 2000 Decree allowing CORA to authorize additional trap nets in this zone.

> **Objection 12: Subsection IV.A.1.b.ii.a.ii.a.2 – Sault Tribe Bay de Noc Zone:** The restriction on trap net operations not retaining walleye is a new restriction on Sault Tribe fishing rights not contained in the 2000 Consent Decree.

The Sault Tribe objects to the "new restriction" on retaining walleye in trap nets in the Bay de Noc Zone, but this restriction is not new. The same prohibition was also contained within the 2000 Decree (*see* ECF No. 1458 at PageID.3282; No. 2103 at PageID.14035).

> **Objection 13: Subsection IV.A.1.b.ii.a.ii.a.3 – Sault Tribe Bay de Noc Zone:** This provision will require the Sault Tribe to remove two of its current trap net fishers in this location if it wishes to permit gill nets whereas Little Traverse Bay Band gains two spots. This is inequitable and prejudicial to Sault Tribe fishers.

Under the 2000 Decree, the Sault Tribe was allowed four trap net licenses, and no gill net licenses, in this zone (*see* ECF No. 1458 at PageID.3224–25). Under the Proposed Decree, the Sault Tribe will be allowed four commercial licenses total, but no more than two of those licenses can be large mesh gill net licenses (*see* ECF No. 2042-1 at PageID.12176). As for the regulations on Little Traverse fishers in this zone, Little Traverse completely surrendered its right to trap net licenses in exchange for 12,000 feet of gill net opportunity that can be divided between no more than three licenses (*Id.*). Because Little Traverse was only allowed one trap net license under the 2000 Decree, the Sault Tribe claims that Little Traverse has gained two licenses, while the Sault Tribe has lost two licenses, as it will only be permitted to issue two trap net licenses if it issues the allowable two large mesh gill net licenses. At the objections hearing, the Sault Tribe claimed that it should be able to issue

*both* the four trap net licenses it was allowed under the 2000 Decree as well as the two new large mesh gill net licenses in this zone (*see* ECF No. 2120 at PageID.14649).

First, the Sault Tribe's interpretation of the Proposed Decree is inaccurate. If the Sault Tribe still wants to issue four trap net licenses for this zone, it is allowed to do so under the Proposed Decree; but issuing four trap net licenses will preclude the Sault's opportunity to issue up to two large mesh gill net licenses for this zone (*see* ECF No. 2042-1 at PageID.12176). In other words, the provision to which the Sault objects gives the Sault Tribe more flexibility to manage its fishery—it does not restrict Sault Tribal fishers' opportunity. Moreover, claiming that Little Traverse gains two licenses is an unfair characterization of Little Traverse's rights in this zone. True, Little Traverse may now issue three licenses, rather than the one trap net license it was allowed under the 2000 Decree, but Little Traverse completely surrendered its opportunity to issue trap net licenses—each of which license is allow fifteen trap nets—in exchange for limited gill net opportunity. As explained at the objections hearing, the Sault Tribe will still have "a minimum of double Little Traverse's effort" in this zone (*see* ECF No. 2120 at PageID.14653–54).

Second, with regard to the Sault Tribe's assertion at the objections hearing that it should be allowed to issue four trap net licenses *and* two large mesh gill net licenses in this zone, the Sault Tribe conceded that it should only be allowed to do so "if the biology supported that in that area" (*Id.* at PageID.14649). Yet, the Sault Tribe has failed to prove—or provide any scientific evidence whatsoever—that the fishery could sustain the allowance of all of these licenses. The Court overrules this objection.

**Objection 16: Subsection IV.A.1.b.ii.a.ii.a.6 – Sault Tribe Bay de Noc Zone:** The prohibition on no fishing with small mesh gill nets is a new restriction on Tribal fishing not contained in the prior decree.

The prohibition on small mesh gill nets in Big Bay de Noc is not a new restriction. Both the 1985 and 2000 Decrees prohibited all gill net use by commercial fishers in this area, except for a small yellow perch fishing zone in the far southeastern part of MM-1 (*see* ECF No. 2124 at PageID.14924; No. 2103 at PageID.14034). The Proposed Decree expands Tribal fishing opportunities for the Sault and Little Traverse Tribes by allowing commercial fishers to use large mesh gill nets in Big Bay de Noc, with conditions, while maintaining the prohibition on small mesh gill nets in this area.

**Objection 42: Subsection IV.A.1.g.i – Southern Lake Michigan Development Zone Description:** This fishing area is reduced as compared to the 2000 Consent Decree, reducing opportunity for Tribal fishers in violation of their rights.

While the Sault Tribe is correct that this zone is smaller, it now allows for limited gill net opportunity, which was not allowed under either the 1985 or 2000 Decrees (*see* ECF No. 2104 at PageID.14140). The reason this zone was reduced in size was to expand Little River's Tribal Zone by incorporating a certain row of grids from the Southern Lake Michigan Development Zone into the Little River Zone (ECF No. 2124 at PageID.14945–36). This change in the size of these zones does not impact the Sault Tribe, given that the area now incorporated into the Little River Zone was not open to Tribal commercial fishing under the 1985 Decree, and the Sault Tribe did not fish this area under the 2000 Decree (*see* ECF No. 2103-2 at PageID.14071–72). Only the Little River Band reported fishing in this area during the 2000 Consent Decree, so this change promotes Little River's opportunities to fish (*Id.*).

**Objection 46: Subsection IV.A.2.a.i – Northern Lake Huron Inter-Tribal Fishing Zone:** The size of the zone is changed from the 2000 Consent Decree. It is not clear what the basis is, in law or fact, for changing the size of this or any of the fishing zones in the decree, or of imposing Tribal fishing zones at all.

True, the size of the Northern Lake Huron Intertribal Zone in the Proposed Decree is changed from the 2000 Decree. However, this change was favorable to the Tribes—all of whom are permitted to fish in this zone—because the size of this zone was expanded from the 2000 Decree (*see* ECF No. 1458 at PageID.3233–34, *with* ECF No. 2042-1 at PageID.12185–86); (*see also* ECF No. 2124 at PageID.14936–37). Moreover, gill nets were previously prohibited in this area, but they will be allowed in this area under the Proposed Decree (*see* ECF No. 2120 at PageID.14664–65).

**Objection 49: Subsection IV.A.2.c.i.b – Sault Tribe Cordwood Point Zone:** The zone described is changed from the 2000 Consent Decree and fails to provide fishing access to all waters to which the Sault Tribe is entitled in violation of its Treaty rights.

In the Proposed Decree, the Cordwood Point Zone in Lake Huron is expanded from the 2000 Decree, which the Sault Tribe conceded at the objections hearing (ECF No. 2120 at PageID.14669). The Sault Tribe argues that this zone should have been expanded even further, but it fails to show that the expansion in the Proposed Decree was insufficient to promote the Treaty right (*see id.* at PageID.14670). Additionally, no Sault Tribe fisher has fished the Cordwood Point Zone in more than a decade (*see Carollino Affidavit*, ECF No. 2103-2 at PageID.14076).

**Objection 53: Subsection IV.A.2.d.ii.c – Southern Lake Huron Trap Net Zone:** The restriction of four (4) trap net operations removes the ability for the Bay Mills and Sault Tribes to add more based on research.

Both the 2000 Decree and the Proposed Decree allow a total of four trap net operations for this zone (*see* ECF No. 1458 at PageID.3239; No. 2042-1 at PageID.12187). However, the 2000 Decree, unlike the Proposed Decree, provided that "[a]dditional operations may be authorized in the future by CORA based on data collected in previous years" (ECF No. 1458 at PageID.3239). However, this provision was not carried over from the 2000 Decree because no party ever requested additional trap netting effort in this zone (*see* ECF No. 2104 at PageID.14141 n.12). The Sault Tribe has provided no evidence that this provision, which went completely unutilized under the 2000 Decree, will be necessary for the Proposed Decree to promote the Treaty right.

> **Objection 56: Subsection IV.A.2.d.iii – Southern Lake Huron Trap Net Zone:** The Sault Tribe objects to the State permitting provisions, which infringe on the Treaty right and go beyond any State authority. Also, the Sault Tribe objects to the changes in this provision as compared to the 2000 Consent Decree. For example, the opening words "The Tribes" previously used to refer to only Bay Mills and Sault Tribe. The word "only" added to the second sentence has significant and unnecessary restrictive implications. And the last sentence provides the State with authority that it would not otherwise have under federal law and the Treaty. The provision should be revised to comport with Tribal authority and sovereignty.

The Sault Tribe raises multiple arguments in this objection. First, it objects to the "State permitting provisions," which allow the Sault Tribe and Bay Mills to authorize Tribal fishers permitted to fish in the Southern Lake Huron Trap Net Zone to "obtain permits from the State to fish with Trap Nets in those waters" and give the State "jurisdiction to enforce the permit conditions under State law" (ECF No. 2042-1 at PageID.12188). This area is within the Disputed Zone, described above under Objection 52. In order to avoid litigating the issue of the boundaries of the Disputed Zone and whether the zone is indeed

within Treaty waters, these permitting provisions appear to be a reasonable compromise by giving both the Tribes and the State authority to oversee trap net fishing in this zone.

Second, the Sault argues that the use of the term "The Tribes" in the opening sentence is ambiguous because it could refer to all five Tribes when it should only refer to Bay Mills and the Sault (*see* ECF No. 2120 at PageID.14685). At the objections hearing, the State clarified that "The Tribes" in this provision refers to only Bay Mills and the Sault, as they are the only Tribes that can authorize fishers to fish in this zone (ECF No. 2120 at PageID.14689). Thus, given the Stipulating Parties' understanding of this provision and how they intend to enforce it, there is no need to change "The Tribes" to "Bay Mills and the Sault" in the opening sentence of this provision.

Third, the Sault argues that the use of the word "only" in the second sentence of this provision is ambiguous because it is unclear whether "only" modifies "Lake Whitefish" or "in the area described above" (*Id.* at PageID.14685). At the objections hearing, the State clarified that "only" modifies "Lake Whitefish" to ensure that "permits are that issued to [T]ribal commercial fishers by the State in the [D]isputed [Z]one can only authorize the harvest of lake whitefish" (*Id.* at PageID.14689). Although this language could likely be cleaned up, the State has now clarified the intended meaning of this language, and the Court has no reason to believe that the State will deviate from the Parties' stated intentions.

> **Objection 59: Subsection IV.C – Closed Commercial Fishing Zones:** This subsection removes certain areas, including Grid 519, from the closed sections without explanation.

It is curious why the Sault Tribe would object to an area no longer being closed to commercial fishing. Grid 519, which was closed to commercial fishing under the 2000

Decree, will now be open to commercial fishing as part of the Little Traverse Tribal Zone (*see* ECF No. 2042-1 at PageID.12177). The opening of this grid promotes the Treaty right.

> **Objection 61: Subsection IV.C.3 – Closed Commercial Fishing Zones, Grid 306:** The closure in this subsection is different from and larger than that contained in the 2000 Consent Decree, reducing fishing opportunity.

The change to the closure within Lake Michigan Grid 306 does not significantly change the size of the closure zone, and it was intended to clarify the boundaries of this zone (*see* ECF No. 2103 at PageID.14037). The 2000 Decree described this closure as "Those portions of Lake Michigan grid 306 that lie within 1836 Treaty waters and north of a line from the mouth of the Ford River to Peninsula Point" (ECF No. 1458 at PageID.3242). Conversely, the Proposed Decree describes this closure zone as "Those portions of Lake Michigan Grid 306 that lie within 1836 Treaty Waters" (ECF No. 2042-1 at PageID.12189). The Stipulating Parties assert that the southern boundary line definition in the 2000 Decree— "a line from the mouth of the Ford River to Peninsula Point"—was too vague to enforce, and therefore, they simply changed the boundary line to the grid line (ECF No. 2103 at PageID.14038). Although "this change adds a small sliver of water to the closed area, it creates a clear boundary that can be easily identified and enforced," which will reduce social conflict (*Id.*). The Sault Tribe has failed to establish that enlarging this closure zone by "a small sliver" will impair the Treaty right.

> **Objection 62: Subsection IV.C.5 – Closed Commercial Fishing Zones, Au Train Bay:** The basis for the latitude and longitude descriptions is not disclosed and those latitude and longitude descriptions are not agreed upon by the Sault Tribe. This provision closes more area than was in the 2000 Consent Decree, unlawfully removing fishing opportunity to the detriment of Tribal rights.

The rationale for using latitude and longitude in the Proposed Decree is discussed above under Objection 19, and this objection is overruled for the same reasons.[21] With regard to the new Au Train Bay closure, the Court finds that it is reasonable given the nature of the area and the shared resource in general. Under the Proposed Decree, Au Train Bay will be closed to commercial fishing from April 1 through May 15 "to protect a long existing State recreational opportunity to harvest salmon" (ECF No. 2120 at PageID.14705; No. 2042-1 at PageID.12190).

But this closure is not nearly as significant as the Sault Tribe claims. First, under the 2000 Decree, this area was only open to trap nets, not gill nets. Now, it will be open to gill nets for the remainder of the season (except from April 1 through May 15), which is an enhancement of the Treaty right (*see id.* at PageID.14705–06). Second, as a trade-off for the seasonal closure of this area and some other small areas in Lake Superior, west of Munising to the boundary of the 1836 Treaty waters near Marquette will be newly opened to commercial gill net fishing (*see id.* at PageID.14704–05; No. 2130 at PageID.14051–52). And third, no Tribal fisher reported fishing within Au Train Bay under the 2000 Decree (*see Caroffino Affidavit*, ECF No. 2103-2 at PageID.14071, ¶ 6). The six-week closure of Au Train Bay to protect a State recreational fishery does not hinder Tribal opportunity.

> **Objection 63: Subsection IV.C.6 – Closed Commercial Fishing Zones, Munising Bay:** Sault Tribe objects to the Munising Bay closure. The area is very important both as a traditional fishing area and as a protected area where they can fish when weather is bad. This larger closure was not in the 2000 Consent Decree, and it is an unwarranted and unlawful removal of fishing opportunity to the detriment of Tribal rights. The basis for the latitude and longitude descriptions is not disclosed and those latitude and longitude descriptions are not agreed upon by the Sault Tribe.

---

[21] For the same reasons, the Court overrules the Sault Tribe's challenges to the use of latitude and longitude under Objections 63 and 64.

Munising Bay was closed to commercial fishing under the 1985 Decree, opened up to commercial fishing under the 2000 Decree, and now it will be closed again under the Proposed Decree (*see* ECF No. 2120 at PageID.14708). The Stipulating Parties agreed to close this area again because it is a heavily trafficked tourist area posing navigational and safety hazards (*Id.*) ("Munising and Munising Bay are important and busy areas for users other than commercial fishers or in addition to commercial fishers. That's where Pictured Rock tours depart from that bay, glass bottom boat tours depart from that bay."). Further, as the Court explained under the previous objection, a large portion of Lake Superior will now be open to commercial gill nets in exchange for closing these small areas (*see* ECF No. 2103 at PageID.14050–51).

> **Objection 64: Subsection IV.C.7 – Closed Commercial Fishing Zones, Big Reef:** This closure was not in the 2000 Consent Decree, and it is an unwarranted and unlawful removal of fishing opportunity to the detriment of Tribal rights. The basis for the latitude and longitude descriptions is not disclosed and those latitude and longitude descriptions are not agreed upon by the Sault Tribe.

Although the Big Reef area was open to Tribal commercial fishing under the 2000 Decree, commercial fishers rarely fished Big Reef (*see Caroffino Affidavit*, ECF No. 2103-3 at PageID.14073–74, ¶ 11). This area was closed to "accommodate State recreational uses and management priorities" (ECF No. 2103 at PageID.14050–51). The closure of this area under the Proposed Decree was part of the deal mentioned above: The area of Lake Superior west of Munising to the boundary of the 1836 Treaty waters near Marquette will be newly opened to commercial gill net fishing (*Id.*).

> **Objection 65: Subsection IV.C.8 – Closed Commercial Fishing Zones, Stannard Rock:** This closure was not in the 2000 Consent Decree, and it is an unwarranted and

unlawful removal of fishing opportunity to the detriment of Tribal rights. The basis for the latitude and longitude descriptions is not disclosed and those latitude and longitude descriptions are not agreed upon by the Sault Tribe.

Again, although the Stannard Rock area was open to Tribal commercial fishing under the 2000 Decree, Tribal commercial fishers never fished Stannard Rock (*see Caroffino Affidavit*, ECF No. 2103-3 at PageID.14073–74, ¶ 11). This area was closed to "accommodate State recreational uses and management priorities" (ECF No. 2103 at PageID.14050–51). The closure of this area was part of the agreement above regarding the opening of much of Lake Superior to commercial gill net fishing (*Id.*).

> **Objection 66: Subsection IV.C.11 – Closed Commercial Fishing Zones, Harbors:** The Sault Tribe objects and does not agree to the size of the harbor closure areas. These descriptions are changed from the 2000 Consent Decree.

There are three specific harbor closures in the Proposed Decree that are slightly different from the 2000 Decree: The closures of the Hammond Bay, Rogers City, and St. James Bay harbors (ECF No. 2042-1 at PageID.12192). At the objections hearing, the Sault Tribe conceded that there is "not a large difference" in these closure areas from the 2000 Decree (ECF No. 2120 at PageID.14710).

With regard to the Hammond Bay harbor area, the boundaries of this closure zone were changed from vague boundaries referencing physical landmarks to clear lines of latitude and longitude (*compare* ECF No. 1458 at PageID.3246 (closing for commercial fishing "[t]he area within one-half (0.5) mile of the break walls at the Hammond Bay Harbor of Refuge. . . ."), *with* ECF No. 2042-1 at PageID.12192 (closing for commercial fishing "Near the Hammond Bay Harbor of Refuge . . . south of a line of latitude at 45.598 degrees and west of a line of longitude at -84.1575 degrees.")). And, as the Stipulating Parties asserted at the

objections hearing, the closure of the Hammond Bay Harbor area is actually smaller than under the 2000 Decree (ECF No. 2120 at PageID.14711).

The closure of the Rogers City harbor area was also changed to reference more clear boundary lines (*compare* ECF No. 1458 at PageID.3246 (closing for commercial fishing "[t]he area within two (2) miles of the break walls at Rogers City"), *with* ECF No. 2042-1 at PageID.12192 (closing for commercial fishing "Near the harbor of Rogers City . . . south of a line of latitude at 45.4345 degrees and west of a line of longitude at -83.7597 degrees")). The purpose of changing the boundaries of these closures zones was not to inhibit Tribal fishing but so that "everybody, [including] commercial fishers, recreational fishers, recreational boaters, enforcement, etcetera, . . . can more easily identify where nets can be and where nets can't be" (ECF No. 2120 at PageID.14712). The Court endorses the Stipulating Parties' reasoning for changing the description of the boundary lines of these closure zones and their efforts in modernizing the Decree for the benefit of everyone.

Finally, the regulations regarding the closure of the St. James Bay harbor and surrounding area are "an improvement over the 2000 [D]ecree" (*Id.* at PageID.14713). This area was subject to many more restrictions under the 2000 Decree, including that both the inner and outer harbor were closed to commercial fishing (*Id.*). Although the inner harbor will remain closed—for good reason given that the Beaver Island ferry departs and arrives in this harbor—the outer harbor will now be open to commercial fishing except for yellow perch fishing (*Id.* at PageID.14173–74); (ECF No. 2042-4 at PageID.12284). Overall, the Court agrees with the Stipulating Parties: This harbor closure is significantly improved for the benefit of the Tribes, and it enhances the Treaty right (ECF No. 2120 at PageID.14714).

**Objection 77: Subsection VII.A.7 – Lake Trout and Whitefish Management:** The Tribal allocation in MM-123 was reduced with no corresponding increase elsewhere, reducing Tribal fishing opportunity.

Comparing the 2000 Decree to the Proposed Decree, allocation of lake trout in MM-123, which is in Lake Michigan, is changed as follows: 90% (Tribes)/10% (State) (ECF No. 1458 at PageID.3256) to 87% (Tribes)/13% (State) (ECF No. 2042-1 at PageID.12201). The Sault argues that the Tribes' lake trout allocation in this management unit was decreased "with no corresponding increase elsewhere." This assertion is plainly incorrect: Tribal lake trout allocation was increased in MH-12 and MI-5 (*see* ECF No. 2104 at PageID.14146; No. 2120 at PageID.14745–47).

At the objections hearing, the Sault Tribe then argued that the increase "was in the wrong place," as the Tribal lake trout allocation was increased in Lake Superior, "which is not as heavily fished by the Sault Tribe," as opposed to Lake Michigan, where most of the Sault Tribe fishes (ECF No. 2120 at PageID.14745).[25] However, the Stipulating Parties noted that the Sault Tribe has more fishers in Lake Superior than any other Tribe (*Id.* at PageID.14746). Also, the Stipulating Parties clarified the reason for the change in allocation: The purported new 87%/13% split "represents the allocation that's taken place over the last seven years of the implementation of the 2000 [D]ecree," pursuant to stipulations between the Parties (*Id.*). In other words, based on the stipulations that this Court has entered, the Proposed Decree does not change how the 2000 Decree has been implemented since 2017 (*see Stipulations*, ECF Nos. 1855, 1915). The Court finds that the alleged "reduction" in the

---

[25] This argument is likely waived, as the Sault Tribe raised it for the first time at the objections hearing. *See Baum*, 2019 WL 6971369, at *3.

Tribal lake trout allocation in MM-123 is reasonable and does not inhibit Tribal fishing opportunity.

> **Objection 78: Subsection VII.A.8 – Lake Trout and Whitefish Management:** This provision reduces the Tribal allocation in MM-123 with no corresponding increase elsewhere, reducing Tribal fishing opportunity. The Sault Tribe objects that this 87%/13% reduced allocation is locked in unless "both" the Tribal and State harvest limits can go up.

The Sault Tribe's objection that the 87%/13% allocation in MM-123—which establishes harvest limits of 550,000 pounds and 80,000 pounds for the Tribes and State, respectively—is "locked in unless 'both' the Tribal and State harvest limits can go up" fails to recognize that the resource is shared. If the model-generated harvest limits allow for additional lake trout harvest in this management unit, it is fair to only allow the harvest limits to be increased if they are increased for both the Tribes and the State.

> **Objection 103: Subsection XI.C.1 – Subsistence Fishing in Little Bay de Noc:** The entirety of these restrictions on Tribal subsistence fishers are new, and not in the 2000 Consent Decree, and impose overly burdensome and unfounded regulation on Tribal subsistence fishing. All of the restrictions in this subsection go far beyond what the State could impose under its limited authority related to Tribal fishing. Nor is there any legal or factual basis to support the imposition of these restrictions on Tribal subsistence fishing. These restrictions will be used to track, target, and harass Tribal subsistence fishers.

As explained above under Objection 99, under the 2000 Decree, the exploitation of fish caught by subsistence fishers in Little Bay de Noc was a serious problem (*see* ECF No. 2093-7). These restrictions are not only reasonable, but they are also necessary to protect the resource. Further, the Sault Tribe has provided no evidence in support of its speculative argument that these restrictions "will be used to track, target, and harass Tribal subsistence fishers."

### 7.   The Sault Tribe Disagrees with the Challenged Provision

The following objections essentially state the Sault Tribe's opposition to the challenged provision without providing any evidentiary support or meaningful argument as to why the Sault Tribe disagrees with them. In the Court's judgment, these objections are all considered waived. *See, e.g., Keller*, 498 F.3d at 326; *Stewart*, 628 F.3d at 256; W.D. Mich. LCivR 7.1(b); *Palmer*, 2010 WL 233858, at *10. However, these objections are also rejected for the specific reasons below.

> **Objection 1: Subsection II.T – Definition of Parties:** The definition of "Parties" must be modified to remove the Sault Tribe, as the Sault Tribe does not consent to the Decree and thus may not be bound by it.

Based on the law of this case outlined above under the Law of the Case section of this Opinion and the discussion regarding the Sault Tribe's general objections, the Court has the power to bind the Sault Tribe to this Decree to protect the resource and enforce the Treaty right. Because the Sault Tribe will be bound by this Decree over its objections and will remain a party under the Decree, the Court overrules this objection.

> **Objection 4: Subsection IV.A.1.b.i – Bay de Noc Zone Description:** The Sault Tribe objects to the geographic description of this zone. The basis for the latitude and longitude descriptions is not disclosed and those latitude and longitude descriptions are not agreed upon by the Sault Tribe; nor are they consistent with the Treaty or the 2000 Consent Decree. The boundaries of the geographic area described are disputed. The Sault Tribe also objects to the Decree's closure of Little Bay de Noc to Tribal commercial fishing.

The Sault Tribe raises several arguments under this objection, all of which have been addressed and rejected throughout this Opinion. With respect to the specific argument regarding the closure of Little Bay de Noc to commercial fishing, this is not a new closure. It has been closed to commercial fishing for both the State and the Tribes for nearly forty years

because "[t]his area is crucial for State recreational fishers and Tribal subsistence fishers, and the tributaries are used for inland harvest by Tribal members" (ECF No. 2103 at PageID.14048). The Sault Tribe fails to raise any meaningful argument as to why this area should be opened to commercial fishing for the first time in decades.

> **Objection 10: Subsection IV.A.1.b.ii.a.ii – Sault Tribe Bay de Noc Zone:** There are errors in the letter/number formatting in this section, which creates changes in meanings in the section.

The Sault Tribe claims that there are formatting errors in this section, but it fails to identify these formatting errors, nor does the Sault Tribe explain how these alleged errors would affect the implementation of the Proposed Decree.

> **Objection 54: Subsection IV.A.2.d.ii.e – Southern Lake Huron Trap Net Zone:** Objection to the time/date limitations and restrictions in this subsection.

Without any explanation to this objection or any suggestion as to how the "time/date limitations and restrictions" in this subsection of the Proposed Decree could be improved, the Court declines to entertain this barebones objection. *See Stewart*, 628 F.3d at 256.

> **Objection 69: Subsection VI.C – Gear Restrictions:** This subsection is focused on commercial fishing only; but it should also include detailed restrictions for State recreational fishing.

This objection creates a false comparison between gear restrictions for Tribal commercial fishers and State recreational fishers. The types of gear that are *permitted* for these two groups are different, as only Tribal commercial fishers are permitted to use gill nets. Considering the majority of this subsection concerns regulations regarding gill nets, these regulations are irrelevant to State fishers and need not be included in the Decree as State restrictions (*see* ECF No. 2120 at PageID.14696).

**Objection 73: Subsection VII.A.2.a.i.a – Harvest Limits:** The Sault Tribe does not agree to the provision requiring the setting of harvest limits in Statistical Districts MH-1 and MH-2, combined as MH-12.

The Sault Tribe fails to explain why it "does not agree" to the setting of harvest limits in Statistical District MH-12. However, the United States provides a thorough unrebutted explanation for the harvest limits in this statistical district, which the Court accepts:

> The decision to combine MH-1 and MH-2 for lake trout allocation was based on MSC evaluation of lake trout data in northern Lake Huron, which showed that lake trout in MH-1 and MH-2 acted as a single population, making a collective management scheme more biologically appropriate. Koproski Aff. ¶¶ 33–35. In 2017, the Parties, including the Sault Tribe, adopted the MSC's recommendation. Koproski Aff. ¶ 34. This change, thus, reflects the biology of MH-1 and MH-2 and does not decrease the Tribes' allocation in those areas. To the contrary, tribal allocation in the combined MH-12 unit is 55%, although the combined tribal allocation for MH-1 and MH-2 under the 2000 Decree was 47%. *Compare* ECF 1458, PageID.3256, *with* ECF 2042-1, PageID.12201.

(ECF No. 2104 at PageID.14146) (footnote omitted).

**Objection 74: Subsection VII.A.4 – Harvest Limits:** The timeframes set in the Decree are too inflexible for the Parties to determine harvest limits; the consequences of failing to determine harvest limits are too rigid.

Under the Proposed Decree, the Modeling Subcommittee ("MSC") shall calculate harvest limits, using the established target mortality rates, "no later than December 1 of the year prior to their intended effect" (ECF No. 2042-1 at PageID.12199). But if a member of the TFC believes the harvest limits calculated by the MSC are inappropriate for management, then "the TFC shall use professional judgment and all relevant data to establish Harvest Limits by consensus, no later than January 15" (*Id.*). If the TFC fails to reach consensus, "multiple proposals shall be presented by the TFC to the Executive Council no later than January 31. . . ." (*Id.*). It is not clear why the Sault Tribe asserts that this timeline

is "inflexible" or "too rigid," as there appears to be a reasonable timeline to establish harvest limits when the relevant individuals fail to agree. Further, the Court finds these provisions to be improved from the 2000 Decree. Under the 2000 Decree, the preliminary harvest limit numbers were provided only one month prior to the establishment of final harvest limits, where the Proposed Decree provides for a forty-five-day timeline to review the preliminary numbers (*see* ECF No. 1458 at PageID.3257). And if an objection is raised, the Proposed Decree provides for an additional sixty days to reach consensus, which was not existent under the 2000 Decree. As discussed more thoroughly under CPMR's Objection 6, the Court finds the harvest-limit provisions in the Proposed Decree to be an improvement from the 2000 Decree.

> **Objection 75: Subsection VII.A.5 – Target Mortality Rates:** The Sault Tribe objects to the manner in which mortality rates are calculated.

Although the Sault Tribe objects to the "manner in which mortality rates are calculated," it does not state what review should be carried out or why the process used to calculate mortality rates is inappropriate. Absent a specific reason why the Sault Tribe objects to the calculation of mortality rates, the Court finds that this argument is waived. *See Stewart*, 628 F.3d at 256.

A thorough discussion of the calculation of mortality rates is below under CPMR's Objection 5. To summarize, target mortality rates are critical to setting sustainable harvest limits, and they will be set using the A-Max method. This method is more transparent and responsive to changes in fish stocks than the process used for lake trout under the 2000 Decree and builds on the procedure already used successfully for lake whitefish management

(*see McDonnell Affidavit*, ECF No. 2104-3 at PageID.14288–90, ¶ 12–14). The A-Max method is informed by age-specific vulnerability, where prior methods used static mortality and vulnerability assumptions for all fish regardless of age, and thus better accounts for age composition in fish populations (*Id.* at ¶ 15–26). Unlike the process used to implement target mortality rates for lake trout under the 2000 Decree, the A-Max method minimizes the probability that any fish, regardless of age, experiences a mortality rate greater than the target mortality rate. Additionally, adopting the A-Max method for lake trout will allow managers to use the same process for implementing target mortality rates for both lake trout and whitefish, the primary commercially targeted species (ECF No. 2104 at PageID.14144).

> **Objection 82: Subsection VIII.A – Allocation and Harvest Limits for Other Species:**
> The actions in the second sentence should not be triggered "if a request is made"; rather, they should occur if the Executive Council determines an allocation and harvest limits are needed.

Under the Proposed Decree, only lake trout and whitefish are allocated. The necessary data is not available to allocate other species. However, this provision in the Proposed Decree allows "[a]ny Party" to request that species be subject to allocation (*see* ECF No. 2042-1 at PageID.12203). Apparently, the Sault Tribe objects to the Parties being able to request allocation, as it wants only the Executive Council, a body of policymakers, to determine whether another species should be allocated. It is not clear how the Sault's proposal would be advantageous for the Tribes, as it would appear to undermine Tribal authority.

> **Objection 90: Subsection VIII.I – Management of Other Species:** It should take more than "a request" by "any party" to assess species management and develop management protocols. There should be consensus that such actions are necessary.

Like the previous objection, the Sault's proposal under this objection also appears to be disadvantageous for the Tribes. The Proposed Decree allows any party to request the TFC to perform an assessment of other species in order to create a management protocol (ECF No. 2042-1 at PageID.12205–06). The Sault objects because "more than" a request by a party—i.e., "consensus" among the Parties—should trigger the assessment of a species. The Stipulating Parties argue that this proposal "presents and infeasible implementation mechanism" (ECF No. 2124 at PageID.14900).  Regardless of the feasibility of this proposal, the Court does not see the practical advantage of the proposal, given that the Tribal opportunity to request assessment of a species would be undermined if a single party objected to the assessment. Further, this language is carried over from the 2000 Decree, and the Sault has failed to demonstrate that its implementation inhibited the Treaty right (ECF No. 1458 at PageID.3288).

> **Objection 93: Section IX – Stocking:** This section improperly leaves out the State requirement to give the Sault Tribe eyed up eggs from Bay de Noc upon request.

It is not clear what "requirement" the Sault Tribe is referencing. The Sault Tribe's proposed facts do not expound upon this objection any further to provide the Court with some context for this objection (*see* ECF No. 2123 at PageID.14848). The State contends that, "A provision regarding fish eggs appears in a separate agreement outside the decree, and it relates to what strains of fish the Parties may stock. All agreements regarding strains to be stocked are contained in separate agreements and never have been—and were not intended to be—included in the decree." (ECF No. 2103 at PageID.14039) (citing *Caroffino Affidavit*, ECF No. 2103-2 at PageID.14071, ¶ 7). Without any support as to why the Sault

Tribe believes the State is "required" to provide the Tribe with eyed up eggs, the Court declines to entertain this objection.

> **Objection 94: Subsection IX.B.1.a – Stocking Process:** The provision should include language that ensures protection of fishing opportunities for Tribal fishers.

This subsection of the Proposed Decree concerns the Parties' stocking obligations, and this specific provision identifies separate stocking zones (ECF No. 2042-1 at PageID.12207). Despite the Sault's objection, it is not clear why specific "language that ensures protection of fishing opportunities for Tribal fishers" should be included in this provision of the Proposed Decree, nor does the Sault Tribe suggest any such language. Because the stocking provisions of the Proposed Decree are subject to all Decree provisions, Tribal fishing opportunities are impliedly and sufficiently protected (*see* ECF No. 2104 at PageID.14155 n.29). Moreover, the relevant case law sufficiently protects Tribal fishers by ensuring that the Treaty and Decree are interpreted in favor of Tribal opportunity. *See, e.g.*, *Michigan*, 12 I.L.R. at 3081 (identifying "protection of Indian fishermen from discrimination in favor of other classes of fishermen" as a factor to consider when approving the decree); *LeBlanc*, 248 N.W.2d at 203–04) ("First, the Supreme Court has held that, so far as is possible, Indian treaties must be interpreted as the Indians would have understood them . . . Second, the United States Supreme Court has directed that ambiguities found in Indian treaties are to be resolved in favor of the Indians.").

> **Objection 115: Subsection XIV.B.4.a – Confidentiality of Commercial Harvest Data:** The State of Michigan should submit a legal opinion that this statement of the law (that Tribal commercial harvest data is not subject to public disclosure under Michigan FOIA) is correct. And there should be specified penalties for noncompliance with this provision in the event that data is unlawfully disclosed by the State.

Unlike the 2000 Decree, the Proposed Decree explicitly states that "Tribal commercial harvest data is not subject to disclosure under the Michigan Freedom of Information Act" (ECF No. 2042-1 at PageID.12216). This positive addition to the Decree will protect Tribal commercial fishers' confidential data, prevent targeting of Tribal fishers, and protect Tribal fishers from discrimination. The Sault Tribe argues that the State of Michigan should submit a legal memorandum that Tribal commercial harvest data is not subject to disclosure under the Michigan FOIA, Mich. Comp. Laws § 15.231 *et seq.* However, the State of Michigan has agreed not to disclose this data, and the Sault Tribe has provided no legal opinion that Tribal commercial harvest data *is* subject to disclosure under the Michigan FOIA. The Court has no reason to believe that the State will disclose this confidential data, given that it has committed not to do so.

**Objection 117: Subsection XIV.B.5.a – Disclosure of Commercial Harvest Data:** Commercial harvest data should not be provided without prior written approval of the owning/issue agency under any circumstances.

The Proposed Decree allows for commercial harvest data to be disclosed, in an anonymized format, to fisheries agencies and universities for bona fide scientific and management purposes (ECF No. 2042-1 at PageID.12216). The 2000 Decree contains similar language (ECF No. 1458 at PageID.3310–11) ("Data from catch reports . . . shall be provided to the parties and may be provided to other fisheries agencies for other bona fide scientific and management purposes."). The Sault Tribe has failed to demonstrate that sharing this data has caused problems under the 2000 Decree. Sharing this data for appropriate scientific purposes promotes conservation and proper management of the

fishery. And as a practical purpose, the United States contends that this data will likely not be disclosed absent a written request and approval (ECF No. 2104 at PageID.14160 n.39).

> **Objection 128: Subsection XVI.B – Enforcement Efforts:** The Decree inadequately addresses the issue of net damage and vandalism to Tribal nets, which is a serious problem. Prosecution of vandals and provisions for recoupment of costs arising from vandalism should be included.

This subsection of the Proposed Decree addresses enforcement efforts and establishes the Law Enforcement Committee ("LEC") (ECF No. 2042-1 at PageID.12221–25). It specifically includes a provision that requires the State and the Tribes to "maintain adequately equipped law enforcement personnel and resources to provide for public safety, protection of the resource, ensure compliance, prevent harassment and vandalism, and maintain public confidence" (*Id.* at PageID.12221). The Sault Tribe claims that this language is insufficient to address the "serious problem" of net vandalism. At the objections hearing, the Sault Tribe argued that the Proposed Decree should set up a fund to remedy any damage and vandalism to Tribal nets (ECF No. 2120 at PageID.14800).

The Court will overrule this objection because the Sault Tribe has failed to show that (1) net damage and vandalism has been a "serious problem," and (2) that the language contained in the Proposed Decree is insufficient to address future net damage and vandalism. Under the 2000 Decree, the LEC did not report that there was an "upsurge" in net vandalism, nor have there been any complaints made to the LEC regarding net vandalism (*Id.* at PageID.14801–02).[26] Moreover, all the Parties have the ability to prosecute purposeful net vandalism, and the victim can receive restitution (*Id.* at PageID.14802–03). In the Court's

---

[26] These assertions were presented by Bay Mills' counsel at the objections hearing, but no Party, including the Sault Tribe, has claimed that these assertions were inaccurate.

judgment, the Enforcement Efforts section of the Proposed Decree adequately addresses the

Sault Tribe's concerns about net damage and vandalism.

> **Objection 129: Section XVII – Executive Council:** For discussions of co-equal government leadership, the Governor should be identified as a participant if the elected leaders of the sovereign Indian Tribes are identified as participants.

Like the 2000 Decree, the Proposed Decree provides for the creation of an Executive

Council, which will meet at least annually to review the status of the fishery resource, the

implementation of the Decree, and any other matters appropriate for consideration by the

Parties at the policy level (ECF No. 2042-1 at PageID.12225). The Executive Council will

consist of the Tribal chairpersons, Director of the MDNR, and the Secretary of the Interior,

or their duly authorized representatives (*Id.*). The members of the Executive Council under

the Proposed Decree are the same as under the 2000 Decree (ECF No. 1458 at

PageID.3323–24). Yet, the Sault Tribe now objects because the State of Michigan Governor

should be a member of the Executive Council. This is an infeasible request. The Director

of the MDNR, an appointee of the Governor, has the authority from the State to represent

the State on the Executive Council. The Executive Council includes leadership from the

agencies who negotiated the Decree, and therefore, the MDNR, rather than the Governor,

is the appropriate State representative on the Executive Council (*see* ECF No. 2104 at

PageID.14161 n.38).

> **Objection 136: Section XXIII – Duration:** The Sault Tribe objects to the proposed twenty-four-year duration, which is longer than the prior 1985 Decree (15 years) and 2000 Decree (20 years). At most, any new decree should be limited to 20 years duration and should make clear that no precedent is created by the entry of any decree.

The Proposed Decree will have a longer duration than either of the previous two decrees. However, this duration is purposeful. The Proposed Decree incorporates three-year and six-year cycles for the review and setting of harvest limits and mortality rates (*see* ECF No. 2042-1 at PageID.12200, 12201). Thus, the twenty-four-year duration, which is a multiple of three and six, makes sense to incorporate these review cycles. Further, the Proposed Decree clearly states that it does not create precedent (*Id.* at PageID.12232).

### 8.   The Challenged Provision Fails to Protect the Resource

**Objection 130: Section XX – Environmental Commitments:** This section as a whole fails to hold the federal and State governments to account for their roles in authorizing destruction of the fishery through failures in environmental regulation.

This entire section of the Proposed Decree is entirely new from the 2000 Decree, and it represents a significant improvement from the 2000 Decree. This section was implemented in response to the drastically changed fishery, which has been affected by invasive species and other environmental problems (*see* ECF No. 2120 at PageID.14804). It commits all the Parties to monitor the fishery, combat invasive species, and rehabilitate the fishery (*see* ECF No. 2042-1 at PageID.12228–29). This objection attempts to place blame on the United States and the State for the decline in the fishery, but there are numerous factors that affected the fishery, and it is impossible to place the blame on any one factor. Overall, this section is a significant step forward from the 2000 Decree to protect the fishery, and the Sault Tribe fails to explain what additional measures should be placed within this section (*see* ECF No. 2103 at PageID.14054) ("The provision commits the State to continue to support important measures affecting the Great Lakes fishery, within the confines of what

108

the State can legally obligate itself to do and the realities of funding restraints. Sault Tribe does not explain how this new section justifies rejection of the Proposed Decree.").

**Objection 131: Subsection XX.A – United States' Environmental Commitments:** This subsection fails to place any specific enforceable commitment on the United States to prevent environmental harm or restore the fishery from past harm. It effectively maintains the status quo to the detriment of the resource and Tribal Treaty rights.

Contrary to the Sault Tribe's objection, the United States and State of Michigan have committed to continued efforts for controlling invasive species, stocking, and researching ways to improve both efforts. The Sault Tribe's assertion that this commitment maintains the "status quo," is plainly incorrect, as the 2000 Decree contained nowhere near the environmental commitments that the Proposed Decree contains. To the extent other measures are required, the Proposed Decree establishes an Environmental Committee to review topics of biological concern, such as pollution and climate change, and it allows the Parties to explore additional measures. The creation of the Environmental Committee will allow the United States to consistently review the needs of the Parties in order to advocate for additional protections where needed and appropriate (*see* ECF No. 2104 at PageID.14163). The Court commends the Parties for taking seriously the environmental concerns affecting the fishery, and it endorses the provisions that the Parties have committed to in the Proposed Decree.

**Objection 132: Subsection XX.B – State of Michigan's Environmental Commitments:** This subsection fails to place any specific enforceable commitment on the State to prevent environmental harm or restore the fishery from past harm. It effectively maintains the status quo to the detriment of the resource and Tribal Treaty rights.

The Proposed Decree commits the State of Michigan to the same environmental obligations as the United States (ECF No. 2042-1 at PageID.12228–29). The Proposed Decree commits the State to continue to support important measures affecting the Great Lakes fishery, within the confines of what the State can legally obligate itself to do and the realities of funding restraints (*see* ECF No. 2103 at PageID.14054). For the reasons explained above, the Court approves the language contained in the Environmental Commitments section of the Proposed Decree.

> **Objection 133: Subsection XX.C – Environmental Committee:** This subsection fails to place any specific enforceable commitments on the United States or the State to prevent environmental harm or restore the fishery from past harm.

The Environmental Committee will be newly established under the Proposed Decree, and its existence alone is a significant improvement from the 2000 Decree. The provision states who will be on the committee and directs the group to meet, "review topics of environmental concern," and provide information to the Executive Council for policy-level discussion and consultation (ECF No. 2042-1 at PageID.12229). The establishment of this committee is an improvement, not a detriment to the Treaty right, and the Sault Tribe fails to explain why this new committee justifies rejection of the Proposed Decree (*see* ECF No. 2103 at PageID.14054).

In sum, none of the Sault Tribe's objections show that the Proposed Decree is unreasonable or inconsistent with the Treaty or the law of the case. However, the Stipulating Parties have established that the Proposed Decree is in the best interest of the fishery and all the Parties, including the Sault Tribe. The Sault Tribe's objections represent what the Sault Tribe's preferred decree, with no compromise from the other Parties, would provide. Such

an outcome is not feasible, nor in the best interest of the resource. Memorializing the good faith efforts (over a period of 3 years) during mediation under the leadership of retired Michigan Supreme Court Justice Michael Cavanagh, the Proposed Decree represents compromise among the seven Parties where not one Party's needs dominate over another's. After careful consideration of the Sault Tribe's objections, the Court will enter the Proposed Decree over the objections of the Sault.

## C.  Sault Tribe's Motion for Reconsideration

Additionally, the Court must address one related matter: the Sault Tribe's motion to reconsider the indefinite extension of the 2000 Decree (ECF No. 2046). About one month after the Court indefinitely extended the 2000 Decree "until all objections to a proposed successor decree have been adjudicated," the Sault Tribe moved for reconsideration of that order, arguing that it should not be subject to the 2000 Decree because it did not agree to the indefinite extension (ECF No. 2046). Upon entry of the accompanying order, the Proposed Decree will become effective as to all Parties, including the Sault Tribe. Thus, the Sault Tribe will no longer be subject to the indefinite extension of the 2000 Decree, and the Sault Tribe's motion for reconsideration shall be denied as moot.

## IV.   CPMR's Objections

CPMR, which is a "group representing the interests of various sport fishing groups" (ECF No. 2125 at PageID.14980), seeks to "protect the Great Lakes for generations to come for all that share the resource" (ECF No. 2062 at PageID.12503). CPMR consists of State-licensed fishers; thus, because the State holds the fishery in trust for the public, including CPMR, CPMR has no independent right to use the resource (*see* ECF No. 1985 at

PageID.11675). Although CPMR and its predecessor organizations have unsuccessfully moved to intervene in this matter on eight different occasions in this Court and four times on appeal, CPMR has been actively participating in this case as an *amicus* for decades, and the Court therefore permitted CPMR to file objections to the Proposed Decree. *See United States v. Michigan*, 68 F.4th 1021, 1024, 1029–30 (6th Cir 2023).[27] CPMR's objections essentially adopt the opposite view of the Sault Tribe's objections (*see* ECF No. 2062). While the Sault Tribe argues that the Proposed Decree imposes too many regulations on the Tribes, CPMR argues that the Proposed Decree does not go far enough in its regulation of the fishery. CPMR is concerned with the environmental impact of the Proposed Decree, particularly its expansion of gill net fishing, "disastrous" harvest limits and target mortality rates, and the lack of conservationist efforts for all the species of fish in the Treaty waters. In the Court's judgment, the Proposed Decree represents a medium between CPMR and the Sault's objections, and it protects the resource while appreciating the Treaty right. For the following reasons, the Court will also overrule all of CPMR's objections.

## A. Witnesses

CPMR has provided affidavits from both proposed expert and fact witnesses (*see* ECF Nos. 2062-2–2062-7). The Court finds that Mr. James E. Johnson, a retired Great Lakes fishery research biologist, qualifies as an expert in Great Lakes fishery biology pursuant to Fed. R. Evid. 702, and the Court will weigh the assertions in Mr. Johnson's affidavit accordingly (*see* ECF No. 2062-5). However, the Court declines to give any weight to the

---

[27] For a detailed history of CPMR's attempts to intervene in this case, see the United States, Bay Mills, Little Traverse, and Little River Band's response in opposition to CPMR's most recent motion to intervene (ECF No. 1970-1 at PageID.11095–99).

report attached to Mr. Johnson's affidavit (*Id.* at PageID.12619–49). Although the report is not directly attributable to an author, it was supposedly authored by Mr. Johnson using "the literature research that [CPMR] conducted" (ECF No. 2062-5 at PageID.12606). It is unclear what qualifications CPMR, a sports fisher organization, possesses to provide the research for Mr. Johnson's report, and the report fails to identify the methods by which its information was discovered, produced, or analyzed. Therefore, absent proper support, the Court will not consult the report attached to Mr. Johnson's affidavit.

CPMR also provides affidavits from two additional fisheries biologists, Christopher Horton (ECF No. 2062-2) and David P. Borgeson (ECF No. 2062-3). The Court will accept their expert testimony regarding Great Lakes fishery biology and will give it the appropriate weight under Fed. R. Evid. 702.

The Court finds that the remaining affidavits submitted by CPMR's witnesses qualify as lay witness testimony, to the extent they provide testimony on personal experience, under Fed. R. Evid. 701. Frank Krist, a retired Environmental Health Officer and the current Vice President of the Hammond Bay Area Anglers Association, lacks the professional experience, credibility, and qualifications to provide his opinions on gill netting and assessment fishing (*see* ECF No. 2062-3). Scott McLennan, the mayor of Rogers City, lacks the professional experience and qualifications to provide his opinion on gill net fishing and its biological impact on the fishery (*see* ECF No. 2062-6). Finally, Captain William Winowiecki, President of the Michigan Charter Boat Association, lacks the professional qualifications and credibility to give his opinion on safety concerns surrounding gill nets (*see* ECF No. 2062-7). With respect to any opinion testimony provided in these affidavits, the Court affords it no weight.

As for the Stipulating Parties' expert witnesses who provide affidavits in response to CPMR's objections, as explained above, the Court finds that Dr. Caroffino (ECF No. 2084-1), Mr. Koproski (ECF No. 2086-2), and Dr. McDonnell (ECF No. 2086-7) are all qualified to give expert testimony regarding the Great Lakes fishery, biological principles of the fishery, the management framework of the fishery, and the relationship between the fishery and the Decrees. *See supra* note 14. The Court also accepts the expert testimony regarding Great Lakes fishery biology from Michael Seider, a supervisory fish biologist for the USFWS (ECF No. 2086-3); Susan E. Wells, a supervisory fish biologist for the USFWS (ECF No. 2086-4); and Dr. Matthew Kornis, a fish biologist at the Green Bay Fish and Wildlife Conservation Office for the USFWS (ECF No. 2086-5).

## B. Objections

1. **Allocation of the fishery:** The Proposed Decree abandons the concept of a roughly equally shared fishery resource and allocates approximately 70% or more of the available harvest to the Tribes, thereby denying the public reasonable access to and opportunities with the Great Lakes fishery within the Treaty waters.

Since the 1985 Decree, the Parties have operated according to the principle that the fishery is a shared resource to be allocated roughly equally between the State and the Tribes, given that it is impossible to allocate the fishery exactly equally, nor does the Treaty require an equal allocation (*see* ECF No. 2119 at PageID.14584–85). Thus, the starting point for allocating the fishery is a 50-50 split, but of course, depending on many factors—including the biological state of the fishery and the result of negotiations—a 50-50 allocation may not be the final allocation in the Decree. In 1985, the Court declined to adopt a strict 50-50 allocation, and it instead found that the zonal management plan—which included certain gear

restrictions and seasonal restrictions—was more equitable than an exact 50-50 allocation. *See*

*Michigan*, 12 I.L.R. at 3084–85. CPMR acknowledges that the 2000 Decree operated under

about a 60-40 allocation of the species available to allocate, with 60% to the Tribes and 40%

to the State (ECF No. 2062 at PageID.12508).

Importantly, the State contends that, to allocate a certain species of fish, "the parties

must have sufficient data to determine how much of that species can be safely harvested"

(ECF No. 2084 at PageID.12957) (citing *Caroffino Affidavit*, ECF No. 2084-1 at

PageID.12986–87, ¶ 4). Because such data is not available for the majority of species, only

two species—lake whitefish and lake trout—are allocated between the State and the Tribes

(*Id.* at PageID.12958). There is no allocation plan regarding the remaining species (more

than 30) of fish that are harvested from the Great Lakes (*Id.*). Because the Tribes mainly

harvest whitefish, under the Proposed Decree, 90% of whitefish are allocated to the Tribes

(*Id.*). As for lake trout, the Tribes and State will share that species approximately equally,

which is not changed from the 2000 Decree (*compare* ECF No. 1458 at PageID.3256, *with*

ECF No. 2042-1 at PageID.12201). And because State recreational fishers harvest

"sportfish"—e.g., Chinook and coho salmon, steelhead, brown trout, and smallmouth bass—

although there is no allocation plan for these species (because the necessary data does not

exist), these species are reserved for State recreational fishers (ECF No. 2084 at

PageID.12958; ECF No. 2086 at PageID.13063).

CPMR's first objections states:

> Estimates of the allocation now contained in the Proposed Decree approach
> 70% while gear limitations and zones in the 2000 Consent Decree that
> permitted State-licensed fishers to obtain their allocation are largely

> eliminated. One need only consider the major shift in the allocation of whitefish and lake trout to the Tribes in Lake Superior to understand that the 60% allocation for the last 22 years will now approach 70% or more under the Proposed Decree.

(ECF No. 2062 at PageID.12508). CPMR's written objection is unclear as to how CPMR calculated the 70% figure because CPMR provided no data or calculations to support this number. Moreover, though CPMR states that 70% "of the available harvest" is allocated to the Tribes, no data exists to make such an assertion, as there is only available data regarding the whitefish and lake trout species (*see Caroffino Affidavit*, ECF No. 2084-1 at PageID.12986–87, ¶ 4).

All the Stipulating Parties and the Sault dispute CPMR's calculations (*see* ECF Nos. 2083, 2084, 2085, 2086). According to the State and the United States, the allocation plan under the Proposed Decree is very similar to the allocation plan that was used under the 2000 Decree, which CPMR previously approved (*see* ECF No. 2086 at PageID.13063). With regard to CPMR's assertion that the "major shift in the allocation of whitefish and lake trout to the Tribes in Lake Superior" is a cause of the "70%" allocation to the Tribes (ECF No. 2062 at PageID.12508), the State explains that such assertion is "unfounded" (ECF No 2084 at PageID.12959). Compared to the 2000 Decree, the Proposed Decree makes no changes to the allocation of whitefish in Lake Superior, and although the Tribal allocation of lake trout will increase in one unit of Lake Superior, that increase is offset by increases in State allocation in Lake Michigan (*Id*.).

At the objections hearing, CPMR shed some light on how it reached its unsupported assertion that 70% of the available harvest has been allocated to the Tribes under the

Proposed Decree: "While the allocation [under the previous decrees] has been roughly 50/50, the [T]ribes have taken 70 percent of the lake trout, and the State recreational fishers have taken 30 percent of the lake trout. This presents a concern that the real allocation between the [P]arties is more like 70/30. . . ." (ECF No. 2119 at PageID.14576). Despite the fact that CPMR's attempt at supporting this objection is likely waived given its failure to do so in its written objections, *see Baum*, 2019 WL 6971369, at *3, CPMR's contention that the Proposed Decree allocates 70% of the fishery to the Tribes is plainly wrong (*see Caroffino Affidavit*, ECF No. 2084-1 at PageID.12986–88, ¶ 4–5). CPMR's objection improperly equates *allocation* with *harvest* (*see* ECF No. 2119 at PageID.14586) ("[A]llocation is [defined as fishers being] entitled to take this many fish . . . Harvest is how many [fish these fishers] go and get. And that may not be full allocation for any number of reasons."). Just because State recreational fishers have not traditionally yielded their full allocation does not mean they were entitled to less than their full allocation (*see id.* at PageID.14586–87). Moreover, just because State recreational fishers choose not to harvest their full allocation does not mean the Tribes should be forced to reduce their allocation.

The Stipulating Parties have properly shown that the species with the appropriate data supporting allocation have been allocated approximately equally under the Proposed Decree in accordance with the law of this case (*Caroffino Affidavit*, ECF No. 2084-1 at PageID.12987–98, ¶ 5); (*Koproski Affidavit*, ECF No. 2086-2 at PageID.13100–01, 13108); *see also Michigan*, 12 I.L.R. at 3084–85 (approving an allocation plan that did not allocate the fishery exactly equally because it "lack[ed] predictability, stability, and invite[d] the continued social conflict so evident in the past"). Conversely, CPMR's objection improperly

equates harvest and allocation, and CPMR has failed to support its contention that the Proposed Decree allocates to the Tribes 70% of the "available harvest." For these reasons, and because the allocation plan under the Proposed Decree is very similar to the allocation plan under the 2000 Decree, the Court will overrule CPMR's first objection.

> 2. **Gill net fishing:** The Proposed Decree abandons the initiative emphasized in the 2000 Consent Decree to move away from the destructive, lethal, gill net fished by the Tribes and to more selective and far less lethal trap nets. The change from gill net fishing to trap net fishing was in no small part a reason for the increasing natural reproduction of lake trout in the treaty waters of the Great Lakes. The Proposed Decree greatly expands the destructive practice of gill net fishing and is at odds with the biological capacity of the Great Lakes.

The gist of CPMR's next objection is that gill net effort is greatly expanded in the Proposed Decree compared to the 2000 Decree. Under the Proposed Decree, the Tribes will be allowed to use gill nets in more zones and more frequently throughout the year. CPMR contends that gill nets are a "lethal" and "destructive" manner to harvest fish because gill nets kill everything that gets caught in the nets, regardless of what species the fisher was targeting (ECF No. 2062 at PageID.12509). Conversely, when fishers use trap nets, where the fish swim into a netted compartment (called "pots") and are able to swim around alive until the net is pulled up to the boat, the fisher can release the species of fish caught in the trap nets the fisher did not intend to catch (*see* ECF No. 2062 at PageID.12510) ("[T]he 2000 Consent Decree . . . aimed to remove 'at least fourteen (14) million feet of large mesh gill net effort from Lakes Michigan and Huron by 2003. . . .' (2000 Consent Decree, Article X(B)). In stark contrast, the Proposed Decree massively expands gillnet fishing into new waters, undoing any of this effort to preserve the fishery resource while seriously jeopardizing the health of the Great Lakes fishery.").

118

In response, the Stipulating Parties explain that CPMR misunderstands the impact of gill nets on the fishery. Most importantly, fishing under the Proposed Decree will continue to be governed by harvest limits, just like the 2000 Decree (*see* ECF No. 2084 at PagID.12960). In other words, the manner in which the Tribes catch the fish is totally irrelevant because their total harvest is limited (*see Caroffino Affidavit*, ECF No. 2084-1 at PageID.12989, ¶ 6) ("The proposed decree includes a commitment by the State and the Tribes to not exceed their respective harvest limit. The method (gill net, trap net, hook and line) by which fish are harvested does not matter, if the total harvest stays within the harvest limit."). Whether they meet that harvest limit quickly by using the efficient method of gill nets, or whether they meet that harvest limit over time by using less efficient means of fishing, the Tribes are still subject to the same harvest limits regardless of gear used (*see* ECF No. 2119 at PageID.14531).[28] Notably, CPMR's biological expert, James E. Johnson, a "retired Great Lakes fishery research biologist and current Chair of the Besser Museum for Northeast Michigan Fishery Heritage Project," fails to address the impact of harvest limits on the expansion of gill nets under the Proposed Decree (*see* ECF No. 2062-5).

With respect to CPMR's concerns about bycatch (the unintentional catching of non-targeted species), the Proposed Decree includes provisions specifically aimed at reducing the likelihood of bycatch, including limitations on when gill nets can be used and how deep they must be set (*see, e.g.*, ECF No. 2042-1 at PageID.12197, 12206). Notably, all the species of fish in the Great Lakes are not constantly swimming around every square inch of the Great

---

[28] The zones where gill net fishing is allowed will also be governed by seasonal closures and depth restrictions, and of course, there are many zones where gill net fishing is not allowed at all (*see* ECF No. 2119 at PageID.14531).

Lakes; rather, certain species stick together in certain types of conditions (i.e., depending on the water temperature, depth, etc.). The Tribes know how to target specific species, and the issue of bycatch is not nearly as big of a problem as CPMR contends:

> [D]ata collected during fish surveys conducted by the Michigan Department of Natural Resources (MDNR) in Lake Michigan using gear similar to what Tribal commercial fishers use show that Atlantic salmon, brown trout, rainbow trout, and smallmouth bass, which are sportfish that commercial fishers are not allowed to harvest, collectively made up less than 1 percent of the catch between 1998 and 2019. (Caroffino Aff., ¶ 7.) Some sportfish species were not caught at all, and Chinook and Coho salmon made up only 0.5 percent of the catch. (*Id.*).

(ECF No. 2084 at PageID.12961). Although Mr. Johnson poses concerns about bycatch in Tribal gill nets, he fails to acknowledge the minimal percentage of bycatch that is caught by gill nets (*see* ECF No. 2062-5). Further, the expanded information sharing system will serve as an additional protection from extreme gill net bycatch because it will help the Parties identify in the future if bycatch from gill nets becomes problematic, and the Parties could work together to impose a solution.

CPMR has failed to establish that the increased use of gill nets under the Proposed Decree will be harmful to the fishery. Indeed, "[t]he treaty-guaranteed fishing rights preserved to the Indians in the 1836 Treaty, including the aboriginal rights to engage in gill net fishing, continue to the present day as federally created and federally protected rights." *Michigan*, 653 F.2d at 278. Although "evidence suggests that *overuse* of gill nets could 'deplete the fish resources of the Great Lakes to the extent that they would be non-existent'" the key word is "overuse." *See Michigan*, 68 F.4th at 1024 (quoting *Mich. United Conservations Clubs v. Anthony*, 280 N.W.2d 883, 888–91 (Mich. Ct. App. 1979))

(emphasis added). The Proposed Decree utilizes sufficient protections and regulations to ensure that overuse of gill nets does not occur.

3. **Lake trout and whitefish rehabilitation:** The Proposed Decree fails to adequately address lake trout rehabilitation or the steep decline of whitefish in lakes Huron and Michigan. A collapse of both of these will cause economic extinction of fishing industries and livelihoods.

CPMR's argument on this objection is contained within the objection regarding gill nets (ECF No. 2062 at PageID.12511–14). CPMR asserts that expanding gill net fishing in Lake Michigan and Lake Huron "is at odds with the reproduction and sustainability of Lake Trout" (*Id.* at PageID.12511). CPMR again relies on the affidavit of Mr. Johnson (ECF No. 2062-5 at PageID.12603). With respect to lake trout in Lake Michigan, Mr. Johnson contends that lake trout harvest is already too high in the areas where gill net fishing would be expanded under the Proposed Decree:

> It is my opinion that excessive lake trout harvest is already being permitted around Lake Michigan's Northern Refuge. MM-1, 2, 3 and portions of MM-5 are adjacent to or near the Lake Michigan Northern Refuge. But mortality rates are already too high in MM-1, 2, 3 for the development of spawning stocks. The Proposed Decree would incentivize increased gillnet fishing there, exacerbating the mortality issue. The utility of a spawning refuge is seriously compromised when spawning-age fish are scarce.

(ECF No. 2062-5 at PageID.12611, ¶ 12(g)(4)). CPMR does not raise any supporting argument with respect to whitefish rehabilitation in Lake Michigan.

Johnson makes similar statements with respect to the population of lake trout and whitefish in Lake Huron:

> The appropriate biological response is to take a conservative approach to setting harvest levels in a new decree that protects the diminished whitefish stocks from overharvest while taking precautionary measures to protect lake trout as the focus of fishing shifts from whitefish to this recovering native

121

species. The Proposed Decree, however, makes available additional fishing opportunities that will heighten harvest pressure on fragile resources . . . The Proposed Decree expands gillnetting opportunities to the detriment of the Great Lakes fishery. This expansive new gillnetting will increase fishing pressure, enable more efficient targeting of lake trout and walleye, and expand gillnetting into areas and zones where they were not previously allowed. It represents a step backward from the framework of the 2000 Consent Decree, which directed $14 million to converting nonselective, lethal gillnets to trapnet fisheries.

(*Id.* at PageID.12608, ¶ 12(a)-(b)). To summarize this objection, CPMR asserts that "[t]he biological information describes a resource in crisis, with lake whitefish abundance at historic low points and lake trout recovery still in early stages in [L]akes Huron and Michigan" (*id.* at PageID.12607, ¶ 10), and the expansion of gill net fishing will only exacerbate the problem of the diminishing population of lake trout and whitefish.

In response, the Stipulating Parties note that lake trout population "are showing signs of gradual improvement" (ECF No. 2086 at PageID.13067) (citing *Kornis Affidavit*, ECF No. 2086-5 at PageID.13201–03, ¶¶ 19, 24). For the most part, the Proposed Decree does not change the regulations regarding the Northern Lake Michigan Lake Trout Refuge ("the NLMR") (as discussed above by Mr. Johnson) (*Id.*). The Proposed Decree allows gill netting in only two previously closed management units close in proximity, but not adjacent to, the NLMR (*Id.*). However, "fishery-independent assessment surveys" show that the NLMR provides sufficient protection to stocked lake trout, supporting the rehabilitation of lake trout (*Id.*). 36% of the lake trout stocked in the NLMR never leave the refuge and were, therefore, never harvested (*see Kornis Affidavit*, ECF No. 2086-5 at PageID.13199, ¶ 15). On the other hand, 88% of lake trout that were stocked in nearby non-refuge waters were harvested in

commercial fishing areas (*Id.*). Thus, the Stipulating Parties argue that efforts to rehabilitate

the lake trout population in Lake Michigan under the Proposed Decree are sufficient.

As for rehabilitating the lake trout population in Lake Huron, the Proposed Decree

seeks to remedy some issues that arose from the 2000 Decree regarding this issue:

> The Proposed Decree opens some parts of the DIR [Drummond Island Refuge] to gill netting because the data indicate these areas are not needed to serve the refuge's lake trout rehabilitation goal. Exhibit E, McDonnell Aff. ¶¶ 18–20; Kornis Aff. ¶ 27. Like other refuges, the DIR is stocked with lake trout to facilitate rehabilitation and fisheries managers track the efficacy of the refuge. *See* Kornis Aff. ¶¶ 27–31; McDonnell Aff. ¶¶ 18-20; Wells Aff. ¶ 14. Certain areas in the refuge are too deep for lake trout spawning habitat, McDonnell Aff. ¶ 20, and anywhere from 79% to 92% of stocked lake trout migrate east into Canadian waters, Kornis Aff. ¶ 27. 10 This finding means that the 2000 Decree refuge boundaries included areas that did not support the refuge's goals. As such, the Proposed Decree opens areas that are not primarily used for lake trout spawning to gill netting, but still includes spawning refuge protections. ECF 1458, PageID.3264; ECF 2042-1, PageID.12202. These changes make DIR management better tailored to lake trout conservation and supportive of treaty fishing opportunity.

(ECF No. 2086 at PageID.13070). Although the Stipulating Parties do not directly address

whitefish rehabilitation efforts in either Lake Michigan or Lake Huron, they do note that

mortality rates for whitefish will be regularly reviewed every six years, and CPMR's concerns

about gill net fishing are unfounded, as explained above. Further, the Parties have committed

to "continue to evaluate the success of stocking Lake Whitefish as a possible means of

recovering stocks" (ECF No. 2042-1 at PageID.12208) (*see also id.* at PageID.12228–29).

In the Court's judgment, the Proposed Decree adequately addresses rehabilitating the

lake trout and whitefish populations (*see id.* at PageID.12206–08). CPMR's assertions

regarding the speculative negative effects of gill netting are properly redressed by numerous

regulations in the Proposed Decree, and the Parties have committed to adequate stocking

and rehabilitation obligations. It is in everyone's best interest to ensure that the fishery is viable into perpetuity, and the Court views the environmental commitments in the Proposed Decree as a significant improvement from the 2000 Decree.[29]

4. **Walleye and perch:** The Proposed Decree drastically increases gill net fishing for the relatively small, finite walleye and perch populations with seemingly no limitations. A collapse of the walleye and perch populations will cause economic extinction of fishing industries and livelihoods.

Similar to the previous objection, CPMR takes issue with the Proposed Decree's "expansion" of small mesh gill net zones for walleye and yellow perch (ECF No. 2062 at PageID.12516). CPMR describes the Proposed Decree as a "drastic shift from the 2000 Consent Decree" regarding small mesh gill net zones, and it states that the current perch and walleye stocks "are not sufficient within the 1836 Treaty Waters to sustain direct commercial fishing as set forth in the expanded gillnet areas." (*Id.*). Mr. Johnson states that the 1836 Treaty Waters are "too cold and unproductive" to be capable of producing a sustainable walleye and perch fishery, and the only way to produce a sustainable commercial fishery is to implement stocking measures (ECF No. 2062-5 at PageID.12609, ¶ 12(d)).

In response, the State asserts that 99% of commercial walleye harvested in the 1836 Treaty Waters have come from large mesh gill nets, meaning the changes to the small mesh gill net opportunity in the Proposed Decree will not affect the walleye population (*see* ECF

---

[29] The Court accepts the Stipulating Parties' proposed finding of fact #108:

> To reduce social conflict and protect the fishery, the expansion of gill netting opportunity under the Proposed Decree is regulated through (1) harvest limits and bag limits, (2) depth and mesh-size restrictions, (3) net-length and seasonal restrictions, (4) spawning closures, and (5) refuges. Seider CPMR Resp. Aff. ¶¶ 9, 13, ECF 2086-3, PageID.13112, 13113; Kornis CPMR Resp. Aff. ¶ 34, ECF 2086-5, PageID.13207; Wells CPMR Resp. Aff. ¶¶ 8, ECF 2086-4, PageID.13122.

(ECF No. 2124 at PageID.14904).

No. 2084 at PageID.12965) (citing *Caroffino Affidavit*, ECF No. 2084-1 at PageID.12995, ¶ 13). As for yellow perch, the State asserts that its data show that yellow perch are only caught in Munising Bay, which will be closed to gill net fishing under the Proposed Decree (*Id.*). And finally, the Proposed Decree includes management provisions specifically for commonly harvested species, including walleye and yellow perch (*see* ECF No. 2042-1 at PageID.12204-05). The Court accepts Dr. Caroffino and the Stipulating Parties' assertions regarding the management of walleye and yellow perch.

Because changes to the small mesh gill net opportunity under the Proposed Decree are not likely to change the amount of walleye and yellow perch harvested, the Court will overrule this objection.

> **5. Undefined target annual mortality rates:** The Proposed Decree fails to define target annual mortality rates for Lake Trout and Whitefish, making it impossible for this Court to determine the impact the Proposed Decree would have on the Great Lakes fishery.

The Proposed Decree does not define specific target annual mortality rates[30] for lake trout and whitefish (*see* ECF No. 2042-1 at PageID.12200). Instead, the Stipulating Parties have already agreed to target annual mortality rates not contained within the Decree, which will go into effect upon the approval of the Proposed Decree (ECF No. 2084 at PageID.12967). The Stipulating Parties contend that the exclusion of mortality rates in the Proposed Decree was deliberate because the Parties will be provided greater flexibility in addressing changes to the fishery (*Id.*); (*see also* ECF No. 2119 at PageID.14516–17)

---

[30] Mortality rates are defined as "the proportion of fish that die in a given year" (ECF No. 2084-1 at PageID.12996). Mortality rates are important because, without target mortality rates, harvest limits could not be calculated (ECF No. 2086 at PageID.13075).

("[Mortality rates] appeared in the 2000 decree which meant they were kind of hard wired into the parties' agreement, and the effect of that was that the parties would have had to come to the Court in order to change it, either by stipulation or some other method. And also the sort of practical effect that they ended up being the same for 23 years. They haven't been changed. So pulling them out is actually intended to provide greater flexibility for the parties to address changes in the fishery, because they can be changed without the Court's involvement.").

CPMR objects to the fact that the Proposed Decree does not contain defined mortality rates for lake trout and whitefish (*see* ECF No. 2062 at PageID.12516). It argues that the Court cannot properly assess whether the agreed-upon mortality rates are sufficient to sustain the fishery, given that the Proposed Decree does not state what these rates are. Moreover, without providing the calculations or necessary support, CPMR contends that mortality rates for all species must be set at 40% or lower to allow the species to naturally reproduce and become self-sustaining (*see* ECF No. 2119 at PageID.14495); (*see also Johnson Affidavit*, ECF No. 2062-5 at PageID.12610) ("Mortality targets for lake trout, if set at 40% or lower, produce harvest policy that favors reproduction—that is self-sustaining lake trout populations that are less dependent or independent of stocking.").

In response, the Stipulating Parties address the problems the Parties faced under the 2000 Decree, which defined exact mortality rates (ECF No. 2084 at PageID.12968). Definite mortality rates suggested that these rates were "stagnant and not meant to change," disincentivizing the Parties from reviewing mortality rates (*Id.*). Further, changing the mortality rates would have required a court order. Not providing for specific mortality rates

126

in the Proposed Decree—but operating pursuant to the rates that the Stipulating Parties have agreed to—allows for the Parties to regularly review mortality rates and change them without court intervention. As an additional precaution, the Proposed Decree defines "mortality" more conservatively than the 2000 Decree:

> The target annual mortality rate for lake trout will represent the maximum level of mortality that can occur for any age in the population that is vulnerable to fishing. (Caroffino Aff., ¶ 14.) This is a more conservative approach to mortality than the definition that was used during implementation of the 2000 Decree, where the target mortality rate essentially represented an average mortality rate that had to be achieved across the ages that could be caught by the fishing gear.

(*Id.* at PageID.12969); (*see also* ECF No. 2086 at PageID.13075) (explaining the "A-Max" method used for the Proposed Decree, a "conservation-focused" method of calculating mortality rates).

The Court endorses the Stipulating Parties' purposeful exclusion of specific mortality rates in the Proposed Decree. Doing so incentivizes the Parties to review the mortality rates often and make changes when necessary, and making changes will not be a burdensome process, as a court order will not be required. Further, excluding mortality rates from the Proposed Decree will actually promote conservation of the fishery, contrary to CPMR's contentions, because mortality rates will be reviewed and adjusted when necessary, unlike under the 2000 Decree (*see* ECF No. 2119 at PageID.14517).

Finally, although these rates are not expressly included in the Consent Decree, the Parties have agreed upon a 55% mortality rate for all lake whitefish, and a 42% to 50% mortality rate for lake trout, depending on the management unit, using the conservation-focused and more biologically accurate A-Max method (ECF No. 2086 at PageID.13075;

127

No. 2119 at PageID.14504–07). CPMR's contention that all mortality rates should be set at 40% regardless of species or location is undeveloped and unsupported. No single mortality rate fits every fish population in each management unit because different populations may experience different relative sources of mortality due to circumstances other than harvest (*see* ECF No. 2124 at PageID.14885) (citing *McDonell Affidavit*, ECF No. 2104-3 at PageID.14288–89, ¶ 12). In addition, it is not even clear how or what method CPMR used in calculating its proposed uniform mortality rate (*see* ECF No. 2119 at PageID.14504).

The Court approves the Parties' use of the A-Max method in calculating mortality rates, which "calculates target annual mortality rates for each age class and then sets target mortality rates for the maximum level of mortality that will be experienced by any age," rather than the target age approach (also known as the "knife's edge approach"), which inaccurately "assumed that all harvested lake trout were around five years old and calculated mortality rates using that assumption" (*Id.* at PageID.14504–05). Although it is not necessary for the Court to assess the target mortality rates the Stipulating Parties have agreed upon—given that they are not contained within the Proposed Decree—the Court would find that they are supported by biology and promote conservation of the fishery (*see Koproski Affidavit*, ECF No. 2086-2 at PageID.13094–96, ¶¶ 9–14).

6. **Review of harvest limits and target annual mortality rates:** The Proposed Decree fails to frequently review harvest limits and target annual mortality rates. This creates an issue of responsiveness to issues that will inevitably arise through the life of the Proposed Decree. Fishery management has to be more nimble to respond to the changing dynamics of the fishery.

Along the same lines as the previous objection, CPMR objects to the period of review regarding mortality rates and harvest limits (*see* ECF No. 2062 at PageID.12518). While the

Proposed Decree provides for a six-year period of review for mortality rates and a three-year period of review for harvest limits, CPMR believes that they each should be reviewed annually (*see* ECF No. 2119 at PageID.14500). CPMR asserts that this purported infrequent review could result in "disastrous consequences" to the fishery if overfishing is not remedied immediately (ECF No. 2062 at PageID.12520).

With respect to review of harvest limits, under the Proposed Decree, harvest limits will be reviewed every three years, rather than annually under the 2000 Decree (ECF No. 2084 at PageID.12971). This change was deliberate. The two species for which harvest limits are set (lake trout and whitefish) live up to twenty years of age, which means that the populations are made up of a variety of ages (*Id.*). Therefore "unless there is an extreme level of mortality due to unexpected circumstances, populations will not significantly change from year to year, making a longer review period appropriate" (*Id.*). Further, annual review—again, which was implemented under the 2000 Decree—is not practical because it would force the Parties to use incomplete data in determining harvest limits, due to the short timeline for collecting data (*Id.*); (ECF No. 2086 at PageID.13077). The Stipulating Parties claim that "[e]xtending the timelines for conducting population modeling by establishing harvest limits for three years will improve the parties' scientific understanding of fish populations by allowing more thorough population modeling to occur" (ECF No. 2084 at PageID.12971).

With respect to mortality rates, the Stipulating Parties contend that the six-year review period is an improvement from the 2000 Decree, which did not provide for any review of

mortality rates (ECF No. 2084 at PageID.12970).[31] The six-year review period "allows the parties to assess and update mortality rates based on two harvest-limit cycles, which will provide enough data for the parties to ensure mortality rates are biologically justified and reflect the state of the fishery under the new management framework" (ECF No. 2086 at PageID.13078).

Contrary to CPMR's objection, the Court finds that the three-year and six-year review periods for harvest limits and mortality rates, respectively, will not biologically harm the fishery, but they will instead help conserve the fishery by allowing the Parties to set harvest limits and mortality rates using complete, accurate data (*see Koproski Affidavit*, ECF No. 2086-2 at PageID.13094–100, ¶¶ 9–27); (*Wells Affidavit*, ECF No. 2086-4 at PageID.13127–28, ¶¶ 22–24); (*Seider Affidavit*, ECF No. 2086-3 at PageID.13115, ¶ 20). CPMR's objection to the review period for harvest limits and mortality rates is based on a misunderstanding of fishery management, and the Court will therefore overrule this objection.

      **7. Information sharing:** The Proposed Decree does not require meaningful total catch reporting. Instead, it only requires limited reporting of a fisher's catch, including only bycatch that is retained. This and other reporting failures will make it impossible to assess the selectivity and bycatch concerns posed by gill nets. It will also be impossible to document and identify when gill net fishing is presenting a serious threat to a sustainable fishery.

CPMR also objects to the information sharing provisions of the Proposed Decree (*see* ECF No. 2042-1 at PageID.12214). As explained above under the Sault Tribe's objections, this section of the Proposed Decree has changed fairly significantly from the 2000

---

[31] Also, the Stipulating Parties assert that they can review the mortality rates more frequently if they choose to do so.

Decree. To summarize, harvest will be reported via an electronic system, which will eliminate data entry errors associated with transferring paper reports into databases. This data will then be transferred automatically to the other Parties, eliminating delays in sharing information. Moreover, commercial fishers will have to report their harvest more frequently (twice a month) than under the 2000 Decree (once a month).

Specifically, CPMR argues that the Proposed Decree only requires reporting of "landed" harvest, and that the Proposed Decree does not require reporting of bycatch (*see* ECF No. 2062 at PageID.12523). In other words, CPMR wants the Parties to report unlanded catches (i.e., fish not retained on the vessel), which the Stipulating Parties argue would be burdensome and unnecessary, as unlanded fish that are thrown back into water alive do not harm the fishery (*see* ECF No. 2086 at PageID.13081). Further, CPMR's concerns about bycatch in gill nets are "overstated," given that bycatch rates of non-targeted species in both deep and shallow waters averages .578 fish per 1,000 feet of gill net, which is insignificant (*Id.* at PageID.13082).

Overall, as the Court has stated numerous times throughout this Opinion, the information sharing section is a significant improvement from the 2000 Decree. CPMR has failed to raise a persuasive reason for the Court to reject this much-improved section of the Proposed Decree.

8. **Net marking:** The Proposed Decree does not adequately address the marking of gill nets, which has been a public safety issue for years and will be exacerbated with expanded gill net activity.

Next, CPMR argues that the Proposed Decree fails to create adequate marking standards for gill nets, despite "dramatically" expanding gill net fishing into areas where such

nets have not been present for decades (ECF No. 2062 at PageID.12525); (ECF No. 2119 at PageID.14553–56). CPMR claims that the marking of gill nets "presents a major public safety issue" because recreational fishers may get their boats' motors caught in gill nets (*Id.*). CPMR provides a specific example from 1993 where "three boaters died when an accident occurred at the Tribal Salmon gillnet zone near Nunns Creek" (*Id.* at PageID.12527). Notably, CPMR has not provided any example of a tragic boating accident, due to inadequate marking of gill nets, during the period in which the 2000 Decree was effective.

The Stipulating Parties assert that the gill net marking requirements under the Proposed Decree are improved from the 2000 Decree because the Proposed Decree requires larger flags, trap net markings will be different than gill net markings, and ice floes must be marked:

> Article VI(C)(3) of the Proposed Decree fully incorporates and updates the 2000 Decree's net marking requirements, which have been successful in ensuring boater safety. It requires that gill nets in water deeper than fifteen feet be marked with one-gallon orange floats every six-hundred feet, 1.5" x 4" standard orange floats every twelve feet, and staff buoys four feet above the surface that include a 16"x16" fluorescent orange flag bearing the fisher's license number. ECF 2042-1, PageID.12196–12197. When ice floes are present, four-foot, red or orange ice poles bearing fisher license numbers must be used. *Id.,* PageID.12196. Trap net markings require similar staff markings with two flags and one-gallon floats on the lead end and king anchor. *Id.,* PageID.12197. These requirements are an improvement on the 2000 Decree, which required smaller flags, did not differ flag markings between gill nets and trap nets, and did not mark ice floes. ECF 1458, PageID.3252–3253.

(ECF No. 2086 at PageID.13086); (*see also* ECF No. 2084 at PageID.12977–78). These improvements appear to be sufficient, especially given that CPMR cannot identify any recent accident involving properly marked gill nets. The need for CPMR to go all the way back to

1993 to identify an example of a tragic boating accident involving a properly marked gill net only undermines its position that such provisions in the Proposed Decree must be improved.

Also, CPMR questions why the Proposed Decree does not incorporate GPS technology to mark gill nets (ECF No. 2119 at PageID.14554). CPMR argues that GPS coordinates and other location information can be made available in real time, and recreational boaters and fishers could thus use this technology to track the nets. However, the practical issues with this proposal are numerous: gill nets can drift, causing the GPS coordinates to be inaccurate; gill nets are frequently moved and adjusted (almost daily); and disclosing the gill nets' location to the public places Tribal commercial gill net fishers at risk of vandalism (*see* ECF No. 2086 at PageID.13088). However, GPS coordinates for gill nets being made available to the public will be piloted in the Little River Tribal Zone (ECF No. 2084 at PageID.12978). If this method of marking proves to be successful, there is no reason why the Parties cannot implement it for other Tribal zones.

Because CPMR's objection to net marking in the Proposed Decree is far too speculative and unsupported, the Court will overrule it.

9. **Local consultation:** The Proposed Decree does not allow local governments and recreational fishing groups to request meetings with the Tribes to address issues of local concern—which was included in the 2000 Consent Decree—and instead gives the State of Michigan an effective veto over local concerns.

Under the 2000 Decree, local governments and recreational fishing groups could request a meeting with the Tribes to discuss issues of local concern, and the Tribes would meet upon request. CPMR objects because the Proposed Decree "has eliminated these provisions and replaces them with terms forcing these groups to ask the State to address

concerns with the Tribes, essentially ending local consultation except with the permission of the State. Further, the new provision eliminates the Tribes' previous commitment to meet with local governments or public interest groups (Proposed Decree, Article XIII(C))" (ECF No. 2062 at PageID.12529). CPMR is concerned that the State's "inability and unwillingness" to address local concerns makes the framework under the Proposed Decree "unworkable" (*Id.* at PageID.12530).

The State responds that, although local groups must now request meetings through the State, the State must still communicate such requests to the other involved Parties (ECF No. 2084 at PageID.12980). Also, any party to the Proposed Decree may invite local groups to meetings. As such, local groups are not shut out from communicating with the Tribes or any Party. Rather, the mechanism for doing so has merely changed. The rationale for this change, which the Court accepts, is to recognize the "government-to-government relationship among the parties" (ECF No. 2119 at PageID.14573). The Sixth Circuit recently affirmed the necessity to "limit participation [in this case] to the sovereign parties," *Michigan*, 68 F. 4th at 1029, and this provision recognizes that goal: It requires local groups to "route their request[s] through the State as opposed to going directly to the [T]ribes" (ECF No. 2119 at PageID.14573). CPMR is adequately represented by the State in this case, and there is no reason it should not first consult the State before requesting a meeting with the Tribes.

CPMR is also concerned that local issues will not be identified in the first place because the Proposed Decree will limit the public's access to information about the fishery (ECF No. 2062 at PageID.12530) ("The Proposed Decree . . . specifically exempts commercial harvest data from disclosure to 'non-parties' allowing little ability for anyone to

understand the impacts of the Proposed Decree"). In response, the State clarifies that this provision preventing disclosure of certain information to "non-parties" refers to "raw data shared among the parties, which includes fisher license numbers" (ECF No. 2084 at PageID.12980). Fisher and Tribal license numbers have never been shared with the public, and there is no need to do so now. However, aggregate harvest information, which has always been shared with the public, will continue to be shared under the Proposed Decree.

In sum, CPMR's contention that the State "does not have time for local concerns" appears to be untrue (*see* ECF No. 2062 at PageID.12530 n.11). The State asserts that it constantly works with constituents to address local issues, and that practice will not end (ECF No. 2084 at PageID.12980); (ECF No. 2119 at PageID.14574) ("I just wanted to emphasize for the Court that the State constantly works with constituents to address matters of local concern, and that will not end under the proposed decree even though the language has changed."). Given the State's assertions and the rationale for changing this provision of the Decree, the Court will overrule this objection as well.

10. **Enforceability:** Many provisions of the Proposed Decree regarding fishing limits are vague to the point of being unenforceable. It contains no method for effectively addressing overfishing.

The Proposed Decree contains the following provision: "The State and the Tribes shall manage their respective fishers to avoid exceeding their respective annual Harvest Limits . . . Large deviations shall be rare and promptly addressed" (*see* ECF No. 2042-1 at PageID.12202). Compared to the language of the 2000 Decree, which provided for defined consequences if a Party overharvested its allowed harvest limit by at least 15% (ECF No.

1458 at PageID.3262), CPMR argues that this provision is vague and unenforceable because it lacks clear consequences for overharvesting (ECF No. 2062 at PageID.12521).

In response, the State asserts that the improved information sharing system will prevent deviations from the allowed harvest limits (ECF No. 2084 at PageID.12973). Further, the penalties under the 2000 Decree for exceeding the set harvest limitation—increasing the non-violating Parties' limit by the same amount the following year—did not protect the resource; rather these penalties sought to achieve fair allocation (*see id.* at PageID.12974). CPMR's objection is framed as a biological concern, although the language under the 2000 Decree—which CPMR ironically endorses—did the opposite of preserving the fishery, as it permitted the non-violating Parties to exceed their harvest limits the following year. Given this context, CPMR's objection appears to be contradictory to the asserted goal of preserving the fishery.

Although this language to which CPMR objects is not the epitome of crystal clear, the Court also agrees with the Stipulating Parties that the improved information sharing system will prevent Parties from exceeding their harvest limits. The Parties will be sharing commercial fishing data twice a month, and if any Party nears its harvest limit, the Court has no doubt that the relevant Party will be promptly notified. Moreover, when looking at the big picture of the Proposed Decree, the reason for the use of the language regarding "large deviations" being "rare and promptly addressed" is to protect Tribal fishers from penalties for minor overharvesting, as well as to protect the resource by eliminating the penalties under the 2000 Decree that increased the other Parties' allocation based on one Party's overharvesting (*see* ECF No. 2119 at PageID.14465–67). In the Court's judgment, this

language is not ambiguous enough to warrant a rejection of the provision. This objection is also overruled.

> **11. Other species:** Article VIII of the Proposed Decree does not provide a workable management framework for other species, including ciscoes, loons, diving ducks, and lake sturgeon.[32]

Finally, CPMR argues that the section of the Proposed Decree regarding the management of other species is insufficient to protect these species from gill nets (*see* ECF No. 2042-1 at PageID.12203–06). CPMR asserts that non-targeted fish, loons, and diving ducks are threatened by gill nets because they will be caught and killed by the nets (*see* ECF No. 2062 at PageID.12524). However, the Proposed Decree improves upon the 2000 Decree by providing a mechanism for the Parties to develop a management framework for other species. Under the Proposed Decree, any Party may request that harvest limits be set and an allocation be made for a species listed in Section VIII (ECF No. 2042-1 at PageID.12203). The 2000 Decree provided no such mechanism.

Further, for the reasons stated above, CPMR's concerns about bycatch from gill nets are unfounded and the data does not support the conclusion that gill net bycatch is a major problem. And CPMR's concerns about gill nets killing loons are hypocritical, as sportfishing is the leading cause of loon mortality. Because sport fishers (who make up CPMR) discard their sport fishing gear, including sinkers and jigs, into the water and loons frequently ingest these discarded items when feeding on the bottom of the lake, loons regularly die from lead

---

[32] In the Court's order outlining the objections hearing, it noted that it would hear oral argument on "all ten of CPMR's objections" (ECF No. 2106 at PageID.14334). This statement was based on the list of objections that CPMR provided at the beginning of its filing, summarizing ten objections (*see* ECF No. 2062 at PageID.12504–05). However, based on the arguments raised in its objections, it appears that CPMR has actually asserted eleven objections, and the objection regarding the management of other species was not included in that initial list.

poisoning (ECF No. 2085 at PageID.13021–24). In fact, the MDNR reports that switching to non-lead sinkers will reduce the number of waterfowl dying from lead poisoning, but sport fishers refuse to do so because non-lead alternatives are more expensive (*Id.*) ("Coalition members successfully opposed government regulation of lead fishing tackle in 2010, with a key reason for their opposition being '[t]he expense of non-lead alternatives' for sport fishers"); (*Id.* at PageID.13023) (explaining that non-lead tackle equipment is generally only pennies more than lead equivalents). CPMR clearly prioritizes pennies over loons, and the Court declines to entertain this hypocritical objection.[33]

CPMR has provided no credible data showing that gill nets are drastically killing non-targeted species, and therefore, the Court will also overrule this objection.

## C.  CPMR's Right to Appeal

Because CPMR is not a party to this case or the Decree, it does not possess any appellate rights. However, as detailed thoroughly throughout this Opinion, this case is not a typical civil case, nor a typical consent-decree case. CPMR has been an *amicus* in this case since 2007, and its member organizations have been involved in this case since at least the 1980s (*see* ECF No. 1875 at PageID.2144). Even though CPMR is merely an *amicus* in this case, it was significantly involved in the negotiation of the Proposed Decree (*see* ECF Nos. 1985, 1986). Despite the Parties' willingness to involve CPMR in the negotiation of the Proposed Decree, that does not mean that CPMR automatically possesses appellate rights

---

[33] Sports fishers' lead equipment is not the only deadly equipment to wildlife. Discarded fishing line—which is simply trash—is deadly to fish, turtles, birds, and other animals (*see* ECF No. 2085 at PageID.13023). The Court draws CPMR's attention to the pictures—showing wildlife entangled in fishing equipment—included in the Tribes' response-brief to CPMR's objections (*Id.* at PageID.13024). CPMR may consider studying these pictures and its own practices that harm the environment before raising baseless assertions attacking Tribal gill nets.

over the entry of the Decree. When CPMR appealed this Court's denial of its motion to intervene in the Fall of 2022, the Sixth Circuit recognized that CPMR did not have the same appellate rights as a Party. *See Michigan*, 68 F.4th at 1030. Therefore, although the Circuit affirmed the denial of CPMR's motion to intervene, it suggested that this Court should allow CPMR the opportunity to appeal the entry of the Proposed Decree. *See id.* ("If the successor decree is ultimately unlawful or otherwise suggests that Michigan failed to protect this public resource, the proper remedy would be for the district court to give the Coalition the right to appeal that decree."). The Court agrees with the Sixth Circuit, and it will do just that. Pursuant to the opinion of the Sixth Circuit, the Court will grant CPMR the right to appeal the entry of the Proposed Consent Decree and raise arguments on appeal within the confines of the objections that it raised before this Court. *See id.*

## V.    Conclusion

For all these reasons, the Court will overrule all of the Sault Tribe and CPMR's objections to the Proposed Decree. The Proposed Decree respects the Treaty right, protects the fishery, and complies with the law of the case. Pursuant to the accompanying Order, the Court will approve and enter the Proposed Decree as filed.

Date:  August 24, 2023                                         /s/ Paul L. Maloney
                                                                                    Paul L. Maloney
                                                                                    United States District Judge